IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT IN AND
FOR HILLSBOROUGH COUNTY, FLORIDA

CASE NO. _____

MATTHEW SIMMONS, SHEILA MURRAY,
JACK MITCHELL, JACKIE RODRIGUEZ,
MADISON LIEFFORT, AND EMILY CARTER,

     Plaintiffs,

vs.

USI INSURANCE SERVICES, LLC, a foreign
limited liability company and USI ADVANTAGE
CORP., a foreign corporation,

     Defendants.

_____/

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs Matthew Simmons, Sheila Murray, Jack Mitchell, Jackie Rodriguez, Madison Lieffort, and Emily Carter (collectively, the "Individuals") sue Defendants USI Insurance Services, LLC and USI Advantage Corp. (collectively, "USI"), and state:

## PRELIMINARY STATEMENT

Days before filing this action, the CEO of USI's Southeast Region warned then-employee Mr. Simmons: **"If you leave, the amount of litigation USI corporate will put you through will be even worse for your health."** This was USI's response to Mr. Simmons' final plea for adequate resources to support his business—the perpetual lack of which had not only negatively impacted his clients, but also resulted in Mr. Simmons being hospitalized.

The Individuals bring this action against USI for unlawfully restraining trade in the insurance brokerage industry through anti-competitive conduct that violates Florida law. USI's conduct involves weaponizing onerous restrictive covenants to create a fear of retribution so

1

employees remain at USI, and if they leave, to pursue aggressive enforcement litigation against them.

**"Every contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful."** § 542.18 Fla. Stat. The restrictive covenants USI made the Individuals sign are an illegal restraint of trade that is not tied to any enforceable contract. In fact, USI has no legitimate business interests. For example, one of the restrictive covenants in an agreement Mr. Simmons signed purports to restrict him from soliciting, providing, or accepting business from all former and existing clients serviced by any USI-affiliated business. This restriction includes USI entities for which Mr. Simmons never worked and clients with whom Mr. Simmons never communicated, or even knew about. USI seeks to use these and other onerous covenants to sideline the Individuals (all former employees) from working for any other provider of insurance brokerage services and block fair market competition merely *because* they left USI's employ.

The reality is that the Individuals were constructively forced out. When Mr. Simmons joined USI, he brought a roster of long-standing personal relationships that he built long before joining USI—friendships dating back to high school and college and other close personal relationships. Mr. Simmons' clients are large, complex operating companies and large complex property clients, multiple times the size of USI's average client, which require significant resources and specialized servicing. Especially over the past couple of years, USI has declined to invest the necessary resources in the form of appropriate staffing and specialists in certain areas of commercial insurance to fully support these clients or the business growth these Individuals fostered with them. Mr. Simmons pleaded for *years* for USI to provide appropriate staffing and resources, including at monthly meetings with USI executives and management. But each time, his requests were met with empty assurances in response. The lack of critical resources hurt the

2

Individuals, who were forced to carry the burden without regard to the stress and fatigue it caused. It also hurt the clients whose businesses could not be properly serviced in the absence of insurance specialists in the region, account management, and other support personnel. USI's actions were designed to protect its own profits at the expense of its employees and clients. Faced with no other choice, the Individuals had to leave.

The Individuals bring this action for declaratory relief seeking a declaration that the restrictive covenants are illegal and unenforceable under section 542.335, Florida Statutes. Because this section is within Florida's Antitrust Act and the covenants restrain trade, they must be scrutinized under antitrust law and given a more exacting review than other contractual provisions. The Federal Trade Commission's proposed rule posted on January 9, 2023 banning non-compete agreements underscores the anti-competitive impact of USI's actions. As the FTC explained, unfair methods of competition are not limited to traditional non-compete clauses, but include other restrictive covenants such as "no business agreements" (which prohibit a worker from doing business with former clients of the employer, whether or not solicited by the worker) that are so broad they function as *de facto* non-compete clauses—the case here. USI's restrictive covenants, as written and as applied to the Individuals, do not withstand antitrust scrutiny and are an unlawful restraint of trade.

## PARTIES

1. Plaintiffs Matthew Simmons, Sheila Murray, Jack Mitchell, Jackie Rodriguez, Madison Lieffort, and Emily Carter are individuals who were formerly employed by USI and are now affiliated with the Southeast Series of Lockton Companies, LLC.

2. Defendant USI Insurance Services, LLC is a limited liability company organized under the laws of the State of Delaware.

3

3.     Defendant USI Advantage Corp. is a company organized under the laws of the State of Delaware.

## JURISDICTION AND VENUE

4.     This Court has subject-matter jurisdiction over the Individuals' claims because they are brought to obtain declaratory relief, and the amount in controversy is in excess of $50,000.00, exclusive of attorney's fees, costs, and interest.

5.     This Court has personal jurisdiction over USI on the grounds that USI: (1) operates, conducts and engages in and carries on a business in this state and has an office or agency in this state; (2) caused injury and damages to persons or property within this state; and (3) engaged in substantial and not isolated activity within this state.

6.     Venue is proper in this Court pursuant to sections 47.041 and 47.051, Florida Statutes.

## BACKGROUND

### USI Imposes Overbroad and Illegal Contractual Restrictions on the Individuals to Ensure they Stay at USI

7.     USI is one of the largest insurance brokerage firms in the world and is engaged in providing various types of commercial insurance products and services.

8.     The Individuals are former employees of USI and worked out of USI's Tampa, Florida office.

9.     Mr. Simmons and Ms. Murray became USI employees as a consequence of USI's acquisition of their former employer's business, Wells Fargo Insurance Services, Inc. ("Wells Fargo"), in late 2017.

10.     At the time of the acquisition, Mr. Simmons already had many long-standing client relationships that came with him to USI.  Mr. Simmons spent over a decade developing these

4

relationships, many dating back to his time in high school and college. Mr. Simmons maintained close personal relationships with these clients over the years—they are individuals with whom he plays golf, vacations, and engages in other social activities.

11.     USI secured the stay of Mr. Simmons and Ms. Murray at USI in three ways. <u>First</u>, it led them to believe the post-acquisition environment would be a continuation of their business under the Wells Fargo model—a model that was beneficial for their clients' businesses and growth of the client accounts. <u>Second</u>, USI paid for them to stay for four and five years, respectively, using a "retention payment." USI structured the payment to make Ms. Murray undergo a two-year gap to receive her final payment and Mr. Simmons to endure a fourteen month wait period *after his bonus was earned* to receive the final payment. If Ms. Murray left before December of 2021 and Mr. Simmons left before mid-January 2023, they would forfeit these final payments. <u>Third</u>, USI required Mr. Simmons and Ms. Murray to sign agreements with severely overbroad and unenforceable restrictive covenants (discussed further below).

12.     Mr. Mitchell, Ms. Rodriguez, Ms. Lieffort, and Ms. Carter each joined USI after the Wells Fargo acquisition.

13.     The Individuals' clients include large complex operating companies and large complex property engagements, including clients who own and operate large multi-family properties, hotels, and resorts. These clients are several times the average client account size by revenue at USI. Due to the sophisticated nature of the work and their size, they have daily and significant servicing needs and require expertise across different insurance specialties to properly place coverage and handle their large risk management and high deductible programs. For example, Mr. Simmons had the most expertise at USI involving complex operating companies and property clients and was the only person in central Florida at USI to hold a CPA designation, which

5

are among the reasons why these clients chose to work with him.

14. When the Individuals joined USI, it required each of them to sign Employment Agreements containing severe restrictions on post-employment activities. The restrictions effectively operate as *de facto* non-competition agreements and are unenforceable because, among other things, they purport to restrict the Individuals from merely accepting business without any solicitation of clients. Such restrictions are unfair methods of competition and are restrictions that USI has no legitimate business interest to enforce under Florida law.

15. USI also required Mr. Simmons to sign separate Restricted Stock Award Agreements ("Stock Agreements") in 2017-2020 with USI Advantage. The Stock Agreements conditionally granted certain restricted stock to Mr. Simmons. However, the stock would not vest unless and until Mr. Simmons remained continually employed for five years after the effective date of the Stock Agreements. Because the earliest Stock Agreement executed by Mr. Simmons did not vest until May 19, 2023, Mr. Simmons forfeited this award, choosing his well-being and that of his clients over the financial incentive.

16. The Stock Agreements, in addition to the restrictions in Mr. Simmons' Employment Agreement, contain severe restrictions on post-employment activities. The covenants purport to restrict Mr. Simmons from soliciting, servicing, or accepting business from clients serviced by any USI entity, including all subsidiaries and affiliates, regardless of whether they have anything to do with Mr. Simmons' work with USI. These too operate as *de facto* non-competition agreements and are unenforceable.

***The Individuals are Forced to Leave USI due to Insufficient Resources and Support***

17. Beginning in 2018, USI began bleeding critical resources.

18. For example, USI dismantled its private equity diligence team not long after Mr.

6

Simmons became a USI employee. Mr. Simmons was forced to reinvent his business—up until this point, he had built his career in private equity placements.

19.     USI also started losing specialists in the Southeast Region (consisting of Florida, Alabama and Tennessee) in directors' and officers' liability insurance ("D&O") and cyber insurance. Over the next five years, the available USI resources plummeted. By 2023, the D&O liability specialists dropped from 16 to 1 and there were zero cyber insurance specialists—as compared to USI's similar-sized competitors who average 10-25 D&O specialists and 3-7 cyber specialists per region.

20.     Within this same period, the number of skilled account managers and property placement specialists also decreased. As individuals in these positions left USI, they were not replaced, forcing existing employees to absorb their work without the commensurate expertise.

21.     USI's business model focuses on smaller market business accounts and high profit margins. By their nature, these accounts are less resource dependent and, thus, less impacted by a cutback in resources. By contrast, the accounts the Individuals handled at USI are multiple times the size of USI's average accounts in revenue, involve complex placements, and require proper resources to service—many of these were developed under Wells Fargo's business model, which focused on larger accounts with lower profit margins.

22.     As a result, the Individuals and the clients they handled were hit hard by the lack of resources. The clients had insurance needs requiring D&O and cyber specialists that the Individuals could not fulfill, and they were understaffed to service these accounts. The Individuals were forced to shoulder the additional responsibility, hours, and do their best to service these clients without proper resources, to retain the clients. Though the Individuals managed to grow their business, year over year, it came at significant personal and professional costs.

7

23.    As the business grew over a five-year period, Mr. Simmons was working 50 to 80-hour work weeks and every weekend, to supplement the lack of adequate account managers and specialists needed to service these clients.  The other Individuals were also working long hours and weekends to cover the USI-created shortage.

24.    As the senior producer, Mr. Simmons initiated monthly meetings with management where he raised these concerns, including to those at the highest level in the region.  He urged USI to provide additional resources.  His requests were rebuffed or met with false assurances that these needs would be met.  When Mr. Simmons grew increasingly impatient and concerned, USI resorted to warnings of litigation to scare him away from leaving USI.

25.    The Individuals continued to shoulder the additional responsibility and hours, but the human toll was considerable.

26.    In June of 2021, Mr. Simmons was asked to handle a new business account, which is owned by KKR, the same company that owns USI.  Having no time to prepare for this new client meeting under his then-present working conditions, Mr. Simmons pulled an "all-nighter" to fulfill the request.

27.    The following week, Mr. Simmons was taken to St. Josephs' hospital by ambulance due to heart attack symptoms.

28.    Mr. Simmons is less than 40 years old with no prior health issues.

29.    During the next four months, Mr. Simmons lost fifty pounds (235-185 pounds) and was in and out of doctor's offices and saw a dozen specialists to address these health issues, brought on by stress and sleep deprivation.

30.    Around Thanksgiving of 2021, Mr. Simmons had to undergo a major surgery.

31.    Still, Mr. Simmons rarely missed a day of work during this time and was given no

relief.

32.     Following his surgery, Mr. Simmons requested an in-person meeting with his direct supervisor and the Regional CEO, Tom Longhta. He advised them of the health issues brought on by the lack of resources to support the growth of his business. He further advised management he would not be able to write new business in 2022 under the present conditions.

33.     The prospect of no new business for the year finally prompted USI to hire one senior account executive for Mr. Simmons around February 2022. Within sixty days, that person resigned. (This person was not replaced before Mr. Simmons resigned.)

34.     Following this resignation, Mr. Simmons continued to raise concerns about account management and resources for his clients. This prompted monthly meetings with Mr. Longhta and other executives. This time, Mr. Simmons requested an executive assistant and offered to pay one hundred percent of the salary. Mr. Longhta initially advised it should not be a problem.

35.     But six months passed, and USI did not approve this request.

36.     In the remaining months preceding the Individuals' departures, Mr. Simmons continued to meet with management and continued to request assistance. His requests were again met with empty assurances.

37.     In November and December of 2022, two significant events occurred. First, Mr. Simmons had a client experience a cyber policy lapse, as a direct consequence of the lack of a single cyber specialist in the Southeast Region capable of handling it.

38.     Second, account managers were putting together D&O comparisons on large complex risks, which they were not qualified to handle, because of the lack of D&O specialists in the region. Mr. Simmons texted his sales leader and Mr. Longhta to express his concern about having professionals who lacked the proper qualifications handle these issues. Mr. Longhta

9

responded, expressly acknowledging USI's lack of resources and the fact that it needed to be addressed. It was not.

39.     After *two years* of empty assurances from management, these issues had finally imposed an untenable strain on the Individuals' professional and personal lives and negatively impacted their clients.

40.     Therefore, the Individuals, for the sake of their well-being, future, and clients, resigned their employment on January 25, 2023.

41.     The Individuals subsequently became affiliated with the Southeast Series of Lockton Companies, LLC, who is a competitor to USI.

42.     The Individuals fear and expect USI to attempt to enforce the unlawful restrictive covenants against them, following USI's warning to initiate litigation.

### Mr. Simmons' Restrictive Covenants in the Stock Agreements are Unenforceable and Illegal Restraints of Trade

43.     The Stock Agreements contain a restrictive covenant titled "non-soliciation." *See* Ex A, at Appx. A(a). The covenant provides, in relevant part:

> Except in the normal course of business on behalf of the Company or any of its Affiliates, the Participant will not, directly or indirectly, (x) solicit, sell, provide or accept any request to provide, or induce the termination, cancellation or non-renewal of, any USI Business from or by any person, corporation, firm or other entity whose account constituted a **Client Account of a USI Company**, at any time within the 24 months preceding the earlier of the date of such act or the date of termination of the Participant's employment with the Company and its subsidiaries, or (y) solicit, offer, negotiate or otherwise seek to acquire any interest in any Active Prospective Acquisition of a USI Company, determined as of the earlier of the date of such act or the effective date of termination of the Participant's employment with the Company and its subsidiaries. The restrictions contained in this Paragraph (a) shall apply throughout the Participant's employment with the Company and its subsidiaries and thereafter until **two (2) years after the effective date** on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

*See* Ex. A, at Appx. A(a) (emphasis added).

10

44.     "Client Account" is defined to include "the account of any client . . . who or which is serviced, as of a specified date, by a specified Person in connection with such specified Person's business. . ." *See* Ex. A, at Appx. A(f)(2). "USI Company" is defined as including USI, its subsidiaries, affiliates, and associates. *Id*. at (5). "Person" is defined as "an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization, a government or any department or agency thereof, or another entity." *Id*. at (4).

45.     The non-soliciation restrictive covenant in Appendix A of the Stock Agreements is illegal and unenforceable for three reasons.

46.     **First**, it does not protect any of USI's legitimate business interests. Protectible customer relationships are limited by Florida law to "substantial" relationships with "specific" customers—relationships that are described as exclusive, long term, cannot be easily identified and solicited by competitors, and for which there is a reasonable expectation of continued future business. *See IDMWORKS, LLC v. Pophaly,* 192 F.Supp.3d 1335, 1340-41 (S.D. Fla. 2016).

47.     The restriction purports to prohibit Mr. Simmons from soliciting insurance services from all clients serviced by ***any person or entity*** at USI, its subsidiaries, and its affiliates. Mr. Simmons was never employed by an entity other than USI. Thus, the restriction applies to all clients of entities for which Mr. Simmons was never employed and clients with which he never communicated, let alone serviced. These clients are not protectible. Nor does USI have a protectible interest in the customer relationships that originated with Mr. Simmons (discussed further below).

48.     **Second**, the covenant is patently unreasonable in scope in two ways. First, it improperly prohibits accepting and servicing business from clients of entities for which Mr. Simmons was never employed and with whom Mr. Simmons never communicated, let alone

11

serviced.  Second, the covenant improperly prohibits merely accepting business without any solicitation of customers.

49.   **Third,** the covenant is unenforceable because it prohibits soliciting or servicing a "Client Account of a USI Company" which broadly applies to entities that were clients at a set period, even if they are no longer clients at the time of the prohibited activity.  Florida law has long prohibited the protection of former customers.  *See Envtl. Servs., Inc. v. Carter*, 9 So. 3d 1258, 1265 (Fla. 5th DCA 2009).

50.   The Stock Agreements also contain a "no hiring" covenant that purports to restrict Mr. Simmons from soliciting the employment of "any other employee or independent producer of any USI Company" for two years post-employment.  *See* Ex. A, at Appx. A(c).

51.   The no hiring covenant is unenforceable and illegal because it is not limited in any way in its scope. The covenant purports to extend to entities Mr. Simmons was never employed by and employees with whom Mr. Simmons had no working relationship or ever met before.

***The Individuals' Restrictive Covenants in the Employment Agreements are Unenforceable and Illegal Restraints of Trade***

52.   The restrictive covenants in the Employment Agreements relating to clients are titled "non-soliciation" and "non-acceptance/non-service" provisions. *See e.g.,* Ex. B at §§ 7.5, 7.6 ("Simmons Agreement").[1]  Section 7.5(a) in the Simmons Agreement contains the non-solicitation provision that provides, in relevant part:

> During the Term and for **two (2) years after Producer is no longer employed** hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of

---

[1] The restrictive covenants are contained in different numbered sections in each of the Employment Agreements, which are set out further below.

12

> record letter with any Client account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; **in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder**.

*See* Ex. B at § 7.5(a) (emphasis added).

Section 7.5(b) purports to extend the exact same restrictions in (i) through (iv) above to "**Active Prospective Clients**" for **six (6) months post-employment** that "Producer solicited and/or about which Producer obtained Confidential information on behalf of the Company within the last six (6) months of Producer's employment hereunder." *See* Ex. B at § 7.5(b) (emphasis added).

53.     Section 7.6 contains the non-acceptance/non-service provision, which purports to prohibit the mere acceptance or servicing of business absent any solicitation. It is identical to the language of the non-soliciation provision except that it replaces the prohibited activities in sections 7.5(a)(i) through (v) with the following:

> . . . Producer shall not (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account…

*See* Ex. B at § 7.6(a).

Like section 7.5(b), 7.6(b) purports to extend the exact same restrictions in (i) and (ii) above to "Active Prospective Customers" for six (6) months post-employment that "Producer solicited and/or about which Producer obtained Confidential information on behalf of the Company within the last six (6) months of Producer's employment hereunder." *See* Ex. B at § 7.6(b).

54.     The Mitchell Agreement contains non-soliciation and non-acceptance/non-service provisions identical to the above-quoted provisions. *See* Ex. C at §§ 6.5, 6.6. The Murray, Rodriguez, and Carter Agreements contain non-solicitation and non-acceptance/non-service

13

provisions identical to the above-quoted provisions with one exception: the word "Employee" is used in place of "Producer". *See e.g.,* Ex. D at §§ 4.5, 4.6 (Murray Agreement); Exs. E and F at §§ 3.5, 3.6 (Rodriguez and Carter Agreements, respectively). Finally, the Lieffort Agreement contains non-solicitation and non-acceptance/non-service provisions identical to the above-quoted provisions with two exceptions: (1) the word "Employee" is used in place of "Producer" and (2) the Agreement purports to extend the "Active Prospective Customers" restriction from six months to one-year post-employment. *See* Ex. G at §§ 3.5, 3.6 (Lieffort Agreement).

55.    The Simmons and Mitchell Agreements further contain a notice provision which purports to require them to work for USI for two months after they elect to terminate their at-will employment, and/or, at USI's sole election, to not perform any services for USI but not work for any other company during such time. It states, in relevant part:

> Producer may terminate Producer's employment hereunder by giving at least sixty **(60) days written notice** to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; **and/or (b) require Producer to cease performing any services hereunder until the termination of employment**.

*See* Ex. B at § 8.2 (Simmons Agreement); Ex. C at § 7.2 (Mitchell Agreement).

56.    The Individuals believe the covenants as written and as applied to them serve only to restrain trade and are unenforceable on multiple grounds.

57.    **First**, the covenants do not protect any of USI's legitimate business interests.

58.    USI has no protectible interest in any existing customer relationships. Again, protectible customer relationships are limited by Florida law to "substantial" relationships with "specific" customers—relationships that described as exclusive, long term, cannot be easily identified and solicited by competitors, and for which there is a reasonable expectation of

14

continued future business. *See IDMWORKS, LLC v. Pophaly,* 192 F.Supp.3d 1335, 1340 (S.D. Fla. 2016). Customer relationships that originated from Mr. Simmons's long-standing friendships and close personal relationships and that he developed in high school, college, and socially are not "substantial" relationships of USI. USI has no contract with these clients establishing an exclusive relationship. Nor does USI have a reasonable expectation in a continuing relationship with clients who are "at will" clients and who on their own volition decide they do not want to stay with USI and elect to work with the Individuals because of these long-standing friendships and close personal relationships. Clients are routinely solicited by other insurance brokerage firms in this industry and insurance placements are often split between different brokers. As point in fact, ***most*** of the clients the Individuals work with engage other brokerage firms in the industry handling certain aspects of their commercial insurance. For example, USI may handle one of these client's property and casualty business while an industry competitor handles its health and benefits business. This completely undercuts any contention that USI maintains "exclusivity" with its customers, or that such customers cannot be easily identified by other competitors in the industry, particularly where some of USI's direct competitors already handle a portion of these clients' business. This plainly does not fall within the scope of "substantial" relationships as interpreted under Florida decisional law.

59.    Similarly, USI has no protectible interest in any prospective customer relationships. The Employment Agreements attempt to wrap into "Active Prospective Clients" "any Person or group of Persons" the Individuals solicited, obtained Confidential Information about, or had documented plans to solicit in the six months preceding their termination (one year prior in Lieffort's case). *See e.g.,* Ex. B at §§ 1(a), 7.5(b), 7.6(b) (Simmons Agreement); Ex. G at §§ 3.5, 3.6 (Lieffort Agreement).    There are no specifically identifiable potential, "substantial"

15

prospective relationships at issue, let alone an expectation that any such relationships are likely to provide business to USI.   In the commercial insurance brokerage industry, any business which is in the market for insurance is regularly solicited by competing insurance brokerage firms for its business.  The fact that there may have been solicitation of such business does not constitute a "substantial relationship," as is required to establish a legitimate business interest under Florida law.

60.    For the same reason USI does not have any protectible interest in any customer relationships, it does not have a protectible interest in "goodwill" associated with those customer relationships.  *See e.g.*, Ex. B at § 1(g) (Simmons Agreement).  Those relationships would not confer any "competitive advantage" on the Individuals where they originated from Mr. Simmons' long-standing friendships and close personal relationships and that he developed in high school, college, and socially.

61.    There is no confidential information at issue that constitutes a legitimate business interest.  The Individuals informed USI in their resignation letters that they returned by overnight courier all hard copy documents in their possession containing any USI information and that they worked with a forensic expert to ensure they no longer had any electronic documents containing any USI information in their possession the day they resigned.  The Individual Defendants did not retain any USI information upon their separation from USI.

62.    **Second**, "Client Account" by definition in each of the Employment Agreements sweeps broadly to purport to encompass "the account of any client . . . which is or **was serviced** by the Company . . .".  *See e.g.,* Ex. B at § 1(c) (Simmons Agreement) (emphasis added).  Thus, USI seeks to prohibit the Individuals from entering into business relationships with former clients of USI.  Florida law has long prohibited the protection of former customers.  *See Envtl. Servs., Inc.*

16

*v. Carter*, 9 So. 3d at 1265.

63.    **Third**, Mr. Simmons and Mr. Mitchell's restrictive covenants are unenforceable due to the notice provisions contained in their agreements.  Mr. Simmons and Mr. Mitchell's Employment Agreements contain a sixty-day notice provision that provides termination is effective on the date specified in the notice.  Therefore, this provision operates to add another two months to the two-year post-termination restrictions in the non-soliciation and non-acceptance/non-service provisions.  Under section 542.335(d), Florida Statutes, a restriction greater than two (2) years is presumed unreasonable.

64.    Further, the notice provision purports to permit USI to force Mr. Simmons and Mr. Mitchell to work for USI after they elect to terminate their at-will employment.  As a matter of law, contracts for employment for personal services cannot be enforced by injunction or specific performance. *See Seaescape, Ltd. v. Maximum Marketing Exposure,* 568 So.2d 952, 954 (Fla. 3d DCA 1990). The appropriate remedy is an action for damages. *Id.*  Enforcing such a provision, especially as to Mr. Simmons after USI kept him there through other written agreements for five years and in the work environment he was in, would be an intolerable restriction.  The provision further purports to permit USI, at its sole election, to keep them on, performing no work and block them from working for any other company, including but not limited to competitors, during such time.  This is unenforceable as restraining lawful competition.

