UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MATTHEW SIMMONS, SHEILA
MURRAY, JACK MITCHELL,
JACKIE RODRIGUEZ, MADISON
LIEFFORT, and EMILY CARTER,

       Plaintiffs,                          CASE NO. 8:23-cv-201-TPB-AAS

vs.

USI INSURANCE SERVICES, LLC, a
foreign limited liability company and
USI ADVANTAGE CORP., a foreign
corporation,

       Defendants.
_____/

USI INSURANCE SERVICES LLC,

       Counter-Plaintiff,

vs.

MATTHEW SIMMONS, JACK MITCHELL
and SOUTHEAST SERIES OF LOCKTON
COMPANIES, LLC,

       Counter-Defendants.
_____/

## AMENDED ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION IN PART AND ENJOINING VIOLATIONS OF EMPLOYMENT AGREEMENTS

This matter is before the Court on Counter-Plaintiff USI Insurance Services

LLC's ("USI") Motion for Temporary Restraining Order and Preliminary Injunction

and Incorporated Memorandum of Law, filed on January 30, 2023 (the "Motion").

(Doc. 9). Counter-Defendants Matthew Simmons, Jack Mitchell, and Southeast

Series of Lockton Companies, LLC ("Lockton") filed objections to the motion to the extent the motion sought a temporary restraining order on January 30, 2023. (Docs. 12; 13).

On February 2, 2023, the Court held a Rule 16 Status Conference and ordered further briefing on the enforceability of the employment agreements underlying the action and USI's motion.  (Doc. 19).  On February 6, 2023, the parties filed additional legal memoranda as directed.  (Docs. 22; 23; 24).  On February 7, 2023, the Court held a hearing on this matter, denied USI's motion to the extent it sought a temporary restraining order, determined that the employment agreements were enforceable, and directed the parties to file proposed orders with respect to preliminary injunctive relief.  (Doc. 25).  On February 10, 2023, the parties filed proposed orders as directed.  (Docs. 29; 30).

On February 15, 2023, the Court entered an Order granting USI's motion in part and prohibiting Simmons and his team from soliciting former USI clients or servicing the client accounts at issue.  (Doc. 31).  The Court declined to enjoin Lockton from accepting former USI clients or from servicing their accounts based on the record before the Court at that time.  However, the Court set a further hearing for April 12, 2023, following limited expedited discovery and further briefing.  *See* (Docs. 31; 36; 46).  The parties engaged in discovery and filed additional briefing. *See* (Docs. 43; 47; 48; 54; 68; 69).  On April 12, 2012, the Court held an evidentiary hearing and heard argument on whether its Order should continue in place or be modified, particularly with respect to Lockton.  (Doc. 62).

Based on the parties' filings and the evidence and argument at the April 12, 2023, hearing, the Court concludes that the preliminary injunctive relief provided by the Court's original Order as to Simmons, Mitchell, and the other Simmons team members will remain in place.  Those parties are ordered to comply with their employment agreements, including without limitation, the prohibitions against directly or indirectly providing services or consulting with respect to the accounts at issue, or attempting to solicit USI clients or to divert services away from USI, or attempting to induce the cancellation or non-renewal of any such account.  *See, e.g.*, (Doc. 3-1, ¶ 7.5, 7.6).  These prohibitions are further extended to two additional former USI employees now employed by Lockton, Chris Kakish and Theresa Kemp.  However, the Court finds that USI has not shown – at least at this juncture based on limited discovery – a substantial likelihood of success on the merits of its claims against Lockton sufficient to obtain an injunction requiring Lockton to end its newly-formed business relationships with former USI clients/accounts.[1]

## Background

USI and Lockton are large national insurance brokerage firms and are competitors in the industry.  Until their departure, Simmons and Mitchell were "Producers" in USI's Tampa, Florida, office.  Simmons led a team that included Mitchell, Emily Carter, Madison Lieffort, Sheila Murray, and Jackie Rodriguez.  (Doc. 9-1 ¶ 5).  In this industry Producers have various responsibilities, but at its

