## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDAex
## TAMPA DIVISION

| | |
|---|---|
| MATTHEW SIMMONS, ET AL.,<br><br>    Plaintiffs,<br><br>v.<br><br>USI INSURANCE SERVICES LLC, ET AL.,<br><br>    Defendants.<br>――――――――――――――――<br>USI INSURANCE SERVICES, LLC<br><br>    Counter-Plaintiff,<br><br>v.<br><br>MATTHEW SIMMONS, JACK MITCHELL and SOUTHEAST SERIES OF LOCKTON COMPANIES, LLC,<br><br>    Counter-Defendants. | Case No. 8:23-CV-00201-TPB-AAS |

## COUNTER-DEFENDANTS MATTHEW SIMMONS, JACK MITCHELL, AND SOUTHEAST SERIES OF LOCKTON COMPANIES, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure and Rule 3.01(a)

of the Local Rules for the Middle District of Florida, Counter-Defendants

Southeast Series of Lockton Companies, LLC ("Lockton Southeast"), Matthew

Simmons, and Jack Mitchell respectfully submit this memorandum in law in

support of their motion for summary judgment on Defendant-Counterclaimant USI Insurance Services, LLC's counterclaims of tortious interference with contractual relationships against Lockton Southeast, civil conspiracy against all three Counter-Defendants; breach of fiduciary duty and the duty of loyalty against Simmons and Mitchell; and aiding and abetting breach of fiduciary duty and the duty of loyalty against Lockton Southeast, and USI's forced-sale theory of damages.  For the following reasons, the Court should grant summary judgment in Counter-Defendants' favor on those claims.

## INTRODUCTION

Matthew Simmons and Jack Mitchell worked for USI, an insurance brokerage, until early this year, when they moved to Lockton Southeast, another brokerage.  When they moved, they sued USI for a declaration that the restrictive covenants in their USI employment agreements are unenforceable.  USI fired back with a battery of counterclaims—some sounding in contract, others in tort.  The questions at the bottom of all these dueling claims are whether Simmons and Mitchell did anything wrong in leaving USI and, if they did, whether Lockton Southeast somehow caused them to do it. This motion does not address USI's breach-of-contract claims against Simmons and Mitchell; those claims will be addressed at trial.  Instead, this motion is about USI's tort claims—for tortious interference, civil conspiracy, breach of fiduciary duty and the duty of loyalty, and aiding and abetting that breach.

The Court should enter summary judgment in favor of Simmons, Mitchell, and Lockton Southeast on all of those tort claims.

USI claims Lockton Southeast tortiously interfered with USI's contracts with Simmons and Mitchell. The trouble with that claim is that USI needs to prove that Lockton Southeast *caused* Simmons and Mitchell to violate their employment agreements. If Simmons and Mitchell were predisposed to engage in the complained-of conduct, then Lockton Southeast can't be liable for any interference. This Court already found, in ruling on USI's motion for a preliminary injunction, that Simmons and Mitchell had every intention to leave USI when they started talking to Lockton Southeast. Not only that, Simmons and Mitchell "approached Lockton with a preexisting intent to engage" in the complained-of conduct. *Simmons v. USI Ins. Servs., LLC*, 2023 WL 3751981, at *7 (M.D. Fla. May 9, 2023). Simmons and Mitchell planned to leave in a specific way: to not give further notice, to inform their clients of their departure, and to accept business from those clients at their new business. That remains the whole story; there is zero evidence that Lockton Southeast induced them to breach any agreement or obligation. All the evidence shows that Simmons and Mitchell were predisposed—in fact, determined—to leave USI in the way they did.

Nor is there any need for a trial on the civil-conspiracy and breach-of-duty claims against Simmons and Mitchell. Those claims are just an effort to

repackage contract claims as tort claims.  The very same conduct that USI argues was a breach of its agreements with Simmons and Mitchell is also the basis for its tort claims against them.  Simmons and Mitchell aren't alleged to have breached any duty independent of those agreements.  And under the independent-tort doctrine, a contracting party can't sue and recover in tort for the non-performance of a contract.  That's what breach-of-contract claims are for—and why USI has already asserted those, too.

This analysis also exposes the fundamental flaw in USI's derivative claims against Lockton Southeast for conspiracy and aiding and abetting.  A conspiracy claim can't stand alone; it must be based on some independent tort. Lockton Southeast can't be liable unless it *did something wrongful*.  Here, the only freestanding tort Lockton Southeast is accused of committing is tortious interference.  But that claim fails for the reasons set forth above, and once it falls away, there is no longer any basis for a conspiracy claim.  The aiding-and-abetting claim fails for similar reasons:  Lockton Southeast can't be liable for aiding and abetting the breach of some extracontractual duty to USI if Simmons and Mitchell had no independent duty in the first place.

