IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MATTHEW SIMMONS, SHEILA MURRAY,
JACK MITCHELL, JACKIE RODRIGUEZ,
MADISON LIEFFORT, and EMILY
CARTER,

     Plaintiffs,

vs.                                        Case No. 8:23-cv-00201-TPB-AAS

USI INSURANCE SERVICES, LLC, a foreign
limited liability company and USI ADVANTAGE
CORP., a foreign corporation,

     Defendants.

_____/

USI INSURANCE SERVICES, LLC,

     Counter-Plaintiff,

vs.

MATTHEW SIMMONS, JACK MITCHELL
and SOUTHEAST SERIES OF LOCKTON
COMPANIES, LLC,

     Counter-Defendants.

_____/

## **COUNTER-DEFENDANTS' MOTION TO EXCLUDE DAMAGES-RELATED OPINIONS OF DR. ANNE GRON AND ROBIN C. FROST**

     Counter-Defendants Matthew Simmons, Jack Mitchell, and Southeast

Series of Lockton Companies, LLC move for an order excluding the damages-

related opinions and testimony of Counter-Plaintiff USI Insurance Services, LLC's proposed experts, Dr. Anne Gron and Robin C. Frost.

## MEMORANDUM OF LAW

### INTRODUCTION

USI offers two damages experts, Dr. Anne Gron and Robin C. Frost. Dr. Gron provides the theory, Frost the numbers. Dr. Gron opines that the departure of Matthew Simmons, Jack Mitchell, and other former employees of USI was akin to a forced sale of a brokerage business. Frost picks up where Dr. Gron left off, assigning a "fair market value" to that supposed sale. In the alternative, Frost offers two ten-year projections of lost profits—one based on gross earnings and the other on net earnings. All these damages measures are foreclosed by Florida law and inconsistent with the facts of this case, and should thus be excluded under Federal Rule of Evidence 702.

Dr. Gron's theory is a non-starter under Florida law. She tries to lay the groundwork for a fair-market valuation, but Florida courts have long held that such a valuation is appropriate only when the claimant's business has been completely destroyed. In all other cases, including this one—where USI's business, far from being destroyed, continues to employ thousands of people, including hundreds in Florida alone—lost profits are the only acceptable measure of damages. Dr. Gron's theory thus threatens to mislead the jury

about the scale of the damages USI could possibly recover and is barred by Florida law.

Dr. Gron's theory has a second, independent flaw:  It doesn't fit the facts of this case. Her forced-sale theory inflates USI's alleged loss beyond recognition. Even if they were enforceable, Simmons's and Mitchell's employment agreements would not entitle USI to all the profits from their business.  All they call for is 60 days of notice before resignation and two years of restricted competition, not a continuing stream of business from any particular client.

Frost's fair-market valuation is the numerical counterpart to Dr. Gron's forced-sale theory, which means that the two rise and fall together.  There's no value to the jury in quantifying a hopelessly flawed idea.

Frost's alternative damages model (his calculations of gross and net profits) falters under Florida law and Rule 702.  His gross-profit calculation is irrelevant because Florida courts routinely discard lost-profits projections based on gross profit, insisting instead that such calculations account for all relevant expenses.  Lost profits must be *net* profits, not gross profits.  And Frost's net-profit calculation is inadmissible because Florida law and Rule 702 don't permit lost-profits calculations that are unduly speculative. All of Frost's lost-profits figures (including his net-profit calculation) rest on the assumption that USI would have been entitled to ten years of lost profits.  That improbably

long time horizon doesn't fit the facts of this case. Simmons and Mitchell signed employment agreements requiring them to give USI 60 days of notice before resigning and limiting their ability to compete with USI for two years. USI never had any right to all the profit from Simmons's and Mitchell's clients, much less the right to profits for an entire decade. Like Dr. Gron, then, Frost has tried to rewrite Simmons's and Mitchell's employment agreements to create rights that USI never had.

This Court should exclude damages-related testimony from both experts and prevent them from misleading the jury about both the law and the facts.

## BACKGROUND

### A.   USI asserts counter-claims against Simmons, Mitchell, and Lockton based on restrictive covenants in Simmons's and Mitchell's employment agreements.

