# Exhibit 2

**Matthew Simmons, Sheila Murray, Jack Mitchell, Jackie Rodriguez, Madison Lieffort and Emily Carter, plaintiffs**

v.

**USI Insurance Services LLC, defendant**

*Civil Action No. 8:23-cv-00201*
*United States District Court for the Middle District of Florida Tampa Division*

*and*

**USI Insurance Services LLC, counter plaintiff**

v.

**Matthew Simmons, Jack Mitchell and Southeast Series of Lockton Companies, LLC, counter defendants**

*Civil Action No. 8:23-cv-00201*
*United States District Court for the Middle District of Florida Tampa Division*

*Prepared by:*
*Robin C. Frost, ACA*



**MYSTIC CAPITAL**
ADVISORS GROUP, LLC

---

**New York, NY**          **Denver, CO**          **Charlotte, NC**          **London, UK**

Confidential-Attorney's Eyes Only



# TABLE OF CONTENTS

| DESCRIPTION | PAGE |
|---|---|
| INTRODUCTION LETTER…………….....……………………….…………..…….…… | 1 |
| BACKGROUND OF BUSINESS…………….……….…………………..……..……… | 6 |
| LOST ACCOUNTS ANNUAL REVENUE …………….…....……...……….……….… | 7 |
| STATEMENT OF ACCOUNT VALUE………....…………………...………...……… | 8 |
| ASSUMPTIONS & LIMITING CONDITIONS……………………….……..……..…… | 19 |
| VALUE CERTIFICATION/REPRESENTATION……………........……….………..… | 22 |
| EXHIBIT I – DOCUMENTS REVIEWED……………………………………….....… | 24 |
| EXHIBIT II – MYSTIC CAPITAL ADVISORS GROUP, LLC……………..……..…… | 25 |
| EXHIBIT III – FROST CURRICULUM VITAE…….……………..……………………... | 26 |

**Confidential-Attorney's Eyes Only**

David Cannella
Partner
Holland & Knight LLP
200 South Orange Ave., Suite 2600
Orlando, FL  32801

At your request, I, Robin C. Frost, ACA, a Vice President of Mystic Capital Advisors Group, LLC ("MYSTIC") was retained to provide opinions in the following cases filed in the United States District Court for the Middle District of Florida Tampa Division:

<u>Matthew Simmons ("SIMMONS"), Sheila Murray ("MURRAY"), Jack Mitchell ("MITCHELL"), Jackie Rodriguez ("RODRIGUEZ"), Madison Lieffort ("LIEFFORT") and Emily Carter ("CARTER") plaintiffs</u>
Civil Action No. 8:23-cv-00201

*and*

<u>USI Insurance Services LLC ("USI"), counter plaintiff</u>
v.
<u>SIMMONS, MITCHELL, and Southeast Series of Lockton Companies, LLC ("LOCKTON"), counter defendants</u>
Civil Action No. 8:23-cv-00201

I understand that Holland & Knight LLP represents USI in the above-referenced litigation, and I have been retained to provide opinions with regard to:

1) Valuation of accounts lost by USI to LOCKTON as a result of the conduct of SIMMONS, MITCHELL, MURRAY, RODRIGUEZ, LIEFFORT, CARTER, Chris Kakish ("KAKISH") and Theresa Kemp ("KEMP"), (hereinafter referred to collectively as "THE DEPARTED EMPLOYEES") and LOCKTON.

My analysis included a calculation of the fair market value of the certain accounts lost by USI (hereinafter collectively "LOSTACCTS").  Such accounts changed their broker of record ("BOR") from USI to LOCKTON, after THE DEPARTED EMPLOYEES left their employment with USI.  The value conclusion is considered as a cash or cash equivalent value.  The valuation date is January 31, 2023, the month-end after THE DEPARTED EMPLOYEES resigned from USI.

**Confidential-Attorney's Eyes Only**

I have performed a calculation engagement, in order to estimate the value of LOSTACCTS, and present my report in conformity with the "Statement of Standards for Valuation Services No. 1" ("SSVS No. 1") of the American Certified Public Accountants ("AICPA"). SSVS No. 1 defines a valuation engagement as "an engagement to estimate value in which a valuation analyst determines an estimate of the value of a subject interest by performing appropriate procedures, as outlined in the AICPA Statement on Standards for Valuation Services and is free to apply the valuation approaches and methods he or she deems appropriate in the circumstances. The valuation analyst expresses the results of the valuation engagement as a conclusion of value, which may be a single amount or a range."

SSVS No. 1 addresses a calculation report as follows: An engagement to estimate value wherein the valuation analyst and the client agree on the specific valuation approaches and valuation methods that the valuation analyst will use and the extent of valuation procedures the valuation analyst will perform to estimate the value of a subject interest. A calculation engagement generally does not include all the valuation procedures required for a valuation engagement. The valuation analyst expresses the results of the calculation engagement as a calculated value, which may be either a single amount or a range.