65.    **Fourth**, the Individuals' restrictive covenants are invalid and unenforceable because of the following vague and ambiguous language contained therein: "Client Account that Employee managed or regularly serviced."  "Regularly serviced" is not defined in the agreements. Some of these Individuals stepped in to help with client accounts when account executives or managers left USI or may have touched other accounts, leaving the Individuals to speculate as to

17

what clients these apply to for each of them. "Managed" is also not defined and connotes managerial responsibilities. Ms. Murray, Ms. Carter, and Ms. Lieffort did not have any managerial responsibilities, and Ms. Rodriguez managed only individuals, not clients. A post-employment restriction should not leave a former employee in doubt about what the employee is to do. *4UOrtho, LLC vs. Practice Partners, Inc.*, 18 So.3d 41 (Fla. 4th DCA 2009).

### Enforcing USI's Restrictive Covenants would Contravene Public Policy and Equitable Considerations

66.    USI's likely position is that these non-soliciation and non-acceptance/non-service provisions are enforceable.

67.    For USI to prevail on enforcing the covenants, it must prove the covenants addressed herein are supported by a legitimate protectable business interest, and that it is necessary to enforce the covenants in order to protect that interest. In addition, the Court must consider all "pertinent legal and equitable defenses" and must "consider the effect of enforcement upon the public health, safety and welfare." §§ 542.335(1)(g)3 and 4, Fla. Stat.

68.    USI's broad restrictive covenants unlawfully perpetuate unfair competition as to the Individuals and harm the public by adversely impacting innocent, non-party businesses.

69.    For example, if USI's covenants are enforced, the Individuals would be prohibited from responding to inquiries and accepting business from clients, who on their own volition and without solicitation, desire to have the Individuals handle their insurance needs—particularly where they have serviced these large, sophisticated clients for some time and have the expertise to do so. For these particular clients, it would cause service disruptions to their businesses (which require daily servicing and expertise) and leave them with a company that has a lack of resources to support their needs and lack the expertise to fill in the gap. Further, it will cause harm to the close, personal relationships that Mr. Simmons has developed. This would essentially force the

18

Individuals to fire these clients who Mr. Simmons has been friends with since high school and college and sees on weekends and vacations. For these same reasons, courts have recognized former employees' pre-existing relationships with clients require different treatment under the law in the restrictive covenant context and have carved out exceptions from a former employer attempting to protect such clients. *See, e.g., BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 393 (N.Y. 1999) ("[E]nforcement of the restrictive covenant as to defendant's personal clients would permit BDO to appropriate goodwill created and maintained through defendant's efforts, essentially turning on its head the principal justification to uphold any employee agreement not to compete based on protection of customer or client relationships."); *Barbagallo v. Marcum LLP*, 925 F.Supp.2d 275, 294-95 (E.D.N.Y. 2013), *aff'd*, 552 F. App'x 102 (2d Cir. 2014) (dismissing breach of restrictive covenant claim because former employee had "pre-existing relationships" with the clients at issue; "sensible clients follow the talent they trust, and not the organizations to which that talent is temporarily attached. Clients are not dragged against their will from one firm to another, but actively choose who they will retain for professional services.").

70.     Further, the enforcement of USI's covenants would give force and effect to illegal contracts in restraint of trade. At least one court has held that USI's non-acceptance provisions were an "unreasonable restraint on trade." *See Wells Fargo Ins. Svcs. USA, Inc. v. Edgewood Partners Ins. Center*, No. 612 WDA 2018, 2019 WL 5491353, at *6 (Sup. Ct. Pa. Oct. 25, 2019) (holding "the non-accept provisions effectively bar WFIS's clients from doing business with the Individuals under *any* circumstance. As a result, we agree that the non-accept clauses 'more broadly restrain[ ] free trade. By its express terms, the provision purports to restrict the liberty of third parties who, of their own volition, unilaterally seek' the Individuals [ ] services.").

71.     The starting point of any analysis of these restrictions under Florida law must begin

with the position that these "contract[s] . . . in restraint of trade or commerce in this state [are] unlawful." *See* § 542.18, Fla. Stat.  The FTC's proposed non-compete rule and supplementary materials emphasize the anti-competitive nature of these broad restrictive covenants. *See* FTC Non-Compete Clause Rule, available at https://www.regulations.gov/document/FTC-2023-0007-0001, at p. 2 ("[N]on-compete clauses have always been considered proper subjects for scrutiny under the nation's antitrust laws.").  *See* FTC Non-Compete Clause Rule, 16 C.F.R. Part 910 (proposed Jan. 9, 2023), at p. 2.  Florida is no different, which codified its restrictive covenant act within Florida's Antitrust Act. *See* § 542.15, Fla. Stat.  To except any restrictive covenants from the prohibition on restraints of trade, they must be scrutinized under antitrust law and properly circumscribed, as set out in section 542.335, Florida Statutes.

72.    USI's covenants are in restraint of trade and do not withstand antitrust scrutiny. USI's attempt to use covenants in contracts with former employees to restrict the liberty of innocent clients who desire to work with the Individuals is just the type of "serious anticompetitive harm" to markets that the FTC was concerned about going unchecked.  16 C.F.R. Part 910, at 3. The FTC specifically addressed client non-solicitation and "no-business" provisions that are so unusually broad in scope that they function as non-compete clauses and, thus, are "de facto" non-compete clauses and constitute unfair methods of competition—just like USI's covenants here. *Id.* at 11.

73.    Moreover, section 542.335(i), Florida Statutes, provides that a court may determine that a restrictive covenant is unenforceable if public policy substantially outweighs the need to protect a legitimate business interest. As discussed above, USI has no legitimate business interest to protect.  But even if it did, the public policy of not permitting USI to wrongfully use its restrictive covenants as threats to dissuade employees from seeking other employment while it neglects the

20

health of its employees and service needs of its clients more than substantially outweighs any of USI's rights to restrict movement of employees or clients.

74.     Thus, enforcing USI's restrictive covenants would contravene these public policy and equitable concerns and harm the Individuals as well as innocent clients.

## Count I – Declaratory Judgment

### (as to all Individuals' restrictive covenants)

75.     The Individuals restate and reallege paragraphs 1 through 74, as if fully set forth herein.

76.     The Individuals believe that the Employment Agreements' restrictive covenants imposed on them and the Stock Agreements' restrictive covenants imposed on Mr. Simmons are illegal and unenforceable as an improper restraint on trade and seek a final judgment declaring such.

77.     USI maintains a contrary position that the Employment Agreements' and the Stock Agreements' restrictive covenants are enforceable.

78.     USI's restrictive covenants constitute unlawful restraints of trade under section 542.335, Florida Statutes, for the following reasons:

      a.   No customer relationships—existing or prospective—potentially at issue are "substantial" or protectible;

      b.   No "goodwill" associated with any of the customer relationships potentially at issue is protectible;

      c.   No confidential or proprietary business information or trade secret is at issue that constitutes a legitimate business interest; and

      d.   There are no other legitimate business interests that could justify enforcement of

21

the agreements' restrictive covenants against the Individuals.

79.     Even if there were a legitimate business interest, these covenants are not necessary to protect that interest and, thus, are unenforceable for the following reasons:

    a.   The covenants prohibit merely accepting business without any solication of clients;

    b.   The covenants improperly seek to restrict relationships with former customers;

    c.   The covenants are vague and overbroad to the extent they seek to protect USI's "Prospective Clients";

    d.   The covenants are so vague and ambiguous the Individuals cannot ascertain to which clients they apply;

    e.   Mr. Simmons and Mr. Mitchell's covenants are presumptively unreasonable because they impose a post-employment restriction in excess of two years;

    f.   Mr. Simmons and Mr. Mitchell's Agreements seek to require employment for personal services following a termination at of at will employment and block them from working for any company for a set period of time;

    g.   Mr. Simmons' covenants improperly seek to prohibit solicitation of clients of entities for which Mr. Simmons was never employed, clients with which he never serviced or even spoke to, and clients he did not know were USI clients; and

    h.   Mr. Simmons' covenants improperly seek to prohibit solicitation of employees of entities for which Mr. Simmons was never employed and with whom Mr. Simmons had no working relationship or ever met before.

80.     Under certain circumstances, a court may refuse enforcement of restrictive covenants on public policy and equitable considerations where they substantially outweigh the need to protect a legitimate business interests established by the person seeking enforcement.

22

Here, the enforcement would harm innocent customers and reward USI for wrongful business practices as discussed *supra*.

81.     A bona fide, actual, and present controversy exists between USI and the Individuals regarding the restrictive covenants, including the rights and obligations of the Individuals as related to the covenants.

82.     As a result of this controversy, the Individuals are in doubt about their rights, duties and obligations as they pertain to the restrictive covenants.

83.     The parties' adverse interests are all before the Court by proper process and the relief sought is not merely the giving of legal advice by the court or the answer to questions propounded from curiosity.

**WHEREFORE**, the Individuals seek a declaration that the Employment Agreements' and Stock Agreements' restrictive covenants are (1) an unlawful restraint on trade and void, and (2) unenforceable as written under section 542.335, Florida Statutes, because they do not serve a legitimate business purpose, are not necessary to serve such a purpose, and are against public policy because their enforcement would harm innocent customers.  The Individuals further seek all other relief they may be entitled to, including but not limited to reasonable attorneys' fees pursuant to section 542.335(k) and court costs.

Dated:  January 25, 2023

Respectfully submitted,

By: */s/ Gregory Brown*

**Gregory P. Brown, Esq.**
Fla. Bar No. 098760
**Robert B. Gough, III, Esq.**
Fla. Bar No. 884839
**HILL WARD HENDERSON, P.A.**
101 E. Kennedy Blvd., Ste. 3700
Tampa, FL 33602
Email: gregory.brown@hwhlaw.com
Email: rgough@hwhlaw.com

**Lyle Shapiro, Esq.**
Fla. Bar No. 120324
**HERSKOWITZ SHAPIRO, PLLC**
9130 S. Dadeland Boulevard
Suite 1609, Miami, FL 33156
Email: lyle@hslawfl.com

**Nicola Gelormino, Esq.**
Fla. Bar No. 91432
**GELORMINO LAW, P.A.**
9130 S. Dadeland Blvd., Ste. 1609
Miami, FL 33156
Email: nicola@gelorminolawpa.com

*Counsel for Plaintiffs*

# EXHIBITS

# EXHIBIT A

## RESTRICTED STOCK AWARD AGREEMENT

### (Peak Equity Program)

THIS AGREEMENT (this "Agreement") is made effective as of the 8th day of May, 2019 (hereinafter called the "Date of Grant"), between USI Advantage Corp., a Delaware corporation (hereinafter called the "Company"), and Matthew Simmons (hereinafter called the "Participant").

### R E C I T A L S:

WHEREAS, the Committee has determined that it would be in the best interests of the Company and its shareholders to grant the restricted stock award provided for herein to the Participant the terms set forth herein. Capitalized terms not defined herein shall have the meanings set forth in the Stockholders Agreement.

NOW THEREFORE, the terms and conditions of this Agreement are as follows:

1.      Grant of the Restricted Shares.  Subject to the terms and conditions set forth in this Agreement, the Company hereby grants to the Participant a restricted stock award  (the "Restricted Stock Award") consisting of 1,000 shares of common stock of the Company (the "Restricted Shares").  The Restricted Shares shall vest and become nonforfeitable in accordance with Section 2 hereof.

2.      Vesting.

(a)      *Vesting Generally.*  Subject to the Participant's continued employment with the Company and its subsidiaries and the other terms hereof, the Restricted Shares shall vest and become nonforfeitable with respect to 100% of the Restricted Shares initially granted on the fifth (5th) anniversary of May 19, 2018 (the "Vesting Date").

(b)      *Effect of Termination of Employment Other Than by Reason of Death, Disability or Qualified Retirement.*  Notwithstanding anything herein to the contrary, if the Participant's employment with the Company and its subsidiaries terminates or is terminated by the Company and its subsidiaries for any reason prior to the Vesting Date, other than by reason of the Participant's death, Disability or Qualified Retirement (as defined in Paragraph (d) below), the Restricted Shares shall be forfeited by the Participant without consideration.

(c)      *Effect of Death or Disability.*  If the Participant's employment with the Company and its subsidiaries terminates or is terminated due to the Participant's death or Disability, then (i) the Restricted Stock Award shall vest as of the date of such termination of employment with respect to 20% of the Restricted Shares covered by the Restricted Stock Award for each full twelve-month period that has elapsed since May 19, 2018 and (ii) the Restricted Shares that do not become vested pursuant to the preceding clause (i) shall be forfeited by the Participant without consideration.

(d)      *Effect of Qualified Retirement.*  If the Participant's employment with the Company and its subsidiaries terminates by reason of the Participant's Qualified Retirement, as determined by the Board of Directors of the Company (the "Board") or the committee to which the Board delegates its powers (the "Committee"), the Restricted Shares shall not be automatically

forfeited upon termination of employment but shall continue to be eligible to vest on the Vesting Date; provided, however, that if the Committee makes a determination, in its sole discretion, that prior to the Vesting Date the Participant (A) is "carrying on any business," or has carried on any business, directly or indirectly, in the insurance industry or any "USI Business", except with the express consent of the Committee, or (B) is in breach of or has breached any other restrictive covenants or other agreements with the Company or its subsidiaries, the Restricted Shares shall not vest and shall be forfeited by the Participant without consideration.  For purposes of this Agreement, "Qualified Retirement" means a resignation of employment, with the advance consent of the Committee, at any time after the Participant reaches 60 or such other age as determined by the Committee in its sole discretion.  Following a Qualified Retirement, the Restricted Shares shall be subject to the call provisions described in Section 12 hereof.

        3.      Rights as a Stockholder.  The Participant shall be the record owner of the Restricted Shares until or unless such Restricted Shares are forfeited or canceled pursuant to Section 2 or Section 11 hereof, and as record owner shall be entitled to all rights of a common stockholder of the Company, including, without limitation, voting rights with respect to the Restricted Shares; provided that (i) any cash or in-kind dividends paid with respect to the Restricted Shares which have not previously vested shall be withheld by the Company and shall be paid to the Participant only when, and if, such Restricted Shares shall become fully vested pursuant to Section 2 and (ii) the Restricted Shares shall be subject to the limitations on transfer and encumbrance set forth in Section 2 and will be subject to the terms of the Management Stockholders' Agreement dated May 16, 2017, as in effect from time to time (the "Stockholders Agreement").  As a condition to the receipt of this Restricted Stock Agreement, the Participant shall deliver to the Company a joinder to the Stockholders Agreement.

        4.      No Right to Continued Employment.  The granting of the Restricted Shares evidenced by this Agreement shall impose no obligation on the Company or any subsidiary or Affiliate to continue the Employment of the Participant and shall not lessen or affect the Company's or any of its subsidiary's or Affiliate's right to terminate the employment of such Participant.

        5.      Transferability.  Notwithstanding anything in the Stockholders Agreement to the contrary, the Restricted Shares may not, at any time prior to becoming vested pursuant to Section 2, be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by the Participant and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or any Affiliate; provided that the designation of a beneficiary shall not constitute an assignment, alienation, pledge, attachment, sale, transfer or encumbrance.

2

6.     Certain Tax Matters.

(a)     The Participant may be required to pay to the Company or any subsidiary or Affiliate, and the Company and its subsidiaries and Affiliates shall have the right and are hereby authorized to withhold, any applicable withholding taxes in respect of the Restricted Shares, their grant or vesting, or lapse of risk of forfeiture, or any payment or transfer under or with respect to the Restricted Shares and to take such action as may be necessary in the opinion of the Committee to satisfy all obligations for the payment of such withholding taxes.

(b)     The Participant is hereby advised to confer promptly with a professional tax advisor to consider whether the Participant should make a so-called "83(b) election" pursuant to Section 83(b) of the Code with respect to the Restricted Shares. Any such 83(b) election, to be effective, must be made in accordance with applicable regulations and within thirty (30) days following the Date of Grant. The Participant shall provide the Company with a copy of any 83(b) election prior to filing, and shall provide the Company with evidence of the timely filing of such 83(b) election. The Company has made no recommendation to the Participant with respect to the advisability of making such an election. IT IS THE PARTICIPANT'S SOLE RESPONSIBILITY, AND NOT THE COMPANY'S OR ITS SUBSIDIARIES' OR AFFILIATES', TO FILE TIMELY THE ELECTION UNDER SECTION 83(b) OF THE CODE, EVEN IF THE PARTICIPANT REQUESTS THE COMPANY OR ITS REPRESENTATIVE TO MAKE THIS FILING ON THE GRANTEE'S BEHALF.

(c)     The award or vesting (or lapse of risk of forfeiture) of the Restricted Shares, and the payment of dividends with respect to such Restricted Shares, may give rise to "wages" subject to withholding. The Participant's rights hereunder are subject to the Participant's promptly paying to the Company in cash (or by such other means as may be acceptable to the Committee, in its discretion) all taxes required to be withheld in connection with such award, vesting, lapse of risk of forfeiture or payment. THE PARTICIPANT (AND NOT THE COMPANY OR ITS SUBSIDIARIES OR AFFILIATES) SHALL BE RESPONSIBLE FOR ANY TAX LIABILITY THAT MAY ARISE AS A RESULT OF THE GRANT, VESTING, LAPSE OF RISK OF FORFEITURE OR ANY PAYMENT IN RESPECT OF THE RESTRICTED SHARES, OR ANY TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

7.     Securities Laws. Upon the vesting of any Restricted Shares, the Participant will make or enter into such written representations, warranties and agreements as the Committee may reasonably request in order to comply with applicable securities laws or with this Agreement.

8.     Notices. Any notice necessary under this Agreement shall be addressed to the Company in care of its Secretary at the principal executive office of the Company and to the Participant at the address appearing in the personnel records of the Company for the Participant or to either party at such other address as either party hereto may hereafter designate in writing to the other. Any such notice shall be deemed effective upon receipt thereof by the addressee.

9.     Choice of Law. **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICTS OF LAWS; PROVIDED, THAT,**

3

**NOTWITHSTANDING THE FOREGOING, SECTION 11 AND <u>APPENDIX A</u> SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK. ALL DISPUTES RELATING TO THIS AGREEMENT MUST BE SUBMITTED TO A STATE OR FEDERAL COURT IN THE COUNTY OF WESTCHESTER, IN THE STATE OF NEW YORK, AND PARTICIPANT SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURT.**

10.    <u>Restricted Stock Award Subject to the Stockholders Agreement</u>.    The Restricted Stock Award and the Restricted Shares granted hereunder are subject to the Stockholders Agreement (and by executing the joinder to the Stockholders Agreement, the Participant agrees to the terms set forth herein). The terms and provisions of the Stockholders Agreement, as may be amended from time to time, are hereby incorporated herein by reference. In the event of a conflict between any term or provision contained herein and any term or provision of the Stockholders Agreement, the applicable terms and provisions of the Stockholders Agreement will govern and prevail.

11.    <u>Restrictive Covenants</u>.  If, at any time prior to the vesting of the Restricted Shares, the Participant engages in any of the activities prohibited by <u>Appendix A</u> during the applicable period specified therein ("<u>Restricted Activities</u>"), then all of the Participant's rights with respect to any of the Restricted Shares that have not then vested shall immediately terminate.  In the event the Participant engages in any Restricted Activities following vesting of the Restricted Shares, the delivery of the Shares by the Company upon such vesting may be rescinded by the Company at any time during the applicable restricted period, and the Participant shall pay to the Company the amount of any gain realized or payment received as a result of any vesting of the Restricted Shares.  Such repayment by the Participant shall be in such manner and on such terms and conditions as may be required by the Company, and the Company shall be entitled to set off against the amount of any such gain any amount owed to the Participant by the Company.  For purposes hereof, gain realized or payment received as a result of any vesting shall be defined as the dollar amount of the aggregate Fair Market Value (within the meaning of the Stockholders Agreement) of the Restricted Shares on the date such Restricted Shares vested.  If any provision of this Section 11 or <u>Appendix A</u> is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction, such provision shall be construed or deemed amended to the extent necessary in such jurisdiction to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Restricted Stock Award, such provision shall be stricken and the remainder of the Restricted Stock Award shall remain in full force and effect.  For the avoidance of doubt, the Company agrees that the provisions of <u>Appendix A</u> are not intended to and do not replace, amend, modify or supersede any similar covenants contained in the Participant's employment agreement, if any, with the Company or its subsidiaries.

12.    <u>Call Rights</u>.

(a)    *General*.  The Participant agrees that, except as otherwise set forth in the Participant's employment agreement, subscription or rollover agreement, or other similar agreement, the Company and the Sponsor Group, collectively, will each have a call right (the "<u>Call Right</u>") on the Restricted Shares held by the Participant after either a Termination or a

4

Restricted Activities Violation (the "Callable Equity") upon the terms and subject to the conditions as set forth in this Section 12.

(b)      *Call Right of the Company*.  Upon either a Termination or a Restricted Activities Violation, the Company may exercise the Call Right with respect to all or any portion of the Callable Equity by one or more written notices (each, a "Call Right Notice") delivered to the Participant at any time during the period commencing on the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restricted Activities Violation, as applicable (the date such notice is given by the Company, the "Call Exercise Date"), and ending one year following the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restrictive Covenant Violation, as applicable. Upon the giving of a Call Right Notice, the Company will be obligated to purchase and the Participant will be obligated to sell all (or any lesser portion indicated in the Call Right Notice) of the Callable Equity for the consideration calculated as set forth in Section 12(d).

(c)      *Call Right of the Sponsor Group*.  If the Company fails to exercise the Call Right, then the Sponsor Group (or any Affiliate of the Sponsor Group as such right may be assigned to by the Sponsor Group) may exercise the Call Right within thirty (30) days after the expiration of the aforesaid one year period by giving one (1) or more written notices (each, a "Sponsor Group Call Right Notice") to the Participant that the Sponsor Group (or Affiliate thereof) is exercising the Call Right (the date such notice is given, the "Sponsor Group Call Exercise Date"). Upon the giving of a Sponsor Group Call Right Notice, the Sponsor Group will be obligated to purchase and the Participant will be obligated to sell all (or any lesser portion indicated in the aforesaid notice) of the Callable Equity for the consideration calculated as set forth in Section 12(d). Notwithstanding anything herein to the contrary, in no event shall the Company or the Sponsor Group (or any Affiliate of the Sponsor Group) be entitled to deliver any Call Right Notice or Sponsor Group Call Right Notice, as applicable, with respect to any Restricted Shares unless and until such Restricted Shares have been issued, vested as of the Vesting Date, and outstanding for at least six (6) months and the applicable period for delivering the Call Notice shall be extended to the fifth (5th) Business Day after the end of such six (6)-month period.

(d) *Consideration for the Exercise of a Call Right.*

(i)  In the case of either (x) a Termination for Cause or (y) a Restrictive Activities Violation, with respect to any Restricted Shares, the consideration will be equal to the lesser of (I) the Cost of such Restricted Shares and (II) the Fair Market Value of such Restricted Shares on the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restricted Activities Violation, as applicable.

(ii)  In the case of a Termination for any reason other than for Cause, the consideration will be equal to the Fair Market Value of such Restricted Shares on the Call Exercise Date or the Sponsor Group Call Exercise Date, as applicable.

(e) *Company Sale*.  Notwithstanding the foregoing, if a Change in Control occurs within 180 days after the Call Exercise Date or the Sponsor Group Call Exercise Date, as

5

applicable, or if the Company enters into a definitive agreement with respect to a Change in Control within 180 days after the Call Exercise Date or the Sponsor Group Call Exercise Date, as applicable, that is consummated, the Company shall pay to the Participant an aggregate amount equal to the additional amount the Participant would have received in respect of the Restricted Shares that were purchased by the Company or the Sponsor Group (or its Affiliate) pursuant to the exercise of such Call Right had such Participant continued to hold such Restricted Shares upon the consummation of such Change in Control; provided, however, that such additional amount shall not be payable following a Termination for Cause, a Restricted Activities Violation or a voluntary resignation (other than a bona fide, planned-for retirement, as determined by the Board in its sole discretion).

(f)     *Definitions*.  Capitalized terms used in this Section 12 but not otherwise defined in this Agreement shall have the meaning set forth in the Stockholders Agreement.

(g)     *Third-Party Beneficiaries*.  The Participant and the Company acknowledge and agree that the Sponsor Group are express third-party beneficiaries of this Section 12.

(h)     *Transfer.*  Participant agrees that he or she will not transfer any Restricted Shares to any person or entity on or after the Vesting Date in accordance with Section 2 of the Stockholders Agreement unless and until the proposed transferee shall have acknowledged and agreed that the transferee and the shares transferred are subject to this Section 12.

13.     Acknowledgement.  The Participant acknowledges and agrees that this Restricted Stock Award is in full and complete satisfaction of the Participant's rights under the Peak Equity Program.

[Remainder of Page Intentionally Left Blank]

6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

USI ADVANTAGE CORP.

By: _____

Agreed and acknowledged as
of the date first above written:

_____
Matthew Simmons

_May 15_ , 2019

7

# APPENDIX A

This Appendix A to the Restricted Stock Award Agreement attached hereto and made a part hereof. By accepting the grant and as a condition to the vesting of the Restricted Shares, the Participant agrees as follows:

(a)     **Non-Solicitation.**   Except in the normal course of business on behalf of the Company or any of its Affiliates, the Participant will not, directly or indirectly, (x) solicit, sell, provide or accept any request to provide, or induce the termination, cancellation or non-renewal of, any USI Business from or by any person, corporation, firm or other entity whose account constituted a Client Account of a USI Company, at any time within the 24 months preceding the earlier of the date of such act or the date of termination of the Participant's employment with the Company and its subsidiaries, or (y) solicit, offer, negotiate or otherwise seek to acquire any interest in any Active Prospective Acquisition of a USI Company, determined as of the earlier of the date of such act or the effective date of termination of the Participant's employment with the Company and its subsidiaries.   The restrictions contained in this Paragraph (a) shall apply throughout the Participant's employment with the Company and its subsidiaries and thereafter until two (2) years after the effective date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

(b)     **Non-Competition.**   The Participant will refrain from carrying on any business, directly or indirectly, which provides any USI Business, except in the normal course of business on behalf of any USI Company.  For all purposes of this Agreement, the term "carrying on any business" shall mean to act as a sole proprietor, partner, member of a limited liability company, stockholder, officer, director, employee, manager, trustee, agent, advisor, joint venturer, or consultant of, with or to, any business, or otherwise to own, manage, operate, control or participate in the ownership, management, operation or control of, or engage in, any business.  It is expressly agreed that the foregoing is not intended to restrict or prohibit the ownership by the Participant of stock or other securities of a publicly-held corporation in which the Participant does not (x) possess beneficial ownership of more than 5% of the voting capital stock of such corporation or (y) participate in any management or advisory capacity.  The restrictions contained in this Paragraph (b) shall apply during the Participant's employment with the Company and its Affiliates.