---

[1] The Court's decision and discussion of the relevant facts is based on the record currently before it after limited discovery, and in the context of USI's motion for preliminary injunction.  As such, this Order does not constitute a final determination of the issues presented in this case in favor of, or against, either party.

core, a "Producer" is a salesperson who, acting on behalf of an insurance broker, convinces clients to purchase insurance products, and then provides ongoing services to those clients for the purpose of encouraging the clients to continue purchasing insurance products through the insurance broker.  Successful Producers in this industry are very highly compensated.  The evidence presented during hearings in this matter demonstrated that a "war for talent" is currently being fought by various insurance brokers for the services of successful Producers.  This case appears to represent a typical battle in that larger war.

Simmons and Mitchell entered into written Employment Agreements with USI (the "Agreements').  (Docs. 3-1: 3-2).  In exchange for his Agreement, Simmons received over $3 million in payments in the year preceding his departure from USI. (Doc. 9-1 ¶ 7).  The Agreements contain a provision requiring the Individuals to provide a 60-day notice of resignation (the "Notice Period").  *See* (Docs. 3-1 § 8.2; 3-2 § 7.2).  It should be noted that the Agreements do not flatly prohibit these employees from leaving USI to join competitors such as Lockton.  They do, however, contain several restrictive covenants including the following.

First, the Agreements provide that Simmons and Mitchell, for two years post-employment, cannot, with respect to Client Accounts that they managed or regularly serviced while at USI, directly or indirectly, (i) sell, provide, or accept any request to provide services in competition with USI for any Client Account; (ii) solicit or attempt to solicit services in competition with USI as to any Client Account; (ii) divert or attempt to divert services away from USI with respect to any

Client Account; (iv) consult for any Client Account with respect to services in competition with USI; (v) sign a broker of record letter with any Client Account to provide services in competition with USI; or (vi) induce the termination, cancellation or non-renewal of any Client Account (the "Account Restriction").[2]  *See* (Docs. 3-1 §§ 7.5, 7.6; 3-2 §§ 6.5, 6.6).

The Account Restriction is specifically limited to: (a) USI Client Accounts that Simmons or Mitchell managed or regularly serviced and/or about which they obtained Confidential Information on behalf of USI within the last two years of their employment with USI; or (b) Active Prospective Clients that Simmons or Mitchell solicited and/or about which they obtained Confidential Information on behalf of USI within the last six months of their employment with USI.  *Id.*

Second, a provision prohibiting Simmons and Mitchell for two years post-employment, from, directly or indirectly, soliciting employees that they worked with at USI (the "Employee Non-Solicit").  *See* (Docs. 3-1 § 7.7; 3-2 § 6.7).

Third, a provision prohibiting Simmons and Mitchell from using or disclosing USI's confidential information (the "Non-Disclosure Provision").  *See* (Docs. 3-1 § 7.2; 3-2 § 6.2).

On January 25, 2023, Simmons and Mitchell resigned from USI via email, stating they would be joining USI's competitor, Lockton, effective immediately. Within a few hours on the same day, Carter, Lieffort, Murray, and Rodriguez, who supported Simmons and Mitchell and worked on the accounts at issue, resigned

---

[2] The capitalized terms used herein have the meanings ascribed to them in the Employment Agreements.

effective immediately to join Lockton.  Two other USI employees, Kakish and Kemp, members of another group at USI, also resigned that day to join Lockton.

Also on January 25, 2023, Simmons, Mitchell, and the other Simmons team members filed a complaint against USI and USI Advantage Corp. in the Thirteenth Judicial Circuit in and for Hillsborough County containing a single count seeking a declaration that their Agreements are illegal and unenforceable.  (Doc. 1).  The action was removed to this Court by Defendants USI and USI Advantage Corp., who then filed an answer.  (Doc. 2).  USI filed a counterclaim against Simmons, Mitchell, and Lockton as an additional counterclaim defendant, alleging claims for injunctive relief, breach of contract, breach of fiduciary duties, tortious interference, conspiracy, and aiding and abetting.  (Doc. 3).