Lastly, USI's two damages experts, Dr. Anne Gron and Robin C. Frost, offer damages measures that are foreclosed by Florida law.  USI's experts rely on a fair-market valuation but Florida courts have long held that such a valuation is appropriate only when the claimant's business has been

completely destroyed and there can be no genuine dispute that USI has carried on swimmingly after the loss of Mitchell and Simmons.

The facts of this case are not complicated. As this Court noted during the preliminary injunction hearing, the Court "has heard all the evidence there is to hear on this." Preliminary Injunction Hearing Transcript at 282:13-14. The Court should streamline the triable issues of fact by entering summary judgment on all of USI's counterclaims except for its breach-of-contract claims and on USI efforts to recover damages foreclosed by the law.

## UNDISPUTED MATERIAL FACTS

### A.  Mitchell and Simmons grow frustrated with USI's lack of resources for servicing clients.

1.  The business of brokering commercial insurance is a sophisticated professional service that requires extensive expertise. Prelim. Injunction Tr., Ex. 1 at 15:25–22.

2.  Matthew Simmons started as a commercial-insurance broker at Wells Fargo Insurance Services in 2013. Simmons March 27, 2023 Dep., Ex. 2 at 30:5–7.

3.  Wells Fargo Insurance Services was acquired in 2017 by USI Insurance Services, LLC, a major insurance brokerage with over $2 billion in revenue. Prelim. Injunction Tr. at 19:4–10.

4.  "Producers" generate business and maintain relationships with

clients.  Simmons March 27, 2023 Dep. at 8:12–19.

5.    Jack Mitchell joined USI as a producer in September 2019.  Prelim.
Injunction Tr. at 50:4–7.

6.    Service professionals, including account executives, account
managers, and account representatives, are assigned to support producers.
Segall Dep., Ex. 3 at 8:23–9:18.

7.    Subject-matter experts, including those specializing in
cybersecurity policies and directors-and-officers policies, are also necessary to
assist producers in providing proper commercial-insurance service to clients.
Prelim. Injunction Tr. at 18:6–24.

8.    USI refers to these subject-matter experts as executive and
professional services or "technical resources."  Wilson March 31, 2023 Dep., Ex.
4 at 20:19–23.

9.    Cyber and directors-and-officers liability experts, among other
things, help clients understand their needs; design appropriate coverage; and
support the account-management team in negotiating with insurance carriers.
Wilson Dep. at 75:5–76:3.

10.    USI describes its experts on directors-and-officers and cyber
insurance as important resources, particularly for the accounts that require a
higher level of expertise.  Wilson Dep. at 76:4–77:3.

11.    For the majority of 2022, USI had only two employees in the

Southeast in its technical-resources department.  Both only had "some level of cyber knowledge."  Doherty March 29, 2023 Dep., Ex. 5 at 59:9–60:15.

12.    USI restricts spending on experts, including cyber experts, to a certain percentage of revenue.  Longhta March 31, 2023 Dep., Ex. 6 at 42:15–43:7.  USI does not change its budget allocations, even in response to an increasingly competitive labor market for experts and specialists.  Wilson Dep. at 18:24–19:5.

13.    Simmons had a complex book of business, and his clients required more expert support than the clients of other producers in USI's Tampa office.  Varnadore Oct. 2, 2023 Dep., Ex. 7 at 55:2–21.

14.    Simmons repeatedly raised his concerns about the lack of support professionals within USI, and USI, in turn, acknowledged that those concerns were legitimate.  Doherty Dep. at 61:16–62:22.

15.    USI acknowledged throughout 2022 that its technical resources were "stretched."  Wilson Dep. at 74:13–75:4.  In April 2022, Andrew Doherty, head of the team that oversaw cyber specialists, admitted that USI's cyber practice was "overwhelmed due to a turnover and a dramatically hardening market."  Doherty Dep. at 7:19–22; 54:12–25.

16.    In 2022, Simmons expressed concern that USI lacked the expertise to manage any new business he wanted to bring in; worse, Simmons told USI Southeast CEO Tom Longhta that he lacked the expert support even to handle

his existing clients.  Prelim. Injunction Tr. at 22:25–23:6; 24:4–7.