Lockton and USI are national insurance brokerages. Simmons and Mitchell were "producers" in USI's office in Tampa, Florida. Dkt. 73 at 3. Among other responsibilities, producers serve as intermediaries between brokerage firms and their clients. *Id.* at 3–4. Simmons and Mitchell's team also included co-plaintiffs Emily Carter, Madison Lieffort, Sheila Murray, and Jackie Rodriguez. *Id.* at 3. Simmons and Mitchell signed employment agreements with USI that contain several restrictive covenants, including a provision requiring them to give 60 days' notice before resigning and provisions limiting their ability to solicit certain

4

USI clients for two years after leaving USI.  *Id.* at 4.

In January 2023, Simmons and Mitchell informed USI that they were resigning and would join Lockton, and so did the rest of their team. Dkt. 73 at 5–6.  That same day, Simmons, Mitchell, and the other co-plaintiffs sued USI in Florida state court, "seeking a declaration that their [employment] [a]greements are illegal and unenforceable." *Id.* at 6.  USI removed the suit to this Court and asserted counterclaims for "injunctive relief, breach of contract, breach of fiduciary duties, tortious interference, conspiracy, and aiding and abetting" against Simmons, Mitchell, and Lockton. *Id.*  In support of its bid for damages from Lockton, USI seeks to rely on the opinions of two experts, Dr. Anne Gron and Robin C. Frost.

### B. To provide a framework for calculating USI's damages, Dr. Gron recharacterizes the departure of Mitchell and Simmons as the forced sale of part of USI's business.

As Dr. Gron puts it, her task was to opine on "how the alleged conduct and the related loss of employees and clients reduced the value of USI." Shapiro Decl., Ex. 1, ¶ 10.  Dr. Gron's theory appears to proceed in three steps. First, she claims that "[i]nsurance brokers and their clients develop relationship-specific assets . . . embedded in the experience of producers and employees as well as client records," which "create switching costs and increase client retention." *Id.* ¶ 11. Over time, she asserts, producers and other employees come to understand clients' "insurance needs, their insurance

programs, claims experience, and related data," making it harder for those clients to replace their broker with a less informed competitor. *Id.* ¶ 17.

Second, Dr. Gron tries to apply this concept of "relationship-specific assets" to this case, stating that Counter-Defendants' "alleged conduct and the simultaneous employee departures reduced USI's [relationship-specific assets] and resulted in a loss of value to USI." Shapiro Decl., Ex. 1, ¶ 11. In other words, Simmons, Mitchell, and the other "departing employees had valuable experience and client relationships"—assets that USI supposedly lost upon their leaving. *Id.*

Finally, Dr. Gron analogizes this supposed loss "to the value transferred in the hypothetical sale of a broker office with a book of business." Shapiro Decl., Ex. 1, ¶ 11. This alleged loss "includes the value of the client accounts that left [and] lost future growth of these client accounts," as well as "lost additional growth from business" that USI would have secured absent these employees' departures thanks to "the greater experience developed in the ongoing servicing of these accounts." *Id.* ¶ 44.

### C.    Frost quantifies Dr. Gron's theory.

Frost takes the baton from Dr. Gron and supplies the numbers that he claims fit her theory. His report translates the concept of a sale into numbers by calculating the alleged "fair market value" of the client accounts that USI claims it lost when Simmons, Mitchell, and the rest of the team left. Shapiro

Decl., Ex. 2, at 3. Frost also puts forward an alternative calculation in the form of "lost profits." *Id.*

To arrive at the supposed fair market value of the accounts, Frost first estimates their earnings before interest, taxes, depreciation, and amortization ("EBITDA"). He then multiplies that estimate by 11, which he asserts is a fair multiple in the industry based on average EBITDA multiples "for valuation of agencies" with similar revenue as the client accounts, as well as his experience with various "insurance agency transactions." Shapiro Decl., Ex. 2, at 9–10. Frost's valuation comes out to about ███ million. *Id.*

Frost calculates lost profits in two ways: "gross profit less producer commission" and "net profit." Shapiro Decl., Ex. 2, at 11. In both approaches, Frost projects lost profits over a period of ten years and applies different hypothetical attrition rates for the accounts. *Id.* The two methods diverge in terms of what Frost subtracts from the estimated revenue of the accounts. To calculate gross profit, Frost subtracts only a ███ producer commission. *Id.* at 12–14. To arrive at net profit, by contrast, Frost accounts for ███ ████████████████████████████████████████ ████████████████████ *Id.* at 15–17. Discounted to present value, Frost's ten-year gross-profit projections range from about ███ million to ███ million, and his ten-year net-profit projections range from about ███ million to ███ million. *Id.* at 11, 18. Frost also seeks to present an average of his gross- and

net-profit calculations, which would exclude half of the costs that would otherwise be included in his net-profit calculus.   *See* Shapiro Decl., Ex. 3, at 57:16–59:6, 127:12–23.