This calculation was performed solely to assist in the determination of the value of LOSTACCTS which were lost from USI as a result of, among other items, alleged breaches of non-solicitation, non-compete, non-interference and notice provisions in the Employment Agreements with THE DEPARTED EMPLOYEES, and the resulting estimate of value should not be used for any other purpose, or by any other party for any purpose, without my express written consent.

My analysis is also in conformance with various revenue rulings, including Revenue Ruling ("Rev. Rul.") 59-60, which outlines the approaches, methods and factors to be considered in a valuation. The standard of value is fair market value, defined by the Internal Revenue Service ("IRS") in Rev. Rul. 59-60, as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties have reasonable knowledge of the relevant facts. Rev. Rul. 59-60 also defines the hypothetical willing buyer and seller as follows: "Court decisions frequently state in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and concerning the market for such property." Furthermore, fair market value assumes that the price is transacted in cash or cash equivalents. Rev. Rul. 59-60, while used in tax valuations, is also used in many nontax valuations.

Fair market value is also defined in a similar way in the *International Glossary of Business Valuation Terms* as "the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms' length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."

**Confidential-Attorney's Eyes Only**

The premise of value is going concern.[1]  The liquidation premise of value was considered and rejected as not applicable.

In my conclusion of value, I considered the following relevant factors, which are specified in Rev. Rul. 59-60:

> ➢ The history and nature of the business;
> ➢ The historical revenue earned on the LOSTACCTS;
> ➢ The earnings capacity associated with the LOSTACCTS; and
> ➢ The current trading multiples for books of business of insurance agencies.

My analysis included, but was not limited to, the above-mentioned factors.

**Scope of Work**

As directed, I have applied a lost profits method to calculate the value of the LOSTACCTS.  In addition to the lost profits method, I have included a calculation of fair market value of the accounts as I believe that this method more appropriately represents the value of the LOSTACCTS as this is the most commonly used methodology in the industry.  The calculated values reflect these findings, my judgment and knowledge of the marketplace, and my expertise in valuation.

The objective of a fair market valuation is to express an opinion as to the value of a business, business ownership interest, or subject, which is supported by all procedures that the appraiser deems to be relevant to the valuation.  It is based on all relevant information available to the appraiser as of the valuation date; the appraiser conducts appropriate procedures to collect and analyze all information expected to be relevant to the valuation, and the appraiser considers all conceptual approaches deemed to be relevant.

To gain an understanding of the LOSTACCTS, I reviewed production financial data provided by USI.

As discussed in this report, I considered all valuation approaches and methods and applied the most appropriate methods from the income, asset and market approaches to derive a conclusion of value of the subject interest.  My fair market value reflects these findings, my judgment and knowledge of the marketplace, and my expertise in valuation.

My conclusion of value is set out in the attached report, which contains the following sections:

> ➢ Background of the Business
> ➢ LOSTACCTS Annual Revenue
> ➢ Statement of Account Value

---

[1] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place."

**Confidential-Attorney's Eyes Only**

Each of these sections is incorporated by reference into this letter.

In performing my work, I was provided with and/or relied upon various sources of information, including items which have been listed as "Documents Reviewed" in an exhibit to this report. All other external data sources are referenced within the report via footnote.

The procedures employed in valuing the subject interest in the Company included such steps as I considered necessary, including (but not limited to):

➢ An analysis of the profitability of the LOSTACCTS;
➢ An analysis of other pertinent facts and data resulting in our conclusion of value.

There were no restrictions or limitations in the scope of my work or data available for analysis.

**Conclusion of Value**

I have performed a calculation engagement, as that term is defined in SSVS No. 1. I performed certain calculation procedures on the LOSTACCTS. The specific calculation procedures are detailed herein. The calculation procedures were performed solely to assist in the determination of the calculated value solely for determining the fair market value and lost profit value of the LOSTACCTS and the resulting estimate of values should not be used for any other purpose, or by any other party for any purpose. This calculation engagement was conducted in accordance with SSVS No. 1. The estimate of value that results from a calculation engagement is expressed as a calculated value.

In a calculation engagement, the valuation analyst and the client agree on the specific valuation approaches and valuation methods the valuation analyst will use and the extent of valuation procedures the valuation analyst will perform to estimate the value of the subject interest. A calculation engagement does not include all of the procedures required for a valuation engagement, as that term is defined in SSVS No. 1.

Based on my calculations as described in this report, which are based solely on the procedures agreed upon as referred to above, and the facts and circumstances as of the calculation date, the resulting calculated value of the LOSTACCTS, which were lost by USI, is in the following ranges based upon a fair market valuation and lost profit valuation of LOSTACCTS:

## FAIR MARKET VALUATION

| Fair Market Valuation Range | Low Range | High Range | Midpoint |
|---|---|---|---|
|  |  |  |  |

## LOST PROFIT VALUATION

| Lost Profit Valuation Ranges | Low Range | High Range | Midpoint |
|---|---|---|---|
|  |  |  |  |

**Confidential-Attorney's Eyes Only**

I reserve the right to update this report, or my conclusion of value, if new information comes to my attention after the date of this report. This conclusion is subject to the Statement of Assumptions and Limiting Conditions found in "Assumptions & Limiting Conditions" section of this report.