(c)     **No Hiring.**   The Participant will not, directly or indirectly, solicit the employment, consulting or other services of any other employee or independent producer of any USI Company or otherwise induce any of such employees to leave any USI Company's employment or to breach an employment or independent producer agreement therewith.  The restrictions contained in this Paragraph (c) shall apply during the Participant's employment with the Company and its subsidiaries and thereafter until two (2) years following the date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

(d)     **Non-Disparagement.**  Subject to obligations under applicable laws and regulations, in the event of a termination of the Participant's employment with the Company and its subsidiaries, neither the Participant nor any of the USI Companies or their senior officers or

directors shall publicly make any statements or comments that disparage the reputation of the Participant, or any of the USI Companies or their senior officers or directors.

     *(e)*     ***Equitable Relief***.  The services to be rendered by the Participant are of a special, unique and extraordinary character and that it would be extremely difficult or impracticable to replace such services, that the material provisions of this <u>Appendix A</u> are of crucial importance to the Company and its Affiliates and that any damage caused by the breach of the provisions of this <u>Appendix A</u> would result in irreparable harm to the business of the Company and its Affiliates for which money damages alone would not be adequate compensation. Accordingly, if the Participant violates the provisions of this <u>Appendix A</u>, the Company and its Affiliates shall, in addition to any other rights or remedies available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction.

     *(f)*     ***Definitions***.  Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them:

     (1)     "**Active Prospective Acquisition**" means any business or enterprise engaged in providing USI Business (i) with which a specified Person (or any of its agents) had engaged in negotiations (whether or not successfully) within the 24 months preceding a specified date, regarding the acquisition of, sale of assets by, or merger or joint venture with, such business or enterprise or (ii) which had been identified by a specified Person (or any of its agents) in the business records of such specified Person within the 24 months preceding a specified date, and actively considered as a candidate, for possible acquisition, merger, sale of assets or joint venture.

     (2)     "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third-party administration claims processing or underwriting is performed by such specified Person for such carrier or other entity) who or which is serviced, as of a specified date, by a specified Person in connection with such specified Person's business, regardless of whether such services are provided by, or through the licenses of, such specified Person or any shareholder, employee or agent of such specified Person.

     (3)     "**USI Business**" means the businesses provided by any of the USI Companies (including, without limitation, the providing of: (i) insurance agency and brokerage, and related insurance services, including, without limitation, risk management and loss control, cost containment, analysis of loss exposures and designs, catastrophic case management, loss reserves and rate reviews, performance of cash flow studies, administration of risk funding and transfer techniques, captive company formation, self-insurance consulting, reinsurance and excess stop loss (both specific and aggregate) placement, management of insurance programs (including programs with respect to membership associations and congregations), third-party administration, actuarial and administrative services for pension and health plans, compensation programs and employee communications; (ii) managed care consulting services and related legal assistance; (iii) human resource and employee compensation consulting services and related legal assistance; and (iv) any insurance or financial services relating to any of the foregoing).

(4)     "**Person**" means an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization, a government or any department or agency thereof, or another entity.

(5)     "**USI Company**" means any of the Company, its subsidiaries (including USI Holdings Corporation), its "affiliates" and "associates" (as defined in Rule 12b-2 of the regulations promulgated under the Exchange Act, without regard to whether any party is a "registrant" under such Act), and any of their successors or assigns.

MANAGEMENT STOCKHOLDER

Name: MATTHEW HALE SIMMONS

Address: 5109 S CRESCENT DR.

TAMPA FL 33611

Facsimile: _____

Email: Matthew.Simmons@usi.com

Accredited Investor:[1]  X yes    __ no

---

[1] See Section 7(b)(v) of this Agreement.

- 34 -

**RESTRICTED STOCK AWARD AGREEMENT**

**(Peak Equity Program)**

THIS AGREEMENT (this "Agreement") is made effective as of the 12th day of May, 2020 (hereinafter called the "Date of Grant"), between USI Advantage Corp., a Delaware corporation (hereinafter called the "Company"), and Matthew Simmons (hereinafter called the "Participant").

R E C I T A L S:

WHEREAS, the Committee has determined that it would be in the best interests of the Company and its shareholders to grant the restricted stock award provided for herein to the Participant the terms set forth herein. Capitalized terms not defined herein shall have the meanings set forth in the Stockholders Agreement.

NOW THEREFORE, the terms and conditions of this Agreement are as follows:

1.      Grant of the Restricted Shares.  Subject to the terms and conditions set forth in this Agreement, the Company hereby grants to the Participant a restricted stock award  (the "Restricted Stock Award") consisting of 2,963 shares of common stock of the Company (the "Restricted Shares").  The Restricted Shares shall vest and become nonforfeitable in accordance with Section 2 hereof.

2.      Vesting.

(a)      *Vesting Generally.*  Subject to the Participant's continued employment with the Company and its subsidiaries and the other terms hereof, the Restricted Shares shall vest and become nonforfeitable with respect to 100% of the Restricted Shares initially granted on the fifth (5th) anniversary of June 29, 2019 (the "Vesting Date").

(b)      *Effect of Termination of Employment Other Than by Reason of Death, Disability or Qualified Retirement.*  Notwithstanding anything herein to the contrary, if the Participant's employment with the Company and its subsidiaries terminates or is terminated by the Company and its subsidiaries for any reason prior to the Vesting Date, other than by reason of the Participant's death, Disability or Qualified Retirement (as defined in Paragraph (d) below), the Restricted Shares shall be forfeited by the Participant without consideration.

(c)      *Effect of Death or Disability.*  If the Participant's employment with the Company and its subsidiaries terminates or is terminated due to the Participant's death or Disability, then (i) the Restricted Stock Award shall vest as of the date of such termination of employment with respect to 20% of the Restricted Shares covered by the Restricted Stock Award for each full twelve-month period that has elapsed since June 29, 2019 and (ii) the Restricted Shares that do not become vested pursuant to the preceding clause (i) shall be forfeited by the Participant without consideration.

(d)      *Effect of Qualified Retirement.*  If the Participant's employment with the Company and its subsidiaries terminates by reason of the Participant's Qualified Retirement, as determined by the Board of Directors of the Company (the "Board") or the committee to which

the Board delegates its powers (the "Committee"), the Restricted Shares shall not be automatically forfeited upon termination of employment but shall continue to be eligible to vest on the Vesting Date; provided, however, that if the Committee makes a determination, in its sole discretion, that prior to the Vesting Date the Participant (A) is "carrying on any business," or has carried on any business, directly or indirectly, in the insurance industry or any "USI Business", except with the express consent of the Committee, or (B) is in breach of or has breached any other restrictive covenants or other agreements with the Company or its subsidiaries, the Restricted Shares shall not vest and shall be forfeited by the Participant without consideration.  For purposes of this Agreement, "Qualified Retirement" means a resignation of employment, with the advance consent of the Committee, at any time after the Participant reaches 60 or such other age as determined by the Committee in its sole discretion.  Following a Qualified Retirement, the Restricted Shares shall be subject to the call provisions described in Section 12 hereof.

　　　　　3.　　Rights as a Stockholder.  The Participant shall be the record owner of the Restricted Shares until or unless such Restricted Shares are forfeited or canceled pursuant to Section 2 or Section 11 hereof, and as record owner shall be entitled to all rights of a common stockholder of the Company, including, without limitation, voting rights with respect to the Restricted Shares; provided that (i) any cash or in-kind dividends paid with respect to the Restricted Shares which have not previously vested shall be withheld by the Company and shall be paid to the Participant only when, and if, such Restricted Shares shall become fully vested pursuant to Section 2 and (ii) the Restricted Shares shall be subject to the limitations on transfer and encumbrance set forth in Section 2 and will be subject to the terms of the Management Stockholders' Agreement dated May 16, 2017, as in effect from time to time (the "Stockholders Agreement").  As a condition to the receipt of this Restricted Stock Agreement, the Participant shall deliver to the Company a joinder to the Stockholders Agreement.

　　　　　4.　　No Right to Continued Employment.  The granting of the Restricted Shares evidenced by this Agreement shall impose no obligation on the Company or any subsidiary or Affiliate to continue the Employment of the Participant and shall not lessen or affect the Company's or any of its subsidiary's or Affiliate's right to terminate the employment of such Participant.

　　　　　5.　　Transferability.  Notwithstanding anything in the Stockholders Agreement to the contrary, the Restricted Shares may not, at any time prior to becoming vested pursuant to Section 2, be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by the Participant and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or any Affiliate; provided that the designation of a beneficiary shall not constitute an assignment, alienation, pledge, attachment, sale, transfer or encumbrance.

2

6.      Certain Tax Matters.

(a)      The Participant may be required to pay to the Company or any subsidiary or Affiliate, and the Company and its subsidiaries and Affiliates shall have the right and are hereby authorized to withhold, any applicable withholding taxes in respect of the Restricted Shares, their grant or vesting, or lapse of risk of forfeiture, or any payment or transfer under or with respect to the Restricted Shares and to take such action as may be necessary in the opinion of the Committee to satisfy all obligations for the payment of such withholding taxes.

(b)      The Participant is hereby advised to confer promptly with a professional tax advisor to consider whether the Participant should make a so-called "83(b) election" pursuant to Section 83(b) of the Code with respect to the Restricted Shares.  Any such 83(b) election, to be effective, must be made in accordance with applicable regulations and within thirty (30) days following the Date of Grant.  The Participant shall provide the Company with a copy of any 83(b) election prior to filing, and shall provide the Company with evidence of the timely filing of such 83(b) election.  The Company has made no recommendation to the Participant with respect to the advisability of making such an election.  IT IS THE PARTICIPANT'S SOLE RESPONSIBILITY, AND NOT THE COMPANY'S OR ITS SUBSIDIARIES' OR AFFILIATES', TO FILE TIMELY THE ELECTION UNDER SECTION 83(b) OF THE CODE, EVEN IF THE PARTICIPANT REQUESTS THE COMPANY OR ITS REPRESENTATIVE TO MAKE THIS FILING ON THE GRANTEE'S BEHALF.

(c)      The award or vesting (or lapse of risk of forfeiture) of the Restricted Shares, and the payment of dividends with respect to such Restricted Shares, may give rise to "wages" subject to withholding.  The Participant's rights hereunder are subject to the Participant's promptly paying to the Company in cash (or by such other means as may be acceptable to the Committee, in its discretion) all taxes required to be withheld in connection with such award, vesting, lapse of risk of forfeiture or payment.  THE PARTICIPANT (AND NOT THE COMPANY OR ITS SUBSIDIARIES OR AFFILIATES) SHALL BE RESPONSIBLE FOR ANY TAX LIABILITY THAT MAY ARISE AS A RESULT OF THE GRANT, VESTING, LAPSE OF RISK OF FORFEITURE OR ANY PAYMENT IN RESPECT OF THE RESTRICTED SHARES, OR ANY TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

7.      Securities Laws.  Upon the vesting of any Restricted Shares, the Participant will make or enter into such written representations, warranties and agreements as the Committee may reasonably request in order to comply with applicable securities laws or with this Agreement.

8.      Notices.  Any notice necessary under this Agreement shall be addressed to the Company in care of its Secretary at the principal executive office of the Company and to the Participant at the address appearing in the personnel records of the Company for the Participant or to either party at such other address as either party hereto may hereafter designate in writing to the other.  Any such notice shall be deemed effective upon receipt thereof by the addressee.

9.      Choice of Law.  **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICTS OF LAWS; PROVIDED, THAT,**

3

**NOTWITHSTANDING THE FOREGOING, SECTION 11 AND <u>APPENDIX A</u> SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.   ALL DISPUTES RELATING TO THIS AGREEMENT MUST BE SUBMITTED TO A STATE OR FEDERAL COURT IN THE COUNTY OF WESTCHESTER, IN THE STATE OF NEW YORK, AND PARTICIPANT SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURT.**

      10.    <u>Restricted Stock Award Subject to the Stockholders Agreement</u>.   The Restricted Stock Award and the Restricted Shares granted hereunder are subject to the Stockholders Agreement (and by executing the joinder to the Stockholders Agreement, the Participant agrees to the terms set forth herein).   The terms and provisions of the Stockholders Agreement, as may be amended from time to time, are hereby incorporated herein by reference. In the event of a conflict between any term or provision contained herein and any term or provision of the Stockholders Agreement, the applicable terms and provisions of the Stockholders Agreement will govern and prevail.

      11.    <u>Restrictive Covenants</u>.   If, at any time prior to the vesting of the Restricted Shares, the Participant engages in any of the activities prohibited by <u>Appendix A</u> during the applicable period specified therein ("<u>Restricted Activities</u>"), then all of the Participant's rights with respect to any of the Restricted Shares that have not then vested shall immediately terminate.   In the event the Participant engages in any Restricted Activities following vesting of the Restricted Shares, the delivery of the Shares by the Company upon such vesting may be rescinded by the Company at any time during the applicable restricted period, and the Participant shall pay to the Company the amount of any gain realized or payment received as a result of any vesting of the Restricted Shares.   Such repayment by the Participant shall be in such manner and on such terms and conditions as may be required by the Company, and the Company shall be entitled to set off against the amount of any such gain any amount owed to the Participant by the Company.   For purposes hereof, gain realized or payment received as a result of any vesting shall be defined as the dollar amount of the aggregate Fair Market Value (within the meaning of the Stockholders Agreement) of the Restricted Shares on the date such Restricted Shares vested.   If any provision of this Section 11 or <u>Appendix A</u> is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction, such provision shall be construed or deemed amended to the extent necessary in such jurisdiction to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Restricted Stock Award, such provision shall be stricken and the remainder of the Restricted Stock Award shall remain in full force and effect.   For the avoidance of doubt, the Company agrees that the provisions of <u>Appendix A</u> are not intended to and do not replace, amend, modify or supersede any similar covenants contained in the Participant's employment agreement, if any, with the Company or its subsidiaries.

      12.    <u>Call Rights</u>.

      (a)    *General*.   The Participant agrees that, except as otherwise set forth in the Participant's employment agreement, subscription or rollover agreement, or other similar agreement, the Company and the Sponsor Group, collectively, will each have a call right (the "<u>Call Right</u>") on the Restricted Shares held by the Participant after either a Termination or a

4

Restricted Activities Violation (the "Callable Equity") upon the terms and subject to the conditions as set forth in this Section 12.

(b)     *Call Right of the Company*.  Upon either a Termination or a Restricted Activities Violation, the Company may exercise the Call Right with respect to all or any portion of the Callable Equity by one or more written notices (each, a "Call Right Notice") delivered to the Participant at any time during the period commencing on the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restricted Activities Violation, as applicable (the date such notice is given by the Company, the "Call Exercise Date"), and ending one year following the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restrictive Covenant Violation, as applicable. Upon the giving of a Call Right Notice, the Company will be obligated to purchase and the Participant will be obligated to sell all (or any lesser portion indicated in the Call Right Notice) of the Callable Equity for the consideration calculated as set forth in Section 12(d).

(c)     *Call Right of the Sponsor Group*.  If the Company fails to exercise the Call Right, then the Sponsor Group (or any Affiliate of the Sponsor Group as such right may be assigned to by the Sponsor Group) may exercise the Call Right within thirty (30) days after the expiration of the aforesaid one year period by giving one (1) or more written notices (each, a "Sponsor Group Call Right Notice") to the Participant that the Sponsor Group (or Affiliate thereof) is exercising the Call Right (the date such notice is given, the "Sponsor Group Call Exercise Date"). Upon the giving of a Sponsor Group Call Right Notice, the Sponsor Group will be obligated to purchase and the Participant will be obligated to sell all (or any lesser portion indicated in the aforesaid notice) of the Callable Equity for the consideration calculated as set forth in Section 12(d). Notwithstanding anything herein to the contrary, in no event shall the Company or the Sponsor Group (or any Affiliate of the Sponsor Group) be entitled to deliver any Call Right Notice or Sponsor Group Call Right Notice, as applicable, with respect to any Restricted Shares unless and until such Restricted Shares have been issued, vested as of the Vesting Date, and outstanding for at least six (6) months and the applicable period for delivering the Call Notice shall be extended to the fifth (5th) Business Day after the end of such six (6)-month period.

(d)  *Consideration for the Exercise of a Call Right.*

(i)  In the case of either (x) a Termination for Cause or (y) a Restrictive Activities Violation, with respect to any Restricted Shares, the consideration will be equal to the lesser of (I) the Cost of such Restricted Shares and (II) the Fair Market Value of such Restricted Shares on the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restrictive Activities Violation, as applicable.

(ii)  In the case of a Termination for any reason other than for Cause, the consideration will be equal to the Fair Market Value of such Restricted Shares on the Call Exercise Date or the Sponsor Group Call Exercise Date, as applicable.

(e)  *Company Sale*.  Notwithstanding the foregoing, if a Change in Control occurs within 180 days after the Call Exercise Date or the Sponsor Group Call Exercise Date, as

5

applicable, or if the Company enters into a definitive agreement with respect to a Change in Control within 180 days after the Call Exercise Date or the Sponsor Group Call Exercise Date, as applicable, that is consummated, the Company shall pay to the Participant an aggregate amount equal to the additional amount the Participant would have received in respect of the Restricted Shares that were purchased by the Company or the Sponsor Group (or its Affiliate) pursuant to the exercise of such Call Right had such Participant continued to hold such Restricted Shares upon the consummation of such Change in Control; provided, however, that such additional amount shall not be payable following a Termination for Cause, a Restricted Activities Violation or a voluntary resignation (other than a bona fide, planned-for retirement, as determined by the Board in its sole discretion).

(f)     *Definitions*.  Capitalized terms used in this Section 12 but not otherwise defined in this Agreement shall have the meaning set forth in the Stockholders Agreement.

(g)     *Third-Party Beneficiaries*.  The Participant and the Company acknowledge and agree that the Sponsor Group are express third-party beneficiaries of this Section 12.

(h)     *Transfer.*  Participant agrees that he or she will not transfer any Restricted Shares to any person or entity on or after the Vesting Date in accordance with Section 2 of the Stockholders Agreement unless and until the proposed transferee shall have acknowledged and agreed that the transferee and the shares transferred are subject to this Section 12.

13.     Acknowledgement.  The Participant acknowledges and agrees that this Restricted Stock Award is in full and complete satisfaction of the Participant's rights under the Peak Equity Program.

[Remainder of Page Intentionally Left Blank]

6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

USI ADVANTAGE CORP.

By:_____

Agreed and acknowledged as
of the date first above written:

_____

Matthew Simmons

_____, 2020

7

# APPENDIX A

This Appendix A to the Restricted Stock Award Agreement attached hereto and made a part hereof. By accepting the grant and as a condition to the vesting of the Restricted Shares, the Participant agrees as follows:

(a)    **Non-Solicitation.**    Except in the normal course of business on behalf of the Company or any of its Affiliates, the Participant will not, directly or indirectly, (x) solicit, sell, provide or accept any request to provide, or induce the termination, cancellation or non-renewal of, any USI Business from or by any person, corporation, firm or other entity whose account constituted a Client Account of a USI Company, at any time within the 24 months preceding the earlier of the date of such act or the date of termination of the Participant's employment with the Company and its subsidiaries, or (y) solicit, offer, negotiate or otherwise seek to acquire any interest in any Active Prospective Acquisition of a USI Company, determined as of the earlier of the date of such act or the effective date of termination of the Participant's employment with the Company and its subsidiaries.  The restrictions contained in this Paragraph (a) shall apply throughout the Participant's employment with the Company and its subsidiaries and thereafter until two (2) years after the effective date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

(b)    **Non-Competition.**    The Participant will refrain from carrying on any business, directly or indirectly, which provides any USI Business, except in the normal course of business on behalf of any USI Company.  For all purposes of this Agreement, the term "carrying on any business" shall mean to act as a sole proprietor, partner, member of a limited liability company, stockholder, officer, director, employee, manager, trustee, agent, advisor, joint venturer, or consultant of, with or to, any business, or otherwise to own, manage, operate, control or participate in the ownership, management, operation or control of, or engage in, any business.  It is expressly agreed that the foregoing is not intended to restrict or prohibit the ownership by the Participant of stock or other securities of a publicly-held corporation in which the Participant does not (x) possess beneficial ownership of more than 5% of the voting capital stock of such corporation or (y) participate in any management or advisory capacity.  The restrictions contained in this Paragraph (b) shall apply during the Participant's employment with the Company and its Affiliates.

(c)    **No Hiring.**    The Participant will not, directly or indirectly, solicit the employment, consulting or other services of any other employee or independent producer of any USI Company or otherwise induce any of such employees to leave any USI Company's employment or to breach an employment or independent producer agreement therewith.  The restrictions contained in this Paragraph (c) shall apply during the Participant's employment with the Company and its subsidiaries and thereafter until two (2) years following the date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

(d)    **Non-Disparagement.**    Subject to obligations under applicable laws and regulations, in the event of a termination of the Participant's employment with the Company and its subsidiaries, neither the Participant nor any of the USI Companies or their senior officers or

directors shall publicly make any statements or comments that disparage the reputation of the Participant, or any of the USI Companies or their senior officers or directors.

    *(e)*    **Equitable Relief**.  The services to be rendered by the Participant are of a special, unique and extraordinary character and that it would be extremely difficult or impracticable to replace such services, that the material provisions of this Appendix A are of crucial importance to the Company and its Affiliates and that any damage caused by the breach of the provisions of this Appendix A would result in irreparable harm to the business of the Company and its Affiliates for which money damages alone would not be adequate compensation.  Accordingly, if the Participant violates the provisions of this Appendix A, the Company and its Affiliates shall, in addition to any other rights or remedies available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction.

    *(f)*    **Definitions**.  Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them:

    (1)    "**Active Prospective Acquisition**" means any business or enterprise engaged in providing USI Business (i) with which a specified Person (or any of its agents) had engaged in negotiations (whether or not successfully) within the 24 months preceding a specified date, regarding the acquisition of, sale of assets by, or merger or joint venture with, such business or enterprise or (ii) which had been identified by a specified Person (or any of its agents) in the business records of such specified Person within the 24 months preceding a specified date, and actively considered as a candidate, for possible acquisition, merger, sale of assets or joint venture.

    (2)    "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third-party administration claims processing or underwriting is performed by such specified Person for such carrier or other entity) who or which is serviced, as of a specified date, by a specified Person in connection with such specified Person's business, regardless of whether such services are provided by, or through the licenses of, such specified Person or any shareholder, employee or agent of such specified Person.

    (3)    "**USI Business**" means the businesses provided by any of the USI Companies (including, without limitation, the providing of: (i) insurance agency and brokerage, and related insurance services, including, without limitation, risk management and loss control, cost containment, analysis of loss exposures and designs, catastrophic case management, loss reserves and rate reviews, performance of cash flow studies, administration of risk funding and transfer techniques, captive company formation, self-insurance consulting, reinsurance and excess stop loss (both specific and aggregate) placement, management of insurance programs (including programs with respect to membership associations and congregations), third-party administration, actuarial and administrative services for pension and health plans, compensation programs and employee communications; (ii) managed care consulting services and related legal assistance; (iii) human resource and employee compensation consulting services and related legal assistance; and (iv) any insurance or financial services relating to any of the foregoing).

(4)      "**Person**" means an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization, a government or any department or agency thereof, or another entity.

(5)      "**USI Company**" means any of the Company, its subsidiaries (including USI Holdings Corporation), its "affiliates" and "associates" (as defined in Rule 12b-2 of the regulations promulgated under the Exchange Act, without regard to whether any party is a "registrant" under such Act), and any of their successors or assigns.

## RESTRICTED STOCK AWARD AGREEMENT

### (Peak Equity Program)

THIS AGREEMENT (this "Agreement") is made effective as of the 12th day of May, 2021 (hereinafter called the "Date of Grant"), between USI Advantage Corp., a Delaware corporation (hereinafter called the "Company"), and Matthew Simmons (hereinafter called the "Participant").

### R E C I T A L S:

WHEREAS, the Committee has determined that it would be in the best interests of the Company and its shareholders to grant the restricted stock award provided for herein to the Participant the terms set forth herein. Capitalized terms not defined herein shall have the meanings set forth in the Stockholders Agreement.

NOW THEREFORE, the terms and conditions of this Agreement are as follows:

1.     Grant of the Restricted Shares.  Subject to the terms and conditions set forth in this Agreement, the Company hereby grants to the Participant a restricted stock award  (the "Restricted Stock Award") consisting of 1,291 shares of common stock of the Company (the "Restricted Shares").  The Restricted Shares shall vest and become nonforfeitable in accordance with Section 2 hereof.