The same day, a number of USI clients whose accounts were previously serviced by Simmons or Mitchell submitted "broker of record" letters naming Lockton as their broker to handle their insurance needs.  One client emailed a "Notice of Broker Change Form" to Lockton, writing that the change form was being submitted "as discussed" and that "Matt [Simmons] and his Team are simply the BEST!," and copied Simmons on the email at his USI email address.  (Doc. 3 ¶¶ 5–6, Doc. 9 ¶ 28).  Since the morning of Simmons' resignation, approximately 20 USI client accounts previously serviced by the Simmons team have moved all or a portion of their business to Lockton.  After leaving USI, Simmons, Mitchell, and the other Simmons team members serviced the accounts of former USI clients to one degree or another in violation of their employment agreements until the Court

entered its prior Order prohibiting them from doing so.  After the Order was entered, Lockton had Kemp and Kakish, who were not expressly covered by the Order, service one or more of these accounts.

USI seeks to continue in place the preliminary injunction entered by this Court on February 15, 2023 (Doc. 31) requiring Simmons, Mitchell, and the other Simmons team members to comply with their Agreements and prohibiting them from servicing accounts of former USI customers that they serviced while at USI. USI also seeks to expand the injunction to enjoin Lockton from tortiously interfering with the Agreements, from soliciting and accepting business from customers of USI serviced by Simmons or Mitchell, and from soliciting, moving, servicing, or accepting broker of record change requests from customers previously serviced by the Simmons team.  Lockton opposes the continuation of any injunctive relief and opposes any expansion of the injunction as to Lockton.

## **Legal Standard**

To obtain injunctive relief in a case of this nature a movant must establish: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, – U.S. – , 141 S. Ct. 63, 65-66 (2020).  The failure of to establish any one of

the preliminary injunction requirements is fatal.  *See Am. Civil Liberties Union of Fla., Inc., v. Miami–Dade Cty. Sch. Bd.,* 557 F.3d 1177, 1198 (11th Cir. 2009)

## <u>Analysis</u>

**1.     Substantial Likelihood of Success on the Merits**

Florida's restrictive covenant statute provides for the enforcement of non-solicitation covenants, like those here, when the covenants are a) set forth in writing and signed by the party against whom enforcement is sought; b) supported by the existence of one or more legitimate business interests; and c) reasonably necessary to protect the legitimate business interests.  § 542.335(1)(a)-(c), *F.S.* Legitimate business interests may include valuable confidential business information, substantial relationships with specific prospective or existing clients, and/or extraordinary or specialized training, among other interests.  § 542.335(1)(b), *F.S.*  To establish that the agreement itself is lawful and enforceable, a person seeking enforcement shall "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant."  *Id.*  "Once the party has established that the restraint is reasonably necessary to protect the legitimate business interest, the burden shifts to the party opposing enforcement of the agreement to establish that it is overbroad, overlong, or otherwise not reasonably necessary."  *Id.*; § 542.335(c), *F.S.*

The Agreements at issue here were set forth in writing and signed by Simmons and Mitchell.  Further, USI has established one or more legitimate business interests justifying the restrictive covenants.  *See, e.g.*, *Hilb Rogal &*

*Hobbs of Fla., Inc. v. Grimmel*, 48 So. 3d 957, 963 (Fla. 4th DCA 2010) (insurance broker had a legitimate business interest in preserving its relationships with customers, so as to support its request for a temporary injunction to enforce similar restrictive covenants).