17.     In the six months before his resignation, Simmons repeatedly told Longhta that he was unsure he could stay at USI for long because of the lack of resources.  Longhta Dep. at 9:19–11:4; Prelim. Injunction Tr. at 30:19–23.

18.     Longhta, in turn, told other USI executives, including Blake Varnadore, the practice leader of USI's Tampa office, that he was concerned about Simmons's longevity at USI.  Longhta Dep. at 12:11–23; Varnadore Oct. 2, 2023 Dep. at 86:4–20.

19.     Longhta told Varnadore that USI needed to do everything it could to keep Simmons at USI.  Longhta Dep. at 12:11–23.

20.     In May 2022, Varnadore wrote to USI's top management: "I keep hearing from virtually all the senior producers that they can't take on anymore and now I am hearing it from our younger ones . . . .  If this doesn't change, we are going to lose members from both our service and production teams." Varnadore Oct. 2, 2023 Dep., Ex. 8.

21.     In January 2023, Varnadore told other members of USI management that USI needed to provide the right tech resource support to retain Simmons.  Varnadore April 3, 2023 Dep., Ex. 9 at 52:17–53:24.

**B.     Simmons decides to leave USI.**

22.     By August 2022, Simmons had decided he needed to leave USI because his pleas for additional resources for client support had fallen on deaf

ears.   Prelim. Injunction Tr., at 30:24–31:11.

23.    Around September 2022, Simmons reached out to numerous insurance brokers —including USI competitors Alliant Insurance Services, and Arthur J. Gallagher Insurance —to explore other career opportunities. Simmons also considered opening his own commercial brokerage business. Simmons March 27, 2023 Dep. at 44:5–45:2; 53:18–54:2.

24.    Lockton Southeast did not seek out or recruit Simmons.   On September 13, 2022, Simmons reached out to Fred Zutel, a producer at Lockton Southeast.  Zutel Dep., Ex. 10 at 38:14–40:7; Prelim. Injunction Tr., 168:25–169:8.

25.    At the outset of his conversations with Lockton Southeast, Simmons shared that he would leave USI; the only question was whether he would join Lockton Southeast, join another firm, or start his own business. Prelim. Injunction Tr. at 33:18–21; Simmons Dep. at 106:23–24.

26.    When Simmons decided to leave USI, he already had planned how he would leave and told every firm he considered that he would only join a firm that would accept his existing clients who wanted to follow him.  Preliminary Injunction Hearing Tr., at 207:12–208:9.  Even if Simmons did not find such a firm, there was "zero" chance Simmons would stay at USI, no matter what Lockton did.  Simmons Nov. 9, 2023 Dep., Ex. 12 at 390:10–392:22.

27.    The decision to resign without notice was Simmons's alone.

Prelim. Injunction Tr. at 208:20–209:17; Sharma March 30, 2023 Dep., Ex. 13 at 78:22–79:2.

28.     Beginning in December, out of loyalty to his personal and professional relationships, Simmons shared with his coworkers that he was in discussions with Lockton Southeast.  The decision to share his intentions with his co-workers was Simmons's alone.  Prelim. Injunction Tr. at 212:6–213:14; Simmons March 27, 2023 Dep. at 65:21–68:6.

29.     When Simmons started interacting with Lockton Southeast, he shared that he would be letting certain of his clients know about his departure beforehand, as a professional courtesy.   Prelim. Injunction Tr. at 213:15–214:16.

**C.    Mitchell decides to leave USI.**

30.     By early 2022, Mitchell, like Simmons, had grown frustrated with the lack of support at USI and didn't agree with how USI was allocating its money and resources.  Mitchell March 28, 2023 Dep. Ex. 14 at 28:12–25; 45:9–46:23.

31.     Mitchell believed that the inadequate service level at USI was impacting his ability to properly service existing clients and to onboard new ones.  Prelim. Injunction Tr. at 52:10–13.

32.     Mitchell communicated his concerns about the deficient level of client service with USI management.  Prelim. Injunction Tr. at 51:3–7.

33.    Lockton Southeast did not seek out or recruit Mitchell.   On November 16, 2022, Mitchell reached out to Zutel at Lockton Southeast. Mitchell Oct. 3, 2023 Dep. Ex 15 at 62:18–63:3.  Mitchell had received Zutel's contact information from a friend of his who was a former Lockton Southeast producer.  Zutel Dep. at 29:20–30:5; Mitchell Oct. 3, 2023 Dep. at 42:6–43:17.