## LEGAL STANDARD

"In federal trials, district courts must act as 'gatekeep[ers]' to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1293 (11th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 & n.7 (1993)).  Federal Rule of Evidence 702 puts up hurdles that expert opinions need to clear for their testimony to be admissible.  *See* Fed. R. Evid. 702.

Guided by Rule 702, this Circuit demands that judges consider three factors in deciding whether to admit expert testimony.  First, the court must determine whether "the expert is qualified to testify competently regarding the matters he intends to address."  *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).  Second, the court should assess whether "the methodology by which the expert reaches his conclusions is sufficiently reliable."  *Id.*  And third, the court must make sure that "the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *Id.* "[T]he burden of establishing [the expert's] qualifications,

reliability, and helpfulness" rests on "the party seeking to introduce the expert at trial." *Knepfle*, 48 F.4th at 1294.

## ARGUMENT

## I.  Dr. Gron's forced-sale theory defies Florida law and doesn't fit the facts of this case.

The purpose of Dr. Gron's report is to reconceptualize USI's alleged loss. In Dr. Gron's telling, the departure of Simmons, Mitchell, and the other former USI employees amounted to a forced "sale of a broker office with a book of business," so the right measure of USI's damages is the fair market value of that lost business. Shapiro Decl., Ex. 1, ¶ 11. There are two fundamental problems with this novel approach. First, Florida courts have consistently held that fair market value is the appropriate measure of damages only when a business has been completely destroyed—and it is undisputed that USI's wasn't.

Second, the forced-sale conceit bears no relationship to USI's claims or to the parties' contractual relationship.  Through Dr. Gron, USI is trying to recover cash flows for a decade from all business Simmons and Mitchell generated.  But it is undisputed that USI's agreements with Simmons and Mitchell entitled it to—at most—60 days' notice before they resigned and two years of restricted competition after they resigned.  In short, Dr. Gron's forced-sale theory is irreconcilable with Florida law, and talk of a "forced sale" and

the loss of a business has no connection to the facts and would mislead the jury. This Court should exclude Dr. Gron's testimony.

**A.    Dr. Gron's forced-sale theory won't assist the trier of fact, because Florida law forbids the recovery of fair market value when a business isn't completely destroyed.**

Dr. Gron is essential to USI's valuation of its lost damages, but not because she provides any numbers of her own. Instead, she offers a theory that lays the groundwork for Frost's calculations—i.e., that the loss of some USI client accounts was functionally akin to the forced sale of a business. In other words, Dr. Gron provides the conceptual backbone of USI's damages theory, which Frost goes on to quantify. The problem with the shared approach of the two experts is that it is foreclosed by Florida law, which doesn't permit a plaintiff to recover the fair market value of a business unless that business has been utterly destroyed. USI's wasn't: overwhelming evidence shows that the business has carried on swimmingly. Lost profits thus are the only acceptable measure of damages. Because Dr. Gron strays from the correct inquiry and instead dives into an approach that Florida law forbids, her framework could not possibly "assist[] the trier of fact . . . to understand the evidence or to determine a fact in issue." *Harcros*, 158 F.3d at 562.

Florida courts have consistently ruled that "[i]f the business is not completely destroyed, then it may recover lost profits" alone. *Montage Grp., Ltd. v. Athle-Tech Computer Sys., Inc.*, 889 So. 2d 180, 193 (Fla. Dist. Ct. App.

2004).  Florida's Standard Jury Instructions for Contract and Business Cases confirm that if the business survives, "then damages based upon the market value of the business are not appropriate."  *In re Standard Jury Instructions— Cont. & Bus. Cases*, 116 So. 3d 284, 335 (Fla. 2013).