Distribution of this letter and report and associated results, which are to be distributed only in their entirety, is intended and restricted to you, your accountants and attorneys, opposing counsel attorneys, and the Court, solely to assist you in providing a conclusion of value of the subject interests. This letter and accompanying report are not to be used with, circulated, quoted or otherwise referred to in whole or in part for any other purpose, or to any other party for any purpose, without my express written consent.

The approaches and methodologies used in my work did not comprise an examination or any attest service in accordance with generally accepted auditing standards, the objective of which is an expression of an opinion regarding the fair presentation of financial statements or other financial information, whether historical or prospective, presented in accordance with generally accepted accounting principles.

I express no opinion and accept no responsibility for the accuracy and completeness of the financial information (audited, reviewed, compiled, internal, prospective or tax returns), or other data provided to me by others, and I have not verified such information unless specifically stated in this report. I assume that the financial and other information provided to me is accurate and complete, and I have relied upon this information in performing our valuation. Should information come forth after issuance of this report, I reserve the right to amend the report accordingly.

My current billing rate is $500 per hour for deposition, trial testimony and all other services. My deposition can be arranged in Charlotte, North Carolina at a mutually agreeable date and time.

Mystic Capital Advisors Group, LLC

Robin C. Frost, ACA
Charlotte, North Carolina
August 18, 2023



Confidential-Attorney's Eyes Only

# BACKGROUND OF BUSINESS

SIMMONS joined Wells Fargo Insurance Services USA, Inc. ("WELLS FARGO") in 2013 to be trained in a sales production role. In 2017 USI acquired the commercial retail insurance business of WELLS FARGO, and SIMMONS executed an employment agreement with USI at the time of the acquisition. Meanwhile, MITCHELL joined USI in a producer role executing his employment agreement in 2019 and started working with SIMMONS taking over some of his accounts in addition to generating some new business of his own. By the end of 2022 the combined book of business of SIMMONS and MITCHELL was generating agency revenue in excess of $8 million annually.

SIMMONS, MITCHELL and all of THE DEPARTED EMPLOYEES had executed Employment Agreements with USI, which included confidentiality, non-compete, non-solicitation and non-interference provisions, and in the case of SIMMONS and MITCHELL also included a requirement to give at least sixty (60) days written notice of termination. For SIMMONS and MURRAY who were with WELLS FARGO prior to the acquisition by USI in 2017, the Employment Agreements also included the provision of retention bonus payments in consideration for the restrictive covenants included in the Employment Agreements.

During 2022 members of the management team of LOCKTON started discussions with SIMMONS regarding his interest in leaving USI and joining LOCKTON. In September 2022 SIMMONS approached MITCHELL to discuss the potential of him also moving to LOCKTON. The recruitment of SIMMONS and MITCHELL was referred to as "Project Buccaneer" internally by management of LOCKTON. During December 2022 and January 2023 SIMMONS had discussions with the non-producer members of THE DEPARTED EMPLOYEES about the potential move to LOCKTON, and on January 25, 2023 all eight (8) of THE DEPARTED EMPLOYEES tendered their resignation from USI without notice and accepted new employment with LOCKTON.

Concurrent with hiring THE DEPARTED EMPLOYEES, LOCKTON filed suit seeking an opinion on the validity of the USI Employment Agreements. Without waiting for a ruling, LOCKTON accepted business of the LOSTACCTS who had submitted BOR Letters to USI appointing LOCKTON as the agent, and within a month of their departure, a substantial number of policies for 26 client accounts had transferred, with further policies for these client accounts transferring in the ensuing months. The circumstances in this case, including the speed with which the clients submitted BOR letters to LOCKTON after THE DEPARTED EMPLOYEES submitted their notices of resignation, strongly suggest that the conduct of THE DEPARTED EMPLOYEES caused the LOSTACCTS to move their business to LOCKTON.

Accordingly, Holland & Knight has requested that I prepare an analysis to determine the value of the LOSTACCTS, which were successfully transferred via a BOR from USI to LOCKTON.

**Confidential-Attorney's Eyes Only**



## LOST ACCOUNTS ANNUAL REVENUE

As previously noted, THE DEPARTED EMPLOYEES, who left USI on January 25, 2023, specialized in commercial lines property and casualty. Immediately after their notice of resignation, they became employees of LOCKTON.

USI asserts THE DEPARTED EMPLOYEES caused LOSTACCTS to change their broker to LOCKTON in January 2023 and the ensuing months since their departure. Furthermore, the pro forma revenue for LOSTACCTS excludes revenue from other accounts which had been produced by THE DEPARTED EMPLOYEES which left USI after January 25, 2023 but did not transfer to LOCKTON.

The following is a list of the LOSTACCTS that were transferred via BOR to LOCKTON.