2.     Vesting.

(a)     *Vesting Generally.*  Subject to the Participant's continued employment with the Company and its subsidiaries and the other terms hereof, the Restricted Shares shall vest and become nonforfeitable with respect to 100% of the Restricted Shares initially granted on the fifth (5th) anniversary of July 17, 2020 (the "Vesting Date").

(b)     *Effect of Termination of Employment Other Than by Reason of Death, Disability or Qualified Retirement.*  Notwithstanding anything herein to the contrary, if the Participant's employment with the Company and its subsidiaries terminates or is terminated by the Company and its subsidiaries for any reason prior to the Vesting Date, other than by reason of the Participant's death, Disability or Qualified Retirement (as defined in Paragraph (d) below), the Restricted Shares shall be forfeited by the Participant without consideration.

(c)     *Effect of Death or Disability.*  If the Participant's employment with the Company and its subsidiaries terminates or is terminated due to the Participant's death or Disability, then (i) the Restricted Stock Award shall vest as of the date of such termination of employment with respect to 20% of the Restricted Shares covered by the Restricted Stock Award for each full twelve-month period that has elapsed since July 17, 2020 and (ii) the Restricted Shares that do not become vested pursuant to the preceding clause (i) shall be forfeited by the Participant without consideration.

(d)     *Effect of Qualified Retirement.*  If the Participant's employment with the Company and its subsidiaries terminates by reason of the Participant's Qualified Retirement, as determined by the Board of Directors of the Company (the "Board") or the committee to which

the Board delegates its powers (the "Committee"), the Restricted Shares shall not be automatically forfeited upon termination of employment but shall continue to be eligible to vest on the Vesting Date; provided, however, that if the Committee makes a determination, in its sole discretion, that prior to the Vesting Date the Participant (A) is "carrying on any business," or has carried on any business, directly or indirectly, in the insurance industry or any "USI Business", except with the express consent of the Committee, or (B) is in breach of or has breached any other restrictive covenants or other agreements with the Company or its subsidiaries, the Restricted Shares shall not vest and shall be forfeited by the Participant without consideration. For purposes of this Agreement, "Qualified Retirement" means a resignation of employment, with the advance consent of the Committee, at any time after the Participant reaches 60 or such other age as determined by the Committee in its sole discretion. Following a Qualified Retirement, the Restricted Shares shall be subject to the call provisions described in Section 12 hereof.

      3.    Rights as a Stockholder. The Participant shall be the record owner of the Restricted Shares until or unless such Restricted Shares are forfeited or canceled pursuant to Section 2 or Section 11 hereof, and as record owner shall be entitled to all rights of a common stockholder of the Company, including, without limitation, voting rights with respect to the Restricted Shares; provided that (i) any cash or in-kind dividends paid with respect to the Restricted Shares which have not previously vested shall be withheld by the Company and shall be paid to the Participant only when, and if, such Restricted Shares shall become fully vested pursuant to Section 2 and (ii) the Restricted Shares shall be subject to the limitations on transfer and encumbrance set forth in Section 2 and will be subject to the terms of the Management Stockholders' Agreement dated May 16, 2017, as in effect from time to time (the "Stockholders Agreement"). As a condition to the receipt of this Restricted Stock Agreement, the Participant shall deliver to the Company a joinder to the Stockholders Agreement.

      4.    No Right to Continued Employment. The granting of the Restricted Shares evidenced by this Agreement shall impose no obligation on the Company or any subsidiary or Affiliate to continue the Employment of the Participant and shall not lessen or affect the Company's or any of its subsidiary's or Affiliate's right to terminate the employment of such Participant.

      5.    Transferability. Notwithstanding anything in the Stockholders Agreement to the contrary, the Restricted Shares may not, at any time prior to becoming vested pursuant to Section 2, be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by the Participant and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or any Affiliate; provided that the designation of a beneficiary shall not constitute an assignment, alienation, pledge, attachment, sale, transfer or encumbrance.

2

6.      Certain Tax Matters.

(a)      The Participant may be required to pay to the Company or any subsidiary or Affiliate, and the Company and its subsidiaries and Affiliates shall have the right and are hereby authorized to withhold, any applicable withholding taxes in respect of the Restricted Shares, their grant or vesting, or lapse of risk of forfeiture, or any payment or transfer under or with respect to the Restricted Shares and to take such action as may be necessary in the opinion of the Committee to satisfy all obligations for the payment of such withholding taxes.

(b)      The Participant is hereby advised to confer promptly with a professional tax advisor to consider whether the Participant should make a so-called "83(b) election" pursuant to Section 83(b) of the Code with respect to the Restricted Shares.  Any such 83(b) election, to be effective, must be made in accordance with applicable regulations and within thirty (30) days following the Date of Grant.  The Participant shall provide the Company with a copy of any 83(b) election prior to filing, and shall provide the Company with evidence of the timely filing of such 83(b) election.  The Company has made no recommendation to the Participant with respect to the advisability of making such an election.  IT IS THE PARTICIPANT'S SOLE RESPONSIBILITY, AND NOT THE COMPANY'S OR ITS SUBSIDIARIES' OR AFFILIATES', TO FILE TIMELY THE ELECTION UNDER SECTION 83(b) OF THE CODE, EVEN IF THE PARTICIPANT REQUESTS THE COMPANY OR ITS REPRESENTATIVE TO MAKE THIS FILING ON THE GRANTEE'S BEHALF.

(c)      The award or vesting (or lapse of risk of forfeiture) of the Restricted Shares, and the payment of dividends with respect to such Restricted Shares, may give rise to "wages" subject to withholding.  The Participant's rights hereunder are subject to the Participant's promptly paying to the Company in cash (or by such other means as may be acceptable to the Committee, in its discretion) all taxes required to be withheld in connection with such award, vesting, lapse of risk of forfeiture or payment.  THE PARTICIPANT (AND NOT THE COMPANY OR ITS SUBSIDIARIES OR AFFILIATES) SHALL BE RESPONSIBLE FOR ANY TAX LIABILITY THAT MAY ARISE AS A RESULT OF THE GRANT, VESTING, LAPSE OF RISK OF FORFEITURE OR ANY PAYMENT IN RESPECT OF THE RESTRICTED SHARES, OR ANY TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

7.      Securities Laws.  Upon the vesting of any Restricted Shares, the Participant will make or enter into such written representations, warranties and agreements as the Committee may reasonably request in order to comply with applicable securities laws or with this Agreement.

8.      Notices.  Any notice necessary under this Agreement shall be addressed to the Company in care of its Secretary at the principal executive office of the Company and to the Participant at the address appearing in the personnel records of the Company for the Participant or to either party at such other address as either party hereto may hereafter designate in writing to the other.  Any such notice shall be deemed effective upon receipt thereof by the addressee.

9.      Choice of Law.  **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICTS OF LAWS; PROVIDED, THAT,**

3

**NOTWITHSTANDING THE FOREGOING, SECTION 11 AND <u>APPENDIX A</u> SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK. ALL DISPUTES RELATING TO THIS AGREEMENT MUST BE SUBMITTED TO A STATE OR FEDERAL COURT IN THE COUNTY OF WESTCHESTER, IN THE STATE OF NEW YORK, AND PARTICIPANT SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURT.**

10.     <u>Restricted Stock Award Subject to the Stockholders Agreement</u>.   The Restricted Stock Award and the Restricted Shares granted hereunder are subject to the Stockholders Agreement (and by executing the joinder to the Stockholders Agreement, the Participant agrees to the terms set forth herein).   The terms and provisions of the Stockholders Agreement, as may be amended from time to time, are hereby incorporated herein by reference. In the event of a conflict between any term or provision contained herein and any term or provision of the Stockholders Agreement, the applicable terms and provisions of the Stockholders Agreement will govern and prevail.

11.     <u>Restrictive Covenants</u>.  If, at any time prior to the vesting of the Restricted Shares, the Participant engages in any of the activities prohibited by <u>Appendix A</u> during the applicable period specified therein ("<u>Restricted Activities</u>"), then all of the Participant's rights with respect to any of the Restricted Shares that have not then vested shall immediately terminate.  In the event the Participant engages in any Restricted Activities following vesting of the Restricted Shares, the delivery of the Shares by the Company upon such vesting may be rescinded by the Company at any time during the applicable restricted period, and the Participant shall pay to the Company the amount of any gain realized or payment received as a result of any vesting of the Restricted Shares.  Such repayment by the Participant shall be in such manner and on such terms and conditions as may be required by the Company, and the Company shall be entitled to set off against the amount of any such gain any amount owed to the Participant by the Company.  For purposes hereof, gain realized or payment received as a result of any vesting shall be defined as the dollar amount of the aggregate Fair Market Value (within the meaning of the Stockholders Agreement) of the Restricted Shares on the date such Restricted Shares vested.  If any provision of this Section 11 or <u>Appendix A</u> is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction, such provision shall be construed or deemed amended to the extent necessary in such jurisdiction to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Restricted Stock Award, such provision shall be stricken and the remainder of the Restricted Stock Award shall remain in full force and effect.  For the avoidance of doubt, the Company agrees that the provisions of <u>Appendix A</u> are not intended to and do not replace, amend, modify or supersede any similar covenants contained in the Participant's employment agreement, if any, with the Company or its subsidiaries.

12.     <u>Call Rights</u>.

(a)     *General*.  The Participant agrees that, except as otherwise set forth in the Participant's employment agreement, subscription or rollover agreement, or other similar agreement, the Company and the Sponsor Group, collectively, will each have a call right (the "<u>Call Right</u>") on the Restricted Shares held by the Participant after either a Termination or a

4

Restricted Activities Violation (the "Callable Equity") upon the terms and subject to the conditions as set forth in this Section 12.

(b)     *Call Right of the Company*.  Upon either a Termination or a Restricted Activities Violation, the Company may exercise the Call Right with respect to all or any portion of the Callable Equity by one or more written notices (each, a "Call Right Notice") delivered to the Participant at any time during the period commencing on the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restricted Activities Violation, as applicable (the date such notice is given by the Company, the "Call Exercise Date"), and ending one year following the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restrictive Covenant Violation, as applicable. Upon the giving of a Call Right Notice, the Company will be obligated to purchase and the Participant will be obligated to sell all (or any lesser portion indicated in the Call Right Notice) of the Callable Equity for the consideration calculated as set forth in Section 12(d).

(c)     *Call Right of the Sponsor Group*.  If the Company fails to exercise the Call Right, then the Sponsor Group (or any Affiliate of the Sponsor Group as such right may be assigned to by the Sponsor Group) may exercise the Call Right within thirty (30) days after the expiration of the aforesaid one year period by giving one (1) or more written notices (each, a "Sponsor Group Call Right Notice") to the Participant that the Sponsor Group (or Affiliate thereof) is exercising the Call Right (the date such notice is given, the "Sponsor Group Call Exercise Date"). Upon the giving of a Sponsor Group Call Right Notice, the Sponsor Group will be obligated to purchase and the Participant will be obligated to sell all (or any lesser portion indicated in the aforesaid notice) of the Callable Equity for the consideration calculated as set forth in Section 12(d). Notwithstanding anything herein to the contrary, in no event shall the Company or the Sponsor Group (or any Affiliate of the Sponsor Group) be entitled to deliver any Call Right Notice or Sponsor Group Call Right Notice, as applicable, with respect to any Restricted Shares unless and until such Restricted Shares have been issued, vested as of the Vesting Date, and outstanding for at least six (6) months and the applicable period for delivering the Call Notice shall be extended to the fifth (5th) Business Day after the end of such six (6)-month period.

(d)  *Consideration for the Exercise of a Call Right.*

(i)  In the case of either (x) a Termination for Cause or (y) a Restrictive Activities Violation, with respect to any Restricted Shares, the consideration will be equal to the lesser of (I) the Cost of such Restricted Shares and (II) the Fair Market Value of such Restricted Shares on the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restrictive Activities Violation, as applicable.

(ii)  In the case of a Termination for any reason other than for Cause, the consideration will be equal to the Fair Market Value of such Restricted Shares on the Call Exercise Date or the Sponsor Group Call Exercise Date, as applicable.

(e)  *Company Sale.*  Notwithstanding the foregoing, if a Change in Control occurs within 180 days after the Call Exercise Date or the Sponsor Group Call Exercise Date, as

5

applicable, or if the Company enters into a definitive agreement with respect to a Change in Control within 180 days after the Call Exercise Date or the Sponsor Group Call Exercise Date, as applicable, that is consummated, the Company shall pay to the Participant an aggregate amount equal to the additional amount the Participant would have received in respect of the Restricted Shares that were purchased by the Company or the Sponsor Group (or its Affiliate) pursuant to the exercise of such Call Right had such Participant continued to hold such Restricted Shares upon the consummation of such Change in Control; provided, however, that such additional amount shall not be payable following a Termination for Cause, a Restricted Activities Violation or a voluntary resignation (other than a bona fide, planned-for retirement, as determined by the Board in its sole discretion).

(f)     *Definitions*.  Capitalized terms used in this Section 12 but not otherwise defined in this Agreement shall have the meaning set forth in the Stockholders Agreement.

(g)     *Third-Party Beneficiaries*.  The Participant and the Company acknowledge and agree that the Sponsor Group are express third-party beneficiaries of this Section 12.

(h)     *Transfer*.  Participant agrees that he or she will not transfer any Restricted Shares to any person or entity on or after the Vesting Date in accordance with Section 2 of the Stockholders Agreement unless and until the proposed transferee shall have acknowledged and agreed that the transferee and the shares transferred are subject to this Section 12.

13.     Acknowledgement.  The Participant acknowledges and agrees that this Restricted Stock Award is in full and complete satisfaction of the Participant's rights under the Peak Equity Program.

[Remainder of Page Intentionally Left Blank]

6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

USI ADVANTAGE CORP.

By:_____

Agreed and acknowledged as
of the date first above written:

_____

Matthew Simmons

_____, 2021

7

## APPENDIX A

This Appendix A to the Restricted Stock Award Agreement attached hereto and made a part hereof. By accepting the grant and as a condition to the vesting of the Restricted Shares, the Participant agrees as follows:

(a)     **Non-Solicitation.**   Except in the normal course of business on behalf of the Company or any of its Affiliates, the Participant will not, directly or indirectly, (x) solicit, sell, provide or accept any request to provide, or induce the termination, cancellation or non-renewal of, any USI Business from or by any person, corporation, firm or other entity whose account constituted a Client Account of a USI Company, at any time within the 24 months preceding the earlier of the date of such act or the date of termination of the Participant's employment with the Company and its subsidiaries, or (y) solicit, offer, negotiate or otherwise seek to acquire any interest in any Active Prospective Acquisition of a USI Company, determined as of the earlier of the date of such act or the effective date of termination of the Participant's employment with the Company and its subsidiaries.   The restrictions contained in this Paragraph (a) shall apply throughout the Participant's employment with the Company and its subsidiaries and thereafter until two (2) years after the effective date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

(b)     **Non-Competition.**   The Participant will refrain from carrying on any business, directly or indirectly, which provides any USI Business, except in the normal course of business on behalf of any USI Company.   For all purposes of this Agreement, the term "carrying on any business" shall mean to act as a sole proprietor, partner, member of a limited liability company, stockholder, officer, director, employee, manager, trustee, agent, advisor, joint venturer, or consultant of, with or to, any business, or otherwise to own, manage, operate, control or participate in the ownership, management, operation or control of, or engage in, any business.   It is expressly agreed that the foregoing is not intended to restrict or prohibit the ownership by the Participant of stock or other securities of a publicly-held corporation in which the Participant does not (x) possess beneficial ownership of more than 5% of the voting capital stock of such corporation or (y) participate in any management or advisory capacity.   The restrictions contained in this Paragraph (b) shall apply during the Participant's employment with the Company and its Affiliates.

(c)     **No Hiring.**   The Participant will not, directly or indirectly, solicit the employment, consulting or other services of any other employee or independent producer of any USI Company or otherwise induce any of such employees to leave any USI Company's employment or to breach an employment or independent producer agreement therewith.   The restrictions contained in this Paragraph (c) shall apply during the Participant's employment with the Company and its subsidiaries and thereafter until two (2) years following the date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

(d)     **Non-Disparagement.**   Subject to obligations under applicable laws and regulations, in the event of a termination of the Participant's employment with the Company and its subsidiaries, neither the Participant nor any of the USI Companies or their senior officers or

directors shall publicly make any statements or comments that disparage the reputation of the Participant, or any of the USI Companies or their senior officers or directors.

    *(e)*    ***Equitable Relief***.  The services to be rendered by the Participant are of a special, unique and extraordinary character and that it would be extremely difficult or impracticable to replace such services, that the material provisions of this <u>Appendix A</u> are of crucial importance to the Company and its Affiliates and that any damage caused by the breach of the provisions of this <u>Appendix A</u> would result in irreparable harm to the business of the Company and its Affiliates for which money damages alone would not be adequate compensation.  Accordingly, if the Participant violates the provisions of this <u>Appendix A</u>, the Company and its Affiliates shall, in addition to any other rights or remedies available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction.

    *(f)*    ***Definitions***.  Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them:

    (1)    "**Active Prospective Acquisition**" means any business or enterprise engaged in providing USI Business (i) with which a specified Person (or any of its agents) had engaged in negotiations (whether or not successfully) within the 24 months preceding a specified date, regarding the acquisition of, sale of assets by, or merger or joint venture with, such business or enterprise or (ii) which had been identified by a specified Person (or any of its agents) in the business records of such specified Person within the 24 months preceding a specified date, and actively considered as a candidate, for possible acquisition, merger, sale of assets or joint venture.

    (2)    "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third-party administration claims processing or underwriting is performed by such specified Person for such carrier or other entity) who or which is serviced, as of a specified date, by a specified Person in connection with such specified Person's business, regardless of whether such services are provided by, or through the licenses of, such specified Person or any shareholder, employee or agent of such specified Person.

    (3)    "**USI Business**" means the businesses provided by any of the USI Companies (including, without limitation, the providing of: (i) insurance agency and brokerage, and related insurance services, including, without limitation, risk management and loss control, cost containment, analysis of loss exposures and designs, catastrophic case management, loss reserves and rate reviews, performance of cash flow studies, administration of risk funding and transfer techniques, captive company formation, self-insurance consulting, reinsurance and excess stop loss (both specific and aggregate) placement, management of insurance programs (including programs with respect to membership associations and congregations), third-party administration, actuarial and administrative services for pension and health plans, compensation programs and employee communications; (ii) managed care consulting services and related legal assistance; (iii) human resource and employee compensation consulting services and related legal assistance; and (iv) any insurance or financial services relating to any of the foregoing).

(4)     "**Person**" means an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization, a government or any department or agency thereof, or another entity.

(5)     "**USI Company**" means any of the Company, its subsidiaries (including USI Holdings Corporation), its "affiliates" and "associates" (as defined in Rule 12b-2 of the regulations promulgated under the Exchange Act, without regard to whether any party is a "registrant" under such Act), and any of their successors or assigns.

## RESTRICTED STOCK AWARD AGREEMENT

### (Peak Equity Program)

THIS AGREEMENT (this "Agreement") is made effective as of the 5th day of May, 2022 (hereinafter called the "Date of Grant"), between USI Advantage Corp., a Delaware corporation (hereinafter called the "Company"), and Matthew Simmons (hereinafter called the "Participant").

## R E C I T A L S:

WHEREAS, the Committee has determined that it would be in the best interests of the Company and its shareholders to grant the restricted stock award provided for herein to the Participant the terms set forth herein. Capitalized terms not defined herein shall have the meanings set forth in the Stockholders Agreement.

NOW THEREFORE, the terms and conditions of this Agreement are as follows:

1.      Grant of the Restricted Shares.  Subject to the terms and conditions set forth in this Agreement, the Company hereby grants to the Participant a restricted stock award (the "Restricted Stock Award") consisting of  2,286 shares of common stock of the Company (the "Restricted Shares").  The Restricted Shares shall vest and become nonforfeitable in accordance with Section 2 hereof.

2.      Vesting.

(a)      *Vesting Generally.*  Subject to the Participant's continued employment with the Company and its subsidiaries and the other terms hereof, the Restricted Shares shall vest and become nonforfeitable with respect to 100% of the Restricted Shares initially granted on the fifth (5th) anniversary of May 6, 2021 (the "Vesting Date").

(b)      *Effect of Termination of Employment Other Than by Reason of Death, Disability or Qualified Retirement.*  Notwithstanding anything herein to the contrary, if the Participant's employment with the Company and its subsidiaries terminates or is terminated by the Company and its subsidiaries for any reason prior to the Vesting Date, other than by reason of the Participant's death, Disability or Qualified Retirement (as defined in Paragraph (d) below), the Restricted Shares shall be forfeited by the Participant without consideration.

(c)      *Effect of Death or Disability.*  If the Participant's employment with the Company and its subsidiaries terminates or is terminated due to the Participant's death or Disability, then (i) the Restricted Stock Award shall vest as of the date of such termination of employment with respect to 20% of the Restricted Shares covered by the Restricted Stock Award for each full twelve-month period that has elapsed since May 6, 2021 and (ii) the Restricted Shares that do not become vested pursuant to the preceding clause (i) shall be forfeited by the Participant without consideration.

(d)      *Effect of Qualified Retirement.*  If the Participant's employment with the Company and its subsidiaries terminates by reason of the Participant's Qualified Retirement, as determined by the Board of Directors of the Company (the "Board") or the committee to which

the Board delegates its powers (the "Committee"), the Restricted Shares shall not be automatically forfeited upon termination of employment but shall continue to be eligible to vest on the Vesting Date; provided, however, that if the Committee makes a determination, in its sole discretion, that prior to the Vesting Date the Participant (A) is "carrying on any business," or has carried on any business, directly or indirectly, in the insurance industry or any "USI Business", except with the express consent of the Committee, or (B) is in breach of or has breached any other restrictive covenants or other agreements with the Company or its subsidiaries, the Restricted Shares shall not vest and shall be forfeited by the Participant without consideration.  For purposes of this Agreement, "Qualified Retirement" means a resignation of employment, with the advance consent of the Committee, at any time after the Participant reaches 60 or such other age as determined by the Committee in its sole discretion.  Following a Qualified Retirement, the Restricted Shares shall be subject to the call provisions described in Section 12 hereof.

      3.     Rights as a Stockholder.  The Participant shall be the record owner of the Restricted Shares until or unless such Restricted Shares are forfeited or canceled pursuant to Section 2 or Section 11 hereof, and as record owner shall be entitled to all rights of a common stockholder of the Company, including, without limitation, voting rights with respect to the Restricted Shares; provided that (i) any cash or in-kind dividends paid with respect to the Restricted Shares which have not previously vested shall be withheld by the Company and shall be paid to the Participant only when, and if, such Restricted Shares shall become fully vested pursuant to Section 2 and (ii) the Restricted Shares shall be subject to the limitations on transfer and encumbrance set forth in Section 2 and will be subject to the terms of the Management Stockholders' Agreement dated May 16, 2017, as in effect from time to time (the "Stockholders Agreement").  As a condition to the receipt of this Restricted Stock Agreement, the Participant shall deliver to the Company a joinder to the Stockholders Agreement.

      4.     No Right to Continued Employment.  The granting of the Restricted Shares evidenced by this Agreement shall impose no obligation on the Company or any subsidiary or Affiliate to continue the Employment of the Participant and shall not lessen or affect the Company's or any of its subsidiary's or Affiliate's right to terminate the employment of such Participant.

      5.     Transferability.  Notwithstanding anything in the Stockholders Agreement to the contrary, the Restricted Shares may not, at any time prior to becoming vested pursuant to Section 2, be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by the Participant and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or any Affiliate; provided that the designation of a beneficiary shall not constitute an assignment, alienation, pledge, attachment, sale, transfer or encumbrance.

2

6.    Certain Tax Matters.

(a)    The Participant may be required to pay to the Company or any subsidiary or Affiliate, and the Company and its subsidiaries and Affiliates shall have the right and are hereby authorized to withhold, any applicable withholding taxes in respect of the Restricted Shares, their grant or vesting, or lapse of risk of forfeiture, or any payment or transfer under or with respect to the Restricted Shares and to take such action as may be necessary in the opinion of the Committee to satisfy all obligations for the payment of such withholding taxes.

(b)    The Participant is hereby advised to confer promptly with a professional tax advisor to consider whether the Participant should make a so-called "83(b) election" pursuant to Section 83(b) of the Code with respect to the Restricted Shares.  Any such 83(b) election, to be effective, must be made in accordance with applicable regulations and within thirty (30) days following the Date of Grant.  The Participant shall provide the Company with a copy of any 83(b) election prior to filing and shall provide the Company with evidence of the timely filing of such 83(b) election.  The Company has made no recommendation to the Participant with respect to the advisability of making such an election.  IT IS THE PARTICIPANT'S SOLE RESPONSIBILITY, AND NOT THE COMPANY'S OR ITS SUBSIDIARIES' OR AFFILIATES', TO FILE TIMELY THE ELECTION UNDER SECTION 83(b) OF THE CODE, EVEN IF THE PARTICIPANT REQUESTS THE COMPANY OR ITS REPRESENTATIVE TO MAKE THIS FILING ON THE GRANTEE'S BEHALF.

(c)    The award or vesting (or lapse of risk of forfeiture) of the Restricted Shares, and the payment of dividends with respect to such Restricted Shares, may give rise to "wages" subject to withholding.  The Participant's rights hereunder are subject to the Participant's promptly paying to the Company in cash (or by such other means as may be acceptable to the Committee, in its discretion) all taxes required to be withheld in connection with such award, vesting, lapse of risk of forfeiture or payment.  THE PARTICIPANT (AND NOT THE COMPANY OR ITS SUBSIDIARIES OR AFFILIATES) SHALL BE RESPONSIBLE FOR ANY TAX LIABILITY THAT MAY ARISE AS A RESULT OF THE GRANT, VESTING, LAPSE OF RISK OF FORFEITURE OR ANY PAYMENT IN RESPECT OF THE RESTRICTED SHARES, OR ANY TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

7.    Securities Laws.  Upon the vesting of any Restricted Shares, the Participant will make or enter into such written representations, warranties and agreements as the Committee may reasonably request in order to comply with applicable securities laws or with this Agreement.