Counter-Defendants assert that USI can have no substantial relationships with Simmons' client accounts because they consisted of contacts with whom Simmons had pre-existing close friendships. As set forth in the Court's original Order, even construing the facts in the light most favorable to Counter-Defendants, the Court finds that the circumstances of Simmons' relationships do not bear on USI's substantial relationships with its customers. Florida courts have held that an employer has a legitimate business interest in its substantial relationships with specific prospective or existing customers even when an employee brings customers to the employer on the basis of existing personal relationships. *See Grimmel*, 48 So. 3d at 961. Also, pursuant to the plain language of his Agreement, Simmons acknowledged that the "Client Accounts are owned by [USI]." *See* (Doc. 3-1 § 10.7). The Court finds that Simmons is a sophisticated individual who was paid retention bonuses of $1.5 million in January 2022 and $1.5 million in January 2023 in part because of his relationships and contacts.

Counter-Defendants have presented evidence that USI failed to provide sufficient expertise and staffing support to Simmons and his team for the clients they serviced. They argue that this failure invalidates or precludes enforcement of the covenants in the employment agreements by rendering them not reasonably

necessary to protect USI's legitimate business interests.  USI disputes these contentions, but even if Counter-Defendants are correct, they point to no terms in the employment agreements that impose any particular obligations on USI with respect to support of Simmons.  Nor do the cases Counter-Defendants cite dictate that otherwise valid restrictive covenants, expressly agreed to be independent of other contract terms, should not be enforced under the circumstances presented here.  *See, e.g.*, *Richland Towers, Inc., v. Denton*, 139 So. 3d 318, 321-22 (Fla. 2d DCA 2014) (holding independent restrictive covenant enforceable notwithstanding employer's breach of agreement).  The Court therefore reaffirms its ruling that the restrictive covenants in the Agreements are valid and enforceable.

Based on the evidence presented at the hearing held on April 12, 2023, the Court concludes USI has a substantial likelihood of proving that Simmons and Mitchell left USI without the giving the notice required by their employment agreements and that while at Lockton they serviced client accounts they had serviced while at USI.  USI also has a substantial likelihood of proving that Simmons and Mitchell at least indirectly solicited or attempted to solicit clients, or induced clients to terminate their accounts, or diverted services on those accounts away from USI, and induced other employees to leave USI.

The evidence presented at the hearing also demonstrated that Simmons was reasonably careful to avoid overtly and directly soliciting clients.  But Simmons appears to have understood his contractual obligations too narrowly.  It is important to recognize that the Agreements at issue here contain *broad restrictions*

that cover actions well beyond direct solicitation.  Most significantly, the

Agreements prohibit direct and *indirect* actions.  And the actions prohibited by the

Agreements are not limited just to solicitation.  Simmons and Mitchell were also

prohibited from indirectly diverting, consulting, and inducing clients to leave USI.

*See* (Docs. 3-1 §§ 7.5, 7.6; 3-2 §§ 6.5, 6.6).  As previously stated, the evidence

presented at the hearing held on April 12, 2023, established that Simmons and

Mitchell at least *indirectly* solicited or attempted to solicit clients, or induced clients

to terminate their accounts, or diverted services on those accounts away from USI,

and induced other employees to leave USI.

Accordingly, the Court concludes USI is likely to succeed on the merits of its

claims that Simmons and Mitchell violated the Agreements.

### 2.    Irreparable Harm

Here, in the wake of Simmons and Mitchell's departure, USI has lost client

accounts to a competitor and faces a potential continued loss. Other courts have

held that "[w]hen the failure to grant injunctive relief creates the possibility of a

permanent loss of customers to a competitor or the loss of goodwill, the irreparable

injury prong has been satisfied." *New Horizons Computer Learning Centers, Inc. v.*

*Silicon Valley Training Partners, Inc.*, Case No. 2:02-cv-459-FtM-29SPC, 2003 WL

23654790 *7 (M.D. Fla. Nov. 12, 2003).  While other courts have so held under

similar facts, this is not a binding rule where, as here, a court is operating in equity.