34.    Mitchell made his own decision to go to Lockton Southeast. Mitchell March 28, 2023 Dep. at 83:4–18.

35.    Mitchell felt it was morally right to communicate to his clients, the day before his resignation, that he was leaving USI.  Mitchell March 28, 2023 Dep. at 67:4–23.

36.    The decision to resign without providing notice to USI was Mitchell's alone.  Sharma March 30, 2023 Dep. at 78:22–79:2.

**D.    Lockton Southeast onboards Simmons and Mitchell.**

37.    During its separate discussions with each of Simmons and Mitchell, Lockton Southeast repeatedly indicated its preference that no business follow Simmons or Mitchell.   Simmons Dep. at 14:8-15; Sharma March 30, 2023 Dep. at 19:20–20:7   In fact, Lockton Southeast offered Simmons additional compensation if he declined business from his former USI customers.  Sharma Nov. 17, 2023 Dep. Exhibit 16 at 282:17–283:6; Prelim. Injunction Tr. at 249:13–250:3.

38.    In response to Simmons's and Mitchell's pronouncement that they

planned to communicate their departure to their clients as a professional
courtesy, Lockton Southeast emphasized to Simmons and Mitchell that they
should *not* solicit their clients or USI employees to join Lockton Southeast.
Sharma March 30, 2023 Dep. at 41:15–42:15, 44:22–45:13; 49:1–5; Simmons
March 27, 2023 Dep. at 14:8–15:1, 104:6–105:8; Mitchell March 28, 2023 Dep.
at 74:18–22.

39.    To ensure that they did not solicit any USI clients, Lockton
Southeast instructed Simmons and Mitchell to relay any inquiries from their
former clients to someone else at Lockton Southeast.  Sharma March 30, 2023
Dep. at 24:17–25.

40.    Even after the former USI employees joined Lockton Southeast
and certain clients chose to follow, the USI Tampa office remains successful
and is, by all accounts, thriving.  Indeed, as of October 2023, the Tampa office
of USI was the third largest office in all of USI and continues to grow "like
crazy."  Carson Dep. Ex. 17 at 101:13–18.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56(a).  "The mere existence of *some* alleged
factual dispute between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (cleaned up). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.

## ARGUMENT

### I. The Court should grant Lockton Southeast summary judgment on USI's tortious-interference claim because Simmons and Mitchell were predisposed to engage in the complained-of conduct before they had any contact with Lockton Southeast.

USI claims Lockton Southeast "willfully engaged in wrongful conduct designed to have" Simmons and Mitchell breach their contractual agreements with USI. Counterclaim ¶ 83. To prevail on that tortious-interference claim, the burden is on USI to establish that Lockton Southeast's actions "induce[d] or otherwise cause[d] nonperformance" of Simmons's and Mitchell's employment agreements. *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1343 (M.D. Fla. 2006). As a matter of law, a party's "predisposition to breach . . . precludes any finding that it was induced to breach by a third party." *Ingenuity, Inc. v. Linshell Innov. Ltd.*, 644 F. App'x 913, 916 (11th Cir. 2016). In ruling on USI's motion for a preliminary injunction, this Court found that "Simmons and Mitchell were plainly predisposed to breach" their employment

agreements when they joined Lockton Southeast. *Simmons v. USI Ins. Servs.,
LLC*, 2023 WL 3751981, at *6 (M.D. Fla. May 9, 2023). No evidence has come
to light since then suggesting anything to the contrary. Because this
undisputed evidence would prevent a reasonable jury from finding that USI
met its burden, the Court should enter summary judgment on USI's tortious-
interference claim.

The Eleventh Circuit affirmed summary judgment on a tortious-
interference claim in a closely analogous case, *Ingenuity, Inc. v. Linshell
Innovations Ltd.*, 644 F. App'x 913 (11th Cir. 2016). That case concerned an
agreement that made Ingenuity the exclusive distributor of the Linziclip, a
hairclip made by Linshell. *Ingenuity, Inc. v. Linshell Innovations Ltd.*, 2014
WL 1230695, at *1 (M.D. Fla. Mar. 25, 2014). The relationship between
Linshell and Ingenuity grew "rocky," and Linshell "decided to find a new
distributor," eventually striking a deal with Conair. *Ingenuity,* 644 F. App'x at
915. Ingenuity sued Linshell for breach of contract and Conair for tortious
interference. *See id.* Conair won summary judgment (and the Eleventh Circuit
affirmed) because the undisputed facts showed that "regardless of whether
Linshell was justified in terminating the contract . . . it was predisposed to do
so *with or without* Conair." *Ingenuity*, 2014 WL 1230695, at *5 (emphasis
added). Linshell was "dissatisfied" with Ingenuity and "was actively seeking
other potential distributors" before landing on Conair. *Id.*