Putting this principle into practice, Florida courts have consistently rejected fair-market valuations in situations where the business persisted:

- In *Environmental Biotech, Inc. v. Sibbitt Enterprises, Inc.*, 2008 WL 5070251 (M.D. Fla. Nov. 24, 2008), the court denied the counter-plaintiff's attempt to recover "the value of its franchise" because it "continue[d] providing [similar] services . . . , oftentimes to the same customers and using the same equipment as it had during the term of the franchise agreement." *Id.* at *4.  The court concluded that the business "was not completely destroyed," and hence that the "proper measure of damages, if any, [was] lost profits." *Id.* at *5.

- The court in *Environmental Biotech* relied on *KMS Restaurant Corp. v. Wendy's International Inc.*, 194 F. App'x 591 (11th Cir. 2006). *Envtl. Biotech*, 2008 WL 5070251, at *4. In that case, the plaintiff sued Wendy's for tortious interference, alleging that Wendy's foiled its effort to buy 27 Wendy's restaurants. *KMS*, 194 F. App'x at 593.  The Eleventh Circuit concluded that the plaintiff didn't deserve the fair market value of the restaurants because the busted deal "did not result in complete destruction of the 27 restaurants" but merely caused "KMS' loss of the use of these restaurants." *Id.* at 602.

- And in *Zinn v. GJPS Lukas, Inc.*, 695 So. 2d 499 (Fla. Dist. Ct. App. 1997), the court similarly reasoned that "while the [plaintiffs'] business was greatly diminished, it was not destroyed." *Id.* at 500.  Even though the defendant's pesticides killed off all the plaintiffs' "outdoor [shrimp] ponds," leaving them able to raise shrimp only "in a covered shed," that was still not enough to support a claim that the business was outright destroyed. *Id.*  Lost profits—not business value—was therefore the right measure of damages. *Id.* at 501.

11

Here, it's undisputed that USI's business hasn't been completely destroyed. There is abundant evidence that the business lives on:

- USI's Tampa office still stands. Shapiro Decl., Ex. 4, at 100:19–101:18.

- And that office is still serving a swelling client base. One of the Tampa office's practice leaders testified that the location was "growing like crazy" and remained USI's "third largest office." *Id.* at 101:15–16. That same witness also stated that in 2023, the Tampa office was on track to be a "PEAK office," which means that it will sell "15 percent new business over [its] retained book." *Id.* at 100:19–25.

In short, the record precludes USI from arguing that it is the type of "completely destroyed" business that would be permitted to recover fair market value as damages. *Montage*, 889 So. 2d at 193. Dr. Gron thus starts from a fatal premise. She theorizes that Simmons, Mitchell, and the other employees' departure amounted to a forced sale of a brokerage business, thereby laying the groundwork for Frost's fair-market valuation. But Florida courts forbid fair-market valuations when, as here, the business survives. Dr. Gron's framework is therefore unhelpful to the trier of fact. *See Harcros*, 158 F.3d at 562. Worse, Dr. Gron's ideas would mislead the jury about the right legal standard—and possibly even "'usurp . . . the role of the trial judge in instructing the jury as to the applicable law.'" *Irizarry v. Mid Fla. Cmty. Servs., Inc.*, 2009 WL 10670198, at *2 (M.D. Fla. July 8, 2009) (quoting *U.S. v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

### B.   Dr. Gron's theory does not fit the facts of this case because the departure of Simmons, Mitchell, and the other employees was nothing like a forced sale.

Even if Dr. Gron's forced-sale theory were allowed under Florida law, it would still be subject to exclusion because it doesn't match the facts of this case. At its core, Dr. Gron's forced-sale theory rests on two false premises: (i) that USI owned the lost clients, and (ii) that USI could include Simmons, Mitchell, and other key employees as part of any hypothetical sale and require them to stay with the buyer. But nowhere in the relevant contracts does it say anything like that. Simmons's and Mitchell's employment agreements required them to give 60 days' notice in advance of any resignation and to refrain from competing against USI in certain respects for two years after leaving the company. Dkt. 73 at 4–5. Those are the provisions that USI claims they breached. But even if enforceable, these restrictive covenants did not prevent Simmons and Mitchell from leaving USI altogether, grant USI the right to specific clients in perpetuity, or give USI the right to sell Simmons and Mitchell as employees. Any damages theory would need to reflect what the employment agreements actually say. Dr. Gron's theory doesn't, and is therefore inadmissible.