### LOST ACCOUNTS

| Client Name | Dec. 31, 2018 | Dec. 31, 2019 | Dec. 31, 2020 | Dec. 31, 2021 | Dec. 31, 2022 | TTM Jan. 31, 2023 | Less: Client Policies not Transferred (*) | Jan. 31, 2023 Pro Forma Revenue |
|---|---|---|---|---|---|---|---|---|
| Total Gross Commission Income | | | | | | | | |

*Matthew Simmons, Sheila Murray, Jack Mitchell, Jackie Rodriguez, Madison Lieffort and Emily Carter v. USI Insurance Services LLC*

*USI Insurance Services LLC v. Matthew Simmons, Jack Mitchell, and Southeast Series of Lockton Companies LLC*    Page 7

Confidential-Attorney's Eyes Only



# STATEMENT OF ACCOUNT VALUE

I was asked to prepare a lost profits analysis of the LOSTACCTS; however, I believe that the fair market value is a more appropriate representation of value of the LOSTACCTS based upon the following:

- The insurance brokerage industry is a highly acquisitive industry ranking very highly in the volume of transactions consummated each year.

- There are a significant number of buyers in the insurance industry that represent top brokers, regional and local agencies, banks and numerous private equity-backed organizations, which are actively soliciting agencies, or book of business purchases.

- A book of business purchase, such as the LOSTACCTS, would have been extremely easy to divest and would take minimal time to negotiate and consummate a transaction, as compared to purchasing the assets of an agency.

- It is customary in the insurance industry for insurance brokers and agencies to facilitate the departure of a producer to a competitor via a negotiated buyout of the producer's book of business, or LOSTACCTS, at a fair market value as it creates a more stable transition of accounts between organizations and minimizes the loss of any clients.

- Although transactions among insurance agencies and brokers are generally not publicized, I have involvement in over one hundred (100) transactions and would have personally been able to consummate a transaction to assist USI in divesting the LOSTACCTS with a number of potential buyers at fair market value.

Based upon the above reasons, I am confident that the LOSTACCTS are more accurately reflected by the fair market valuation methodology below; however, I have prepared, and have also presented, lost profit valuation calculations.

### Risk, Economy and Industry

In determining the value of an agency, or in this case the LOSTACCTS, it is necessary for a third party to review the underlying risk factors of the account. Results of an analysis of the inherent risk components are every bit as critical as commission volume and profitability and ultimately play a significant role in determining the interest a buyer might put forth in evaluating a proposed transaction. I am unaware of any economic, or other, changes in the industries or the businesses of the LOSTACCTS, which would negatively impact the annual revenue, as of the valuation date of January 31, 2023. Additionally, I am not aware of any changes in the insurance industry, or carrier appetite for such accounts, and assume that premiums charged and commission earned would be similar to the amounts for the twelve months ended January 31, 2023. These assertions are consistent for all of the following calculations of value.

Confidential-Attorney's Eyes Only

## FAIR MARKET VALUATION

The fair market valuation methodology that is utilized in the insurance industry for a book of business of the size of LOSTACCTS is a multiple of account profitability. The following discusses this approach, calculates a fair market valuation based upon this methodology and summarizes the results.

*Account Profitability ("EBITDA") Valuation*

In determining value, it is necessary to determine the profitability of the account. Accordingly, the following table reflects the revenue based upon the annual agency commission revenue received in the twelve months ending January 31, 2023.

As the value of a business or individual account(s) is determined based upon overall profitability of the account(s), I have utilized the most recent commission income available and as determined in the preceding section to be $ ███████    Additionally, I have applied a typical profit sharing/contingent income received from the carrier of 6.9% of commission revenue. Expenses, as it relates to USI, were determined based upon the renewal commission rates earned by producers at USI and on expense data for USI Southeast for the calendar year 2022.

The majority of transactions in the insurance industry, and certainly those with sophisticated buyers, determine purchase price based upon the annual profitability, or earnings before interest, taxes, depreciation and amortization ("EBITDA"), of the agency or in this instance, accounts. A calculation of the estimated profitability of LOSTACCTS is included on the following page which reflects EBITDA of LOSTACCTS estimated to be $ ██████

### PRO FORMA EBITDA



| Valuation - Fair Market Value Sale, EBITDA | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Pro Forma Assumption | Pro Forma 1.31.2023 | Jan. 31, 2023 | Dec. 31, 2022 | Dec. 31, 2021 | Dec. 31, 2020 | Dec. 31, 2019 | Dec. 31, 2018 |

---

[2] The 2022 Best Practices Study Update, Independent Insurance Agents of America and Reagan Consulting, Agencies with Revenues over $25,000,000, pg. 46.

[3] USI producer renewal commission rate paid on accounts in excess of $10,000 in agency commission revenue as per SIMMONS's Employment Agreement, Section 3.2(b) and (e), page 7.

[4] USI Southeast Commercial Lines 2022 expense ratio data.

[5] USI Southeast Overhead 2022 expense ratio data.