8.    Notices.  Any notice necessary under this Agreement shall be addressed to the Company in care of its Secretary at the principal executive office of the Company and to the Participant at the address appearing in the personnel records of the Company for the Participant or to either party at such other address as either party hereto may hereafter designate in writing to the other.  Any such notice shall be deemed effective upon receipt thereof by the addressee.

9.    Choice of Law.  **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO CONFLICTS OF LAWS; PROVIDED, THAT,**

3

**NOTWITHSTANDING THE FOREGOING, SECTION 11 AND <u>APPENDIX A</u> SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.   ALL DISPUTES RELATING TO THIS AGREEMENT MUST BE SUBMITTED TO A STATE OR FEDERAL COURT IN THE COUNTY OF WESTCHESTER, IN THE STATE OF NEW YORK, AND PARTICIPANT SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURT.**

        10.    <u>Restricted Stock Award Subject to the Stockholders Agreement</u>.   The Restricted Stock Award and the Restricted Shares granted hereunder are subject to the Stockholders Agreement (and by executing the joinder to the Stockholders Agreement, the Participant agrees to the terms set forth herein).   The terms and provisions of the Stockholders Agreement, as may be amended from time to time, are hereby incorporated herein by reference. In the event of a conflict between any term or provision contained herein and any term or provision of the Stockholders Agreement, the applicable terms and provisions of the Stockholders Agreement will govern and prevail.

        11.    <u>Restrictive Covenants</u>.   If, at any time prior to the vesting of the Restricted Shares, the Participant engages in any of the activities prohibited by <u>Appendix A</u> during the applicable period specified therein ("<u>Restricted Activities</u>"), then all of the Participant's rights with respect to any of the Restricted Shares that have not then vested shall immediately terminate.   In the event the Participant engages in any Restricted Activities following vesting of the Restricted Shares, the delivery of the Shares by the Company upon such vesting may be rescinded by the Company at any time during the applicable restricted period, and the Participant shall pay to the Company the amount of any gain realized or payment received as a result of any vesting of the Restricted Shares.   Such repayment by the Participant shall be in such manner and on such terms and conditions as may be required by the Company, and the Company shall be entitled to set off against the amount of any such gain any amount owed to the Participant by the Company.   For purposes hereof, gain realized or payment received as a result of any vesting shall be defined as the dollar amount of the aggregate Fair Market Value (within the meaning of the Stockholders Agreement) of the Restricted Shares on the date such Restricted Shares vested.   If any provision of this Section 11 or <u>Appendix A</u> is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction, such provision shall be construed or deemed amended to the extent necessary in such jurisdiction to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Restricted Stock Award, such provision shall be stricken and the remainder of the Restricted Stock Award shall remain in full force and effect.   For the avoidance of doubt, the Company agrees that the provisions of <u>Appendix A</u> are not intended to and do not replace, amend, modify or supersede any similar covenants contained in the Participant's employment agreement, if any, with the Company or its subsidiaries.

        12.    <u>Call Rights</u>.

        (a)    *General*.   The Participant agrees that, except as otherwise set forth in the Participant's employment agreement, subscription or rollover agreement, or other similar agreement, the Company and the Sponsor Group, collectively, will each have a call right (the "<u>Call Right</u>") on the Restricted Shares held by the Participant after either a Termination or a

4

Restricted Activities Violation (the "Callable Equity") upon the terms and subject to the conditions as set forth in this Section 12.

(b)    *Call Right of the Company*.  Upon either a Termination or a Restricted Activities Violation, the Company may exercise the Call Right with respect to all or any portion of the Callable Equity by one or more written notices (each, a "Call Right Notice") delivered to the Participant at any time during the period commencing on the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restricted Activities Violation, as applicable (the date such notice is given by the Company, the "Call Exercise Date"), and ending one year following the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restrictive Covenant Violation, as applicable. Upon the giving of a Call Right Notice, the Company will be obligated to purchase and the Participant will be obligated to sell all (or any lesser portion indicated in the Call Right Notice) of the Callable Equity for the consideration calculated as set forth in Section 12(d).

(c)    *Call Right of the Sponsor Group*.  If the Company fails to exercise the Call Right, then the Sponsor Group (or any Affiliate of the Sponsor Group as such right may be assigned to by the Sponsor Group) may exercise the Call Right within thirty (30) days after the expiration of the aforesaid one year period by giving one (1) or more written notices (each, a "Sponsor Group Call Right Notice") to the Participant that the Sponsor Group (or Affiliate thereof) is exercising the Call Right (the date such notice is given, the "Sponsor Group Call Exercise Date"). Upon the giving of a Sponsor Group Call Right Notice, the Sponsor Group will be obligated to purchase and the Participant will be obligated to sell all (or any lesser portion indicated in the aforesaid notice) of the Callable Equity for the consideration calculated as set forth in Section 12(d). Notwithstanding anything herein to the contrary, in no event shall the Company or the Sponsor Group (or any Affiliate of the Sponsor Group) be entitled to deliver any Call Right Notice or Sponsor Group Call Right Notice, as applicable, with respect to any Restricted Shares unless and until such Restricted Shares have been issued, vested as of the Vesting Date, and outstanding for at least six (6) months and the applicable period for delivering the Call Notice shall be extended to the fifth (5th) Business Day after the end of such six (6)-month period.

(d)  *Consideration for the Exercise of a Call Right.*

(i)  In the case of either (x) a Termination for Cause or (y) a Restrictive Activities Violation, with respect to any Restricted Shares, the consideration will be equal to the lesser of (I) the Cost of such Restricted Shares and (II) the Fair Market Value of such Restricted Shares on the date of Termination or the date on which the Board acquires actual knowledge of the occurrence of the Restrictive Activities Violation, as applicable.

(ii)  In the case of a Termination for any reason other than for Cause, the consideration will be equal to the Fair Market Value of such Restricted Shares on the Call Exercise Date or the Sponsor Group Call Exercise Date, as applicable.

(e)  *Company Sale*.  Notwithstanding the foregoing, if a Change in Control occurs within 180 days after the Call Exercise Date or the Sponsor Group Call Exercise Date, as

5

applicable, or if the Company enters into a definitive agreement with respect to a Change in Control within 180 days after the Call Exercise Date or the Sponsor Group Call Exercise Date, as applicable, that is consummated, the Company shall pay to the Participant an aggregate amount equal to the additional amount the Participant would have received in respect of the Restricted Shares that were purchased by the Company or the Sponsor Group (or its Affiliate) pursuant to the exercise of such Call Right had such Participant continued to hold such Restricted Shares upon the consummation of such Change in Control; provided, however, that such additional amount shall not be payable following a Termination for Cause, a Restricted Activities Violation or a voluntary resignation (other than a bona fide, planned-for retirement, as determined by the Board in its sole discretion).

(f)     *Definitions*.  Capitalized terms used in this Section 12 but not otherwise defined in this Agreement shall have the meaning set forth in the Stockholders Agreement.

(g)     *Third-Party Beneficiaries*.  The Participant and the Company acknowledge and agree that the Sponsor Group are express third-party beneficiaries of this Section 12.

(h)     *Transfer*.  Participant agrees that he or she will not transfer any Restricted Shares to any person or entity on or after the Vesting Date in accordance with Section 2 of the Stockholders Agreement unless and until the proposed transferee shall have acknowledged and agreed that the transferee and the shares transferred are subject to this Section 12.

13.    Acknowledgement.  The Participant acknowledges and agrees that this Restricted Stock Award is in full and complete satisfaction of the Participant's rights under the Peak Equity Program.

[Remainder of Page Intentionally Left Blank]

6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

USI ADVANTAGE CORP.

By:_____

Agreed and acknowledged as
of the date first above written:

_____

Matthew Simmons
Date:_____

7

## APPENDIX A

This Appendix A to the Restricted Stock Award Agreement attached hereto and made a part hereof. By accepting the grant and as a condition to the vesting of the Restricted Shares, the Participant agrees as follows:

(a)     **Non-Solicitation.**   Except in the normal course of business on behalf of the Company or any of its Affiliates, the Participant will not, directly or indirectly, (x) solicit, sell, provide or accept any request to provide, or induce the termination, cancellation or non-renewal of, any USI Business from or by any person, corporation, firm or other entity whose account constituted a Client Account of a USI Company, at any time within the 24 months preceding the earlier of the date of such act or the date of termination of the Participant's employment with the Company and its subsidiaries, or (y) solicit, offer, negotiate or otherwise seek to acquire any interest in any Active Prospective Acquisition of a USI Company, determined as of the earlier of the date of such act or the effective date of termination of the Participant's employment with the Company and its subsidiaries.  The restrictions contained in this Paragraph (a) shall apply throughout the Participant's employment with the Company and its subsidiaries and thereafter until two (2) years after the effective date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

(b)     **Non-Competition.**   The Participant will refrain from carrying on any business, directly or indirectly, which provides any USI Business, except in the normal course of business on behalf of any USI Company.  For all purposes of this Agreement, the term "carrying on any business" shall mean to act as a sole proprietor, partner, member of a limited liability company, stockholder, officer, director, employee, manager, trustee, agent, advisor, joint venture, or consultant of, with or to, any business, or otherwise to own, manage, operate, control or participate in the ownership, management, operation or control of, or engage in, any business.  It is expressly agreed that the foregoing is not intended to restrict or prohibit the ownership by the Participant of stock or other securities of a publicly-held corporation in which the Participant does not (x) possess beneficial ownership of more than 5% of the voting capital stock of such corporation or (y) participate in any management or advisory capacity.  The restrictions contained in this Paragraph (b) shall apply during the Participant's employment with the Company and its Affiliates.

(c)     **No Hiring.**   The Participant will not, directly or indirectly, solicit the employment, consulting or other services of any other employee or independent producer of any USI Company or otherwise induce any of such employees to leave any USI Company's employment or to breach an employment or independent producer agreement therewith.  The restrictions contained in this Paragraph (c) shall apply during the Participant's employment with the Company and its subsidiaries and thereafter until two (2) years following the date on which the Participant's employment with the Company and its subsidiaries, or their respective successors in interest, terminates.

(d)     **Non-Disparagement.**  Subject to obligations under applicable laws and regulations, in the event of a termination of the Participant's employment with the Company and its subsidiaries, neither the Participant nor any of the USI Companies or their senior officers or

directors shall publicly make any statements or comments that disparage the reputation of the Participant, or any of the USI Companies or their senior officers or directors.

      *(e)*      ***Equitable Relief***.  The services to be rendered by the Participant are of a special, unique and extraordinary character and that it would be extremely difficult or impracticable to replace such services, that the material provisions of this Appendix A are of crucial importance to the Company and its Affiliates and that any damage caused by the breach of the provisions of this Appendix A would result in irreparable harm to the business of the Company and its Affiliates for which money damages alone would not be adequate compensation. Accordingly, if the Participant violates the provisions of this Appendix A, the Company and its Affiliates shall, in addition to any other rights or remedies available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction.

      *(f)*      ***Definitions***.  Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them:

      (1)      "**Active Prospective Acquisition**" means any business or enterprise engaged in providing USI Business (i) with which a specified Person (or any of its agents) had engaged in negotiations (whether or not successfully) within the 24 months preceding a specified date, regarding the acquisition of, sale of assets by, or merger or joint venture with, such business or enterprise or (ii) which had been identified by a specified Person (or any of its agents) in the business records of such specified Person within the 24 months preceding a specified date, and actively considered as a candidate, for possible acquisition, merger, sale of assets or joint venture.

      (2)      "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third-party administration claims processing or underwriting is performed by such specified Person for such carrier or other entity) who or which is serviced, as of a specified date, by a specified Person in connection with such specified Person's business, regardless of whether such services are provided by, or through the licenses of, such specified Person or any shareholder, employee or agent of such specified Person.

      (3)      "**USI Business**" means the businesses provided by any of the USI Companies (including, without limitation, the providing of: (i) insurance agency and brokerage, and related insurance services, including, without limitation, risk management and loss control, cost containment, analysis of loss exposures and designs, catastrophic case management, loss reserves and rate reviews, performance of cash flow studies, administration of risk funding and transfer techniques, captive company formation, self-insurance consulting, reinsurance and excess stop loss (both specific and aggregate) placement, management of insurance programs (including programs with respect to membership associations and congregations), third-party administration, actuarial and administrative services for pension and health plans, compensation programs and employee communications; (ii) managed care consulting services and related legal assistance; (iii) human resource and employee compensation consulting services and related legal assistance; and (iv) any insurance or financial services relating to any of the foregoing).

(4)     "**Person**" means an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization, a government or any department or agency thereof, or another entity.

(5)     "**USI Company**" means any of the Company, its subsidiaries (including USI Holdings Corporation), its "affiliates" and "associates" (as defined in Rule 12b-2 of the regulations promulgated under the Exchange Act, without regard to whether any party is a "registrant" under such Act), and any of their successors or assigns.

# EXHIBIT B

*Execution Version*

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("**Agreement**"), effective as of the Effective Date (as defined below), is by and between Wells Fargo Insurance Services USA, Inc., a North Carolina corporation (the "**Company**"), and Matthew Simmons ("**Producer**").   The Company and Producer are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

### RECITALS

WHEREAS, pursuant to that certain Stock Purchase Agreement (the "**Purchase Agreement**") by and between USI Insurance Services LLC, a Delaware limited liability company ("**USI LLC**") and Wells Fargo & Company, a Delaware corporation ("**Seller**"), USI LLC will purchase from Seller all of the issued and outstanding shares of capital stock of ACO Brokerage Holdings Corporation, a Delaware corporation ("**ACO**"); and

WHEREAS, ACO owns, directly or indirectly, all of the issued and outstanding equity interests of the Company; and

WHEREAS, contingent upon the closing of the transactions contemplated by the Purchase Agreement (the "**Closing**"), and provided this Agreement is accepted in full by Producer, the Company desires to employ Producer on the terms and conditions herein and Producer is willing to accept employment on such terms and conditions; and

WHEREAS, Producer's covenants herein are a material inducement for the Company to enter into this Agreement; and

WHEREAS, Producer acknowledges and agrees that by virtue of employment with the Company, Producer will receive a direct financial benefit and other good and valuable consideration; and

WHEREAS, Producer hereby acknowledges and agrees that the Retention Payment (as defined below) is a separate and additional payment to which Producer is not otherwise entitled and constitutes material and sufficient consideration to induce Producer to enter into this Agreement; and

WHEREAS, by virtue of past employment with the Company or any Predecessor and future employment with the Company, Producer:

    (a)  had, has, and will continue to have, as applicable, access to, and has gained and will continue to gain knowledge of, Confidential Information of the Company, any Predecessor and/or any USI Company, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company or any USI Company; and

(b) had, has, and will have, as applicable, significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to certain of the Company's customers and suppliers and, as such, has developed, will continue to develop, or will develop close and direct relationships with such customers and suppliers; and

(c) has developed, will continue to develop and/or will develop, as applicable, close and direct relationships with the officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations of the Company or any USI Company; and

(d) has benefitted, will continue to benefit and/or will benefit, as applicable, from the Company's investment of time, money and trust in Producer and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, had, has, and will continue to have, the ability to harm or threaten the Company's legitimate business interests; and

(e) has made use of, and will continue to make use of, Producer's significant skills, training and experience; and

(f) for these and other reasons, will render services to the Company that Producer acknowledges are special, unique or extraordinary; and

WHEREAS, Producer acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests; and

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, including Producer's employment with the Company, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

**AGREEMENT**

1. **DEFINITIONS**.  Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

(a) "**Active Prospective Client**" means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Producer's employment hereunder.

(b) "**Cause**" shall mean (i) commission by Producer of a willful and material act of dishonesty in the course of Producer's duties hereunder; (ii) conviction of Producer by a court of competent jurisdiction of a crime constituting a felony or conviction in respect of any act involving fraud, dishonesty or moral turpitude; (iii) Producer's performance under the influence of illegal drugs or the abuse of legal drugs, or continued habitual intoxication, during working hours, after the Company shall have provided notice to Producer and given Producer 30 days within which to commence rehabilitation with respect thereto, and Producer shall have failed to commence such rehabilitation or continued to perform under the influence after such rehabilitation; (iv) frequent or extended, and unjustifiable (not as a result of incapacity or disability) absenteeism which shall not have been cured within 30 days after the Company shall have advised Producer of its intention to terminate Producer's employment for Cause, in the event such condition shall not have been cured; (v) Producer's personal, willful and continuing misconduct or gross negligence that is injurious to the Company's reputation or business; (vi) refusal to perform duties and responsibilities described in this Agreement (or as they may be assigned from time to time), or to carry out reasonable and lawful directives of the Regional CEO or such Regional CEO's designee, including with respect to execution of any material policy; in each case which, if capable of being cured, shall not have been cured within 60 days after the Company shall have advised Producer of its intention to terminate Producer's employment for Cause; or (vii) material non-compliance with the terms of this Agreement.

(c) "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

(d) "**Coded to Producer**" means all policies and other business coded to Producer, as determined in good faith by the Company based on standards generally used in the insurance industry. In the event of a dispute it shall be the Company's sole and absolute discretion to determine the coding attributable to Producer.

(e) "**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of

a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(f) **"Competitive Product"** means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Producer or the Company has sold, marketed, distributed or developed in the last two (2) years of Producer's employment with the Company, or about which Producer has acquired Confidential Information.

(g) **"Confidential Information"** means at any date, any information of the Company, any Predecessor and/or a USI Company to which Producer has access, that is not already generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to:   (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi) the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof; (vii) the information that is password-protected; (viii) all internal memoranda and other office records, including electronic and data processing files and records; (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database; and (x) any and all other information that constitutes a trade secret under applicable law.

(h) **"Effective Date"** means the Closing date.

(i) **"Goodwill"** means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts,

business transactions, Confidential Information, or other efforts to develop lasting relationships.

(j) **"Net Commissions and Fees"** means all commissions and fees received and actually collected by the Company, specifically on a policy Coded to Producer, less payments to external service providers such as, but not limited to vendors and value-added service providers, and/or to other USI Companies, and any sponsorships and/or charitable contributions made to a client by the Company, unless otherwise provided for by local USI practice. "Net Commissions and Fees" shall not include any overrides or profit-sharing; interest on premiums on deposit; or contingent, bonus, excess, supplemental, non-standard, annually computed, non-specific volume based, or any other similar commissions or fees.

(k) **"New"** means any policy lines of coverage for a new client or any new policy lines of coverage for an existing client written by the Company or the other USI Companies, as the case may be. New will not encompass any client for which similar coverage was "In-Force" in the previous twelve (12) months and such business will be considered Renewal business. For policies with a coverage period of more than twelve (12) months, New shall be determined by the Company in accordance with the Company's policies in effect at such time.

(l) **"Person"** means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(m) **"Predecessor"** means any Person, in its capacity as predecessor-in-interest to the assets of the Company.

(n) **"Producer's Book of Business"** means the annual Net Commissions and Fees received by the Company on Client Accounts Coded to Producer.

(o) **"Renewal"** means the second and any subsequent year of any New coverage. For policies with a coverage period of more than twelve (12) months, Renewal shall be determined by the Company in accordance with the Company's policies in effect at such time.

(p) **"USI Business"** means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(q) **"USI Companies"** or **"USI Company"** means USI Advantage Corp., a Delaware corporation ("**USI**"), its subsidiaries (including USI LLC and the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether

any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

## 2. POSITION, RESPONSIBILITIES AND TERM

2.1 *Position and Responsibilities*.  On the terms and conditions in this Agreement, and conditioned upon the Closing, the Company shall employ Producer as a producer for the Company.  Producer shall perform all services and duties customarily attendant to such position, including the goals outlined in any applicable Producer expectation form as amended from time to time, and such other services and duties commensurate with such position as prescribed from time to time by Producer's Regional Chief Executive Officer or his/her designee (hereinafter, the "**Regional CEO**").   Nothing in this Agreement shall confer upon Producer any right to continued employment hereunder or interfere with the Company's right to change the terms and conditions of Producer's employment hereunder.

2.2 *Insurance Licenses*.  Producer shall obtain and retain the proper licenses for all lines of insurance solicited and serviced by Producer.  Notwithstanding anything to the contrary in this Agreement, Producer acknowledges Producer is not entitled to any commissions for sales or servicing of policies within a line of insurance if Producer is not properly licensed for such line of insurance.

2.3 *No Conflicts of Interest*.  During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company.  Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

2.4 *Duty of Loyalty*.  Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of any USI Company.

2.5 *Term*.  This Agreement, including Producer's employment hereunder, shall commence on the Effective Date and continue until terminated pursuant to Section 8 (the "**Term**").

## 3. COMPENSATION AND BENEFITS

3.1 *Draw*.  The Company agrees to pay Producer commissions, calculated pursuant to Section 3.2, and a recoverable draw against such future commissions in an amount determined by the Company based on Producer's Book of Business ("**Draw**"); provided, however, that the Company may adjust Producer's Draw upward or downward in its discretion to fairly reflect the commissions Producer will likely earn based on Producer's Book of Business.   The Draw shall be offset by commissions earned by Producer

pursuant to this Agreement.  The Draw will be payable in equal installments by the Company (or another USI Company designated by the Company) according to its normal payroll practices.

3.2 **Calculation of Commissions**.   The Company agrees to pay Producer commissions calculated in accordance with the following policies:

(a) Forty percent (40%) of annual Net Commissions and Fees received by the Company on Client Accounts for New policies (and thirty percent (30%) on New surety products), subject to Section 3.2(e) below, assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies.  For the avoidance of doubt, Producer shall not be paid commissions for New policies on accounts below the account minimums set forth in Section 3.2(e) below.

(b) Twenty-five percent (25%) of annual Net Commissions and Fees received by the Company on Client Accounts for Renewal policies (and thirty percent (30%) on Renewals of surety products and zero percent (0%) on Renewals of personal lines policies), subject to Section 3.2(e) below, assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies.  For the avoidance of doubt, Producer shall not be paid commissions for (i) Renewal policies on personal lines policies or (ii) accounts that fall below the account minimums set forth in Section 3.2(e) below.

(c) An amount determined on a case by case basis by the Company for Client Accounts where a substantial portion of fee based revenue is attributable in whole or part to Producer's efforts as an originating/selling or servicing producer.

(d) An amount determined by the Company's policies then in effect on Client Accounts, including cross-sold business and transferred business, for which Producer is not both the sole originating/selling producer and the sole servicing producer.

(e) No commission will be paid on Client Accounts Coded to Producer that generate annual Net Commissions and Fees of less than Ten Thousand Dollars ($10,000) on commercial property and casualty, or Ten Thousand Dollars ($10,000) on employee benefits. There shall be no account minimum on surety products.

(f) Producer's commissions shall be reduced by payments to co-brokers, sub-brokers, and sub-producers (including commissions and fees), referral fees, and return commissions, so that the Company's total payments to all Persons from the Net Commissions and Fees do not exceed any applicable maximum commission percentages under Company policy as amended from time to time.

(g)  Producer's commissions shall be reduced by, and Producer shall have an ongoing duty to return to the Company, any commissions previously paid to Producer on premiums or fees subsequently refunded or not collected by the Company. Producer shall be subject to any Company policies regarding charges to and/or deductions from commissions in effect at the time such commissions are determined.  Producer shall also be subject to any Company policies, as amended from time to time, regarding bad debts and write-offs from clients that require reimbursement from Producer.

(h)  Producer's commissions shall not be considered earned until all charges and/or deductions have been made pursuant to this Agreement and the Company's compensation policies.  In addition, such commissions only become earned by Producer if: (i) the business transaction is completed during Producer's employment hereunder; and (ii) Producer is still employed hereunder on the date the Company receives such commissions.

3.3  **Payment of Commissions**.  The Company shall calculate, no less often than quarterly, commissions earned by Producer and received by the Company.  Earned commissions shall be offset against:  (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance.  Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after each quarter.  If Producer's Draw and any other applicable offsets for such period exceed Producer's earned commissions, such shortfall may be offset against installments of Producer's Retention Payment under Section 4 and/or installments of Producer's Draw for subsequent quarters and Producer's Draw for the subsequent quarter may be reduced commensurate with current earned commission levels to minimize the risk of a shortfall in the new period.

3.4  **Commissions Upon Termination**.  Producer acknowledges that Producer shall not be eligible to earn or receive any commissions received by the Company after Producer is no longer employed hereunder because Producer will no longer be performing the essential duties of Producer's position which form the basis for such compensation. Accordingly, if Producer's employment hereunder is terminated for any reason, including death, the Company shall calculate commissions earned by Producer and received by the Company prior to Producer's termination.  Earned commissions shall be offset against:  (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance.  Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after the effective date of Producer's termination.  No further commissions shall be due or payable after such payment.  If Producer's Draw and any other applicable offsets for such period exceed Producer's

earned commissions, such shortfall shall be due and payable to the Company within sixty (60) days after the effective date of Producer's termination.

3.5   **Right to Modify**. The Company may modify the policies and terms in Section 3 by giving at least thirty (30) days written notice to Producer, provided, however, that the Company may not modify the commission percentages set forth in Section 3.2(a) and 3.2(b) prior to the end of the Measurement Period without Producer's consent. For the avoidance of doubt, the Company may modify any commission percentages following the end of the Measurement Period.  Producer's continued employment hereunder following any change shall be considered sufficient consideration for, and acceptance of, such change.