Indeed, during the hearings in this matter evidence was introduced showing the

financial value that Simmons and/or Lockton placed on Simmons' "book of

business." Such evidence suggests that the harm inflicted here would not be irreparable because the amount of monetary damages could be ascertained with a reasonable degree of accuracy.

While this is somewhat of a close call, under the facts presented here irreparable harm has been established based on the undisputed and immediate loss of customers to a competitor along with the resulting loss of goodwill.

### 3.   Balance of Equities

The threatened (and realized) harm to USI includes lost customers, revenue, and goodwill. The threatened harm to Simmons and Mitchell is the temporary inability to solicit or service customers they serviced when they were employed by USI. Simmons and Mitchell are not prohibited from working in the industry or even from working at Lockton or from servicing any account they did not manage or regularly service while at USI. The Court finds that the harm to USI outweighs any harm that would result to Simmons or Mitchell from an injunction that merely requires that they comply with the restrictive covenants to which they agreed and for which they were substantially compensated.

### 4.   The Public Interest

The public has a cognizable interest in the protection and enforcement of contractual rights. Lockton argues that client choices should not be limited at a time when Florida's property insurance market is in a state of disarray. This Order, however, allows Lockton to provide services to former USI clients, albeit temporarily through different individual employees and without the services of

Simmons and his team.  The evidence does not suggest Lockton will be unable to serve these clients or that any client will be deprived of the ability to obtain insurance.  They will simply be served by different individuals at Lockton.  *See Grimmel*, 48 So. 3d at 962 ("The fact that the customers will have to use a different insurance broker does not make the enforcement of this agreement against public policy.").  Accordingly, an injunction will serve the public interest.

**5.     Bond**

Under Florida law, a bond is required to issue an injunction enforcing a non-compete agreement.  § 542.335(j), *F.S.*; *see also* Fed. R. Civ. P. 65(c) (requiring movant to give security for issuance of preliminary injunction).  Here, the Court's original Order required USI to post a bond in the amount of $500,000.00, which USI has done.  This is sufficient to compensate Simmons and Mitchell for any loss incurred as a result of an injunction if they ultimately prevail on the merits of this case.

**6.     The Notice Period**

The Court finds that enforcing the 60-day Notice Period is neither practicable or useful at this point, nor is it necessary to ensure compliance with the restrictive covenants or protect USI's interests, given the injunctive relief granted by this Order.

**7.     The Simmons Team and Other Individuals**

The undisputed timing of the Simmons team's departure from USI to join Lockton suggests they were and are acting in concert with Simmons and Lockton.

Other evidence, however, tends to support a conclusion they acted individually in connection with their departure from USI, albeit coordinating with Lockton on matters relating to the departure.  In all events, given their close connection to Simmons and his clients, allowing Simmons team members Carter, Lieffort, Murray, or Rodriguez to solicit or service customers previously serviced while at USI would result Simmons and/or Mitchell accomplishing indirectly what they are prohibited from doing directly.  Moreover, these Simmons team members are represented by the same counsel as Simmons, Mitchell, and Lockton, and joined together in filing the complaint that initiated this action.  Their employment agreements, attached as exhibits to the complaint, contain restrictions substantially similar to those in the Simmons and Mitchell Agreements.  Accordingly, pursuant to the Court's equitable powers, its power to ensure this Order is effective, and its authority to enjoin persons in active concert or participation with Simmons or Mitchell, the Court also enjoins Plaintiffs Carter, Lieffort, Murray, and Rodriguez, as set forth below.

USI's moving papers presented no evidence Kakish and Kemp were part of Simmons' team at USI.  Accordingly, the Court's initial Order granting preliminary injunctive relief did not expressly prohibit them from servicing the accounts of former USI clients.  However, the evidence now indicates that while at USI they were involved at least to some extent in servicing accounts also serviced by the Simmons team and they left USI on the same day as the Simmons team.  Accordingly, the Court finds that extending the injunction to Kakish and Kemp is

necessary to prevent an indirect violation of the injunction and ensure that the injunction remains effective.