14

Other courts have granted motions for summary judgment on tortious-interference claims in cases with similar facts. Take, for example, *Centennial Bank v. ServisFirst Bank Inc.*, 2022 WL 10219893 (M.D. Fla. Oct. 10, 2022). There, one bank (Centennial) sued another bank (ServisFirst) for tortious interference, on the theory that ServisFirst had poached Centennial's senior executive. *Id.* at *8. But the executive had joined Centennial in the first place only because Centennial had acquired the bank where he worked, and there was undisputed evidence that the executive had "always intended to leave" Centennial after the acquisition closed. *Id* at *1–2. The court noted that the executive "spoke to seven other financial institutions before ServisFirst" about moving his book of business and team of professionals and that he "was the one who approached ServisFirst about potential employment"; "ServisFirst did not approach him." *Id.* at *9. Given the executive's predisposition to breach his contract, the court granted summary judgment on Centennial's tortious-interference claim; ServisFirst couldn't have caused or intentionally procured a breach of contract that was going to happen anyway. *Id.*

This case is legally indistinguishable from *Ingenuity* and *Centennial Bank*, and the result here should be the same as in those cases: summary judgment for the new employer on the tortious-interference claim. The undisputed evidence demonstrates Simmons and Mitchell planned to engage in the complained-of conduct without any encouragement from Lockton

15

Southeast.    Simmons and Mitchell repeatedly complained that USI had inadequate resources to service their existing clients or even generate new ones.    Statements from USI management, including Tom Longhta and Blake Varnadore, confirm that Simmons's concerns were valid, that USI knew as much, and that USI itself was concerned that the lack of resources could force Simmons to leave.    Undisputed Facts ¶¶ 18–21.    Despite repeated requests for more help, USI declined to hire key technical-resources staff.    Undisputed Facts ¶ 22.    And as this Court found in its decision on USI's motion for a preliminary injunction, "Simmons made the decision to leave USI on his own." *Simmons*, 2023 WL 3751981, at *6.    No evidence to the contrary has come to light since then, and so there is no genuine dispute that Simmons was predisposed to leaving USI.    USI pushed him out; Lockton Southeast didn't pull him in.

Mitchell's path to resignation was similar.    He, too, was frustrated with the lack of client-service support from USI and believed the inadequate service level at USI was impacting his ability to properly service existing clients and attract new ones.    Undisputed Facts ¶¶ 30–31.    In November 2022, Mitchell made his own inquiries about potential landing spots and reached out to a friend who had previously worked at Lockton Southeast.    Undisputed Facts ¶ 33.  Lockton Southeast didn't pull Mitchell out of USI either; he was already determined to leave.

16

In short, after years of pleading with USI for additional resources, Simmons and Mitchell, like the maker of the Linziclip, grew "dissatisfied" and actively sought out other firms where they would be better supported. *Ingenuity*, 2014 WL 1230695, at \*5. Like the bank executive in *Centennial*, Simmons and Mitchell began to consider their employment options, including by talking to a list of USI competitors. Undisputed Facts ¶¶ 23, 33. The question wasn't whether they would leave USI; it was where they would end up.

It happened to be Lockton Southeast. By the time Simmons and Mitchell approached Lockton Southeast about potential employment in 2022, they already intended to leave USI and knew exactly how they planned to do it. Undisputed Facts ¶¶25–29, 35–36. Both Simmons and Mitchell told Lockton Southeast that they would be resigning from USI, effective immediately. Undisputed Facts ¶¶ 27, 36. Simmons and Mitchell also shared that they would be providing courtesy communications to certain of their existing clients about their departure from USI and that they intended to accept business from clients that wished to follow them and would provide services to them. Undisputed Facts ¶¶ 26, 29, 35. Instead of encouraging Simmons and Mitchell to breach their agreements, Lockton tried to talk them out of it including by offering Simmons more money to turn clients away from Lockton

17

Southeast.  Undisputed Facts ¶¶ 37–39.  Simmons refused and indicated he
would rather go elsewhere or start his own firm.  *Id.*

The undisputed facts are no different now than when the Court decided
that Simmons and Mitchell "were plainly predisposed to breach" their
agreements.  *Simmons*, 2023 WL 3751981, at *6.  For that reason, Lockton
Southeast can't be liable to USI for tortious interference, and the Court should
grant Lockton Southeast summary judgment on that claim.