Rule 702 precludes experts from giving opinions that stray from the facts—a safeguard also known as "fit." *Daubert*, 509 U.S. at 591. That means courts should consider "whether expert testimony proffered in the case is

sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* In *Boca Raton Community Hospital, Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227 (11th Cir. 2009), for example, a hospital sued a healthcare provider network for supposed overcharges, but the district court excluded the hospital's damages experts because they were out of step with the hospital's liability theory. *Id.* at 1230-32. The Eleventh Circuit agreed. *Id.* at 1232. While the hospital's "liability theory rested on overcharging," the hospital's experts "made no attempt to figure out what [the defendant] could have lawfully charged, so they did not know how much [the defendant] had overcharged." *Id.* The damages theory was thus "like an oversized coat"— simply "cover[ing] too much" by faulting the defendant even for those charges that were possibly lawful. *Id.* at 1233. The hospital could not "hang a baggy injury and damages theory" on "a trim-fitting liability theory." *Id.*

*Boca Raton* concerned a damages opinion that was too broad—just like Dr. Gron's. Dr. Gron's forced-sale theory inflates Counter-Defendants' liability far beyond USI's contractual rights as an employer. Like the expert in *Boca Raton*, Dr. Gron paints with too broad a brush, asserting without proof that USI had a legal right to certain clients and employees (dubbed "relationship-specific assets"). Shapiro Decl., Ex. 1, ¶ 11. In this sense, Dr. Gron's report is a post-hoc effort to rewrite USI's counterclaim, expanding Counter-Defendants' liability through a damages report. When experts tell

tales that bend the facts beyond their breaking point, the Eleventh Circuit counsels courts to exclude these experts' ill-fitting assertions. Here, that means excluding Dr. Gron's testimony.

## II.   Florida law and Rule 702 forbid all of Frost's valuation methods.

While Dr. Gron provides the theory, Frost applies that theory to yield supposed damages numbers. Frost estimates the "fair market value" of the client accounts; in the alternative, he offers two calculations of lost profits: gross and net profit. Shapiro Decl., Ex. 2, at 3. But each of Frost's figures turns out to be worthless—for reasons both tied to and independent of the flaws in Dr. Gron's report:

- Frost's fair-market valuation depends on Dr. Gron's forced-sale theory—and therefore is just as verboten under Florida law.

- But even if fair market value were appropriate in this case, Frost's calculation of that value would still fall short on the facts and thus be unhelpful to the jury, mainly because Frost ignores how the departure of the lost client accounts is unlike the sale of an actual brokerage business.

- And while lost profits are the right measure of damages, Frost's gross- and net-profit calculations have fatal errors of their own. Gross profit isn't actual profit because it omits many key expenses. And Frost projects both gross and net profit over a ten-year timeframe that is unsupported by the facts, making both of his lost-profits projections too speculative under Florida law and Rule 702.

### A.   Frost's fair-market valuation shares the same flaws as Dr. Gron's forced-sale theory and doesn't match the facts.

Frost's estimate of fair market value is joined at the hip with Dr. Gron's forced-sale theory—its numerical twin, in fact. But numbers can't rehabilitate

an unworkable theory. Florida law simply doesn't permit parties to seek the fair market value of a business when that business wasn't totally destroyed. What's true of the forced sale in theory remains true when it's dressed up in numbers.

Even if fair market value were a permissible measure of damages, Frost's opinion should still be excluded because it doesn't value what USI lost due to the alleged wrongdoing. Most conspicuously, Frost ignores that in most sales of an insurance brokerage, ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *See* Shapiro Decl., Ex. 5, at 60:11–17. Here, by contrast, USI has held onto the right to do business with the lost client accounts and is actively competing—and engaging in costly litigation—to get that business back. USI has also won an injunction from this Court preventing Simmons, Mitchell, and the other former USI employees from servicing business from the lost client accounts. *See* Dkt. 73 at 20–21. Thus, the supposed "buyers" in this forced sale—Simmons and Mitchell—have been prevented from engaging in the very business they just "bought." In the real world, no buyer would agree to such an arrangement.