**Confidential-Attorney's Eyes Only**

Based upon my knowledge and involvement in over 60 insurance agency transactions during 2021 and 2022, and well in excess of 100 transactions in the past 10 years, it is my opinion that the accounts would trade at an EBITDA multiple range of 10.0x to 12.0x with a midpoint range of 11.0x.  The multiple of EBITDA is a standard method of valuing in the insurance industry and attempts to simplify and quantify a value based upon an investor's need for a return on investment over a period of years (i.e., 10.0 to 12.0 years). Per a widely accepted insurance industry benchmark study, the average EBITDA multiple for valuation of agencies with annual revenue between $3 million and $10 million was 12.0x[6] in 2021. Furthermore, as the specialized knowledge of THE DEPARTED EMPLOYEES also transferred to Lockton with the LOSTACCTS, this further enhances the valuation. The EBITDA result, in this case $1,578,408, is multiplied by this industry multiple in order to calculate the value of the account.

A valuation is not a precise figure; it is an estimate, which is best expressed in a range.  This estimate of value is based on the information gathered and presented during the review of the information on the LOSTACCTS, together with the opinions and judgments of the appraiser.  It is my opinion, the asset value of the LOSTACCTS is in the range of $15,784,080 to $18,940,896, with a midpoint value of $17,362,488.

| *Fair Market Valuation Range* | | | |
|---|---|---|---|
| | **Low Range** | **High Range** | **Midpoint** |
| *Net Earnings Before Interest, Taxes, Depreciation & Amortization* | | | |
| *Current Fair Market Trading Multiple of EBITDA* | | | |
| *Fair Market Valuation Range* | | | |

---

[6] The 2022 Best Practices Study Update, Independent Insurance Agents of America and Reagan Consulting, pg. 12.

*Matthew Simmons, Sheila Murray, Jack Mitchell, Jackie Rodriguez, Madison Lieffort and Emily Carter v. USI Insurance Services LLC*

*USI Insurance Services LLC v. Matthew Simmons, Jack Mitchell, and Southeast Series of Lockton Companies LLC*    Page 10

Confidential-Attorney's Eyes Only



## LOST PROFIT VALUATION

I have also prepared a lost profit analysis. I have chosen to provide two (2) methodologies including 1) gross profit less producer commission and 2) net profit. The following discusses both approaches, calculates a lost profit valuation based upon both methodologies and summarizes the results.

Both of the lost profit valuation methodologies below utilize certain of the same assumptions. Generally, there may be "attrition" of accounts in a book of business. This refers to accounts which may leave during the year and is netted by new accounts which are produced. The typical retention of an average insurance agency is between 90 and 95%. In order to prepare the lost profit valuations, I assumed first year retention rates of 80%, 90% and 85% to reflect the low, high and midpoint lost profit valuations of the book of business. Additionally, for purposes of forecasting the profits, I utilized a 10% attrition rate in years two (2) through year 10, which reflects the approximate rate that is typical in the insurance industry.

Additionally, both analyses have utilized the same discount rate, calculated as follows:

| Description | |
|---|---|
| Risk Free Rate | 3.50%[7] |
| Equity Risk Premium | 6.00%[7] |
| Size Risk Premium | 10.99%[7] |
| Industry Risk Premium | -1.38%[7] |
| Company Specific Risk Premium | -2.00%[8] |
| Discount Rate | 17.11% |

The following pages represent the lost profit calculations. Each calculation is based upon the order of 80%, 90% and 85% to reflect the low, high and midpoint lost profit valuations of the book of business. Additionally, the footnotes in both analyses correspond to those included in the Account Profitability ("EBITDA") fair market valuation methodology as such sources are from USI's actual producer renewal commission rate and a widely-accepted insurance industry benchmark study.

---

[7]Kroll Cost of Capital Data as of January 31, 2023.

[8] Company specific premium is calculated based upon appraiser judgment. As USI is a well-established broker and one of the largest brokers in the insurance industry, it would inherently bear less risk than a smaller broker or agency in which the Industry Risk Premium is derived.



Confidential-Attorney's Eyes Only

## Gross Profit Less Producer Commission Valuation

**Valuation – Net Present Value of Lost Net Profit, 80% annual Retention**

| | Pro Forma Assumption | Pro Forma 1.31.2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Revenue* | | | | | | | | | | | | |

Net Present Value Analysis of Lost Net Income

**Estimated Net Present Value Valuation Range**

| | Low Range | High Range | Midpoint |
|---|---|---|---|
| Percentage Retention | 80% | 90% | 85% |
| NPV of Lost Gross Profit less Producer Commission | | | |


MYSTIC CAPITAL

Confidential-Attorney's Eyes Only

## *Gross Profit Less Producer Commission Valuation (continued)*

Valuation – Net Present Value of Lost Net Profit, 90% annual Retention

| | Pro Forma Assumption | Pro Forma 1.31.2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Revenue* | | | | | | | | | | | | |

Net Present Value Analysis of Lost Net Income

**Estimated Net Present Value Valuation Range**

| | Low Range | High Range | Midpoint |
|---|---|---|---|
| *Percentage Retention* | 80% | 90% | 85% |
| *NPV of Lost Gross Profit less Producer Commission* | | | |



Confidential-Attorney's Eyes Only

## Gross Profit Less Producer Commission Valuation *(continued)*

Valuation – Net Present Value of Lost Net Profit, 85% annual Retention

| | Pro Forma Assumption | Pro Forma 1.31.2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Revenue* | | | | | | | | | | | | |