3.6   **Tax Withholding**. The Company shall deduct from all payments and benefits under this Agreement any taxes required to be withheld and/or paid pursuant to federal, state and local taxing authorities.

3.7   **Benefits**. Producer shall be entitled to benefits, other than paid time off, on the same terms generally provided to similar employees of the Company.  Notwithstanding the foregoing, nothing contained in this Agreement shall require the Company to establish, maintain or continue any of the benefit plans already in existence or hereafter adopted for producers of the Company, or restrict the right of the Company to amend, modify or terminate such benefit plans.

3.8   **Paid Time Off**.  Producer shall not accrue or be entitled to any paid time off ("**PTO**") under this Agreement or the Company's PTO policy.

4.   **RETENTION BONUS PAYMENT.**  Producer shall be eligible for a special retention bonus payment (the "**Retention Payment**").

4.1   **Amount.**  The amount of the Retention Payment shall be equal to ninety percent (90%) of the average annual Net Commissions and Fees received by the Company (subject to the exceptions set forth at the end of this Section 4.1) in each case, for Client Accounts assigned and Coded to Producer as the sole originating/selling and sole servicing employee during each of (a) the period beginning on the first anniversary of the Effective Date and ending one (1) day prior to the second anniversary of the Effective Date, (b) the period beginning on the second anniversary of the Effective Date and ending one (1) day prior to the third anniversary of the Effective Date and (c) the period beginning on the third anniversary of the Effective Date and ending one (1) day prior to the fourth anniversary of the Effective Date (collectively, the "**Measurement Period**"). By way of example, if the Effective Date is December 1, 2017, and Net Commissions and Fees in Producer's book of business (subject to the exceptions set forth at the end of this Section 4.1) are $900,000 for the year beginning December 1, 2018 and ending November 30, 2019 $1,000,000 for the year beginning December 1, 2019 and ending

November 30, 2020, and $1,100,000 for the year beginning December 1, 2020 and ending November 30, 2021, the amount of the Retention Payment would be $900,000 (the average of $900,000, $1,000,000 and $1,100,000 equals $1,000,000, multiplied by ninety percent (90%) equals thereto). When calculating the Net Commissions and Fees received by the Company, the following Net Commissions and Fees shall be excluded and not counted toward the Retention Payment (i) Client Accounts transferred to Producer by the Company or a USI Company, (ii) life insurance, other heaped commission life and health insurance products, and any heaped commission property and casualty insurance products, (iii) Net Commissions and Fees for Client Accounts that do not meet the account minimums required to receive commissions as set forth in this Agreement, any amendment thereto or any modification pursuant to Section 3.5, and (iv) large, non-recurring, and unusual commissions and fees, each as reasonably determined by the Company.

4.2   **Timing and Eligibility.** The Company shall pay Producer fifty percent (50%) of the Retention Payment within forty-five (45) days following the end of the Measurement Period, and the remaining fifty percent (50%) of the Retention Payment shall be paid to Producer on the payroll date immediately following the first anniversary of the payment of the first installment. Continuing on with the example in Section 4.1 above, the first installment of $450,000 would be paid within forty-five (45) days after November 30, 2021, and the remaining installment of $450,000 would be paid on the payroll date immediately following the one (1) year anniversary of the date of payment of the first installment. If Producer's employment with the Company terminates or Producer is not actively employed on the dates the installment payments under this Section 4.2 are due, Producer shall not earn or be paid such installment. Notwithstanding the foregoing, if Producer is employed by the Company as of the last day of the Measurement Period and the Company thereafter terminates Producer's employment without Cause, or Producer's employment terminates by reason of death or disability, or if Producer becomes employed by a successor or assign of the Company, then Producer or Producer's estate shall nevertheless be eligible to receive any installment payment Producer would otherwise be eligible to receive, in accordance with the timetable set forth in this Section 4.2. For the avoidance of doubt, if (i) the Company terminates Producer's employment with Cause before or after the Measurement Period, (ii) Producer resigns or terminates employment for reasons other than death or disability after the Measurement Period, or (iii) Producer is not actively employed with the Company for any reason before the end of the Measurement Period, then in each case, Producer shall not earn or be paid any installment of the Retention Payment that Producer has not already been paid. Each installment of the Retention Payment is subject to offset as set forth in Section 3.3.

5.   **EXPENSES**. During the Term, the Company shall reimburse Producer, in accordance with and subject to Company and USI policy, as amended from time to time, for expenses

reasonably and properly incurred by Producer in connection with the performance of Producer's duties hereunder and the conduct of the business of the Company.

6. **COMPANY PROPERTY**.  Producer acknowledges and agrees all Confidential Information of the Company, including information transferred from any Predecessor under the Purchase Agreement, and/or of the USI Companies, which Producer has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Producer's employment.  Producer further acknowledges and agrees that Producer has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

7. **COVENANTS**

7.1 *Confidential Information*.  The Company agrees to provide Producer with Confidential Information to assist Producer in the course and scope of Producer's duties.  Producer acknowledges that the Company's agreement to provide this Confidential Information to Producer is in consideration for, and ancillary to, Producer's agreement to the other terms in this Agreement.

7.2 *Confidentiality During and Following Term*.  During the Term and for five (5) years after Producer is no longer employed hereunder, for any reason, Producer will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except:  (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Producer shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure).

7.3 *Defend Trade Secrets Act Required Notice*.  Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Producer acknowledges and understands that:

(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that:  (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the

Matthew Simmons
Producer – SALES EXEC 1
(FL) 2016v1
NAI-1503031780v1

11

individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

7.4 **Assignment and Ownership of Intellectual Property**.  Producer acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law. To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Producer is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Producer hereby irrevocably transfers and assigns to the Company all rights, title and interest Producer may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Producer may have or acquire therein. "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Producer in whole or in part during the Term:  (a) using Producer's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Producer's work for the Company.

7.5 **Non-Solicitation of Clients and Active Prospective Clients**.   In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity:

(i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

7.6  ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients.***  In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

7.7  ***Non-Interference With Employees.***  In consideration of Producer's employment with the Company, and for other good and valuable consideration, Producer agrees, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company.

7.8 **Tolling**. Producer agrees the duration of the covenants in this Agreement shall be extended by any period of time in which Producer is in breach of any such obligations and the extended duration shall be measured from the date of the court order granting injunctive relief.

7.9 **Purpose of Restrictions**. The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Producer's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill. Producer agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

7.10 **Modification**. If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

7.11 **Independent Enforcement**. Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Producer against the Company or any USI Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Producer or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 7 of this Agreement. The Company shall not be barred from enforcing any of the covenants in Section 7 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Producer.

## 8. TERMINATION

8.1 **Termination by the Company**. The Company may terminate Producer's employment hereunder by giving written notice to Producer. The termination of employment shall be effective on the date specified in such notice.

8.2 **Termination by Producer**. Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the

Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

8.3 **Payments Upon Termination**.   If Producer's employment hereunder is terminated pursuant to Section 8, the Company shall:  (a) reimburse Producer for any expenses properly incurred through the date of termination pursuant to Section 5; and (b) pay Producer any earned and payable commissions through the date of termination (in excess of Producer's Draw and any other applicable offsets) pursuant to Section 3.4.

8.4 **Miscellaneous Termination Provisions**.   Upon termination of Producer's employment hereunder, Producer hereby irrevocably promises to:

(a) Immediately return to the Company any and all property of any of the USI Companies in Producer's possession or control, including electronic devices and equipment, corporate credit cards and building keys, including any and all such property acquired as a result of employment with any Predecessor.

(b) Immediately destroy or return to the Company, as directed by the Company, any and all documents, data or other materials (and all copies thereof) in Producer's possession or control, whether in written, digital or other form, which contain or refer to any Confidential Information, including any and all such materials acquired as a result of employment with any Predecessor.

(c) Not access any of the USI Companies' internal or restricted premises, records, files, databases, networks, websites, emails, voicemails, or other communications.

(d) For two (2) years after Producer is no longer employed hereunder, for any reason, provide each new employer with a copy of Section 7 of this Agreement prior to taking any position with such new employer.

(e) Subject to obligations under applicable laws and regulations, not publicly make any statements or comments that disparage the reputation of any of the USI Companies or their senior officers or directors.

9. **REMEDIES**.  Producer acknowledges:  (a) the services to be rendered by Producer are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Producer's breach of Section 7 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Producer agrees, if Producer violates Section 7 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without

limitation, temporary injunction and permanent injunction. Producer agrees to waive any requirement for the Company to post a bond.

10. **PRODUCER'S REPRESENTATIONS AND WARRANTIES**

10.1 ***Disclosure of Agreements; No Conflict***. Producer represents and warrants that Producer has supplied to the Company all agreements between Producer and any Person, other than the Company, that employed or otherwise retained Producer within the past five (5) years. Producer further represents and warrants that Producer's execution of this Agreement and performance of the duties contemplated hereunder do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Producer is bound.

10.2 ***No Confidential Information***. Producer represents and warrants that Producer has not taken any confidential information from any Person that employed or otherwise retained Producer, that Producer has no such confidential information in Producer's possession or control, and that Producer will not use any such confidential information in the performance of Producer's duties hereunder.

10.3 ***No Copyright Materials***. Producer represents and warrants that Producer has not taken any copyrighted materials from any Person that employed or otherwise retained Producer, that Producer has no such copyrighted materials in Producer's possession or control, and that Producer will not use any such copyrighted materials in the performance of Producer's duties hereunder.

10.4 ***No Restrictive Purchase Agreements***. Except with regard to any employment agreements with the Company, Producer represents and warrants that Producer is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not, which prevents or restricts Producer from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

10.5 ***Clients of Former Employers or Entities***. Producer represents and warrants to the Company that, during any period of time in which such Producer was subject to any restrictions prohibiting Producer from competing with, or soliciting the clients, customers or business of such other organization, individual or business entity, that Producer has not made any contact with any clients of any Person that employed or otherwise retained Producer, within the past five (5) years, concerning Producer's business relationship with the Company or concerning a prospective business relationship with such client in violation of such restrictive covenant. Producer further represents and warrants that Producer will not, without prior express direction of the

Regional CEO, solicit any clients of any Person that employed or otherwise retained Producer, within the past five (5) years in violation of such restrictive covenant.

10.6 ***Employees of Former Employers or Entities***. Producer represents and warrants that Producer has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Producer, within the past five (5) years, concerning a prospective employment relationship with the Company.

10.7 ***No Ownership Rights to Client Accounts***. Producer represents and warrants to the Company that Producer has no direct or indirect ownership rights to any Client Accounts of the Company and expressly acknowledges that the Client Accounts are owned by the Company and/or a USI Company.

11. **ENTIRE AGREEMENT**. No agreements or representations, oral or otherwise, express or implied, have been made with respect to Producer's employment hereunder except as set forth in this Agreement. This Agreement supersedes and preempts any prior oral or written understandings, agreements or representations by or between Producer and the Company or any Predecessor, including without limitation, any previous employment or other similar agreement between the Producer and the Company or any Predecessor, which may have related to the subject matter hereof in any way.

12. **AMENDMENT**. Except as set forth in Sections 3.5, 7.10, 14, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

13. **GOVERNING LAW**. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflicts of law.

14. **SEVERABILITY**. The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the minimum extent and in the manner necessary to render it valid, legal, and enforceable. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

15. **WAIVERS**. No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default. Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

16. **ASSIGNMENT**.  Producer may not assign any rights (other than the right to receive income hereunder) under this Agreement without the prior written consent of the Company. Producer's obligations under this Agreement inure to the Company, its successors and assigns.  The Company may, at any time and without Producer's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor.  Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**WELLS FARGO INSURANCE SERVICES USA, INC.**      **PRODUCER**

By: _____      By: _____

    Ernest J. Newborn, II                     Matthew Simmons
    Secretary

Matthew Simmons
Producer – SALES EXEC 1
(FL) 2016v1
NAI-1503031780v1

# EXHIBIT C

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT ("**Agreement**"), effective as of September 30, 2019 (the "**Effective Date**"), by and between USI Insurance Services LLC ("**Company**"), a Delaware limited liability company, and Jack Mitchell ("**Producer**"). The Company and Producer are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

### RECITALS

WHEREAS, the Company is a subsidiary of USI Advantage Corp. ("**USI**"), a Delaware corporation.

WHEREAS, the Company desires to employ Producer on the terms and conditions herein and Producer is willing to accept employment on such terms and conditions.

WHEREAS, Producer's covenants herein are a material inducement for the Company to enter into this Agreement.

WHEREAS, Producer acknowledges and agrees that by virtue of employment hereunder, Producer will receive a direct financial benefit and other good and valuable consideration.

WHEREAS, by virtue of employment hereunder, Producer:

(a) will have access to, and gain knowledge of, Confidential Information of the Company and the USI Companies, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company;

(b) will have significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to the Company's customers and suppliers and, as such, will develop close and direct relationships with such customers and suppliers;

(c) will develop close and direct relationships with the Company's officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations;

(d) will benefit from the Company's investment of time, money and trust in Producer and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, will have the ability to harm or threaten the Company's legitimate business interests;

(e) will make use of Producer's significant skills, training and experience; and

(f)   for these and other reasons, will render services to the Company that Producer acknowledges are special, unique or extraordinary.

WHEREAS, Producer acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests.

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, including Producer's employment with the Company, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

## AGREEMENT

1. **DEFINITIONS**. Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

   (a)   "**Active Prospective Client**" means any Person or group of Persons the Company specifically solicited or had documented plans to solicit within the last six (6) months of Producer's employment hereunder.

   (b)   "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by a USI Company for such carrier or other entity) which is or was serviced by a USI Company in connection with such USI Company's business, regardless of whether such services are provided by, or through the licenses of a USI Company or any shareholder, employee or agent of a USI Company.

   (c)   "**Coded to Producer**" means all policies and other business coded to Producer, as determined in good faith by the Company based on standards generally used in the insurance industry.   In the event of a dispute it shall be the Company's sole and absolute discretion to determine the coding attributable to Producer.

   (d)   "**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product.   Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(e)  "**Competitive Product**" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the USI Companies, in existence, which Producer or the Company has sold, marketed, distributed or developed in the last two (2) years of Producer's employment with the Company, or about which Producer has acquired Confidential Information.

(f)  "**Confidential Information**" means any information of the Company or a USI Company that is not generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to:  (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Company's Client Accounts or Active Prospective Clients; (ii) types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Company's Client Accounts or Active Prospective Clients; (iii) terms and conditions of benefits and compensation plans of the Company's Client Accounts or Active Prospective Clients; (iv) information furnished to the Company in confidence by any Client Account or Active Prospective Client; (v) business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company and its corporate affiliates; (vi) lists of the Company's Client Accounts or Active Prospective Clients, and any analyses and compilations thereof; (vii) data, analyses, lists, and business methodologies regarding prospective employees, candidates or Company hiring targets of the Company; (viii) compilations and lists of names and other personally identifiable information regarding Company employees; (ix) information that is password-protected; (x) all internal memoranda and other office records, including electronic and data processing files and records; (xi) all other proprietary information, including any information contained within a proprietary database and workbook product binders including without limitation OMNI Solutions Workbooks, OMNI Library Pages, OMNI Case Studies, and other OMNI Work Product;; and (xii) all other information that constitutes a trade secret under applicable law.

(g)  "**Goodwill**" means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's investment in repeated contacts, business transactions, Confidential Information, and other efforts to develop lasting relationships.

(h)  "**Net Commissions and Fees**" means all commissions and fees received and actually collected by the Company, specifically on a policy Coded to Producer, less payments to external service providers such as, but not limited to vendors and value-added service providers, and/or to other USI Companies, and any sponsorships and/or charitable contributions made to a client by the Company, unless otherwise provided

for by local USI practice.  "Net Commissions and Fees" shall not include any overrides or profit-sharing; interest on premiums on deposit; or contingent, bonus, excess, supplemental, non-standard, annually computed, non-specific volume based, or any other similar commissions or fees.

(i)   "**New**" means any policy lines of coverage for a new client or any new policy lines of coverage for an existing client written by the Company or the other USI Companies, as the case may be.  New will not encompass any client for which similar coverage was "In-Force" in the previous twelve (12) months and such business will be considered Renewal business.  For policies with a coverage period of more than twelve (12) months, New shall be determined by the Company in accordance with the Company's policies in effect at such time.

(j)   "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(k)   "**New Business Appointment**" means a meeting with an Active Prospective Client, provided: (i) such meeting is documented in advance in UEngage with a completed OMNI; (ii) such Active Prospective Client, it converted into a Client Account, would be expected to generate annual Net Commissions and Fees that satisfy the minimum account revenue in Section 3.5(f); and (iii) such Active Prospective Client has not been credited as a New Business Appointment within the past twelve (12) months.

(l)   "**Producer's Book of Business**" means the annual Net Commissions and Fees received by the Company on Client Accounts Coded to Producer.

(m)   "**Renewal**" means the second and any subsequent year of any New coverage.  For policies with a coverage period of more than twelve (12) months, Renewal shall be determined by the Company in accordance with the Company's policies in effect at such time.

(n)   "**USI Business**" means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(o)   "**USI Companies**" or "**USI Company**" means USI Advantage Corp., a Delaware Corporation, its subsidiaries (including the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

2.   **POSITION, RESPONSIBILITIES AND TERM**

2.1.  **Position and Responsibilities**.  On the terms and conditions in this Agreement, the Company shall employ Producer as a Producer.  Producer shall perform all services and duties customarily attendant to such position, including the goals outlined in any applicable Producer expectation form as amended from time to time, and such other services and duties commensurate with such position as prescribed from time to time by Producer's Regional CEO or his/her designee (hereinafter, the "**Regional CEO**").  Nothing in this Agreement shall confer upon Producer any right to continued employment hereunder.

2.2.  **Insurance Licenses**.  Producer shall obtain and retain the proper licenses for all lines of insurance solicited and serviced by Producer.  Notwithstanding anything to the contrary in this Agreement, Producer acknowledges Producer is not entitled to any commissions for sales or servicing of policies within a line of insurance if Producer is not properly licensed for such line of insurance.

2.3.  **No Conflicts of Interest**.  During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company.  Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

2.4.  **Duty of Loyalty**.  Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of the USI Companies.

2.5.  **Term**.  Producer's employment hereunder shall commence on the Effective Date and continue until terminated pursuant to Section 7 (the "**Term**").

3.  **COMPENSATION AND BENEFITS**

3.1.  **Base Salary Through Conversion**.  From the Effective Date through (a) Producer's first four (4) calendar years of employment hereunder (i.e. through December 31, 2022) (or a later date in the Company's discretion) or (b) until the date on which Producer validates his/her Base Salary as determined by the Company (e.g. Producer's Book of Business exceeds four (4) times an amount equal to Producer's Base Salary plus the maximum annual New Business Appointment Bonus in the amount of Twelve Thousand Dollars ($12,000) (or a later date in the Company's discretion), whichever occurs first (hereinafter "**Producer's Conversion Date**"), to the extent Producer remains employed hereunder, the Company agrees to pay Producer a base salary in the annual amount of Sixty Eight Thousand Dollars ($68,000) ("**Base Salary**"); provided, however, the Company may adjust Producer's Base Salary upward or downward in its discretion and/or pursuant to Company polices as amended from time to time.  The Base Salary will be payable in equal installments in accordance with the Company's normal payroll practices.

3.2. ***New Business Appointment Bonus Through Conversion***.  From the Effective Date through Producer's Conversion Date, to the extent Producer remains employed hereunder, the Company agrees to pay Producer a bonus equal to One Thousand Dollars ($1,000) for each calendar month in which Producer conducts and attends at least five (5) New Business Appointments in such month (the **"New Business Appointment Bonus"**) provided that (i) the median amount of the annual Net Commissions and Fees expected from the five (5) or more monthly qualified Active Prospective Clients is at least Twenty Thousand Dollars ($20,000); and (ii) a Practice Leader must "ride along" with Producer for at least two (2) of the five (5) or more monthly first appointments; and (iii) at least two (2) or more of the monthly first appointments that include a Practice Leader "ride along" must be opportunities that have expected annual Net Commissions and Fees of at least Twenty Thousand Dollars ($20,000).

   (a)   During the period beginning from the Effective Date through the end of the first full calendar month of employment, only, Producer will not have to satisfy the requirements in Sections 3.2 (i), (ii) and (iii), above, for the New Business Appointment Bonus, and will receive  a New Business Appointment Bonus of $1,000 for such period, which will be paid on the first regular payroll following the completion of the first full calendar month of employment. Thereafter, the Producer must satisfy the requirements in Sections 3.2 (i), (ii) and (iii), above, for the New Business Appointment Bonus.

   (b)   Each New Business Appointment Bonus, if any, shall be due and payable no later than thirty (30) days after each respective monthly bonus period; provided, however, Producer shall not earn or receive any bonus herein unless Producer is still actively employed hereunder on the respective bonus payment date.

   (c)   If Producer fails to meet all requirements required to remain on Producer funding per the Company policy, as amended from time to time, then Producer will no longer be eligible to earn or receive any New Business Appointment Bonus.

3.3. ***Production Bonus Through Conversion***.  From the Effective Date through Producer's Conversion Date, to the extent Producer remains employed hereunder, Producer shall be eligible for the bonuses herein (the "**Production Bonuses**").  Each Production Bonus, if any, shall be due and payable as soon as it can be reasonably calculated but no later than sixty (60) days after each respective bonus period; provided, however, Producer shall not earn or receive any bonus herein unless Producer is still actively employed hereunder on the respective bonus payment date.

   (a)   During calendar year 2019 or through Producer's Conversion Date, whichever occurs first, if the annual Net Commissions and Fees received by the Company on Client Accounts for New and Renewal policies Coded to Producer as the sole originating/selling and sole servicing producer exceed one hundred percent (100%) of an amount equal to Producer's pro-rated average annual Base Salary plus the pro-

rated maximum annual New Business Appointment Bonus Amount for such calendar year (such calculation resulting in the "2019 Threshold") , the Company shall pay Producer, subject to the minimum account threshold in Section 3.5(f) and the adjustments in Sections 3.5(g) to 3.5(i), a bonus equal to thirty percent (30%) of such Net Commissions and Fees that exceed the 2019 Threshold.

(b) During calendar year 2020 or through Producer's Conversion Date, whichever occurs first, if the annual Net Commissions and Fees received by the Company on Client Accounts for New and Renewal policies Coded to Producer as the sole originating/selling and sole servicing producer exceed one hundred percent (100%) of an amount equal to Producer's average annual Base Salary plus the maximum annual New Business Appointment Bonus Amount) for such calendar year (such calculation resulting in the "2020 Threshold"), the Company shall pay Producer, subject to the minimum account threshold in Section 3.5(f) and the adjustments in Sections 3.5(g) to 3.5(i) a bonus equal to thirty percent (30%) of such Net Commissions and Fees that exceed the 2020 Threshold.

(c) During calendar year 2021 or through Producer's Conversion Date, whichever occurs first, if the annual Net Commissions and Fees received by the Company on Client Accounts for New and Renewal policies Coded to Producer as the sole originating/selling and sole servicing producer exceed two hundred percent (200%) of an amount equal to Producer's average annual Base Salary plus the maximum annual New Business Appointment Bonus Amount) for such calendar year (such calculation resulting in the "2021 Threshold"), the Company shall pay Producer, subject to the minimum account threshold in Section 3.5(f) and the adjustments in Sections 3.5(g) to 3.5(i), a bonus equal to thirty percent (30%) of such Net Commissions and Fees that exceed the 2021 Threshold.

(d) During calendar year 2022 or through Producer's Conversion Date, whichever occurs first, if the annual Net Commissions and Fees received by the Company on Client Accounts for New and Renewal policies Coded to Producer as the sole originating/selling and sole servicing producer exceed three hundred percent (300%) of an amount equal to Producer's average annual Base Salary plus the maximum annual New Business Appointment Bonus Amount) for such calendar year (such calculation resulting in the "2022 Threshold"), the Company shall pay Producer, subject to the minimum account threshold in Section 3.5(f) and the adjustments in Sections 3.5(g) to 3.5(i), a bonus equal to thirty percent (30%) of such Net Commissions and Fees that exceed the 2022 Threshold.

3.4. ***Draw After Conversion***. Commencing after Producer's Conversion Date, the Company agrees to pay Producer commissions, calculated pursuant to Section 3.5, and a recoverable draw against such future commissions in an amount determined by the Company based on Producer's Book of Business ("**Draw**"); provided, however, the Company may adjust Producer's Draw upward or downward in its discretion to fairly

reflect the commissions Producer will likely earn based on Producer's Book of Business. The Draw shall be earned and offset by commissions earned by Producer pursuant to this Agreement. The Draw will be payable in equal installments by the Company (or another USI Company designated by the Company) according to its normal payroll practices.

3.5. ***Calculation of Commissions***.    Commencing after Producer's Conversion Date, the Company agrees to pay Producer commissions calculated in accordance with the following policies:

(a) Forty percent (40%) of annual Net Commissions and Fees received by the Company on Client Accounts for New policies (except thirty percent (30%) on New Surety business, Builders Risk business, and WRAP products): (i) invoiced and effective on or after Producer's Conversion Date; and (ii) assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies.

(b) Twenty-five percent (25%) of annual Net Commissions and Fees received by the Company on Client Accounts for Renewal policies (except thirty percent (30%) on Renewal Surety business, Builders Risk business, and WRAP products, and zero percent (0%) on Renewals of personal lines policies): (i) invoiced and effective on or after Producer's Conversion Date; and (ii) assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies.