### 8.  Lockton

USI argues that Lockton's actions were unlawful and sufficiently egregious that the injunctive relief previously entered should be expanded to prohibit Lockton from serving the former USI clients that transferred their business to Lockton immediately after Simmons' resignation.  This would effectively deprive Lockton of clients who moved their business from USI in the wake of Simmons' and Mitchell's departure.  USI argues this relief is justified because Lockton tortiously interfered with the employment agreements between USI and the departing employees by inducing them to violate their Agreements' restrictive covenants.

Specifically, USI argues that Lockton incentivized Simmons' and Mitchell's breaches by, among other things, (a) structuring compensation packages based in part on an expectation that clients would immediately move with Simmons and Mitchell from USI to Lockton; (b) allowing Simmons and Mitchell to service clients who moved; and (c) agreeing to indemnify Simmons and Mitchell for any claims brought by USI.  Furthermore, USI argues that Lockton strategically dictated that all members of Simmons team quit USI and join Lockton on the same day, thereby creating a mass exodus of USI personnel that were needed by USI to try to retain Simmons' and Mitchell's clients.

The undisputed evidence shows that the move of Simmons and his team from USI was welcomed and facilitated in various ways by Lockton.  So, the question is

not whether Lockton was involved – the question is whether Lockton's involvement rose to the level of being unlawful and, more particularly, whether USI has demonstrated a substantial likelihood of prevailing on the merits of its claim that Lockton's actions were unlawful.

The evidence presented at the hearing showed that Simmons made the decision to leave USI on his own and he began exploring his options with various brokers, including but not limited to Lockton.  At some point he initiated contact with Lockton and planned for his own reasons to take the actions that breached his Agreement, rather than being induced to do so by Lockton.  "Under Florida law, a party's predisposition to breach . . . precludes any finding that [it] was induced to breach by [a third party]." *Ingenuity, Inc. v. Linshell Innovations Ltd.*, 644 F. App'x 913, 915 (11th Cir. 2016) (quoting *Farah v. Canada*, 740 So. 2d 560, 562 (Fla. 5th DCA 1999)); *Centennial Bank v. ServisFirst Bank, Inc.*, No. 8:16-cv-88-CEH-CPT, 2022 WL 10219893, at *8 (M.D. Fla. Oct. 10, 2022).  Based on the evidence presented, Simmons and Mitchell were plainly predisposed to breach, rather than being induced to do so by Lockton.[3]

---

[3] USI relies on *Arthur J. Gallagher Service Co. v. Egan*, No. 12-CV-80361-RYSKAMP/HOPKINS, 2013 WL 11981917 (S.D. Fla. April 8, 2013), *aff'd*, 567 F. App'x 857 (11th Cir. 2014), for a purported exception to the rule that the breaching party's predisposition to breach precludes a tortious interference claim.  *Arthur J. Gallagher* held that notwithstanding a party's predisposition to breach, where a defendant permits the breach to continue, rewards the breach financially, and profits from the breach, a claim for tortious interference will lie.  The Court agrees with Judge Honeywell's conclusion in *Centennial Bank*, 2022 WL 10219893, at *8, that this exception is not supported by Florida law.

Lockton certainly took advantage of the situation by hiring Simmons and
Mitchell on their requested terms, knowing their planned course of conduct would
violate prohibitions in their contracts with USI.  But that, without more, is
insufficient for liability under Florida law.  "A party 'does not induce another to
commit a breach of contract with a third person . . . when he merely enters into an
agreement with the other with knowledge that the other cannot perform both it and
his contract with the third person.'"  *Martin Petroleum Corp. v. Amerada Hess
Corp.*, 769 So. 2d 1105, 1107 (Fla. 4th DCA 2000) (quoting Restatement (Second)
Torts, § 766, comment n).