## II.    The Court should grant the counter-defendants summary judgment on USI's tort counterclaims, which are just disguised contract claims.

USI contends Simmons and Mitchell breached their employment
agreements.  Those breach-of-contract claims are not part of this motion.  But
USI wasn't content to assert only contract claims against Simmons and
Mitchell (and against their new employer, Lockton Southeast).  It has also
asserted *tort* claims (for civil conspiracy and breach of fiduciary duty and the
duty of loyalty).  The problem with those claims is that they're just an effort to
"recast causes of action that are otherwise breach-of-contract claims as tort
claims."  *Altamonte Pediatric Assocs., P.A. v. Greenway Health, LLC,* 2020 WL
5350303, at *5 (M.D. Fla. Sept. 4, 2020).  The supposed conspiracy here was
one to breach Simmons's and Mitchell's employment agreements; and the duty
Simmons and Mitchell supposedly breached is set forth in their contracts.  If
USI has any claim, it's for breach of contract, not conspiracy or breach of some

extracontractual duty.  The Court should therefore grant summary judgment in favor of Simmons, Mitchell, and Lockton Southeast on the breach-of-duty and conspiracy claims.

### A.    The Court should grant Simmons and Mitchell summary judgment on USI's breach of duty of loyalty and/or fiduciary duty claim because the only duty USI claims they breached is contractual.

USI has asserted a tort claim for breach of the duty of loyalty and/or fiduciary duty.  But under Florida law, the independent-tort doctrine "bars a contracting party from recovery in tort where the act complained of relates to the performance of the contract."  *Nafta Traders, Inc. v. Corkcicle, LLC*, 2020 WL 7422060, at *3 (M.D. Fla. May 27, 2020).  Here, Simmons and Mitchell aren't alleged to have breached some duty independent of the duties set out in their contracts.  The Court should apply the independent-tort doctrine and enter summary judgment in favor of Simmons and Mitchell on the breach-of-duty claim.

Consider, for example, *Certain Underwriters at Lloyd's of London v. Ocean Walk Resort Condominium Ass'n, Inc.*, 2017 WL 3034069 (M.D. Fla. July 18, 2017).  That case involved a large resort that contained some timeshare units owned by Wyndham.  Wyndham paid the resort fees and, in exchange, the resort conducted all maintenance and inspections in the common areas.  In February 2011, a timeshare unit flooded because of a busted sprinkler pipe,

and the unit's insurer sued the resort for both breach of contract and negligence.  *Id.* at *2–3.  The court granted summary judgment on the negligence claim, holding that, as a matter of law, the resort had no duty to the insurer independent of its contract with Wyndham.  *Id.* at *11.  The court explained that the facts supporting the negligence claim were "indistinguishable" from those supporting the breach-of-contract claim; both depended on the resort's "nonperformance of its promise to conduct all maintenance and inspections necessary to maintain the Sprinkler System."  *Id.*

Here, similarly, the facts supporting USI's breach-of-duty claim are "indistinguishable" from those supporting its breach-of-contract claim.  USI alleges that Simmons and Mitchell "breached the fiduciary duties they owed to USI as its employees, including the duties of loyalty, confidence and non-competition."  Counterclaim ¶ 93.  But any duties Simmons and Mitchell may have had to USI would have arisen solely from their employment contracts.  Indeed, as highlighted in the table below, all of the duties Simmons and Mitchell are accused of breaching are contractual ones, set out in their employment agreements with USI.  That includes the duty of loyalty, which is addressed in each agreement:  "Producer acknowledges a duty of loyalty to the Company and agrees to us his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities herein in furtherance of the business of any USI Company."  Dkt. 3, Exhibit A, § 2.4; Exhibit B § 2.4.  A

breach of the duty of loyalty therefore would be nothing more than a breach of contract—which USI has already separately asserted.