Frost's valuation also includes losses not caused by the alleged wrongdoing, such as losses caused by Simmons and Mitchell's mere resignations. Frost admitted that his model values not only the lost accounts,

16

but also the right to employ Simmons and Mitchell themselves.  Shapiro Decl.,

Ex. 3, at 67:16–68:9, 70:16–22, 116:9–24.  But Simmons and Mitchell were free

to quit at any point, subject only to the restrictive covenants (assuming they

are lawful).  Moreover, a stand-alone business would include intellectual

property, data and records, infrastructure, real estate, and potentially cash, ███

████████████████████████████████████████████████████████████████

███████████████████████  *See* Shapiro Decl., Ex. 6, at v, vi.  Thus, Frost's fair-

market value model values far more than what USI lost due to the alleged

wrongdoing, which only further underlines that Dr. Gron's concept of a forced

sale is sheer fiction.

> **B.**   **Frost's gross-profit and "average" models fail to satisfy Rule 702 and Florida law because they ignore relevant costs and therefore are not based on sufficient facts or data.**

Lost profits are the only potentially appropriate measure of damages in

this case.  But that doesn't mean just anything labeled a "lost-profits" analysis

will fly.  Rule 702 demands that an expert's testimony be "based on sufficient

facts or data."  Fed. R. Evid. 702(b).  So Frost's estimates must actually capture

lost profits—i.e., total revenue minus *all* expenses.  Florida law makes this

explicit:  "'If the party presents evidence only of gross receipts or fails to prove

expenses with some specificity,' an award of damages cannot stand."  *Lipscher*

*v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1317 (11th Cir. 2001); *accord, e.g.*, *Born*

*v. Goldstein*, 450 So. 2d 262, 264 (Fla. Dist. Ct. App. 1984).  Frost's gross-profit

analysis fails this test because it subtracts from USI's revenue only the producer commissions, Shapiro Decl., Ex. 2, at 12, ignoring five other cost categories that his own net-profit calculus includes. *See id.* at 15.

Courts use Rule 702 to strike expert testimony that dresses up gross profit as lost profits. For example, in *ConSeal International Inc. v. Neogen Corp.*, 2020 WL 5797631 (S.D. Fla. Sept. 29, 2020), the court noted that a gross-profit damages measure was "at odds with Florida law." *Id.* at *5. Accordingly, the court struck the expert's lost-profits analysis "to the extent that [it] fail[ed] to include, among others, certain supervisory salaries or fixed costs, administrative expenses, and overhead expenses." *Id.* And in an Eleventh Circuit case applying Georgia law (which is the same as Florida law on this score), the court observed that the damages expert "had not factored in expenses [the claimant] would normally incur in generating income and sales." *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004), abrogated on other grounds by *Innovative Clinical & Consulting Services, LLC v. First National Bank of Ames*, 620 S.E.2d 352 (Ga. 2005). The Eleventh Circuit thus affirmed the lower court's decision to strike the damages expert because of his "flawed methodology" under Rule 702 and *Daubert. Id.*

Similarly, when Florida trial courts fail to exclude gross-profit measures on the front end, the Court of Appeal has cut their damages figures down to size on the back end.  For example:

- In *Sostchin v. Doll Enterprises, Inc.*, 847 So. 2d 1123 (Fla. Dist. Ct. App. 2003), a negligence case, the court vacated the lost-profits award because it "was improperly based upon gross profits, rather than net profits, and was, to say the least, speculative." *Id.* at 1125.

- In *Fu Sheng Industrial Co. v. T/F Systems, Inc.*, 690 So. 2d 617 (Fla. Dist. Ct. App. 1997), the Court of Appeal ruled that "[t]he trial court should have required an accounting for all costs associated with the selling" of an oil reclamation device. *Id.* at 623.  In other words, lost profits should have been derived from "net profit." *Id.*

- In *E. T. Legg & Associates, Ltd. v. Shamrock Auto Rentals, Inc.*, 386 So. 2d 1273 (Fla. Dist. Ct. App. 1980), too, the plaintiff's damages evidence related only to "income or gross receipts, not profits." *Id.* at 1274.  Because the "testimony concerning expenses did not establish specific dollar amounts," the evidence was "inadequate to prove lost profits." *Id.*

These cases show that Rule 702 and Florida law are aligned in holding that gross profit can't be the measure of lost profits.  Because it doesn't reflect any costs except producer commissions, Frost's gross-profit figure isn't an effort to calculate lost profits at all.  In fact, Frost concedes the inadequacy of his gross-profit method by also offering a net-profit projection that does account for the many expenses that his gross-profit calculation omits, includin █████

███████████████████████████████████████████████████████████

████████ *See* Shapiro Decl., Ex. 2, at 15.  And, unsurprisingly, the gross-profit figures are about █████ he net-profit figures, *see id.* at 18; the chasm

19

between the two underscores just how unrealistic and inflated the gross-profit figures are—and why this Court should exclude them.