**Net Present Value Analysis of Lost Net Income**

*Estimated Net Present Value Valuation Range*

| | Low Range | High Range | Midpoint |
|---|---|---|---|
| *Percentage Retention* | 80% | 90% | 85% |
| *NPV of Lost Gross Profit less Producer Commission* | | | |



Confidential-Attorney's Eyes Only

## Net Lost Profit Valuation

Valuation – Net Present Value of Lost Net Profit, 80% annual Retention

| | Pro Forma Assumption | Pro Forma 1.31.2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Revenue

Net Present Value Analysis of Lost Net Income

Estimated Net Present Value Valuation Range

| | Low Range | High Range | Midpoint |
|---|---|---|---|
| Percentage Retention | 80% | 90% | 85% |
| NPV of Lost Net Income | | | |



**Confidential-Attorney's Eyes Only**

## *Net Lost Profit Valuation (continued)*

| Valuation - Net Present Value of Lost Net Profit, 90% annual Retention | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pro Forma Assumption | Pro Forma 1.31.2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
| [redacted] | | | | | | | | | | | | |

**Net Present Value Analysis of Lost Net Income**

[redacted]

| *Estimated Net Present Value Valuation Range* | | | |
|---|---|---|---|
| | Low Range | High Range | Midpoint |
| *Percentage Retention* | 80% | 90% | 85% |
| *NPV of Lost Net Income* | [redacted] | | |





Confidential-Attorney's Eyes Only

## Net Lost Profit Valuation (continued)

**Valuation – Net Present Value of Lost Net Profit, 85% annual Retention**

| | Pro Forma Assumption | Pro Forma 1.31.2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Revenue* | | | | | | | | | | | | |

**Net Present Value Analysis of Lost Net Income**

**Estimated Net Present Value Valuation Range**

| | Low Range | High Range | Midpoint |
|---|---|---|---|
| *Percentage Retention* | 80% | 90% | 85% |
| *NPV of Lost Net Income* | | | |

Confidential-Attorney's Eyes Only



### *Summary of Lost Profit Valuation Methods*

The following is a summary of the 1) gross profit less producer commission and 2) net profit valuation calculations and an average thereof:



| Lost Profit Valuation Ranges | Low Range | High Range | Midpoint |
|---|---|---|---|

Confidential-Attorney's Eyes Only 

# ASSUMPTIONS & LIMITING CONDITIONS

The primary assumptions and limiting conditions pertaining to the conclusion of value stated in this summary report are summarized below. Other assumptions are cited elsewhere in this report.

1.  The calculated value arrived at herein is valid only for the stated purpose as of the date of the calculation.

2.  Financial statements, prospective financial projections, and other related information provided by the Company or its representatives, in the course of this engagement, have been accepted without any verification as fully and correctly reflecting the enterprise's business conditions and operating results for the respective periods, except as specifically noted herein. I have not audited, reviewed, or compiled the financial information provided to me and, accordingly, I express no audit opinion or any other form of assurance on this information.

3.  Public information and industry and statistical information have been obtained from sources I believe to be reliable. I base the nature of the reliability as these are common sources relied-upon in the insurance industry; however, I make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

4.  The conclusion of value arrived at herein is based on the assumption that the current level of management expertise and effectiveness would continue to be maintained and that the character and integrity of the enterprise through any sale, reorganization, exchange, or diminution of the owners' participation would not be materially or significantly changed.

5.  The calculated values arrived at herein are for the exclusive use of USI, and USI's accountants and attorneys, for the sole and specific purposes as noted herein. They may not be used for any other purpose or by any other party for any purpose. Furthermore, the report and conclusion of value are not intended by the author and should not be construed by the reader to be investment advice in any manner whatsoever. The conclusion of value represents the considered opinion of Robin Frost, based on information furnished to him by the Company and other sources.

6.  Neither all nor any part of the contents of this report should be disseminated to the public through advertising media, public relations, news media, sales media, mail, direct transmittal, or any other means of communication, including but not limited to the Securities and Exchange Commission or other governmental agency or regulatory body, without the prior written consent and approval of Robin Frost.

Confidential-Attorney's Eyes Only



7.  Future services regarding the subject matter of this report, including, but not limited to testimony or attendance in court, shall not be required of Robin Frost unless previous arrangements have been made in writing.

8.  No change of any item in this report shall be made by anyone other than Robin Frost, and I shall have no responsibility for any such unauthorized change.

9.  Unless otherwise stated in the report, the calculated value of the subject has not considered or incorporated the potential economic gain or loss resulting from contingent assets, liabilities or events existing as of the valuation date.

10. All facts and data set forth in our letter report are true and accurate to the best of the Appraiser's knowledge and belief.

11. During the course of the valuation, I have considered information provided by management and other third parties. I believe these sources to be reliable, but no further responsibility is assumed for their accuracy.

12. I reserve the right to update this report for events or circumstances occurring subsequent to the date of this report.