(c) Fifteen percent (15%) of annual Net Commissions and Fees received by the Company on Client Accounts for policies:  (i) transferred by the Company on or after Producer's Conversion Date; and (ii) assigned and Coded to Producer as servicing producer (but not originating/selling producer) in accordance with the Company's producer compensation policies.

(d) An amount determined on a case by case basis by the Company for Client Accounts where a substantial portion of fee based revenue is attributable in whole or part to Producer's efforts as an originating/selling or servicing producer.

(e) An amount determined by the Company's policies then in effect on Client Accounts, except for transferred business in Section 3.5(c), for which Producer is not both the sole originating/selling producer and the sole servicing producer.

(f) No commission will be paid on Client Accounts Coded to Producer that generate annual Net Commissions and Fees of less than Ten Thousand Dollars ($10,000) on commercial property and casualty, or Ten Thousand Dollars ($10,000) on employee benefits. There is no minimum on personal lines.

(g) Producer's commissions shall be reduced by payments to co-brokers, sub-brokers, and sub-producers (including commissions and fees), referral fees, and return commissions, so that the Company's total payments to all Persons from the Net Commissions and Fees do not exceed any applicable maximum commission percentages under Company policy as amended from time to time.

(h) Producer's commissions shall be reduced by, and Producer shall have an ongoing duty to return to the Company, any commissions previously paid to Producer on premiums or fees subsequently refunded or not collected by the Company.  Producer shall be subject to any Company policies regarding charges to and/or deductions from salary and/or commissions in effect at the time such salary and/or commissions are determined.  Producer shall also be subject to any Company policies, as amended from time to time, regarding bad debts and write-offs from clients that require reimbursement from Producer.

(i) Producer's commissions shall not be considered earned until all charges and/or deductions have been made pursuant to this Agreement and the Company's compensation policies.  In addition, such commissions only become earned by Producer if: (i) the business transaction is completed during Producer's employment hereunder; and (ii) Producer is still employed hereunder on the date the Company receives such commissions.

3.6. **Payment of Commissions**.  Commencing after Producer's Conversion Date, the Company shall calculate, no less often than quarterly, commissions earned by Producer and received by the Company.  Earned commissions shall be offset against: (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance.  Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after each quarter.  If Producer's Draw and any other applicable offsets for such period exceed Producer's earned commissions, such shortfall may be offset against installments of Producer's Draw for subsequent quarters and Producer's Draw for the subsequent quarter may be reduced commensurate with current earned commission levels to minimize the risk of a shortfall in the new period.

3.7. **Commissions Upon Termination**.  Producer acknowledges that Producer shall not be eligible to earn or receive any commissions received by the Company after Producer is no longer employed hereunder because Producer will no longer be performing the essential duties of Producer's position which form the basis for such compensation.  Accordingly, if Producer's employment hereunder is terminated for any reason, including death, the Company shall calculate commissions earned by Producer and received by the Company prior to Producer's termination.  Earned commissions shall be offset against: (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance.  Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than

sixty (60) days after the effective date of Producer's termination.  No further commissions shall be due or payable after such payment.  If Producer's Draw and any other applicable offsets for such period exceed Producer's earned commissions, such shortfall shall be due and payable to the Company within sixty (60) days after the effective date of Producer's termination.

3.8. **Right to Modify**.  The Company may modify the policies and terms in Section 3, including any commission percentages or other amounts herein, by giving at least thirty (30) days written notice to Producer.  Producer's continued employment hereunder following any change shall be considered sufficient consideration for, and acceptance of, such change.

3.9. **Tax Withholding**.  The Company shall deduct from all payments and benefits under this Agreement any taxes required to be withheld and/or paid pursuant to federal, state and local taxing authorities.

3.10. **Benefits**.  Producer shall be entitled to benefits, other than paid time off, on the same terms generally provided to similar employees of the Company.  Notwithstanding the foregoing, nothing contained in this Agreement shall require the Company to establish, maintain or continue any of the benefit plans already in existence or hereafter adopted for producers of the Company, or restrict the right of the Company to amend, modify or terminate such benefit plans.

3.11. **Paid Time Off**.  Producer shall not accrue or be entitled to any paid time off ("**PTO**") under this Agreement or the Company's PTO policy.

4. **EXPENSES**.  The Company shall reimburse Producer, in accordance with and subject to Company and USI policy, as amended from time to time, for expenses reasonably and properly incurred by Producer in connection with the performance of Producer's duties hereunder and the conduct of the business of the Company.

5. **COMPANY PROPERTY**.  Producer acknowledges and agrees all Confidential Information of the Company and/or USI Companies, which Producer has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Producer's employment.  Producer further acknowledges and agrees that Producer has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

6. **COVENANTS**

6.1. **Confidential Information**.  The Company agrees to provide Producer with Confidential Information to assist Producer in the course and scope of Producer's duties.  Producer acknowledges that the Company's agreement to provide this Confidential Information to

Producer is in consideration for, and ancillary to, Producer's agreement to the other terms in this Agreement.

6.2. **Confidentiality During and Following Term**.  During the Term and for five (5) years after Producer is no longer employed hereunder, for any reason, Producer will not use or disclose any Confidential Information of the Company or any USI Company except:  (a) in the normal course of business on behalf of the Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Producer shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure).  Producer will also use reasonable efforts to prevent any prohibited use or disclosure by any other Person. Notwithstanding anything in this Agreement to the contrary, nothing contained herein prohibits Producer from reporting, without prior authorization of the Company and without notifying the Company, possible violations of federal law or regulation to the United States Congress or other governmental agency having apparent supervisory authority over the business of the Company, or making other disclosures that are protected under the whistleblower provisions of Federal law or regulation.

6.3. **Defend Trade Secrets Act Required Notice**.  Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Producer acknowledges and understands that:

   (a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

   (b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

6.4. **Assignment and Ownership of Intellectual Property**.  Producer acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law.  To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Producer is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Producer hereby irrevocably transfers and assigns to the Company all rights, title and

interest Producer may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Producer may have or acquire therein. "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Producer in whole or in part during the Term: (a) using Producer's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Producer's work for the Company.

6.5.   ***Non-Solicitation of Clients and Active Prospective Clients***.  In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees:

   (a)   During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

   (b)   During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

6.6.   ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients***.  In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees:

(a)   During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

(b)   During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

6.7.   ***Non-Interference With Employees***.   In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employees to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company.

6.8.   ***Tolling***.   Producer agrees the duration of the covenants in this Agreement shall be extended by any period of time in which Producer is in breach of any such obligations and the extended duration shall be measured from the date of the court order granting injunctive relief.

6.9.   ***Purpose of Restrictions***.   The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Producer's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill.   Producer agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

6.10.   ***Modification***.   If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum

permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

6.11. ***Independent Enforcement***. Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Producer against the Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Producer or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 6 of this Agreement. The Company shall not be barred from enforcing any of the covenants in Section 6 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Producer.

## 7. **TERMINATION**

7.1. ***Termination by the Company***. The Company may terminate Producer's employment hereunder by giving written notice to Producer. The termination of employment shall be effective on the date specified in such notice.

7.2. ***Termination by Producer***. Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

7.3. ***Payments Upon Termination***. If Producer's employment hereunder is terminated pursuant to Section 7, the Company shall: (a) reimburse Producer for any expenses properly incurred through the date of termination pursuant to Section 4; (b) pay Producer any earned but unpaid Base Salary through the date of termination pursuant to Section 3.1; and (c) pay Producer any earned and payable commissions through the date of termination (in excess of Producer's Draw and any other applicable offsets) pursuant to Section 3.7.

7.4. ***Miscellaneous Termination Provisions***. Upon termination of Producer's employment hereunder, Producer hereby irrevocably promises to:

(a) Immediately return to the Company any and all property of any of the USI Companies in Producer's possession or control, including electronic devices and equipment, corporate credit cards, and building keys.

(b)   Immediately destroy or return to the Company, as directed by the Company, any and all documents, data or other materials (and all copies thereof) in Producer's possession or control, whether in written, digital or other form, which contain or refer to any Confidential Information.

(c)   Not access any of the USI Companies' internal or restricted premises, records, files, databases, networks, websites, emails, voicemails, or other communications.

(d)   For two (2) years after Producer is no longer employed hereunder, for any reason, provide each new employer with a copy of Section 6 of this Agreement prior to taking any position with such new employer.

(e)   Subject to obligations under applicable laws and regulations, not publicly make any statements or comments that disparage the reputation of any of the USI Companies or their senior officers or directors.

8.   **REMEDIES**.  Producer acknowledges:  (a) the services to be rendered by Producer are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Producer's breach of Section 6 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation.  Accordingly, Producer agrees, if Producer violates Section 6 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction.  Producer agrees to waive any requirement for the Company to post a bond.

9.   **PRODUCER'S REPRESENTATIONS AND WARRANTIES**

9.1.   ***Disclosure of Agreements; No Conflict***.  Producer represents and warrants that Producer has supplied to the Company all agreements between Producer and any Person that employed or otherwise retained Producer within the past five (5) years.  Producer further represents and warrants that Producer's execution of this Agreement and performance of the duties contemplated hereunder do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Producer is bound.

9.2.   ***No Confidential Information***.  Producer represents and warrants that Producer has not taken any confidential information from any Person that employed or otherwise retained Producer, that Producer has no such confidential information in Producer's possession or control, and that Producer will not use any such confidential information in the performance of Producer's duties hereunder.

9.3.  **No Copyright Materials**.  Producer represents and warrants that Producer has not taken any copyrighted materials from any Person that employed or otherwise retained Producer, that Producer has no such copyrighted materials in Producer's possession or control, and that Producer will not use any such copyrighted materials in the performance of Producer's duties hereunder.

9.4.  **No Restrictive Purchase Agreements**.  Producer represents and warrants that Producer is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not, which prevents or restricts Producer from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

9.5.  **Clients of Former Employers or Entities**.  Producer represents and warrants that, during any period of time in which Producer was subject to any restrictions prohibiting Producer from competing with, or soliciting the clients, customers or business of such other organization, individual or business entity, Producer has not made any contact with any clients of any Person that employed or otherwise retained Producer, within the past five (5) years, concerning Producer's business relationship with the Company or concerning a prospective business relationship with such client in violation of such restrictive covenant. Producer further represents and warrants that Producer will not, without prior express direction of the Regional CEO, solicit any clients of any Person that employed or otherwise retained Producer, within the past five (5) years in violation of such restrictive covenant.

9.6.  **Employees of Former Employers or Entities**.  Producer represents and warrants that Producer has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Producer, within the past five (5) years, concerning a prospective employment relationship with the Company.

10.  **ENTIRE AGREEMENT**.  No agreements or representations, oral or otherwise, express or implied, have been made with respect to Producer's employment hereunder except as set forth in this Agreement and the Company's offer letter with Exhibit A attached thereto. This Agreement supersedes and cancels any prior agreement between the Parties regarding Producer's employment with the Company or any USI Company.

11.  **AMENDMENT**.  Except as set forth in Sections 3.8, 6.10, 13, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

12.  **GOVERNING LAW**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflicts of law.

13. **SEVERABILITY**.  The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable.  In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render it valid, legal, and enforceable.  If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

14. **WAIVERS**.  No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default.  Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

15. **ASSIGNMENT**.  Producer may not assign any rights (other than the right to receive income hereunder) under this Agreement without the prior written consent of the Company.  Producer's obligations under this Agreement inure to the Company, its successors and assigns.  The Company may, at any time and without Producer's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor.  Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the dates set forth below.

**USI Insurance Services LLC**                 **Producer**

By: _____          By: _____
　　　　Thomas C. Longhta                              Jack Mitchell
　　　　Regional Chief Executive Officer

Date: _____          Date: _____

# EXHIBIT D

## CONFIDENTIALITY, NON-SOLICITATION & NON-INTERFERENCE AGREEMENT

This CONFIDENTIALITY, NON-SOLICITATION & NON-INTERFERENCE AGREEMENT ("**Agreement**"), effective as of the **Effective Date** (as defined below), is by and between Wells Fargo Insurance Services USA, Inc., a North Carolina corporation (the "**Company**") and Sheila L. Murray ("**Employee**").  The Company and Employee are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

### RECITALS

WHEREAS, pursuant to that certain Stock Purchase Agreement (the "**Purchase Agreement**") by and between USI Insurance Services LLC, a Delaware limited liability company ("**USI LLC**") and Wells Fargo & Company, a Delaware corporation ("**Seller**"), USI LLC will purchase from Seller all of the issued and outstanding shares of capital stock of ACO Brokerage Holdings Corporation, a Delaware corporation ("**ACO**"); and

WHEREAS, ACO owns, directly or indirectly, all of the issued and outstanding equity interests of the Company; and

WHEREAS, contingent upon the closing of the transactions contemplated by the Purchase Agreement (the "**Closing**"), and provided this Agreement is accepted in full by Employee, the Company desires to employ Employee on the terms and conditions herein and Employee is willing to accept employment on such terms and conditions; and

WHEREAS, Employee's covenants herein are a material inducement for the Company to enter into an at-will employment relationship with Employee pursuant to this Agreement; and

WHEREAS, Employee hereby acknowledges and agrees that the Retention Payment (as defined below) is a separate and additional payment to which Employee is not otherwise entitled and constitutes material and sufficient consideration to induce Employee to enter into this Agreement; and

WHEREAS, Employee acknowledges and agrees that by virtue of employment with the Company, Employee will receive a direct financial benefit and other good and valuable consideration; and

WHEREAS, by virtue of past employment with the Company or any Predecessor and future employment with the Company, Employee:

(a)  had, has, and will continue to have, as applicable, access to, and has gained and will continue to gain knowledge of, Confidential Information of the Company, any Predecessor and/or any USI Company, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company or any USI Company; and

AE Confidentiality, NS & NI Agreement
(USI All States Except AZ, CA, CO, GA, MN, ND, NV, VA) 2017v1
NAI-1502996825v2

(b)   had, has, and will have, as applicable, significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to certain of the Company's customers and suppliers and, as such, has developed, will develop, and/or will continue to develop close and direct relationships with such customers and suppliers; and

(c)   has developed, will continue to develop and/or will develop, as applicable close and direct relationships with the officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations of the Company or any USI Company; and

(d)   has benefitted, will benefit, and/or will continue to benefit, as applicable, from the Company's investment of time, money and trust in Employee and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, had, has, and will continue to have, the ability to harm or threaten the Company's legitimate business interests; and

(e)   has made use of, and will continue to make use, of Employee's significant skills, training and experience; and

(f)   for these and other reasons, will render services to the Company that Employee acknowledges are special, unique or extraordinary; and

WHEREAS, Employee acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests; and

NOW THEREFORE, in consideration of the Employee's employment with the Company, and the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

## AGREEMENT

1. **DEFINITIONS**.  Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

(a) "**Active Prospective Client**" means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Employee's employment with the Company.

(b) "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

(c) "**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product.  Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(d) "**Competitive Product**" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Employee or the Company has sold, marketed, distributed or developed in the last two (2) years of Employee's employment with the Company, or about which Employee has acquired Confidential Information.

(e) "**Confidential Information**" means at any date, any information of the Company, any Predecessor and/or a USI Company to which Employee has access, that is not generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi)

the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof; (vii) the information that is password-protected; (viii) all internal memoranda and other office records, including electronic and data processing files and records; (ix) any and all other proprietary information of the Company, any Predecessor or a USI Company, including any information contained within a proprietary database; and (x) any and all other information that constitutes a trade secret under applicable law.

(f)  "**Effective Date**" means the Closing date.

(g)  "**Goodwill**" means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts, business transactions, Confidential Information, or other efforts to develop lasting relationships.

(h)  "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(i)  "**Predecessor**" means any Person, in its capacity as predecessor-in-interest to the assets of the Company.

(j)  "**USI Business**" means the businesses provided by the Company or the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(k)  "**USI Companies**" or "**USI Company**" means USI Advantage Corp., a Delaware corporation ("**USI**"), its subsidiaries (including USI LLC and the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

2.  **RETENTION BONUS PAYMENT.**  Employee shall be eligible for a special retention bonus payment (the "**Retention Payment**").

2.1  ***Retention Payment.***  The Company shall pay Employee $81,200.00 payable in the following two (2) installments: (i) $10,150.00 paid within forty-five (45) days following the first anniversary of the Effective Date and (ii) $71,050.00 paid within forty-five (45) days following the fourth anniversary of the Effective Date.

2.2 **Eligibility for Retention Payment.** Notwithstanding the foregoing, if Employee's employment with the Company terminates or Employee is not actively employed, for any reason, on the dates the installment payments under Section 2.1 are due, Employee shall not earn or be paid such installment.

3. **COMPANY PROPERTY.** Employee acknowledges and agrees that all Confidential Information of the Company, including information transferred from any Predecessor under the Purchase Agreement, and/or of the USI Companies, which Employee has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Employee's employment. Employee further acknowledges and agrees that Employee has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

4. **COVENANTS**

4.1 **Confidential Information.** The Company agrees to provide Employee with Confidential Information to assist Employee in the course and scope of Employee's duties. Employee acknowledges that the Company's agreement to provide this Confidential Information to Employee is in consideration for, and ancillary to, Employee's agreement to the other terms in this Agreement.

4.2 **Confidentiality During and Following Employment.** During Employee's employment with the Company and for five (5) years after Employee is no longer employed with the Company, for any reason, Employee will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except: (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Employee shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure).

4.3 **Defend Trade Secrets Act Required Notice.** Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Employee acknowledges and understands that:

(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the

individual and use the trade secret information in the court proceeding, if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

4.4 **_Assignment and Ownership of Intellectual Property_**. Employee acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law. To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Employee is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Employee hereby irrevocably transfers and assigns to the Company all rights, title and interest Employee may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Employee may have or acquire therein. "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Employee in whole or in part during Employee's employment with the Company: (a) using Employee's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Employee's work for the Company.

4.5 **_Non-Solicitation of Clients and Active Prospective Clients_**. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees that:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company.

(b)   During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

4.6   ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients***.  In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees that:

(a)   During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company.

(b)   During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

4.7   ***Non-Interference With Employees***.  In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees, during Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (a) solicit the

employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Employee worked or obtained knowledge about as a result of Employee's employment with the Company.

4.8  **Tolling**.  Employee agrees the duration of the covenants in this Agreement shall be extended by any period of time in which Employee is in breach of any such obligations and the extended duration shall be measured from the date of the court order granting injunctive relief.

4.9  **Purpose of Restrictions**.  The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Employee's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill.  Employee agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

4.10  **Modification.**  If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations.  If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced.  The Company may unilaterally limit the scope of these covenants.

4.11  **Independent Enforcement**.  Each of the covenants in this Agreement shall be construed as an agreement independent of (a) any other agreements or (b) any other provision in this Agreement, and the existence of any claim or cause of action by Employee against the Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Employee or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 4 of this Agreement.  The Company shall not be barred from enforcing any of the covenants in Section 4 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Employee.

5.  **REMEDIES**.  Employee acknowledges: (a) the services to be rendered by Employee are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Employee's breach of Section 4 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation.  Accordingly, Employee agrees, if Employee violates Section 4 of this Agreement, the Company shall, in

addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction.  Employee agrees to waive any requirement for the Company to post a bond.

6.  **EMPLOYEE'S REPRESENTATIONS AND WARRANTIES**

6.1  ***Disclosure of Agreements; No Conflict.***  Employee represents and warrants that Employee has supplied to the Company all agreements between Employee and any Person, other than the Company, that employed or otherwise retained Employee within the past five (5) years.  Employee further represents and warrants that Employee's execution of this Agreement and performance of Employee's duties for the Company do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Employee is bound.

6.2  ***No Confidential Information.***  Employee represents and warrants that Employee has not taken any confidential information from any Person that employed or otherwise retained Employee, that Employee has no such confidential information in Employee's possession or control, and that Employee will not use any such confidential information in the performance of Employee's duties for the Company.

6.3  ***No Copyright Materials.***  Employee represents and warrants that Employee has not taken any copyrighted materials from any Person that employed or otherwise retained Employee, that Employee has no such copyrighted materials in Employee's possession or control, and that Employee will not use any such copyrighted materials in the performance of Employee's duties for the Company.

6.4  ***No Restrictive Purchase Agreements.***  Except with regard to any employment agreements with the Company, Employee represents and warrants that Employee is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not, which prevents or restricts Employee from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

6.5  ***Clients of Former Employers or Entities.***  Employee represents and warrants that, during any period of time in which such Employee was subject to any restrictions prohibiting Employee from competing with, or soliciting the clients, customers or business of such other organization, individual or business entity, Employee has not made any contact with any clients of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning Employee's business relationship with the Company or concerning a prospective business relationship with such client in violation of such restrictive covenant.  Employee further represents and warrants that Employee will not,

without prior express direction of the Regional Chief Executive Officer (the "**Regional CEO**"), solicit any clients of any Person that employed or otherwise retained Employee, within the past five (5) years in violation of such restrictive covenant.

6.6   ***Employees of Former Employers or Entities***.   Employee represents and warrants that Employee has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning a prospective employment relationship with the Company.

6.7   ***No Ownership Rights to Client Accounts***.   Employee represents and warrants that Employee has no direct or indirect ownership rights to any Client Accounts of the Company and expressly acknowledges that the Client Accounts are owned by the Company and/or a USI Company.

7.   **AT-WILL EMPLOYMENT**.   Employee understands and agrees that Employee's employment with the Company is at-will and that nothing in this Agreement shall be construed or considered to affect the nature of such at-will employment.

8.   **ADDITIONAL TERMS**

8.1   ***Amendment***.   Except as set forth in Sections 4.10, 8.5, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

8.2   ***Assignment***.   Employee may not assign any rights under this Agreement without the prior written consent of the Company.   Employee's obligations under this Agreement inure to the Company, its successors and assigns.   The Company may, at any time and without Employee's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor.   Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

8.3   ***Entire Agreement***.   This Agreement constitutes the entire agreement between the Parties with respect to the matters specifically referred to herein.   Employee affirms that, in entering into this Agreement, Employee is not relying upon any oral or written promise or statement made by anyone at any time on behalf of the Company.

8.4   ***Governing Law***.   This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflicts of law.

8.5   ***Severability***.   The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable.   In the event any provision of this

Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the minimum extent and in the manner necessary to render it valid, legal, and enforceable.  If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

8.6   *Waivers*.  No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default.  Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

[*Signature Page Follows*]

Sheila L. Murray
AE Confidentiality, NS & NI Agreement
(USI FL) 2017v1
NAI-1502996825v2

11

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**WELLS FARGO INSURANCE SERVICES USA, INC.**          **EMPLOYEE**

By: _____          By: _____

      Name: Ernest J. Newborn, II                Sheila L. Murray
      Title: Secretary

# EXHIBIT E

CONFIDENTIALITY, NON-SOLICITATION & NON-INTERFERENCE AGREEMENT ("**Agreement**"), effective as of  03-Dec-2018 (the "**Effective Date**"), by and between  USI Insurance Services LLC ("**Company**"), a Delaware limited liability company, and Jackie Rodriguez ("**Employee**"). The Company and Employee are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, the Company is a subsidiary of USI Advantage Corp. ("USI"), a Delaware corporation.

WHEREAS, the Company desires to hire Employee.

WHEREAS, Employee's covenants herein are a material inducement for the Company to enter into an at-will employment relationship with Employee.

WHEREAS, Employee acknowledges and agrees that by virtue of employment with the Company, Employee will receive a direct financial benefit and other good and valuable consideration.

WHEREAS, by virtue of employment with the Company, Employee:

(a) will have access to, and gain knowledge of, Confidential Information of the Company and the USI Companies, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company;

(b) will have significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to the      Company's customers and suppliers and, as such, will develop close and direct relationships with such customers and suppliers;

(c) will develop close and direct relationships with the Company's officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations;

(d) will benefit from the Company's investment of time, money and trust in Employee and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, will have the ability to harm or threaten the Company's legitimate business interests;

(e) will make use of Employee's significant skills, training and experience; and

(f) for these and other reasons, will render services to the Company that Employee acknowledges are special, unique or extraordinary.

WHEREAS, Employee acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests.

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the Parties, intending to become legally bound, agree as follows:

## AGREEMENT

1. **DEFINITIONS**. Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

(a) "**Active Prospective Client**" means any Person or group of Persons the Company specifically solicited or had documented plans to solicit within the last six (6) months of Employee's employment with the Company.

(b) "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or

broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by a USI Company for such carrier or other entity) which is or was serviced by a USI Company in connection with such USI Company's business, regardless of whether such services are provided by, or through the licenses of a USI Company or any shareholder, employee or agent of a USI Company.

(c) "**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(d) "**Competitive Product**" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the USI Companies, in existence, which Employee or the Company has sold, marketed, distributed or developed in the last two (2) years of Employee's employment with the Company, or about which Employee has acquired Confidential Information.

(e) "**Confidential Information**" means any information of the Company or a USI Company that is not generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Company's Client Accounts or Active Prospective Clients; (ii) types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Company's Client Accounts or Active Prospective Clients; (iii) terms and conditions of benefits and compensation plans of the Company's Client Accounts or Active Prospective Clients; (iv) information furnished to the Company in confidence by any Client Account or Active Prospective Client; (v) business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company and its corporate affiliates; (vi) lists of the Company's Client Accounts or Active Prospective Clients, and any analyses and compilations thereof; (vii) data, analyses, lists, and business methodologies regarding prospective employees, candidates or Company hiring targets of the Company;  (viii) compilations and lists of names and other personally identifiable information regarding Company employees; (ix) information that is password-protected; (x) all internal memoranda and other office records, including electronic and data processing files and records; (xi) all other proprietary information, including any information contained within a proprietary database and workbook product binders including without limitation OMNI Solutions Workbooks, OMNI Library Pages, OMNI Case Studies, and other OMNI Work Product; and (xii) all other information that constitutes a trade secret under applicable law.