Here, of course, Lockton clearly did more than merely entering into
agreements with Simmons and Mitchell with knowledge that they could not
perform both their contractual obligations to Lockton and their contractual
obligations to USI.  It is inconceivable that the events that transpired here,
including the filing of a lawsuit by newly hired Lockton employees against USI the
same day they quit, could have occurred without substantial involvement by
Lockton.  But the details and scope of Lockton's activities are not yet known and
whether Lockton's activities were unlawful is not clear.  For example, USI argues
that Lockton chose a coordinated date to hire Simmons' team to sabotage USI and
make it impossible for USI to retain important clients due to lack of personnel.
Lockton's Chief Operating Officer Manoj Sharma, however, testified that Lockton
chose a coordinated date to hire Simmons' team to facilitate a more efficient
onboarding of the new employees.  Lockton facilitated Simmons and his team

leaving USI in various additional ways, none of which have been shown to be
unlawful.  At this stage in the proceedings USI has not identified sufficient evidence
of unlawful action on the part of Lockton to establish a substantial likelihood of
success on this issue.  *See Merle Norman Cosmetics, Inc. v. Labarbera*, No. 07-
60811-CV, 2007 WL 1812039, at *3-4 (S.D. Fla. June 22, 2007) (denying injunction
where circumstantial evidence did not rise to the level required to show a
substantial likelihood of success).

USI argues that liability for tortious interference may be found where the
defendant's conduct is "unfair" according to contemporary business standards.  *See,
e.g., Azar v. Lehigh Corp.,* 364 So. 2d 860, 862 (Fla. 2d DCA 1978).  USI points to
evidence that Lockton has been involved in litigation on multiple occasions relating
to disputes over employees, has been subjected to injunctions, and in litigation itself
has criticized "unscrupulous corporate raiding."  Allegations and arguments
presented in litigation do not necessarily reflect industry standards, however, and
USI has not persuaded the Court what those standards are or precisely how
Lockton's conduct violated them.

This case lacks the clear evidence of egregious conduct presented in cases
such as *Mountain West Series of Lockton Companies LLC v. Alliant Ins. Services*,
No. 2019-0226-JTL, 2019 WL 2536104 (Del. Ch. June 20, 2019).  In that case,
Lockton's competitor Alliant Insurance Services engaged in a seven-month
campaign to induce seven producers and nineteen others to leave Lockton's Denver
office, instructed them to resign without notice, and encouraged them to engage in a

"full court press" to solicit their former clients at Lockton.  Alliant's conduct also included, among other things, destroying evidence and presenting inaccurate affidavits to the court.

The evidence here falls short of that.  It appears that Simmons, dissatisfied with USI, approached Lockton with a preexisting intent to engage in conduct that would breach his contractual duties to USI.  Lockton apparently decided to profit from the situation to the greatest extent legally possible.  Rather than avoiding any appearance of impropriety and standing well away from any potential line between lawful and unlawful conduct, Lockton walked right up to the line and *may* have crossed it.  But competitors in this industry are engaged in a continual and aggressive "war for talent," and the evidence and legal arguments to date have failed to show that Lockton did in fact cross the line.  Lockton provided counsel to advise USI employees preparing to leave USI to join Lockton, and USI argues that the assertion of attorney-client privilege as to some of their communications may be subject to challenge.  That may be the case, and additional discovery may reveal evidence that will alter the Court's view.  But on the current record, the Court cannot conclude USI has a substantial likelihood of success on its claims against Lockton.[4]

---

[4] Even if USI had shown a likelihood of success on its claims, expanding the injunctive relief already granted as to Simmons and his team to further bar Lockton from serving clients who have already moved from USI to Lockton is not necessary to prevent breaches of the restrictive covenants or prevent irreparable harm to USI in the future, and is not supported by the balance of the equities.