When, as in this case, a duty arises from an underlying contract, a plaintiff may bring only a breach-of-contract claim, not a breach-of-fiduciary-duty claim. *E.g.*, *Tulepan v. Roberts*, 2015 WL 235441, at *13 (S.D. Fla. Jan. 16, 2015). Because there can be no genuine dispute that the duty Simmons and Mitchell allegedly breached was a contractual one, the court should grant Simmons and Mitchell summary judgment on USI's breach-of-duty claim.

| Restrictive covenants in USI employment agreements | Civil-conspiracy counterclaim | Breach-of-duty counterclaims |
|---|---|---|
| Simmons or Mitchell "could terminate his employment with USI upon giving at least sixty (60) days' written notice to the Company." Counterclaim ¶¶ 36, 41. | "As evidenced by the timing of the resignations . . . the Departing Producers and Lockton acted with malice and intent to deprive USI of its lawful interest in its various agreements," Counterclaim ¶ 89. | |
| "[F]or a period of two years after termination of employment for any reason, [Simmons or Mitchell] was . . . not to solicit, participate in, or promote the solicitation of any USI client, customer, or prospective customer . . . for the purpose of providing competitive products/services." Counterclaim ¶¶ 34, 39. | "As evidenced by . . . the continuing solicitation of USI's clients . . . and the servicing of USI's clients . . . the Departing Producers and Lockton acted with malice and intent to deprive USI of its lawful interest in its various agreements." Counterclaim ¶ 89. | "The Departing Producers were prohibited from actively competing with USI during the tenure of their employment." Counterclaim ¶ 95. |
| "[F]or a period of two years after termination of employment for any reason, [Simmons or Mitchell] was . . . not to accept insurance business from and/or provide competitive products/services to any client or customer of USI." Counterclaim ¶¶ 34, 39. | "As evidenced by . . . the acceptance of insurance business . . . the Departing Producers and Lockton acted with malice and intent to deprive USI of its lawful interest in its various agreements." Counterclaim ¶ 89. | "The Departing Producers were prohibited from actively competing with USI during the tenure of their employment." Counterclaim ¶ 95. |
| "[F]or a period of two years after termination of employment for any reason, [Simmons or Mitchell] was . . . not to solicit, recruit, or promote the solicitation or recruitment of any employee of USI for the purpose of encouraging that employee to leave employment with USI." Counterclaim ¶¶ 34, 39. | | "The Departing Producers were prohibited, while still employed by USI from soliciting their fellow employees to leave USI." Counterclaim ¶ 94. |

**B.    The Court should grant Simmons and Mitchell summary judgment on the conspiracy claim because the only alleged conspiracy here is one to breach a contract.**

Courts also regularly apply the independent-tort doctrine to dismiss breach-of-contract claims disguised as conspiracy claims.   That's what happened in, for example, *Alhassid v. Bank of America, N.A.*, 60 F. Supp. 3d 1302 (S.D. Fla. 2014).   There, homeowners alleged that a mortgage servicer and a bank engaged in a scheme whereby they "manufactured, imposed and inflated unauthorized and improper fees in connection with mortgage loans." *Id.* at 1307.   The homeowners sued the mortgage servicer and the bank for civil conspiracy and breach of contract on behalf of a nationwide class.   *Id.* at 1307. The court dismissed the conspiracy claim because the facts supporting it were "identical to their remaining breach of contract allegations"; both concerned the mortgage servicer's "improper defaulting, fee charging, and foreclosure procedures."   *Id.*  at 1317–18.  Given the lack of any breach "separate and apart from their breach of contract claims," the plaintiffs' conspiracy claim could not survive.   *Id.*  at 1318.

This case, too, is an effort to bring a redundant tort claim that is rooted in contracts.   In alleging a conspiracy, USI focuses on "the timing of the resignations, the continuing solicitation of USI's clients, the acceptance of insurance business, and the servicing of USI's clients."   Counterclaim ¶ 89.   As the table above shows, these allegations are *identical* to USI's breach-of-

contract allegations. The restrictive covenants in the employment agreements
of Simmons and Mitchell expressly govern everything that USI claims was a
conspiracy, including their decision to leave without providing notice 60 days
in advance and their supposed solicitation of USI clients. Counterclaim ¶ 89.

"Under Florida law, a civil conspiracy must have as its object the
commission of an underlying tort." *United Techs. Corp. v. Mazer*, 556 F.3d
1260, 1281 (11th Cir. 2009). USI hasn't alleged or discovered evidence of any
"breach or injury separate and apart from their breach of contact claim"
against Simmons and Mitchell. *Alhassid*, 60 F. Supp. 3d at 1318. Because
there can be no genuine dispute that the allegations supporting USI's
conspiracy counterclaim are rooted not in a separate injury, but in contracts,
that counterclaim is barred by the independent-tort doctrine, and the Court
should enter summary judgment in favor of Simmons and Mitchell.