Frost also seeks to present an average of his gross- and net-profit calculations ███████████████████████████████████████████████
████████████████████████████████████████████████████████████ *See* Shapiro Decl., Ex. 3, at 57:16–59:6, 127:12–23. ████████████████████
████████████████████████ *Id.* at 57:19. Frost's arbitrary averaging of his gross-profit calculations with his net-profit calculations should be excluded for the same reason as his gross-profit calculations: the averages also fail to account for all relevant costs.

## C. The ten-year timeline for both of Frost's lost-profits projections is too speculative under Florida law and Rule 702.

To calculate his two varieties of lost profits, Frost adds up ten years of projected earnings from the client accounts that USI allegedly lost. *See* Shapiro Decl., Ex. 2, at 11. Accordingly, all of Frost's figures depend on a counterfactual world in which USI would have been entitled to profits from those accounts over a period of ten years. But that ten-year premise is untethered from the facts and doesn't comply with Florida law and Rule 702.

Florida law bars lost-profits calculations that are "'the result of speculation or conjecture.'" *Levitt-ANSCA Towne Park P'ship v. Smith & Co.*, 873 So. 2d 392, 396 (Fla. Dist. Ct. App. 2004). And in general, "'anticipated

profits of a commercial business are too speculative and dependent upon changing circumstances'" to pass muster—unless they "'can be established with reasonable certainty.'" *Levitt*, 873 So. 2d at 396.  In some cases, lost-profits analyses are too speculative because they don't show "that the defendant's wrongful conduct proximately *caused* damages." *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 923 (11th Cir. 1987).  Courts have consistently thrown out damages figures that flunked this causation test:

- In *Messer*, the claimant's rejected lost-profits projection "was premised on [his] following an investment plan devised by his broker." 833 F.2d at 922. The problem, the court observed, was that "there [was] little reason to believe that [the claimant] would have followed [the] investment plan." *Id.* at 923.  In other words, the claimant could not show that the defendant's "unauthorized trade proximately resulted in lost future profits." *Id.*

- In *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172 (11th Cir. 2002), the Eleventh Circuit noted that, under Florida law, lost profits may not be awarded "when those profits are dependent on a party taking an action that it is unclear he would have taken." *Id.* at 1177.  The plaintiff's lost-profits theory was based on the defendant's selling certain properties that would have earned the plaintiff a commission. *Id.* at 1177–78. Observing that the defendant "had no [contractual] obligation ever to make a sale of property," *id.* at 1178, the court went on to discard the damages award as "based on speculation." *Id.* at 1177.

Frost's testimony presents much the same problem.  Like the experts in *Messer* and *Brough*, Frost hasn't built a causal chain between Counter-Defendants' alleged wrongdoing and USI's claimed losses.  Indeed, Frost admitted in his deposition that he hadn't determined whether the lost client accounts left due to Simmons's or Mitchell's breach of their restrictive

covenants or because of other factors.  *See* Shapiro Decl., Ex. 3, at 75:22–76:2, 99:25–100:8.  In the same vein, Frost admitted that he never even tried to measure the "damages suffered by USI as a result of the alleged wrongful conduct in this case" or the difference between a world in which Simmons and Mitchell left *without* violating their contracts and a world in which they allegedly did.  *See id.* at 60:4–11, 221:10–17.  Instead, he simply valued the lost accounts as of a certain date, regardless of what might have happened in the real world, especially once the restrictive covenants expired.  *Id.* at 94:5–95:8. The key question, then, remains unanswered: how any breach of the restrictive covenants would grant USI the right to *ten years* of future profits.