13. The various estimates of value presented in this report apply to my assignment to value the LOSTACCTS in the context of the *SIMMONS, MURRAY, MITCHELL, RODRIGUEZ, LIEFFORT and CARTER v. USI* and *USI v. SIMMONS, MITCHELL and LOCKTON* litigation, and may not be used out of the context presented herein.

14. In all matters that may be potentially challenged by a Court or other party I do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take, nor for the costs or fees that may be incurred in the defense of my recommendations against challenge(s).  I will, however, retain my supporting workpapers for your matter(s), and will be available to assist in defending the professional positions taken, at my then current rates, plus direct expenses at actual, and according to our then current Standard Professional Agreement.

15. The report will not be used for financing, or included in a private placement or other public documents and may not be relied upon by any third parties.

16. The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

17. I express no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

**Confidential-Attorney's Eyes Only**



18. Unless stated otherwise in this report, I express no opinion with regards to tax matters.

19. This report is neither an offer to sell, nor a solicitation to buy securities, and/or equity in, or assets of, the Company.

20. This report is prepared with the assumption that the Company was conducting business in an approved manner during the period under review and in accordance with the regulations of the State of Florida.

*Matthew Simmons, Sheila Murray, Jack Mitchell, Jackie Rodriguez, Madison Lieffort and Emily Carter v. USI Insurance Services LLC*

*USI Insurance Services LLC v. Matthew Simmons, Jack Mitchell, and Southeast Series of Lockton Companies LLC*      *Page 21*

Confidential-Attorney's Eyes Only



# VALUATION CERTIFICATION/REPRESENTATION

**I represent/certify that, to the best of my knowledge and belief:**

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions and calculated of value are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, independent, unbiased, objective professional analyses, opinions and conclusions.

3. I have no present or prospective/contemplated financial or other interest in the business or property that is the subject of this report, and I have no personal financial or other interest or bias with respect to the property or the parties involved.

4. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

5. My compensation for completing this assignment is fee-based and is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the outcome of the valuation, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

6. The economic and industry data included in the valuation report have been obtained from various printed or electronic reference sources that the valuation analyst believes to be reliable. The valuation analyst has not performed any corroborating procedures to substantiate that data.

7. My analyses, opinions, conclusions (valuation engagement) and this detailed/comprehensive appraisal report were developed in conformity with the SSVS No. 1 and the National Association of Certified Valuation Analysts ("NACVA") Professional Standards.

8. The parties for which the information and use of the valuation report is restricted are identified; the calculation report is not intended to be and should not be used by anyone other than such parties.

9. The valuation analyst did not use the work of an outside specialist to assist during the valuation engagement.

10. The valuation analyst has no obligation to update the report or the opinion of value for information that comes to our attention after the date of the report.



**Confidential-Attorney's Eyes Only**

11. This report and analysis was prepared by Robin Frost, Vice President of Mystic Capital
    Advisors Group, LLC.  A biography of Mr. Frost is attached herein.


Mystic Capital Advisors Group, LLC


*[signature]*

Robin C. Frost, ACA,
Vice President

**_NACVA_**
*This valuation and report were completed in accordance with the National Association of Certified Valuation*
*Analysts Professional Standards for Conducting and Reporting on Business Valuations.*

*Matthew Simmons, Sheila Murray, Jack Mitchell, Jackie Rodriguez, Madison Lieffort and Emily Carter v. USI Insurance*
*Services LLC*
*USI Insurance Services LLC v. Matthew Simmons, Jack Mitchell, and Southeast Series of Lockton Companies LLC    Page 23*

Confidential-Attorney's Eyes Only



# EXHIBIT I - DOCUMENTS REVIEWED

| Description | Document # | File Type |
|---|---|---|
| 1. Matt Simmons – HR File (including Employment Agreement and Resignation Email) | USI_001718 | PDF |
| 2. Jack Mitchell – Employment Agreement | | PDF |
| 3. Sheila Murray – HR File (including Confidentiality, Non-Solicitation & Non-Interference Agreement and Resignation Email) | USI_001666 | PDF |
| 4. Madison Lieffort – HR File (including Confidentiality, Non-Solicitation & Non-Interference Agreement and Resignation Email) | USI_001574 | PDF |
| 5. Emily Carter – HR File (including Confidentiality, Non-Solicitation & Non-Interference Agreement and Resignation Email) | USI_001475 | PDF |
| 6. Theresa Kemp – HR File (including Confidentiality, Non-Solicitation & Non-Interference Agreement and Resignation Email) | USI_000748 | PDF |
| 7. Christopher Kakish – Confidentiality, Non-Solicitation & Non-Interference Agreement | USI_003975 | PDF |
| 8. Jackie Rodriguez – Confidentiality, Non-Solicitation & Non-Interference Agreement | | PDF |
| 9. BOR January 2023 (Simmons & Mitchell production data with dates of BOR's) | | Excel |
| 10. Lost Surety Clients Revenue (Simmons & Mitchell production data with dates of USI) | | Excel |
| 11. Simmons & Mitchell Books of Business 2017-2022 | USI_000417 - 000422 | PDF & Excel |
| 12. Confidential OCEO – Level 1 % (2022)- ACTUAL (Expense ratio analysis of USI Southeast) | USI_000025 - 000033 | PDF |
| 13. Simmons, Murray, Mitchell, Rodriguez, Lieffort and Carter's Complaint for Declaratory Relief filed 1/25/2023 | | PDF |
| 14. USI's Counter-Plaintiff Supplemental Briefing in Support of Motion for Injunction filed 4/17/2023 | | PDF |
| 15. Simmons Deposition Transcript 3/27/2023 | | PDF |

Confidential-Attorney's Eyes Only



# EXHIBIT II - MYSTIC CAPITAL ADVISORS GROUP, LLC

**Mystic Capital Advisors Group, LLC** is the premier financial consulting firm serving the retail insurance, wholesale insurance and financial services industries.