(f) "**Goodwill**" means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's investment in repeated contacts, business transactions, Confidential Information, and other efforts to develop lasting relationships.

(g) "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(h) "**USI Business**" means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(i) "**USI Companies**" or "USI Company" means USI, Inc., a Delaware Corporation, its subsidiaries (including the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

2. **COMPANY PROPERTY**. Employee acknowledges and agrees all Confidential Information of the Company and/or USI Companies, which Employee has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Employee's employment. Employee further acknowledges and agrees that Employee has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

3.1. **Confidential Information**. The Company agrees to provide Employee with Confidential Information to assist Employee in the course and scope of Employee's duties. Employee acknowledges that the Company's agreement to provide this Confidential Information to Employee is in consideration for, and ancillary to, Employee's agreement to the other terms in this Agreement.

3.2. **Confidentiality During and Following Employment**. During Employee's employment with the Company and for five (5) years after Employee is no longer employed with the Company, for any reason, Employee will not use or disclose any Confidential Information of the Company or any USI Company except: (a) in the normal course of business on behalf of the Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Employee shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure). Employee will also use reasonable efforts to prevent any prohibited use or disclosure by any other Person.

3.3. **Defend Trade Secrets Act Required Notice**. Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Employee acknowledges and understands that:
(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.
(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

3.4. **Assignment and Ownership of Intellectual Property**. Employee acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law. To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Employee is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Employee hereby irrevocably transfers and assigns to the Company all rights, title and interest Employee may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Employee may have or acquire therein. "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Employee in whole or in part during Employee's employment with the Company: (a) using Employee's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Employee's work for the Company.

3.5. **Non-Solicitation of Clients and Active Prospective Clients**. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client, Account, or divert or attempt to divert services away from the Company with respect to any Client

Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

3.6. **Non-Acceptance / Non-Service of Clients and Active Prospective Clients** . In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

3.7. **Non-Interference With Employees**. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees, during Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employees to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Employee worked or obtained knowledge about as a result of Employee's employment with the Company.

3.8. **Tolling**. Employee agrees the duration of the covenants in this Agreement shall be extended by any period of time in which Employee is in breach of any such obligations and the extended duration shall be measured from the date of the court order granting injunctive relief.

3.9. **Purpose of Restrictions**. The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Employee's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill. Employee agrees that the time,

geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

Case 8:23-cv-00201-TPB-AAS   Document 1-3   Filed 01/27/23   Page 125 of 143 PageID 308

3.10. **Modification**. If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

3.11. **Independent Enforcement**. Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Employee against the Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Employee or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 3 of this Agreement. The Company shall not be barred from enforcing any of the covenants in Section 3 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Employee.

4. **REMEDIES**. Employee acknowledges: (a) the services to be rendered by Employee are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Employee's breach of Section 3 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Employee agrees, if Employee violates Section 3 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction. Employee agrees to waive any requirement for the Company to post a bond.

5. **EMPLOYEE'S REPRESENTATIONS AND WARRANTIES**

5.1. **Disclosure of Agreements; No Conflict.** Employee represents and warrants that Employee has supplied to the Company all agreements between Employee and any Person that employed or otherwise retained Employee within the past five (5) years. Employee further represents and warrants that Employee's execution of this Agreement and performance of Employee's duties for the Company do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Employee is bound.

5.2. **No Confidential Information.** Employee represents and warrants that Employee has not taken any confidential information from any Person that employed or otherwise retained Employee, that Employee has no such confidential information in Employee's possession or control, and that Employee will not use any such confidential information in the performance of Employee's duties for the Company.

5.3. **No Copyright Materials.** Employee represents and warrants that Employee has not taken any copyrighted materials from any Person that employed or otherwise retained Employee, that Employee has no such copyrighted materials in Employee's possession or control, and that Employee will not use any such copyrighted materials in the performance of Employee's duties for the Company.

5.4. **No Restrictive Purchase Agreements**. Employee represents and warrants that Employee is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past

ten (10) years, whether heretofore expired or not, which prevents or restricts Employee from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

5.5. **_Clients of Former Employers or Entities_**. Employee represents and warrants that Employee has not made any contact with any clients of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning Employee's business relationship with the Company or concerning a prospective business relationship with such client. Employee further represents and warrants that Employee will not, without prior express direction of the Regional CEO, solicit any clients of any Person that employed or otherwise retained Employee, within the past five (5) years.

5.6. **_Employees of Former Employers or Entities_**. Employee represents and warrants that Employee has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning a prospective employment relationship with the Company.

6. **AT-WILL EMPLOYMENT.** Employee understands and agrees that Employee's employment with the Company is at-will and that nothing in this Agreement shall be construed or considered to affect the nature of such at-will employment.

7. **ADDITIONAL TERMS**

7.1. **_Amendment._** Except as set forth in Sections 3.10, 7.5, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

7.2. **_Assignment._** Employee may not assign any rights under this Agreement without the prior written consent of the Company. Employee's obligations under this Agreement inure to the Company, its successors and assigns. The Company may, at any time and without Employee's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor. Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

7.3. **_Entire Agreement_**. This Agreement constitutes the entire agreement between the Parties with respect to the matters specifically referred to herein, and supersedes and cancels all prior and contemporaneous written and oral agreements, if any, between the Parties with respect to the matters specifically referred to herein. Employee affirms that, in entering into this Agreement, Employee is not relying upon any oral or written promise or statement made by anyone at any time on behalf of the Company.

7.4. **_Governing Law_**. This Agreement shall be governed by and construed in accordance with the laws of the State of FL, without regard to principles of conflicts of law.

7.5. **_Severability._** The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render it valid, legal, and enforceable. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

7.6. **Waivers.** No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default. Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

Please review and electronically acknowledge this agreement to confirm your acceptance. The Parties hereto have caused this Agreement to be duly executed and effective as of the date first described above.

By: USI Insurance Services LLC

DocuSigned by:

*Jackie Rodriguez*

1D85AA47EB0F4BB...

DocuSigned by:

*Tom Longhta*

459C3AB3845344E...

Jackie Rodriguez

Confidentiality, NS & NI Agreement

(USI FL) 2018v1

About USI | Property & casualty | Employee Benefits | Personal Risk | Retirement Consulting

©2018 USI Insurance Services. All Rights Reserved.

 

# EXHIBIT F

CONFIDENTIALITY, NON-SOLICITATION & NON-INTERFERENCE AGREEMENT ("**Agreement**"), effective as of 13-Apr-2020 (the "**Effective Date**"), by and between USI Insurance Services LLC ("**Company**"), a Delaware limited liability company, and Emily Carter ("**Employee**"). The Company and Employee are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, the Company is a subsidiary of USI Advantage Corp. ("USI"), a Delaware corporation.

WHEREAS, the Company desires to hire Employee.

WHEREAS, Employee's covenants herein are a material inducement for the Company to enter into an at-will employment relationship with Employee.

WHEREAS, Employee acknowledges and agrees that by virtue of employment with the Company, Employee will receive a direct financial benefit and other good and valuable consideration.

WHEREAS, by virtue of employment with the Company, Employee:

(a) will have access to, and gain knowledge of, Confidential Information of the Company and the USI Companies, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company;

(b) will have significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to the    Company's customers and suppliers and, as such, will develop close and direct relationships with such customers and suppliers;

(c) will develop close and direct relationships with the Company's officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations;

(d) will benefit from the Company's investment of time, money and trust in Employee and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, will have the ability to harm or threaten the Company's legitimate business interests;

(e) will make use of Employee's significant skills, training and experience; and

(f) for these and other reasons, will render services to the Company that Employee acknowledges are special, unique or extraordinary.

WHEREAS, Employee acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests.

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the Parties, intending to become legally bound, agree as follows:

## AGREEMENT

1. **DEFINITIONS**. Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

(a) "**Active Prospective Client**" means any Person or group of Persons the Company specifically solicited or had documented plans to solicit within the last six (6) months of Employee's employment with the Company.

(b) "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or

broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by a USI Company for such carrier or other entity) which is or was serviced by a USI Company in connection with such USI Company's business, regardless of whether such services are provided by, or through the licenses of a USI Company or any shareholder, employee or agent of a USI Company.

(c) "**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(d) "**Competitive Product**" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the USI Companies, in existence, which Employee or the Company has sold, marketed, distributed or developed in the last two (2) years of Employee's employment with the Company, or about which Employee has acquired Confidential Information.

(e) "**Confidential Information**" means any information of the Company or a USI Company that is not generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Company's Client Accounts or Active Prospective Clients; (ii) types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Company's Client Accounts or Active Prospective Clients; (iii) terms and conditions of benefits and compensation plans of the Company's Client Accounts or Active Prospective Clients; (iv) information furnished to the Company in confidence by any Client Account or Active Prospective Client; (v) business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company and its corporate affiliates; (vi) lists of the Company's Client Accounts or Active Prospective Clients, and any analyses and compilations thereof; (vii) data, analyses, lists, and business methodologies regarding prospective employees, candidates or Company hiring targets of the Company; (viii) compliations and lists of names and other personally identifiable information regarding Company employees; (ix) information that is password-protected; (x) all internal memoranda and other office records, including electronic and data processing files and records; (xi) all other proprietary information, including any information contained within a proprietary database and workbook product binders including without limitation OMNI Solutions Workbooks, OMNI Library Pages, OMNI Case Studies, and other OMNI Work Product; and (xii) all other information that constitutes a trade secret under applicable law.

(f) "**Goodwill**" means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's investment in repeated contacts, business transactions, Confidential Information, and other efforts to develop lasting relationships.

(g) "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(h) "**USI Business**" means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(i) "**USI Companies**" or "USI Company" means USI, Inc., a Delaware Corporation, its subsidiaries (including the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

2. **COMPANY PROPERTY**. Employee acknowledges and agrees all Confidential Information of the Company and/or USI Companies, which Employee has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Employee's employment. Employee further acknowledges and agrees that Employee has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

3.1. *Confidential Information*. The Company agrees to provide Employee with Confidential Information to assist Employee in the course and scope of Employee's duties. Employee acknowledges that the Company's agreement to provide this Confidential Information to Employee is in consideration for, and ancillary to, Employee's agreement to the other terms in this Agreement.

3.2. *Confidentiality During and Following Employment*. During Employee's employment with the Company and for five (5) years after Employee is no longer employed with the Company, for any reason, Employee will not use or disclose any Confidential Information of the Company or any USI Company except: (a) in the normal course of business on behalf of the Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Employee shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure). Employee will also use reasonable efforts to prevent any prohibited use or disclosure by any other Person.

3.3. *Defend Trade Secrets Act Required Notice*. Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Employee acknowledges and understands that:
(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.
(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

3.4. *Assignment and Ownership of Intellectual Property*. Employee acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law. To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Employee is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Employee hereby irrevocably transfers and assigns to the Company all rights, title and interest Employee may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Employee may have or acquire therein. "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Employee in whole or in part during Employee's employment with the Company: (a) using Employee's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Employee's work for the Company.

3.5. *Non-Solicitation of Clients and Active Prospective Clients*. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client

Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

3.6. **Non-Acceptance / Non-Service of Clients and Active Prospective Clients** . In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company.

(b) During Employee's employment with the Company and for six (6) months after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last six (6) months of Employee's employment with the Company.

3.7. **Non-Interference With Employees**. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees, during Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employees to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Employee worked or obtained knowledge about as a result of Employee's employment with the Company.

3.8. **Tolling**. Employee agrees the duration of the covenants in this Agreement shall be extended by any period of time in which Employee is in breach of any such obligations and the extended duration shall be measured from the date of the court order granting injunctive relief.

3.9. **Purpose of Restrictions**. The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Employee's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill. Employee agrees that the time,

geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential
Information and Goodwill.

Case 8:23-cv-00201-TPB-AAS   Document 1-3   Filed 01/27/23   Page 133 of 143 PageID 316

3.10. *Modification*. If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

3.11. *Independent Enforcement*. Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Employee against the Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Employee or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 3 of this Agreement. The Company shall not be barred from enforcing any of the covenants in Section 3 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Employee.

4. **REMEDIES**. Employee acknowledges: (a) the services to be rendered by Employee are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Employee's breach of Section 3 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Employee agrees, if Employee violates Section 3 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction. Employee agrees to waive any requirement for the Company to post a bond.

5. **EMPLOYEE'S REPRESENTATIONS AND WARRANTIES**

5.1. *Disclosure of Agreements; No Conflict.* Employee represents and warrants that Employee has supplied to the Company all agreements between Employee and any Person that employed or otherwise retained Employee within the past five (5) years. Employee further represents and warrants that Employee's execution of this Agreement and performance of Employee's duties for the Company do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Employee is bound.

5.2. *No Confidential Information.* Employee represents and warrants that Employee has not taken any confidential information from any Person that employed or otherwise retained Employee, that Employee has no such confidential information in Employee's possession or control, and that Employee will not use any such confidential information in the performance of Employee's duties for the Company.

5.3. *No Copyright Materials.* Employee represents and warrants that Employee has not taken any copyrighted materials from any Person that employed or otherwise retained Employee, that Employee has no such copyrighted materials in Employee's possession or control, and that Employee will not use any such copyrighted materials in the performance of Employee's duties for the Company.

5.4. *No Restrictive Purchase Agreements*. Employee represents and warrants that Employee is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past

ten (10) years, whether heretofore expired or not, which prevents or restricts Employee from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

5.5. **Clients of Former Employers or Entities**. Employee represents and warrants that Employee has not made any contact with any clients of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning Employee's business relationship with the Company or concerning a prospective business relationship with such client. Employee further represents and warrants that Employee will not, without prior express direction of the Regional CEO, solicit any clients of any Person that employed or otherwise retained Employee, within the past five (5) years.

5.6. **Employees of Former Employers or Entities**. Employee represents and warrants that Employee has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning a prospective employment relationship with the Company.

6. **AT-WILL EMPLOYMENT.** Employee understands and agrees that Employee's employment with the Company is at-will and that nothing in this Agreement shall be construed or considered to affect the nature of such at-will employment.

7. **ADDITIONAL TERMS**

7.1. **Amendment.** Except as set forth in Sections 3.10, 7.5, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

7.2. **Assignment.** Employee may not assign any rights under this Agreement without the prior written consent of the Company. Employee's obligations under this Agreement inure to the Company, its successors and assigns. The Company may, at any time and without Employee's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor. Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

7.3. **Entire Agreement**. This Agreement constitutes the entire agreement between the Parties with respect to the matters specifically referred to herein, and supersedes and cancels all prior and contemporaneous written and oral agreements, if any, between the Parties with respect to the matters specifically referred to herein. Employee affirms that, in entering into this Agreement, Employee is not relying upon any oral or written promise or statement made by anyone at any time on behalf of the Company.

7.4. **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of FL, without regard to principles of conflicts of law.

7.5. **Severability.** The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render it valid, legal, and enforceable. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

7.6. **Waivers.** No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default. Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

Please review and electronically acknowledge this agreement to confirm your acceptance. The Parties hereto have caused this Agreement to be duly executed and effective as of the date first described above.

**By: USI Insurance Services LLC**

Emily Carter

Confidentiality, NS & NI Agreement

(USI FL) 2018v1

About USI  |  Property & casualty  |  Employee Benefits  |  Personal Risk  |  Retirement Consulting

©2020 USI Insurance Services. All Rights Reserved.



# EXHIBIT G

CONFIDENTIALITY, NON-SOLICITATION & NON-INTERFERENCE AGREEMENT ("**Agreement**"), effective as of 09-Nov-2020 (the "**Effective Date**"), by and between USI Insurance Services LLC ("**Company**"), a Delaware limited liability company, and Madison Lieffort ("**Employee**"). The Company and Employee are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, the Company is a subsidiary of USI Advantage Corp. ("USI"), a Delaware corporation.

WHEREAS, the Company desires to hire Employee.

WHEREAS, Employee's covenants herein are a material inducement for the Company to enter into an at-will employment relationship with Employee.

WHEREAS, Employee acknowledges and agrees that by virtue of employment with the Company, Employee will receive a direct financial benefit and other good and valuable consideration.

WHEREAS, by virtue of employment with the Company, Employee:

(a) will have access to, and gain knowledge of, Confidential Information of the Company and the USI Companies, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company;

(b) will have significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to the Company's customers and suppliers and, as such, will develop close and direct relationships with such customers and suppliers;

(c) will develop close and direct relationships with the Company's officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations;

(d) will benefit from the Company's investment of time, money and trust in Employee and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, will have the ability to harm or threaten the Company's legitimate business interests;

(e) will make use of Employee's significant skills, training and experience; and

(f) for these and other reasons, will render services to the Company that Employee acknowledges are special, unique or extraordinary.

WHEREAS, Employee acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests.

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the Parties, intending to become legally bound, agree as follows:

## AGREEMENT

1. **DEFINITIONS**. Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

(a) "**Active Prospective Client**" means any Person or group of Persons the Company specifically solicited or had documented plans to solicit within the last twelve (12) months of Employee's employment with the Company.

(b) "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity) to the extent third party administration claims processing or underwriting is performed by a USI Company for such carrier or other entity) which is or was serviced by a USI Company in connection with such USI Company's business, regardless of whether such services are provided by, or through the licenses of a USI Company or any shareholder, employee or agent of a USI Company.

(c) "**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product. Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(d) "**Competitive Product**" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the USI Companies, in existence, which Employee or the Company has sold, marketed, distributed or developed in the last two (2) years of Employee's employment with the Company, or about which Employee has acquired Confidential Information.

(e) "**Confidential Information**" means any information of the Company or a USI Company that is not generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to: (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Company's Client Accounts or Active Prospective Clients; (ii) types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Company's Client Accounts or Active Prospective Clients; (iii) terms and conditions of benefits and compensation plans of the Company's Client Accounts or Active Prospective Clients; (iv) information furnished to the Company in confidence by any Client Account or Active Prospective Client; (v) business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company and its corporate affiliates; (vi) lists of the Company's Client Accounts or Active Prospective Clients, and any analyses and compilations thereof; (vii) data, analyses, lists, and business methodologies regarding prospective employees, candidates or Company hiring targets of the Company;  (viii) compliations and lists of names and other personally identifiable information regarding Company employees; (ix) information that is password-protected; (x) all internal memoranda and other office records, including electronic and data processing files and records; (xi) all other proprietary information, including any information contained within a proprietary database and workbook product binders including without limitation OMNI Solutions Workbooks, OMNI LIbrary Pages, OMNI Case Studies, and other OMNI Work Product; and (xii) all other information that constitutes a trade secret under applicable law.

(f) "**Goodwill**" means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's investment in repeated contacts, business transactions, Confidential Information, and other efforts to develop lasting relationships.

(g) "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(h) "**USI Business**" means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(i) "**USI Companies**" or "USI Company" means USI, Inc., a Delaware Corporation, its subsidiaries (including the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

2. **COMPANY PROPERTY**. Employee acknowledges and agrees all Confidential Information of the Company and/or USI Companies, which Employee has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Employee's employment. Employee further acknowledges and agrees that Employee has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

3.1. **Confidential Information**. The Company agrees to provide Employee with Confidential Information to assist Employee in the course and scope of Employee's duties. Employee acknowledges that the Company's agreement to provide this Confidential Information to Employee is in consideration for, and ancillary to, Employee's agreement to the other terms in this Agreement.

3.2. **Confidentiality During and Following Employment**. During Employee's employment with the Company and for five (5) years after Employee is no longer employed with the Company, for any reason, Employee will not use or disclose any Confidential Information of the Company or any USI Company except: (a) in the normal course of business on behalf of the Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Employee shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure). Employee will also use reasonable efforts to prevent any prohibited use or disclosure by any other Person. Nothing in this Agreement shall prohibit Employee from disclosing data or information which has been independently developed and disclosed by others or which has otherwise entered the public domain through lawful means. Notwithstanding anything in this Agreement to the contrary, nothing contained herein prohibits Employee from reporting, without prior authorization of the Company and without notifying the Company, possible violations of federal law or regulation to the United States Congress or other governmental agency having apparent supervisory authority over the business of the Company, or making other disclosures that are protected under the whistleblower provisions of Federal law or regulation.

3.3. **Defend Trade Secrets Act Required Notice**. Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Employee acknowledges and understands that:
(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.
(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

3.4. **Assignment and Ownership of Intellectual Property**. Employee acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law. To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Employee is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Employee hereby irrevocably transfers and assigns to the Company all rights, title and interest Employee may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Employee may have or acquire therein. "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Employee in whole or in part during Employee's employment with the Company: (a) using Employee's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Employee's work for the Company.

3.5. **Non-Solicitation of Clients and Active Prospective Clients**. In consideration of Employee's employment

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company.

(b) During Employee's employment with the Company and for twelve (12) months after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last twelve (12) months of Employee's employment with the Company.

3.6. **Non-Acceptance / Non-Service of Clients and Active Prospective Clients** . In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees:

(a) During Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Employee managed or regularly serviced and/or about which Employee obtained Confidential Information on behalf of the Company within the last two (2) years of Employee's employment with the Company.

(b) During Employee's employment with the Company and for twelve (12) months after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Employee solicited and/or about which Employee obtained Confidential Information on behalf of the Company within the last twelve (12) months of Employee's employment with the Company.

3.7. **Non-Interference With Employees**. In consideration of Employee's employment with the Company, and for other good and valuable consideration, Employee agrees, during Employee's employment with the Company and for two (2) years after Employee is no longer employed with the Company, for any reason, Employee shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employees to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Employee worked or obtained knowledge about as a result of Employee's employment with the Company.

3.8. **Tolling**. Employee agrees the duration of the covenants in this Agreement shall be extended by any period

of time in which Employee is in breach of any such obligations and the extended duration shall be measured
from the date of the court order granting injunctive relief.

Case 8:23-cv-00201-TPB-AAS   Document 1-3   Filed 01/27/23   Page 141 of 143 PageID 324

3.9. **Purpose of Restrictions**. The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Employee's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill. Employee agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

3.10. **Modification**. If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations. If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the extent necessary to permit the remaining terms to be enforced. The Company may unilaterally limit the scope of these covenants.

3.11. **Independent Enforcement**. Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Employee against the Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Employee or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 3 of this Agreement. The Company shall not be barred from enforcing any of the covenants in Section 3 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Employee.

4. **REMEDIES**. Employee acknowledges: (a) the services to be rendered by Employee are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Employee's breach of Section 3 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Employee agrees, if Employee violates Section 3 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction. Employee agrees to waive any requirement for the Company to post a bond.

5. **EMPLOYEE'S REPRESENTATIONS AND WARRANTIES**

5.1. **Disclosure of Agreements; No Conflict.** Employee represents and warrants that Employee has supplied to the Company all agreements between Employee and any Person that employed or otherwise retained Employee within the past five (5) years. Employee further represents and warrants that Employee's execution of this Agreement and performance of Employee's duties for the Company do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Employee is bound.

5.2. **No Confidential Information.** Employee represents and warrants that Employee has not taken any confidential information from any Person that employed or otherwise retained Employee, that Employee has no such confidential information in Employee's possession or control, and that Employee will not use any such confidential information in the performance of Employee's duties for the Company.

5.3. **No Copyright Materials**. Employee represents and warrants that Employee has not taken any copyrighted

materials from any Person that employed or otherwise retained Employee, that Employee has no such copyrighted materials in Employee's possession or control, and that Employee will not use any such copyrighted materials in the performance of Employee's duties for the Company.

5.4. ***No Restrictive Purchase Agreements***. Employee represents and warrants that Employee is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not, which prevents or restricts Employee from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

5.5. ***Clients of Former Employers or Entities***. Employee represents and warrants that Employee has not made any contact with any clients of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning Employee's business relationship with the Company or concerning a prospective business relationship with such client. Employee further represents and warrants that Employee will not, without prior express direction of the Regional CEO, solicit any clients of any Person that employed or otherwise retained Employee, within the past five (5) years.

5.6. ***Employees of Former Employers or Entities***. Employee represents and warrants that Employee has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Employee, within the past five (5) years, concerning a prospective employment relationship with the Company.

6. **AT-WILL EMPLOYMENT.** Employee understands and agrees that Employee's employment with the Company is at-will and that nothing in this Agreement shall be construed or considered to affect the nature of such at-will employment.

7. **ADDITIONAL TERMS**

7.1. ***Amendment.*** Except as set forth in Sections 3.10, 7.5, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

7.2. ***Assignment.*** Employee may not assign any rights under this Agreement without the prior written consent of the Company. Employee's obligations under this Agreement inure to the Company, its successors and assigns. The Company may, at any time and without Employee's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor. Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

7.3. ***Entire Agreement***. This Agreement constitutes the entire agreement between the Parties with respect to the matters specifically referred to herein, and supersedes and cancels all prior and contemporaneous written and oral agreements, if any, between the Parties with respect to the matters specifically referred to herein. Employee affirms that, in entering into this Agreement, Employee is not relying upon any oral or written promise or statement made by anyone at any time on behalf of the Company.

7.4. ***Governing Law***. This Agreement shall be governed by and construed in accordance with the laws of the State of FL, without regard to principles of conflicts of law.

7.5. ***Severability.*** The provisions of this Agreement are intended to be interpreted in a manner which makes

them valid, legal, and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render it valid, legal, and enforceable. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

7.6. **Waivers.** No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default. Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

Please review and electronically acknowledge this agreement to confirm your acceptance. The Parties hereto have caused this Agreement to be duly executed and effective as of the date first described above.

**By: USI Insurance Services LLC**

Madison Lieffort

Confidentiality, NS & NI Agreement

(USI FL) 2018v1