Finally, USI also argues that Lockton aided and abetted breaches of fiduciary duty by Simmons and his team.  Largely for the reasons discussed above, the Court concludes USI has not – at least at this stage of the proceedings – shown a substantial likelihood of establishing that Lockton knowingly and substantially assisted a breach of fiduciary duty by any USI employee as required for aiding and abetting liability.  *See Lawrence v. Bank of Am., N.A.,* 455 F. App'x 904, 906 (11th Cir. 2012) (holding that aiding and abetting liability requires knowledge of an underlying violation and substantial assistance by the defendant).

It is therefore

**ORDERED**, **ADJUDGED, and DECREED** that:

1.    "Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and Incorporated Memorandum of Law" (Doc. 9) is **GRANTED IN PART** and **DENIED IN PART** as follows.

2.    The injunctive relief provided by the Court's February 15, 2023, Order remains in effect.

3.    Simmons must comply with the restrictive covenants of his Agreement in sections 7.2, 7.5, 7.6, and 7.7, and Mitchell must comply with the restrictive covenants of his Agreement in sections 6.2, 6.5, 6.6, and 6.7, and Simmons and Mitchell are enjoined, until further order of the Court from:

     a.   Using or disclosing any Confidential Information of USI, any Predecessor, or any USI Company except as authorized in the Agreements;

b.  directly or indirectly, soliciting, servicing, consulting with, accepting
business, diverting, signing a broker of record letter, inducing
termination, cancellation or nonrenewal, with respect to the Client
Accounts as set forth in more detail in the Account Restriction in
sections 7.5 and 7.6 of the Simmons Agreement and sections 6.5 and
6.6 of the Mitchell Agreement.

The foregoing prohibitions are limited to: (a) USI Client Accounts that Simmons or
Mitchell managed or regularly serviced and/or about which they obtained
Confidential Information on behalf of USI within the last two years of their
employment with USI; or (b) Active Prospective Clients that Simmons or Mitchell
solicited and/or about which they obtained Confidential Information on behalf of
USI within the last six months of their employment with USI.  The prohibitions
apply regardless of whether the relevant present or former USI customer has
named Lockton as broker of record with respect to all or a portion of its insurance
policies, or has moved all or a part of its business to Lockton, since the departure of
Simmons and Mitchell from USI.

4.  Plaintiffs Carter, Lieffort, Murray, and Rodriguez, as well as non-
parties Kakish and Kemp, are also enjoined from taking any of the actions
prohibited by the preceding paragraph.

5.  Nothing in this Order shall prohibit Lockton, at this time, from
working with and servicing the insurance needs of current clients of Lockton or any
entity associated with Lockton, including but not limited to those former USI clients

who have returned executed broker of record letters to Lockton.  However, through the date the Court enters a final judgment or otherwise modifies this Order, Simmons, Mitchell, the Simmons team members, Kemp, and Kakish, are enjoined pursuant to this Order from having any contact or involvement whatsoever, direct or indirect, with former USI clients who may choose to move, or already have moved, their business to Lockton, to the extent the Client Accounts are within the scope of paragraphs 3 and 4 above.  Lockton is not otherwise enjoined from soliciting the business of USI clients.  However, through the date the Court enters a final judgment or otherwise modifies this Order, Simmons, Mitchell, the Simmons team members, Kemp, and Kakish are enjoined from having any contact or involvement whatsoever, direct or indirect, in any efforts to move USI clients to Lockton, to the extent the Client Accounts are within the scope of paragraphs 3 and 4 above.

6.      By no later than May 15, 2023, Lockton is directed to inform any former USI clients it services of the Court's decision, using the form of notice filed by USI.  (Doc. 68-1).

7.       Lockton, Simmons, Mitchell, the Simmons team members, Kemp, and Kakish, are directed to file with the Court bimonthly a declaration under penalty of perjury that they have complied with the foregoing restrictions.

8.     The motion is otherwise **DENIED WITHOUT PREJUDICE.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 9th day of May, 2023.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**