**C.    Summary judgment for Lockton Southeast on USI's
        tortious-interference claim would require summary
        judgment on USI's conspiracy claim against Lockton
        Southeast.**

There is no such thing as a freestanding civil-conspiracy claim. A
plaintiff must "allege an underlying illegal act or tort on which the conspiracy
is based." *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla.
2014). No underlying tort, no liability for conspiracy. Here, USI alleges only
one tort—tortious interference on the part of Lockton Southeast with USI's

relationships with Simmons and Mitchell. But if the Court grants summary judgment in favor of Lockton Southeast on that claim, there would no longer be any tort in the case that Lockton Southeast could have conspired to commit. Accordingly, the Court should enter summary judgment in favor of Lockton Southeast on the civil-conspiracy claim as well. *See e.g., Grayson v. No Labels, Inc.,* 2021 WL 2869870, at *7 (M.D. Fla. Jan. 26, 2021); *Allocco v. City of Coral Gables*, 221 F. Supp. 2d 1317, 1361 (S.D. Fla. 2002); *Palmer v. Gotta Have it Golf Collectibles, Inc.*, 106 F. Supp. 2d 1289, 1303 (S.D. Fla. 2000).

> ### D.    Summary judgment on USI's breach-of-duty claim against Simmons and Mitchell would require summary judgment on USI's aiding-and-abetting claim against Lockton Southeast.

Should the Court grant summary judgment in favor of Simmons and Mitchell on USI's claim for breach of fiduciary duty and the duty of loyalty, it should do the same on USI's claim against Lockton Southeast for aiding and abetting any such breach. Aiding-and-abetting liability requires "an underlying violation on the part of the primary wrongdoer." *Lawrence v. Bank of Am., N.A.,* 455 F. App'x 904, 906 (11th Cir. 2012). It's impossible to aid and abet the breach of a fiduciary duty when that duty hasn't been breached in the first place. Here, if Simmons and Mitchell didn't breach any extracontractual duty to USI, there was nothing for Lockton Southeast to aid and abet. The

Court should therefore grant Lockton Southeast summary judgment on USI's aiding-and-abetting claim.

### III. The Court should grant summary judgment on USI's fair-market-value theory of damages because it runs contrary to Florida law.

USI seeks the fair market value of the accounts it lost. But, as explained at length in Counter-Defendants' motion to exclude the damages-related opinions of USI's experts, the fair market value of a business is the right measure of damages only when a business is completely destroyed. *In re Sherwood Invs. Overseas Ltd., Inc.*, 2016 WL 5719450, at *9 (M.D. Fla. Sept. 30, 2016). USI's wasn't. USI continues to operate its commercial brokerage business and, as of October 2023, the Tampa office of USI was the third largest office in all of USI and continues to grow "like crazy." Undisputed Facts ¶ 40. Because there can be no genuine dispute that USI was not "completely destroyed," a damages calculation based upon the market value of any lost business is inappropriate as a matter of law. Accordingly, recoverable damages should be limited to lost profits, if any.

CONCLUSION

The Court should grant summary judgment in Counter-Defendants' favor on all of USI's counterclaims except its breach-of-contract claims and on USI's fair-market-value theory of damages.

Dated: November 30, 2023          Respectfully submitted,

*/s/Lyle E. Shapiro*

Lyle Shapiro (Fla. Bar No. 120324)
HERSKOWITZ SHAPIRO, PLLC
9130 S. Dadeland Boulevard
Suite 1609, Miami, FL 33156
lyle@hslawfl.com

Nicola Gelormino (Fla. Bar No. 91432)
GELORMINO LAW, P.A.
9130 S. Dadeland Blvd., Ste. 1609
Miami, FL 33156
nicola@gelorminolawpa.com

Christopher J. Banks (admitted pro hac vice)
Molly A. Jones (admitted pro hac vice)
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor, San
Francisco, CA 94111
cbanks@crowell.com
mojones@crowell.com

Lauren Goldman (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York NY 10166
lgoldman@gibsondunn.com

Daniel R. Adler (admitted pro hac vice)
GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 900071
DAdler@gibsondunn.com

*Attorneys for Counter-Defendants
Southeast Series of Lockton
Companies, LLC, Matthew Simmons,
and Jack Mitchell*

26

## LOCAL RULE 3.01(g) CERTIFICATION

Lockton Southeast hereby certifies that its counsel has conferred with the opposing party regarding the relief sought via email and, at the time of this filing, Plaintiff's counsel has advised that they oppose the requested relief.

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of via transmission of Notice of Electronic Filing generated by CM/ECF.

s/ Lyle E. Shapiro