Damages awards are also unduly speculative when they are projected over too long a timeframe.  In addition to rejecting the expert's gross-profit measure, the court in *Sostchin* also stressed that "the damages claimed were highly speculative and conjectural" because the expert used an "increase in sales" in one year to project future profits "for the entire six and a half year remainder of the [plaintiff's] lease term." 847 So. 2d at 1127. The court explained that "the mere existence of a leasehold interest for six and [a] half years . . . does not establish that profits would have been realized for that entire time." *Id.* at 1128.  And in *Fidelity Warranty Services, Inc. v. Firstate Insurance Holdings, Inc.*, 74 So. 3d 506 (Fla. Dist. Ct. App. 2011), the counter-claimant's expert "projected lost profits for five years into the future" to

estimate the "market value" of the business. *Id.* at 514. But the trial court noted the counter-defendant's "right to terminate [the contract] . . . with ninety days' notice," which meant that "any future income more than ninety days out was too speculative." *Id.* at 510. The Court of Appeal agreed that "'[i]t is as inappropriate to use purely speculative forecasts of future revenue to determine the market value of a business as it is to use such speculative forecasts in determining lost future profits.'" *Id.* at 514–15.

For this reason, too, Frost's ten-year profits horizon is pure guesswork. Frost doesn't justify that timeframe with anything in the record— let alone Simmons's and Mitchell's employment agreements. To the contrary, the record undercuts the ten-year timeline. In September 2023, two other producers left USI's Tampa office. Even though these producers gave 60 days' notice, six of their clients left USI before the producers' 60-day notice period was even over. *See* Shapiro Decl., Ex. 7, at 26–28. ███████████████

████████████████████████████████████████████████

██████████████████████████████ Client attrition is common and expected following the resignation of a producer, especially when, as here, the client relationships were based on personal ties. *See* Shapiro Decl., Ex. 8, at 31:16–24. To top it all off, Frost himself admitted that it would be "speculative" to assess how much business would have stayed at USI after

Simmons's and Mitchell's restrictive covenants expired. *See* Shapiro Decl., Ex. 3, at 98:5–7. Yet his model does just that and passes it off as an economic certainty.

In short, Frost doesn't have a crystal ball that would allow him to see whether and for how long the lost client accounts would have stayed with USI. *Sostchin* and *Fidelity* advise courts to take claims about temporally distant lost profits with a boulder of salt. Like Dr. Gron's theory, Frost's ten-year projection is a Trojan horse. Under the guise of a lost-profits calculation, Frost smuggles in a broader liability theory than the employment agreements here permit—a trick that Rule 702 doesn't allow. Both experts' reports veer too far into fiction, so this Court should exclude Dr. Gron's forced-sale theory and Frost's damages calculations in their entirety.

## CONCLUSION

This Court should exclude the damages-related opinions and testimony of Dr. Anne Gron and Robin C. Frost.

Respectfully submitted,

By: */s/ Lyle E. Shapiro*

Lyle Shapiro, Esq.
Fla. Bar No. 120324
Herskowitz Shapiro, PLLC
9130 S. Dadeland Boulevard,
Suite 1609, Miami, FL 33156
lyle@hslawfl.com

Gregory P. Brown, Esq.
Fla. Bar No. 098760
Robert B. Gough, III, Esq.
Fla. Bar No. 884839
Hill Ward Henderson, P.A.
101 E. Kennedy Boulevard, Suite
3700, Tampa, FL 33602
gregory.brown@hwhlaw.com
rgough@hwhlaw.com

Nicola Gelormino, Esq.
Fla. Bar No. 91432
Gelormino Law, P.A.
9130 S. Dadeland Boulevard,
Suite 1609, Miami, FL 33156
nicola@gelorminolawpa.com

Christopher J. Banks (admitted
pro hac vice)
Molly A. Jones (admitted pro hac
vice)
Crowell & Moring LLP
3 Embarcadero Center, 26th
Floor, San Francisco, CA 94111
cbanks@crowell.com
mojones@crowell.com

Lauren Goldman (admitted pro
hac vice)
Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY
10166
LGoldman@gibsondunn.com

Daniel R. Adler (admitted pro
hac vice)
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los
Angeles, CA 90071
DAdler@gibsondunn.com

*Counsel for Plaintiffs And
Counter-Defendants*

## LOCAL RULE 3.01(g) CERTIFICATION

Counter-Defendants certify that their counsel has conferred with the opposing party regarding the relief sought via email and, at the time of this filing, Counter-Plaintiff's counsel has advised that they oppose the requested relief.

## CERTIFICATE OF SERVICE

I certify that on November 30, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

<u>s/ Lyle E. Shapiro</u>