Founded in October 2001 by three former employees of The Hartford Financial Services Group, Inc., the group has more than 50 years of experience in financial consulting and advising on mergers and acquisitions transactions.

Clients include independent insurance agencies and brokerage firms, insurance aggregators and wholesalers, managing general agencies (MGA's), program administrators, banks, insurance companies, third party administrators (TPA's) and credit unions.  Services provided to clients include:

> ➢ Mergers and Acquisitions,
> ➢ Due Diligence,
> ➢ Business Valuations,
> ➢ Independent Analyst Coverage,
> ➢ Perpetuation and Succession Planning,
> ➢ Owner and Producer Compensation Plans,
> ➢ Industry Benchmarking, and
> ➢ Expert Witness Testimony.

## BIOGRAPHY

***Robin C. Frost, Vice President.***    Robin has spent over thirty years in various insurance-related finance and accounting roles.  Robin rejoined Mystic Capital in 2017 having also previously worked with the firm from 2007 to 2011.  In between these two (2) positions he was a Director at TIAA where he served as Chief Financial Officer of TIAA Charitable in Charlotte, North Carolina.  Prior to joining Mystic in 2007, he was the acting Chief Financial Officer of RSA Group's Latin America regional office in Charlotte, North Carolina.  Robin's work experience includes over 15 years with RSA, four (4) years with TIAA, and over three (3) years with Price Waterhouse.  Robin has a Bachelor of Science ("B.S.") in Mathematics from the University of Warwick.  He has earned the Chartered Accountant ("ACA") designation and is a member of the Institute of Chartered Accountants of England &Wales.

Confidential-Attorney's Eyes Only



# EXHIBIT III - FROST CURRICULUM VITAE

## Robin C. Frost, ACA

**PROFESSIONAL EXPERIENCE**

2007 – 2011 /
2017 - Present

**Mystic Capital Advisors Group LLC, Charlotte, NC**
*Investment banking firm focused on M&A transactional advisory services in the insurance space*
**Vice President**
- Represent both buyers and sellers in the insurance sector in M&A transactions leading to in excess of 100 closed deals,
- Perform business valuations for buyer, sellers, and agencies securing financing,
- Perform due diligence procedures on target companies for buy-side clients,
- Facilitate due diligence procedures for sell-side clients.

2012 - 2016

**TIAA, Charlotte, NC**
*Fortune 100 diversified financial services organization*
**Director**
- Line of business CFO supporting a wide array of businesses including a charitable giving administrator, an IT services provider and internal support functions including corporate strategy and M&A teams.

1992 - 2006

**RSA Group, Charlotte, NC / Horsham, UK / London, UK**
*FTSE-100 global property and casualty insurance group*
**Divisional CFO / Divisional Financial Controller (Charlotte, NC)**
- Directed financial operations in the Latin America division across 14 companies in separate countries with a combined revenue of $1B,
- Successfully completed acquisitions of companies in Argentina, Brazil, Chile and Mexico, and disposals in Antigua, Bahamas, Bermuda, Chile, Peru and Puerto Rico.
**Group Accounting Manager (Horsham, UK)**
- Managed team with responsibility for the international consolidation of financial statements, group internal reinsurance and agency accounting systems.
**Senior Project Accountant (London, UK)**
- Managed overall group consolidation of financial statements and quarterly London stock exchange releases.

Confidential-Attorney's Eyes Only

| | |
|---|---|
| 1988 - 1992 | **<u>Price Waterhouse</u>, London, UK / Bristol, UK**<br>*Global financial advisory, assurance and tax services group*<br>**Audit Senior**<br>• Assisted in audits for clients in manufacturing and financial services sector. |
| **PROFESSIONAL ASSOCIATIONS** | Institute of Chartered Accountants of England & Wales (ICAEW)<br>Final exams completed in 1992. |
| **EDUCATION** | Bachelor of Science (Honors), Pure Mathematics - 1987<br>University of Warwick, United Kingdom<br>Postgraduate Certificate in Education (Mathematics) - 1988<br>University of Bristol, United Kingdom. |
| **PUBLICATIONS** | Author, "Perpetuating is Easy – Isn't It",<br>published *Rough Notes, January 2011.*<br><br>Author, "Navigating the Winds of Change",<br>published *Rough Notes, September 2009.*<br><br>Author, "Enhancing Agency Value",<br>published *Rough Notes, July 2009.* |