# Exhibit 3

CERTIFIED COPY

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

CASE NO. 8:23-cv-00201-TPB-AAS

MATTHEW SIMMONS, SHEILA MURRAY,

JACK MITCHELL, JACKIE RODRIGUEZ,

MADISON LIEFFORT, and EMILY CARTER,

     Plaintiffs,

     v.

USI INSURANCE SERVICES, LLC, a foreign

limited liability company, and USI

ADVANTAGE CORP., a foreign corporation,

     Defendants.         /

USI INSURANCE SERVICES, LLC,

     Counter-Plaintiff,

     v.

MATTHEW SIMMONS, JACK MITCHELL and

SOUTHEAST SERIES OF LOCKTON COMPANIES, LLC,

     Counter-Defendants.       /

DEPOSITION OF ROBIN FROST

OCTOBER 25, 2023

JANET HAYDEN, COURT REPORTER, NOTARY PUBLIC
1039121




(310) 207-8000 Los Angeles  (415) 433-5777 San Francisco  (949) 955-0400 Irvine  (858) 455-5444 San Diego
(310) 207-8000 Century City  (408) 885-0550 San Jose  (760) 322-2240 Palm Springs  (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento  (800) 222-1231 Martinez  (702) 366-0500 Las Vegas  (800) 222-1231 Monterey
(951) 686-0606 Riverside  (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson  (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn  (518) 490-1910 Albany  (914) 510-9110 White Plains
(312) 379-5566 Chicago  00+1+800 222 1231 Paris  00+1+800 222 1231 Dubai  001+1+800 222 1231 Hong Kong

1          UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF FLORIDA

3                TAMPA DIVISION

4                    CASE NO. 8:23-cv-00201-TPB-AAS

5   MATTHEW SIMMONS, SHEILA MURRAY,

6   JACK MITCHELL, JACKIE RODRIGUEZ,

7   MADISON LIEFFORT, and EMILY CARTER,

8        Plaintiffs,

9        v.

10  USI INSURANCE SERVICES, LLC, a foreign

11  limited liability company, and USI

12  ADVANTAGE CORP., a foreign corporation,

13       Defendants.                    /

14  USI INSURANCE SERVICES, LLC,

15       Counter-Plaintiff,

16       v.

17  MATTHEW SIMMONS, JACK MITCHELL and

18  SOUTHEAST SERIES OF LOCKTON COMPANIES, LLC,

19       Counter-Defendants.                /

20  DEPOSITION OF:       ROBIN FROST

21  DATE TAKEN:          WEDNESDAY, OCTOBER 25, 2023

22  TIME:                10:00 A.M. TO 3:34 P.M.

23  PLACE:               VIRTUAL DEPOSITION

24  REPORTED BY:         JANET HAYDEN, COURT

25                       REPORTER, NOTARY PUBLIC

1

```
 1                       APPEARANCES:

 2        CROWELL & MORING, LLP, by
          MR. CHRISTOPHER J. BANKS, ESQ.
 3        3 Embarcadero Center, 26th Floor
          San Francisco, CA  94111
 4        cbanks@crowell.com

 5        and

 6        HERSKOWITZ SHAPIRO, PLLC. BY
          MR. LYLE SHAPIRO, ESQ.
 7        9130 S. Dadeland Boulevard, Suite 1609
          Miami, FL 33150
 8        lyle@hslawfl.com

 9              appeared on behalf of the Plaintiffs and
                Counter-Defendants;
10

11        HOLLAND & KNIGHT - ORLANDO, by
          MR. DAVID CANNELLA, ESQ. and
12        MS. KRISTIN ROYAL, ESQ. and
          MR. MATTHEW ZIMMERMAN, ESQ.
13        200 S. Orange Avenue, Suite 2600
          Orlando, FL  32801-5127
14        david.cannella@hklaw.com
          kristin.royal@hklaw.com
15
                appeared on behalf of the
16              Defendant.

17

18   ALSO PRESENT:

19        Ms. Sara Romine, Esq., Lockton inhouse
          counsel
20        Ms. Anne Gron
          Mr. Dale Salton, Truest Consultants
21        Mr. Justin Lewis, Truest Consultants
          Mr. Richard Loftus, videographer

22

23

24

25


                        2
```

```
 1                      I N D E X

 2  WITNESS:  Robin Frost
                                            Page No.
 3     Examination By:  Mr. Banks                5
                        Mr. Cannella           195
 4                      Mr. Banks              218

 5
                      E X H I B I T S
 6
                                            Page No.
 7

 8   (Exhibits retained by counsel.  When they are submitted
     to the court reporter, they will be attached to the
 9   transcript.)

10   Exhibit No. 1 (August 21, 2023 Report)        48

11   Exhibit No. 2 (Rebuttal Report)              110

12   Exhibit No. 3 (J. Mitchell emplmt. Agreement) 134

13   Exhibit No. 4 (Mystic Capital invoice)       169

14   Exhibit No. 5 (Deal List)                    174

15

16

17

18

19

20

21

22

23

24

25
```

3

ROBIN FROST

```
 1          THE VIDEOGRAPHER:  We are now on the record.  This
 2    begins Videotape No. 1 in the deposition of Robin Frost
 3    in the matter of Matthew Simmons, et al v. USI
 4    Insurance Services, LLC.  Today is October 25th, 2023,
 5    and the time is 10:07 A.M.  This deposition is being
 6    taken virtually at the request of Crowell and Moring,
 7    LLP.  The videographer is Richard Loftus of Magna Legal
 8    Services, and the court reporter is Janet Hayden.
 9               Will counsel and all parties present
10    state their appearances and whom they represent.
11        MR BANKS:  Good morning.  This is Christopher
12    Banks of the firm Crowell and Moring on behalf of the
13    Southeast Series of Lockton Companies.
14        MR. SHAPIRO:  Good morning.  Lyle Shapiro from
15    Herskowitz Shapiro on behalf of the plaintiff and
16    counter-defendants.
17        MR. CANNELLA:  This is Dave Cannella with Holland
18    and Knight, with Matthew Zimmerman and Kristin Royal on
19    behalf of USI.
20        MR. BANKS:  And just for the record, also present
21    is Sara Romine, inhouse counsel at the Southeast --
22    well, for Lockton, for the Southeast Series of Lockton
23    Companies.  And we have present Dale Salton from Truest
24    Consulting.  And at some point, we will likely also
25    have Justin Lewis maybe in about an hour from Truest
```

4

1    Consulting.

2        THE VIDEOGRAPHER:  Will the court reporter please

3    swear in the witness.

4        THE COURT REPORTER:  Please raise your right hand.

5                    (The oath was thereupon duly

6                     administered to the witness by the

7                     Notary.)

8                    ROBIN FROST,

9    having been first duly sworn, was examined and

10   testified as follows:

11

12                   EXAMINATION

13                   By:  Mr. Banks

14       Q.   All right.  Good morning, Mr. Frost.  Could

15   you tell us where you are presently testifying from?

16       A.   I'm in testifying from my home in -- which is

17   in Tega Cay, South Carolina.

18       Q.   And do you have anything open on your

19   computer other than this Zoom meeting at this time?

20       A.   No, I don't.  Just the Zoom meeting.

21       Q.   All right.  And do you any documents with you

22   that relate at all to your engagement in this matter?

23       A.   I do have some printouts.  I have a printout

24   of my -- both of the reports I produced.  I have a

25   printout of an excerpt of the report that Ms. (sic)

ROBIN FROST

1   Lewis produced, just -- I thought we might be referring

2   to it.

3        Q.   That's appropriate.  I just want to know what

4   all it is.

5        A.   All right.

6        Q.   I'm sorry.  I think I also may have

7   interrupted your answer there.

8             Is there anything else?

9        A.   I produced a deal listing for you.  I wasn't

10  sure if I might need that.  So, I have that, too.

11       Q.   And that was produced with your rebuttal

12  report?

13       A.   No.  I was subpoenaed to produce certain

14  documentation.  That was one of the requests.  It was

15  part of that.

16       Q.   And do you also have your -- the notes from

17  your communications with USI personnel?

18       A.   I don't have them.  I could get to them

19  though, if needed.  Yeah.

20       Q.   I can also put, you know, put them in the --

21  as exhibits.  I just want to know what you have.

22       A.   Okay.

23       Q.   Do you have any notes or highlighting or

24  anything like that on any of the documents you have

25  with you?

6

1      A.   I don't believe I do.  I try to have clean

2   copies.  So, no.  These are clean copies.  Yes.

3      Q.   Have you annotated, you know, with

4   handwritten notes, or highlighting, things like that, a

5   copy of the Frost -- not the Frost report -- the Lewis

6   report?

7      A.   No.  I just got a clean copy of that.  Yeah.

8   I did -- I made sure I just had a clean copy today.

9   So, no notes.

10     Q.   So, in front of you, you have a copy of your

11  initial report and your rebuttal report.  Correct?

12     A.   Yes.

13     Q.   Portions of the Lewis report.  Correct?

14     A.   Yes.

15     Q.   And a copy of a deal list that you provided;

16  is that correct?

17     A.   That's correct.  Yes.

18     Q.   Is the deal list something from of USI's

19  deals, or deals that you worked on?

20     A.   It's the deals that I worked on.

21     Q.   Does that have Bates numbers on it?

22     A.   Not my copy, though I'm sure the one that was

23  submitted for discovery.  I just got the original

24  document I produced.

25     Q.   Have you testified in other cases before?

7

1      A.   I have not.

2      Q.   Have you given a deposition before?

3      A.   I have not.

4      Q.   All right.  So, I want to make sure we go

5   over some ground rules to make sure we're all on the

6   same page to start with.

7           First, I had asked you about things that

8   you may have in front of you.  If, at any point, you

9   look up anything else, or retrieve anything else, will

10  you please make sure to tell us you are doing so, so we

11  can determine whether that would be appropriate, and

12  whether it's something needs to be turned over.  Okay?

13     A.   Yes.  Will do.

14     Q.   Do you have a phone or anything like that in

15  front of you that would allow you to communicate with

16  anyone?

17     A.   I have got my cell phone me with me.  I can

18  remove it if you would prefer.

19     Q.   I understand that sometimes people, you know,

20  may have emergencies and things like that, so I

21  wouldn't expect you to turn it off, you know, or

22  completely hide it.  But I would ask if you are -- if

23  you receive any messages that relate to this matter,

24  will you please let us know?

25     A.   Yes.  Of course, yes.

1   Q.   And in general, I want to be clear:  You

2   should not be receiving such messages.  That's why I

3   raise it.

4          Do you have -- is there anybody else in

5   the room with you?

6   A.   No.  I'm on my own.

7   Q.   And if anybody else comes into the room, will

8   you please let us know as well?

9   A.   Yes, of course.  I highly doubt anyone else.

10  I'm in the house on my own.  So, yeah.

11  Q.   So, if someone comes in, that probably would

12  not be a good thing.

13  A.   Yes.

14  Q.   All right.  We want to make sure we have a

15  complete and accurate transcript today, which means a

16  couple of things.  First is that we have to be careful

17  not to interrupt each other.  So, during the

18  deposition, please wait until I finish my questions

19  before you answer, and I will try to do the same with

20  your answers.

21          Do you understand that?

22  A.   Yes.  I'll do my best to do that.  Thank you.

23  Q.   Right.  Now, it may come from time to time

24  that you either anticipate what my question is, and

25  become conversational, or I might even pause in a

9

1    question and you think I'm done.  If that happens, and

2    I'm not done, I'll probably raise my hand and ask you

3    to wait.  And I'm not being rude.  I just need to make

4    sure we have an accurate transcript.

5              Do you understand that?

6       A.    I do.

7       Q.    Similarly, if in answering a question,

8    especially if you're giving a longer answer, there

9    might come a time that I think you're finished, and I

10   might start to ask another question.  If you are not

11   done with your answer, will you please stop me so that

12   you can finish your answer, and we can get a complete

13   record of your testimony?

14             Okay?

15      A.    Yes.

16      Q.    During the deposition, USI's lawyer may offer

17   an objection despite the fact that all of my questions

18   are perfect.  I'm joking.  But if that happens, we need

19   to give him the same courtesy that we're trying to give

20   each other.  And that is, that we need to let him make

21   his objections.  So, if Mr. Cannella is making an

22   objection, will you please wait, and allow him to make

23   his objection before you answer?

24      A.    Yes.

25      Q.    Those objections, to be clear, are for the

10

1    record.  There's no judge here today, so no one is

2    going to be ruling on them.  Which means that if

3    there's an objection, I may change my question.  And if

4    that happens, you should only answer the new question.

5              Do you understand that?

6        A.   Yes.  Understood.

7        Q.   On the other hand, if I do not change my

8    question, you should still answer the original question

9    to the best of your ability.

10             Do you understand that?

11       A.   Yes.

12       Q.   Now, during the deposition, if I ever ask you

13   something that is unclear to you for any reason, and

14   regardless of whether there is an objection or not,

15   will you please let me know so that we can clarify the

16   question.  Because otherwise the jury, the Court will

17   understand that you understood my question.

18             Do you understand that?

19       A.   Yes.  I understand.  Yeah.

20       Q.   There might come a time where Mr. Cannella

21   makes an instruction about what you can and cannot

22   reveal in an answer.  If that happens, I may ask to

23   confirm with you that you will follow the instruction

24   just to get a complete record.  But that is different

25   from an objection.  And if that happens, I assume that

11

1    you will follow the instruction, and not provide

2    whatever he is telling you not to provide.  Usually

3    that comes up if there's a question of privilege or

4    attorney work product.

5                    Do you understand that?

6        A.    I do.  Thank you.  Yes.

7        Q.    All right.  During the deposition, there may

8    be occasions where I'm asking you something, and you do

9    not know the answer specifically.  I want to be clear.

10    I don't want you to speculate in your answers, but on

11    the other hand, I may ask you to provide me an estimate

12    if you're able to do so.

13                    To clarify, usually, you know, lawyers

14    give this example:  The difference between an estimate

15    and speculation would be, for example, are you sitting

16    at a desk today?

17        A.    Yes.

18        Q.    You may have heard this before.  If I asked

19    you what the size of the desk is, you may not know it

20    precisely, but because it's in front of you, you can

21    give me a good estimate based on your experience and

22    your observations.

23                    Do you understand that?

24        A.    I do.  Yes.

25        Q.    All right.  But if I asked you what the size

12

1    of the desk was that I'm sitting at, you can't see,

2    you've never been here, and that would be a guess

3    because you don't have any information to base an

4    estimate on.

5              Do you understand that?

6         A.   I do.  Yes.

7         Q.   So, if that comes up, that's what I'm asking

8    for.  As I mentioned at the beginning, what we want is

9    an accurate, complete record of your testimony.  We

10   want to make sure it's also truthful.  You understand

11   you took an oath today, and even though there's no

12   judge, it has the same effect as if you were testifying

13   in court.

14             Do you understand that?

15        A.   I understand that, yes.

16        Q.   Is there any reason today why you would not

17   be able to give complete and accurate and truthful

18   testimony, such as, you know, medication, or some

19   health problem that might affect your memory?

20        A.   No.  No reason.  I'm good today.

21        Q.   Okay.  Great.  All right.  So, you haven't

22   testified before, but have you ever offered expert

23   opinions in a litigation matter before?

24        A.   I have not.

25        Q.   And in asking that, I want to be clear, I'm

13

ROBIN FROST

1    including arbitrations or other non-court proceedings

2    but that are still to -- designed to adjudicate

3    disputes.

4              Have you ever given an opinion in

5    anything like that?  Any sort of arbitration or court

6    proceeding in the United States or otherwise?

7         A.   No.  I have not.  No.

8         Q.   All right.  You have, on the other hand, you

9    work at a company called Mystic Capital.  Correct?

10        A.   I do, yes.

11        Q.   So, you personally have worked on a variety

12   of transactions; is that correct?

13        A.   That is correct.  Yes.

14        Q.   What is your role usually in working on those

15   transactions?

16        A.   It varies.  A lot of what I do, I'm doing

17   financial due diligence work where a buyer has engaged

18   us to assist them with acquiring an agency, a book of

19   business, and I'm doing the financial due diligence

20   based on them.  On other transactions, I'm work with

21   the seller where Mystic is representing the seller, and

22   I'm specifically helping them, making sure they're

23   providing the data requested, and so on.

24        Q.   So, your role in those transactions is in

25   collecting data and analyzing data; is that correct?

14

1       A.   Yes.

2       Q.   Are you involved in the negotiations of those

3   deals?

4       A.   Yes.  I should say.  I didn't reference that

5   previously.  Yeah.  In other transactions, yes, I'm

6   involved in the negotiations part of it.  Yes.

7       Q.   And what is your role when you've been

8   involved in negotiations?

9       A.   Basically assisting the client that we are

10  representing, just making sure that they're, you know,

11  responding to the questions asked, I suppose.  But

12  yeah, I do.  We help them in searching what we think

13  the value of their company is, helping them with a

14  valuation so they have a price that they are trying to

15  achieve.

16      Q.   And how many transactions have you assisted

17  in determining a valuation for the business?

18      A.   Oh, a handful I would say of the ones I've

19  been involved in.  I can't give you a precise number.

20      Q.   Can you give me an estimate?  You know, a

21  range?

22      A.   It's very hard to come up with.  It's more

23  than ten, I would say.  But yeah.  I -- yeah.

24      Q.   More than ten, but less than 20?

25      A.   Probably.  Yes.  Yes.

15

1      Q.   And were those all in the insurance brokerage

2  industry, or did some of those involve other

3  industries?

4      A.   No.  All in the insurance brokerage industry.

5  We -- Mystic Capital specializes just in the insurance

6  industry.

7      Q.   And were any of those instances in which you

8  were involved in determining the value for some sort of

9  business that was being sold or bought, did you ever

10  work for USI?

11      A.   No.  I've never worked with USI.  No.

12      Q.   Now, your role on the due diligence end, have

13  you ever worked with USI?

14      A.   No, I have not.  No.

15      Q.   And to be clear, when I say "with USI," I'm

16  including either for USI or involved in representing a

17  seller in a transaction with USI.

18           Does that change your answer at all?

19      A.   No, it does not.  I have not worked in a deal

20  involving USI personally.  No.

21      Q.   So, in the proximately 10 to 20 transactions

22  wherein you personally participated in valuation

23  analysis, can you list for me any of those

24  transactions?

25      A.   Well, one that comes to mind is the Beal

16

1    (ph.)  -- I think the Beal (ph.)  Insurance -- Beal

2    (ph.)  Agency I should say, sorry, with Acrisure.

3    That's one that just pops into my head.  Yes.

4         Q.   And which side did Mystic Capital work on

5    that transaction?

6         A.   We were representing Beal (ph.)  Agency who

7    was selling.  And they end up selling to Acrisure.

8         Q.   And did they sell the entire business to

9    Acrisure, or was it only a portion of the business?

10        A.   They sold the entire business, yes.

11        Q.   Was it an equity sale, or an asset sale?

12        A.   I'm -- I can't recall exactly.  I think it

13   was an asset sale, but I'd have to check to be

14   absolutely certain of that.

15        Q.   Was it for all of the assets of the entity?

16        A.   Yes.  Again, I would have to check to be

17   absolutely certain, but I'm fairly certain it was for

18   all of the assets.  Yes.

19        Q.   And was it also for all of the liabilities,

20   or were there liabilities that were excluded?

21        A.   There would be -- typically there would be

22   liabilities that are excluded, yes.  If an agency has

23   any debt, for example, typically that is excluded from

24   the transaction.

25        Q.   When was this transaction closed?  The Beal

17

1    (ph.) Agency -- Beal (ph.) Insurance Agency

2    transaction?

3         A.   Is it okay if I refer to my list of

4    transactions at this time?  Is that okay?

5         Q.   Yes.

6         A.   I could look it up.  I think it's 2018, but I

7    have the list.  I thought you might ask about this.

8    That's why I had it with me.  Beal (ph.), yes.  May

9    2018.  I see it.

10        Q.   And what was the multiple on that

11   transaction?

12        A.   Oh, I can't recall.  I would really have to

13   go and check that.  I really can't recall.

14        Q.   Of the approximately 10 to 20 transactions

15   where you were involved in valuation analysis, how many

16   of those related to the sale of a book of business as

17   opposed to a business?

18        A.   I'm speculating.  I can't recall exactly, I

19   should say.  In most cases, it would be the agency.

20   I'm trying to think of an example where it would just

21   be a piece of a business.  I would expect there are

22   some in there, but none come to mind right at this

23   moment.

24        Q.   So, as of this time, you cannot recall any

25   particular transactions that you worked on valuation

18

1   analysis for -- that were for a book of business as

2   opposed to a business?

3       MR. CANNELLA:  Object to the form of the question.

4       THE WITNESS:  I can't recall any at the moment,

5   but I have been involved in transactions which involve

6   a book of business where someone else has done the

7   valuation piece of the work.  I'm coming in, and I'm --

8   so when I'm doing financial due diligence, for example,

9   I'm involved in the transaction.  I know what the

10  valuation is, what the pricing is and so on.

11          So, I've been involved in a number of

12  transactions where there's a book of business being

13  sold.  But yeah.  On the valuation side, I just can't

14  recall any right now as you ask.

15  BY MR. BANKS:

16      Q.   To be clear, on those situations that you're

17  talking about where you've been involved, you're

18  talking on the due diligence side?

19      A.   Yes.  I'm trying to think if there's any

20  other scenarios.  No.  It would be on the due diligence

21  side, yes.

22      Q.   And on the due diligence side, are you

23  working to validate or test the valuation, or is to

24  test the sufficiency of the disclosures?

25      A.   It's more to test the validity of the

19

1    financial statements, and to derive a pro forma

2    financial statement.  Pro forma income statement I

3    should say.

4        Q.   So, you're looking at the financials, and

5    trying to assess or determine the income statement; is

6    that correct?

7        A.   Yes.  That's a part of what I do.  Yes.

8        Q.   But you're not in those cases where you're

9    involved in the due diligence side.  You're not, for

10   example, determining the valuation or testing it?

11       A.   Where we're representing the buyer --

12       MR. CANNELLA:  Objection.

13       THE WITNESS:  Sorry.  Excuse me.  Where we're --

14   BY MR. BANKS:

15       Q.   Let him make the objection.

16       A.   Where we're representing a buyer, typically

17   no, I would not have been involved in the valuation

18   piece.  But I am aware of what the -- in most cases,

19   I'm aware of what the valuation is, and what the

20   multiple is and so -- they share that with me.

21       Q.   In those cases, do you know how the valuation

22   and the multiple was determined?

23       A.   In some case we discuss it, but not in all of

24   them.

25       Q.   So, in your report, are you relying in part

20

1    on what you learned about the valuation in those

2    transactions where you work on the due diligence side?

3         A.    I wouldn't say that's correct, no.  My focus

4    when I'm doing financial due diligence is on validating

5    the revenue and on producing a pro forma financial

6    income statement.

7         Q.    In your reports, you distinguish at times

8    between the sale or purchase of a business as opposed

9    to a book of business; is that correct?

10        A.    Yes.

11        Q.    What is the difference?

12        A.    There's really very little difference.  So,

13   if you're selling -- particularly if it's an asset

14   sale, if you're selling an agency, you're selling all

15   of the accounts of the agency; and typically staff

16   would transfer, producers would transfer with that.  If

17   you're selling a book of business, you're only selling

18   one piece of the agency.

19              A typical example would be if there's an

20   agency which is writing both P and C and employee

21   benefits business.  They may, for whatever reason they

22   choose, decide they're going to focus on just one line,

23   say, P and C.  So, they're only selling the employee

24   benefits accounts.

25        Q.    In the sale of a business -- we'll start with

21

1   that -- what generally are the assets being sold?

2         A.    The main asset is the actual policies that

3   the agency has produced, the expirations of those

4   policies.  That is by far and away the major asset that

5   the acquirer would like to have.  Also it's the actual

6   -- the talent of the staff of the agency they're very

7   interested in.  Particularly the production staff, the

8   sales staff.

9         Q.    Anything else?

10        A.    Well, there's the assets and equipment needed

11  to service the business.  But little service.  For

12  example, you know, the desk, computers, office space.

13  So, you know, all of that.  And -- but value isn't

14  typically specifically ascribed to those.  It's built

15  into the valuation of the fundamental assets, which is

16  the policies.

17        Q.    When you're talking about the assets and

18  equipment, the office space, are you talking about

19  physical assets?

20        A.    Yeah.  I was -- yeah.  That's what I was

21  thinking of, yes.  Physical assets, yes.

22        Q.    So, the computers, the desks, chairs,

23  lighting.  That sort of thing?

24        A.    Yeah, that sort of thing.  Yeah.

25        Q.    What about intellectual property?

ROBIN FROST

1      A.    In times there's intellectual property.    If

2  and agency, for example, has a particular technology

3  that they developed and they've got a patent for it.

4  But that's unusual.    If there is some intellectual

5  property involved, that might even be a separate

6  transaction.

7      Q.    Have you reviewed the transaction documents

8  from USI's acquisition of Wells Fargo Insurance

9  Services?

10     A.    I have not.    No.

11     Q.    Do you know whether USI acquired any valuable

12 intellectual property from Wells Fargo as part of that

13 transaction?

14     A.    I don't know, no.    As I say, I haven't

15 reviewed that transaction.    I'm aware of it, but I

16 don't know the details.

17     Q.    In general, do insurance brokerages have

18 valuable intellectual property?

19     A.    Typically not.    In my experience, it's quite

20 unusual really for intellectual property to be

21 discussed at all.

22     Q.    In your experience, the value in the

23 insurance agency is the relationships and the contracts

24 between the employees and the clients; is that correct?

25     A.    The value is the actual policies themselves,

23

ROBIN FROST

1    and what sustains those is the relationships that the

2    producers have with them.  But it's the actual policies

3    themselves that are the assets.

4         Q.    Have you ever been involved in a transaction

5    whereby an insurance brokerage sold policies without

6    also selling the personnel?

7         A.    Very few.  I can recall one or two, at most.

8         Q.    And what were those transactions?

9         A.    They're typically transactions where it's

10   employee benefits, but individual employee benefits

11   business, which is a simple product.  It's almost

12   commoditized, you could say.  Or if it's personal lines

13   P and C business, you know, homeowners, auto policies,

14   again it's a fairly simple product, so the relationship

15   with the insurance agency is potentially -- you would

16   expect would be less, less significant.

17        Q.    So, in couple of transactions that you're

18   aware of where there was a sale of policies without

19   also selling the personnel, those are cases where there

20   were minimal personal relationships involved in the --

21   between the employees and the clients?

22        MR. CANNELLA:  Object to the form of the question.

23        THE WITNESS:  Yeah.  I wouldn't say that exactly.

24   I'm sure the person had great relationships with their

25   clients.  I hope they did.  But it wasn't -- it's --

24

1    the nature of the business is that it's an individual

2    policy.  And so if they just transfer to another

3    seller, I don't -- in most case you would expect the

4    policyholder wouldn't -- would not mind.

5         Q.   And in those cases, there would also be some

6    sort of restrictions on competition by the seller to

7    not compete for that business with the buyer for some

8    period of time after the sale.  Correct?

9         A.   Yes, definitely.  Yes.

10        Q.   And what length of time, in your experience,

11   do such restrictions typically last?

12        A.   Typically two years.  I've also -- I have

13   seen three years.  I've seen as long as five years, but

14   two years is a decent benchmark I would say.  That's

15   the norm, I would say.

16        Q.   In transactions where a seller is selling a

17   book of business, your experience is that the

18   restrictions on their ability to compete with the

19   business that's been sold is typically two years?

20        A.   Well, typically the seller -- most of the

21   transactions I work on, the seller actually transfers

22   with the business, so they become an employee of the

23   acquirer.  But they would sign a condition -- a

24   condition of the transaction closing is that they would

25   sign an employment agreement which contains

25

ROBIN FROST

1    non-solicitation, non-interference, non-competition

2    provisions.  And those would typically be for a period

3    of two years post-termination.

4        Q.   Did you review Ed Bowler's testimony about

5    the length of the restrictions that USI requires when

6    it buys a portion of a business from another brokerage?

7        MR. CANNELLA:  Object to form.  Go ahead.

8        THE WITNESS:  I was an observer at Bowler's

9    testimony, so I recall that being discussed, but I

10   can't recall the exact time periods that were

11   mentioned.

12   BY MR. BANKS:

13       Q.   And I want to be clear.  I'm asking about

14   restrictions on the selling entity as opposed to

15   restrictions in some employment agreements that might

16   come over.

17           And do you recall whether Mr. Bowler

18   indicated that USI generally would require more than

19   two years from the seller where the seller is selling

20   only a portion of a business?

21       MR. CANNELLA:  Object to the form of the question.

22       THE WITNESS:  I don't recall.  I don't recall what

23   his answer was with regard to that.  No.  Apologies.  I

24   don't recall.

25

26

1    BY MR. BANKS:

2         Q.   So, focussing back on the couple of

3    transactions that you're aware of where there was a

4    sale of clients -- or client policies without the sale

5    of employees, what were the multiples used on those

6    transactions?

7         MR. CANNELLA:  Object to the form of the question.

8         THE WITNESS:  Again, I'd have to go back and check

9    specifically.  And the examples I were giving -- I

10   mentioned where I would expect this would occur and

11   that I have seen have occurred in my experience, it's

12   personal lines business, which would typically attract

13   a lower multiple.

14   BY MR. BANKS:

15        Q.   In preparing your analysis in this case, you

16   did not specifically consider the multiples used in the

17   sale of client policies without the sale of the

18   employee relationships as well.  Correct?

19        A.   No.  I didn't, no.

20        Q.   And sitting here today, you can't tell us

21   what the specific multiples were used in those couple

22   of transactions.  Correct?

23        MR. CANNELLA:  Object to the form of the question.

24        THE WITNESS:  Yeah, not to -- I would have to look

25   it up.

27

1    BY MR. BANKS:

2        Q.    And you did not produce any documents in this

3    case related to such transactions where there was a

4    sale of client policies without the sale of employment

5    relationships as well.  Correct?

6        A.    No.  I didn't produce any documents of that.

7    No.

8        Q.    And so you have no opinions in this case

9    based on what the proper valuation would be in the sale

10   of a -- of client policies without including the sale

11   of employment relationships.  Correct?

12       MR. CANNELLA:  Object to the form of the question.

13       THE WITNESS:  I would have to -- in any every case

14   it's different, so it's a hypothetical you're giving me

15   here.  I would have to see the individual case, you

16   know, what are the policies involved.  As I say, if it

17   was personal lines, it would have a lower multiple.

18            The fact that the staff are not

19   transferring, the producers are not transferring is

20   potentially less relevant.  It depends on the nature of

21   the personal lines policies, I suppose.  So, yeah.  It

22   would be hard to say.  I'd have to look at the -- it's

23   a hypothetical you're giving me.  I would have to look

24   at the facts.

25

1    BY MR. BANKS:

2        Q.   So, as of today, you have not developed any

3    opinions for what the proper multiple would be in the

4    case of a sale of client posts without also including

5    the sale of employment relationships with the employees

6    who might have client relationships related those

7    client policies?

8        A.   Again, as I said previously, it's hard for me

9    to give an opinion on that without knowing the facts of

10   the case, really.

11       Q.   When were you first engaged in this matter?

12       A.   Oh, I want to say it was June of this year.

13   Yeah.  I'm pretty sure it was June.  June 2023.

14       Q.   And what did you do in forming your opinions

15   in this case?  How did go about your work?

16       A.   So, well, I followed the procedure I would

17   follow for a typical transaction.  So, documentation

18   was provided from discovery.  I reviewed documentation.

19   I then set about particularly digging into the

20   financial documentation to determine, you know, what's

21   the -- what's the revenue that we're dealing with in

22   this case.  I looked at expense data to come to a pro

23   forma EBITDA number and the -- type applied a multiple

24   that's appropriate for this type of business at this

25   time to come to a conclusion of value.

29

1          Q.    And what was the methodology you used to come

2     to a conclusion of value?

3          A.    As I say, there's two pieces to it.  It's

4     first of all determining what the pro forma EBITDA IS.

5     And that that involves, you know, making sure that

6     we're including revenue that should be included, but

7     also on the other hand, making sure we're not including

8     revenue that's not part of this, you know.  Making sure

9     we have just what should be involved.  And then, yeah,

10    defining the expense to come to that pro forma EBITDA.

11    And then applying a multiple that's appropriate to the

12    type of business, what the market values are at the

13    moment, what the market multiples are at that time.

14         Q.    What you've described for me was your process

15    used to determine your fair market value opinion; is

16    that correct?

17         A.    That's correct.  Yes.  I was describing the

18    fair market value, yes.

19         Q.    You've also offered a lost profits model; is

20    that correct?

21         A.    I did, yes.

22         Q.    Would you agree that those are not additive,

23    it would one or the other as an appropriate measure of

24    damages?

25         A.    Yes, I'd agree.  They're not additive.

30

ROBIN FROST

1    They're quite separate.  Yes.

2         Q.   And so any award of both fair market value

3    and lost profits would be duplicative.  Correct?

4         A.   Yes.  That would be duplicative.  I'd agree.

5    Yes.

6         Q.   I want to start first with your lost profits

7    model.  Okay?

8         A.   (Nonverbal response.)

9         Q.   All right.  Within that you offered -- let's

10   see here -- two different calculations.  Correct?  A

11   gross profit less producer commission model, and a

12   second model, the net lost profits valuation model 'is

13   that correct?

14        A.   That's correct.  Yes.

15        Q.   Would you agree that the gross profit less

16   producer commission model is not an appropriate measure

17   of damages in this case?

18        MR. CANNELLA:  Object to the form of the question.

19        THE WITNESS:  I wouldn't -- no.  I wouldn't

20   characterize it that way.  It's presented for the

21   scenario where an acquirer already has the support

22   staff in place, has, you know, the capacity to bring on

23   this business.  So, it's to model that scenario.

24   BY MR. BANKS:

25        Q.   In the gross profit less producer commission

31

1  model, you began by determining the revenues generated

2  for the clients that transferred from USI to the

3  Southeast Series of Lockton after Mr. Simmons' and

4  Mr. Mitchell's resignations based on their last 12

5  months of revenue at USI.  Correct?

6      A.   That's correct.  Yes.

7      Q.   And from that, you then deducted the

8  commissions that were paid to Mr. Simmons and

9  Mr. Mitchell on those accounts.  Correct?

10      A.   Not exactly.  I deducted the commissions that

11  would be payable to any producer under, you know, the

12  USI commission structure, which as it happens Simmons

13  and Mitchell were receiving those amounts.  But yeah,

14  it's not specifically just for those two individuals.

15  It's for all producers of USI.

16      Q.   So, to clarify, you began by getting the

17  revenues for the last 12 months of the client accounts

18  in question.  Correct?

19      A.   Yes.

20      Q.   And then from that you deducted a standard

21  commission that you anticipate would be charged on

22  those accounts based on USI's averages.  Correct?

23      A.   That's correct.  Yes.

24      Q.   And what was that percent that you used?

25      A.   As I understand USI's commission structure,

32

1    they pay -- and I believe this is in the -- well, I

2    know this is in the employment agreements submitted for

3    discovery.  Producers for commercial lines accounts, A

4    and C commercial lines, receive 25 percent on policies

5    that are generating commission revenue of $10,000 or

6    more.  Or client accounts.  Sorry.  I said policies.

7    Client accounts that are generating $10,000 or more.

8         Q.   So, you applied 25 percent commission to

9    those accounts that have generated $10,000 or more.

10   Correct?

11        A.   Yes.  That was the way I did it.  Yes.

12        Q.   And that's the only cost that you deducted

13   from the revenues in the gross profit less producer

14   commission model.  Correct?

15        A.   That's correct.  That's the way that model

16   would work.  Yes.

17        Q.   And you made no deduction, for example, for

18   the cost involved or account management expenses for

19   those accounts.  Correct?

20        A.   Not in the gross profit less producer

21   commission model I didn't.  No.  Because as I said,

22   that's the model that -- it's the model that -- where

23   an acquirer would have sufficient support staff in

24   place.

25        Q.   I apologize.  I think I set us up for a

33

1    double negative there, because I asked you didn't do

2    something, and you said no.  I think I know what you

3    meant, but I want to make sure we have a clean record.

4                So, is it true that in the gross profit

5    less producer commission model you made no deduction

6    for account management expenses?

7        A.    That is true, yes.

8        Q.    You also, in the gross profit less producer

9    commission model, made no decision for specialty

10   insurance services that, for example, are classed at

11   USI as technical resources?

12       A.    No.  Those wouldn't -- those would not be

13   included in that particular model, no.

14       Q.    Do you understand what is included at USI as

15   technical resources?

16       A.    So, yes.  My understanding is they have a

17   separate area that, you know, provides support for

18   producers in certain specialized products and so on.

19   Yeah.

20       Q.    So, that would include both specialty

21   insurance products, like cyber insurance,

22   officer/director liability insurance, errors and

23   omissions.  Correct?

24       A.    I understand those are the products that they

25   cover.  Yeah.  I'm sure there's others, but yes, those

34

ROBIN FROST

1    would be included.  Yes.

2        Q.   And in addition to the specialty insurance

3    products, technical resources at USI would include

4    expenses for assisting clients with claims.  Correct?

5        MR. CANNELLA:  Object to form.

6        THE WITNESS:  I would imagine it would do.  Yes,

7    yes.  You would expect that would be part of the

8    service that USI would offer.  Yes.

9    BY MR. BANKS:

10       Q.   And do you have any understanding as to

11   whether the technical resources expenses at USI also

12   include things like assisting clients with risk

13   management or loss control?

14       A.   I don't work for USI, and in particular I

15   don't work in the specialized support area, but I would

16   imagine that risk management is very much a part of

17   what they do.  Yes.

18       Q.   And you would agree that both account

19   management expenses and the technical resource expenses

20   are expenses incurred by an insurance brokerage in

21   supporting business.  Correct?

22       A.   Yes.  That's correct.  Yes.

23       Q.   And in this case, are you aware of whether

24   there were particular individuals employed by USI for

25   the sole purpose of supporting the Matt Simmons' book

1    of business?

2          A.    From testimony that I've read, I don't think

3    there were specific -- if we're talking about the

4    specialized and technical support, I don't think there

5    was specific technical people.  There was a team, and

6    from testimony I've read, they were quite attentive to

7    Mr. Simmons.  He was considered a priority in their

8    work.  But I don't think there was a specific

9    specialized person attached to it.  No.

10         Q.    Let me follow up there.  First, I was

11   actually asking about the account management expenses

12   as opposed to the technical resources.  I want to

13   clarify and re-ask you that in a moment, but I want to

14   follow up on something you said.  So, new question.

15              The -- you said that you reviewed

16   testimony from individuals that said that they were

17   attentive to Mr. Simmons in providing some of these

18   specialty resources; is that correct?

19         A.    That's correct.  Yeah.  That was the

20   testimony of Lisa Power.  That's her name, wasn't it?

21   Yes.

22         Q.    And did you also review testimony and

23   documents from people who disagreed with that, such as

24   from Mr. Simmons?

25         A.    I read -- some time ago I read the testimony

36

1    of Mr. Simmons as well.  Yes.

2        Q.    Did you do anything to verify whether the

3    resources provided by USI for specialty insurance

4    products were, in fact, sufficient for Mr. Simmons'

5    clients?

6        A.    That would outside the scope of my

7    engagement.  I'm doing valuation of the accounts.  So,

8    no.  I did not do that, no.

9        Q.    Would you agree that you are not an expert in

10   determining what sort of specialty insurance products

11   are needed or not needed by particular clients?

12       A.    I would agree.  Yeah.  That's not my area of

13   expertise.  Yes.

14       Q.    So, you are assuming that the testimony from

15   Lisa Power was correct, and the testimony from

16   Mr. Simmons was incorrect; is that fair?

17       MR. CANNELLA:  Object to the form of the question.

18       THE WITNESS:  I didn't really make an assumption

19   as to whether Mr. Simmons was correct or Ms. Power was

20   correct with regard to it.  As I said, that was outside

21   the scope of what I was doing.  I was doing a valuation

22   of the accounts.

23   BY MR. BANKS:

24       Q.    Well, you did assume that USI had the ability

25   to adequately service Mr. Simmons' accounts if they

37

1   stayed with USI.  Correct?

2       A.   I wouldn't say that assumption is built into

3   it.  Let me think about that.  I mean, the valuation is

4   based on the accounts as they were just prior to the

5   departure of Mr. Simmons and Mr. Mitchell.  So, yeah.

6   That's how I valued it.  You know, those are the

7   accounts that are in place, and those are the expenses

8   to support them.

9       Q.   Did you do anything to analyze whether the

10  clients whose business left USI following Mr. Simmons

11  and Mr. Mitchell's departures were satisfied with the

12  level of specialty insurance products support they were

13  getting at USI?

14      A.   Again, similarly, that would be outside the

15  scope of what I was doing, an valuation.  So, no, I did

16  not look at that.

17      Q.   And you did not interview any customers in

18  this case.  Correct?

19      A.   No.  I did not.

20      Q.   Did you consider testimony from any customers

21  in this case?

22      A.   I can't recall seeing -- reading specific

23  testimony of any customers.  I have seen them referred

24  to in other testimony, but I can't -- no, I can't

25  recall reading testimony of any specific customers.

38

1      Q.   And you didn't conduct any surveys the

2   customers to assess their level of satisfaction with

3   USI's specialty services -- specialty insurance

4   services.  Correct?

5      MR. CANNELLA:  Object to form of the question.

6   BY MR. BANKS:

7      Q.   You can answer.

8      A.   Correct.  I did not.  That would be beyond

9   the scope of what I was doing.

10      Q.   I want to go back to my other question.

11           Is it true that there were account

12   management personnel -- so, account executives, account

13   managers, account representatives -- that USI employed

14   before Mr. Simmons departure that were specifically

15   employed to support Mr. Simmons' book of business?

16      A.   Yes.  That's my understanding.  Yes.

17      Q.   So, you would agree that those costs for

18   those employees would be variable depending on whether

19   that business continued to be associated with USI.

20   Correct?

21      MR. CANNELLA:  Object to the form of the question.

22      THE WITNESS:  It would depend on the -- when you

23   say they're variable, I presume you mean they're

24   variable on the amount of revenue.  So, yes.  They

25   would be in as much as that, if there was a dramatic

39

1    increase in revenue, you'd think they'd need to hire

2    more resources.  If there was a significant reduction

3    in revenue, maybe they'd have to let some of them go.

4    BY MR. BANKS:

5        Q.   What amount of revenue are you considering as

6    significant?

7        A.   Again, I'm speculating.  But we're talking

8    about between Simmons and Mitchell, they had a book of

9    business of approximately 8 million at the time of just

10   prior to their departure.  So, you would think if it

11   went down by a million, say, that's a significant

12   reduction.  So that would -- maybe they'd have to

13   question, you know, how they move a resource or --

14       Q.   Do you recall testimony from Mr. Bowler as to

15   approximately how much revenue is associated with

16   having the need for additional personnel?

17       MR. CANNELLA:  Object to the form of the question.

18       THE WITNESS:  I'm trying to recall.  I think he

19   mentioned in his testimony -- I think he was responding

20   to a question on, you know, how many employees would

21   there be in an acquisition.  And he used a rule of

22   thumb to, you know, he said, "Well, if you take the

23   revenue, divide by this number, we'll come to a number

24   of employees.  Was it -- again, I'd have to check, but

25   I think he said 250,000.

                              40

1    BY MR. BANKS:

2        Q.    I'll represent to you that's what he said.

3    Mr. Cannella can agree or disagree.  I'm looking at it

4    right now.

5                    So, if the revenue associated with the

6    customers that left USI exceeded $250,000, would you

7    expect that the variable costs would be affected on the

8    level of personnel based on Mr. Bowler's testimony?

9        A.    Not necessarily, no, because when he was

10   using -- it's a different -- we're talking a different

11   circumstance.  So, when he uses the $250,000 figure to

12   estimate number of employees, it's not just support

13   staff for producers.  It's all the back room -- the

14   back office staff, the accounting, HR, the IT support.

15   Whatever else.  So, you know, there's a whole lot more

16   goes into it.  So, I don't think it's fair to say that

17   if there was a change of 250,000 that would impact the

18   support staff for a producer.  No.

19       Q.    What about a change of about $4 million in

20   annual revenue?

21       A.    You would expect that would have an impact,

22   yes, on variable cost for sure.  Yeah.

23       Q.    But your gross profit less commission model

24   does not account for any change in USI's personnel

25   expenses other than the producer commissions based on

41

1    the lost revenue that is being alleged in this case.

2    Correct?

3        A.   As I say, in this particular model, the gross

4    profit less producer commissions, this is the model

5    whereby an inquirer would have the sufficient support

6    staff in place.  So, it doesn't capture those expenses.

7    Correct.

8        Q.   Is the gross profit less producer commission

9    model only useful as a measure of anything in your

10   analysis as it relates to, hey, net present value

11   valuation?

12       A.   Can you rephrase that again?  Sorry.  I

13   wasn't quite following the question.

14       Q.   Yes.  Let me ask a better question, because

15   that wasn't clear.

16            In measuring lost profits, separate and

17   aside from your net present value model, to be clear,

18   are you trying to measure the loss that USI suffered

19   just to its profits, or are you measuring something

20   else?

21       A.   I'm measuring the loss.  The underlying

22   concept in that model is, yes, it's the loss to USI.

23   So, I've been saying this from the point of view of an

24   acquirer that wouldn't have sufficient support staff.

25   Another way you could look at it, this is the

42

1    contribution margin from that business.

2        Q.   But as we've just discussed, there are other

3    personnel costs involved in the business that was lost

4    by USI correct?

5        MR. CANNELLA:  Object to the form of the question.

6        THE WITNESS:  Sorry.  Can you repeat the question,

7    Chris?  Sorry.

8    BY MR. BANKS:

9        Q.   If we're only measuring the lost profits to

10   USI, would you agree that given the volume of alleged

11   losses in this case, lost revenue in this case, that

12   USI's lost profits should also account for personnel

13   costs that it would not need to incur without that

14   business?

15       A.   That's captured in the net profit model of

16   the lost profit.  The gross commission less producer --

17   gross -- sorry, gross revenue less producer commission

18   model, that represents the contribution margin of that

19   business -- to the business, to USI.

20       Q.   And by "contribution margin," the only cost

21   you're considering in the gross profit less producer

22   commission model is just the commissions to the

23   producers.  Correct?

24       A.   Yes, which are directly correlated to that

25   business.  Yes.

43

1    Q.   So, when you referred to the contribution

2    margin, that is different from the lost profit.

3    Correct?

4    A.   Yeah.   They're two different things.   So,

5    yeah.   I've done two different lost profits valuations.

6    One based on revenue less producer commissions, which

7    is effectively the contribution margin.   And then I've

8    done the net profit basis of a lost profit valuation.

9    And that's -- that includes other expenses.   Yeah,

10   other expenses.

11   Q.   So, to be clear, your net lost profit

12   valuation is an analysis of alleged lost profits to

13   USI.   Correct?

14   MR. CANNELLA:   Object to form of the question.

15   Asked and answered.

16   THE WITNESS:   As I said previously, yes, that's

17   the intention of the model.   It's looking at, well,

18   here is the revenue.   Here's the expenses associated

19   with it, and projecting that out into the future.

20   BY MR. BANKS:

21   Q.   And the gross profit less producer commission

22   model is not measuring alleged lost profits.   Correct?

23   MR. CANNELLA:   Object to form of the question.

24   THE WITNESS:   Again, as I said previously, it's

25   measuring the lost contribution from those accounts,

44

1    from that business, which it just includes the direct

2    cost associated with it.

3    BY MR. BANKS:

4        Q.    Wouldn't a contribution margin typically

5    include a deduction of all direct variable expenses?

6        A.    No, it wouldn't typically.  It would only

7    include those -- well, the way you phrased that, you

8    said -- I think you said direct variable.  I mean,

9    effectively it does.  The direct variable cost of this

10   business are the producer commissions.  The support

11   staff have a fixed salary.  It doesn't vary.  If they

12   brought on a new account, and it was deemed they didn't

13   need more staff, that expense would not change.  So,

14   it's not exactly variable.  So, therefore not involved

15   in the contribution model.

16       Q.    So, is it your testimony that the salaries

17   paid to the account management team that supported Matt

18   Simmons were fixed costs at USI for ten years?

19       A.    I mean, they may get production bonuses and

20   so on if the business is doing well, and their salaries

21   would increase, you would hope, over years.  So, it's

22   part of the cost of support.  I described it as a fixed

23   cost is not exactly correct.  No.  It would be -- as

24   we, you know, sometime ago earlier on we were talking

25   about if they brought on a whole load of new business,

45

1  would they need to increase the staff?  Probably yes, I

2  would say.

3      Q.  In this case, you have measured the lost

4  gross revenue for one year at approximately

5  $4.56 million.  Correct?

6      A.  Yeah.  I'd have to look at the number.  But,

7  yeah.  It's 4.5 million each year.  That sounds right.

8  Yeah.

9      Q.  So, is it your testimony that the cost of

10  account management expenses to support that

11  $4.56 million in lost revenue would have continued to

12  be incurred by USI for ten years even after that

13  business loss was lost?

14      MR. CANNELLA:  Object to form of the question.

15      THE WITNESS:  So, you're speculating really --

16  here really.  It's not really the -- it's not really

17  the nature of the model.  The model is just looking at:

18  This is the cashflow that would -- that we're

19  projecting forward here, which is, you know, I prefer

20  the fair market value.  But the lost profit valuation

21  projecting forward, here is the revenue, here is the

22  expenses that would be associated with it.  So, yeah.

23  BY MR. BANKS:

24      Q.  Aren't service costs necessarily and directly

25  charged to those accounts?

46

1        A.    Typically they would be, and that's captured

2    in that net profits model.  Yes.

3        Q.    It's captured in the net profits model, but

4    not in the gross profit less producer commission model.

5    Correct?

6        A.    That's correct.  Yes.

7        Q.    And let's see here.  I mean, these two models

8    yield different number, right, between the gross profit

9    less producer commission model and the net lost profit

10   valuation.  Correct?

11       A.    Correct.  Yes.

12       Q.    And the net lost profit valuation model, you

13   value over ten years as between 7.1 million

14   approximately and 8 million approximately.  Correct?

15       A.    I would have to check, that sounds about

16   right though.  Yes.

17       Q.    But the gross profit less producer commission

18   model, you value at somewhere between 9.8 million and

19   $11 million over ten years.  Correct?

20       A.    Again, can I refer to my report just to check

21   numbers here?

22       Q.    Yes.  Why don't -- I just -- your report is

23   marked.

24       MR. BANKS:  Actually, Dave, we agreed that

25   Ms. Romine can review the report.  Correct?  Before.

47

```
 1        MR. CANNELLA:  Hold on a second.  I think we
 2   agreed that she could see the summary, but you know,
 3   the tables.  You know, the summary tables that set
 4   forth the ranges.  We agreed to that.
 5        MR. BANKS:  Right.
 6        MR. CANNELLA:  It's for balance, I think it's
 7   OCEO.  Actually, I know it's OCEO.
 8        MR. BANKS:  That's why I'm asking.  Why don't we
 9   go for our break, and let's discuss that?
10        MR. CANNELLA:  Yeah.  Okay.  We've been going for
11   an hour and ten minutes, so we'll go for our break.
12        THE VIDEOGRAPHER:  Off the record:  11:11 a.m.
13                       (There was a break taken, after
14                        which the deposition was resumed
15                        as follows:)
16        THE VIDEOGRAPHER:  On the record:  11:24 a.m.
17   BY MR. BANKS:
18        Q.   Okay.  Mr. Frost, I will mark as Exhibit 1 to
19   this deposition a copy of your August -- let's see,
20   what was this -- August 21, 2023 report.  So, your
21   first report.  Okay?
22        A.   Okay.
23                       (Whereupon, the document was marked
24                        as Deposition Exhibit No. 1 for
25                        identification.)
```

48

1   BY MR. BANKS:

2      Q.   And you have a copy there with you.  Correct?

3      A.   I have a hard copy, yes.

4      Q.   All right.  I'd like you to turn to the page

5   marked page 4 in your report.

6      A.   Yes.

7      Q.   I think it's actually, for the record, it's

8   page 6 of the PDF.

9           And you see at the bottom of the page you

10  have two charts showing fair market valuation and lost

11  profit valuation.  Correct?

12     A.   Correct, yes.

13     Q.   I will share screen so we can all see these.

14  All right.

15          So, I am looking -- we've been talking

16  about your two analyses under lost profit valuation.

17     A.   Yeah.

18     Q.   And so, I want to draw your attention here to

19  the net present value, gross profit less producer

20  commission model.

21          All right?  Do you see that?

22     A.   Yes, I do.  Yes.

23     Q.   So, in that model, just to recap:  We know

24  the first two things you did was, first, you looked at

25  the last 12 months of revenue for the departed

49

1    accounts; and second you deducted 25 percent as the

2    producer commission.  Correct?

3        A.   Yes.  On client's accounts greater than

4    10,000.  Yes.

5        Q.   Right.  Only on client accounts greater than

6    $10,000.

7        A.   Uh-huh.

8        Q.   Correct?

9        A.   Correct.  Yes.  Sorry.  Yes.

10       Q.   As a matter of fact, I meant to say that at

11   the beginning.  If, during the deposition, you ever

12   give, you know, a nod or a shake of the head, or a

13   sound like "uh-huh," I will ask you to verbalize your

14   answer because the court reporter can't really take

15   those down very well.

16            Do you understand that?

17       A.   Yeah.  Understood.  Yeah.

18       Q.   All right.  The next thing you did then is

19   you took that number that you came up with, so sort of

20   the one year gross profit less producer commission, and

21   you ran that out for ten years assuming some attrition.

22   Correct?

23       A.   I did, correct.  Yes.

24       Q.   And in the first year, you considered three

25   scenarios where either USI retained 80 percent, 85

50

1    percent, or 90 percent of the lost accounts in that

2    first year.  Correct?

3         A.   That's correct.  Yes.

4         Q.   Which would be the flip side of saying:  You

5    assume they lost somewhere between 10 to 20 percent of

6    the business in the first year; is that correct?

7         A.   Yes, that's fair.  Yeah.  That's correct.

8    Yes.

9         Q.   And you ran three different numbers within

10   that range.  Correct?

11        A.   Correct.  Yes.

12        Q.   Then for the subsequent years, years two

13   through ten, you assumed that USI lost 10 percent of

14   the business each year.  Correct?

15        A.   That is correct.

16        Q.   And in all cases, you did this on a dollar

17   value of the business basis, not on a number of client

18   basis.  Correct?

19        A.   Correct.  Yeah.  It's on the revenue dollars.

20   Yes.

21        Q.   And then you net present valued that amount

22   over ten years using a discount rate.  Correct?

23        A.   Correct.  Yes.

24        Q.   And based on that, you came up with a low

25   range, high range, and midpoint for the net present

51

1    value gross profit, less producer commission.  Correct?

2         A.   Correct.  Yes.

3         Q.   And so, is the difference between the low

4    high and the midpoint just based on whether it was 80,

5    85, or 90 percent retention in year one?

6         A.   Correct.  Yeah.  That's the difference

7    between the three scenarios.  Yes.

8         Q.   So, this midpoint number assumes that USI

9    retained 85 percent of the otherwise lost accounts in

10   year one on a dollar volume basis.  Correct?

11        A.   That is correct.  Yes.

12        Q.   Now, this model measures USI's losses with

13   the only expense considered being the amount of

14   commissions paid to the producer or producers who

15   serviced -- who were the producers on the accounts.

16   Correct?

17        A.   That's right.  Just the producer commission,

18   the direct producer commission is considered here.

19   Yes.

20        Q.   And would you agree that there is no scenario

21   in the real world where USI would be able to retain

22   this volume of business for ten years without incurring

23   account management expenses?

24        MR. CANNELLA:  Object to the form of the question.

25        THE WITNESS:  As I said previously, this is

52

1    looking at the net contribution margin.  So, only

2    considering those expenses that are directly correlated

3    to the revenue, i.e., the producer commission.

4    BY MR. BANKS:

5        Q.    How are account management expenses not

6    directly correlated to the revenue?

7        A.    Well, the producer commission, it's a direct

8    percentage of revenue.  ███████████████████████

     ███████████████████████████████████████████████

     ███  ██████████████████████    Whereas account management staff,

11   you know, if the account renews for more in a

12   subsequent year, they don't share in the -- they don't

13   get a percentage of the increase in revenue.  So, hence

14   just the producer commission is directly correlated to

15   the revenue, whereas the other expenses are not

16   directly correlated.

17       Q.    Do they -- do those other expenses, would

18   they vary based on the amount of revenue at stake?

19       A.    As we talked about previously, if there was a

20   sufficient increase or a sufficient reduction, then you

21   would anticipate there would be changes in those

22   expenses, yes.

23       Q.    But for you -- go ahead.

24       A.    I was going to say, but not -- you know, just

25   for small increases and, you know, if an account -- I

53

1    mean, revenue increases due to increases in insurance

2    premiums.  So, that doesn't drive up an increase in the

3    amount of support.  It's still the same amount of

4    business.  So, it doesn't impact it.

5        Q.    ████████████████████████████████████

     ██████████████████████████    █████████    ████████████████

     █████████████████████████████████████████████

     ████████████

     ███    █████████████████████████

     █████████████████████    █████████████████████████

     ████████████████████

     ███    ██████████████████████████████████████████████

     ███████████████████████████████████████████████████████████

     █████████████    ████████████████

15        MR. CANNELLA:  Object to form.

16        THE WITNESS:  Yes.  And those are captured in the

17   net profit model.  The objective of the gross profit

18   less producer commission model is just to show the

19   contribution margin, just those costs which are

20   directly correlated with it, with revenue.

21   BY MR. BANKS:

22        Q.    In other words, the gross profit less

23   producer commission model is just to show what the

24   margin is that USI enjoys on revenue, deducting only a

25   single cost.  Correct?

54

ROBIN FROST

1      A.   Deducting --

2      MR. CANNELLA:  Object to form.

3      THE WITNESS:  Apologies, Dave.  Deducting the

4  producer commission that directly correlates to it.

5  Correct.  Yes.

6  BY MR. BANKS:

7      Q.   All right.  The net present value

8  calculation, which is the second calculation here,

9  deducts other costs.  Correct?

10      A.   Yes.  It allows for account management costs

11  that you've been talking about, and other support

12  costs.  Yes.

13      Q.   And in this model, the net profit retention

14  model, you are -- I'm sorry, the net profit model, you

15  deducted all of the costs that you determined were

16  variable for USI for the business being retained.

17  Correct?

18      A.   Yes.  That's correct.  All of the costs that

19  would be associated with that business.  Yes.

20      Q.   ██████████████████████████████████████████

██  ██████████████████████████████████████████

██  ████████████████████████████████████████████████

██  ██████████████████████████    ████████████

██  ██████  ██████  ████████████████    ███████████████████

██  ████████████  ████████

55

ROBIN FROST

1    Q.    And just to be clear, the way you determined

2    that number is you began with the same first step as

3    the gross profit less producer commission model.  And

4    you looked at the last 12 months of revenue associated

5    with the lost accounts.  Correct?

6        A.    Yes.  That's correct.  Yes.

7        Q.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████    Correct?

10       A.    Yes, I did.  Yeah.  Same as the previous

11   model.  Yes.

12       Q.    But the third thing you did then, is you

13   deducted all of the other variable costs that you

14   determined were associated with retaining that

15   business.  Correct?

16       A.    Correct.  Yes.

17       Q.    And then the fourth is you assumed somewhere

18   between 80 to 90 percent retention of the business in

19   the first year.  Correct?

20       A.    Correct.  Yes.

21       Q.    And then you ran the numbers out for another

22   nine years after that for a total of ten years, where

23   years two through ten had another 10 percent business

24   loss on a dollar volume basis each year.  Correct?

25       A.    That's correct.  Yes.

56

1      Q.    Then you added it all up, and applied a --

2   well, no.  I'm sorry.  Before you added it up, you

3   applied a discount rate to the future years.  Correct?

4      A.    Well, the discount rate is -- when we do a

5   net present value of those future cash flows, a

6   discount rate is used in deriving that.  Yes.

7    ██    ████████████████████████████████████

 █   ████████████████████████   ████████████

9      A.    That's correct.  Yes.

10      Q.    And the only difference between the low,

11   high, and mid point numbers is -- in your net profit

12   model, is the difference between 80, 85, and 90 percent

13   client retention in year one?

14      A.    Again, yes.  That's correct.  Same as the

15   previous model.  Yes.

16      Q.    What is the economic justification for

17   creating this average of lost profit value, which

18   ranges from ████████████████████████████████████

19      A.    They're for presentational purposes.  There's

20   two different models.  There's the contribution base

21   model, there is the net profit model.  It shows that,

22   you know, if you -- that's the average of the two.

23   That's all.

24      Q.    So, basically, the difference here is in this

25   average of lost profit value, you just ignored

57

1    50 percent of the variable costs.  Correct?  Other than

2    producer compensation?

3         MR. CANNELLA:  Object to the form of the question.

4         THE WITNESS:  I'd have to run the numbers just to

5    check if that statement is totally accurate.  But

6    essentially that's -- that's the gist of it, yes.  It's

7    the average of the two methods.  Yes.

8    BY MR. BANKS:

9         Q.   Right.  And again, the only difference

10   between the two methods is that in the net profit

11   model, you've deducted all variable costs associated

12   with retaining the business, whereas in the gross

13   profit less producer commission model, the only expense

14   deducted is the producer comission.  Correct?

15        A.   Correct.  Yes.

16        Q.   So, if you average those two, you just --

17   you're keeping half of the other variable costs and

18   disregarding the other half.  Correct?

19        MR. CANNELLA:  Object to the form of the question.

20        THE WITNESS:  Mathematically that sounds correct.

21   Yes.

22   BY MR. BANKS:

23        Q.   So, what is the economic justification for

24   ignoring half of the variable costs associated with

25   retaining the lost business other than producer

58

1    commission?

2        MR. CANNELLA:  Object to the form of the question.

3        THE WITNESS:  As I say, it's purely

4    presentational.  I did two different versions of a lost

5    profit valuation, and I'm just presenting them both,

6    and then showing the averages of the two.  That's all.

7    BY MR. BANKS:

8        Q.   And so, were you asked in this case to value

9    damages suffered by USI due to the alleged wrongful

10   conduct, or were you asked to determine the value of

11   the lost -- of lost profits associated with certain

12   accounts and what a fair market value would be?

13       MR. CANNELLA:  Object to the form of the question.

14       THE WITNESS:  I was asked to perform a valuation

15   of the lost business.  And I was specifically requested

16   to produce a lost profit valuation in addition to my

17   own -- the valuation I would prefer, that I would have

18   done in a typical transaction.  So, that is why the

19   lost profit valuation is included in the report.

20   BY MR. BANKS:

21       Q.   Were you asked to provide an opinion on

22   damages suffered by USI that were caused by the alleged

23   wrongful conduct in this case?

24       MR. CANNELLA:  Object to the form of the question.

25       THE WITNESS:  Sorry, Chris, you were asking was I

59

1   asked to -- sorry.  Could you just repeat the question?

2   Apologies.

3   BY MR. BANKS:

4        Q.   Were you asked to provide an opinion

5   measuring damages suffered by USI as a result of the

6   alleged wrongful conduct in this case?

7        MR. CANNELLA:  Object to the form of the question.

8        THE WITNESS:  I wasn't asked to form an opinion on

9   this.  I was asked to produce a valuation of the

10  accounts that were lost.  So, no.  I was not

11  specifically asked to form an opinion on that.  No.

12  BY MR. BANKS:

13       Q.   And you have not offered -- you have not done

14  any analysis to determine whether these models -- the

15  fair market valuation or lost profit valuation --

16  measured the damages suffered by USI on accounts -- or

17  due to the alleged wrongful conduct in this case.

18  Correct?

19       MR. CANNELLA:  Object to the form of the question.

20       THE WITNESS:  Again, I'm not sure I fully

21  understand the question.  I'm just -- I was providing a

22  valuation of the accounts that were lost.

23  BY MR. BANKS:

24       Q.   All right.  I'm going to take this down for

25  now.

60

1        A.    Sure.

2        Q.    So, thinking again of the gross profit less

3   producer commission model, you said that was useful for

4   determining what the -- what -- what the margin would

5   be for a business that was buying these accounts but

6   already had sufficient personnel in place to handle the

7   accounts?

8        A.    Yeah.  You can think of it in that way.  In

9   the scenario that an acquirer already has sufficient

10  support staff in place that they can take on new

11  business.  It models that scenario.

12       Q.    That is not a measure of the profits lost by

13  USI from the loss of the lost accounts; is that

14  correct?

15       MR. CANNELLA:  Object to the form.

16       THE WITNESS:  I would say what it models is the

17  lost contribution, as we discussed previously.  It

18  models the loss of the revenue and the direct expenses

19  associated with it.

20  BY MR. BANKS:

21       Q.    All right.  The second model of damages you

22  offered -- or second category -- I shouldn't say

23  damages.  I'm sorry.

24              The second thing you did was you also

25  made -- you also created a fair market valuation for

61

ROBIN FROST

1    the sale of a business comprised of the so-called lost

2    accounts; is that correct?

3         MR. CANNELLA:  Object to the form of the question.

4         THE WITNESS:  Yeah.  It's the valuation of those

5    accounts.  Yeah, that's correct.  Yes.

6    BY MR. BANKS:

7         Q.   And let's be clear, when I refer to lost

8    accounts, that's a term you used in your report; is

9    that correct?

10        A.   Yes.  I did use that term.  Yes.

11        Q.   And the loss accounts, as you've defined

12   them, are those accounts that were in the Matt Simmons

13   and/or Jack Mitchell books of business that left USI to

14   go to the Southeast Series of Lockton Companies after

15   Mr. Mitchell and Mr. Simmons resigned from USI.

16   Correct?

17        A.   That's correct.  Yes.

18        Q.   So, I'll use that same definition.  When I

19   refer to the lost accounts in this deposition, I'm just

20   referring to those accounts that transferred from USI

21   to the southeast series of Lockton following

22   Mr. Mitchell's and Mr. Simmons' departures that had

23   previously been in the books of business at USI.

24              Okay?

25        A.   Yes.  That's okay.  Got you.

1    Q.   All right.  And so, in the fair market

2    valuation model, to understand what you did, you

3    essentially took one year of lost profits; is that

4    correct?  You started with that?

5    A.   No.  I don't think that's a good way to

6    describe it.

7    Q.   Why don't you tell me, and then I'll see if I

8    can break it down step by step.

9    A.   Okay.  That's fair.  So, for the fair market

10   valuation, I did start with the same basis of

11   determining the revenue for the 12-month period through

12   the date of departure.  I should just clarify.

13   Specifically, the data is actually through January 31st

14   of 2023 just because, you know, accounting records

15   close at the end of each month end.  So, that was the

16   nearest date to January 25.

17              So, I've taken that 12 months' worth of

18   data.  Determined what the revenue is that we need to

19   be considering in the valuation.  Then I've looked at

20   what the expenses are of servicing that business, come

21   to a pro forma EBITDA number, and apply it in an

22   appropriate -- multiple -- a range of multiples to come

23   to a fair market value.

24              So, when you described it as looking at

25   the lost profits, the two are very quite different

63

1    really.

2        Q.   So, let me make sure I have it down then.

3             So, the first step is, just like with the

4    lost profits analyses you did, you began with 12 months

5    of revenues.  Correct?

6        A.   Correct.  Yes.

7        Q.   And that was measured from February 1, 2022,

8    through January 31st, 2023.  Correct?

9        A.   Correct.  That was the data I had.  Yes.

10       Q.   And then the second thing you did is you

11   deducted certain expenses to come up with an EBITDA --

12   that's EBIT-D-A -- associated with those -- with those

13   revenues.  Correct?

14       A.   Yes.

15       Q.   And in doing so, did you deduct all of the

16   variable costs associated with the retention of that

17   business like you did in your second lost profits

18   model?  The --

19       A.   The net profits.

20       Q.   Yes, the net profits model?

21       A.   Yes, I did.  Yes.

22       Q.   And so that's how you came up with an EBITDA

23   amount for one year.  Correct?

24       A.   A pro forma EBITDA number, yes.

25       Q.   And then you multiplied that by three

64

1    different multiples.  Correct?

2         A.   Yes, a range.  10 to 12, yeah.  So, the way I

3    presented it is I show the low point, high point,

4    midpoint.  So, yeah, 10, 11 and 12.  Yes.

5         Q.   So, and that's it.  That's how you came up

6    with the valuation.  Correct?

7         A.   More or less, yes.  I would say that

8    describes it.  Yes.

9         Q.   And of the three, between the low, mid, and

10   high point numbers, which one is correct?

11        A.   It's a range.

12        MR. CANNELLA:  I'm sorry.  Object to the form of

13   the question.  Go ahead.

14        THE WITNESS:  Valuation is, you know, you -- to

15   come up with one number and say this is 100 percent the

16   valuation is -- that would be incorrect in a valuation

17   report.  You typically present them in a range.  Hence,

18   I've shown a range of 10 to 12.  But I've shown a

19   midpoint to say, you know, they're the average of what

20   you would expect.

21   BY MR. BANKS:

22        Q.   And in this case, we go back to the chart on

23   page 4, I will show that again.

24        A.   Right.  Okay.

25        Q.   That analysis of taking one year's EBITDA,

65

ROBIN FROST

1    and multiplying it by 10, 11 and 12 yielded this range

2    of ██████████████████████████████████████████████

3    Correct?

4         A.   That's correct.  Yes.

5         ████    ████████████████████████████████

     █  ████████████████████   ██████████████

     █    ████    ██████████    ██████

     █    ████    ██████████████████████████████████████

9    million measure the loss suffered by USI due to the

10   alleged wrongful conduct in this case?

11        A.   Okay.  So, I say in my report elsewhere that

12   I -- my opinion is that the fair market value is the

13   correct valuation in this case, because what that's

14   valuing is, it's taking those accounts which have left

15   due to the actions of Simmons and Mitchell, and

16   ascribing a value to them.

17             So, you know, USI had these accounts.

18   They have a value.  And in a fair market transaction,

19   this would be an appropriate range for what they're

20   worth.

21        Q.   Now, in your initial report, you did describe

22   this fair market valuation as the value of the lost

23   accounts.  Correct?

24        A.   Yes.  I -- because I referred to the -- you

25   can see it on the screen there.  Lost accounts is the

66

ROBIN FROST

1   -- yeah, what I'm referring to, the business that we're

2   considering here.  Yes.

3       Q.   But in your rebuttal report, you clarified

4   that this fair market valuation is valuing not only the

5   value of the lost accounts, but also the value of the

6   producers that would be part of any theoretical sale of

7   a business.  Correct?

8       MR. CANNELLA:  Object to form.

9       THE WITNESS:  The valuation assumes that the

10  production staff are included with it, because prior to

11  their departure, they were part of USI.  And that's

12  what USI had prior to the actions of Simmons and

13  Mitchell.  So, that's the appropriate valuation.

14  BY MR. BANKS:

15      Q.   But that is valuing -- I want to be clear.

16          The fair market valuation model is

17  looking at what you believe a willing buyer would pay a

18  willing seller for a business comprised of both the

19  lost accounts as well as the personnel involved in

20  producing and servicing those accounts.  Correct?

21      A.   It's assumed in the multiple that the

22  staffing is there, and the production staff are there

23  with the accounts.  Yes.

24      Q.   And I want to be clear.

25          Does that include both the producers and

67

1   the account management staff?

2       A.   Effectively, yes, it does, because I mean

3   we've allowed for that in pro forma EBITDA.  So, yes.

4       Q.   Now, in this case, do you understand whether

5   Jack Mitchell and Matt Simmons were free to leave USI,

6   after giving 60-days notice to USI under their

7   contracts?

8       A.   Yes, of course they are.  They are free to

9   leave.

10      Q.   And in this case, is it also true that the

11  account managers and other personnel that left USI to

12  go to the Southeast series of Lockton were at-will

13  employees?

14      A.   Yes.  I looked at their employment

15  agreements, and yes, they were also free to leave.

16  However, what I should say is they're free to leave,

17  but it's -- the issue at hand here is the breach of the

18  employment agreement, the restrictive covenants in the

19  employment agreements.

20      Q.   Move to strike after "however" as

21  nonresponsive.  But let me follow up on what you said.

22           You said there are restrictive -- it

23  includes restrictive covenants; is that right?

24      A.   Yes.  Yeah.  Their employment agreements.

25  Yes.

68

1      Q.    Whose employment agreements are you referring

2   to?

3      A.    All of the parties here.  So, Matt Simmons,

4   Jack Mitchell, and all the other support staff.

5      Q.    And so first, with respect to the team

6   members other than Mitchell and Simmons, is it your

7   understanding that they had no requirements in their

8   contracts with USI to give advance notice before

9   departing?

10      MR. CANNELLA:  Object to form.

11      THE WITNESS:  Apologies, sir.  Yeah, I read the

12   agreements, and that -- that's as I recall it.  Yeah,

13   there was no notice provision for those staff.

14   BY MR. BANKS:

15      Q.    And so, in valuing the fair market valuation

16   model, are you -- is there some portion of that value

17   that is associated with the restrictive covenants

18   associated with the non-producer team members that

19   changed from USI to the Southeast Series of Lockton?

20      A.    That's an unusual question.  I don't think

21   that's specifically considered in fair market

22   valuation.  It's really the production staff that are

23   the key piece that would go to support the multiples

24   and so on.  The support staff are, you know, assumed in

25   the support expenses.

69

1    Q.   And so they do not contribute to the value or

2    the revenue.  Your understanding is they are just an

3    expense?

4    A.   Correct.  Although I should -- I should

5    elaborate on that.  If there was -- if there was a

6    member of staff who was especially, you know,

7    technically knowledgeable and so on, or was especially

8    useful, that would be part of a, you know, a selling

9    point for an agency or a book of business.  So, that

10   could increase the multiple.

11   Q.   Are you aware in this case of any clients

12   that changed from USI to the Southeast Series of

13   Lockton because of anything that anyone did other than

14   Jack Mitchell and Matt Simmons?

15   A.   I'm not aware of any.  No.

16   Q.   With respect to the fair market valuation

17   model, so you're saying that this would be essentially

18   the price a willing buyer would pay a willing seller

19   for the rights to the producer relationship as well as

20   the client accounts.  Correct?

21   A.   Yes, with the producer transferring with

22   them.  Yes.

23   Q.   And it would also include the costs

24   associated with the other team members.  Correct?

25   A.   It does include those expenses.  Yes.

1    Q.   Does it also include -- in a real -- sorry.

2    Strike that.

3              In a real world scenario when a buyer is

4    purchasing a business from a seller in the insurance

5    brokerage industry, whether that's a whole business or

6    a portion of a business, that would normally include

7    restrictions on the seller's ability to compete for

8    that business that's been sold for a period of time

9    following the transaction.  Correct?

10   A.   Yeah.  That would definitely be included in a

11   sale and purchase agreement.  Yes.

12   Q.   And in this case, after Matt Simmons and Jack

13   Mitchell left, USI has been free to compete for the

14   business -- for the lost account business.  Correct?

15   MR. CANNELLA:  Object to form.

16   THE WITNESS:  Well, they are free to compete.

17   However, it -- how can I say.  It's not exactly a level

18   playing field, because the -- Simmons and Mitchell's

19   breach of their employment agreement and their

20   soliciting -- soliciting their accounts prior to their

21   departure and subsequent to their departure clouded the

22   issue.  And so, USI were effectively denied their right

23   to fairly compete for this business.  They weren't

24   given the opportunity to install a new team to support

25   the staff, and sufficient time for them to establish

71

1  relationships, and so on.

2  BY MR. BANKS:

3      Q.   It's your opinion that USI was deprived of

4  the ability to compete for the lost accounts because

5  Simmons and Mitchell poisoned the well by notifying the

6  lost accounts of their departure from USI before they

7  notified USI.  Correct?

8      A.   Correct.  Yes.

9      Q.   And because they notified clients of their

10  intents to depart from USI before telling USI, it's

11  your opinion that USI could not compete with them for

12  those accounts.  Correct?  Effectively?

13      A.   Effectively, yes.  They couldn't compete

14  effectively.  Yes.  That is my opinion.

15      Q.   So, even though legally they could compete

16  for the business, it is your opinion that there was no

17  way they could actually compete for the lost accounts

18  because Mitchell and Simmons told those lost accounts

19  of their intent to depart USI before leaving.  Correct?

20      MR. CANNELLA:  Object to the form of the question.

21      THE WITNESS:  I think it fairly impeded their

22  ability to compete.  There are -- I know that there are

23  accounts that didn't transfer to USI.  So, some

24  remained.

25

72

1    BY MR. BANKS:

2        Q.   Do you know which clients Simmons and

3    Mitchell told in advance they intended to resign from

4    USI?

5        A.   There was a testimony or -- apologies, it

6    might be interrogations?  There was a document I read

7    where there's a listing of -- there's a number of --

8    listed different accounts that they spoke to.  Yes.

9    I've seen that.

10   BY MR. BANKS:

11       Q.   Did you compare that list to the list of lost

12   accounts?

13       A.   Not directly, but I -- it appeared to include

14   the majority of them, I would say.

15       Q.   Are you aware of any lost accounts that are

16   not accounts that Mitchell and/or Simmons told in

17   advance of their intents to resign from USI?

18       A.   I haven't done that analysis, because that

19   was beyond the scope of what I was doing.  So, I'm not

20   aware of any.

21       Q.   Are you aware of any accounts that were in

22   either the Jack Mitchell or Matt Simmons' books of

23   business that stayed with USI where neither Mitchell

24   nor Simmons -- or where either Mitchell or Simmons told

25   the account in advance of their intents to resign?

73

1    MR. CANNELLA:  Hold on a second.  Object to the

2    form of the question.

3    MR. BANKS:  Yeah, I tried to clarify.  Let me ask

4    a clean question so we have a clean record.

5    MR. CANNELLA:  Thanks.

6    BY MR. BANKS:

7    Q.   With respect to the clients that were in the

8    Simmons' and Mitchell's books of business that stayed

9    at USI -- let's call those the retained clients.

10   Do you understand that?

11   A.   Yes.  Sure.

12   Q.   So, for the retained clients, do you know

13   whether Simmons or Mitchell told any of those clients

14   of their intent to depart?

15   A.   I didn't do any analysis of the retained

16   accounts.  I was just looking at the accounts that were

17   lost.  So, I don't know is the correct answer.

18   Q.   So, going back to what you did say, you said

19   that USI was deprived of the ability to compete for the

20   lost accounts because Simmons and Mitchell poisoned the

21   well by notifying the lost accounts of their departures

22   from USI before they notified USI.  Correct?

23   A.   Correct.

24   MR. CANNELLA:  Object to the form of the question.

25

74

1   BY MR. BANKS:

2        Q.   So, is it true that all damages in this case

3   flowed from that notification?

4        MR. CANNELLA:  Object to form of the question.

5   BY MR. BANKS:

6        Q.   In your opinion?

7        A.   I wouldn't say it's all.  You're referencing

8   a specific notification.  So, it's not -- it's not just

9   that one notification.  It's a number of actions, I

10  would say, that went to it.  But essentially, they have

11  in place restrictive covenants in their employment

12  agreements that they shouldn't be soliciting accounts

13  for -- well, there's a 60-day notice period, and then

14  subsequent to that, the two-year non-solicitation

15  period.

16              And the fact that slightly over half of

17  the -- in terms of revenue anyway -- slightly over half

18  of the accounts transferred very, very shortly after

19  their transfer to Lockton strongly implies that there

20  was -- that the cause of them departing to Lockton was

21  because of Simmons' and Mitchell's actions.

22        Q.   Have you done anything to determine whether

23  any of the lost accounts left USI due to a breach of

24  contract by Mitchell or Simmons as opposed to simply

25  the fact that Mitchell or Simmons were no longer at

75

1    USI?

2         A.   I haven't done that analysis, no.

3         Q.   And so, in your damages -- well, I'm sorry.

4    Strike that.

5              In the calculations that you performed of

6    lost profit valuation and fair market valuation, in

7    both of those, you assumed that all of the lost

8    accounts were lost because of breaches of contract by

9    Mitchell and/or Simmons, or not?

10        A.   There is an underlying assumption that the

11   lost accounts that's transferred to Lockton are due to

12   the actions of Simmons and Mitchell.  So, it's -- that

13   is the assumption that underlies it.  I'm doing a

14   valuation of these accounts.  Yea.  And we're assuming

15   there has been a breach of their restrictive covenants

16   which has caused them to transfer to Lockton.

17        Q.   But I'm trying it differentiate as to the

18   actions, because you said it was due to the actions of

19   Mitchell and Simmons.  Correct?

20        A.   Yes.  I did just say that.  Yes.

21        Q.   Have you assessed which accounts left due to

22   wrongful actions of Mitchell and Simmons as opposed to

23   simply their no longer being at USI?

24        MR. CANNELLA:  Object to the form of the question.

25        THE WITNESS:  Okay.  No.  I have not performed an

76

1    account-by-account analysis. I've not dug into what

2    the actions of Simmons and Mitchell were with any

3    specific accounts.

4    BY MR. BANKS:

5        Q.   And you also haven't dug into the reasons why

6    any particular account chose to leave USI. Correct?

7        A.   Correct. That's beyond the scope of what I

8    was asked to do. I was asked to value these accounts.

9    So, yeah, I didn't do that analysis.

10       Q.   In either your lost profit valuation models

11   or in your fair market valuation models, did you

12   disaggregate your calculations by client?

13       A.   By client? In the revenue table that's

14   further on in this report, yes. I have the revenue by

15   client. Yes.

16       Q.   Have you determined the net present value of

17   the net profit generated -- or that would be related to

18   clients on a client-by-client basis?

19       A.   I haven't done that analysis, no. I've done

20   it in totality.

21       Q.   So, if the jury determines that some clients

22   were lost due to wrongful conduct, and some clients

23   departed from USI simply because Mitchell and Simmons

24   were no longer there, you've given the jury no

25   calculations for them to isolate out the lost profits

77

1    -- or the lost net profits associated just with those

2    clients that left due to breaches?

3        MR. CANNELLA:  Object to the form of the question.

4        THE WITNESS:  As I said before, I looked at the

5    business in total.  That's -- that was what I was asked

6    to do.  So, yeah.  It's done as a totality.  I haven't

7    done it by client.

8    BY MR. BANKS:

9        Q.    And you said that's what you were asked to

10   do.

11            By whom?

12       A.    Well, I was asked to produce a fair market

13   valuation of the lost accounts.  No one specifically

14   directed me whether I do that account by account or in

15   totality, but I followed the normal procedure I would

16   in a transaction where I'm looking -- I'm looking at

17   the total book of business, and coming up with a value.

18   So, you know, I just followed my normal procedure here.

19       Q.    And similarly, in your fair market value

20   valuation analysis, you have only given a valuation

21   range based on the loss of all the lost accounts.

22   Correct?

23       A.    Correct, yes.

24       Q.    And you have not analyzed a fair market value

25   range for accounts on an account-by-account basis.

78

1    Correct?

2         A.    Correct.  So, yeah.  Exactly.  Same as we

3    discussed just previously.

4         Q.    So, if the jury determines that some accounts

5    in the lost accounts were lost due to wrongful conduct,

6    and other accounts were lost for other reasons, your

7    fair market valuation range would be wrong?

8         MR. CANNELLA:  Object to the form of the question.

9         THE WITNESS:  Well, it's a hypothetical.  If it

10   was determined that some of the accounts that are

11   included in the lost accounts shouldn't be in there, I

12   would need to go back and look at the numbers again

13   really.

14   BY MR. BANKS:

15        Q.    But you have not done that --

16        A.    No.  I have not.

17        Q.    -- correct?

18        A.    No.  No, I have not.

19        Q.    Going back to your testimony about how

20   Simmons and Mitchell poisoned the well, I want to focus

21   on that.

22              Okay?

23        A.    Okay.

24        Q.    All right.  So, it is your opinion again that

25   USI although legally able to complete, in reality can

79

1  no longer compete for those lost accounts.  Correct?

2      A.  Yeah.  Effectively they cannot compete for

3  them.  Yes.

4      Q.  Are you aware that there is an injunction --

5  a preliminary injunction that has been issued in this

6  case?

7      A.  I'm not a -- I'm not a legal expert by any

8  means.  So, I have seen there are actions that have

9  being taken.  So, yeah.  I'm not sure what the correct

10  terminology for all the interactions are, but yes.

11      Q.  Are you aware that under the preliminary

12  injunction in this case, that neither Mitchell nor

13  Simmons are permitted to work on the lost accounts at

14  this time?

15      A.  I think I did read that.  Yes, yes.  That's

16  my understanding.  But my understanding was that was

17  subsequent to the accounts transferring, or at least

18  some of them.

19      Q.  And are you -- you're aware that they

20  departed on January 25th, 2023.  Correct?

21      A.  Correct.  Yes.

22      Q.  And are you aware that there was a hearing on

23  the preliminary injunction on approximately February 7,

24  2023?

25      A.  I can't recall the date, but if you say so.

1    Yes.

2        MR. BANKS:  Dave, am I right on the date?  Or

3    Lyle?

4        MR. CANNELLA:  I don't remember, to be honest.

5    It was in February.

6        MR. SHAPIRO:  Ask it again, Chris.  Sorry.

7        MR. BANKS:  The date of the preliminary injunction

8    hearing.

9        MR. CANNELLA:  There were several here.

10       MR. BANKS:  The first one.

11       MR. SHAPIRO:  The first one?

12       MR. BANKS:  Yes.

13       MR. SHAPIRO:  I have to look.  There was a few.

14   BY MR. BANKS:

15       Q.   Are you aware that at that initial

16   preliminary injunction hearing, the judge indicated

17   that Simmons and Mitchell should not work on the lost

18   accounts?

19       MR. CANNELLA:  Objection to the form of the

20   question.  I think that's a mischaracterize of the

21   first hearing.

22       MR. SHAPIRO:  That was February 7, Chris, if you

23   want to ask the question.

24       MR. CANNELLA:  And the order wasn't entered into

25   until February 15, I believe.

81

```
1        MR. BANKS:  Correct.
2   BY MR. BANKS:
3        Q.   So, let me ask this again, Mr. Frost.
4             Are you aware whether there's testimony
5   in this case that as of February 7, 2023, Mitchell and
6   Simmons ceased working on the lost accounts?
7        MR. CANNELLA:  Objection to the form of the
8   question.
9        THE WITNESS:  I did read some legal documentation
10  that they had been required to step away from -- step
11  away from their former accounts from USI.  Yes.
12  BY MR. BANKS:
13       Q.   And are you aware of testimony in this case
14  that since approximately February 15, 2023, that not
15  only did Simmons and Mitchell not work on the lost
16  accounts, bus neither did Jackie Rodriguez, Sheila
17  Murray, Madison Lieffort, or Emily Carter?
18       A.   Again, I can't specifically recall, but that
19  sounds correct.  Yes.
20       Q.   And are you aware of any testimony in this
21  case that since approximately April 14th, 2023, that in
22  addition to those folks, neither Chris Kakish nor
23  Theresa Kemp worked on any of the lost accounts?
24       MR. CANNELLA:  Object to the form of the question.
25  Lack of foundation.
```

82

1       THE WITNESS:  I wasn't aware of that one actually.

2  No.  I can't recall reading that, but if you say so.

3  BY MR. BANKS:

4       Q.   Are you aware of any of the lost accounts in

5  this case leaving the Southeast Series of Lockton

6  Companies since the Court's preliminary injunction in

7  this case?

8       A.   I have to go back and check the dates, but I

9  know a good deal of them left almost within -- almost

10 immediately after January 25th.  So, within one or two

11 weeks.  And then in a number of cases, you know, some

12 policies -- for a specific client, some policies were

13 transferred fairly quickly.  And then there'd be some

14 delay on others following suit.  So, as I say, there

15 were some after February 15.  I can't recall how much

16 that was.  I'd have to go back and look at dates.

17      Q.   Let me -- I think you and I may have talked

18 past each other.  I was -- I think I was asking

19 something slightly different.  So, let me repeat or

20 rephrase.  Let's see.

21           I was asking about:  Do you know whether

22 any clients in the lost accounts have left the

23 Southeast Series of Lockton -- not USI, but left

24 Lockton since the entry of the preliminary injunctions?

25      A.   I have no information on that.  No.  I don't

83

ROBIN FROST

1  know.

2       Q.   And so, let's assume -- I'm going to ask you

3  to assume that there haven't been any losses since the

4  entry of the preliminary injunction.  Okay?  Can you

5  follow with me on that assumption?

6       A.   Yeah.  Sure.  It's a hypothetical, but yes.

7  Keep going.

8       Q.   At least so far, let's assume, that no

9  clients have left Southeast Series of Lockton, of the

10 lost accounts, since the preliminary injunction was

11 issued.  All right?

12      A.   Okay.  Yes.

13      Q.   Assuming that's correct, is that consistent

14 with your opinion that Mitchell and Simmons poisoned

15 the well with those clients?  Meaning that USI really

16 cannot ever compete for those clients again?

17      A.    I'd say that is consistent, because there was

18 the contact made prior to their departure, and there's

19 the contact immediately after, which was prior to the

20 dates of the injunctions, and prior to the enforcement

21 of the injunctions.

22      Q.   And so, because the relationships between USI

23 and those clients was already poisoned, in your

24 opinion, and USI has been unable to compete for those

25 clients' business, would you agree that the preliminary

84

1  injunction is superfluous?

2      MR. CANNELLA:  Object to the form of the question.

3      THE WITNESS:  No.  I would say -- I wouldn't say

4  it was -- again, I'm not a legal expert, but I would

5  say the sensible move would be for USI, just to -- as a

6  damage limitation exercise, just to stop any other

7  accounts going.

8  BY MR. BANKS:

9      Q.   Well, it's your opinion, isn't it, that with

10 respect to the lost accounts, USI can't compete for

11 that business anymore?

12     A.   Effectively they can't.  They weren't

13 afforded the opportunity to install a new production

14 team, a new support time, establish relations, and so

15 on.  So, they were denied the opportunity to work with

16 those clients to retain them.  So, yes.  They were not

17 afforded the chance to effectively compete for them.

18     Q.   So, in your opinion, those clients are gone

19 from USI for the next ten years.  Right?

20     MR. CANNELLA:  Objection to the form of the

21 question.  And if we're done with this exhibit, can we

22 take it down for now?  It's just easier to follow.

23     MR. BANKS:  Yeah.

24     THE WITNESS:  Yeah, that's fair.  That wasn't

25 really pertinent to these questions.  I don't really

85

1    make an assumption that they're going to stay with

2    Lockton for ten years.  In fact, there's a -- you know,

3    you would expect there would be some attrition where

4    ever they were, whether they remained with USI, whether

5    they transferred to Lockton, who ever.  There's a risk

6    in selling a business that, you know, an acquirer buys

7    a business, and some of those accounts may leave

8    subsequently.

9    BY MR. BANKS:

10       Q.   I asked a different question.  I asked:  Your

11   assumption -- or no, your opinion is that the lost

12   accounts that left, left USI for ten years, and they're

13   not coming back.  Right?

14       MR. CANNELLA:  Object to form of the question.

15       THE WITNESS:  It would -- it's speculative.  I'm

16   just looking at what was the value of those accounts as

17   of January 25th, prior to the actions of what happened.

18   So there's no -- what happened subsequently, you know,

19   is not relevant to the fair market valuation.

20   BY MR. BANKS:

21       Q.   But what about your lost profits analysis?

22       A.   Again, I --

23       MR. CANNELLA:  Object to the form of the question.

24   Go ahead.

25       THE WITNESS:  Again, with the lost profits

86

1  analysis, it's just projecting forward as of -- so,

2  sorry, going back.  As of January 25th, the subsequent

3  actions that caused those accounts to leave, those are

4  the profits that they -- that's a projection of the

5  profits that they then lost because of those actions.

6  BY MR. BANKS:

7       Q.   So, your loss profits analysis, your opinion

8  is that those lost accounts were lost to USI for ten

9  years because Mitchell and Simmons poisoned the well.

10 Correct?

11      MR. CANNELLA:  Object to the form of the question.

12      THE WITNESS:  I don't form a specific opinion on

13 whether they would be lost for any particular period of

14 time.  I mean --

15 BY MR. BANKS:

16      Q.   Did you -- sorry.

17      A.   I was going to say, there is actually

18 attrition assumptions included in the lost profits

19 models.  There's an assumption that it's business as

20 usual.  Business comes and goes.  So --

21      Q.   Did you make any allowance in your lost

22 profit calculation for the possibility that any of the

23 last accounts might return to USI in the real world

24 during the ten-year period?

25      A.   That wouldn't be appropriate to the

87

1    methodology.  So no, I did not.

2        Q.  Would you agree that in your lost profits

3    model -- well, strike that.

4            In your lost profits model, are you

5    trying to measure the losses that USI incurred in the

6    real world versus a hypothetical world where there were

7    no -- where there was no wrongful conduct?

8        A.  So, that's -- so, I'm looking at what is as

9    of January 25th.  They've lost these accounts.  What's

10   the future profitability of what they've last.  What

11   you're talking about is subsequently -- actions

12   subsequent to that, which, you know, we can't

13   determine.

14           We're speculating what that could be:

15   Whether they came, whether they went, what have you.

16   So, I'm just looking as of that moment, they had those

17   accounts; those are the profits that they could

18   reasonably expect to have -- the current value of the

19   future profits that they can reasonably expect to earn.

20       Q.  Aren't you, in your lost profits analysis,

21   assuming that none of the lost accounts would return to

22   USI in the real world?

23       MR. CANNELLA:  Hold on.  Object to the form of the

24   question.  Asked and answered several times.

25       THE WITNESS:  Yeah, I would say this is what we've

88

ROBIN FROST

1  just been discussing.  I don't make an assumption as to

2  whether the account -- I've assumed business as usual

3  attrition in the lost profits analysis.  So, there's no

4  assumption as to where the accounts go in particular.

5  The fact that it's -- the basis of it is that these

6  accounts were lost to USI effective January 25th, and

7  subsequent.  And so, that would be the profits --

8  that's a valuation of the profits that they have lost

9  from losing those accounts.

10  BY MR. BANKS:

11      Q.  So, is there a possibility that some of this

12  business could return to USI in the next nine and a

13  half years from today, or not?

14      MR. CANNELLA:  I object to the form of the

15  question.

16      THE WITNESS:  It's speculative.  But I mean, it

17  could.  It could go to other agencies.  It could go to

18  anyone -- Marsh, whoever.

19  BY MR. BANKS:

20      Q.  So, is it your opinion or not that USI has

21  lost the ability to compete for this business because

22  of Mitchell and Simmons poisoning the well?

23      A.  It is my opinion, yes.

24      MR. BANKS:  All right.  Why don't we take our

25  ten-minute break?

89

1        MR. CANNELLA:  Why don't we make it a lunch break?

2   It's almost 12:30 on the East Coast.

3        THE VIDEOGRAPHER:  Off the record.  12:23 P.M.

4                        (There was a break taken, after

5                         which the deposition was resumed

6                         as follows:)

7        THE VIDEOGRAPHER:  All right.  On the record.

8   1:16 P.M.

9   BY MR. BANKS:

10       Q.   All right.  Mr. Frost, you understand that

11  although we took lunch, you remain under the same oath

12  you took at the beginning of the day to tell the truth?

13       A.   I do, yes.

14       Q.   All right.  Did you do anything over the

15  lunch period related to this case?

16       A.   Nothing related to this.  No.  I had lunch.

17       Q.   Very good.  All right.  And you had enough

18  time to do lunch, take a break, et cetera?

19       A.   Absolutely.  Yes.  Thank you very much.  Yes.

20       Q.   Thank David.  He's the one who reminded us it

21  was lunchtime.  You can always count on Dave to

22  remember the breaks.

23       MR. CANNELLA:  I won't miss a meal.  That's for

24  sure.

25

90

1    BY MR. BANKS:

2        Q.   All right.  So, let's turn back to -- I want

3    to focus on your lost profits valuation.

4                  As we established earlier, your lost

5    profits analysis assumes a ten-year horizon.  I'm

6    sorry, not assumes.

7                  It uses a ten-year horizon.  Correct?

8        A.   It projects profits out for ten years.

9    Correct.

10       Q.   All right.  And in your analysis, you did not

11   use any different attrition rate after year two than

12   you did after years three through ten.  Correct?

13       A.   Correct.  So, I used an average rate of ten

14   percent.  Yes.

15       Q.   Now, you understood that after two years,

16   Mitchell and Simmons were free to complete with USI for

17   the lost accounts under their contracts.  Correct?

18       A.   Yeah.  Under the terms.  If they had stuck

19   with the terms, yes.  After two years, correct.

20       Q.   And yet your assumption is that USI after two

21   years -- I'm sorry.  Strike that.

22                  Your opinion is that after two years, USI

23   would have lost no more business among the lost

24   accounts to Mitchell and Simmons re-entering the

25   marketplace than USI would have lost in any other year,

91

ROBIN FROST

1    years two through ten.   Correct?

2         A.    That's the way the model has it.   Correct.

3    Yeah.

4         Q.    So, did you review any -- what is the basis

5    for your opinion that USI would not have lost more

6    business after Mitchell and Simmons re-entered the

7    marketplace than USI did in any other year?

8         A.    Well, I would say there's two pieces to that.

9    There's the fact that the valuation is looking at, you

10   know, as of January 25th, as of that date when they

11   left, you know, what was -- what did they lose, and

12   what is the value of those profits projected -- the net

13   present value of those profits projected forward.   So,

14   what happens subsequently doesn't really enter it.

15             Then on the other hand, the two-year

16   period you referred to, if USI had the opportunity to

17   install the team and, you know, they had a chance to

18   make relationships and so on, we don't know what would

19   have happened.  We don't know they could, you know --

20   we can't project really what would have happened had

21   USI been afforded the opportunity to install a team --

22   a new team to service them.

23        Q.    So, it is your opinion that in this scenario

24   where USI would have retained the lost accounts, you

25   cannot project what would have happened after two years

92

1  when Mitchell and Simmons re-entered the marketplace?

2  A.   Yes.  Getting back to my previous answer, I'm

3  looking at the value after -- you know, as of the date

4  of loss, if you like.  That's the January 25th.  That's

5  -- those are the profits that they've -- the future

6  profits they've lost.  If they come back subsequently,

7  then, you know, that's good news for USI I would say.

8  But it doesn't affect the value as of that time.

9  Q.   I'm not sure we're talking about the same

10  thing.  I'm talking about --

11          Well, first, so are you saying that your

12  lost profits analysis is not measuring the difference

13  between what USI would have generated had it retained

14  the lost accounts in the first instance versus what

15  happened in the real world?

16  MR. CANNELLA:  Object to the form of the question.

17  THE WITNESS:  It's an attempt to value the loss of

18  profits from losing those accounts.

19  BY MR. BANKS:

20  Q.   But you've said that it's valuing them as of

21  January 25th, 2023, and what happened afterwards in the

22  real world is not really -- or what would have happened

23  afterwards is not really relevant; is that correct?

24  A.   It doesn't speculate on -- as to, you know,

25  what's going to happen with specific accounts and so

93

1    on.  It has, as we've discussed, it has an attrition

2    assumption.  Just a business as usual, 10 percent

3    attrition assumption built into it to allow for the

4    fact that accounts do come and go.

5         Q.   Did you do any analysis to determine what

6    USI's real world experience was in retaining clients

7    that had been part of the departed producers' book of

8    business after the expiration of their restrictive

9    covenants?

10        A.   I didn't do any specific analysis on that.

11   No.

12        Q.   Did you rely on any other analysis of such a

13   scenario where a producer begins competing after the

14   expiration of their restrictive covenants, and how that

15   affects their prior employer's ability to retain

16   business in the departed producer's book of business?

17        A.   I didn't.  But I'd go back to the fact that

18   I'm saying I'm valuing it as of the date of loss.  And

19   so, whether they lose the account and lose, you know,

20   lose it indefinitely, you know, it's irrelevant, you

21   know?  Those are the profits they lost as of that time.

22        Q.   So, is it true, you're not really measuring

23   what the lost business was over ten years.  You're just

24   trying -- you're just valuing a present value for those

25   accounts?

94

ROBIN FROST

1       A.    Present value of loss -- what the loss of

2   profits from losing those accounts is correct, yes.

3       Q.    And you're not comparing that to a scenario

4   in which Simmons and Mitchell would be free to compete

5   after two years.  Correct?

6       A.    I didn't factor that into the analysis.  I

7   look at, you know, what the value is of the loss from

8   the accounts that have gone.

9       Q.    Well, you're looking at the value of the

10  accounts regardless of what the restrictive covenants

11  would allow in the future.  Correct?

12      MR. CANNELLA:  Object to the form of the question.

13      THE WITNESS:  So, I'm -- I feel like I keep

14  repeating the same thing.  I'm valuing the loss of

15  profits from those accounts.  What -- you know, we --

16  the model factors in loss of business by having an

17  attrition assumption in there, but it doesn't -- you

18  know, we don't look at an account-by-account basis or

19  anything like that.  We just -- it's just in totality

20  looking forward.

21  BY MR. BANKS:

22      Q.    Did you consider the testimony of Benjamin

23  Greer related to the ability of an insurance broker to

24  retain business after a producer's -- a departed

25  producers restrictive covenant's expired?

1      MR. CANNELLA:  Object to form.

2      THE WITNESS:  I am aware of Mr. Greer's testimony,

3  and I recently saw his -- that he was -- there was a

4  deposition of Mr. Greer, I understand quite recently,

5  to discuss what he had said in a previous case.  So,

6  the 40 percent I found to be somewhat anecdotal for

7  Mr. Greer.  It seemed like it's a measure that they use

8  as a worse case scenario to, you know, to manager

9  whether they're going -- it's to encourage management

10  not to let go of producers who they think are

11  underperforming.  You know, potentially the very worst

12  case scenario if this person goes, that this would be

13  the loss.  That's how I understood what he was saying

14  in the recent testimony.

15  BY MR. BANKS:

16      Q.  Was it your understanding in reading that

17  testimony that Mr. Greer was saying that that worst

18  case scenario was for losses they would suffer

19  immediately, or after the producer returns to being

20  able to compete after the expiration of non-competes?

21      MR. CANNELLA:  Object to form.

22      THE WITNESS:  It was my understanding that was

23  their worst case scenario after a producer can compete

24  after the two years.  But he did also say they don't

25  actually measure these things.  So, in his testimony,

96

1    he says it's speculative.  He's guessing.  He doesn't

2    actually have an accurate measure.

3    BY MR. BANKS:

4        Q.    Do you believe it is speculative to determine

5    -- strike that.

6                Is it speculative to analyze how much

7    business USI would be able to retain from a departed

8    producer's book of business after that producer --

9    after that producer's restrictive covenant expires?

10       A.    Again, you know, I don't work at USI, so I

11   don't know their internal metrics and so on.  But from

12   reading through the testimony of Mr. Greer, what he was

13   saying is that there's so many variables involved, it's

14   very hard.  So, if an account leaves two years later,

15   it may not be because of the departed producers.  It

16   may be some other factor -- they got taken over, or

17   something happened to the business.

18               So, it's -- that's what he was saying.

19   It's very hard to actually really pinpoint specifically

20   what is due to a departed producer being able to

21   compete again after two years.

22       Q.    Setting aside Mr. Greer's testimony, so I'm

23   trying to ask a different question.

24       A.    Okay.

25       Q.    Is it your opinion that it would be

97

1    speculative to try to assess how much business USI

2    would retain after a departed producer's restrictive

3    covenant expires?

4         MR. CANNELLA:  Object to form.

5         THE WITNESS:  Yes.  Unless -- if they had some

6    reliable data on that, possibly.  But in the absence of

7    that, yes, I would say it was speculative.  Yes.

8    BY MR. BANKS:

9         Q.   Have you seen -- you reviewed the deposition

10   testimony of Katy Santiago.  Correct?

11        A.   Katy Santiago.  I think I did read that one.

12   Yes.  Yes.

13        Q.   Let me -- I'll ask you slightly differently.

14             Did you review the testimony of USI's

15   Southeast Regions regional CFO?

16        A.   Oh, yes, who is Katy Santiago.  Yes.  I'm

17   pretty sure I did.  I'm sorry.  I read so many of

18   these, I forget which ones.  But yeah, I'm fairly sure

19   I did read that one.  Yes.

20        Q.   So, are you familiar with her testimony about

21   USI's experiences with the resignations this year of

22   other producers?

23        A.   She does reference that, yes.  I recall that.

24   Yes.

25        Q.   And is it your understanding that there were

98

ROBIN FROST

1  two producers who worked together with the last names

2  Goding and Cardew?

3       A.   Yeah, I recall she testified that.  Yes.

4       Q.   She identified -- strike that.

5            Do you recall that she identified that

6  there were some clients that had been in their books of

7  business that departed from USI during their 60-day

8  notice period after those producers gave notice to USI

9  of their intents to resign?

10      A.   I think she said that, yes, from my

11 recollection.  Yes.

12      Q.   And you were critical of Mr. Lewis for not

13 determining what the dollar value was of that accounts

14 versus the dollar amount in the books of business of

15 Mr. Cardew and Goding.  Correct?

16      A.   Yeah.  As I recall, it was Ms. Santiago had

17 referenced it, and I think it's Mr. Simmons says, Oh,

18 he thinks it's X number of clients.  And it's just a

19 number of clients, but we don't know what the dollar

20 value is.  So, yeah.

21      Q.   Did you do anything to request that data from

22 USI?

23      A.   No.  I didn't.  I felt that was outside the

24 scope of doing a valuation of the accounts at hand.

25      Q.   And that's because you weren't really

99

ROBIN FROST

1    measuring what losses USI suffered due to the alleged

2    wrongful conduct, and instead were just measuring the

3    value of certain accounts that were specified by USI.

4    Correct?

5         MR. CANNELLA:  Object to the form of the question.

6         THE WITNESS:  Yeah, the purpose of my report is to

7    value those accounts that were lost as of January 25th,

8    2023.

9    BY MR. BANKS:

10        Q.   And, so you didn't do anything to consider

11   what the normal rate of attrition was at USI during a

12   60-day notice period -- client attrition.  Correct?

13        MR. CANNELLA:  Object to form.

14        THE WITNESS:  No, I didn't do that.  I didn't

15   think that was relevant to the analysis.

16   BY MR. BANKS:

17        Q.   And why wouldn't it be relevant to consider

18   what USI's real world experience was in client

19   attrition after a producer gave notice of their

20   resignation?

21        A.   Because the fact that the producer has left

22   has caused, you know -- the actions of the producer has

23   caused those accounts to leave.  And whether they leave

24   within the 60-day notice period or, you know, either

25   way they've been lost.  So, it's a loss of profits to

100

ROBIN FROST

1  USI.  I didn't think it relevant -- deem it relevant.

2  Sorry.

3      Q.  Did -- do you know whether the

4  cross-complaint defendants in this case requested data

5  from USI about the size of Mr. Cardew and Goding's

6  books of business and the value of the accounts that

7  had departed?

8      A.  I don't know.  I don't know what happened

9  there.

10     Q.  You don't know whether USI has refused to

11 turn that over.  Correct?

12     A.  I have absolutely --

13     MR. CANNELLA:  Object to form.

14     THE WITNESS:  -- no idea.  Sorry, Dave.

15     MR. CANNELLA:  That's all right.

16 BY MR. BANKS:

17     Q.  Have you requested any information from USI

18 about whether any clients that have been in the

19 Mitchell and Simmons' books of business have since left

20 USI since the entry of the preliminary injunctions?

21     A.  Let me make sure.  Sorry.  Can you just

22 repeat the question to make sure I'm answering

23 correctly?

24     Q.  Yeah.  That's fair.  So, earlier we talked

25 about the retained accounts being the accounts from the

101

1    Simmons and Mitchell's books of business that stayed

2    with USI, at least initially, following the Mitchell

3    and Simmons resignations.  Right?

4        A.   Yes.

5        Q.   So, of those retained accounts, have you

6    asked USI at any point whether any of those retained

7    accounts have since left USI?

8        A.   I haven't specifically asked that question.

9    During the process of producing the initial valuation

10   report, we had iterations of the production data, and

11   there were changes, you know, as information was coming

12   in.  So, it could be that some things changed from the

13   first version to the last version.  I'd have to go and

14   compare the two.  But no, I didn't specifically ask

15   about -- as we're referring to them -- the retained

16   accounts.  No, I did not.

17       Q.   Would you agree that for USI to have retained

18   the business that was lost with the lost accounts, that

19   USI would, number one, have to have the capability of

20   adequately serving those accounts.  Correct?

21       A.   Yes.  I mean, well, they're already accounts

22   of USI that they've been servicing.  So, yes.  They

23   would continue servicing them.  Yes.

24       Q.   Number two, the clients would have to want to

25   stay with USI.  Correct?

102

1        A.    Yes.   That's correct.

2        Q.    And so, did you do anything to try to assess

3   whether clients that did not leave with the departed

4   accounts, whether those clients were satisfied with

5   USI's service?

6        A.    No.   I couldn't comment on that.   No.   I did

7   not -- did not inquire as to anything regarding the

8   remaining accounts.   No.

9        Q.    I'm going to ask you about some specific

10  clients.   Sorry.   I thought I had it up.   Just give me

11  a moment.

12             Are you familiar with the account named

13  AJI Holdings?

14       A.    I recall that one being one of the lost

15  accounts.   I'm pretty sure.   Yeah.   I didn't really do

16  any analysis account by account.   But that name is

17  familiar.   Yes.

18       Q.    So, is AJI Holdings included in your analysis

19  of the lost accounts?

20       MR. CANNELLA:   Object to form of the question.

21       THE WITNESS:   Is it okay if I check my report?

22  BY MR. BANKS:

23       Q.    Yes.

24       A.    Because I recall that name.   I'm pretty sure

25  it's in there, but let me confirm for sure.   No.   I

103

 1   don't see AJI Holdings.  AJI Holdings was not one of

 2   the lost accounts.  Apologies if I misspoke previously.

 3   As I was said, I was trying to recollect.  But I do

 4   recall that being in the production data.

 5        Q.   AJI Holdings was one of the retained accounts

 6   with USI.  Correct?

 7        A.   It would appear so.  It's definitely not one

 8   of the lost accounts.  So, either it was retained, or

 9   maybe it was lost elsewhere.  I don't know.  But it was

10   not a lost account.  Not lost to Lockton.

11        Q.   Do you know whether AJI Holdings submitted a

12   broker of record letter to USI changing its business

13   away from USI on or about September 15, 2023?

14        A.   I don't have any information regarding that.

15   No, I don't.  I didn't know -- don't know.

16        Q.   And so, do you have any information one way

17   or the other as to why AJI Holdings may have ceased

18   doing business with UIS?

19        A.   No.  I don't have that information.  No.

20        Q.   Do you have any information one way or the

21   other whether AJI Holdings was satisfied with USI's

22   services after the departures of Mr. Simmons and the

23   others who went to Lockton?

24        A.   I don't have any --

25        MR. CANNELLA:  Object to form.

                              104

ROBIN FROST

1        THE WITNESS:  Apologies, Dave.  I don't have any

2   information on that, no.

3   BY MR. BANKS:

4        Q.   Do you know the client Transportation Control

5   Systems?

6        A.   Again, that's another name.  Again, can I

7   just check my list of accounts in the report?

8        Q.   Yes.  Please do.

9        A.   Again, I'm just looking at my hard copy

10  report which only shows the loss accounts.  But no,

11  that's not in there.  But from memory that is an

12  account I recall in the production data.

13       Q.   Do you believe that was one of the retained

14  accounts?

15       A.   It's not a -- again, it's not a lost account,

16  so yeah.  In the absence of any other data, it's

17  retained or not lost to Lockton at least.

18       Q.   Do you know whether Transportation Control

19  Systems submitted a broker of record letter to USI on

20  or around June 29, 2023?

21       A.   I have no information regarding -- or at

22  least if I do, I can't recollect it.  No.

23       Q.   Do you have any information one way or the

24  other as to why Transportation Control Systems decided

25  to move any business away from USI?

105

1      A.   No.  I don't have that information.

2      MR. CANNELLA:  Form.

3   BY MR. BANKS:

4      Q.   Do you -- are you familiar with the client

5   Ruth's Chris?

6      A.   What was the name again?

7      Q.   Ruth's Chris, the steakhouse.

8      A.   Oh, the steakhouse.  Yeah.  I'm familiar with

9   them, yes.  I've been.  But, yeah.  But it's not one of

10  the lost accounts.  Correct.

11     Q.   And do you recall whether that was one of the

12  retained accounts?

13     A.   I actually don't recall seeing Ruth's Chris.

14  That's one think I would have remembered.  But I'd have

15  to go back and check.  If you're saying they're on the

16  production data, I presume that's correct.  I don't

17  recall seeing them, actually.

18     Q.   Do you know whether ruth's Chris submitted a

19  broker of record letter to move its business away from

20  USI on or around June 22nd, 2023?

21     A.   I don't have any information on that.  No.

22     Q.   Do you have any information one way or the

23  other as to why Ruth's Chris may have moved its

24  business away from USI?

25     A.   No, I don't.

ROBIN FROST

1      Q.   Do you agree that it would be relevant to

2   know whether the retained accounts at USI stayed at USI

3   following the events, you know, earlier in this case,

4   in assessing whether USI would have actually retained

5   the business of the lost accounts?

6      MR. CANNELLA:  Object to form.

7      THE WITNESS:  I don't think that is relevant

8   really, because I'm looking at the accounts that they

9   lost, you know, which went to Lockton as a consequence

10  of the actions of Simmons and Mitchell.  So, if the

11  other accounts departed as well, in some ways they're

12  almost ancillary damages to USI you could say of the

13  actions.  But they're not.  I don't know if that's the

14  correct English expression.  But they wouldn't come

15  into this calculation because we're just looking at

16  those account that went to Lockton.

17  BY MR. BANKS:

18     Q.   Do you have any information that would

19  suggest that Mr. Simmons or Mr. Mitchell or Mr. -- or

20  the Southeast Series of Lockton Companies have done

21  anything wrongful to cause the departures of AJI

22  Holdings, Transportation Control Systems and/or Ruth's

23  Chris from USI?

24     MR. CANNELLA:  Object to form.

25     THE WITNESS:  I don't have any information on

107

1    those accounts.  No.

2    BY MR. BANKS:

3        Q.    And when you said something earlier about

4    that that would be damages from what happened here,

5    you're not distinguishing between breaches of contract

6    by Mr. Simmons and Mr. Mitchell and lawful actions of

7    Mr. Simmons and Mr. Mitchell.  Correct?

8        MR. CANNELLA:  Object to the form of the question.

9        THE WITNESS:  I'm just considering those accounts

10   that were lost to Lockton, which the circumstances

11   suggest were due to the actions of Simmons and

12   Mitchell.  So, they solicited them prior to departure.

13   They solicited them immediately after departure.  They

14   left in very short order after

15   January 25th.  So, it would -- the facts of the case

16   seem to indicate that the two matters are related;

17   that's why they went to Lockton.

18   BY MR. BANKS:

19       Q.    What's your basis of saying that Mitchell and

20   Simmons solicited any of those clients?

21       A.    There was testimony in one of the documents I

22   looked at that they approached all of those accounts

23   prior to departure.  And I remember specific reference

24   to one account, PGT Innovation, I think, in the

25   deposition of Mr. Simmons.  But they were specifically

108

1    referenced in that, that they spoke to them just prior

2    to their departure, informing them of their move to

3    Lockton.

4        Q.    So, when you say "solicit," you mean Mitchell

5    and/or Simmons told the clients that they were thinking

6    of leaving or they intend to leave USI?

7        A.    That was my understanding.  Yes.

8        Q.    You have no other basis for saying that

9    clients were solicited by Mitchell or Simmons.

10   Correct?

11       MR. CANNELLA:  Object to the form of the question.

12       THE WITNESS:  Only from what I've read in

13   testimony.  Correct.

14   BY MR. BANKS:

15       Q.    And again, that testimony was that they told

16   the clients they were going to leave USI.  Correct?

17       A.    I believe that's what it was.  Yes.

18       Q.    Do you have -- you have not done anything,

19   though, to independently to determine why any

20   particular client left USI.  Correct?

21       A.    No, I haven't.  I've looked at it as a --

22   what I was doing was doing a valuation of those

23   accounts that were lost.  So, I didn't do an

24   account-by-account analysis.  Just the book that was

25   lost.

109

ROBIN FROST

1      Q.    And you wouldn't be qualified to offer an

2    opinion as to why particular clients left.   Correct?

3      A.    Yeah.   I'd say that's fair.   I don't think

4    I'd be qualified to offer an opinion on that.

5      Q.    All right.   I would like to actually get into

6    the rebuttal report, which I'm going to mark as

7    Exhibit 2.

8      A.    Okay.

9                        (Whereupon, the document was marked

10                       as Deposition Exhibit No. 2 for

11                       identification.)

12     MR. BANKS:   Now, before I do, I'm check the

13   confidentiality designation.   So, Dave, my

14   understanding is this is listed as attorney's eyes

15   only, not outside counsel's eyes only.   If you want to

16   take look at it to confirm?

17     MR. CANNELLA:   I think that's right.

18     MR. BANKS:   So, Ms. Romine can stay on if she's

19   still on.

20     MR. CANNELLA:   She can.   It is a --

21     MR. BANKS:   Yeah.   It's attorney eyes only, and so

22   just a reminder to Ms. Romine that it should not be

23   disclosed to anyone in the business at Lockton.

24     MR. CANNELLA:   Right.

25     MR. BANKS:   Okay.   So, first, in the chat just so

110

ROBIN FROST

1    we have a complete record, and so the court reporter

2    can get these if you can -- you can't?  Okay.  Well,

3    I'm going to still put it in so we have a complete

4    record for ourselves.

5              First is Exhibit 1, is the August 21st,

6    2023, report.  And then Exhibit 2 is the rebuttal

7    report.  And they are both -- they're both in the chat

8    now.  So, they can be downloaded.

9    BY MR. BANKS:

10    Q.   And I understand, Mr. Frost, you do have a

11    copy already, but you are free to download these if you

12    want to look at them.  I will try to show things on

13    screen as well.  Okay?

14        MR. CANNELLA:  Hold on.  Just for the first

15    Exhibit 1, I would request that that not be downloaded

16    by anybody that's not outside counsel on this.

17        MR. BANKS:  It is also marked:  Attorney's eyes

18    only.

19        MR. CANNELLA:  Yeah, but in the transmittal e-mail

20    we made sure that outside counsel eyes only.

21        MR. BANKS:  I see.  Okay.  My apologies.

22        MR. CANNELLA:  Yeah.  So, we can take it down, or

23    I'll just assume that nobody who is not outside counsel

24    is going to --

25        MR. BANKS:  Yeah, I don't think I --

111

1    unfortunately, I don't think I can take it off the

2    chat.

3         MR. CANNELLA:  Okay.  Well, then we'll be on our

4    more professional best behavior.

5         MR. BANKS:  Yeah.

6    BY MR. BANKS:

7         Q.   So, focusing on your rebuttal report, first,

8    could you -- why don't you go ahead and download it,

9    Mr. Frost.  And I'd like you just to confirm this is

10   your rebuttal report that I marked as Exhibit 2.

11        A.   Yeah.  Bear with me.  Yeah, it's this one.

12   Bear with me one second.

13        Q.   Sure.  Take as much time as you need.

14        A.   Okay.  Thank you.  Yeah, at a glance this

15   looks like the same report I'd say.

16        MR. CANNELLA:  This is the rebuttal report?

17        THE WITNESS:  Yes.

18   BY MR. BANKS:

19        Q.   And you signed this on or around October 20th

20   of 2023.  Correct?

21        A.   Yes.  Fairly recently.  Yeah.

22        Q.   Which would be last Friday, last week.

23   Correct?

24        A.   Yes.  I believe last Friday was the deadline

25   to get it submitted.  Yes.

112

1    Q.   And let's take a look at page 2.  I'm sorry,

2    it's marked as page 2 in your report.  I can show it on

3    the screen as well.

4              So, this has the Page No. 2 at the bottom

5    right-hand corner.  Do you see that?

6    A.   Got you.  Yeah.

7    Q.   Now, you wrote here in the second paragraph,

8    "I believe all the assertions made in the Lewis report

9    against the valuation report can be disregarded."  I

10   just want to stop there.

11             So, first, the valuation report as

12   referenced in this rebuttal is your original report.

13   Correct?

14   A.   Correct.  Yes.

15   Q.   And the Lewis report is the report from

16   Mr. Justin Lewis of Truest Consulting.  Correct?

17   A.   Yes.  That's right.  Yes.

18   Q.   Now, you say here that "all the assertions

19   made in the Lewis report can be disregard," but isn't

20   it true that in your rebuttal report, you do agree that

21   the fair market value valuation model that you prepared

22   includes a valuation of both the client accounts and

23   the producer relationships -- employment relationships?

24   A.   I say in here that I assume that the

25   producers are included within the valuation.  Correct.

113

1       Q.   Let me go down to the second paragraph after

2   the charts.  You wrote, "I express no opinion and

3   accept no responsibility for the accuracy and

4   completeness of the financial information audited,

5   reviewed, compiled, internal, prospective or tax

6   returns, or other data provided to me by others.  And I

7   have not verified such information unless specifically

8   stated in this report."

9            And that was true.  Correct?

10      A.   That's correct.  Yes.

11      Q.   And have you been asked to verify any

12  financial information that was provided to you by USI?

13      MR. CANNELLA:  Object to form.

14      THE WITNESS:  No.  As I state in the report, I

15  haven't -- I haven't verified the data that was

16  provided to me.

17  BY MR. BANKS:

18      Q.   And the data that was provided to you was

19  provided to you by USI.  Correct?

20      A.   That was the original source.  It was relayed

21  to me by Holland and Knight law firm, but I believe it

22  came from USI originally.  Yes.

23      Q.   Yeah.  Understanding there may have been a

24  middle person, but the source of the information was

25  ultimately USI.  Correct?

114

ROBIN FROST

1     A.   Correct.  Yes.

2     Q.   Let's take a look at the next page.  I want

3   to focus on your last paragraph.  In the second

4   sentence you write, "Insurance brokerage is a

5   relationship based industry, and it is a standard

6   practice in the sale of an agency or a book of business

7   that producers transfer with the accounts."

8               That was true.  Correct?

9     A.   Yes.  That's true.  Yeah.

10    Q.   And that's why in this case, when you valued

11  the lost accounts, your analysis is also valuing what

12  the loss associated with the loss of Simmons and

13  Mitchell was to USI.  Correct?

14    A.   As regards to the lost accounts, yes.  Yes.

15  So, I'm assuming that the value of the accounts in

16  question here, yeah, it includes the relationship

17  Simmons and Mitchell have with them.  Yes.

18    Q.   Well, not only the relationship that Simmons

19  and Mitchell had, it's including the value of the

20  economic relationship of the employment relationship

21  between USI and Simmons and Mitchell.  Correct?

22    A.   Yes.  The -- yes.  That's in this.  Yes.

23    Q.   Then you wrote, "This is considered a key

24  component of any sale.  And typically the closing of

25  the deal will be contingent on the producer signing new

115

ROBIN FROST

1    employment agreements with the acquiring entity."

2                    That was true.  Correct?

3        A.    That is correct.  Yes.

4        Q.    So, you continued, "The FMV assumes that the

5    producers would be part of any sale.  So, projecting

6    whether accounts would have remained with USI after the

7    departures of Simmons and Mitchell is not relevant to

8    the calculation."

9                    So, first, is it correct that your fair

10   market value calculations assume that Mitchell and

11   Simmons -- that their employment was part of the

12   hypothetical transaction that you're valuing?

13       A.    Effectively, yes.  So, what I'm doing in the

14   fair market valuation is I'm looking at the value of

15   the account -- what was lost to USI, if you like.  So,

16   they lost both the accounts and they lost Simmons and

17   Mitchell with it.  So, yeah.  That's factored into it.

18   Yes.

19       Q.    So, your calculations assume that one of the

20   losses suffered by USI was the loss of their employment

21   relationship with Matt Simmons and Jack Mitchell.

22   Correct?

23       A.    That's -- yeah, it's factored into the value

24   of the lost accounts.  Yes.

25       Q.    Next page.  Okay.  So, we're now looking at

116

1   page 4 of your rebuttal report.  I want to focus on

2   this paragraph that begins "the sixth."

3         A.    Oh, okay.  Yes.

4         Q.    So, you see where you wrote "the sixth (6)

5   bullet point cites Lorna Gunnersen, a colleague of mine

6   at Mystic Capital Advisors Group, from her testimony in

7   another case that clients take approximately two years

8   to get comfortable with new producers and service

9   staff.  And then uses this commentary to assert that

10  60 days is simply not enough time to introduce new

11  personnel and form new relationships with clients."

12              You see that.  Right?

13        A.    Yes, I do.  And I recall that.  Yes.

14        Q.    Lorna Gunnersen was a colleague of your at

15  Mystic Capital.  Correct?

16        A.    Yeah, and still is.  Yes.

17        Q.    Thank you.  That's what I was going to ask

18  next.

19              So, she's still there.  Right?

20        A.    Yes, she is.  Yes.

21        Q.    And she's testified for USI in other

22  litigation matters.  Correct?

23        A.    Yes, she has.  I understand -- well, I know

24  she has.  She's -- she's told me, yes.

25        Q.    Are you partners at Mystic Capital, or what's

                              117

1    your relationship?

2        A.   Lorna is actually a principal of Mystic

3    Capital Advisors.  She's one of the founding partners.

4    I'm an employee there.

5        Q.   I see.  All right.  And do you agree with her

6    testimony that it takes approximately two years for new

7    producers and service staff to get comfortable and form

8    relationships with clients?

9        A.   It's a reasonable time period to give them

10   time to establish a relationship with a client.  Yes, I

11   would say so.

12       Q.   Can that be accomplished in 60 days?

13       A.   It would seem unlikely that it could, I would

14   say.  It's possible, but it doesn't seem like

15   sufficient time in most cases.

16       Q.   I want to skip down a couple sentences where

17   you write, "Indeed in valuing agencies or books of

18   business, if there are no employment agreements in

19   place, or if the employment agreements in place do not

20   contain appropriate restrictive covenants with regard

21   to non-solicitation of clients and non-interference

22   with employees, this is considered a negative factor

23   and reduces value."

24              I want to clarify something.  You say, If

25   there are no employment agreements in place or if the

118

1  employment agreements don't contain appropriate

2  restrictive covenants."

3            So, is it your testimony that the

4  restrictive covenants are necessary, or just any old

5  employment agreements are necessary?

6     A.   I'm saying if there are no employment

7  agreements in place at all, then there's an issue.  But

8  even if there are employment agreements in place, if

9  they don't contain the restrictive covenants that we're

10  considering, than yeah, that's not good for the value

11  of the business.

12     Q.   Are insurance brokerages valued with lower

13  multiples in California than in other states?

14     A.   They are not.  To my knowledge, from my

15  experience, they're typically valued similarly.

16  Although, you know, logic would suggest that they

17  should be valued a little less, because it's -- in

18  California, restrictive covenants are not enforceable.

19  Again, I' not a lawyer, but that's my understanding.

20  So, but in practice, they're valued similarly.

21     Q.   So, doesn't that suggest to you that the

22  existence of the restrictive covenant does not affect

23  the value of the business?

24     MR. CANNELLA:  Object to form.

25     THE WITNESS:  No, not necessarily.  If a business

119

ROBIN FROST

1    is doing -- if an agency is doing business in -- I

2    don't know -- well, Florida because we're talking about

3    Florida.  And, you know, it's market practice to have

4    restrictive covenants for producers, and an agency

5    doesn't, that would be seen as a bit of a negative

6    against that agency.  Whereas in California, as these

7    are unenforceable, it's kind of business as usual in

8    California.

9    BY MR. BANKS:

10        Q.   And those insurance brokerages still have the

11    same value -- or still use the same multiples as you

12    would use in a state where they enforceable.  Correct?

13        MR. CANNELLA:  Object to form.

14        THE WITNESS:  Yeah, I don't see any discernible

15    different between multiples in California and multiples

16    elsewhere.  But typically when an agency or a book of

17    business is in California, it's part of the

18    conversation.  It's like, oh, well, do you realize

19    we're in California, so there's -- the restrictive

20    covenants aren't there.  So, it is considered.

21    California, it's an attractive state to do business in,

22    so people will be willing to pay to get business there.

23    BY MR. BAKS:

24        Q.   You've seen no discernable difference in the

25    multiples used in California compared to other states.

120

ROBIN FROST

1    Correct?

2        A.   I'd say that is my experience.  Yes.

3        Q.   The next paragraph is where you state,

4    "Finally, the 7th bullet point discusses the departure

5    of two (2) other producers from USI's Tampa office,

6    including Simmons' assessment of how many of these

7    accounts subsequently left USI.  The Lewis report

8    states this is an approximation, which by its very

9    nature is speculative in nature; and hence, can be

10   disregarded."

11            So, first, the number of accounts that

12   left came from Ms. Santiago, not from Mr. Simmons.

13   Right?

14       MR. CANNELLA:  Form.

15       THE WITNESS:  I'd have to check.  I thought -- I

16   can't recall.  From my memory, I thought it was Mr. --

17   the quote in the Lewis report is Mr. Simmons saying he

18   recalls this many of the accounts had left or

19   something.  Yeah, I'd have to check to be absolutely

20   certain.

21   BY MR. BANKS:

22       Q.   Wasn't the information that came from

23   Mr. Simmons the total number of accounts that were in

24   those producers' book of business?

25       A.   Oh, yes.  That's right.  Thank you.  Yes,

121

ROBIN FROST

1    yes.  So, yeah, Katy Santiago testified to the number,

2    but Simmons speculated or estimated that, you know,

3    there were however many accounts he said there were.

4    But he's -- as I say, it's an approximation.  And the

5    Lewis report correctly states that it's an

6    approximation.  So, all I'm saying is that, well, hey,

7    this is an approximation.  So, we, you know, can we

8    really rely on this?

9         Q.   So, in other words, the numerator came from

10   Ms. Santiago, but the denominator came from Mr. Simmons

11   in determining the ratio of business that left?

12        A.   Correct.  Yes.

13        Q.   And you're working for USI's lawyers.

14   Correct?

15        MR. CANNELLA:  Form.

16        THE WITNESS:  Yes.  I've been engaged by USI's

17   lawyers.  Yes.

18   BY MR. BANKS:

19        Q.   You didn't do anything to get the real

20   numbers for that denominator from USI.  Correct?

21        MR. CANNELLA:  Object to form.

22        THE WITNESS:  No.  I haven't done anything for

23   that, no.

24   BY MR. BANKS:

25        Q.   Go to the next page.  The first discussion

                              122

1    here is about the criticisms by Mr. Lewis of your fair

2    market value analysis.  Correct?

3         A.   Correct.  Yeah.  Section 7.2 of this report.

4    Yes.

5         Q.   Now, your fair market value model -- I just

6    want to make sure I understand -- you're not

7    distinguishing damages for losses between, for example,

8    Simmons and Lewis's (sic) alleged solicitation of

9    clients versus their alleged solicitation of Sheila

10   Murray versus their alleged solicitation of Chris

11   Kakish.  Correct?

12        MR. CANNELLA:  Object to form.

13        THE WITNESS:  I'm really focused on lost accounts.

14   So, it's their solicitation of their accounts.  But the

15   fact that the, you know, a group of employees left with

16   them simultaneously, you know, it magnifies the damage,

17   if you like, done to USI.

18   BY MR. BANKS:

19        Q.   If Mitchell and Simmons poisoned the

20   relationship with the clients by telling them they were

21   departing before they told USI, how does the alleged

22   solicitation of any particular employee add to the

23   loss?

24        A.   Well, I mean, so if -- as you just described

25   it there, if they tell their clients, hey, we're

123

1    leaving.  So, the clients are going -- the clients have

2    said, okay, we'll come with you.  And then they say,

3    Oh, well, let's take some of the employees with us as

4    well, then sure, that is adding to the damage that's

5    been done to USI.  And also the fact that it's not just

6    the producers but a good number of the support team,

7    you know, further damages the relationship USI has with

8    those clients.

9        Q.   Well, let's take a look here on page 6.  In

10   your second to last paragraph, at the end you write,

11   Moreover, USI has been deprived of the ability to

12   compete because Simmons and Mitchell poisoned the well

13   by notifying the lost accounts of their departure from

14   USI before they notified USI."

15              And you're identifying the notification

16   as the source of the poisoning.  Correct?

17       A.   Poisoning is a -- you know, it's used in a

18   figurative sense here obviously.  But it's -- yeah,

19   it's notifying those accounts prior to even telling USI

20   that they are leaving.  Yes.  I am referencing that.

21   Yes.

22       Q.   And you reference that a number of times in

23   your report.  Correct?

24       A.   Yes, I do so.  Yes, because quite often what

25   I found is -- as I was responding to similar points, so

124

ROBIN FROST

1    I ended up using similar arguments.

2         Q.    And so, focusing back on the loss of

3    employees by -- let me stop sharing -- by USI, you

4    earlier testified again that you attributed the lost

5    revenue in the first year -- you attributed about

6    $4.56 million to that.  Correct?

7         A.    Correct.

8         Q.    And you agreed that that was a sufficient

9    enough revenue that you would expect that to affect

10   USI's need for a head count.  Correct?

11        MR. CANNELLA:  Object to form.

12        THE WITNESS:  I would anticipate that would be the

13   case, yes.

14   BY MR. BANKS:

15        Q.    And so, with the loss of that revenue, USI

16   would have had excess head count, at least until they

17   let people go, or repurposed them?

18        MR. CANNELLA:  Object to form.

19        THE WITNESS:  Well, but I guess what I'm doing

20   here is I'm valuing the lost accounts.  So, whether --

21   the fact that staff then would subsequently leave is

22   somewhat irrelevant to that I would say.  I'm just

23   valuing, you know, what was the situation prior to

24   their departure.  And the fact that they did happen to

25   take some of the employees with them doesn't lessen the

125

1    damage, I would say, at all.

2    BY MR. BANKS:

3        Q.   So, if we use the Ed Bowler rule of thumb of

4    about one employee for every $250,000 in revenue, the

5    loss of that have $4.56 million means that USI would,

6    right after the loss of that revenue, have about 18

7    excess employees.  Correct?

8        A.   Mathematically, that's a correct calculation,

9    more or less.  But like I said before, it's not just

10   the support staff.  That 250 factors in all the other

11   staff of USI, i.e. back office staff, HR, finance, IT,

12   what have you.

13       Q.   Would it include any account management, in

14   your opinion?

15       A.   Yeah.  I mean, they're part of the employees.

16   So, yes.  It has to include them.  Yes.

17       Q.   And so, inevitably, USI, with the loss of

18   that business, would have had to reduce head count.

19   Correct?

20       MR. CANNELLA:  Object to form.

21       THE WITNESS:  Again, I will repeat what I said

22   before.  I am valuing the lost accounts as of

23   January 25th.  So, whether -- so when -- whether they

24   would have had to reduce head count because of that is

25   somewhat irrelevant, I think, because the value doesn't

126

ROBIN FROST

1   change.  So, yeah.  I don't think it would have changed

2   anything in my opinion.

3   BY MR. BANKS:

4       Q.   And that's because your opinion only

5   includes, like, half of the variable costs associated

6   with maintaining these accounts.  Correct?

7       MR. CANNELLA:  Object to the form of the question.

8       THE WITNESS:  I don't think it does only include

9   half the variable costs.

10   BY MR. BANKS:

11      Q.   Well, okay.  Let me clarify.

12           Your net present value lost profits model

13   includes all the variable costs associated with

14   ███████████████████████████████████   Correct?

15      A.   Yes.  Yeah, we discussed previously, yes.

16      Q.   But your gross profit model does not include

17   those other costs beyond just the producer

18   compensation.  Correct?

19      A.   Correct.  That's right.  Just the direct

20   costs.  Yes.

21      Q.   And then your average numbers were just for

22   presentation purposes.  Correct?

23      A.   Yeah.  As we discussed earlier.

24      MR. CANNELLA:  Object to form.

25   BY MR. BANKS:

127

1    Q.   So, the loss of the employees, Sheila Murray,

2  Jackie Rodriguez, Emily Carter, Madison Lieffort --

3  see, who else -- Chris Kakish, and Theresa Kemp --

4  that's what?  Seven employees?

5    A.   Oh, gosh.  I have to count.  I thought it was

6  --

7    Q.   Six employees.

8    A.   I thought it was six employees and two

9  producers in total.

10   Q.   It's six other employees.  Correct?

11   A.   Yeah.  That's my understanding, yes.

12   Q.   Didn't Lockton actually do USI a favor by

13  reducing some of the head count that it was going to

14  have to let go anyway?

15   MR. CANNELLA:  Object to the form of the question.

16   THE WITNESS:  I think that's kind of an unusual

17  way to look at it.  They took their accounts, and then

18  helped them out by also taking their employees?  I

19  would say they -- like I said before, I think that's

20  adding to the damage that they've done if they've also

21  taken employees who I presume USI was very happy with.

22  And I think they were still employed by them, you can

23  only assume they were doing a good job.  So, you know.

24  BY MR. BANKS:

25   Q.   What would USI have done with those six other

128

1   employees had Mitchell and Simmons left and not --

2       A.   They had --

3       MR. CANNELLA:  Hold on a second.  Let him finish

4   the question.

5       THE WITNESS:  I'm sorry.  He didn't finish.

6   Sorry.  My bad.

7       MR. CANNELLA:  I'm going to object, but go ahead.

8   BY MR. BANKS:

9       Q.   I'm going to strike that.  I'm not even going

10  to ask the question.

11      A.   Okay.

12      Q.   All right.  Your -- focusing back on your

13  report on page 5 --

14      A.   This is the rebuttal report.  Yes.

15      Q.   Correct.  Exhibit 2, your rebuttal report.

16      A.   Yes.

17      Q.   Your last sentence reads, "It is clear that

18  USI had ownership of the lost accounts prior to the

19  departed employees simultaneously leaving their

20  employment and starting with Lockton."

21           What is the basis for your opinion that

22  it was clear that USI had ownership of the lost

23  accounts?

24      MR. CANNELLA:  Object to form.

25      THE WITNESS:  Well, I referenced it in the

129

ROBIN FROST

1    paragraph just preceding that.  That's taken from their

2    employment agreements.  The employment agreement that

3    they had with both the production staff and the support

4    staff states that they have no ownership right.  The

5    staff have no ownership rights, and their client

6    accounts are owned by the company.  So, I'm just

7    reiterating that.

8    BY MR. BANKS:

9        Q.   So, is it your opinion that a company can own

10   clients?

11       A.   It owns the expiration to the policies.  Yes.

12   So, it owns the revenue stream deriving from producing

13   those policies.

14       Q.   And those policies have an expiration date

15   within one year of when they were entered.  Correct?

16       MR. CANNELLA:  Object to the form.

17       THE WITNESS:  Correct, yes.

18   BY MR. BANKS:

19       Q.   Do you have any evidence -- are you aware of

20   any evidence that any of the departed employees or

21   Southeast Series of Lockton Companies diverted any

22   revenues from USI that were derived based on the

23   renewal of an insurance policy that took place at USI?

24       A.   I don't have any information regarding that.

25   No.  No.

130

ROBIN FROST

1     Q.   To the contrary, isn't it your understanding

2   that if an insurance policy was renewed before the

3   departed employees left USI, that that revenue stayed

4   with USI?

5     A.   So, in the case of a policy that was prior to

6   their departure, it's a USI policy and it renews with

7   USI, yes.  That revenue would -- all else being equal,

8   that revenue would stay with USI.  Yes.

9     Q.   So, if a policy was renewed December of 2022,

10  and it derived any future commissions for USI during

11  that year, that would have stayed with -- that did stay

12  with USI.  Right?

13    A.   Yes.  Pending anything else happening, yes.

14  Yes.

15    Q.   And are you aware, were there some policies

16  that were being renewed up until January 25th, 2023?

17    A.   I'm sure there were.  I didn't really read --

18  look into renewal dates in particular of policies.  I

19  look at the BOR dates, you know, for those clients that

20  had transferred to Lockton.

21    Q.   And is it true that for any policies where

22  the renewal was completed through January 25th, 2023,

23  that the revenues with those policies remained with

24  USI?

25    MR. CANNELLA:  Object to form.

131

ROBIN FROST

1        THE WITNESS:  If they hadn't departed USI, then

2    yes, if I'm understanding you correctly.  Yeah.  That

3    revenue would stay with USI.  Yes.

4    BY MR. BANKS:

5        Q.   And it did stay with USI.  So, revenue based

6    on a policy that was bound on, say, January 24th, 2023,

7    that stayed with USI for that year.  Correct?

8        MR. CANNELLA:  Object to form.

9        THE WITNESS:  So, I think I understand what you're

10   getting at now.  So, it depends on the payment terms.

11   You know, when was the cash received and so on.  You

12   know, when was it -- so, if they -- is that what you

13   are talking about?

14   BY MR. BANKS:

15       Q.   Yeah.  I'm asking, are you aware of any -- I

16   mean, even if it wasn't paid for by January 25th, 2023,

17   are you aware of any renewals or new policies that were

18   bound as of January 25th, 2023, where USI didn't retain

19   the revenue?

20       A.   I haven't done that analysis, but if we -- I

21   think -- I'm a little confused.  I think we're still

22   talking about the retained accounts here as we referred

23   to them previously.  Then yes, that revenue would stay

24   with USI.

25       Q.   I mean even for the lost accounts.  Accounts

132

1    that changed brokers, broker of record, after

2    January 25th, 2023.  If their policy had been bound

3    while they were still at USI in the preceding year, the

4    revenue for that policy all stayed with USI.  Correct?

5        A.    But they've lost the renewal.  So, they've

6    lost the account.  Yes.  They have the revenue --

7    whatever revenue has been recognized for that policy

8    depending on the dates and so on.  But they've lost the

9    future revenue stream from those accounts.

10        Q.    Right.  Future revenue for future policies

11    that may be renewed in the future.  Correct?

12        A.    Correct.  Yes.

13        Q.    Now, you cited in your report this sentence

14    from the producer contract.  It says, "Produce further

15    acknowledges and agreed that producer has no ownership

16    rights to any client accounts.  And that the client

17    accounts are owned by the company and/or USI

18    companies."  Correct?

19        A.    Correct.  Yes.

20        Q.    And "client accounts" is a capitalized term.

21    Correct?

22        A.    Yes.

23        Q.    And client accounts is defined in the

24    producer agreements.  Correct?

25        A.    I will presume it is.  I can't recall the

133

ROBIN FROST

1    exact definition.  But yes, you would think the fact it

2    is capitalized would indicate that.  Yes.

3         Q.   And do you recall how that was defined?

4         A.   As I said, I don't recall the exact

5    definition.

6         Q.   I'm going to try and pull up the agreement.

7         MR. CANNELLA:  While you're doing that, is now a

8    good time for our hour break?

9         MR. BANKS:  Yeah, that's fine.

10        THE VIDEOGRAPHER:  Off the record.  2:23 p.m.

11                         (There was a break taken, after

12                          which the deposition was resumed

13                          as follows:)

14        THE VIDEOGRAPHER:  On the record.  2:32 p.m.

15    BY MR. BANKS:

16        Q.   Okay.  Mr. Frost, I was going to mark next as

17    Exhibit 3, which I will do, a copy of -- in this case,

18    it's the Jack Mitchell USI agreement.  And it's in the

19    chat.

20                         (Whereupon, the document was marked

21                          as Deposition Exhibit No. 3 for

22                          identification.)

23        THE WITNESS:  I'll download.  Okay.  I have that.

24    Yeah.

25    BY MR. BANKS:

1    Q.    So, first, the portion of the agreement that

2    you were citing to, that said that the -- that USI

3    owned the clients' accounts is in -- is in Paragraph 5,

4    Company Property.  Right?

5    A.    Yes.  I see it there.  Yes.

6    Q.    And it's last sentence of Company Property.

7    It says, "Producer further acknowledges and agrees that

8    producer has no ownership rights to any client

9    accounts, and that the client accounts are owned by the

10   company and/or USI companies."  Correct?

11   A.    Correct.  Yes.

12   Q.    And the term "client accounts" is defined up

13   on page 2 of this document.  Right?

14   A.    Yes.  I see that.

15   Q.    It's in Section 1(b).  Correct?

16   A.    That is correct.  Yes.

17   Q.    I'll show that on screen.

18   A.    Yes.  Let's read it together.

19   Q.    It says:  "Client account" means the account

20   of any client, including without limitation any retail

21   insurance agent or broker, individual insured,

22   association, and any member thereof, and any insurance

23   carrier or other entity to the extent third-party

24   administration claims processing or underwriting is

25   performed by a USI company or such carrier or other

135

1    entity, which was -- which is or was serviced by a USI

2    company in connection with such USI company's business,

3    regardless of whether such services are provided by or

4    through the license of a USI company or any

5    shareholder, employee, or agent of a USI company."

6    Correct?

7         A.   Yes.  Yes.  That's correct.

8         Q.   So, it's the account of the client, which --

9    and then the "clients" are defined in that

10   parenthetical.  Correct?

11        A.   Yes.  True.

12        Q.   The contract does not say that USI owns the

13   relationship between the broker and the clients.  Does

14   it?

15        A.   It doesn't reference that here.  No, it does

16   not.

17        Q.   And are you familiar in this case with

18   testimony that some of the client relationships that

19   are at issue in this case date back to, you know,

20   childhood friends of Mr. Mitchell's or friends of his,

21   you know, parents, parents of his daughter's friends

22   and thing like that?

23        MR. CANNELLA:  Object to form.

24        THE WITNESS:  Apologies.  I haven't read all of

25   it.  But, yeah, I have seen reference to them being,

```
 1   you know, he's friends with some of these people.  Yes.
 2   BY MR. BANKS:
 3       Q.   Let's go on to -- back to your rebuttal
 4   report.  And on page 6 of your rebuttal report, I'll
 5   share screen again.
 6            You have a paragraph that begins "the
 7   fifth."  Do you see that?
 8       A.   Yes.  Yes, I do.
 9       Q.   You indicate in here that the multiple range
10   of 10X to 12x that you used in your fair market value
11   analysis was somewhat conservative compared to pricing
12   you saw in the market prior to January 2023.
13            Do you see that?
14       A.   Yes.  I do see that.  Yes.
15       Q.   What about January 2023 and forward?  Have
16   you done anything to analyze what multiple ranges have
17   been used this year in 2023?
18       A.   Well, no, I haven't done anything
19   specifically to analyze multiples.  I mean, I have my
20   experiences of them.  My experience is that they're not
21   really moving much from where they were at the start of
22   the year or towards the end of 2022.  However, it's
23   important to say the valuation report, it's a date in
24   time.  The valuation is as of January 25th, 2023.  So,
25   subsequent events don't impact it.
```

137

1      Q.    But you were looking at data through the end

2    of 2022.  Correct?

3      A.    Yes.  Yes.  All around the time of January

4    2023, yes.

5      Q.    You didn't look at data in January 2023; is

6    that correct?

7      A.    I couldn't say if I specifically was looking

8    at -- it's unusual for a deal to close in January,

9    actually.  So, I can't think I looked at a specific

10    deal that closed in January.  Typically they -- people

11    try to close deals at the end of the year for tax

12    purposes.  So, December 31st is usually a busy closing

13    date.  And January is a quiet month.

14      Q.    So, in assessing the value in January 2023,

15    you looked at deals through December of 2022, but not

16    after?

17      A.    Effectively, yes.  I would say, yes.

18      Q.    Now, then you also write, "This range is also

19    supported by USI's acquisition history.  In the

20    deposition of Mr. Edward Bowler, senior vice president

21    and CFO of corporate development at USI, Mr. Bowler

22    testified that the EBITDA multiple range of 10X to 12X

23    is too conservative compared to the current market,

24    stating that 14X is more in line with the current

25    pricing."

ROBIN FROST

1                     Do you see that?

2        A.   I do, yes.  Yes.

3        Q.   And did you look at not only his testimony,

4   but also the deal list that he produced?

5        A.   I did.  Yes.  I looked at that.  Yes.

6        Q.   That deal list included average multiples

7   used each year.  Correct?

8        A.   Yes.  I think they do do an average each

9   year.  Yes.  That's correct, from memory.  Yes.

10        Q.   And those reflected two different averages:

11   Both an average based on the amount paid to the seller

12   -- there a multiple, and the average multiple used

13   essentially for the total acquisition, including monies

14   paid to producers and third parties.  Correct?

15        A.   Yeah.  And that second column is -- the

16   second piece, I recall this from Mr. Bowler's

17   testimony.  It includes -- as you just said, it

18   includes expenses, you know, paying producers, costs to

19   USI.  But it does also include any earn-out payments

20   that would be payable to the seller as well.

21        Q.   And so the first column -- he testified the

22   first multiple number is the amount that was actually

23   paid to the seller.  Correct?

24        A.   Not exactly.  He says that that is the --

25   that's the payment at closing.  That's the initial

                          139

1    payment.  So, it's not the total amount that was paid

2    to the seller.

3        Q.   And do you know -- if you're saying that some

4    portion of the second multiple, the difference, was

5    paid to the seller, and some amount was paid to other

6    third parties like producers and other employees, do

7    you know what the breakdown is between those two

8    categories?

9        A.   Unfortunately, the report doesn't give us

10   that breakdown.  They're put in together.

11       Q.   You would agree, though, that using that

12   second number, the larger number, would be

13   inappropriate in this case because that includes monies

14   paid to parties other than the seller?

15       MR. CANNELLA:  Object to the form.

16       THE WITNESS:  I'd say that was closer to the real

17   number than the first number though, because -- yeah,

18   earn out payment are definitely part of the total cost

19   of acquiring a business.  So, we have to factor those

20   in.

21   BY MR. BANKS:

22       Q.   I thought you just said you didn't know what

23   the breakdown was between amounts paid to employees and

24   amounts paid to the seller in the second number?

25       A.   Correct.  It's unfortunate.  We can't derive

140

1    the exact amount paid to the -- paid to the seller from

2    the data on that report.

3        Q.   So, how can you say the second number is

4    closer to the correct number if you have no idea what

5    amount of that second number was paid to third parties

6    as opposed to paid to the seller?

7        A.   That's fair.  I was making a supposition that

8    the earn out payments would be higher than the

9    retention bonuses paid to producers, but I don't have

10   that information.  I guess what I was saying is that

11   the first number is too low.

12       Q.   The first number too low, but you don't know

13   whether that's closer to the amount paid to the seller

14   than the second number?

15       A.   I don't have that information.  Correct.

16       Q.   And you didn't ask for that information.

17   Correct?

18       A.   Not for every transaction that USI has done

19   in history.  No.

20       Q.   For any of the transactions did you ask for

21   that information?

22       A.   Not for any of them.  No, I did not.

23       Q.   Okay.  We looked at this sentence already.

24   I've got it highlighted, "Moreover, USI has been

25   deprived of the ability to compete."  Right?

1        A.    Yes.  That's right.  Yes.

2        Q.    And you say something similar here at the end

3   of the next paragraph where you say, "Once Simmons and

4   Mitchell had departed without giving notice, and having

5   informed their clients prior to their departure and

6   shortly after joining Lockton, USI was effectively

7   deprived of its right to compete to retain the

8   accounts."  Correct?

9        A.    Correct.  Yes.

10       Q.    On the next page under Section 7.2.1.1.  This

11  is on page 7 of your report.

12            Do you see the paragraph that begins,

13  "Section 7.2.1.1 discusses," et cetera?

14       A.    I do, yes.

15       Q.    You write here in the last sentence, "Again,

16  as stated previously, the FMV contemplates the transfer

17  of the producers with the accounts."  Correct?

18       A.    Yes.  That's right.  Yes.

19       Q.    And again, your fair market value model

20  assumes that USI would be selling not only the client

21  accounts but also Mitchell and Simmons in this

22  hypothetical sale.  Correct?

23       A.    Yes, because that's what they had prior to

24  January 20 -- prior to January 25th, excuse me, of

25  2023.  They had the accounts, and they had the

                                    142

1    producers servicing them.  Yes.

2         Q.   So, is it your assumption that Mitchell's and

3    Simmons' departure in and of itself was wrongful?

4         A.   No.  You asked some time ago, you know, were

5    they free to leave their employment with USI?  Yes, of

6    course.  They can leave.  It's the breach of the -- of

7    their employment agreement.  The restrictive covenants

8    in their employment agreements that's the issue here.

9         Q.   Your fair market value analysis is -- it does

10   include the right to employ Mitchell and Simmons.

11   Correct?  It's part of what's being transferred?

12        A.   Apologies, I cut you off.  It assumes they

13   transfer with the accounts.  Yes.

14        Q.   And you said here again at the bottom of the

15   page, "Again, as previously stated, the FMV assumes

16   that the producers would be part of any sale."

17   Correct?

18        A.   Correct.  Yes.

19        Q.   Who services the accounts in an insurance

20   brokerage?

21        A.   Sorry.  I didn't quite catch that.  Can you

22   repeat the question?

23        Q.   Who services the client accounts at an

24   insurance brokerage?

25        A.   It's a team of people.  So, it's the

                              143

1    producers.  It's the account management staff of the

2    client service representatives supporting them.  Yeah,

3    a team of people for a commercial lines account, which

4    are the accounts that we're discussing here.

5         Q.   So, take look at page 8 of your report.  And

6    do you see under the Section 7.2.2 EBITDA

7    overstatements?

8         A.   Yes.

9         Q.   You wrote in the second sentence, "In the

10   insurance brokerage industry, the key assets in any

11   sale transaction are the accounts and the producers who

12   service them."

13             Producers generally don't service their

14   own accounts.  Correct?

15        A.   They have a role in servicing them, yes.  But

16   yes, there's a team behind the producers who do a lot

17   of the work.  Yes.

18        Q.   Now, in this case Mr. Simmons has testified

19   that he did spend a lot of time servicing his accounts

20   himself; is that correct?

21        A.   That's his testimony, yes.  As I read it,

22   yes.

23        Q.   And so the key assets in the sale of an

24   insurance brokerage or book of business is the accounts

25   and the producers.  Correct?

                                              144

1        A.   Yes.   That's the key assets.   Yes.

2        Q.   And as you said earlier, intellectual

3   property generally doesn't factor in as an asset; is

4   that correct?

5        MR. CANNELLA:  Object to form.

6        THE WITNESS:  Typically not, no.

7   BY MR. BANKS:

8        Q.   Does USI have any valuable intellectual

9   property?

10       MR. CANNELLA:  Object to form.

11       THE WITNESS:  I couldn't say.  I don't know what

12  if USI has any intellectual property.  I recall in Ed

13  Bowler's testimony, he refers to the -- he refers to

14  producer relationships as intellectual property.  So

15  from that point of view, yes, they have much

16  intellectual property.  But I think of it more in the,

17  you know, patents on systems and so on, what have you.

18  BY MR. BANKS:

19       Q.   So, in the sale of an insurance brokerage or

20  a -- well, in the sale of an insurance brokerage, you

21  would agree there are other assets being sold besides

22  just the employment relationships and whatever

23  contractual rights there are to client accounts.

24  Correct?

25       A.   Typically the way -- in my experience, the

145

1    way they're structured is anything -- any other

2    equipment and what have you to enable the servicing of

3    the business is assumed included in the purchase price.

4         Q.    Is that because they're not valuable?

5         A.    Relative to the -- that is the assumption, I

6    would say, underlying that -- that methodology, that

7    typically, you know, the desk, the chairs, the

8    computers are not considered a significant enough piece

9    of the deal.  So, it's just rolled into the valuation

10   of the book of business.

11        Q.    And what about intellectual property?

12        A.    Again, we talked about this some time ago

13   now.  It's unusual to come across intellectual

14   property, by which I mean, you know, a patent on a

15   system or a patent on a methodology or whatever that an

16   agency owns.  So, that might even be a separate

17   transaction if there is something specific like that.

18   But like I said, that's quite unusual.

19        Q.    Would you agree that fixed costs generally

20   become variable costs over time?

21        A.    Oh, that's -- I have think about that one.

22   Not necessarily, no.  It depends on the type of costs.

23   Like I say, I have to think that one through.  But I

24   don't think that's true necessarily all the time.

25   Somewhat speculative, I guess.  Yeah.

146

1      Q.   On your next page, page 9 of your report, in

2   the second paragraph you refer to -- the report then

3   goes on to cite, "EBITDA margins for four book of

4   business transactions from a listing of historic

5   transactions submitted for discovery by USI."

6             You were there for Mr. Bowler's testimony

7   about those transactions.  Correct?

8      A.   Yes, I was.  Yes.

9      Q.   And did you recall that he actually -- he

10  testified that actually -- although those were listed

11  as lines of business on the sheet, they were not

12  actually from his lines of business?

13     MR. CANNELLA:  Object to form.

14     THE WITNESS:  I don't recall what he said.  It was

15  something about -- along the lines that they were

16  taking books from -- oh, gosh, I don't remember who the

17  seller was now.  But I can't recall exactly what he

18  said regarding the -- apologies.

19  BY MR. BANKS:

20     Q.   Well, for example, he said one was for an

21  office, and three others were for something else, but

22  he wasn't sure.  Maybe a single client even.

23             Do you remember that?

24     A.   I remember that.  Sorry.  Yes.  In some

25  cases, he said, it may have even been a single client.

                          147

1    Yes, that's right.

2        Q.   Regardless, you noted in here, "We do not

3    have information as to the nature of these businesses."

4    Correct?

5        A.   Yes.  Correct.

6        Q.   Did you ask for any of the documentation for

7    USI related to any of those transactions?

8        A.   I did not.  But I'd also add -- from memory

9    again, we'd have to go back and check -- those four

10   specific transactions were some years ago.  So, I don't

11   know how pertinent they would be to a valuation as of

12   January 2023.

13       Q.   Do you recall that in a lot of the

14   transactions, Mr. Bowler explained that they were

15   acquisitions of smaller employee benefits practices

16   where the producer intended to retire?

17       MR. CANNELLA:  Object to form.

18       THE WITNESS:  I think he did refer to some of

19   those.  Yes.

20   BY MR. BANKS:

21       Q.   And in those transactions, the goal for USI

22   was for the business to transfer over to their

23   wholesale employee benefits practice.  Correct?

24       MR. CANNELLA:  Object to form.

25       THE WITNESS:  As I recall that was the goal.  Yes.

148

ROBIN FROST

 1    Yes.

 2    BY MR. BANKS:

 3        Q.   And so, but they didn't just buy the business

 4    from those producers without the producers.  They still

 5    expected the produces to stick around for at least

 6    three years to transfer the relationships.  Correct?

 7        MR. CANNELLA:  Objection to form.

 8        THE WITNESS:  Apologies, Dave.  I think that was

 9    what -- as I recall, that was his testimony with regard

10    to some specific the accounts that were going to, yeah,

11    to their wholesale benefits operation.  Yes.

12    BY MR. BANKS:

13        Q.   And did you take into account Mr. Bowler's

14    testimony in your opinions that it is difficult to

15    transfer relationships from one producer to others at a

16    company?

17        A.   It takes --

18        MR. CANNELLA:  Object to form.

19        THE WITNESS:  Yeah.  It takes time for the new

20    relationship to form, obviously, and for them to get to

21    know each other.  But in that particular case, I think

22    he was talking about employee benefit -- was it group

23    employee benefits or was it personal lines?  I can't

24    recall.  But I think he was talking about the fact that

25    the guys wanted to -- they were looking to retire.  So,

                                149

1   it was keeping them on for a few years.  I can't

2   remember all the facts of what he said actually.  I'd

3   have to go back and look.

4   BY MR. BANKS:

5        Q.   Is it your understanding that it would be

6   different if it was property and casualty, the amount

7   of time it would take to transfer relationships?

8        A.   If it's commercial lines, if it's either

9   group benefits or commercial lines, property and

10  casualty, I think it would be similar.  It would take,

11  you know, there's a relationship -- you know, it's a

12  corporate relationship with a corporate client.  So,

13  yeah, it takes time to develop that either way.

14       Q.   Let's take look at page 10 of your report.

15  So, the top of the page you're now addressing the

16  EBITDA multiple that was used in your fair market

17  valuation analysis.  Correct?

18       A.   Yeah.  I'm responding to Mr. Lewis's

19  discussion of it.  Yes.

20       Q.   And you write here, "The Lewis report argues

21  that the proposed EBITDA multiple range is improper for

22  valuing a book of business as compared to an insurance

23  agency.  As previously discussed, the distinction is

24  irrelevant, and the same multiples would apply."

25            Is that because in your use of the sale

150

ROBIN FROST

1   of a book of business, you're not talking about just

2   client accounts, but you're talk about just like a

3   portion of a whole business being sold, including

4   employees?

5       A.   Yeah.

6       MR. CANNELLA:  Object to form.

7       THE WITNESS:  Like we discussed previously, I'm

8   assuming the producer's transfer with it.  So, yes.

9   BY MR. BANKS:

10      Q.   In Mr. Bowler's list of transactions, you

11  agree that he explained that the multiples on that

12  sheet are a multiple of the anticipated EBITDA that USI

13  could achieve with a business after being purchased by

14  USI.  Correct?

15      A.   He did say that.  It's a multiple of what

16  they consider the pro forma EBITDA.  Yes.

17      Q.   So, it wasn't the EBITDA that was being

18  achieved by the seller that was used to derive the

19  multiple.  It was the anticipated closed acquisition

20  EBITDA.  Correct?

21      A.   Correct.  Yes.  That's -- as I recall, that's

22  what he said.  Yes.

23      Q.   But in your analysis, your fair market value

24  opinion is based on applying the multiple to the

25  seller's EBITDA.  Correct?

151

1    A.   So, I start with a -- so, this is where I

2  lean back on my financial due diligence experience.

3  That typically the way this is done, in your cases I

4  would say, we -- I start with the seller's income

5  statement, and then I normalize it, if you like, to

6  arrive at a pro forma.  So, I take out anything that's

7  non-recurring, discretionary, and so on to arrive at,

8  you know, here's the clean revenue and here's the clean

9  expenses that you would expect for this business going

10  forward to come to a pro forma.

11          So, yes, I used USI's numbers because

12  that would be the starting point I'd go with in a

13  regular transaction if that was how I was doing this.

14  Yeah.

15    Q.   It would be the starting point but not the

16  ending point in a real world transaction.  Correct?

17    A.   Yeah.  Yeah.  That's right.  Although, it's

18  important to add a large number of the -- a significant

19  amount of the work I do, we're dealing with small

20  agencies where there's discretionary costs and so on

21  going through.  The owner's car payments are being

22  processed through business or something like that.  So,

23  we need to strip those out, because they won't be

24  transferring to the buyer.

25          So, in the case of USI, this is a, you

152

1    know, a large multi-national business, there's not

2    going to be too much car payments, I think, going

3    through, and that kind of nature of expenses you would

4    hope.  So, the numbers they have are fairly clean

5    already, I would hope.

6         Q.   You would agree that USI has a blueprint that

7    it uses to try to control what it spends on various

8    costs in servicing the business based on the revenue

9    generated by that business?

10        A.   Again, I don't work for USI, but that's my

11   understanding from the testimony of Ed Bowler.  Yeah.

12        Q.   And so, in normalizing the seller's pro

13   forma, what you would do is also look at what the

14   purchaser's cost structure would be post-acquisition.

15   Correct?

16        A.   In some regards I would, yes, yes.  I'd look

17   at, you know, what -- in particular with regard to

18   employee benefits expenses is typically where we see

19   differences, where one employer may be more generous to

20   the portions that they -- up versus another.

21        Q.   And another difference might be if the

22   acquirer spends more or less on service team salaries.

23   Correct?

24        A.   Typically, no.  That wouldn't be -- typically

25   the work I'm doing, I, you know, the whole team is

1    transferring.  So, we already have the -- we already

2    have the service staff compensation figures in there.

3    So, there's no adjustment to be made here.  It's not as

4    though we're overlaying new service staff over the --

5    onto the business.

6        Q.   I think my question was poor.  I shouldn't

7    say the service staff salaries.  I should say the

8    amount of service provided to the -- so, maybe not the

9    amounts paid individuals, but whether they keep

10   everybody employed might change.  Correct?

11       MR. CANNELLA:  Object to form.

12       THE WITNESS:  Correct.  It could change, but

13   that's -- again, leaning on my financial due diligence

14   experience, that's something we keep an eye on.  If a

15   seller says, "Oh, yes, here's my employees.  And I'm

16   selling this book of business.  We've been doing very

17   well.  Oh, by the way, we can cut five people after we

18   sell."  We would question that.

19            It's like, well, why were you employing

20   them prior to that?  Were they -- who is going to do

21   that work after they've gone?  So, we, you know, there

22   could be changes, but it's unusual unless there was

23   significant overstaffing, or maybe, you know, some one

24   like the owner's wife was working as an administrative,

25   and wasn't really, you know, it was just a way of

154

1   giving her some salary or something like that.  But

2   typically, no.  We wouldn't -- you'd expect the number

3   of service staff to remain the same.

4   BY MR. BANKS:

5        Q.   Are you aware of layoffs that took place at

6   USI after it acquired Wells Fargo Insurance Services?

7        A.   I don't know the details of what happened

8   there.  I don't know if there were or weren't.  I don't

9   know.

10       Q.   What about the flip side?  What if the

11  acquiring company generally spends more on support

12  services for the clients?

13       A.   But then -- I'm sorry.  What's the question

14  there?

15       Q.   Would that affect the normalized pro forma

16  that you would generate as part of a transaction?

17       A.   I don't think it would.  Again, my

18  experience, unless they -- unless it was deemed -- and

19  the seller, there's a negotiation process as you work

20  through this.  But if the seller said, "Oh, you know,

21  we really do need more people to service the business,"

22  then we'd add someone into the pro forma expense.  But

23  it's unusual for that to be the case.  Typically

24  they're -- hopefully they're correctly staffed prior to

25  sale.

155

1      Q.   In this case, are you aware of testimony from

2   Mr. Simmons and others that one of the reasons he went

3   to Lockton was because Lockton did spend more on

4   specialty support services for clients than USI had

5   done?

6      MR. CANNELLA:  Object to form.

7      THE WITNESS:  I've seen his testimony.  I can't

8   recall what he said specifically about Lockton, but I

9   know he -- I've seen his testimony where he complains

10  about the lack of support in USI.  Yes.

11  BY MR. BANKS:

12     Q.   Did you do anything in this case to normalize

13  the USI pro forma that you considered for the lost

14  accounts to adjust for any increased expenses that

15  Lockton anticipated having to service those same

16  accounts?

17     MR. CANNELLA:  Object to form.

18     THE COURT REPORTER:  What was the answer?

19     THE WITNESS:  No, I did not.

20  BY MR. BANKS:

21     Q.   You did not?  Is that correct?  Just because

22  there was cross talk.

23     A.   Yeah.  No, I did not.  Yeah.  No, I did not.

24     Q.   In the next paragraph you write about carrier

25  contracts.  What is the basis for your statement that

1   carrier contracts generally don't transfer in the sale

2   of a business or a book of business?

3        A.   If it's an asset sale.  So, if there's an --

4   if an agency holds a carrier contract with -- I don't

5   know, Travelers, that's just an insurance company -- if

6   it's just selling the accounts, then the acquirer needs

7   to have an agreement with travelers.  And if there was

8   an issue there, then that's something that needs to be

9   worked out.

10       Q.   If you could turn ahead to page 12?

11       A.   Yes.

12       Q.   You write, "Next, this section criticizes,"

13  this is at the top of the page.  Sorry.

14       A.   Got you.  Yeah.

15       Q.   You write, "Next, this section criticizes the

16  net lost profit valuation or profit valuation model for

17  excluding national level expenses.  As disclosed in the

18  deposition testimony of Mr. Bowler, the national level

19  expenses of USI are fixed costs, which would not be

20  impacted by the sale of the lost accounts."

21            Well, first, do you recall testimony from

22  Katy Santiago that only, for example, a certain portion

23  of litigation expenses show up on the regional P&L

24  statements?

25       A.   I do recall that.  Yes.

157

1      Q.   And, in fact, there are regional litigation

2   expenses that are only on the national P&L.  Correct?

3      A.   That's right.  I think the way she described

4   it, it's litigation expenses up to a certain dollar

5   threshold or charge regionally.  And any excess is

6   incurred nationally.  I think -- is that -- I think

7   that's how I recall her testimony.

8      Q.   Do you also recall testimony about a super

9   region and the availability of technical resources for

10  people who worked in the southeast region to also be

11  able to use technical resources from the south region?

12     A.   I do recall reading about that.  Yes.

13     Q.   So, those costs would not show up on the

14  regional P&L.  Correct?

15     A.   They wouldn't, no.  Correct.

16     Q.   And similarly, do you also recall testimony

17  from USI's personnel that, you know, Mr. Simmons and

18  his team could also use national resources from

19  technical resources.  Correct?

20     A.   I recall that, yes.  Yes.

21     Q.   And those costs do not show up on the

22  regional P&L.  Correct?

23     A.   That's correct.  Yes.

24     Q.   So, there are costs incurred either in other

25  regions or at the national level by USI that supported

158

ROBIN FROST

1   the Simmons book of business.  Correct?

2        A.   Yes.  But however, like you referenced the

3   super regional concept.  So, they could use the

4   services of the south region -- I think that's the

5   terminology.  But then it's vice versa as well.

6   Couldn't the south region use the southeast team?  So,

7   there's some diminution of expenses there.  So, are the

8   two offsetting somewhat?

9        Q.   Did you do anything to determine whether they

10  were, in fact, offsetting?

11       A.   I didn't do that analysis.  No.

12       Q.   And did you do anything to analyze whether

13  the national resources at all could be increased -- or

14  could be decreased with the loss of the lost accounts?

15       A.   I didn't.  I was just -- I think I referenced

16  in the report.  You know, per Ed Bowler's testimony,

17  these are fixed costs that are impacted by the, you

18  know, the loss of a -- accounts the size of the lost

19  accounts that we're discussing today.

20       Q.   But you didn't do anything to independent

21  verify that.  Correct?

22       A.   No, I did not.  No.

23       Q.   In the next Section 7.3.2, the second

24  paragraph begins, "The ten year period."  Do you see

25  that?

159

1    A.    Yeah.   Yeah.

2    Q.    And in the next sentence you write, "As

3    previously discussed, once Simmons and Mitchell had

4    departed without giving notice, and had informed their

5    clients prior to their departure, and shortly after

6    joining Lockton, USI was effectively deprived of its

7    right to compete to retain the accounts."

8              That's similar to your earlier statements

9    about how they were giving notice to clients before

10   they gave notice to USI poisoned the accounts.

11   Correct?

12   A.    Yes.   It's similar, definitely.   Yes.

13   Q.    Then you write, "Absent of these events, USI

14   had a reasonable expectation that the lost accounts

15   would remain with them for the foreseeable future."

16             Do you see that?

17   A.    I do, yes.

18   Q.    What is your basis for saying that, that the

19   clients -- you know, there was a reasonable expectation

20   that clients would have stayed at USI but for Simmons

21   and Mitchell telling the clients that they were going

22   to leave USI?

23   A.    Based on the fact that, you know, per the

24   information USI has provided, and per the industry

25   averages, you know, retention rates are 90 percent.

1    So, you would expect, absent of the usual amount of

2    attrition, that they would stay with them.  That's --

3    it's a fundamental part of the valuation of insurance

4    agencies and books of business that you're valuing an

5    asset that by its nature they could all leave tomorrow.

6    Couldn't they?  That happens.  But -- well, it rarely

7    happens in practice that they all leave tomorrow.

8              But they, so there is -- but there is a

9    value to these accounts.  And in valuing them, you

10   include the risk that there is a, you know, there's

11   some attrition of these accounts in the future.

12        Q.   So, let me try and understand.  One thing you

13   identified as the basis for this statement that it was

14   reasonable -- that there was a reasonable expectation

15   USI would have retained all the lost accounts but for

16   Mitchell and Simmons giving those accounts notice of

17   their plans to resign, one thing that you're relying on

18   is the normal attrition rate.  Correct?

19        A.   Yes.  Just normal practice in insurance

20   agencies.  Yes.

21        Q.   And the second thing you said was information

22   given to you by USI.

23              What information are you referring to?

24        A.   Oh, okay.  Yes.  So, we're talking about

25   90 percent retention rate here.  In the Five Diamonds

161

ROBIN FROST

1    report I think they it is, they've got some performance

2    metrics which support the 10 percent attrition rate.  I

3    think that's where I got it from.

4         Q.   The 10 percent attrition rate is just normal

5    year-to-year attrition.  Correct?

6         A.   Correct.  Yeah.  And USI's metrics seemed to

7    -- well, are in line with that.

8         Q.   And you're not aware of any effort at USI to

9    track what percent of business is retained and what

10   percent is loss after a producer leaves.  Correct?

11        MR. CANNELLA:  Object to form.  Asked and

12   answered.

13        THE WITNESS:  Yeah.  We like we just discussed

14   before, that was per the testimony of Ben Greer that

15   they don't track this he said, because there's too many

16   variables.

17   BY MR. BANKS:

18        Q.   And you didn't do anything personally to try

19   and analyze any data related to such a question about

20   what business generally is retained -- what percentage

21   of business is retained and what percentage is lost

22   following the departure of a producer.  Correct?

23        A.   I did not, because I felt that was outside

24   the scope of what I was doing here.

25        Q.   And that's because what you were asked to do

162

1    was not measure damages, but just to value the

2    accounts.  Correct?

3        MR. CANNELLA:  Object to form.

4        THE WITNESS:  Yes.  I was asked to do a valuation

5    of these accounts.  Yes.

6    BY MR. BANKS:

7        Q.   Is there anything else that you're relying on

8    besides the normal annual attrition rate at USI for

9    your statement that USI had a reasonable expectation

10   that the lost accounts would remain with USI for the

11   foreseeable future absent Mr. Mitchell and Mr. Simmons

12   telling the accounts that they were going to resign?

13       A.   No, I don't think so.  I think it's just that

14   was -- as I -- as you just stated, that's the normal

15   experience in insurance brokerage, insurance agencies.

16   So, yes.

17       Q.   And you've never worked as a producer in an

18   insurance agency.  Correct?

19       A.   That's correct.  Yes.

20       Q.   And have you -- you've never worked in any

21   capacity at an insurance brokerage; is that correct?

22       A.   Not at an insurance brokerage.  I've worked

23   for an insurance carrier, but not a brokerage.

24   Correct.

25       Q.   So, you personally are not an expert in what

                              163

```
 1    it takes to retain a client, correct, at an insurance

 2    brokerage?

 3        A.   I think that's a fair statement.  Yeah.  I'm

 4    not a -- yeah, a sales management person and so on.

 5    No, I'm not.

 6        Q.   And you have not endeavored to provide an

 7    opinion as to what USI would have needed to do to

 8    retain clients following Simmons' and Mitchell's

 9    departures even assuming that they had honored every

10    other provision in their contract.  Correct?

11        A.   Correct.

12        MR. CANNELLA:  Form.

13        THE WITNESS:  I have done no analysis of that.

14    Yeah.

15    BY MR. BANKS:

16        Q.   Give me a moment here.

17        A.   Sure.

18        Q.   So, actually, let's take our break.  I think

19    were are a few minutes early.  I need to look at

20    something.  And we're probably rounding the bend here.

21    Okay?

22        THE VIDEOGRAPHER:  Off the record.  3:20 p.m.

23                        (There was a break taken, after

24                         which the deposition was resumed

25                         as follows:)
```

164

1          THE VIDEOGRAPHER:  On the record.  3:30 p.m.

2     BY MR. BANKS:

3          Q.   Mr. Frost, I went over a few times with you

4     wherein your rebuttal report you said things along the

5     line that by informing clients before resigning to USI,

6     Mitchell and Simmons prevented USI for being able to

7     compete for those accounts.

8               Do you recall that?

9          A.   I do recall, yes.

10          Q.   And that that poisoned the relationship.

11     Correct?

12          A.   Correct.  Yes.

13          Q.   Do you have any basis -- well, is it your

14     opinion at all that that would have been different if

15     instead Mitchell and Simmons had not notified clients

16     that they were resigning until 60 days after they gave

17     notice to USI?

18          A.   That would have given USI sometime to at

19     least put in place a new service team.  But then still

20     there is the -- there would be a two-year

21     non-solicitation period subsequent to that according to

22     the employment agreement.  So yeah, the team would be

23     afforded the opportunity, you know, to build a

24     relationship, the new time.

25          Q.   Well, even if they didn't service the

165

1    accounts for two years, the clients would have known

2    that Mitchell and Simmons had left.  Right?

3         A.   Yes.  They would know that.  Yes.

4         Q.   And these insurance producers, they operate

5    publicly.  Right?

6         A.   Correct.  Yes.

7         Q.   There's nothing that would have prevented

8    Mitchell and Simmons from putting on Linked In that

9    they were working somewhere else.  Correct?

10        A.   Yes.  I don't see why they couldn't do that.

11   But actively soliciting the accounts would clearly be a

12   violation of the employment agreement if they were to

13   do that.

14        Q.   But telling the clients that they had

15   departed, were no longer at USI, had gone to Lockton is

16   not in and itself solicitation.  Correct?

17        MR. CANNELLA:  Object to form.

18        THE WITNESS:  Correct.  It's not, but you would

19   hope they would also say, "I have a two-year

20   non-solicitation, so, you know, I can't accept your

21   business for a for couple of years at least."

22   BY MR. BANKS:

23        Q.   So, let's take a -- let's give an assumption

24   here.  Assume that a client relationship is a childhood

25   friend of Mr. Simmons, and Mr. Simmons leaves USI,

166

ROBIN FROST

1    gives 60-days notice, goes to a competitor.

2              Don't you think that it's reasonable that

3    that client might have some concerns about staying at

4    USI, and their good friend didn't think it was worth

5    staying at USI?

6         MR. CANNELLA:  Object to form.

7         THE WITNESS:  We don't know.  We're speculating.

8    You know, they haven't had a chance to meet the new

9    team.  They might really hit it off.  Who knows?  And

10   it's -- you know, Simmons and Mitchell took a good

11   number of staff with them but didn't take all the

12   staff.  So, there's still some relationships that USI

13   has with those clients.  Who knows?  Who knows?

14   There's so many different variables involved here.

15   It's hard to say.

16   BY MR. BANKS:

17        Q.   Right.  There's a lot of different variables,

18   and you didn't do anything to try and analyze what

19   normally happens in that situation.  Correct?

20        A.   I didn't, because that's outside the scope of

21   what I was doing.  I'm just providing a valuation of

22   what those accounts are worth.

23        Q.   Right.  You're not looking at what losses

24   were actually caused by any particular breaches.

25   Correct?

167

ROBIN FROST

1     A.   I didn't dig into the causes of losses

2    specifically for any particular account.  No.

3     Q.   If the jury were to find that Simmons and

4    Mitchell breached their agreements to give 60 days

5    notice, but didn't breach their non-solicitation

6    provisions, your damages analysis -- or your

7    calculations -- I'm sorry, your calculations don't do

8    anything to measure any losses attributable solely to

9    the failure to give 60 days notice; is that correct?

10     MR. CANNELLA:  Object to the form.

11     THE WITNESS:  That's correct.  I don't

12    specifically consider a 60-day period in any of it

13    because I'm just looking at the value as of

14    January 25th, regardless of what subsequently happens.

15    BY MR. BANKS:

16     Q.   And again, your analysis -- similarly how

17    your -- strike that.

18          That's similar to how your analysis

19    doesn't consider whether any clients would have

20    actually stayed with USI for ten years.  Correct?

21     MR. CANNELLA:  Object to form.

22     THE WITNESS:  Yeah, that's a different question,

23    but we discussed previously.  Yeah.  It's just the

24    model assumes usual attrition rates.  So, it doesn't

25    consider any individual accounts, and how long an

168

ROBIN FROST

1    individual account would stay with them.  No.

2    BY MR. BANKS:

3        Q.   How much -- well, let me pull up the exhibit

4    here.  This will be Exhibit 4.  Sorry.  I have to save

5    it first.  I can't import it right from my e-mail.

6                        (Whereupon, the document was marked

7                         as Deposition Exhibit No. 4 for

8                         identification.)

9    BY MR. BANKS:

10       Q.   I have put in the chat as Exhibit 4 a Mystic

11   Capital invoice.

12       A.   Oh, okay.

13       Q.   And would ask if you could open that up?

14       A.   Yeah.  Bear with me.  Yes, I have it.

15       Q.   So, is this the only invoice -- well, first,

16   is this an invoice for your services to USI?

17       A.   Yes, it is.  Yes.

18       Q.   And is this the only invoice for your work

19   through October 23rd, 2023?

20       A.   Yes, it is.  Yes.

21       Q.   I'm going to show on screen here the invoice.

22            So, your work through the completion of

23   your rebuttal report was for 57,925.  Correct?

24       A.   That's the invoice.  Yes.  Correct.

25       Q.   And what is your hourly rate?

169

1        A.    It's $500.

2        Q.    $500 an hour?

3        A.    (Nonverbal response.)

4        Q.    And did you have anybody assisting you, or

5    was it all your -- exclusively your time?

6        A.    It's exclusively my time.

7        Q.    So, if we look here on the second page, this

8    is the hourly breakdown.  Correct?

9        A.    Correct.  Yes.

10        Q.    And your report was -- your initial report

11    was submitted on August -- what did we say --

12    August 21st?

13        A.    Yes.  I think it was August 21st.  If you

14    look on the line, August 21st report review

15    finalization.  There you are go.

16        Q.    Okay.  Let's draw a little line there.

17        A.    Yeah.  That's fair.

18        Q.    And so the work up to that blue line, that's

19    the work you spent that went into the initial report.

20    Correct?

21        A.    That's correct.  Yes.

22        Q.    And then the work after August 21st

23    ultimately went into your rebuttal report; is that

24    fair?

25        A.    Yeah, and some time spent on gathering the

170

1  data for the subpoena documentation request.  In

2  particular, producing the list of transactions.  It's

3  something I had never produced before, so it took some

4  time to put it together.

5       Q.   And that's this --

6       A.   Yeah.

7       Q.   -- six hours that you spent?

8       A.   Yep.  Sure.

9       Q.   Then you reviewed the other expert reports,

10 attended the deposition of Mr. Bowler, and then wrote a

11 rebuttal; is that correct?

12      A.   Yeah.  That's more or less it.  Yeah.

13      Q.   Do you anticipate doing any other work

14 between now and the time of trial following this

15 deposition?

16      A.   All things being equal, I would imagine I'd

17 need to catch up a little bit prior to the trial

18 because it's some way away.  But other than today,

19 obviously there's been a bit of work here, I don't

20 anticipate anything more.  No.

21      Q.   Let me be clear in my question.  So, setting

22 aside just preparing to give testimony related the

23 opinions already expressed, is there anything else that

24 you intend to do between now and trial related to this

25 case?

171

1      MR. CANNELLA:  Let me object to the form.  I may

2  ask him to sit in with me next week for Mr. Lewis, for

3  example.

4      MR. BANKS:  Good point.

5      THE WITNESS:  Yeah.  So, there's that for example

6  that Dave just referenced.  But potentially attending

7  the deposition of Mr. Lewis, I imagine -- I'm jumping

8  ahead here, but there would be a transcript of this

9  deposition.  I might want to review that and so on.

10  So, yeah.  Those sorts of things.  But unless something

11  else arises, you know, unless Dave and the Holland and

12  Knight team advise of anything else they might require,

13  I don't anticipate much more between now and the trial.

14  BY MR. BANKS:

15      Q.   Is there any additional research -- how's

16  that -- that you anticipate you may do between now and

17  trial based on anything you've learned to date?

18      A.   I don't envision any additional research.

19  No.

20      Q.   Do you anticipate any additional opinions

21  that you may wish to express at trial that you have not

22  either put in your report or disclosed here today?

23      A.   No.  I don't anticipate that.  No.

24      Q.   And sitting here today, do you have any other

25  opinions related to this litigation for which you

172

1    believe you are qualified to give an opinion that you

2    have not disclosed in your original report, or your

3    rebuttal report, or in your testimony here today?

4        A.   No.  I don't have any other opinions than

5    those disclosed.  No.

6        Q.   All right.  I'd like to mark as the final

7    exhibit --

8        A.   Oh, by the way, we're watching your screen

9    here.

10       MR. CANNELLA:  Yeah.  You want to stop share,

11   because we're looking at your --

12       MR. BANKS:  Thank you.  I appreciate that.

13       MR. CANNELLA:  No problem.

14       MR. BANKS:  I forget sometimes.

15       MR. CANNELLA:  I do it, too, sometimes.

16       MR. BANKS:  Yeah, I know.  It happens.  It

17   happens.

18   BY MR. BANKS:

19       Q.   Just a second.  I need to do the same thing I

20   did before.  I need to save this document, and then

21   I'll put it in the chat.  This should be your deal

22   list.

23       A.   Oh, okay.

24       Q.   I have put in the chat as Exhibit 5 a

25   document entitled -- that I labeled Frost Deal List.

173

1        A.    Okay.

2                         (Whereupon, the document was marked

3                          as Deposition Exhibit No. 5 for

4                          identification.)

5        MR. CANNELLA:   This is designated OCEO.

6        MR. BANKS:   Oh, yeah.   Sara, can you maybe hop off

7   at this point?   Oh, she's either already hopped off or

8   she --

9        THE COURT REPORTER:   She heard you.

10       MR. BANKS:   -- wasn't on.   Okay.   Good.   I

11  couldn't tell.   She's not on now at least.

12       THE WITNESS:   Okay.   Yep.   I have this, yes.

13  BY MR. BANKS:

14       Q.    So, Mr. Frost, if you could just open it up

15  and confirm for me this was the list of deals that you

16  prepared that identifies the insurance brokerage

17  transactions that you worked on from 2017 to present.

18       A.    That's correct.   Yes.   I prepared this list.

19  Yes.

20       Q.    How did you go about preparing it?

21       A.    It took some time.   I had to go over all my

22  old files.   Basically I keep a folder for each deal

23  I've worked on, and I go through them all.   So, listing

24  the deals is fairly straightforward, I would say.   But

25  the piece that I wanted to confirm was for each -- each

                              174

1    deal I checked have they actually been disclosed

2    publicly.  That was the piece that took some time.  So,

3    there's few of them where there's an NA.  And -- yeah.

4    If the deal hasn't been disclosed.

5         Q.   And then you also have a notes column here

6    for each deal.

7              Is that indicating your personal role on

8    the transaction?

9         A.   Yes, it is.  That's --

10        Q.   So, in the cases where you participated in

11   the valuation, did you label those in the notes "fair

12   market valuation"?

13        A.   Either those or the ones where I'm acting on

14   behalf of the seller, if there was diligence, I would

15   have been involved in some valuation work as well.

16        Q.   Let's see if we can identify those.

17             So, I see that Deal No. 7 --

18        A.   Yep.  Paramount General Agency, yeah.

19        Q.   That is a deal from July of 2017.  Correct?

20        A.   Correct.  It was a -- we were doing a

21   valuation of that agency.  Yes.

22        Q.   And you did a valuation of ███████████████

     ███████████   Correct?

24        A.   Correct.  Yes.

25        Q.   And so, in that you participated in the

                          175

ROBIN FROST

1    actual valuation analysis?

2        A.    Yeah.    I performed the valuation analysis for

3    that one.  Yes.  Yes.

4        Q.    Was that not a transaction but instead just a

5    valuation?

6        A.    It was just a valuation assignment in that

7    case.  Yes.  There was no transaction.

8        Q.    Number 26 is a July 2018 transaction where

9    ███████████████████████████████████████████████████████

     █   ████████████████████████████████████is that correct?

11       A.    That's correct.  Yes.  That was -- yeah.

12   They're in Florida.  Yes.

13       Q.    And that's the -- I think did you mention

14   this one?  Or no, you mentioned ██████  Which one did

15   you mention earlier today?  Barnes or ██████

16       A.    I mentioned the one above that, ██████.  That

17   was one that just came to -- that was awhile ago now.

18   May 2018.  Didn't seem that long ago, but yes.  They

19   were an agency.  They're out in Scottsdale, Arizona.

20       Q.    That was actually entry No. 25.  Correct?

21       A.    Correct.  Yeah.  That's the one we're looking

22   at.  You skipped No. 16 as well, ██████████████████████

23       Q.    Yeah.

24       A.    It's hard to pick them out, I guess.

25       Q.    Just because it's not a -- the scan is not

176

ROBIN FROST

1    OCR.  So, all right.  So, in 16, 25 and 26, you were

2    the lead.  You did the lead financial due diligence for

3    the seller.

4         A.   So, yes.

5         Q.   16 and 25.  Correct?

6         A.   16 and 25 and -- yeah, on 26, yeah.  I was

7    working with another colleague on that one.  I'd say he

8    was the lead, but I was very much involved.  But yes,

9    correct.

10        Q.   And I think my question, I corrected it.  Let

11   me just get a clean record.

12             On 16 and 25 you served as the lead for

13   financial due diligence for the seller.  Correct?

14        A.   That's correct.  Yes.

15        Q.   And then on 26 you assisted with the

16   financial due diligence for the seller.  Correct?

17        A.   That's correct.  Yes.

18        Q.   So, on those three transactions, in addition

19   to the Transaction No. 7, you participated in the

20   development of a fair market valuation.  Correct?

21        A.   Yes.  I was involved in -- yes, for all of

22   those.  Yes.

23        Q.   In the other transactions listed on this

24   page 1 of Exhibit 5, is it true that you participated

25   in financial due diligence, but you did not participate

177

1    in the development of a valuation?

2        A.    That's fair.  Yeah.  I'm aware of what the

3    valuations were, and what the pricing was, but I didn't

4    derive those valuations.  Correct.  Yeah.

5        Q.    On the second page -- let's see, the first

6    transaction I see where you were doing due diligence

7    for a seller is 51.  ████████████████████████████████

8    ████████████████████████████████████████████

9    Services/BAII; is that correct?

10       A.    That is correct.  I'm just trying to find it.

11   No. 51?

12       Q.    51.  Do you want me to show --

13       A.    No.  It's okay.  I've got it.  Yeah.

14       Q.    I'll go ahead and show this so we're looking

15   at the same thing.  I notice the 50, if says you did

16   lead financial due diligence for the buyer in a

17   transaction between the same two parties.

18            Is that the same transaction, or was it

19   -- were they different transactions between those

20   parties?

21       MR. CANNELLA:  Hold on a second.  I object to the

22   form.  I don't think that those are the same two

23   parties.  Maybe you can't --

24   BY MR. BANKS:

25       Q.    ████████████████████████████████

178

ROBIN FROST

1      A.   I don't understand why it says ▮▮▮ next to

2  ▮▮▮▮▮▮▮▮▮ because they're two unrelated

3  entities.  Yeah, I was working for -- I was engaged by

4  Patriot for that acquisition of ▮▮▮▮▮▮▮▮

5  ▮▮▮▮▮  And then we were representing ▮▮▮ and

6  ▮▮▮▮▮▮▮▮▮ on the deal.  And it happened that

7  ▮▮▮▮▮ were the acquirer.  So, we were sitting on the

8  other side of the table from them, if you like.

9      Q.   Entry 52.  You did a fair market valuation

10  for ▮▮▮▮▮▮▮▮▮▮▮▮ Correct?

11      A.   Yes.  I recall --

12      Q.   That was not in the context of a sale or

13  purchase.  Correct?

14      A.   Yeah.  They were just, you know, I can't

15  recall the motivation.  Maybe to get funding, but yeah.

16  We did -- yes, I did the valuation.  Yes.

17      Q.   No. 60 between ▮▮▮▮▮▮▮▮

▮  ▮▮▮▮▮▮▮▮▮ you did due diligence for the

19  seller.  Correct?

20      A.   Correct, yes.  A med-mal agency in Michigan.

21  Yeah.

22      Q.   And so you were involved in the valuation

23  analysis in that one.  Correct?

24      A.   Yeah.  For ▮▮▮▮▮▮ yes.

25      Q.   And are there any other transactions on page

179

1   2 other than 51, 52 and 60 wherein you personally

2   participated in the fair market valuation analysis that

3   was created?

4       A.   The list I've got here, no.  I would say not,

5   no.

6       Q.   On page 3 -- Page 3 is the last page.

7   Correct?

8       A.   Yes.

9       Q.   The first transaction that I see where you

10  were involved with the seller is Transaction 105, which

11  is ██████████████████████████ --

12      A.   Oh, ██████, yes.

13      Q.   -- ██████; is that correct?

14      A.   Correct.  Yes.

15      Q.   I don't see any other transactions where you

16  did a financial -- a fair market value analysis for

17  work for the seller on this page; is that right?

18      A.   That's right.  Yes.

19      Q.   So, is that the only transaction on this page

20  in which you participated in the actual fair market

21  valuation analysis?

22      A.   Yeah, where I was actively involved in what

23  the valuation is.  Yes.  Correct.

24      Q.   So, in that transaction, 105, what was the

25  EBITDA multiple --

180

1      A.   Oh.

2      Q.   -- that was used?

3      A.   I'd have to go back and check.  I'm sorry.  I

4  can't recall ██████████████████ specifically.

5      Q.   Do you still have the information necessary

6  to find that out?

7      A.   I should do, yeah.  I'd have to --

8      MR. CANNELLA:  Hold on a second.  I'm going to

9  object.  He's already testified he doesn't remember,

10  but I just want to put on the record that we object to

11  further discovery on this due to NDAs between Mystic

12  and non-parties involved.

13  BY MR. BANKS:

14      Q.   In forming your opinion on the proper

15  multiple to use in the fair market valuation analysis

16  that you performed in this case, did you rely on any of

17  the transactions -- your experience on any of the

18  transactions listed on this Exhibit 5?

19      A.   Yes.  All of them, I'd say.  Well,

20  particularly the ones more recently.  So, although

21  you've highlighted the ones where I was working with

22  the seller and I'm actually involved in the valuation,

23  for all those other transactions where I'm doing

24  financial diligence for the buyer, I know what terms

25  they're -- you know, I know what terms they're offering

181

ROBIN FROST

1   and what multiples they are using.  So, yes.  I'm

2   familiar with the rates that are used in the market at

3   the moment.

4        Q.   Do you know, or do you have access to the

5   information?

6        A.   I know in most cases.

7        Q.   So, can I --

8        A.   Some sellers are more open about their terms

9   than others.  So, sometimes I'm work -- sorry, sellers

10  -- I meant buyers.  Sometimes I'm working with a buyer,

11  and they would rather not disclose their terms, because

12  it is so -- it's confidential information.  So,

13  sometimes they don't want to share with others.  But

14  the vast majority of cases, we do.  So, for example,

15  ██████████████████████████████████  you see a few there.

16       Q.   Yeah.

17       A.   Lately I've noticed that ████████'s don't

18  share the terms when we work with them.  So, fair

19  enough.  That's the way we, you know, we'll do the

20  work.  But I don't know exactly what they paid for

21  those ones.

22       Q.   Did you do anything to, you know, to actually

23  do like data analysis on what the multiples were used

24  in these actual transactions for your opinions in this

25  case?

182

1    A.   Oh, I see.  I didn't go through and write

2   down what the multiples were for each one.  No.

3    Q.   And you didn't try to average them or analyze

4   trends specifically in these transactions, did you?

5    A.   Not specifically, no.  It's just my

6   experience that I'm seeing multiples of -- well, really

7   12, 13 times lately.  But yeah, 10 to 12 is a decent

8   estimate I'd say, and very achievable for a book of

9   business the size of the accounts in question here.

10    Q.   And is there any way you can disclose to us

11   what the actual multiples were in those transactions

12   that we can, you know, assess whether your 10 to 12

13   estimate is accurate?

14    A.   Well, my issue is that that's extremely

15   confidential information, and we basically are the --

16   Mystic services are in question if we, you know, if we

17   disclosure that kind of information.  But it's very

18   confidential to the buyer and the seller.  That's why I

19   searched, again, for every single one if there's

20   anything published on the deal pricing.  There was one

21   where I had an amount.  I don't see it on this listing.

22   But yeah, just one where there was an amount that was

23   disclosed, because it was a bank that were selling, and

24   they happened to do a press release saying, oh, we sold

25   our agency for X million dollars.  That was the only

183

ROBIN FROST

1    one where there was anything public.

2        Q.   What methodology, if any, did you use to test

3    whether your estimate of 10 to 12X accurately matches

4    your actual experience in these transactions?

5        A.   I just know from my knowledge that the 10 to

6    12 is well within the range of the deals I've been

7    seeing in the last year or so.

8        Q.   That's your personal estimate based on your

9    recollection of the valuations used in these deals.

10   Correct?

11       A.   Correct.  And as I say, actually in a number

12   of cases, it's higher than that.

13       Q.   Is it lower in some cases?

14       A.   Rarely.  There's occasionally a deal where,

15   you know, I'm surprised at how low the multiple is.

16   But typically that would be if it was a smaller

17   transaction or so on.

18       Q.   Have you done anything to average the

19   multiples used during particular timeframes?

20       A.   I haven't specifically carried out that

21   exercise.  No.

22       Q.   And you haven't done any sort of, like,

23   weighted averaging either.  Correct?

24       A.   No.  No, I have haven't.

25       Q.   And have you done anything to try to identify

184

ROBIN FROST

1    trends in the types of transactions where lower

2    multiples are used versus higher multiples?

3        A.   Personally, I haven't.  But I've cited the

4    best practices update in my report which, you know,

5    cites 12 times.  And that was back in 2021.  And then I

6    know in the Lewis report, he cites a quote from Agency

7    Brokerage.

8            Mike Mench (ph.), who I actually worked

9    with, he was representing the other side on at least

10   two of the deals on the list.  And he quotes some

11   multiples, but then says, you know, however, these

12   days, you know, the multiples are significantly higher.

13   He's quoting some historical multiples from years ago.

14           So, again I haven't done any specific

15   research myself, but they are -- there's publications

16   that list what they think current multiples are out

17   there.

18       Q.   And in each of these transactions on your

19   Exhibit 5, these involve the sale of rights to do

20   business with an account.  Correct?  Or accounts?

21       A.   Yes.  In every case where -- yeah.  In every

22   case they're selling either the entire agency or

23   they're selling a piece of the agency.

24       Q.   And they included the employees.  Correct?

25       A.   Yes.  In nearly every single case they were

185

ROBIN FROST

1    including employees.  Yes.

2         Q.   They included historical books and records,

3    documentation, things like that.  Correct?

4         A.   Yes.  I would imagine -- I've never really

5    thought about the historical books and record.  But

6    yes, yes.  They would need those.  They're servicing

7    the business, so yes.

8         Q.   They included any intellectual property that

9    is associated with that business.  Correct?

10        A.   Like I say that's -- like I said previously,

11   it's very rare that there' intellectual property

12   involved -- specifically involved.  So, yeah.  But if

13   there was any, yes, that was involved.  That was

14   included.  Sorry.

15        Q.   They would include sometimes offices.

16   Correct?  Real estate?  Leases?

17        A.   So, yeah.  Typically what happens is if the

18   selling entity is not going to -- if it's relatively

19   small, and the acquirer already has an office nearby,

20   they may just move into their existing office space.

21   But if it's not near to a location of the buyer, or if

22   it's relatively large and they, you know, they'll

23   likely remain in the space they're in currently.  And

24   what happens in those cases is the lease is terminated,

25   and new lease is bought out with the acquiring entity

186

1    of the lessee.

2        Q.    And they would include, you know, fixtures,

3    the furniture.  Things like that.  The physical assets.

4    Correct?

5        A.    Yes.  All the physical assets needed to

6    service the business.  So, in a purchase agreement,

7    there are disclose schedules which, you know, a listing

8    of all the accounts and all the agreements that are in

9    place and so on.  It's really quite a detailed process.

10   On one of those schedules is typically any excluded

11   assets.

12            So, it could be, you know, the owner has

13   a painting in their office which is actually personal

14   in nature.  You know, and they'd specifically list,

15   hey, that's not for sale.  That's mine, you know.

16       Q.    Have you ever participated in a transaction

17   where the business being sold was one where the key

18   producers with the client relationships had just

19   departed?

20       A.    Sorry.  Just give me a second.  I'm just

21   trying to think.  There's one that's not listed here

22   because it didn't close.  And a number of producers had

23   departed.  And actually in the end it didn't close

24   because there was -- well, there was basically a loss

25   of trust between the seller and the buyer in that case.

1   But like I said, it's not listed.  It didn't close.

2   There's a number of deals I've worked on which they

3   never did close that aren't listed here.

4              But other than that, the one that really

5   comes to mind -- yeah, there are a number of these

6   where a producer would have left and, you know, then

7   recently hired new sales talent.  So, yes, yes.  I've

8   come across that.  Yes.

9       Q.   Let me focus first on the situation where you

10  said it was discovered during the discussions -- or the

11  negotiations that some of the key producers had left

12  the business being sold.  Okay?

13      A.   Oh, the one I referred to that didn't close,

14  you mean?

15      Q.   Yes.

16      A.   Yes.  Okay.  In that situation -- they were

17  actually in Florida.  They had disclosed that, you

18  know, this has happened.  This was a significant event.

19  But they were -- they hadn't -- they quantified the

20  effects of the loss, but they hadn't actually -- they

21  were hiding some of it.  They didn't disclose all of

22  it.  So, when we dug in and realized, hold on, you're

23  not disclosing everything here, there was a -- you

24  know, the deal broke down because there was a loss of

25  trust.

188

ROBIN FROST

1      Q.   In that case, you were representing the

2  buyer, or the seller?

3      A.   The buyer in that case.

4      Q.   And in that case, did the buyer balk --

5  b-a-l-k, at paying a high multiple on a business where

6  the key relationship producers had left?

7      A.   I -- again, it was actually -- it was

8  actually a few years ago.  It was -- I want to say at

9  least 2020 or earlier.  I remember, because it was an

10 awful lot of work, and then it all fell through.  Yeah.

11 I don't recall if there was any discount on multiples.

12 But again, it was -- it's historic.  It was a number of

13 years ago.

14     Q.   The transaction was a number years ago, or

15 the departures were a number of years before the

16 potential transaction?

17     A.   No.  The transaction -- the potential

18 transaction we should say, was a number of years ago.

19 It was around about 2020-ish.

20     Q.   And I'm just saying, compared to the

21 prevailing multiples used in 2020, was the purchaser --

22 did they expect not to pay the same multiples for a

23 business where a number of key producers had just left?

24     MR. CANNELLA:  Object to the form of the question.

25     THE WITNESS:  Again, I think I said just

189

1    previously, I can't recall exactly what the multiple

2    was on that deal.  I have to check really.  I can't

3    recall.

4    BY MR. BANKS:

5        Q.   Is there a way you can do that?

6        A.   There is, but --

7        MR. CANNELLA:  Object to the form of the question.

8        THE WITNESS:  I'd have to go back and look through

9    documentation to find it.  Yes.  And again, without

10   giving anything away, that was actually a █████████

     ████████████████████████████ deal, and it didn't actually

12   occur.  So, and as I said, unfortunately ██████████████

     ████████████████████████ is one of the buyers we worked with

14   who is not totally forthcoming with what the deal terms

15   are when we worked with them.

16   BY MR. BANKS:

17       Q.   You said you worked -- so, does that mean you

18   can find that information or not?

19       A.   I'd have to check.  It could be that, in that

20   particular case, they did provide that information.

21   But it could be they didn't.  I'd have to go and check.

22       Q.   So now, you mentioned there were some other

23   situations where you were involved in a transaction

24   where there had been at least some departure or

25   departures in the past.  Correct?

190

ROBIN FROST

1    A.   Yeah.  Goodness.  I mean, that happens

2  relatively frequently.  If, I'd say, you know, we were

3  looking through the employee roster, and we will see

4  that, you know, there was a producer being paid, but

5  they're no longer with them, but then recently there

6  has been a new hire.  That's something we'll discuss.

7  And they'll explain, "Oh, yeah.  That person didn't

8  make it.  They left, and we're excited about the new

9  person."  So, yeah.  That -- I see that situation quite

10  often.

11    Q.   Are you familiar with any situations where it

12  was determined that the departed person had key

13  relationships that were lost with their departure?

14    A.   I've worked on ones where something similar

15  to the situation we're discussing here has occurred

16  where, you know, producers have left and have breached

17  their employment agreements and have, you know, taken

18  some accounts.  And in those cases, we're aware of it

19  because there had been a legal action, and it either

20  had been settled or, you know.  Or was still ongoing.

21    Q.   Okay.  I just want to focus on a situation

22  where a -- let's -- maybe even more specific.

23         In this case, you're trying to measure

24  the fair market value of a business that was comprised

25  of Mitchell and Simmons as the producers, and the lost

191

1    accounts as the accounts.  Correct?

2         A.   Yes.  That's correct.  Yes.

3         Q.   Have you ever valued a business where all of

4    the producers involved with the accounts at issue had

5    just left?

6         A.   No.  I've never encountered that situation.

7    No.

8         Q.   Based on your experience, would you expect a

9    business comprised of accounts handled by just a couple

10   of producers who had strong client relationships and

11   they've just left, where the sale of that business

12   would be at the -- you know, otherwise predominating

13   multiples?

14        MR. CANNELLA:  Object to form of the question.

15        THE WITNESS:  It's a hypothetical scenario, so

16   we'd have to see the facts of the matter:  What the

17   type of business was, and so on; how long they'd been

18   with the agency, and so on.  I couldn't speculate

19   really.  It's a hypothetical.  It would be an unusual

20   situation, I'd say.

21   BY MR. BANKS:

22        Q.   And you can't -- you couldn't really value

23   that business; is that fair?

24        MR. CANNELLA:  Object to the form of the question.

25        THE WITNESS:  I would suspect we could value a

192

1   business, of course.  We always could.

2   BY MR. BANKS:

3        Q.   Well, what else would you need to know then?

4        A.   The nature of the business, you know, what

5   the -- all of those factors, and so on.

6        Q.   Is that what you did here?

7        A.   In the case of USI --

8        Q.   Did you try to value a business comprised of

9   the lost accounts without Mitchell and Simmons?

10       A.   No.  I --

11       MR. CANNELLA:  Form.

12       THE WITNESS:  Like we discussed previously, I

13  assumed that -- I'm valuing the value of these accounts

14  prior to or as of, or just before January 25th, 2023,

15  when USI has the accounts, and has -- and Mitchell and

16  Simmons and the other departed employees are employees

17  of USI.  So, I'm doing the value at that time.

18  BY MR. BANKS:

19       Q.   But you're valuing, in your fair market value

20  analysis, a business that could have, in theory, been

21  sold by USI that comprised of Mitchell, Simmons, Sheila

22  Murray, Jackie Rodriguez, Chris Kakish, Theresa Kemp,

23  and Madison Lieffort, and strictly the accounts -- the

24  lost accounts and whatever, you know, other stuff that

25  would go into a business like that?

193

ROBIN FROST

1    A.    Yeah.    I'm valuing -- what I was tasked to do

2  was to do a valuation of those accounts.    So, it's a

3  valuation of those accounts, and the cost of the

4  producers and support staff to service it.    Correct.

5  Yes.

6    Q.    Well, did you value the accounts, or did you

7  value the accounts combined with the employment of

8  Mitchell and Simmons?

9    MR. CANNELLA:    Object to form.    Asked and

10  answered.

11    THE WITNESS:    Yeah.    As we previously discussed,

12  I'm assuming the producers go with it.    So, yes.    It

13  assumes the producers are with the accounts.

14  BY MR. BANKS:

15    Q.    And it also assumes that in that -- well, I

16  don't need -- I already covered it.    All right.    That's

17  it.    I don't have any further questions at this time.

18  I do want to confer afterwards about getting some

19  information about the multiples and these transactions,

20  even if it's an itemized or even if it's done on

21  averages or weighted averages in some way again an

22  itemized.    We can do that afterwards, but I think that

23  that should be turned over.    And there may be follow-up

24  questions depending on what that data shows.

25    MR. CANNELLA:    Right.    Can you take down the

194

1    screen share, please?

2        MR. BANKS:  Of course.

3        MR. CANNELLA:  I'm going to have a few follow-up

4    questions for --

5        MR. BANKS:  Yeah, go ahead.

6        MR. CANNELLA:

7                    EXAMINATION

8                By:  Mr. Cannella

9    Q.   Mr. Frost, you were asked about intellectual

10   property.

11               What do you understand intellectual

12   property to be?  What's your understanding of

13   intellectual property?

14   A.   So, when we were discussing intellectual

15   property, I'm thinking of patents on processes or

16   systems or what have you.  So, that -- that was the

17   definition I was considering.

18   Q.   And you're not a lawyer; is that correct?

19   A.   No, I'm not lawyer.  No.

20   Q.   Some intellectual property lawyers would say

21   things like customer information or formulas or things

22   of that nature would also be intellectual property.

23               When you were talking about intellectual

24   property, did you consider customer information to be

25   -- to be IP when giving that testimony?

                          195

1      A.   No.  I wasn't considering that when I was

2   thinking of it, no.

3      Q.   Is customer information something that would

4   be part of a fair market value transaction?

5      A.   Yes, for sure.  Yeah, yeah.

6      Q.   You were asked questions about damages versus

7   valuation.

8           Do you see a distinction between damages

9   and valuation?

10     A.   Not especially.  I would --

11     MR. BANKS:  Object.

12   BY MR. CANNELLA:

13     Q.   You can go ahead.

14     MR. BANKS:  Object to form.  Please go ahead and

15   answer.

16     THE WITNESS:  Not especially, no.  You know, my

17   view is that USI had these accounts.  The accounts have

18   a value.  Come up with my opinion on what a fair value

19   for those account is, and that's what they lost.

20   BY MR. CANNELLA:

21     Q.   You testified several times that the

22   valuation that you provided was as of January 25th,

23   2023.

24           Can you explain what you mean by that?

25     A.   So, a valuation may change, you know,

196

ROBIN FROST

1  depending on the date that you do it.  So, I'm

2  specifically looking at the situation as of the 25th,

3  you know, the date that all those -- Simmons and

4  Mitchell and the other employees departed USI.  So,

5  we're valuing what USI had prior to the actions --

6  their actions.

7      Q.   I want to talk about the lost profit

8  valuation.

9           Was that also a valuation based on a

10  specific date and time, and projecting forward?

11     A.   In as much as I've used the prior 12 months

12  revenue as my basis.  So, yes.  It is effective

13  January 25th, 2023.  It's the projected lost profits as

14  of that date.

15     Q.   And the lost profit model, is that based on

16  what USI could have anticipated making had the business

17  stayed with USI?  The business it had on January 25th,

18  2023, had that remained at USI, is that what the model

19  projects out?

20     MR. BANKS:  Object to form.

21     THE WITNESS:  That's the intention of the model,

22  yes.  The intention of the model is to look at what the

23  potential -- well, what the future profits of those

24  accounts were.  As I say in my report, though, we could

25  look at what future profits are, the calculated cash

197

ROBIN FROST

1  for and the current value of that, but really these are

2  assets that there's a ready market for.  So, the fair

3  market value, I feel, is a more accurate reflection of

4  the value of these accounts.

5  BY MR. CANNELLA:

6       Q.  Why do you believe the fair market value is a

7  more accurate measure of the value of these accounts?

8       THE COURT REPORTER:  You're trailing off, Dave.

9       THE WITNESS:  As I just said, these can readily --

10 easily be sold in a transaction.  Insurance brokerage

11 space is extremely active in a mergers and acquisitions

12 space.  There's a lot of sales and sales going on.  So,

13 it's an attractive business to acquirers.  There's a

14 number of new players that enter into the market every

15 year because it's an attractive business.  It's a nice

16 cashflow business.  It's sticky business, but you have

17 the 90 percent retention we've been referring to.  It's

18 a consistent flow of cash.  It's attractive.

19 BY MR. CANNELLA:

20      Q.  Let me ask you about the 90 percent retention

21 rate.

22           Is that -- in your experience, is that an

23 industry -- is that common in the industry?

24      A.  Yeah.  It's kind of a rule of thumb:

25 90 percent retention rate.  Yeah.  I mean, it's

198

ROBIN FROST

1  consistent with what I see in the market.  Yes.

2      Q.  And do you know whether that's consistent

3  with what USI was doing in Tampa, as far as the

4  retention rate in PSC?

5      A.  Yes.  My understanding, it is actually quite

6  consistent.  They have those five diamond -- like KPI,

7  key performance indicator reports.  And yeah, they show

8  over the last couple years approximately 10 percent

9  attrition.  Or put another way, 90 percent retention.

10     Q.  You were asked questions about client

11  satisfaction with USI.

12              The lost accounts, were you provided with

13  the history of how long those accounts have been with

14  USI?

15     A.  Oh, yeah.  I was given some historic

16  financials so I could see, you know, there's a

17  five-year look-back period.  And the reason I was

18  looking at that, just to look at revenue trends, just

19  to make sure there was nothing untoward within a 12

20  month date.  I doubt if there was anything remarkably

21  different from the history.

22     Q.  Did the lost accounts have a history that

23  went beyond one or two years, for the most part?

24     MR. BANKS:  Object to form.

25     THE WITNESS:  Some did, some didn't.  There was a

199

ROBIN FROST

1   -- yeah, there were one or two that were really quite

2   recent.  But, you know, a lot of them have been there

3   for a long, long time.

4   BY MR. CANNELLA:

5       Q.   Let me show you from Exhibit 1, which is your

6   report.  The table report.  I'm just looking at the

7   gallery to make sure that there's -- everyone is either

8   outside counsel or experts.

9       A.   Yeah.  Here we go.

10      Q.   Is this a table that you prepared, sir?

11      A.   Yes, it is.  Yes.

12      Q.   You can see several of these clients, Avesta,

13  for example, have revenue history dating back to 2018.

14           Do you see that, sir?

15      A.   I do.  I do.  And it can go back further

16  than, you know, further into the past.  I only

17  collected data for the -- or only had data for the past

18  five years.

19      Q.   And then you see with the PGT Innovations --

20      A.   Yes.

21      Q.   -- you made a note.

22           What's the note you made here on the

23  history of PGT?

24      A.   So, it only shows revenue -- a tiny amount of

25  revenue, less than $396 in 2020, and then a smaller

1  amount in 2021, and then the full amount coming through

2  in 2022.  My understanding is that that was an account

3  that was -- had historically been with USI, but was

4  transferred to -- to -- for Simmons to manage.

5       Q.   What is -- thank you, sir.  What is the

6  client history going back for five years, and maybe

7  beyond what some of these accounts, suggest to you

8  about those clients' satisfaction with USI?

9       MR. BANKS:  Object to form.

10      THE WITNESS:  It suggests they were satisfied with

11 them.  They'd been with them a number of years.

12 BY MR. CANNELLA:

13      Q.   So, would that support one of your

14 conclusions that USI had a reasonable expectation that

15 these relationships would continue?

16      MR. BANKS:  Object to form.

17      THE WITNESS:  That -- yes, that would definitely

18 support that, that conclusion or that opinion.

19 BY MR. CANNELLA:

20      Q.   Now, with respect to the -- going back to the

21 lost profit analysis.

22           Did you discount those losses at present

23 value?

24      A.   Yes.  That's right.

25      Q.   And can you explain for the jury what

                              201

                         ROBIN FROST

1    discount present value means?

2        A.   Sure.  So, it's looking at what's the current

3    value of a future stream of cash flows or revenues.

4    So, if you're going to receive $100 in, you know, in

5    this year, or you're going to receive $100 ten years

6    from now, that $100 ten years from now is not as

7    valuable to you as $100 this year.  So, it's

8    discounting it with what's the present value, the value

9    to you today of that cash flow.  I hope I explained

10   that reasonably well.  Sorry.  That was a bit garbled.

11       Q.   I've heard the discount to present value

12   described like a reverse interest rate.  You're getting

13   the money --

14       THE COURT REPORTER:  You're fading, Dave.

15   BY MR. CANNELLA:

16       Q.   I'm sorry.  I've heard reduction to present

17   value described as like a reverse interest rate.

18   You're getting the money now as opposed to having to

19   wait ten years for it.

20            Does that jive with your understanding of

21   what a discount rate is and discount present value?

22       A.   Yeah.  That's another way of thinking of it.

23   So, in the analogy I was just saying, $100 ten years

24   from now, effectively discounting that to today's

25   money, it's what money would you need to put in the

202

1   bank under a assumed interest rate for it to be worth

2   $100 ten years from now.

3       Q.   What discount rate did you use for your lost

4   profit analysis?

5       A.   I used 17.1 percent, which was -- had been

6   derived from analysis from the Kroll cost of capital

7   data.  Yes.

8       Q.   Just so the record is clear, that's 17 --

9   17.11 percent?

10      A.   Yes.  I'm just looking it up on my report

11  just to make sure.  But from memory, yeah, 17.11.

12  Yeah.

13      Q.   You attended Mr. Bowler's deposition earlier

14  this month?

15      A.   I did, yes.

16      Q.   Do you recall what Mr. Bowler said about the

17  discount rate that you used in your report?

18      MR. BANKS:  Object to form.

19      THE WITNESS:  Yeah.  Mr. Bowler thought it was

20  somewhat overstated.  He said that internally, USI

21  would consider ██████████  So, cost of capital or

22  discount rate to be what they measured themselves

23  against.  So, he felt something more of that measure

24  would be more appropriate.

25  BY MR. CANNELLA:

                            203

1        Q.   What impact would using your lower discount

2   rate have on your lost profit calculation?

3        A.   It would increase the valuation.

4        Q.   So, it would increase the numbers; is that

5   correct?

6        A.   Yes, correct.  That would increase the final

7   numbers.  Yes.

8        Q.   Now, you were asked questions about

9   solicitation.

10            In addition to the testimony that you

11   relied on, did the timing of the departures of these

12   clients play any role in your finding that there more

13   likely than not was a solicitation of the clients?

14        MR. BANKS:  Object to form.

15        THE WITNESS:  Yes, I would say most definitely.  I

16   state that in the report.  But the timing of all of the

17   employees leaving simultaneously, and then their

18   clients following them within -- many cases -- most

19   cases I think -- even within the next week or two, it's

20   highly suggestive that it's a consequence of the

21   actions of the producers leaving.

22   BY MR. CANNELLA:

23        Q.   And to your knowledge, what was the timing of

24   the departure of the lost accounts?  You know, the

25   table that we previously looked at at page 7 in your

                        204

1    report?

2        A.    Okay.    I think within -- almost without

3    exception, all of them had left within one month.    And

4    I want to say that the -- when I say "all of them," at

5    least one -- at least one policy or more -- some

6    policies of these client accounts had left within one

7    month, and then a few, you know, came later.    And quite

8    a few, from my recollection -- I don't have precise

9    dates on here, but quite a few were before the end of

10   January and the first week of February.    So, within a

11   couple weeks.

12       Q.    You were asked about a paragraph in your

13   rebuttal report about a statement you made --

14   disclaimer you made that you didn't conduct an audit or

15   verify USI's numbers.

16            Do you remember that testimony?

17       A.    Yes, I do.    Yes.

18       Q.    Did you conduct an audit, sir?

19       A.    No, I did not conduct an audit.    That's

20   essentially what that statement is getting at:    That,

21   you know, this isn't an audit.    This is a valuation

22   report.

23       Q.    Was your valuation report conducted in

24   accordance with any published standards?

25       A.    Yes.    It was conducted in accordance with

205

1    Statement of Standards of Valuation Services, No. 1.

2    SSVS No. 1, which is a statement from the AICPA.  It's

3    in accordance with Revenue Rule 5960 from the IRS.

4         Q.   Did you do the valuation in this case as you

5    would do any typical transaction that is not one in

6    litigation but, you know, one of the many typical

7    transactions?

8         MR. BANKS:  Object to form.

9         THE WITNESS:  Apologies.  I cut you off.  Yes.

10   Yes.  Very much so.  Yeah.  I just followed the typical

11   procedure I would do.  Yes.

12   BY MR. CANNELLA:

13        Q.   Did you ask USI for anything that it did not

14   -- it was not able to provide?

15        A.   No, no.  Most of the data was already

16   provided.  But yeah, where I had any further

17   follow-ups, everything I asked for was provided.  Yes.

18        Q.   You were asked some questions by Mr. Banks

19   about whether USI would have to layoff employees, or

20   whether it could continue the employment of the

21   Simmons' team if just Mr. Simmons and Mr. Mitchell

22   left.

23             Do you know if the Tampa office revenue

24   has grown in 2023, not withstanding Simmons' departure?

25        A.   I don't have that information.  So, no.  I

206

ROBIN FROST

1    don't know.

2        Q.   If the Tampa -- for purposes of this

3    question, assume that the Tampa office revenue has

4    grown in 2023.

5             Could USI have retained the account

6    manager and the account executives that were on the

7    Simmons team?

8        MR. BANKS:  Object to form.

9        THE WITNESS:  Potentially, yes.  You would hope if

10   they're good -- despite the loss of business, if

11   they're good individuals, you know, USI would want to

12   keep good people.

13   BY MR. CANNELLA:

14       Q.   Are you aware of any evidence in this case

15   that USI would not have kept the remaining employees

16   underneath Simmons and Mitchell?

17       A.   I'm not aware of any evidence.  No.

18       Q.   Now, in Mr. Banks' examination, he seemed to

19   take you into task for applying the seller EBITDA

20   against -- the multiple rather than the buyer EBITDA.

21             Do you remember that testimony?

22       A.   Yes, I do.

23       MR. BANKS:  Object to form.

24   BY MR. CANNELLA:

25       Q.   Do you have the Southeast Series of Lockton's

                          207

ROBIN FROST

1    EBITDA?

2          A.   No, I don't have that information.

3          Q.   Do you know if USI's attorneys requested that

4    from the Southeast Series?

5          MR. BANKS:  Object to form.

6          THE WITNESS:  I think I recall you may have

7    mentioned that had been requested, but I haven't seen

8    it.

9    BY MR. CANNELLA:

10          Q.   Do you know if the Southeast Series objected

11    to providing their EBITDA, and have not provided it?

12          MR. BANKS:  Object to form.

13          THE WITNESS:  I don't know.

14    BY MR. CANNELLA:

15          Q.   Can you rely on data that you're not provided

16    with?

17          A.   No.

18          MR. BANKS:  Object to form.

19          THE WITNESS:  I relied on the data I was provided.

20    Yes.

21    BY MR. CANNELLA:

22          Q.   Are you aware of any evidence that the

23    Southeast Series of Lockton spent more to service the

24    clients accounts than USI does?

25          A.   I'm not aware of any data to -- any for that,

208

ROBIN FROST

1    to support that.

2         Q.   Let me rephrase the question.

3              Are you aware of any objective data, a

4    document showing the spend, that shows that the

5    Southeast Series of Lockton spends more to service

6    client accounts than USI's spends?

7         MR. BANKS:  Object to form.

8         THE WITNESS:  I'm not aware of any statistical

9    objective data that shows that, no.

10        MR. CANNELLA:

11        Q.   Mr. Frost, we've talked about the 90 percent

12   retention rate both in the industry and with USI.

13             Do you remember that?

14        A.   Yes.

15        Q.   And in the industry, do you producers come

16   and go?

17        A.   They do, yes.

18        Q.   And is it fair to say that the 90 percent

19   retention rate would increase scenarios in which

20   producers depart?

21        A.   Yeah, it's an industry --

22        MR. BANKS:  Form.

23        THE WITNESS:  Apologies.  It's an industry

24   average.  So, yeah.  It accounts for the fact that, you

25   know, the business as usual.  And as you say, producers

209

1    do come and go.  So, yes.  That's incorporated into

2    that 90 percent.

3    BY MR. CANNELLA:

4        Q.   Do you know if the Southeast Series of

5    Lockton, or any Lockton affiliated entity, tracks the

6    retention rate after a producer leaves?

7        A.   Not to my knowledge, no.  I'm not aware of

8    any -- I have never seen any statistics for that.

9        Q.   Do you know if anyone in the industry tracks

10   that?

11       A.   Not that I'm aware of.

12       Q.   Now, you were asked questions about the

13   Simmons team members and their right to leave.

14            Do you remember that line of questions?

15       A.   Yes.

16       Q.   Did the Simmons team members have restrictive

17   covenants?

18       A.   They did.

19       MR. BANKS:  Form.

20       THE WITNESS:  Yeah, they do have restrictive

21   covenants.  Yes.

22   BY MR. CANNELLA:

23       Q.   So, even though they are free to leave, are

24   they free under their restrictive covenants to service

25   the same accounts that they serviced while they were

                              210

1    with USI?

2        MR. BANKS:  Object to form.

3        THE WITNESS:  That would be a breach of their

4    covenants on the face of it.

5    BY MR. CANNELLA:

6        Q.   Could a Simmons team member, who was free to

7    leave, accept business from the same accounts that they

8    serviced while they were at USI?

9        MR. BANKS:  Object to form.

10       THE WITNESS:  During that non-solicitation period,

11   that would appear to be a breach of their covenants.

12   BY MR. CANNELLA:

13       Q.   You were asked a series questions about the

14   notification that Simmons and Mitchell provided to

15   clients before they told USI that they were going to

16   resign.

17            Do you remember that line of questioning?

18       A.   Yes, I do.  Yes.

19       Q.   Do you know if Mr. Simmons told any of the

20   clients that their entire USI Simmons team was going to

21   join him at the Southeast Series of Lockton?

22       MR. BANKS:  Object to form.

23       THE WITNESS:  Yeah.  I think there's testimony to

24   that effect, that yeah, he told them that the team was

25   transferring.  Yes.

                              211

1

2    BY MR. CANNELLA:

3        Q.   And in that instance, is that more in your

4    mind than a mere notification to a client that I'm

5    going to work somewhere else?

6        MR. BANKS:  Objection to form.

7        THE WITNESS:  Yeah.

8    BY MR. CANNELLA:

9        Q.   Let me rephrase the question.

10            Is there a difference between Mr. Simmons

11   posting on Linked In that he's now working for the

12   Southeast Series of Lockton and Mr. Simmons contacting

13   the client before he notifies USI, and telling that

14   client that he's leaving, and the entire team that

15   services that client's account is also leaving?

16       MR. BANKS:  Object to form.

17       THE WITNESS:  Yes.  I would say there's quite a

18   difference.  Yes.

19   BY MR. CANNELLA:

20       Q.   What's the difference?

21       MR. BANKS:  Object to form.

22       THE WITNESS:  I would say that the second scenario

23   -- or the scenario that occurred, where they were

24   telling their clients prior to their departure that,

25   hey, me and the team are leaving.  We're going to

212

 1   Lockton.  That's essentially a solicitation.

 2   BY MR. CANNELLA:

 3       Q.   Now, I want to go over your qualifications a

 4   little bit, because we didn't really go into that too

 5   much during Mr. Banks' examination.

 6       A.   Okay.

 7       Q.   Do you have any certifications?

 8       A.   I'm a chartered accountant, an ACA, which is

 9   -- it's the Institute of Chartered Accountants of

10   England and Wales.

11       Q.   Are you from the U.K.?

12       A.   Yes.  I am, yes.  Originally.

13       Q.   I couldn't tell from the accent.  Sorry.

14   It's been a long day.

15            How long have you been with Mystic

16   Partners?

17       A.   Well, I've actually been with them since

18   2006.  However, I did take a four-year hiatus.  Shortly

19   after joining them, the 2008 recession hit, and the

20   market really, really slowed down.  So, it was really

21   for my benefit and their benefit that I departed.  I

22   went to, you know, TIAA, a local asset management

23   company that's here in Charlotte.  And when I left

24   TIAA, I just happened to reach out to my friends at

25   Mystic, and said, Hey, I'm looking."  And they said,

                                213

1    "Well, have you ever thought of coming back to us?"

2    And I'm really glad they said that.  So, I'm back with

3    them, and I have been since 2017.

4         Q.   You testified about your experience and your

5    knowledge of the multiples in the market in the

6    acquisition business.

7              Is that based on your experience?

8         A.   Yeah.  It's based on my experience.  And also

9    in the report, you know, the best practices, which is

10   a, you know, kind of considered the gold standard if

11   you like, the gold standard of reference material of

12   the industry, does, you know, supports that.

13        Q.   Then I want to ask about the best practices

14   report.

15              What is that?

16        A.   Okay.  So, it's Reagan Consultancy, who is

17   actually a competitor of Mystic, and I've worked with

18   them a number of times -- they've -- in addition to

19   doing their M and A business, similar to that I work

20   on, they've also engaged in this -- producing this best

21   practices manual in association with the Institute of

22   Insurance Agents and Brokerages.  And yeah.  It's

23   become a very, very useful tool in the industry.  It's

24   a great provider of metrics across the industry.

25        Q.   Do you consider the best practices manual to

214

ROBIN FROST

1  be something that is relied upon in the industry?

2       A.   Yeah.  I would say it's relied upon in the

3  industry.  It's -- yeah.  It's often quoted.

4       Q.   Is it an authority in the industry?

5       A.   Yeah.  I'd say that's a fair description.

6  It's considered the authority to -- a basis for a place

7  to find metrics.  Yes.

8       Q.   Does the Best Practices report support your

9  conclusion of a multiple between 10X and 12X applied

10  against EBITDA for the acquisition of an agent?

11       A.   Yes.  It very much supports it.  And in fact,

12  it's suggested it may even be slightly under value.

13       Q.   You also had the opportunity to review USI's

14  deal track; is that correct?

15       A.   I have, yes.

16       Q.   And does that support your opinion of the 10X

17  to 12X multiple ranges?

18       A.   Yes.  I'd say broadly it does.  Yeah.  If you

19  recall the testimony of Ed Bowler, he himself said, you

20  know, USI don't like to acquire businesses that they

21  think are overpriced.  So, they -- if anything, the USI

22  multiples should be a little lower than market you

23  would think.  But they tend to support the 10 to 12

24  range, I'd say.

25       Q.   Is it fair to say that the best practices

215

1    metric is -- sorry, Best Practices manual is a good

2    metric.  But that's not what you relied upon to form

3    your opinion?

4        A.   I wouldn't say solely what I relied upon, but

5    it supported it.  But, yeah.

6        Q.   You were asked about acquisitions in which

7    there was some kind of retention payment made to

8    producers who stayed with the company that was being

9    bought.

10              Is that paid at closing?

11       MR. BANKS:  Object to form.

12       THE WITNESS:  Typically not, no.  The whole idea

13   of a retention payment is you want retain the staff.

14   So, in order to encourage that, you pay it after a

15   retention period.  So, maybe one year, and then another

16   payment after three years, or however it's structured.

17   BY MR. CANNELLA:

18       Q.   The USI deal chart numbers, is that a good

19   metric that supports your opinion?

20       MR. BANKS:  Object to form.

21       THE WITNESS:  I wouldn't consider that a good

22   metric to, you know, to measure the market against.

23   It's just USI's -- just their deals.  But as I said

24   just previously, Mr. Bowler indicated USI -- don't like

25   to overpay.  They go for the lower valuations where

                              216

1  they can.  So, yeah.  I'd say the best practices

2  industry average is a better measure of the

3  reasonableness, not of the range of multiples here.

4  BY MR. CANNELLA:

5      Q.   You were asked questions about -- let me go

6  back to the notification point.

7              Would telling a client that Southeast

8  Series of Lockton has more resources or is better,

9  would that be a solicitation in your view?

10     MR. BANKS:  Object to form.

11     THE WITNESS:  I think that would be part of a

12  solicitation.  If you're telling them, hey, we're

13  moving to Southeast Series of Lockton, and they've got

14  better -- yeah, that would be a part of it.  Yeah.

15     MR. CANNELLA:  Give me just a break.  I'm going to

16  look at my notes.  Could I have five minutes?

17     MR. BANKS:  Yeah.  That's fine.

18     MR. CANNELLA:  All right.  We'll take a

19  five-minute break.  It will be just five minutes.

20  Thanks.

21     THE VIDEOGRAPHER:  Off the record.  4:46 p.m.

22                    (There was a break taken, after

23                     which the deposition was resumed

24                     as follows:)

25     THE VIDEOGRAPHER:  On the record.  4:51 p.m.

217

1

2   BY MR. CANNELLA:

3       Q.   Okay.   Thank you, Mr. Frost.   I don't have

4   any further questions.

5       MR. BANKS:   Okay.   Mr. Frost, a couple things to

6   follow up on.

7                       RE-EXAMINATION

8                       By:  Mr. Banks

9       Q.   Is it your experience that most producers

10  change jobs every year?

11      A.   No.   I think that's an inaccurate

12  characterization.   Many producers stay with the same

13  agency for many years, I'd say.

14      Q.   And, for example, Matt Simmons worked at both

15  Wells Fargo and then USI after it purchased it for many

16  years.   Correct?

17      A.   Correct.   Yeah.

18      Q.   Ant so, when you testified that the

19  90 percent retention rate includes in its averaging the

20  loss of customers or some producers that have departed

21  that year.

22              Do you remember that testimony?

23      A.   Yes, I do.   Yes.

24      Q.   That also includes producers that didn't

25  change jobs that year.   Correct?

218

1      A.   That's right.  Yes.

2      Q.   It's an average of all of that.  Right?

3      A.   Yes.  It's an average of all of that.  Yes.

4      Q.   And most of the producers calculated in there

5  would not have changed jobs at USI that year.  Correct?

6      A.   Hopefully not, no.

7      Q.   Have you ever seen any statics on producer

8  turnover at USI?

9      A.   No, I haven't.  No.

10      Q.   You're not an expert on what constitutes

11  solicitation, are you?

12      A.   I'd say that's fair to say.  No, I'm not an

13  expert on what constitutes solicitation.

14      Q.   And you're not a lawyer.  Right?

15      A.   No.  I'm not a lawyer.  No.

16      Q.   And you haven't done any special study as

17  opposed -- to determine what constitutes solicitation

18  under Florida law.  Correct?

19      A.   Correct.

20      Q.   And you're not an expert on contract

21  interpretation.  Correct?

22      A.   Correct.  Yes.

23      Q.   Did you testify that you're a financial --

24  your valuation analyses are the same as damages in this

25  case?

219

ROBIN FROST

1          A.   I think Mr. Cannella was asking me, you know,

2     what -- his question was:  Is there a difference

3     between damages and valuation?  Apologies if I'm

4     mistaken what the question was.  And yeah, my answer

5     was that I would think that the valuation of the

6     accounts is the fair compensation for what USI has

7     lost.  So, is that -- does that answer your question

8     then?

9          Q.   Have you ever evaluated damages in a

10    litigation case before?

11         A.   No, I haven't.  No.

12         Q.   Did you attempt to analyze what the value was

13    that USI lost in the real world in comparison to a

14    world in which Mr. Simmons and Mr. Mitchell, you know,

15    did -- did whatever they did, but did not breach their

16    contracts?

17         MR. CANNELLA:  Object to the form.

18         THE WITNESS:  I would say my valuation holds up to

19    the real world analogy, if you like, because in the

20    real world they lost -- they've lost these accounts.

21    And they, you know, they would have expected to retain

22    them in the future absent these events.

23    BY MR. BANKS:

24         Q.   Well, your fair market valuation is valuing

25    -- again, not only the loss of the accounts, but also

                              220

ROBIN FROST

1    the loss of Mr. Simmons and Mr. Mitchell, and everyone

2    else.  Correct?

3        MR. CANNELLA:  Object to form.

4        THE WITNESS:  Apologies.  It includes the cost of

5    them.  Yes.

6    BY MR. BANKS:

7        Q.  Well, it also includes the benefit of the

8    goodwill that they had with those clients.  Correct?

9        A.  Effectively, yes.

10       Q.  You didn't try to measure the difference

11   between a world in which Mr. Simmons and Mr. Mitchell

12   left but didn't breach their contracts versus one in

13   which they did, did you?

14       MR. CANNELLA:  Form.

15       THE WITNESS:  It was outside the scope of what I

16   was doing.  I'm doing a valuation of the accounts.  So

17   no, I did not do that.

18       MR. BANKS:  I have no other questions.

19       MR. CANNELLA:  I don't have any other questions.

20   The witness will read and sign.  And I can explain to

21   you off line what that means, Robin.

22       THE WITNESS:  Okay.

23       MR. BANKS:  Just for the record, I do have the

24   same reservation I expressed before, Mr. Cannella.  And

25   we can talk about that off line.  I just didn't want to

1    waive anything.

2         MR. CANNELLA:  Understood.

3         THE COURT REPORTER:  Can we get the orders on the

4    record, please?

5         MR. BANKS:  Yeah, we're ordering expedited basis.

6    The same as we've been doing.

7         MR. CANNELLA:  We'll do the same.

8         THE VIDEOGRAPHER:  Off the record.  4:56 p.m.

9         THE COURT REPORTER:  Chris, when do you need this

10   by?

11        MR. BANKS:  Whatever is reasonable.  Monday is

12   good.

13

14             (AND FURTHER THE DEPONENT SAITH NOT.)

15

16

17

18

19

20

21

22

23

24

25

222

1

2         C E R T I F I C A T E   O F   O A T H

3

4   STATE OF FLORIDA         )
                             )
5   COUNTY OF MARTIN         )

6

7

8       I, the undersigned authority, certify that ROBIN

9   FROST appeared via videoconference before me and was

10  duly sworn.

11

12

13      WITNESS my hand and official seal this 28th day of

14  October, 2023.

15

16

17

18                        Janet L. Hayden

19                        Court Reporter

20                        Notary Public - State of Florida

21                        My Commission No. HH040306

22                        Expires:  September 8, 2024

23

24

25

223

ROBIN FROST

1

2                    C E R T I F I C A T E

3

4    STATE OF FLORIDA        )

5    COUNTY OF MARTIN         )

6

7         I, Janet Hayden, certify that I was authorized

8    to and did stenographically report the deposition of

9    ROBIN FROST; that a review of the transcript was

10   requested; and that the transcript is a true and

11   complete record of my stenographic notes.

12

13        I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorneys or counsel connected with the action, nor am

17   I financially interested in the action.

18

19        DATED this 28th day of October, 2023.

20
                    _____
21                  JANET L. HAYDEN
                    Court Reporter
22                  Notary Public

23

24

25

                              224

ROBIN FROST

1

2      PLEASE ATTACH TO THE DEPOSITION OF ROBIN FROST,

3      TAKEN ON OCTOBER 25, 2023, IN THE CASE OF MATTHEW

4      SIMMONS, ET AL. V. USI INSURANCE SERVICES, LLC.

5

6

7      PAGE     LINE       CORRECTION AND REASON THEREFOR

8

9

10

11

12

13

14

15

16

17

18     I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY
       CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY
19     SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.

20

21     _____     _____

       ROBIN FROST                         DATE
22

23     _____     _____

24     WITNESS TO SIGNATURE                DATE

25

                              225

ROBIN FROST

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 228 of 253
PageID 10323

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

**$**

**$10,000 (5)**
33:5,7,9;50:6;
53:10
**$100 (6)**
202:4,5,6,7,23;
203:2
**$11 (1)**
47:19
**$15.8 (1)**
66:8
**$17.4 (1)**
66:5
**$18.9 (2)**
66:2,8
**$250,000 (3)**
41:6,11;126:4
**$396 (1)**
200:25
**$4 (1)**
41:19
**$4.4 (1)**
55:22
**$4.56 (7)**
46:5,11;54:7,12;
125:6;126:5;127:14
**$5 (2)**
55:22;57:8
**$500 (2)**
170:1,2
**$8 (1)**
57:18

**A**

**ability (12)**
11:9;25:18;37:24;
71:7;72:4,22;74:19;
89:21;94:15;95:23;
124:11;141:25
**able (10)**
12:12;13:17;
52:21;79:25;96:20;
97:7,20;158:11;
165:6;206:14
**above (1)**
176:16
**absence (2)**
98:6;105:16
**Absent (4)**
160:13;161:1;
163:11;220:22
**absolutely (5)**
17:14,17;90:19;
101:12;121:19
**ACA (1)**
213:8
**accent (1)**
213:13
**accept (3)**
114:3;166:20;

211:7
**access (1)**
182:4
**accomplished (1)**
118:12
**accordance (3)**
205:24,25;206:3
**according (1)**
165:21
**account (54)**
33:18;34:6;35:18;
36:11;39:11,12,12,
13;41:24;43:12;
45:12,17;46:10;
52:23;53:5,10,11,25;
55:10;68:1,11;
71:14;73:25;77:6;
78:14,14;89:2;
94:19;97:14;103:12,
16,16;104:10;
105:12,15;107:16;
108:24;116:15;
126:13;133:6;
135:19,19;136:8;
144:1,3;149:13;
168:2;169:1;185:20;
196:19;201:2;207:5,
6;212:15
**accountant (1)**
213:8
**Accountants (1)**
213:9
**account-by-account (4)**
77:1;78:25;95:18;
109:24
**accounting (2)**
41:14;63:14
**accounts (264)**
21:15,24;32:9,17,
22;33:3,6,7,9,19;
37:7,22,25;38:4,7;
44:25;46:25;50:1,3,
5;51:1;52:9,15;54:7;
56:5;59:12;60:10,16,
22;61:5,7,13;62:2,5,
8,11,12,19,20;66:14,
17,23,25;67:5,19,20,
23;70:20;71:20;
72:4,6,12,17,18,23;
73:8,12,15,16,21;
74:16,16,20,21;
75:12,18,23;76:8,11,
14,21;77:3,8;78:13,
21,25;79:4,5,6,10,
11;80:1,13,17;81:18;
82:6,11,16,23;83:4,
22;84:10;85:7,10;
86:7,12,16;87:3,8,
23;88:9,17,21;89:4,
6,9;91:17,24;92:24;
93:14,18,25;94:4,25;
95:2,8,10,15;99:13,
24;100:3,7,23;101:6,

25,25;102:5,7,16,18,
20,21;103:4,8,15,19;
104:2,5,8;105:7,10,
14;106:10,12;107:2,
5,8,11;108:1,9,22;
109:23;113:22;
115:7,11,14,15;
116:6,16,24;121:7,
11,18,23;122:3;
123:13,14;124:13,
19;125:20;126:22;
127:6;128:17;
129:18,23;130:6;
132:22,25,25;133:9,
16,17,20,23;135:3,9,
9,12;142:8,17,21,25;
143:13,19,23;144:4,
11,14,19,24;145:23;
149:10;151:2;
156:14,16;157:6,20;
159:14,18,19;160:7,
10,14;161:9,11,15,
16;163:2,5,10,12;
165:7;166:1,11;
167:22;168:25;
183:9;185:20;187:8;
191:18;192:1,1,4,9;
193:9,13,15,23,24;
194:2,3,6,7,13;
196:17,17;197:24;
198:4,7;199:12,13,
22;201:7;204:24;
205:6;208:24;209:6,
24;210:25;211:7;
220:6,20,25;221:16
**accuracy (1)**
114:3
**accurate (9)**
9:15;10:4;13:9,17;
58:5;97:2;183:13;
198:3,7
**accurately (1)**
184:3
**achievable (1)**
183:8
**achieve (2)**
15:15;151:13
**achieved (1)**
151:18
**acknowledges (2)**
133:15;135:7
**acquire (1)**
215:20
**acquired (2)**
23:11;155:6
**acquirer (11)**
22:5;25:23;31:21;
33:23;42:24;61:9;
86:6;153:22;157:6;
179:7;186:19
**acquirers (1)**
198:13
**acquiring (5)**

14:18;116:1;
140:19;155:11;
186:25
**acquisition (8)**
23:8;40:21;
138:19;139:13;
151:19;179:4;214:6;
215:10
**acquisitions (3)**
148:15;198:11;
216:6
**Acrisure (3)**
17:2,7,9
**across (3)**
146:13;188:8;
214:24
**acting (1)**
175:13
**action (1)**
191:19
**actions (22)**
66:15;67:12;75:9,
21;76:12,18,18,22;
77:2;80:8;86:17;
87:3,5;88:11;
100:22;107:10,13;
108:6,11;197:5,6;
204:21
**active (1)**
198:11
**actively (2)**
166:11;180:22
**actual (9)**
22:2,5;23:25;24:2;
176:1;180:20;
182:24;183:11;
184:4
**actually (44)**
25:21;36:11;
47:24;48:7;49:7;
63:13;72:17;83:1;
87:17;96:25;97:2,
19;106:13,17;107:4;
110:5;118:2;128:12;
138:9;139:22;147:9,
10,12;150:2;164:18;
167:24;168:20;
175:1;176:20;
181:22;182:22;
184:11;185:8;
187:13,23;188:17,
20;189:7,8;190:10,
11;199:5;213:17;
214:17
**add (4)**
123:22;148:8;
152:18;155:22
**added (3)**
57:1,2,7
**adding (2)**
124:4;128:20
**addition (6)**
35:2;59:16;82:22;

177:18;204:10;
214:18
**additional (4)**
40:16;172:15,18,
20
**additive (2)**
30:22,25
**addressing (1)**
150:15
**adequately (2)**
37:25;102:20
**adjudicate (1)**
14:2
**adjust (1)**
156:14
**adjustment (1)**
154:3
**administered (1)**
5:6
**administration (1)**
135:24
**administrative (1)**
154:24
**advance (4)**
69:8;73:3,17,25
**advise (1)**
172:12
**Advisors (2)**
117:6;118:3
**affect (5)**
13:19;93:8;
119:22;125:9;
155:15
**affected (1)**
41:7
**affects (1)**
94:15
**affiliated (1)**
210:5
**afforded (4)**
85:13,17;92:21;
165:23
**afterwards (4)**
93:21,23;194:18,
22
**Again (54)**
17:16;24:14;27:8;
29:8;38:14;40:7,24;
42:12;44:24;47:20;
57:14;58:9;60:20;
61:2;65:23;79:12,
24;81:6;82:3,18;
84:16;85:4;86:22,
25;97:10,21;105:6,6,
9,15;106:6;109:15;
119:19;125:4;
126:21;137:5;
142:15,19;143:14,
15;146:12;148:9;
153:10;154:13;
155:17;168:16;
183:19;185:14;
189:7,12,25;190:9;

Case 8:23-cv-00201-TPB-AAS Document 128-4 Filed 11/30/23 Page 229 of 253
PageID 10324

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

194:21;220:25

**against (6)**
113:9;120:6;
203:23;207:20;
215:10;216:22
**agencies (6)**
89:17;118:17;
152:20;161:4,20;
163:15
**agency (38)**
14:18;17:2,6,22;
18:1,1,19;21:14,15,
18,20;22:3,6;23:2,
23;24:15;70:9;
115:6;120:1,4,6,16;
146:16;150:23;
157:4;163:18;
175:18,21,23;
176:19;179:18,20;
183:25;185:6,22,23;
192:18;218:13
**agent (3)**
135:21;136:5;
215:10
**Agents (1)**
214:22
**ago (12)**
36:25;45:24;
143:4;146:12;
148:10;176:17,18;
185:13;189:8,13,14,
18
**agree (22)**
30:22,25;31:4,15;
35:18;37:9,12;
39:17;41:3;43:10;
52:20;84:25;88:2;
102:17;107:1;
113:20;118:5;
140:11;145:21;
146:19;151:11;
153:6
**agreed (5)**
47:24;48:2,4;
125:8;133:15
**agreement (13)**
25:25;68:18;
71:11,19;130:2;
134:6,18;135:1;
143:7;157:7;165:22;
166:12;187:6
**agreements (22)**
26:15;33:2;68:15,
19,24;69:1,12;75:12;
116:1;118:18,19,25;
119:1,5,7,8;130:2;
133:24;143:8;168:4;
187:8;191:17
**agrees (1)**
135:7
**ahead (12)**
26:7;53:23;65:13;
86:24;112:8;129:7;

157:10;172:8;
178:14;195:5;
196:13,14
**AICPA (1)**
206:2
**AJI (9)**
103:13,18;104:1,1,
5,11,17,21;107:21
**al (1)**
4:3
**Alera (2)**
176:9;179:17
**alleged (14)**
42:1;43:10;44:12,
22;59:9,22;60:6,17;
66:10;100:1;123:8,9,
10,21
**allow (4)**
8:15;10:22;94:3;
95:11
**allowance (1)**
87:21
**allowed (1)**
68:3
**allows (1)**
55:10
**almost (6)**
24:11;83:9,9;90:2;
107:12;205:2
**along (2)**
147:15;165:4
**Although (7)**
70:4;79:25;90:11;
119:16;147:10;
152:17;181:20
**always (2)**
90:21;193:1
**among (1)**
91:23
**amount (27)**
39:24;40:5;51:21;
52:13;53:18;54:3,3,
6;55:20;64:23;
99:14;139:11,22;
140:1,5;141:1,5,13;
150:6;152:19;154:8;
161:1;183:21,22;
200:24;201:1,1
**amounts (4)**
32:13;140:23,24;
154:9
**analogy (2)**
202:23;220:19
**analyses (3)**
49:16;64:4;219:24
**analysis (55)**
16:23;18:15;19:1;
27:15;42:10;44:12;
60:14;65:25;73:18;
74:15;76:2;77:1,9,
19;78:20;86:21;
87:1,7;88:20;89:3;
91:5,10;93:12;94:5,

10,12;95:6;100:15;
103:16,18;109:24;
115:11;123:2;
132:20;137:11;
143:9;150:17;
151:23;159:11;
164:13;168:6,16,18;
176:1,2;179:23;
180:2,16,21;181:15;
182:23;193:20;
201:21;203:4,6
**analyze (9)**
38:9;97:6;137:16,
19;159:12;162:19;
167:18;183:3;
220:12
**analyzed (1)**
78:24
**analyzing (1)**
14:25
**ancillary (1)**
107:12
**and/or (7)**
62:13;73:16;76:9;
107:22;109:5;
133:17;135:10
**anecdotal (1)**
96:6
**annotated (1)**
7:3
**annual (2)**
41:20;163:8
**answered (4)**
44:15;88:24;
162:12;194:10
**Ant (1)**
218:18
**anticipate (10)**
9:24;32:21;53:21;
125:12;171:13,20;
172:13,16,20,23
**anticipated (4)**
151:12,19;156:15;
197:16
**anymore (1)**
85:11
**Apologies (16)**
26:23;55:3;60:2;
69:11;73:5;104:2;
105:1;111:21;
136:24;143:12;
147:18;149:8;206:9;
209:23;220:3;221:4
**apologize (1)**
33:25
**appear (2)**
104:7;211:11
**appearances (1)**
4:10
**appeared (1)**
73:13
**applied (5)**
29:23;33:8;57:1,3;

215:9
**apply (2)**
63:21;150:24
**applying (3)**
30:11;151:24;
207:19
**appreciate (1)**
173:12
**approached (1)**
108:22
**appropriate (13)**
6:3;8:11;29:24;
30:11,23;31:16;
63:22;66:19;67:13;
87:25;118:20;119:1;
203:24
**approximately (15)**
18:14;40:9,15;
46:4;47:14,14;
57:18;66:2,6;80:23;
82:14,21;117:7;
118:6;199:8
**approximation (4)**
121:8;122:4,6,7
**April (1)**
82:21
**arbitration (1)**
14:5
**arbitrations (1)**
14:1
**area (3)**
34:17;35:15;37:12
**argues (1)**
150:20
**arguments (1)**
125:1
**arises (1)**
172:11
**Arizona (1)**
176:19
**Armstrong (1)**
176:22
**around (6)**
105:20;106:20;
112:19;138:3;149:5;
189:19
**arrive (2)**
152:6,7
**ascribed (1)**
22:14
**ascribing (1)**
66:16
**aside (3)**
42:17;97:22;
171:22
**assert (1)**
117:9
**assertions (2)**
113:8,18
**assess (5)**
20:5;39:2;98:1;
103:2;183:12
**assessed (1)**

76:21
**assessing (2)**
107:4;138:14
**assessment (1)**
121:6
**asset (9)**
17:11,13;21:13;
22:2,4;145:3;157:3;
161:5;213:22
**assets (17)**
17:15,18;22:1,10,
15,17,19,21;24:3;
144:10,23;145:1,21;
187:3,5,11;198:2
**assignment (1)**
176:6
**assist (1)**
14:18
**assisted (2)**
15:16;177:15
**assisting (4)**
15:9;35:4,12;
170:4
**associated (23)**
39:19;40:15;41:5;
44:18;45:2;46:22;
55:19;56:4,14;58:11,
24;59:11;61:19;
64:12,16;69:17,18;
70:24;78:1;115:12;
127:5,13;186:9
**Associates (1)**
181:4
**association (2)**
135:22;214:21
**assume (13)**
11:25;37:24;51:5;
84:2,3,8;111:23;
113:24;116:10,19;
128:23;166:24;
207:3
**assumed (9)**
51:13;56:17;
67:21;69:24;76:7;
89:2;146:3;193:13;
203:1
**assumes (11)**
52:8;67:9;91:5,6;
116:4;142:20;
143:12,15;168:24;
194:13,15
**assuming (9)**
37:14;50:21;
76:14;84:13;88:21;
115:15;151:8;164:9;
194:12
**assumption (17)**
37:18;38:2;76:10,
13;84:5;86:1,11;
87:19;89:1,4;91:20;
94:2,3;95:17;143:2;
146:5;166:23
**assumptions (1)**

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 230 of 253
PageID 10325

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

87:18
**attached (1)**
36:9
**attempt (2)**
93:17;220:12
**attended (2)**
171:10;203:13
**attending (1)**
172:6
**attention (1)**
49:18
**attentive (2)**
36:6,17
**attorney (2)**
12:4;110:21
**attorneys (1)**
208:3
**attorney's (2)**
110:14;111:17
**attract (1)**
27:12
**attractive (4)**
120:21;198:13,15,
18
**attributable (1)**
168:8
**attributed (2)**
125:4,5
**attrition (20)**
50:21;86:3;87:18;
89:3;91:11;94:1,3;
95:17;100:11,12,19;
161:2,11,18;162:2,4,
5;163:8;168:24;
199:9
**at-will (1)**
68:12
**audit (4)**
205:14,18,19,21
**audited (1)**
114:4
**August (8)**
48:19,20;111:5;
170:11,12,13,14,22
**authority (2)**
215:4,6
**auto (1)**
24:13
**availability (1)**
158:9
**average (18)**
57:17,22,25;58:7,
16;65:19;91:13;
127:21;139:6,8,11,
12;183:3;184:18;
209:24;217:2;219:2,
3
**averages (6)**
32:22;59:6;
139:10;160:25;
194:21,21
**averaging (2)**
184:23;218:19

**Avesta (1)**
200:12
**award (1)**
31:2
**aware (39)**
20:18,19;23:15;
24:18;27:3;35:23;
70:11,15;73:15,20,
21;80:4,11,19,22;
81:15;82:4,13,20;
83:1,4;96:2;130:19;
131:15;132:15,17;
155:5;156:1;162:8;
178:2;191:18;
207:14,17;208:22,
25;209:3,8;210:7,11
**away (9)**
22:4;82:10,11;
104:13;105:25;
106:19,24;171:18;
190:10
**awful (1)**
189:10
**awhile (1)**
176:17

## B

**BAAI (2)**
179:1,5
**back (36)**
27:2,8;39:10;
41:13,14;65:22;
74:18;79:12,19;83:8,
16;86:13;87:2;91:2;
93:2,6;94:17;
106:15;125:2;
126:11;129:12;
136:19;137:3;148:9;
150:3;152:2;181:3;
185:5;190:8;200:13,
15;201:6,20;214:1,2;
217:6
**bad (1)**
129:6
**BAKS (1)**
120:23
**balance (1)**
48:6
**balk (1)**
189:4
**b-a-l-k (1)**
189:5
**bank (2)**
183:23;203:1
**BANKS (195)**
4:11,12,20;5:13;
19:15;20:14;26:12;
27:1,14;28:1;29:1;
31:24;35:9;37:23;
39:6;40:4;41:1;43:8;
44:20;45:3;46:23;
47:24;48:5,8,17;

49:1;53:4;54:11,21;
55:6;58:8,22;59:7,
20;60:3,12,23;61:20;
62:6;65:21;67:14;
69:14;72:2;73:1,10;
74:3,6;75:1,5;77:4;
78:8;79:14;81:2,7,
10,12,14;82:1,2,12;
83:3;85:8,23;86:9,
20;87:6,15;89:10,19,
24;90:9;91:1;93:19;
95:21;96:15;97:3;
98:8;100:9,16;
101:16;103:22;
105:3;106:3;107:17;
108:2,18;109:14;
110:12,18,21,25;
111:9,17,21,25;
112:5,6,18;114:17;
120:9;121:21;
122:18,24;123:18;
125:14;126:2;127:3,
10,25;128:24;129:8;
130:8,18;132:4,14;
134:9,15,25;137:2;
140:21;145:7,18;
147:19;148:20;
149:2,12;150:4;
151:9;155:4;156:11,
20;162:17;163:6;
164:15;165:2;
166:22;167:16;
168:15;169:2,9;
172:4,14;173:12,14,
16,18;174:6,10,13;
178:24;181:13;
190:4,16;192:21;
193:2,18;194:14;
195:2,5;196:11,14;
197:20;199:24;
201:9,16;203:18;
204:14;206:8,18;
207:8,23;208:5,12,
18;209:7,22;210:19;
211:2,9,22;212:6,16,
21;216:11,20;
217:10,17;218:5,8;
220:23;221:6,18,23;
222:5,11
**Banks' (2)**
207:18;213:5
**Barnes (2)**
176:9,15
**base (2)**
13:3;57:20
**based (28)**
12:21;14:20;28:9;
32:4,22;38:4;41:8,
25;44:6;51:24;52:4;
53:9,18;78:21;
115:5;130:22;132:5;
139:11;151:24;
153:8;160:23;

172:17;184:8;192:8;
197:9,15;214:7,8
**Basically (5)**
15:9;57:24;
174:22;183:15;
187:24
**basis (21)**
44:8;51:17,18;
52:10;56:24;63:10;
77:18;78:25;89:5;
92:4;95:18;108:19;
109:8;129:21;
156:25;160:18;
161:13;165:13;
197:12;215:6;222:5
**Bates (1)**
7:21
**Beal (10)**
16:25;17:1,1,6,25;
18:1,8;176:14,15,16
**Bear (3)**
112:11,12;169:14
**become (4)**
9:25;25:22;
146:20;214:23
**began (4)**
32:1,16;56:2;64:4
**beginning (3)**
13:8;50:11;90:12
**begins (6)**
4:2;94:13;117:2;
137:6;142:12;
159:24
**behalf (4)**
4:12,15,19;175:14
**behavior (1)**
112:4
**behind (1)**
144:16
**Ben (1)**
162:14
**benchmark (1)**
25:14
**bend (1)**
164:20
**benefit (4)**
149:22;213:21,21;
221:7
**benefits (10)**
21:21,24;24:10,
10;148:15,23;
149:11,23;150:9;
153:18
**Benjamin (1)**
95:22
**besides (2)**
145:21;163:8
**best (12)**
9:22;11:9;112:4;
185:4;214:9,13,20,
25;215:8,25;216:1;
217:1
**better (4)**

172:17;184:8;192:8;
42:14;217:2,8,14
**beyond (7)**
39:8;54:13;73:19;
77:7;127:17;199:23;
201:7
**bit (5)**
120:5;171:17,19;
202:10;213:4
**blue (1)**
170:18
**blueprint (1)**
153:6
**bonuses (2)**
45:19;141:9
**book (29)**
14:18;18:16;19:1,
6,12;21:9,17;25:17;
35:25;39:15;40:8;
70:9;78:17;94:7,16;
97:8;109:24;115:6;
120:16;121:24;
144:24;146:10;
147:3;150:22;151:1;
154:16;157:2;159:1;
183:8
**books (14)**
62:13,23;73:22;
74:8;99:6,14;101:6,
19;102:1;118:17;
147:16;161:4;186:2,
5
**BOR (1)**
131:19
**both (17)**
5:24;21:20;31:2;
34:20;35:18;59:5;
67:18,25;76:7;111:7,
7;113:22;116:16;
130:3;139:11;
209:12;218:14
**bottom (3)**
49:9;113:4;143:14
**bought (3)**
16:9;186:25;216:9
**bound (3)**
132:6,18;133:2
**Bowler (13)**
26:17;40:14;
126:3;138:20,21;
148:14;153:11;
157:18;171:10;
203:16,19;215:19;
216:24
**Bowler's (10)**
26:4,8;41:8;
139:16;145:13;
147:6;149:13;
151:10;159:16;
203:13
**breach (10)**
68:17;71:19;
75:23;76:15;143:6;
168:5;211:3,11;

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 231 of 253
PageID 10326

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

220:15;221:12
**breached (2)**
168:4;191:16
**breaches (4)**
76:8;78:2;108:5;
167:24
**break (15)**
48:9,11,13;63:8;
89:25;90:1,4,18;
134:8,11;164:18,23;
217:15,19,22
**breakdown (4)**
140:7,10,23;170:8
**breaks (1)**
90:22
**bring (1)**
31:22
**broadly (1)**
215:18
**broke (1)**
188:24
**broker (7)**
95:23;104:12;
105:19;106:19;
133:1;135:21;
136:13
**brokerage (21)**
16:1,4;24:5;26:6;
35:20;71:5;115:4;
143:20,24;144:10,
24;145:19,20;
163:15,21,22,23;
164:2;174:16;185:7;
198:10
**brokerages (4)**
23:17;119:12;
120:10;214:22
**brokers (1)**
133:1
**brought (2)**
45:12,25
**build (1)**
165:23
**built (3)**
22:14;38:2;94:3
**bullet (2)**
117:5;121:4
**bus (1)**
82:16
**business (197)**
14:19;15:17;16:9;
17:8,9,10;18:16,17,
21;19:1,2,6,12;21:8,
9,17,21,25;22:11;
24:11,13;25:1,7,17,
19,22;26:6,20;27:12;
29:24;30:12;31:23;
35:21;36:1;38:10;
39:15,19;40:9;43:1,
3,14,19,19,25;45:1,
10,20,25;46:13;51:6,
14,17;52:22;54:4,12;
55:16,19;56:9,15,18,

23;58:12,25;59:15;
61:5,11;62:1,13,23;
63:20;64:17;67:1,7,
18;70:9;71:4,5,6,8,
14,14,23;72:16;
73:23;74:8;78:5,17;
84:25;85:11;86:6,7;
87:19,20;89:2,12,21;
91:23;92:6;94:2,8,
16,16,23;95:16,24;
97:7,8,17;98:1;99:7,
14;101:6,19;102:1,
18;104:12,18;
105:25;106:19,24;
107:5;110:23;115:6;
118:18;119:11,23,
25;120:1,7,17,21,22;
121:24;122:11;
126:18;136:2;
140:19;144:24;
146:3,10;147:4,11,
12;148:22;149:3;
150:22;151:1,3,13;
152:9,22;153:1,8,9;
154:5,16;155:21;
157:2,2;159:1;
161:4;162:9,20,21;
166:21;176:9;183:9;
185:20;186:7,9;
187:6,17;188:12;
189:5,23;191:24;
192:3,9,11,17,23;
193:1,4,8,20,25;
197:16,17;198:13,
15,16,16;207:10;
209:25;211:7;214:6,
19
**businesses (2)**
148:3;215:20
**busy (1)**
138:12
**buy (1)**
149:3
**buyer (18)**
14:17;20:11,16;
25:7;67:17;70:18;
71:3;152:24;178:16;
181:24;182:10;
183:18;186:21;
187:25;189:2,3,4;
207:20
**buyers (2)**
182:10;190:13
**buying (1)**
61:5
**buys (2)**
26:6;86:6

**C**

**calculated (2)**
197:25;219:4
**calculation (7)**

55:8,8;87:22;
107:15;116:8;126:8;
204:2
**calculations (8)**
31:10;76:5;77:12,
25;116:10,19;168:7,
7
**California (9)**
119:13,18;120:6,8,
15,17,19,21,25
**call (1)**
74:9
**called (1)**
14:9
**came (12)**
50:19;51:24;
64:22;65:5;88:15;
114:22;121:12,22;
122:9,10;176:17;
205:7
**can (70)**
6:20;8:11,17;
10:12,12;11:15,21;
12:20;15:20;16:23;
24:7;39:7;41:3;
42:12;43:6;47:20,
25;49:13;61:8,10;
63:8;66:25;71:17;
79:25;84:4;85:21;
88:19;90:21;96:23;
101:21;105:6;
110:18,20;111:2,2,8,
22;112:1;113:2,9,19;
118:12;121:9;122:7;
128:22;130:9;141:3;
143:6,21;154:17;
174:6;175:16;182:7;
183:10,12;190:5,18;
194:22,25;196:13,
24;198:9;200:12,15;
201:25;208:15;
217:1;221:20,25;
222:3
**Cannella (185)**
4:17,17;10:21;
11:20;19:3;20:12;
24:22;26:7,21;27:7,
23;28:12;31:18;
30:5;37:17;39:5,21;
40:17;41:3;43:5;
44:14,23;46:14;48:1,
6,10;52:24;54:10,15;
55:2;58:3,19;59:2,
13,24;60:7,19;61:15;
62:3;65:12;67:8;
69:10;71:15;72:20;
74:1,5,24;75:4;
76:24;78:3;79:8;
81:4,9,19,24;82:7,
24;85:2,20;86:14,23;
87:11;88:23;89:14;
90:1,23;93:16;
95:12;96:1,21;98:4;

55:8,8;87:22;
100:5,13;101:13,15;
103:20;104:25;
106:2;107:6,24;
108:8;109:11;
110:17,20,24;
111:14,19,22;112:3,
16;114:13;119:24;
120:13;121:14;
122:15,21;123:12;
125:11,18;126:20;
127:7,24;128:15;
129:3,7,24;130:16;
131:25;132:8;134:7;
136:23;140:15;
145:5,10;147:13;
148:17,24;149:7,18;
151:6;154:11;156:6,
17;162:11;163:3;
164:12;166:17;
167:6;168:10,21;
172:1;173:10,13,15;
174:5;178:21;181:8;
189:24;190:7;
192:14,24;193:11;
194:9,25;195:3,6,8;
196:12,20;198:5,19;
200:4;201:12,19;
202:15;203:25;
204:22;206:12;
207:13,24;208:9,14,
21;209:10;210:3,22;
211:5,12;212:2,8,19;
213:2;216:17;217:4,
15,18;218:2;220:1,
17;221:3,14,19,24;
222:2,7
**capability (1)**
102:19
**capacity (2)**
31:22;163:21
**Capital (10)**
14:9;16:5;17:4;
117:6,15,25;118:3;
169:11;203:6,21
**capitalized (2)**
133:20;134:2
**capture (1)**
42:6
**captured (4)**
43:15;47:1,3;
54:16
**car (2)**
152:21;153:2
**Cardew (3)**
99:2,15;101:5
**careful (1)**
9:16
**Carolina (1)**
5:17
**carried (1)**
184:20
**carrier (6)**
135:23,25;156:24;

157:1,4;163:23
**Carter (2)**
82:17;128:2
**case (80)**
20:23;25:3;27:15;
28:3,8,13,15;29:4,
10,15,22;31:17;
35:23;38:18,21;
42:1;43:11,11;46:3;
54:5;59:8,23;60:6,
17;65:22;66:10,13;
68:4,10;70:11;
71:12;75:2;80:6,12;
82:5,13,21;83:5,7;
90:15;96:5,8,12,18,
23;101:4;107:3;
108:15;115:10;
117:7;125:13;131:5;
134:17;136:17,19;
140:13;144:18;
149:21;152:25;
155:23;156:1,12;
171:25;176:7;
181:16;182:25;
185:21,22,25;
187:25;189:1,3,4;
190:20;191:23;
193:7;206:4;207:14;
219:25;220:10
**cases (21)**
7:25;18:19;20:8,
18,21;24:19;25:5;
51:16;83:11;118:15;
147:25;152:3;
175:10;182:6,14;
184:12,13;186:24;
191:18;204:18,19
**cash (6)**
57:5;132:11;
197:25;198:18;
202:3,9
**cashflow (2)**
46:18;198:16
**casualty (2)**
150:6,10
**catch (2)**
143:21;171:17
**categories (1)**
140:8
**category (1)**
61:22
**cause (2)**
75:20;107:21
**caused (6)**
59:22;76:16;87:3;
100:22,23;167:24
**causes (1)**
168:1
**Cay (1)**
5:17
**ceased (2)**
82:6;104:17
**cell (1)**

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 232 of 253
PageID 10327

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

8:17
**certain (11)**
6:13;17:14,17,17;
34:18;59:11;64:11;
100:3;121:20;
157:22;158:4
**certifications (1)**
213:7
**cetera (2)**
90:18;142:13
**CFO (2)**
98:15;138:21
**chairs (2)**
22:22;146:7
**chance (3)**
85:17;92:17;167:8
**change (13)**
11:3,7;16:18;
41:17,19,24;45:13;
127:1;154:10,12;
196:25;218:10,25
**changed (6)**
69:19;70:12;
102:12;127:1;133:1;
219:5
**changes (3)**
53:21;102:11;
154:22
**changing (1)**
104:12
**characterization (1)**
218:12
**characterize (1)**
31:20
**charge (1)**
158:5
**charged (2)**
32:21;46:25
**Charlotte (1)**
213:23
**chart (2)**
65:22;216:18
**chartered (2)**
213:8,9
**charts (2)**
49:10;114:2
**chat (7)**
110:25;111:7;
112:2;134:19;
169:10;173:21,24
**check (20)**
17:13,16;18:13;
27:8;40:24;47:15,
20;58:5;83:8;
103:21;105:7;
106:15;110:12;
121:15,19;148:9;
181:3;190:2,19,21
**checked (2)**
175:1
**childhood (2)**
136:20;166:24
**choose (1)**

21:22
**chose (1)**
77:6
**Chris (15)**
43:7;59:25;81:6,
22;82:22;106:5,7,13,
18,23;107:23;
123:10;128:3;
193:22;222:9
**Christopher (1)**
4:11
**circumstance (1)**
41:11
**circumstances (1)**
108:10
**cite (1)**
147:3
**cited (2)**
133:13;185:3
**cites (3)**
117:5;185:5,6
**citing (1)**
135:2
**claims (2)**
35:4;135:24
**clarified (1)**
67:3
**clarify (8)**
11:15;12:13;
32:16;36:13;63:12;
74:3;118:24;127:11
**classed (1)**
34:10
**clean (11)**
7:1,2,7,8;34:3;
74:4,4;152:8,8;
153:4;177:11
**clear (18)**
9:1;10:25;12:9;
13:25;16:15;19:16;
26:13;42:15,17;
44:11;56:1;62:7;
67:15,24;129:17,22;
171:21;203:8
**clearly (1)**
166:11
**client (60)**
15:9;27:4,17;28:4,
10;29:4,6,7;32:17;
33:6,7;50:5;51:17;
57:13;70:20;77:12,
13,15;78:7;83:12;
100:12,18;105:4;
106:4;109:20;
113:22;118:10;
130:5;133:16,16,20,
23;135:8,9,12,19,20;
136:8,18;142:20;
143:23;144:2;
145:23;147:22,25;
150:12;151:2;164:1;
166:24;167:3;
187:18;192:10;

199:10;201:6;205:6;
209:6;212:4,13,14;
217:7
**client-by-client (1)**
77:18
**clients (80)**
23:24;24:21,25;
27:4;32:2;35:4,12;
37:5,11;38:10;
70:11;72:9;73:2;
74:7,9,12,13;77:18,
21,22;78:2;83:22;
84:9,15,16,23;85:16,
18;94:6;99:6,18,19;
101:18;102:24;
103:3,4,10;108:20;
109:5,9,16;110:2;
117:7,11;118:8,21;
123:9,20,25;124:1,1,
8;130:10;131:19;
136:9,13;142:5;
155:12;156:4;160:5,
9,19,20,21;164:8;
165:5,15;166:1,14;
167:13;168:19;
200:12;204:12,13,
18;208:24;211:15,
20;212:24;221:8
**clients' (3)**
84:25;135:3;201:8
**client's (2)**
50:3;212:15
**close (8)**
63:15;138:8,11;
187:22,23;188:1,3,
13
**closed (3)**
17:25;138:10;
151:19
**closer (3)**
140:16;141:4,13
**closing (5)**
25:24;115:24;
138:12;139:25;
216:10
**clouded (1)**
71:21
**Coast (1)**
90:2
**colleague (3)**
117:5,14;177:7
**collected (1)**
200:17
**collecting (1)**
14:25
**column (3)**
139:15,21;175:5
**combined (1)**
194:7
**comfortable (2)**
117:8;118:7
**coming (6)**
19:7;78:17;86:13;

102:11;201:1;214:1
**commission (2)**
53:9;58:14
**comment (1)**
103:6
**commentary (1)**
117:9
**commercial (5)**
33:3,4;144:3;
150:8,9
**commission (38)**
31:11,16,25;32:12,
21,25;33:5,8,14,21;
34:5,9;41:23;42:8;
43:16,17,22;44:21;
47:4,9,17;49:20;
50:2,20;52:1,17,18;
53:3,7,14;54:18,23;
55:4;56:3,8;58:13;
59:1;61:3
**commissions (10)**
32:8,10;41:25;
42:4;43:22;44:6;
45:10;52:14;54:14;
131:10
**commoditized (1)**
24:12
**common (1)**
198:23
**communicate (1)**
8:15
**communications (1)**
6:17
**Companies (8)**
4:13,23;62:14;
83:6;107:20;130:21;
133:18;135:10
**company (17)**
14:9;15:13;130:6,
9;133:17;135:4,6,10,
25;136:2,4,5;149:16;
155:11;157:5;
213:23;216:8
**company's (1)**
136:2
**compare (2)**
73:11;102:14
**compared (5)**
120:25;137:11;
138:23;150:22;
189:20
**comparing (1)**
95:3
**comparison (1)**
220:13
**compensation (4)**
58:2;127:18;
154:2;220:6
**compete (29)**
25:7,18;71:7,13,
16,23;72:4,11,13,15,
17,22;74:19;80:1,2;
84:16,24;85:10,17;

102:11;201:1;214:1

89:21;95:4;96:20,
23;97:21;124:12;
141:25;142:7;160:7;
165:7
**competing (1)**
94:13
**competition (1)**
25:6
**competitor (2)**
167:1;214:17
**compiled (1)**
114:5
**complains (1)**
156:9
**complete (9)**
9:15;10:12;11:24;
13:9,17;79:25;
91:16;111:1,3
**completed (1)**
131:22
**completely (1)**
8:22
**completeness (1)**
114:4
**completion (1)**
169:22
**component (1)**
115:24
**comprised (6)**
62:1;67:18;
191:24;192:9;193:8,
21
**computer (1)**
5:19
**computers (3)**
22:12,22;146:8
**concept (2)**
42:22;159:3
**concerns (1)**
167:3
**conclusion (4)**
29:25;30:2;
201:18;215:9
**conclusions (1)**
201:14
**condition (2)**
25:23,24
**conduct (13)**
39:1;59:10,23;
60:6,17;66:10;
77:22;79:5;88:7;
100:2;205:14,18,19
**conducted (2)**
205:23,25
**confer (1)**
194:18
**confidential (3)**
182:12;183:15,18
**confidentiality (1)**
110:13
**confirm (6)**
11:23;103:25;
110:16;112:9;

174:15,25
**confused (1)**
132:21
**connection (1)**
136:2
**consequence (2)**
107:9;204:20
**conservative (2)**
137:11;138:23
**consider (13)**
27:16;38:20;
95:22;100:10,17;
151:16;168:12,19,
25;195:24;203:21;
214:25;216:21
**considered (12)**
36:7;50:24;52:13,
18;69:21;115:23;
118:22;120:20;
146:8;156:13;
214:10;215:6
**considering (9)**
40:5;43:21;53:2;
63:19;67:2;108:9;
119:10;195:17;
196:1
**consistent (6)**
84:13,17;198:18;
199:1,2,6
**constitutes (3)**
219:10,13,17
**Consultancy (1)**
214:16
**Consulting (3)**
4:24;5:1;113:16
**contact (2)**
84:18,19
**contacting (1)**
212:12
**contain (3)**
118:20;119:1,9
**contains (1)**
25:25
**contemplates (1)**
142:16
**context (1)**
179:12
**contingent (1)**
115:25
**continue (3)**
102:23;201:15;
206:20
**continued (3)**
39:19;46:11;116:4
**contract (8)**
75:24;76:8;108:5;
133:14;136:12;
157:4;164:10;
219:20
**contracts (8)**
23:23;68:7;69:8;
91:17;156:25;157:1;
220:16;221:12

**contractual (1)**
145:23
**contrary (1)**
131:1
**contribute (1)**
70:1
**contribution (12)**
43:1,18,20;44:1,7,
25;45:4,15;53:1;
54:19;57:20;61:17
**control (6)**
35:13;105:4,18,
24;107:22;153:7
**conversation (1)**
120:18
**conversational (1)**
9:25
**copies (2)**
7:2,2
**copy (12)**
7:5,7,8,10,15,22;
48:19;49:2,3;105:9;
111:11;134:17
**corner (1)**
113:5
**corporate (3)**
138:21;150:12,12
**corrected (1)**
177:10
**correctly (4)**
101:23;122:5;
132:2;155:24
**correlated (6)**
43:24;53:2,6,14,
16;54:20
**correlates (1)**
55:4
**cost (16)**
33:12,18;41:22;
43:20;45:2,9,22,23;
46:9;54:25;140:18;
153:14;194:3;203:6,
21;221:4
**costs (35)**
39:17;41:7;43:3,
13;45:18;46:24;
54:19;55:9,10,12,15,
18;56:13;58:1,11,17,
24;64:16;70:23;
127:5,9,13,17,20;
139:18;146:19,20,
22;152:20;153:8;
157:19;158:13,21,
24;159:17
**counsel (6)**
4:9,21;111:16,20,
23;200:8
**counsel's (1)**
110:15
**count (7)**
90:21;125:10,16;
126:18,24;128:5,13
**counter-defendants (1)**

4:16
**couple (10)**
9:16;24:17;27:2,
21;118:16;166:21;
192:9;199:8;205:11;
218:5
**course (6)**
8:25;9:9;68:8;
143:6;193:1;195:2
**court (14)**
4:8;5:2,4;11:16;
13:13;14:5;50:14;
111:1;156:18;174:9;
198:8;202:14;222:3,
9
**courtesy (1)**
10:19
**Court's (1)**
83:6
**covenant (3)**
97:9;98:3;119:22
**covenants (21)**
68:18,23;69:17;
75:11;76:15;94:9,
14;95:10;118:20;
119:2,4,9,18;120:4,
20;143:7;210:17,21,
24;211:4,11
**covenant's (1)**
95:25
**cover (1)**
34:25
**covered (1)**
194:16
**created (2)**
61:25;180:3
**creating (1)**
57:17
**critical (1)**
99:12
**criticisms (1)**
123:1
**criticizes (2)**
157:12,15
**cross (1)**
156:22
**cross-complaint (1)**
101:4
**Crowell (2)**
4:6,12
**current (6)**
88:18;138:23,24;
185:16;198:1;202:2
**currently (1)**
186:23
**customer (3)**
195:21,24;196:3
**customers (7)**
38:17,20,23,25;
39:2;41:6;218:20
**cut (3)**
143:12;154:17;
206:9

**cyber (1)**
34:21

---

### D

**Dagley (1)**
179:10
**Dale (1)**
4:23
**damage (5)**
85:6;123:16;
124:4;126:1;128:20
**damages (21)**
30:24;31:17;59:9,
22;60:5,16;61:21,23;
75:2;76:3;107:12;
108:4;123:7;124:7;
163:1;168:6;196:6,
8;219:24;220:3,9
**data (34)**
14:23,25,25;
29:22;63:13,18;
64:9;98:6;99:21;
101:4;102:10;104:4;
105:12,16;106:16;
114:6,15,18;138:1,5;
141:2;162:19;171:1;
182:23;194:24;
200:17,17;203:7;
206:15;208:15,19,
25;209:3,9
**date (18)**
63:12,16;80:25;
81:2,7;92:10;93:3;
94:18;130:14;
136:19;137:23;
138:13;172:17;
197:1,3,10,14;
199:20
**dates (7)**
83:8,16;84:20;
131:18,19;133:8;
205:9
**dating (1)**
200:13
**daughter's (1)**
136:21
**Dave (13)**
4:17;47:24;55:3;
81:2;90:21;101:14;
105:1;110:13;149:8;
172:6,11;198:8;
202:14
**David (1)**
90:20
**day (2)**
90:12;213:14
**days (6)**
117:10;118:12;
165:16;168:4,9;
185:12
**deadline (1)**
112:24

**deal (28)**
6:9;7:15,18;16:19;
83:9;115:25;138:8,
10;139:4,6;146:9;
173:21,25;174:22;
175:1,4,6,17,19;
179:6;183:20;
184:14;188:24;
190:2,11,14;215:14;
216:18
**dealing (2)**
29:21;152:19
**deals (13)**
7:19,19,20;15:3;
138:11,15;174:15,
24;184:6,9;185:10;
188:2;216:23
**debt (1)**
17:23
**December (3)**
131:9;138:12,15
**decent (2)**
25:14;183:7
**decide (1)**
21:22
**decided (1)**
105:24
**decision (1)**
34:9
**decreased (1)**
159:14
**deduct (1)**
64:15
**deducted (11)**
32:7,10,20;33:12;
50:1;55:15;56:7,13;
58:11,14;64:11
**deducting (3)**
54:24;55:1,3
**deduction (3)**
33:17;34:5;45:5
**deducts (1)**
55:9
**deem (1)**
101:1
**deemed (2)**
45:12;155:18
**defendants (1)**
101:4
**defined (5)**
62:11;133:23;
134:3;135:12;136:9
**defining (1)**
30:10
**definitely (7)**
25:9;71:10;104:7;
140:18;160:12;
201:17;204:15
**definition (4)**
62:18;134:1,5;
195:17
**delay (1)**
83:14

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 234 of 253
PageID 10329

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

**denied (2)**
71:22;85:15
**denominator (2)**
122:10,20
**depart (4)**
72:10,19;74:14;
209:20
**departed (28)**
49:25;77:23;
80:20;94:7,16;
95:24;97:7,15,20;
98:2;99:7;101:7;
103:3;107:11;
129:19;130:20;
131:3;132:1;142:4;
160:4;166:15;
187:19,23;191:12;
193:16;197:4;
213:21;218:20
**departing (3)**
69:9;75:20;123:21
**departure (26)**
38:5;39:14;40:10;
63:12;67:11;71:21,
21;72:6;84:18;
108:12,13,23;109:2;
121:4;124:13;
125:24;131:6;142:5;
143:3;160:5;162:22;
190:24;191:13;
204:24;206:24;
212:24
**departures (10)**
38:11;62:22;
74:21;104:22;
107:21;116:7;164:9;
189:15;190:25;
204:11
**depend (1)**
39:22
**depending (4)**
39:18;133:8;
194:24;197:1
**depends (3)**
28:20;132:10;
146:22
**DEPONENT (1)**
222:14
**deposition (30)**
4:2,5;8:2;9:18;
10:16;11:12;12:7;
48:14,19,24;50:11;
62:19;90:5;96:4;
98:9;108:25;110:10;
134:12,21;138:20;
157:18;164:24;
169:7;171:10,15;
172:7,9;174:3;
203:13;217:23
**deprived (6)**
72:3;74:19;
124:11;141:25;
142:7;160:6

**derive (4)**
20:1;140:25;
151:18;178:4
**derived (3)**
130:22;131:10;
203:6
**deriving (2)**
57:6;130:12
**describe (2)**
63:6;66:21
**described (7)**
30:14;45:22;
63:24;123:24;158:3;
202:12,17
**describes (1)**
65:8
**describing (1)**
30:17
**description (1)**
215:5
**designated (1)**
174:5
**designation (1)**
110:13
**designed (1)**
14:2
**desk (5)**
12:16,19;13:1;
22:12;146:7
**desks (1)**
22:22
**despite (2)**
10:17;207:10
**detailed (1)**
187:9
**details (2)**
23:16;155:7
**determine (13)**
8:11;20:5;29:20;
30:15;59:10;60:14;
75:22;88:13;94:5;
97:4;109:19;159:9;
219:17
**determined (9)**
20:22;55:15;56:1,
8,14;63:18;77:16;
79:10;191:12
**determines (2)**
77:21;79:4
**determining (10)**
15:17;16:8;20:10;
30:4;32:1;37:10;
61:4;63:11;99:13;
122:11
**develop (1)**
150:13
**developed (2)**
23:3;29:2
**development (3)**
138:21;177:20;
178:1
**diamond (1)**
199:6

**Diamonds (1)**
161:25
**difference (18)**
12:14;21:11,12;
52:3,6;57:10,12,24;
58:9;93:12;120:24;
140:4;153:21;
212:10,18,20;220:2;
221:10
**differences (1)**
153:19
**different (28)**
11:24;28:14;
31:10;41:10,10;44:2,
4,5;47:8;51:9;57:20;
59:4;63:25;65:1;
73:8;83:19;86:10;
91:11;97:23;120:15;
139:10;150:6;
165:14;167:14,17;
168:22;178:19;
199:21
**differentiate (1)**
76:17
**differently (1)**
98:13
**difficult (1)**
149:14
**dig (1)**
168:1
**digging (1)**
29:19
**diligence (21)**
14:17,19;16:12;
19:8,18,20,22;20:9;
21:2,4;152:2;
154:13;175:14;
177:2,13,16,25;
178:6,16;179:18;
181:24
**diminution (1)**
159:7
**direct (8)**
45:1,5,8,9;52:18;
53:7;61:18;127:19
**directed (1)**
78:14
**directly (9)**
43:24;46:24;53:2,
6,14,16;54:20;55:4;
73:13
**disaggregate (1)**
77:12
**disagree (1)**
41:3
**disagreed (1)**
36:23
**discernable (1)**
120:24
**discernible (1)**
120:14
**disclaimer (1)**
205:14

**disclose (4)**
182:11;183:10;
187:7;188:21
**disclosed (9)**
110:23;157:17;
172:22;173:2,5;
175:1,4;183:23;
188:17
**disclosing (1)**
188:23
**disclosure (1)**
183:17
**disclosures (1)**
19:24
**discount (14)**
51:22;57:3,4,6;
189:11;201:22;
202:1,11,21,21;
203:3,17,22;204:1
**discounting (2)**
202:8,24
**discovered (1)**
188:10
**discovery (5)**
7:23;29:18;33:3;
147:5;181:11
**discretionary (2)**
152:7,20
**discuss (4)**
20:23;48:9;96:5;
191:6
**discussed (15)**
23:21;26:9;43:2;
61:17;79:3;94:1;
127:15,23;150:23;
151:7;160:3;162:13;
168:23;193:12;
194:11
**discusses (2)**
121:4;142:13
**discussing (5)**
89:1;144:4;
159:19;191:15;
195:14
**discussion (2)**
122:25;150:19
**discussions (1)**
188:10
**disputes (1)**
14:3
**disregard (1)**
113:19
**disregarded (2)**
113:9;121:10
**disregarding (1)**
58:18
**distinction (2)**
150:23;196:8
**distinguish (1)**
21:7
**distinguishing (1)**
108:5;123:7
**diverted (1)**

**disclose**
130:21
**divide (1)**
40:23
**document (11)**
7:24;48:23;73:6;
110:9;134:20;
135:13;169:6;
173:20,25;174:2;
209:4
**documentation (9)**
6:14;29:17,18,20;
82:9;148:6;171:1;
186:3;190:9
**documents (7)**
5:21;6:24;23:7;
28:2,6;36:23;108:21
**dollar (7)**
51:16;52:10;
56:24;99:13,14,19;
158:4
**dollars (2)**
51:19;183:25
**done (35)**
10:1,2,11;19:6;
44:5,8;59:18;60:13;
73:18;75:22;76:2;
77:19,19;78:6,7;
79:15;85:21;107:20;
109:18;122:22;
123:17;124:5;
128:20,25;132:20;
137:16,18;141:18;
152:3;156:5;164:13;
184:18,22,25;
185:14;194:20;
219:16
**double (1)**
34:1
**doubt (2)**
9:9;199:20
**down (3)**
40:11;50:15;
60:24;63:8;64:2;
85:22;111:22;114:1;
118:16;183:2;
188:24;194:25;
213:20
**download (3)**
111:11;112:8;
134:23
**downloaded (2)**
111:8,15
**dramatic (1)**
39:25
**draw (2)**
49:18;170:16
**drive (1)**
54:2
**due (35)**
14:17,19;16:12;
19:8,18,20,22;20:9;
21:2,4;54:1;59:9;
60:17;66:9,15;

75:23;76:11,18,21;
77:22;78:2;79:5;
97:20;100:1;108:11;
152:2;154:13;177:2,
13,16,25;178:6,16;
179:18;181:11
**dug (3)**
77:1,5;188:22
**duly (2)**
5:5,9
**duplicative (2)**
31:3,4
**during (14)**
9:17;10:16;11:12;
12:7;50:11;87:24;
99:7;100:11;102:9;
131:10;184:19;
188:10;211:10;
213:5

**E**

**earlier (12)**
45:24;91:4;
101:24;107:3;108:3;
125:4;127:23;145:2;
160:8;176:15;189:9;
203:13
**early (1)**
164:19
**earn (3)**
88:19;140:18;
141:8
**earn-out (1)**
139:19
**easier (1)**
85:22
**easily (1)**
198:10
**East (1)**
90:2
**EBITDA (25)**
29:23;30:4,10;
63:21;64:11,22,24;
65:25;68:3;138:22;
144:6;147:3;150:16,
21;151:12,16,17,20,
25;180:25;207:19,
20;208:1,11;215:10
**EBIT-D-A (1)**
64:12
**economic (3)**
57:16;58:23;
115:20
**Ed (6)**
26:4;126:3;
145:12;153:11;
159:16;215:19
**Edward (1)**
138:20
**effect (2)**
13:12;211:24
**effective (2)**

89:6;197:12
**effectively (16)**
44:7;45:9;68:2;
71:22;72:12,13,14;
80:2;85:12,17;
116:13;138:17;
142:6;160:6;202:24;
221:9
**effects (1)**
188:20
**effort (1)**
162:8
**either (18)**
9:24;16:16;50:25;
73:22,24;77:10;
100:24;104:8;150:8,
13;158:24;172:22;
174:7;175:13;
184:23;185:22;
191:19;200:7
**elaborate (1)**
70:5
**else (22)**
6:8;8:9,9;9:4,7,9;
19:6;22:9;41:15;
42:20;128:3;131:7,
13;147:21;163:7;
166:9;171:23;
172:11,12;193:3;
212:5;221:2
**elsewhere (1)**
66:11;104:9;
120:16
**e-mail (2)**
111:19;169:5
**emergencies (1)**
8:20
**Emily (2)**
82:17;128:2
**employ (1)**
143:10
**employed (5)**
35:24;39:13,15;
128:22;154:10
**employee (16)**
21:20,23;24:10,
10;25:22;27:18;
118:4;123:22;126:4;
136:5;148:15,23;
149:22,23;153:18;
191:3
**employees (39)**
23:24;24:21;27:5;
29:5;39:18;40:20,
24;41:12;68:13;
118:22;123:15;
124:3;125:3,25;
126:7,15;128:1,4,7,
8,10,18,21;129:1,19;
130:20;131:3;140:6,
23;151:4;154:15;
185:24;186:1;
193:16,16;197:4;

204:17;206:19;
207:15
**employer (1)**
153:19
**employer's (1)**
94:15
**employing (1)**
154:19
**employment (37)**
25:25;26:15;28:4,
11;29:5;33:2;68:14,
18,19,24;69:1;71:19;
75:11;113:23;
115:20;116:1,11,20;
118:18,19,25;119:1,
5,6,8;129:20;130:2,
2;143:5,7,8;145:22;
165:22;166:12;
191:17;194:7;
206:20
**enable (1)**
146:2
**encountered (1)**
192:6
**encourage (2)**
96:9;216:14
**end (11)**
16:12;17:7;63:15,
15;124:10;137:22;
138:1,11;142:2;
187:23;205:9
**endeavored (1)**
164:6
**ended (1)**
125:1
**ending (1)**
152:16
**enforceable (2)**
119:18;120:12
**enforcement (1)**
84:20
**engaged (5)**
14:17;29:11;
122:16;179:3;
214:20
**engagement (2)**
5:22;37:7
**England (1)**
213:10
**English (1)**
107:14
**enjoys (1)**
54:24
**enough (5)**
90:17;117:10;
125:9;146:8;182:19
**enter (2)**
92:14;198:14
**entered (2)**
81:24;130:15
**entire (5)**
17:8,10;185:22;
211:20;212:14

**entities (1)**
179:3
**entitled (1)**
173:25
**entity (8)**
17:15;26:14;
116:1;135:23;136:1;
186:18,25;210:5
**entry (5)**
83:24;84:4;
101:20;176:20;
179:9
**envision (1)**
172:18
**equal (2)**
131:7;171:16
**equipment (3)**
22:10,18;146:2
**equity (1)**
17:11
**errors (1)**
34:22
**especially (5)**
10:8;70:6,7;
196:10,16
**essentially (7)**
58:6;63:3;70:17;
75:10;139:13;
205:20;213:1
**establish (3)**
71:25;85:14;
118:10
**established (1)**
91:4
**estate (1)**
186:16
**estimate (10)**
12:11,14,21;13:4;
15:20;41:12;183:8,
13;184:3,8
**estimated (1)**
122:2
**et (3)**
4:3;90:18;142:13
**evaluated (1)**
220:9
**even (21)**
9:25;13:11;23:5;
46:12;72:15;119:8;
124:19;129:9;
132:16,25;146:16;
147:22,25;164:9;
165:25;191:22;
194:20,20;204:19;
210:23;215:12
**event (1)**
188:18
**events (4)**
107:3;137:25;
160:13;220:22
**everybody (1)**
154:10
**everyone (2)**

200:7;221:1
**evidence (5)**
130:19,20;207:14,
17;208:22
**exact (4)**
26:10;134:1,4;
141:1
**exactly (12)**
17:12;18:18;
24:23;32:10;45:14,
23;71:17;79:2;
139:24;147:17;
182:20;190:1
**EXAMINATION (4)**
5:12;195:7;
207:18;213:5
**examined (1)**
5:9
**example (19)**
12:14,15;17:23;
18:20;19:8;20:10;
21:19;22:12;23:2;
33:17;34:10;123:7;
147:20;157:22;
172:3,5;182:14;
200:13;218:14
**examples (1)**
27:9
**exceeded (1)**
41:6
**exception (1)**
205:3
**excerpt (1)**
5:25
**excess (3)**
125:16;126:7;
158:5
**excited (1)**
191:8
**excluded (4)**
17:20,22,23;
187:10
**excluding (1)**
157:17
**exclusively (2)**
170:5,6
**Excuse (2)**
20:13;142:24
**executives (2)**
39:12;207:6
**exercise (2)**
85:6;184:21
**Exhibit (23)**
48:18,24;85:21;
110:7,10;111:5,6,15;
112:10;129:15;
134:17,21;169:3,4,7,
10;173:7,24;174:3;
177:24;181:18;
185:19;200:5
**exhibits (1)**
6:21
**existence (1)**

Case 8:23-cv-00201-TPB-AAS   Document 128-4   Filed 11/30/23   Page 236 of 253
PageID 10331

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

119:22

**existing (1)**
186:20

**expect (18)**
8:21;18:21;24:16;
25:3;27:10;35:7;
41:7,21;65:20;86:3;
88:18,19;125:9;
152:9;155:2;161:1;
189:22;192:8

**expectation (5)**
160:14,19;161:14;
163:9;201:14

**expected (2)**
149:5;220:21

**expedited (1)**
222:5

**expense (7)**
29:22;30:10;
45:13;52:13;58:13;
70:3;155:22

**expenses (40)**
33:18;34:6;35:4,
11,19,19,20;36:11;
38:7;41:25;42:6;
44:9,10,18;45:5;
46:10,22;52:23;53:2,
5,15,17,22;54:13;
61:18;63:20;64:11;
69:25;70:25;139:18;
152:9;153:3,18;
156:14;157:17,19,
23;158:2,4;159:7

**experience (25)**
12:21;23:19,22;
25:10,17;27:11;
94:6;100:18;119:15;
121:2;137:20;
145:25;152:2;
154:14;155:18;
163:15;181:17;
183:6;184:4;192:8;
198:22;214:4,7,8;
218:9

**experiences (2)**
98:21;137:20

**expert (9)**
13:22;37:9;80:7;
85:4;163:25;171:9;
219:10,13,20

**expertise (1)**
37:13

**experts (1)**
200:8

**expiration (5)**
94:8,14;96:20;
130:11,14

**expirations (1)**
22:3

**expired (1)**
95:25

**expires (2)**
97:9;98:3

**explain (4)**
191:7;196:24;
201:25;221:20

**explained (3)**
148:14;151:11;
202:9

**express (2)**
114:2;172:21

**expressed (2)**
171:23;221:24

**expression (1)**
107:14

**extent (1)**
135:23

**extremely (2)**
183:14;198:11

**eye (1)**
154:14

**eyes (5)**
110:14,15,21;
111:17,20

---

## F

**face (1)**
211:4

**fact (23)**
10:17;28:18;37:4;
50:10;75:16,25;
86:2;89:5;92:9;94:4,
17;100:21;123:15;
124:5;125:21,24;
134:1;149:24;158:1;
159:10;160:23;
209:24;215:11

**factor (5)**
95:6;97:16;
118:22;140:19;
145:3

**factored (2)**
116:17,23

**factors (3)**
95:16;126:10;
193:5

**facts (5)**
28:24;29:9;
108:15;150:2;
192:16

**fading (1)**
202:14

**failure (1)**
168:9

**fair (69)**
30:15,18;31:2;
37:16;41:16;46:20;
49:10;51:7;59:12;
60:15;61:25;63:1,9,
9,23;66:12,18,22;
67:4,16;69:15,21;
70:16;76:6;77:11;
78:12,19,24;79:7;
85:24;86:19;101:24;
110:3;113:21;116:9,

14;123:1,5;137:10;
141:7;142:19;143:9;
150:16;151:23;
164:3;170:17,24;
175:11;177:20;
178:2;179:9;180:2,
16,20;181:15;
182:18;191:24;
192:23;193:19;
196:4,18;198:2,6;
209:18;215:5,25;
219:12;220:6,24

**fairly (9)**
17:17;24:14;
71:23;72:21;83:13;
98:18;112:21;153:4;
174:24

**familiar (8)**
98:20;103:12,17;
106:4,8;136:17;
182:2;191:11

**far (3)**
22:4;84:8;199:3

**Fargo (4)**
23:8,12;155:6;
218:15

**favor (1)**
128:12

**February (9)**
64:7;80:23;81:5,
22,25;82:5,14;83:15;
205:10

**feel (2)**
95:13;198:3

**fell (1)**
189:10

**felt (3)**
99:23;162:23;
203:23

**Ference (3)**
178:8,25;179:6

**few (12)**
24:7;81:13;150:1;
164:19;165:3;175:3;
182:15;189:8;195:3;
205:7,8,9

**field (1)**
71:18

**fifth (1)**
137:7

**figurative (1)**
124:18

**figure (1)**
41:11

**figures (1)**
154:2

**files (1)**
174:22

**final (2)**
173:6;204:6

**finalization (1)**
170:15

**Finally (1)**

121:4

**finance (1)**
126:11

**financial (22)**
14:17,19;19:8;
20:1,2;21:4,5;29:20;
114:4,12;152:2;
154:13;176:10;
177:2,13,16,25;
178:16;179:10;
180:16;181:24;
219:23

**financials (2)**
20:4;199:16

**find (6)**
168:3;178:10;
181:6;190:9,18;
215:7

**finding (1)**
204:12

**fine (2)**
134:9;217:17

**finish (4)**
9:18;10:12;129:3,
5

**finished (1)**
10:9

**firm (2)**
4:12;114:21

**first (45)**
5:9;8:7;9:16;
29:11;30:4;31:6;
36:10;48:21;49:24,
24;50:24;51:2,6;
56:2,19;64:3;69:5;
81:10,11,21;93:11,
14;102:13;110:25;
111:5,14;112:7;
113:11;116:9;
121:11;122:25;
125:5;135:1;139:21,
22;140:17;141:11,
12;157:21;169:5,15;
178:5;180:9;188:9;
205:10

**five (8)**
25:13;154:17;
161:25;199:6;
200:18;201:6;
217:16,19

**five-minute (1)**
217:19

**five-year (1)**
199:17

**fixed (6)**
45:11,18,22;
146:19;157:19;
159:17

**fixtures (1)**
187:2

**flip (2)**
51:4;155:10

**Florida (8)**

120:2,3;176:12;
178:25;179:2,4;
188:17;219:18

**flow (2)**
198:18;202:9

**flowed (1)**
75:3

**flows (2)**
57:5;202:3

**FMV (3)**
116:4;142:16;
143:15

**focus (8)**
21:3,22;79:20;
91:3;115:3;117:1;
188:9;191:21

**focused (1)**
123:13

**focusing (3)**
112:7;125:2;
129:12

**focussing (1)**
27:2

**folder (1)**
174:22

**folks (1)**
82:22

**follow (9)**
11:23;12:1;29:17;
36:10,14;68:21;
84:5;85:22;218:6

**followed (4)**
29:16;78:15,18;
206:10

**following (11)**
38:10;42:13;
62:21;71:9;83:14;
102:2;107:3;162:22;
164:8;171:14;
204:18

**follows (6)**
5:10;48:15;90:6;
134:13;164:25;
217:24

**follow-up (2)**
194:23;195:3

**follow-ups (1)**
206:17

**foreseeable (2)**
160:15;163:11

**forget (2)**
98:18;173:14

**form (146)**
19:3;24:22;26:7,
21;27:7,23;28:12;
31:18;35:5;37:17;
39:5,21;40:17;43:5;
44:14,23;46:14;
52:24;54:10,15;
55:2;58:3,19;59:2,
13,24;60:7,8,11,19;
61:15;62:3;65:12;
67:8;69:10;71:15;

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 237 of 253
PageID 10332

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

72:20;74:2,24;75:4;
76:24;78:3;79:8;
81:19;82:7,24;85:2,
20;86:14,23;87:11,
12;88:23;89:14;
93:16;95:12;96:1,
21;98:4;100:5,13;
101:13;103:20;
104:25;106:2;107:6,
24;108:8;109:11;
114:13;117:11;
118:7;119:24;
120:13;121:14;
122:15,21;123:12;
125:11,18;126:20;
127:7,24;128:15;
129:24;130:16;
131:25;132:8;
136:23;140:15;
145:5,10;147:13;
148:17,24;149:7,18,
20;151:6;154:11;
156:6,17;162:11;
163:3;164:12;
166:17;167:6;
168:10,21;172:1;
178:22;189:24;
190:7;192:14,24;
193:11;194:9;
196:14;197:20;
199:24;201:9,16;
203:18;204:14;
206:8;207:8,23;
208:5,12,18;209:7,
22;210:19;211:2,9,
22;212:6,16,21;
216:2,11,20;217:10;
220:17;221:3,14

**forma (16)**
20:1,2;21:5;29:23;
30:4,10;63:21;
64:24;68:3;151:16;
152:6,10;153:13;
155:15,22;156:13
**former (1)**
82:11
**forming (2)**
29:14;181:14
**formulas (1)**
195:21
**forth (1)**
48:4
**forthcoming (1)**
190:14
**forward (8)**
46:19,21;87:1;
92:13;95:20;137:15;
152:10;197:10
**found (2)**
96:6;124:25
**foundation (1)**
82:25
**founding (1)**

118:3
**four (2)**
147:3;148:9
**fourth (1)**
56:17
**four-year (1)**
213:18
**free (13)**
68:5,8,15,16;
71:13,16;91:16;
95:4;111:11;143:5;
210:23,24;211:6
**frequently (1)**
191:2
**Friday (2)**
112:22,24
**friend (2)**
166:25;167:4
**friends (5)**
136:20,20,21;
137:1;213:24
**front (4)**
7:10;8:8,15;12:20
**Frost (18)**
4:2;5:8,14;7:5,5;
48:18;82:3;90:10;
111:10;112:9;
134:16;165:3;
173:25;174:14;
195:9;209:11;218:3,
5
**full (1)**
201:1
**fully (1)**
60:20
**fundamental (2)**
22:15;161:3
**funding (1)**
179:15
**furniture (1)**
187:3
**further (11)**
77:14;124:7;
133:14;135:7;
181:11;194:17;
200:15,16;206:16;
218:4;222:14
**future (19)**
44:19;57:3,5;
88:10,19;93:5;
95:11;131:10;133:9,
10,10,11;160:15;
161:11;163:11;
197:23,25;202:3;
220:22

## G

**gallery (1)**
200:7
**garbled (1)**
202:10
**gathering (1)**

170:25
**gave (4)**
99:8;100:19;
160:10;165:16
**general (4)**
9:1;23:17;175:18,
22
**generally (8)**
22:1;26:18;
144:13;145:3;
146:19;155:11;
157:1;162:20
**generate (1)**
155:16
**generated (5)**
32:1;33:9;77:17;
93:13;153:9
**generating (2)**
33:5,7
**generous (1)**
153:19
**gist (1)**
58:6
**given (9)**
8:2;14:4;43:10;
71:24;77:24;78:20;
161:22;165:18;
199:15
**gives (1)**
167:1
**giving (12)**
10:8;27:9;28:14,
23;68:6;142:4;
155:1;160:4,9;
161:16;190:10;
195:25
**glad (1)**
214:2
**glance (1)**
112:14
**goal (2)**
148:21,25
**Goding (2)**
99:2,15
**Goding's (1)**
101:5
**goes (5)**
41:16;87:20;
96:12;147:3;167:1
**gold (2)**
214:10,11
**Good (25)**
4:11,14;5:14;9:12;
12:21;13:20;63:5;
83:9;90:17;93:7;
119:10;124:6;
128:23;134:8;167:4,
10;172:4;174:10;
207:10,11,12;216:1,
18,21;222:12
**Goodness (1)**
191:1
**goodwill (1)**

221:8
**gosh (2)**
128:5;147:16
**Great (3)**
13:21;24:24;
214:24
**greater (2)**
50:3,5
**Greer (6)**
95:23;96:4,7,17;
97:12;162:14
**Greer's (2)**
96:2;97:22
**gross (28)**
31:11,15,25;33:13,
20;34:4,8;41:23;
42:3,8;43:16,17,17,
21;44:21;46:4;47:4,
8,17;49:19;50:20;
52:1;54:17,22;56:3;
58:12;61:2;127:16
**ground (1)**
8:5
**Group (6)**
117:6;123:15;
149:22;150:9;176:9;
179:17
**grown (2)**
206:24;207:4
**Growth (4)**
178:7;182:15;
190:11,12
**guess (5)**
13:2;125:19;
141:10;146:25;
176:24
**guessing (1)**
97:1
**Gunnersen (2)**
117:5,14
**guys (1)**
149:25

## H

**half (8)**
58:17,18,24;75:16,
17;89:13;127:5,9
**hand (9)**
5:4;10:2;11:7;
12:11;14:8;30:7;
68:17;92:15;99:24
**handful (1)**
15:18
**handle (1)**
61:6
**handled (1)**
192:9
**handwritten (1)**
7:4
**happen (2)**
93:25;125:24
**happened (16)**

86:17,18;92:19,20,
25;93:15,21,22;
97:17;101:8;108:4;
155:7;179:6;183:24;
188:18;213:24
**happening (1)**
131:13
**happens (16)**
10:1,18;11:4,22,
25;32:12;92:14;
161:6,7;167:19;
168:14;173:16,17;
186:17,24;191:1
**happy (1)**
128:21
**hard (9)**
15:22;28:22;29:8;
49:3;97:14,19;
105:9;167:15;
176:24
**Hayden (1)**
4:8
**head (7)**
17:3;50:12;
125:10,16;126:18,
24;128:13
**health (1)**
13:19
**heard (4)**
12:18;174:9;
202:11,16
**hearing (4)**
80:22;81:8,16,21
**help (1)**
15:12
**helped (1)**
128:18
**helping (2)**
14:22;15:13
**hence (3)**
53:13;65:17;121:9
**Here's (4)**
44:18;152:8,8;
154:15
**Herskowitz (1)**
4:15
**hey (7)**
42:10;122:6;
123:25;187:15;
212:25;213:25;
217:12
**hiatus (1)**
213:18
**hide (1)**
8:22
**hiding (1)**
188:21
**high (6)**
51:25;52:4;57:11;
65:3,10;189:5
**higher (4)**
141:8;184:12;
185:2,12

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 238 of 253
PageID 10333

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

**highlighted (2)**
141:24;181:21
**highlighting (2)**
6:23;7:4
**highly (2)**
9:9;204:20
**himself (2)**
144:20;215:19
**hire (2)**
40:1;191:6
**hired (1)**
188:7
**historic (3)**
147:4;189:12;
199:15
**historical (3)**
185:13;186:2,5
**historically (1)**
201:3
**history (8)**
138:19;141:19;
199:13,21,22;
200:13,23;201:6
**hit (2)**
167:9;213:19
**Hold (8)**
48:1;74:1;88:23;
111:14;129:3;
178:21;181:8;
188:22
**Holdings (9)**
103:13,18;104:1,1,
5,11,17,21;107:22
**holds (2)**
157:4;220:18
**Holland (3)**
4:17;114:21;
172:11
**home (1)**
5:16
**homeowners (1)**
24:13
**honest (1)**
81:4
**honored (1)**
164:9
**hop (1)**
174:6
**hope (7)**
24:25;45:21;
153:4,5;166:19;
202:9;207:9
**hopefully (2)**
155:24;219:6
**hopped (1)**
174:7
**horizon (2)**
91:5,7
**hour (4)**
4:25;48:11;134:8;
170:2
**hourly (2)**
169:25;170:8

**hours (1)**
171:7
**house (1)**
9:10
**how's (1)**
172:15
**HR (2)**
41:14;126:11
**hypothetical (9)**
28:14,23;79:9;
84:6;88:6;116:12;
142:22;192:15,19

**I**

**I' (1)**
119:19
**idea (3)**
101:14;141:4;
216:12
**identification (5)**
48:25;110:11;
134:22;169:8;174:4
**identified (3)**
99:4,5;161:13
**identifies (1)**
174:16
**identify (2)**
175:16;184:25
**identifying (1)**
124:15
**ie (2)**
53:3;126:11
**ignored (1)**
57:25
**ignoring (1)**
58:24
**imagine (5)**
35:6,16;171:16;
172:7;186:4
**immediately (4)**
83:10;84:19;
96:19;108:13
**impact (5)**
41:17,21;54:4;
137:25;204:1
**impacted (2)**
157:20;159:17
**impeded (1)**
72:21
**implies (1)**
75:19
**import (1)**
169:5
**important (2)**
137:23;152:18
**improper (1)**
150:21
**inaccurate (1)**
218:11
**inappropriate (1)**
140:13
**include (20)**

34:20;35:3,12;
45:5,7;67:25;70:23,
25;71:1,6;73:13;
126:13,16;127:8,16;
139:19;143:10;
161:10;186:15;
187:2
**included (17)**
30:6;34:13,14;
35:1;59:19;67:10;
71:10;79:11;87:18;
103:18;113:25;
139:6;146:3;185:24;
186:2,8,14
**includes (14)**
44:9;45:1;68:23;
113:22;115:16;
127:5,13;139:17,18;
140:13;218:19,24;
221:4,7
**including (12)**
14:1;16:16;28:10;
29:4;30:6,7;115:19;
121:6;135:20;
139:13;151:3;186:1
**income (4)**
20:2,5;21:6;152:4
**incorporated (1)**
210:1
**incorrect (2)**
37:16;65:16
**increase (11)**
40:1;45:21;46:1;
53:13,20;54:2;
70:10;204:3,4,6;
209:19
**increased (2)**
156:14;159:13
**increases (3)**
53:25;54:1,1
**incur (2)**
43:13;54:13
**incurred (5)**
35:20;46:12;88:5;
158:6,24
**incurring (1)**
52:22
**Indeed (1)**
118:17
**indefinitely (1)**
94:20
**independent (1)**
159:20
**independently (1)**
109:19
**indicate (3)**
108:16;134:2;
137:9
**indicated (3)**
26:18;81:16;
216:24
**indicating (1)**
175:7

**indicator (1)**
199:7
**individual (6)**
24:10;25:1;28:15;
135:21;168:25;
169:1
**individuals (5)**
32:14;35:24;
36:16;154:9;207:11
**industries (1)**
16:3
**industry (21)**
16:2,4,6;71:5;
115:5;144:10;
160:24;198:23,23;
209:12,15,21,23;
210:9;214:12,23,24;
215:1,3,4;217:2
**inevitably (1)**
126:17
**information (43)**
13:3;83:25;
101:17;102:11;
104:14,16,19,20;
105:2,21,23;106:1,
21,22;107:18,25;
114:4,7,12,24;
121:22;130:24;
141:10,15,16,21;
148:3;160:24;
161:21,23;181:5;
182:5,12;183:15,17;
190:18,20;194:19;
195:21,24;196:3;
206:25;208:2
**informed (2)**
142:5;160:4
**informing (2)**
109:2;165:5
**inhouse (1)**
4:21
**initial (7)**
7:11;66:21;81:15;
102:9;139:25;
170:10,19
**initially (1)**
102:2
**injunction (10)**
80:4,5,12,23;81:7,
16;83:6;84:4,10;
85:1
**injunctions (4)**
83:24;84:20,21;
101:20
**Innovation (1)**
108:24
**Innovations (1)**
200:19
**inquire (1)**
103:7
**inquirer (1)**
42:5
**install (4)**

71:24;85:13;
92:17,21
**instance (2)**
93:14;212:3
**instances (1)**
16:7
**instead (3)**
100:2;165:15;
176:4
**Institute (2)**
213:9;214:21
**instruction (3)**
11:21,23;12:1
**Insurance (64)**
4:4;16:1,4,5;17:1;
18:1;23:8,17,23;
24:5,15;34:10,21,21,
22;35:2,20;37:3,10;
38:12;39:3;54:1;
71:4;95:23;115:4;
119:12;120:10;
130:23;131:2;
135:21,22;143:19,
24;144:10,24;
145:19,20;150:22;
155:6;157:5;161:3,
19;163:15,15,18,21,
22,23;164:1;166:4;
174:16;176:10;
178:7,8;179:5,6,10,
18;180:11;182:15;
190:11,13;198:10;
214:22
**insured (1)**
135:21
**intellectual (22)**
22:25;23:1,4,12,
18,20;145:2,8,12,14,
16;146:11,13;186:8,
11;195:9,11,13,14,
20,22,23
**intend (2)**
109:6;171:24
**intended (2)**
73:3;148:16
**intent (2)**
72:19;74:14
**intention (3)**
44:17;197:21,22
**intents (4)**
72:10;73:17,25;
99:9
**interactions (1)**
80:10
**interest (3)**
202:12,17;203:1
**interested (1)**
22:7
**internal (2)**
97:11;114:5
**internally (1)**
203:20
**interpretation (1)**

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 239 of 253
PageID 10334

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

219:21
**interrogations (1)**
  73:6
**interrupt (1)**
  9:17
**interrupted (1)**
  6:7
**interview (1)**
  38:17
**into (30)**
  9:7;17:3;22:15;
  29:19;38:2;41:16;
  44:19;77:1,5;81:24;
  94:3;95:6;107:15;
  110:5;116:17,23;
  131:18;146:9;
  149:13;155:22;
  168:1;170:19,23;
  186:20;193:25;
  198:14;200:16;
  207:19;210:1;213:4
**introduce (1)**
  117:10
**invoice (6)**
  169:11,15,16,18,
  21,24
**involve (3)**
  16:2;19:5;185:19
**involved (37)**
  15:2,6,8,19;16:8,
  16;18:15;19:5,9,11,
  17;20:9,17;23:5;
  24:4,20;28:16;30:9;
  33:18;43:3;45:14;
  67:19;97:13;167:14;
  175:15;177:8,21;
  179:22;180:10,22;
  181:12,22;186:12,
  12,13;190:23;192:4
**involves (1)**
  30:5
**involving (1)**
  16:20
**IP (1)**
  195:25
**irrelevant (4)**
  94:20;125:22;
  126:25;150:24
**IRS (1)**
  206:3
**isolate (1)**
  77:25
**issue (8)**
  68:17;71:22;
  119:7;136:19;143:8;
  157:8;183:14;192:4
**issued (2)**
  80:5;84:11
**itemized (2)**
  194:20,22
**iterations (1)**
  102:10

**J**

**Jack (8)**
  62:13;68:5;69:4;
  70:14;71:12;73:22;
  116:21;134:18
**Jackie (3)**
  82:16;128:2;
  193:22
**Janet (1)**
  4:8
**January (39)**
  63:13,16;64:8;
  80:20;83:10;86:17;
  87:2;88:9;89:6;
  92:10;93:4,21;
  100:7;108:15;
  126:23;131:16,22;
  132:6,16,18;133:2;
  137:12,15,24;138:3,
  5,8,10,13,14;142:24,
  24;148:12;168:14;
  193:14;196:22;
  197:13,17;205:10
**jive (1)**
  202:20
**job (1)**
  128:23
**jobs (3)**
  218:10,25;219:5
**join (1)**
  211:21
**joining (3)**
  142:6;160:6;
  213:19
**joking (1)**
  10:18
**judge (3)**
  11:1;13:12;81:16
**July (2)**
  175:19;176:8
**jumping (1)**
  172:7
**June (5)**
  29:12,13,13;
  105:20;106:20
**jury (6)**
  11:16;77:21,24;
  79:4;168:3;201:25
**justification (2)**
  57:16;58:23
**Justin (2)**
  4:25;113:16

**K**

**Kakish (4)**
  82:22;123:11;
  128:3;193:22
**Katy (5)**
  98:10,11,16;
  122:1;157:22

**Keep (6)**
  84:7;95:13;154:9,
  14;174:22;207:12
**keeping (2)**
  58:17;150:1
**Kemp (3)**
  82:23;128:3;
  193:22
**kept (1)**
  207:15
**key (11)**
  69:23;115:23;
  144:10,23;145:1;
  187:17;188:11;
  189:6,23;191:12;
  199:7
**kind (7)**
  120:7;128:16;
  153:3;183:17;
  198:24;214:10;
  216:7
**Knight (3)**
  4:18;114:21;
  172:12
**knowing (1)**
  29:9
**knowledge (5)**
  119:14;184:5;
  204:23;210:7;214:5
**knowledgeable (1)**
  70:7
**known (1)**
  166:1
**knows (3)**
  167:9,13,13
**KPI (1)**
  199:6
**Kristin (1)**
  4:18
**Kroll (1)**
  203:6

**L**

**label (1)**
  175:11
**labeled (1)**
  173:25
**Lack (2)**
  82:25;156:10
**large (3)**
  152:18;153:1;
  186:22
**larger (1)**
  140:12
**last (20)**
  25:11;32:4,17;
  49:25;56:4;87:23;
  88:10;99:1;102:13;
  112:22,22,24;115:3;
  124:10;129:17;
  135:6;142:15;180:6;
  184:7;199:8

**Lately (2)**
  182:17;183:7
**later (2)**
  97:14;205:7
**law (2)**
  114:21;219:18
**lawful (1)**
  108:6
**lawyer (6)**
  10:16;119:19;
  195:18,19;219:14,15
**lawyers (4)**
  12:13;122:13,17;
  195:20
**layoff (1)**
  206:19
**layoffs (1)**
  155:5
**lead (5)**
  177:2,2,8,12;
  178:16
**lean (1)**
  152:2
**leaning (1)**
  154:13
**learned (2)**
  21:1;172:17
**lease (2)**
  186:24,25
**Leases (1)**
  186:16
**least (15)**
  80:17;84:8;102:2;
  105:17,22;125:16;
  149:5;165:19;
  166:21;174:11;
  185:9;189:9;190:24;
  205:5,5
**leave (21)**
  68:5,9,15,16;77:6;
  86:7;87:3;100:23,
  23;103:3;109:6,16;
  125:21;143:5,6;
  160:22;161:5,7;
  210:13,23;211:7
**leaves (4)**
  97:14;162:10;
  166:25;210:6
**leaving (11)**
  72:19;83:5;109:6;
  124:1,20;129:19;
  204:17,21;212:14,
  15,25
**left (43)**
  38:10;41:6;62:13;
  66:14;68:11;71:13;
  75:23;76:21;78:2;
  83:9,22,23;84:9;
  86:12,12;92:11;
  100:21;101:19;
  102:7;108:14;
  109:20;110:2;121:7,
  12,18;122:11;

123:15;129:1;131:3;
  166:2;188:6,11;
  189:6,23;191:8,16;
  192:5,11;205:3,6;
  206:22;213:23;
  221:12
**Legal (5)**
  4:7;80:7;82:9;
  85:4;191:19
**legally (2)**
  72:15;79:25
**length (2)**
  25:10;26:5
**less (36)**
  15:24;24:16,16;
  28:20;31:11,15,25;
  33:13,20;34:5,8;
  41:23;42:4,8;43:16,
  17,21;44:6,21;47:4,
  9,17;49:19;50:20;
  52:1;54:18,22;56:3;
  58:13;61:2;65:7;
  119:17;126:9;
  153:22;171:12;
  200:25
**lessee (1)**
  187:1
**lessen (1)**
  125:25
**letter (3)**
  104:12;105:19;
  106:19
**level (7)**
  38:12;39:2;41:8;
  71:17;157:17,18;
  158:25
**Levi (3)**
  180:12,13;181:4
**Lewis (17)**
  4:25;6:1;7:5,13;
  99:12;113:8,15,16,
  19;121:7,17;122:5;
  123:1;150:20;172:2,
  7;185:6
**Lewis's (2)**
  123:8;150:18
**liabilities (3)**
  17:19,20,22
**liability (1)**
  34:22
**license (1)**
  136:4
**Lieffort (3)**
  82:17;128:2;
  193:23
**lighting (1)**
  22:23
**likely (3)**
  4:24;186:23;
  204:13
**limitation (2)**
  85:6;135:20
**line (11)**

Case 8:23-cv-00201-TPB-AAS   Document 128-4   Filed 11/30/23   Page 240 of 253
PageID 10335

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

21:22;138:24;
162:7;165:5;170:14,
16,18;210:14;
211:17;221:21,25
**lines (13)**
24:12;27:12;
28:17,21;33:3,4;
144:3;147:11,12,15;
149:23;150:8,9
**Linked (2)**
166:8;212:11
**Lisa (2)**
36:20;37:15
**list (20)**
7:15,18;16:23;
18:3,7;73:11,11;
105:7;139:4,6;
151:10;171:2;
173:22,25;174:15,
18;180:4;185:10,16;
187:14
**listed (8)**
73:8;110:14;
147:10;177:23;
181:18;187:21;
188:1,3
**listing (6)**
6:9;73:7;147:4;
174:23;183:21;
187:7
**litigation (8)**
13:23;117:22;
157:23;158:1,4;
172:25;206:6;
220:10
**little (8)**
21:12;22:11;
119:17;132:21;
170:16;171:17;
213:4;215:22
**LLC (2)**
4:4;176:9
**LLP (1)**
4:7
**load (1)**
45:25
**local (1)**
213:22
**location (1)**
186:21
**Lockton (49)**
4:13,22,22;32:3;
62:14,21;68:12;
69:19;70:13;75:19,
20;76:11,16;83:5,23,
24;84:9;86:2,5;
104:10,23;105:17;
107:9,16,20;108:10,
17;109:3;110:23;
128:12;129:20;
130:21;131:20;
142:6;156:3,3,8,15;
160:6;166:15;

208:23;209:5;210:5,
5;211:21;212:12;
213:1;217:8,13
**Lockton's (1)**
207:25
**Loftus (1)**
4:7
**logic (1)**
119:16
**long (9)**
25:13;168:25;
176:18;192:17;
199:13;200:3,3;
213:14,15
**longer (7)**
10:8;75:25;76:23;
77:24;80:1;166:15;
191:5
**look (36)**
8:9;18:6;27:24;
28:22,23;38:16;
42:25;46:6;79:12;
81:13;83:16;95:7,
18;110:16;111:12;
113:1;115:2;124:9;
128:17;131:18,19;
138:5;139:3;144:5;
150:3,14;153:13,16;
164:19;170:7,14;
190:8;197:22,25;
199:18;217:16
**look-back (1)**
199:17
**looked (13)**
29:22;49:24;56:4;
63:19;68:14;78:4;
108:22;109:21;
138:9,15;139:5;
141:23;204:25
**looking (38)**
20:4;41:3;44:17;
46:17;49:15;53:1;
63:24;67:17;74:16;
78:16,16;86:16;88:8,
16;92:9;93:3;95:9,
20;105:9;107:8,15;
116:14,25;138:1,7;
149:25;167:23;
168:13;173:11;
176:21;178:14;
191:3;197:2;199:18;
200:6;202:2;203:10;
213:25
**looks (1)**
112:15
**Lorna (3)**
117:5,14;118:2
**lose (4)**
92:11;94:19,19,20
**losing (3)**
89:9;93:18;95:2
**loss (43)**
35:13;42:18,21,

22;46:13;56:24;
61:13,18;62:11;
66:9;78:21;87:7;
93:4,17;94:18;95:1,
1,7,14,16;96:13;
100:25;105:10;
115:12,12;116:20;
123:23;125:2,15;
126:5,6,17;128:1;
159:14,18;162:10;
187:24;188:20,24;
207:10;218:20;
220:25;221:1
**losses (12)**
43:11;52:12;84:3;
88:5;96:18;100:1;
116:20;123:7;
167:23;168:1,8;
201:22
**lost (189)**
30:19;31:3,6,12;
42:1,16;43:3,9,11,
12,16;44:2,5,8,11,12,
22,25;46:3,11,13,20;
47:9,12;49:10,16;
51:1,5,13;52:9;54:7;
55:20;56:5;57:17,
25;58:25;59:4,11,11,
15,16,19;60:10,15,
22;61:12,13,17;62:1,
7,19;63:3,25;64:4,
7;66:22,25;67:5,19;
71:14;72:4,6,17,18;
73:11,15;74:17,20,
21;75:23;76:6,7,8,
11;77:10,22,25;78:1,
13,21;79:5,5,6,11;
80:1,13;81:17;82:6,
15,23;83:4,22;84:10;
85:10;86:11,21,25;
87:5,8,8,13,18,21;
88:2,4,9,20,21;89:3,
6,8,21;91:3,4,17,23,
23,25;92:5,24;93:6,
12,14;94:21,23;
100:7,25;102:18,18;
103:14,19;104:2,8,9,
10,10;105:15,17;
106:10;107:5,9;
108:10;109:23,25;
115:11,14;116:15,
16,16,24;123:13;
124:13;125:4,20;
126:22;127:12;
129:18,22;132:25;
133:5,6,8;156:13;
157:16,20;159:14,
18;160:14;161:15;
162:21;163:10;
191:13,25;193:9,24;
196:19;197:7,13,15;
199:12,22;201:21;
203:3;204:2,24;

220:7,13,20,20
**lot (9)**
14:16;41:15;
144:16,19;148:13;
167:17;189:10;
198:12;200:2
**low (8)**
51:24;52:3;57:10;
65:3,9;141:11,12;
184:15
**lower (8)**
27:13;28:17;
119:12;184:13;
185:1;204:1;215:22;
216:25
**lunch (5)**
90:1,11,15,16,18
**lunchtime (1)**
90:21
**Lyle (2)**
4:14;81:3

# M

**Madison (3)**
82:17;128:2;
193:23
**Magna (1)**
4:7
**magnifies (1)**
123:16
**main (1)**
22:2
**maintaining (2)**
127:6,14
**major (1)**
22:4
**majority (2)**
73:14;182:14
**makes (1)**
11:21
**making (8)**
10:21;14:22;
15:10;30:5,7,8;
141:7;197:16
**manage (1)**
201:4
**management (19)**
33:18;34:6;35:13,
16,19;36:11;39:12;
45:17;46:10;52:23;
53:5,10;55:10;68:1;
96:9;126:13;144:1;
164:4;213:22
**manager (2)**
96:8;207:6
**managers (2)**
39:13;68:11
**manual (3)**
214:21,25;216:1
**many (15)**
15:16;18:15;
40:20;97:13;98:17;

121:6,18;122:3;
162:15;167:14;
204:18;206:6;
218:12,13,15
**margin (10)**
43:1,18,20;44:2,7;
45:4;53:1;54:19,24;
61:4
**margins (1)**
147:3
**mark (4)**
48:18;110:6;
134:16;173:6
**marked (10)**
47:23;48:23;49:5;
110:9;111:17;
112:10;113:2;
134:20;169:6;174:2
**market (62)**
30:12,13,15,18;
31:2;46:20;49:10;
59:12;60:15;61:25;
63:1,9,23;66:12,18,
22;67:4,16;69:15,21;
70:16;76:6;77:11;
78:12,19,24;79:7;
86:19;113:21;
116:10,14;120:3;
123:2,5;137:10,12;
138:23;142:19;
143:9;150:16;
151:23;175:12;
177:20;179:9;180:2,
16,20;181:15;182:2;
191:24;193:19;
196:4;198:2,3,6,14;
199:1;213:20;214:5;
215:22;216:22;
220:24
**marketplace (3)**
91:25;92:7;93:1
**Marsh (1)**
89:18
**matches (1)**
184:3
**material (1)**
214:11
**Mathematically (2)**
58:20;126:8
**Matt (10)**
35:25;45:17;
62:12;68:5;69:3;
70:14;71:12;73:22;
116:21;218:14
**matter (7)**
4:3;5:22;8:23;
13:23;29:11;50:10;
192:16
**matters (2)**
108:16;117:22
**Matthew (2)**
4:3,18
**may (33)**

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 241 of 253
PageID 10336

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

6:6;8:8,20;9:23;
10:16;11:3,22;12:7,
11,18,19;18:8;21:21;
45:19;83:17;86:7;
97:15,16;104:17;
106:23;114:23;
133:11;147:25;
153:19;172:1,16,21;
176:18;186:20;
194:23;196:25;
208:6;215:12

**maybe (13)**
4:25;40:3,12;
104:9;147:22;154:8,
23;174:6;178:23;
179:15;191:22;
201:6;216:15

**meal (1)**
90:23

**mean (22)**
38:3;39:23;45:8,
19;47:7;54:1;68:2;
87:14;89:16;102:21;
109:4;123:24;
126:15;132:16,25;
137:19;146:14;
188:14;190:17;
191:1;196:24;
198:25

**Meaning (1)**
84:15

**means (7)**
9:15;11:2;80:8;
126:5;135:19;202:1;
221:21

**meant (3)**
34:3;50:10;182:10

**measure (18)**
30:23;31:16;42:9,
18;61:12;66:9;88:5;
96:7,25;97:2;163:1;
168:8;191:23;198:7;
203:23;216:22;
217:2;221:10

**measured (4)**
46:3;60:16;64:7;
203:22

**measures (1)**
52:12

**measuring (11)**
42:16,19,21;43:9;
44:22,25;60:5;
93:12;94:22;100:1,2

**medication (1)**
13:18

**med-mal (1)**
179:20

**meet (1)**
167:8

**meeting (2)**
5:19,20

**member (3)**
70:6;135:22;211:6

**members (5)**
69:6,18;70:24;
210:13,16

**memory (6)**
13:19;105:11;
121:16;139:9;148:8;
203:11

**Mench (1)**
185:8

**mention (2)**
176:13,15

**mentioned (8)**
13:8;26:11;27:10;
40:19;176:14,16;
190:22;208:7

**mere (1)**
212:4

**mergers (1)**
198:11

**messages (2)**
8:23;9:2

**methodology (5)**
30:1;88:1;146:6,
15;184:2

**methods (2)**
58:7,10

**metric (4)**
216:1,2,19,22

**metrics (5)**
97:11;162:2,6;
214:24;215:7

**Michigan (1)**
179:20

**mid (2)**
57:11;65:9

**middle (1)**
114:24

**midpoint (6)**
51:25;52:4,8;65:4,
19;66:5

**might (20)**
6:1,10;9:25;10:9,
10;11:20;13:19;
18:7;23:5;26:15;
29:6;73:6;87:23;
146:16;153:21;
154:10;167:3,9;
172:9,12

**Mike (1)**
185:8

**million (25)**
40:9,11;41:19;
46:5,7,11;47:13,14,
18,19;54:7;55:22,22;
57:8,18,18;66:2,2,5,
8,9;125:6;126:5;
127:14;183:25

**mind (5)**
16:25;18:22;25:4;
188:5;212:4

**mine (2)**
117:5;187:15

**minimal (1)**

24:20

**minutes (4)**
48:11;164:19;
217:16,19

**mischaracterize (1)**
81:20

**miss (1)**
90:23

**misspoke (1)**
104:2

**mistaken (1)**
220:4

**Mitchell (90)**
32:9,13;38:5;40:8;
62:13,15;66:15;
67:13;68:5;69:4,6;
70:14;71:13;72:5,
18;73:3,16,22,23,24;
74:13,20;75:24,25;
76:9,12,19,22;77:2,
23;79:20;80:12;
81:17;82:5,15;
84:14;87:9;89:22;
91:16,24;92:6;93:1;
95:4;101:19;102:2;
107:10,19;108:6,7,
12,19;109:4,9;
115:13,17,19,21;
116:7,10,17,21;
123:19;124:12;
129:1;134:18;142:4,
21;143:10;160:3,21;
161:16;163:11;
165:6,15;166:2,8;
167:10;168:4;
191:25;193:9,15,21;
194:8;197:4;206:21;
207:16;211:14;
220:14;221:1,11

**Mitchell's (10)**
32:4;38:11;62:22;
71:18;74:8;75:21;
102:1;136:20;143:2;
164:8

**model (77)**
30:19;31:7,11,12,
12,16,23;32:1;33:14,
15,21,22,22;34:5,9,
13;41:23;42:3,4,9,
17,22;43:15,18,22;
44:17,22;45:15;
46:17,17;47:2,3,4,9,
12,18;49:20,23;
52:12;54:17,18,23;
55:13,14,14,21;56:3,
11;57:12,15,21,21;
58:11,13;61:3,21;
63:2;64:18,20;
67:16;69:16;70:17;
88:3,4;92:2;95:16;
113:21;123:5;
127:12,16;142:19;
157:16;168:24;

197:15,18,21,22

**models (9)**
47:7;57:20;60:14;
61:11,16,18;77:10,
11;87:19

**moment (2)**
18:23;19:4;30:13;
36:13;88:16;103:11;
164:16;182:3

**Monday (1)**
222:11

**money (4)**
202:13,18,25,25

**monies (2)**
139:13;140:13

**month (6)**
63:15;138:13;
199:20;203:14;
205:3,7

**months (6)**
32:5,17;49:25;
56:4;64:4;197:11

**months' (1)**
63:17

**more (39)**
15:22,24;19:25;
26:18;33:6,7,9;40:2;
41:15;45:13;53:11;
65:7;91:23;92:5;
112:4;126:9;138:24;
145:16;153:19,22;
155:11,21;156:3;
171:12,20;172:13;
181:20;182:8;
191:22;198:3,7;
203:23,24;204:12;
205:5;208:23;209:5;
212:3;217:8

**Moreover (2)**
124:11;141:24

**Moring (2)**
4:6,12

**morning (3)**
4:11,14;5:14

**most (13)**
18:19;20:18;24:7;
25:3,20;118:15;
182:6;199:23;
204:15,18;206:15;
218:9;219:4

**motivation (1)**
179:15

**move (7)**
40:13;68:20;85:5;
105:25;106:19;
109:2;186:20

**moved (1)**
106:23

**moving (2)**
137:21;217:13

**much (18)**
35:16;39:25;
40:15;83:15;90:19;

97:6;98:1;112:13;
137:21;145:15;
153:2;169:3;172:13;
177:8;197:11;
206:10;213:5;
215:11

**multi-national (1)**
153:1

**multiple (32)**
18:10;20:20,22;
27:13;28:17;29:3,
23;30:11;63:22;
67:21;70:10;137:9,
16;138:22;139:12,
12,22;140:4;150:16,
21;151:12,15,19,24;
180:25;181:15;
184:15;189:5;190:1;
207:20;215:9,17

**multiples (36)**
27:5,16,21;30:13;
63:22;65:1;69:23;
119:13;120:11,15,
15,25;137:19;139:6;
150:24;151:11;
182:1,23;183:2,6,11;
184:19;185:2,2,11,
12,13,16;189:11,21,
22;192:13;194:19;
214:5;215:22;217:3

**multiplied (1)**
64:25

**multiplying (1)**
66:1

**Murray (4)**
82:17;123:10;
128:1;193:22

**myself (1)**
185:15

**Mystic (14)**
14:9,21;16:5;17:4;
117:6,15,25;118:2;
169:10;181:11;
183:16;213:15,25;
214:17

**N**

**NA (1)**
175:3

**name (5)**
36:20;103:16,24;
105:6;106:6

**named (1)**
103:12

**names (1)**
99:1

**national (6)**
157:17,18;158:2,
18,25;159:13

**nationally (1)**
158:6

**nature (11)**

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 242 of 253
PageID 10337

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

25:1;28:20;46:17;
121:9,9;148:3;
153:3;161:5;187:14;
193:4;195:22
**NDAs (1)**
181:11
**near (1)**
186:21
**nearby (1)**
186:19
**nearest (1)**
63:16
**nearly (1)**
185:25
**necessarily (5)**
41:9;46:24;
119:25;146:22,24
**necessary (3)**
119:4,5;181:5
**need (24)**
6:10;10:3,18,20;
40:1,16;43:13;
45:13;46:1;63:18;
79:12;112:13;
125:10;152:23;
155:21;164:19;
171:17;173:19,20;
186:6;193:3;194:16;
202:25;222:9
**needed (6)**
6:19;22:10;37:11,
11;164:7;187:5
**needs (3)**
8:12;157:6,8
**negative (3)**
34:1;118:22;120:5
**negotiation (1)**
155:19
**negotiations (4)**
15:2,6,8;188:11
**neither (4)**
73:23;80:12;
82:16,22
**net (32)**
31:12;42:10,17;
43:15;44:8,11;47:2,
3,9,12;49:19;51:21,
25;53:1;54:17;55:7,
13,14,21,21;57:5,11,
21;58:10;64:19,20;
77:16,17;78:1;
92:12;127:12;
157:16
**new (25)**
11:4;36:14;45:12,
25;61:10;71:24;
85:13,14;92:22;
115:25;117:8,10,11;
118:6;132:17;
149:19;154:4;
165:19,24;167:8;
186:25;188:7;191:6,
8;198:14

**news (1)**
93:7
**next (20)**
50:18;85:19;
89:12;115:2;116:25;
117:18;121:3;
122:25;134:16;
142:3,10;147:1;
156:24;157:12,15;
159:23;160:2;172:2;
179:1;204:19
**nice (1)**
198:15
**nine (2)**
56:22;89:12
**nobody (1)**
111:23
**nod (1)**
50:12
**non-competes (1)**
96:20
**non-competition (1)**
26:1
**non-court (1)**
14:1
**none (2)**
18:22;88:21
**non-interference (2)**
26:1;118:21
**non-parties (1)**
181:12
**non-producer (1)**
69:18
**non-recurring (1)**
152:7
**nonresponsive (1)**
68:21
**non-solicitation (7)**
26:1;75:14;
118:21;165:21;
166:20;168:5;
211:10
**Nonverbal (2)**
31:8;170:3
**nor (3)**
73:24;80:12;82:22
**norm (1)**
25:15
**normal (8)**
78:15,18;100:11;
161:18,19;162:4;
163:8,14
**normalize (2)**
152:5;156:12
**normalized (1)**
155:15
**normalizing (1)**
153:12
**normally (2)**
71:6;167:19
**Notary (1)**
5:7
**note (2)**

**200:21,22**
**noted (1)**
148:2
**notes (7)**
6:16,23;7:4,9;
175:5,11;217:16
**notice (19)**
68:6;69:8,13;
75:13;99:8,8;100:12,
19,24;142:4;160:4,9,
10;161:16;165:17;
167:1;168:5,9;
178:15
**noticed (1)**
182:17
**notification (7)**
75:3,8,9;124:15;
211:14;212:4;217:6
**notified (5)**
72:7,9;74:22;
124:14;165:15
**notifies (1)**
212:13
**notifying (4)**
72:5;74:21;
124:13,19
**number (55)**
15:19;19:11;
29:23;40:23,23;
41:12;46:6;47:8;
50:19;51:17;52:8;
56:2;63:21;64:24;
65:15;73:7;75:9;
83:11;99:18,19;
102:19,24;121:11,
23;122:1;124:6,22;
139:22;140:12,12,
17,17,24;141:3,4,5,
11,12,14;152:18;
155:2;167:11;176:8;
184:11;187:22;
188:2,5;189:12,14,
15,18,23;198:14;
201:11;214:18
**numbers (16)**
7:21;47:21;51:9;
56:21;57:11;58:4;
65:10;79:12;122:20;
127:21;152:11;
153:4;204:4,7;
205:15;216:18
**numerator (1)**
122:9

**O**

**oath (3)**
5:5;13:11;90:11
**Object (130)**
19:3;24:22;26:7,
21;27:7,23;28:12;
31:18;35:5;37:17;
39:5,21;40:17;43:5;

44:14,23;46:14;
52:24;54:10,15;
55:2;58:3,19;59:2,
13,24;60:7,19;61:15;
62:3;65:12;67:8;
69:10;71:15;72:20;
74:1,24;75:4;76:24;
78:3;79:8;82:24;
85:2;86:14,23;
87:11;88:23;89:14;
93:16;95:12;96:1,
21;98:4;100:5,13;
101:13;103:20;
104:25;107:6,24;
108:8;109:11;
114:13;119:24;
120:13;122:21;
123:12;125:11,18;
126:20;127:7,24;
128:15;129:7,24;
130:16;131:25;
132:8;136:23;
140:15;145:5,10;
147:13;148:17,24;
149:18;151:6;
154:11;156:6,17;
162:11;163:3;
166:17;167:6;
168:10,21;172:1;
178:21;181:9,10;
189:24;190:7;
192:14,24;194:9;
196:11,14;197:20;
199:24;201:9,16;
203:18;204:14;
206:8;207:8,23;
208:5,12,18;209:7;
211:2,9,22;212:16,
21;216:11,20;
217:10;220:17;
221:3
**objected (1)**
208:10
**objection (13)**
10:17,22,23;11:3,
14,25;20:12,15;
81:19;82:7;85:20;
149:7;212:6
**objections (2)**
10:21,25
**objective (3)**
54:17;209:3,9
**observations (1)**
12:22
**observer (1)**
26:8
**obviously (3)**
124:18;149:20;
171:19
**occasionally (1)**
184:14
**occasions (1)**
12:8

**occur (2)**
27:10;190:12
**occurred (3)**
27:11;191:15;
212:23
**OCEO (3)**
48:7,7;174:5
**OCR (1)**
177:1
**October (3)**
4:4;112:19;169:19
**off (16)**
8:21;48:12;90:3;
112:1;134:10;
143:12;164:22;
167:9;174:6,7;
198:8;206:9;217:21;
221:21,25;222:8
**offer (4)**
10:16;35:8;110:1,
4
**offered (5)**
13:22;30:19;31:9;
60:13;61:22
**offering (1)**
181:25
**office (11)**
22:12,18;41:14;
121:5;126:11;
147:21;186:19,20;
187:13;206:23;
207:3
**officer/director (1)**
34:22
**offices (1)**
186:15
**offsetting (2)**
159:8,10
**often (3)**
124:24;191:10;
215:3
**old (2)**
119:4;174:22
**omissions (1)**
34:23
**Once (2)**
142:3;160:3
**one (90)**
6:14;7:22;11:1;
16:25;17:3;21:18,
22;24:7;30:23;44:6;
46:4;50:20;52:5,10;
57:13;63:3;64:23;
65:10,15,25;75:9;
78:13;81:10,11;83:1,
10;90:20;98:11,19;
102:19;103:14,14;
104:1,5,7,16,20;
105:13,23;106:9,11,
14,22;108:21,24;
112:11,12;116:19;
118:3;126:4;130:15;
146:21,23;147:20;

Case 8:23-cv-00201-TPB-AAS   Document 128-4   Filed 11/30/23   Page 243 of 253
PageID 10338

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

149:15;153:19;
154:23;156:2;
161:12,17;176:3,14,
14,16,17,21;177:7;
179:23;183:2,19,20,
22;184:1;187:10,17,
21;188:4,13;190:13;
199:23;200:1;
201:13;205:3,5,5,6;
206:5,6;216:15;
221:12

**ones (7)**
15:18;98:18;
175:13;181:20,21;
182:21;191:14

**ongoing (1)**
191:20

**only (43)**
11:4;17:9;21:17,
23;26:20;33:12;
42:9;43:9,20;45:6;
50:5;52:13;53:1;
54:24;57:10;58:9,
13;67:4;78:20;
82:15;105:10;
109:12;110:15,15,
21;111:18,20;
115:18;127:4,8;
128:23;139:3;
142:20;157:22;
158:2;169:15,18;
180:19;183:25;
200:16,17,24;220:25

**onto (1)**
154:5

**open (4)**
5:18;169:13;
174:14;182:8

**operate (1)**
166:4

**operation (1)**
149:11

**opinion (45)**
14:4;29:9;30:15;
59:21;60:4,8,11;
66:12;72:3,11,14,16;
75:6;79:24;84:14,
24;85:9,18;86:11;
87:7,12;89:20,23;
91:22;92:5,23;
97:25;110:2,4;
114:2;126:14;127:2,
4;129:21;130:9;
151:24;164:7;
165:14;173:1;
181:14;196:18;
201:18;215:16;
216:3,19

**opinions (10)**
13:23;28:8;29:3,
14;149:14;171:23;
172:20,25;173:4;
182:24

**opportunity (7)**
71:24;85:13,15;
92:16,21;165:23;
215:13

**opposed (10)**
18:17;19:2;21:8;
26:14;36:12;75:24;
76:22;141:6;202:18;
219:17

**order (3)**
81:24;108:14;
216:14

**ordering (1)**
222:5

**orders (1)**
222:3

**original (5)**
7:23;11:8;113:12;
114:20;173:2

**originally (2)**
114:22;213:12

**others (9)**
34:25;83:14;
104:23;114:6;
147:21;149:15;
156:2;182:9,13

**otherwise (4)**
11:16;14:6;52:9;
192:12

**ourselves (1)**
111:4

**out (19)**
44:19;50:21;
56:21;77:25;91:8;
128:18;140:18;
141:8;152:6,23;
157:9;176:19,24;
181:6;184:20;
185:16;186:25;
197:19;213:24

**outside (10)**
37:6,20;38:14;
99:23;110:15;
111:16,20,23;
162:23;167:20;
200:8;221:15

**over (22)**
8:5,12;26:16;
45:21;47:13,19;
51:22;55:23;75:16,
17;90:14;94:23;
97:16;101:11;
146:20;148:22;
154:4;165:3;174:21;
194:23;199:8;213:3

**overlaying (1)**
154:4

**overpay (1)**
216:25

**overpriced (1)**
215:21

**overstaffing (1)**
154:23

**overstated (1)**
203:20

**overstatements (1)**
144:7

**own (5)**
9:6,10;59:17;
130:9;144:14

**owned (4)**
130:6;133:17;
135:3,9

**owner (1)**
187:12

**owner's (2)**
152:21;154:24

**ownership (6)**
129:18,22;130:4,
5;133:15;135:8

**owns (4)**
130:11,12;136:12;
146:16

---

## P

**P&L (4)**
157:23;158:2,14,
22

**page (37)**
8:6;49:4,5,8,9;
65:23;113:1,2,4;
115:2;116:25;117:1;
122:25;124:9;
129:13;135:13;
137:4;142:10,11;
143:15;144:5;147:1,
1;150:14,15;157:10,
13;170:7;177:24;
178:5;179:25;180:6,
6,6,17,19;204:25

**paid (24)**
32:8;45:17;52:14;
56:9;132:16;139:11,
14,23;140:1,5,5,14,
23,24;141:1,1,5,6,9,
13;154:9;182:20;
191:4;216:10

**painting (1)**
187:13

**paragraph (15)**
113:7;114:1;
115:3;117:2;121:3;
124:10;130:1;135:3;
137:6;142:3,12;
147:2;156:24;
159:24;205:12

**Paramount (2)**
175:18,22

**parenthetical (1)**
136:10

**parents (2)**
136:21,21

**part (26)**
6:15;15:6;20:7,25;
23:12;30:8;35:7,16;

45:22;67:6,11;70:8;
94:7;116:5,11;
120:17;126:15;
140:18;143:11,16;
155:16;161:3;196:4;
199:23;217:11,14

**participate (1)**
177:25

**participated (8)**
16:22;175:10,25;
177:19,24;180:2,20;
187:16

**particular (7)**
18:25;23:2;34:13;
35:14,24;37:11;
42:3;77:6;87:13;
89:4;109:20;110:2;
123:22;131:18;
149:21;153:17;
167:24;168:2;171:2;
184:19;190:20

**particularly (4)**
21:13;22:7;29:19;
181:20

**parties (9)**
4:9;69:3;139:14;
140:6,14;141:5;
178:17,20,23

**partners (3)**
117:25;118:3;
213:16

**past (4)**
83:18;190:25;
200:16,17

**patent (3)**
23:3;146:14,15

**patents (2)**
145:17;195:15

**Patriot (5)**
178:7;179:4;
182:15;190:10,12

**Patriots (1)**
179:7

**Patriot's (1)**
182:17

**pause (1)**
9:25

**pay (6)**
33:1;67:17;70:18;
120:22;189:22;
216:14

**payable (2)**
32:11;139:20

**paying (2)**
139:18;189:5

**payment (7)**
132:10;139:25;
140:1,18;216:7,13,
16

**payments (4)**
139:19;141:8;
152:21;153:2

**PCF (1)**

180:11

**PDF (1)**
49:8

**Pending (1)**
131:13

**people (13)**
8:19;36:5,23;
120:22;125:17;
137:1;138:10;
143:25;144:3;
154:17;155:21;
158:10;207:12

**per (4)**
159:16;160:23,24;
162:14

**percent (39)**
32:24;33:4,8;50:1,
25;51:1,1,5,13;52:5,
9;53:8;56:8,18,23;
57:12;58:1;65:15;
91:14;94:2;96:6;
160:25;161:25;
162:2,4,9,10;198:17,
20,25;199:8,9;203:5,
9,21;209:11,18;
210:2;218:19

**percentage (4)**
53:8,13;162:20,21

**perfect (1)**
10:18

**perform (1)**
59:14

**performance (2)**
162:1;199:7

**performed (5)**
76:5,25;135:25;
176:2;181:16

**period (20)**
25:8;26:2;63:11;
71:8;75:13,15;87:13,
24;90:15;92:16;
99:8;100:12,24;
118:9;159:24;
165:21;168:12;
199:17;211:10;
216:15

**periods (1)**
26:10

**permitted (1)**
80:13

**person (8)**
24:24;36:9;96:12;
114:24;164:4;191:7,
9,12

**personal (9)**
24:12,20;27:12;
28:17,21;149:23;
175:7;184:8;187:13

**personally (7)**
14:11;16:20,22;
162:18;163:25;
180:1;185:3

**personnel (14)**

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 244 of 253
PageID 10339

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

6:17;24:6,19;
39:12;40:16;41:8,
24;43:3,12;61:6;
67:19;68:11;117:11;
158:17
**pertinent (2)**
85:25;148:11
**PGT (3)**
108:24;200:19,23
**ph (8)**
17:1,1,2,6;18:1,1,
8;185:8
**phone (2)**
8:14,17
**phrased (1)**
45:7
**physical (4)**
22:19,21;187:3,5
**pick (1)**
176:24
**piece (10)**
18:21;19:7;20:18;
21:18;69:23;139:16;
146:8;174:25;175:2;
185:23
**pieces (2)**
30:3;92:8
**pinpoint (1)**
97:19
**place (17)**
31:22;33:24;38:7;
42:6;61:6,10;75:11;
118:19,19,25;119:7,
8;130:23;155:5;
165:19;187:9;215:6
**plaintiff (1)**
4:15
**plans (1)**
161:17
**play (1)**
204:12
**players (1)**
198:14
**playing (1)**
71:18
**please (13)**
5:2,4;8:10,24;9:8,
18;10:11,22;11:15;
105:8;195:1;196:14;
222:4
**PM (9)**
90:3,8;134:10,14;
164:22;165:1;
217:21,25;222:8
**point (18)**
4:24;8:8;42:23;
57:11;65:3,3,10;
70:9;102:6;117:5;
121:4;145:15;
152:12,15,16;172:4;
174:7;217:6
**points (1)**
124:25

**poisoned (10)**
72:5;74:20;79:20;
84:14,23;87:9;
123:19;124:12;
160:10;165:10
**poisoning (3)**
89:22;124:16,17
**policies (29)**
22:2,4,16;23:25;
24:2,5,13,18;27:4,
17;28:4,10,16,21;
29:7;33:4,6;83:12,
12;130:11,13,14;
131:15,18,21,23;
132:17;133:10;
205:6
**policy (11)**
25:2;130:23;
131:2,5,6,9;132:6;
133:2,4,7;205:5
**policyholder (1)**
25:4
**poor (1)**
154:6
**pops (1)**
17:3
**portion (9)**
17:9;26:6,20;
69:16;71:6;135:1;
140:4;151:3;157:22
**Portions (2)**
7:13;153:20
**possibility (2)**
87:22;89:11
**possible (1)**
118:14
**possibly (1)**
98:6
**post-acquisition (1)**
153:14
**posting (1)**
212:11
**posts (1)**
29:4
**post-termination (1)**
26:3
**potential (3)**
189:16,17;197:23
**potentially (5)**
24:15;28:20;
96:11;172:6;207:9
**Power (3)**
36:20;37:15,19
**practice (6)**
115:6;119:20;
120:3;148:23;161:7,
19
**practices (10)**
148:15;185:4;
214:9,13,21,25;
215:8,25;216:1;
217:1
**preceding (2)**

130:1;133:3
**precise (2)**
15:19;205:8
**precisely (1)**
12:20
**predominating (1)**
192:12
**prefer (3)**
8:18;46:19;59:17
**preliminary (11)**
80:5,11,23;81:7,
16;83:6,24;84:4,10,
25;101:20
**premiums (1)**
54:2
**prepared (4)**
113:21;174:16,18;
200:10
**preparing (3)**
27:15;171:22;
174:20
**present (24)**
4:9,20,23;42:10,
17;49:19;51:21,25;
55:7,21;57:5;65:17;
77:16;92:13;94:24;
95:1;127:12;174:17;
201:22;202:1,8,11,
16,21
**presentation (1)**
127:22
**presentational (2)**
57:19;59:4
**presented (2)**
31:20;65:3
**presenting (1)**
59:5
**presently (1)**
5:15
**president (1)**
138:20
**press (1)**
183:24
**presume (4)**
39:23;106:16;
128:21;133:25
**pretty (4)**
29:13;98:17;
103:15,24
**prevailing (1)**
189:21
**prevented (2)**
165:6;166:7
**previous (4)**
56:10;57:15;93:2;
96:5
**previously (24)**
15:5;29:8;44:16,
24;52:25;53:19;
61:17;62:23;79:3;
104:2;127:15;
132:23;142:16;
143:15;150:23;

151:7;160:3;168:23;
186:10;190:1;
193:12;194:11;
204:25;216:24
**price (3)**
15:14;70:18;146:3
**pricing (5)**
19:10;137:11;
138:25;178:3;
183:20
**principal (1)**
118:2
**printout (2)**
5:23,25
**printouts (1)**
5:23
**prior (29)**
38:4;40:10;67:10,
12;71:20;84:18,19,
20;86:17;94:15;
108:12,23;109:1;
124:19;125:23;
129:18;131:5;
137:12;142:5,23,24;
154:20;155:24;
160:5;171:17;
193:14;197:5,11;
212:24
**priority (1)**
36:7
**privilege (1)**
12:3
**pro (16)**
20:1,2;21:5;29:22;
30:4,10;63:21;
64:24;68:3;151:16;
152:6,10;153:12;
155:15,22;156:13
**probably (5)**
9:11;10:2;15:25;
46:1;164:20
**problem (2)**
13:19;173:13
**procedure (4)**
29:16;78:15,18;
206:11
**proceeding (1)**
14:6
**proceedings (1)**
14:1
**process (4)**
30:14;102:9;
155:19;187:9
**processed (1)**
152:22
**processes (1)**
195:15
**processing (1)**
135:24
**produce (7)**
6:13;28:2,6;59:16;
60:9;78:12;133:14
**produced (8)**

5:24;6:1,9,11;
7:24;22:3;139:4;
171:3
**producer (70)**
31:11,16,25;
32:11;33:13,20;34:5,
8;41:18,25;42:4,8;
43:16,17,21;44:6,21;
45:10;47:4,9,17;
49:19;50:2,20;52:1,
14,17,18;53:3,7,14;
54:13,18,23;55:4;
56:3,8;58:2,13,14,
25;61:3;70:19,21;
94:13;96:19,23;97:8,
20;100:19,21,22;
113:23;115:25;
127:17;133:14,15,
24;135:7,8;145:14;
148:16;149:15;
162:10,22;163:17;
188:6;191:4;210:6;
219:7
**producers (65)**
21:16;24:2;28:19;
32:15;33:3;34:18;
41:13;43:23;52:14,
15;56:9;67:6,25;
95:25;96:10;97:15;
98:22;99:1,8;
113:25;115:7;116:5;
117:8;118:7;120:4;
121:5;124:6;128:9;
139:14,18;140:6;
141:9;142:17;143:1,
16;144:1,11,13,16,
25;149:4,4;166:4;
187:18,22;188:11;
189:6,23;191:16,25;
192:4,10;194:4,12,
13;204:21;209:15,
20,25;216:8;218:9,
12,20,24;219:4
**producers' (2)**
94:7;121:24
**producer's (6)**
94:16;95:24;97:8,
9;98:2;151:8
**produces (1)**
149:5
**producing (6)**
21:5;67:20;102:9;
130:12;171:2;
214:20
**product (3)**
12:4;24:11,14
**production (11)**
22:7;45:19;67:10,
22;69:22;85:13;
102:10;104:4;
105:12;106:16;
130:3
**products (7)**

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 245 of 253
PageID 10340

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

34:18,21,24;35:3;
37:4,10;38:12
**professional (1)**
112:4
**profit (59)**
31:11,15,25;33:13,
20;34:4,8;41:23;
42:4,8;43:15,16,21;
44:2,8,8,11,21;
46:20;47:4,8,9,12,
17;49:11,16,19;
50:20;52:1;54:17,17,
22;55:13,14,21;56:3;
57:11,17,21,25;
58:10,13;59:5,16,19;
60:15;61:2;76:6;
77:10,17;87:22;
127:16;157:16,16;
197:7,15;201:21;
203:4;204:2
**profitability (1)**
88:10
**profits (55)**
30:19;31:3,6,12;
42:16,19;43:9,12;
44:5,12,22;47:2,3;
55:20;59:11;61:12;
63:3,25;64:4,17,19,
20;77:25;78:1;
86:21,25;87:4,5,7,
18;88:2,4,17,19,20;
89:3,7,8;91:3,5,8;
92:12,13;93:5,6,12,
18;94:21;95:2,15;
100:25;127:12;
197:13,23,25
**project (2)**
92:20,25
**projected (3)**
92:12,13;197:13
**projecting (6)**
44:19;46:19,21;
87:1;116:5;197:10
**projection (1)**
87:4
**projects (2)**
91:8;197:19
**proper (3)**
28:9;29:3;181:14
**property (26)**
22:25;23:1,5,12,
18,20;135:4,6;145:3,
9,12,14,16;146:11,
14;150:6,9;186:8,11;
195:10,12,13,15,20,
22,24
**proposed (1)**
150:21
**prospective (1)**
114:5
**provide (8)**
12:1,2,11;59:21;
60:4;164:6;190:20;

206:14
**provided (19)**
7:15;29:18;37:3;
114:6,12,16,18,19;
136:3;154:8;160:24;
196:22;199:12;
206:16,17;208:11,
15,19;211:14
**provider (1)**
214:24
**provides (1)**
34:17
**providing (5)**
14:23;36:17;
60:21;167:21;
208:11
**provision (2)**
69:13;164:10
**provisions (2)**
26:2;168:6
**proximately (1)**
16:21
**PSC (1)**
199:4
**public (1)**
184:1
**publications (1)**
185:15
**publicly (2)**
166:5;175:2
**published (2)**
183:20;205:24
**pull (2)**
134:6;169:3
**purchase (6)**
21:8;71:11;146:3;
178:8;179:13;187:6
**purchased (3)**
151:13;176:9;
218:15
**purchaser (1)**
189:21
**purchaser's (1)**
153:14
**purchasing (1)**
71:4
**purely (1)**
59:3
**purpose (2)**
35:25;100:6
**purposes (4)**
57:19;127:22;
138:12;207:2
**put (13)**
6:20,20;111:3;
140:10;165:19;
169:10;171:4;
172:22;173:21,24;
181:10;199:9;
202:25
**putting (1)**
166:8

**Q**

**qualifications (1)**
213:3
**qualified (3)**
110:1,4;173:1
**quantified (1)**
188:19
**quickly (1)**
83:13
**quiet (1)**
138:13
**quite (16)**
23:19;31:1;36:6;
42:13;63:25;96:4;
124:24;143:21;
146:18;187:9;191:9;
199:5;200:1;205:7,
9;212:17
**quote (2)**
121:17;185:6
**quoted (1)**
215:3
**quotes (1)**
185:10
**quoting (1)**
185:13

**R**

**raise (3)**
5:4;9:3;10:2
**ran (3)**
50:21;51:9;56:21
**range (24)**
15:21;51:10,25,
25;55:22;57:8;
63:22;65:2,11,17,18;
66:1,8,19;78:21,25;
79:7;137:9;138:18,
22;150:21;184:6;
215:24;217:3
**ranges (4)**
48:4;57:18;
137:16;215:17
**rare (1)**
186:11
**rarely (2)**
161:6;184:14
**rate (28)**
51:22;57:3,4,6;
91:11,13;100:11;
161:18,25;162:2,4;
163:8;169:25;
198:21,25;199:4;
202:12,17,21;203:1,
3,17,22;204:2;
209:12,19;210:6;
218:19
**rates (3)**
160:25;168:24;
182:2

**rather (2)**
182:11;207:20
**ratio (1)**
122:11
**reach (1)**
213:24
**read (17)**
36:2,6,25,25;
69:11;73:6;80:15;
82:9;98:11,17,19;
109:12;131:17;
135:18;136:24;
144:21;221:20
**readily (1)**
198:9
**reading (6)**
38:22,25;83:2;
96:16;97:12;158:12
**reads (1)**
129:17
**ready (1)**
198:2
**Reagan (1)**
214:16
**real (17)**
52:21;71:1,3;
87:23;88:6,22;93:15,
22;94:6;100:18;
122:19;140:16;
152:16;186:16;
220:13,19,20
**reality (1)**
79:25
**realize (1)**
120:18
**realized (1)**
188:22
**really (47)**
18:12,13;21:12;
23:20;29:10;37:18;
46:15,16,16,16;
50:14;64:1;69:22;
79:13;84:15;85:25,
25;92:14,20;93:22,
23;94:22;97:19;
99:25;103:15;107:8;
122:8;123:13;
131:17;137:21;
154:25;155:21;
167:9;183:6;186:4;
187:9;188:4;190:2;
192:19,22;198:1;
200:1;213:4,20,20,
20;214:2
**re-ask (1)**
36:13
**reason (5)**
11:13;13:16,20;
21:21;199:17
**reasonable (9)**
118:9;160:14,19;
161:14,14;163:9;
167:2;201:14;

222:11
**reasonableness (1)**
217:3
**reasonably (3)**
88:18,19;202:10
**reasons (3)**
77:5;79:6;156:2
**rebuttal (21)**
6:11;7:11;67:3;
110:6;111:6;112:7,
10,16;113:12,20;
117:1;129:14,15;
137:3,4;165:4;
169:23;170:23;
171:11;173:3;
205:13
**recall (68)**
17:12;18:12,13,18,
24;19:4,14;24:7;
26:9,10,17,22,22,24;
38:22,25;40:14,18;
69:12;80:25;82:18;
83:2,15;98:23;99:3,
5,16;103:14,24;
104:4;105:12;
106:11,13,17;
117:13;121:16;
133:25;134:3,4;
139:16;145:12;
147:9,14,17;148:13,
25;149:9,24;151:21;
156:8;157:21,25;
158:7,8,12,16,20;
165:8,9;179:11,15;
181:4;189:11;190:1,
3;203:16;208:6;
215:19
**recalls (1)**
121:18
**recap (1)**
49:23
**receive (4)**
8:23;33:4;202:4,5
**received (1)**
132:11
**receiving (2)**
9:2;32:13
**recent (2)**
96:14;200:2
**recently (6)**
96:3,4;112:21;
181:20;188:7;191:5
**recession (1)**
213:19
**recognized (1)**
133:7
**recollect (2)**
104:3;105:22
**recollection (3)**
99:11;184:9;205:8
**record (32)**
4:1,20;10:13;11:1,
24;13:9;34:3;48:12,

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 246 of 253
PageID 10341

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

16;49:7;74:4;90:3,7;
104:12;105:19;
106:19;111:1,4;
133:1;134:10,14;
164:22;165:1;
177:11;181:10;
186:5;203:8;217:21,
25;221:23;222:4,8
**records (2)**
63:14;186:2
**reduce (2)**
126:18,24
**reduces (1)**
118:23
**reducing (1)**
128:13
**reduction (4)**
40:2,12;53:20;
202:16
**re-entered (2)**
92:6;93:1
**re-entering (1)**
91:24
**RE-EXAMINATION (1)**
218:7
**refer (6)**
18:3;47:20;62:7,
19;147:2;148:18
**reference (7)**
15:4;98:23;
103:23;124:22;
136:15,25;214:11
**referenced (7)**
99:17;109:1;
113:12;129:25;
159:2,15;172:6
**referencing (2)**
75:7;124:20
**referred (6)**
38:23;44:1;66:24;
92:16;132:22;
188:13
**referring (7)**
6:1;62:20;67:1;
69:1;102:15;161:23;
198:17
**refers (2)**
145:13,13
**reflected (1)**
139:10
**reflection (1)**
198:3
**refused (1)**
101:10
**regard (5)**
26:23;37:20;
118:20;149:9;
153:17
**regarding (5)**
103:7;104:14;
105:21;130:24;
147:18
**regardless (5)**

11:14;95:10;
136:3;148:2;168:14
**regards (2)**
115:14;153:16
**region (5)**
158:9,10,11;159:4,
6
**regional (5)**
98:15;157:23;
158:1,14,22;159:3
**regionally (1)**
158:5
**Regions (2)**
98:15;158:25
**regular (1)**
152:13
**reiterating (1)**
130:7
**relate (2)**
5:22;8:23
**related (13)**
18:16;28:3;29:6;
77:17;90:15,16;
95:23;108:16;148:7;
162:19;171:22,24;
172:25
**relates (1)**
42:10
**relations (1)**
85:14
**relationship (20)**
24:14;70:19;
115:5,16,18,20,20;
116:21;118:1,10;
123:20;124:7;
136:13;149:20;
150:11,12;165:10,
24;166:24;189:6
**relationships (27)**
23:23;24:1,20,24;
27:18;28:5,11;29:5,
6;72:1;84:22;92:18;
113:23,23;117:11;
118:8;136:18;
145:14,22;149:6,15;
150:7;167:12;
187:18;191:13;
192:10;201:15
**Relative (1)**
146:5
**relatively (3)**
186:18,22;191:2
**relayed (1)**
114:20
**release (1)**
183:24
**relevant (10)**
28:20;86:19;
93:23;100:15,17;
101:1,1;107:1,7;
116:7
**reliable (1)**
98:6

**relied (6)**
204:11;208:19;
215:1,2;216:2,4
**rely (4)**
94:12;122:8;
181:16;208:15
**relying (3)**
20:25;161:17;
163:7
**remain (5)**
90:11;155:3;
160:15;163:10;
186:23
**remained (5)**
72:24;86:4;116:6;
131:23;197:18
**remaining (2)**
103:8;207:15
**remarkably (1)**
199:20
**remember (15)**
81:4;90:22;
108:23;147:16,23,
24;150:2;181:9;
189:9;205:16;
207:21;209:13;
210:14;211:17;
218:22
**remembered (1)**
106:14
**reminded (1)**
90:20
**reminder (1)**
110:22
**remove (1)**
8:18
**renewal (4)**
130:23;131:18,22;
133:5
**renewals (1)**
132:17
**renewed (4)**
131:2,9,16;133:11
**renews (2)**
53:11;131:6
**repeat (6)**
43:6;60:1;83:19;
101:22;126:21;
143:22
**repeating (1)**
95:14
**rephrase (4)**
42:12;83:20;
209:2;212:9
**report (93)**
5:25;6:12;7:5,6,
11,11,13;20:25;
47:20,22,25;48:20,
21;49:5;55:24;
59:19;62:8;65:17;
66:11,21;67:3;
77:14;100:6;102:10;
103:21;105:7,10;

110:6;111:6,7;112:7,
10,15,16;113:2,8,9,
11,12,15,15,19,20;
114:8,14;117:1;
121:7,17;122:5;
123:3;124:23;
129:13,14,15;
133:13;137:4,4,23;
140:9;141:2;142:11;
144:5;147:1,2;
150:14,20;159:16;
162:1;165:4;169:23;
170:10,10,14,19,23;
172:22;173:2,3;
185:4,6;197:24;
200:6,6;203:10,17;
204:16;205:1,13,22,
23;214:9,14;215:8
**reporter (11)**
4:8;5:2,4;50:14;
111:1;156:18;174:9;
198:8;202:14;222:3,
9
**reports (4)**
5:24;21:7;171:9;
199:7
**represent (2)**
4:10;41:2
**representatives (2)**
39:13;144:2
**representing (9)**
14:21;15:10;
16:16;17:6;20:11,
16;179:5;185:9;
189:1
**represents (1)**
43:18
**repurposed (1)**
125:17
**request (4)**
4:6;99:21;111:15;
171:1
**requested (6)**
14:23;59:15;
101:4,17;208:3,7
**requests (1)**
6:14
**require (2)**
26:18;172:12
**required (1)**
82:10
**requirements (1)**
69:7
**requires (1)**
26:5
**research (3)**
172:15,18;185:15
**reservation (1)**
221:24
**resign (7)**
73:3,17,25;99:9;
161:17;163:12;
211:16

**resignation (1)**
100:20
**resignations (3)**
32:4;98:21;102:3
**resigned (1)**
62:15
**resigning (2)**
165:5,16
**resource (2)**
35:19;40:13
**resources (14)**
34:11,15;35:3,11;
36:12,18;37:3;40:2;
158:9,11,18,19;
159:13;217:8
**respect (5)**
69:5;70:16;74:7;
85:10;201:20
**responding (4)**
15:11;40:19;
124:25;150:18
**response (2)**
31:8;170:3
**responsibility (1)**
114:3
**restrictions (7)**
25:6,11,18;26:5,
14,15;71:7
**restrictive (24)**
68:18,22,23;
69:17;75:11;76:15;
94:8,14;95:10,25;
97:9;98:2;118:20;
119:2,4,9,18,22;
120:4,19;143:7;
210:16,20,24
**result (1)**
60:5
**resumed (5)**
48:14;90:5;
134:12;164:24;
217:23
**retail (1)**
135:20
**retain (13)**
52:21;85:16;
94:15;95:24;97:7;
98:2;132:18;142:7;
160:7;164:1,8;
216:13;220:21
**retained (26)**
50:25;52:9;55:16;
74:9,12,15;92:24;
93:13;101:25;102:5,
6,15,17;104:5,8;
105:13,17;106:12;
107:2,4;132:22;
161:15;162:9,20,21;
207:5
**retaining (4)**
56:14;58:12,25;
94:6
**retention (20)**

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 247 of 253
PageID 10342

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

52:5;55:13;56:18;
57:13;64:16;141:9;
160:25;161:25;
198:17,20,25;199:4,
9;209:12,19;210:6;
216:7,13,15;218:19
**retire (2)**
148:16;149:25
**retrieve (1)**
8:9
**return (3)**
87:23;88:21;89:12
**returns (2)**
96:19;114:6
**reveal (1)**
11:22
**revenue (72)**
21:5;29:21;30:6,8;
32:5;33:5;39:24;
40:1,3,5,15,23;41:5,
20;42:1;43:11,17;
44:6,18;46:4,11,21;
49:25;51:19;53:3,6,
8,13,15,18;54:1,6,7,
20,24;56:4;61:18;
63:11,18;70:2;
75:17;77:13,14;
125:5,9,15;126:4,6;
127:14;130:12;
131:3,7,8;132:3,5,
19,23;133:4,6,7,9,
10;152:8;153:8;
197:12;199:18;
200:13,24,25;206:3,
23;207:3
**revenues (8)**
32:1,17;33:13;
64:5,13;130:22;
131:23;202:3
**reverse (2)**
202:12,17
**review (8)**
26:4;36:22;47:25;
92:4;98:14;170:14;
172:9;215:13
**reviewed (7)**
23:7,15;29:18;
36:15;98:9;114:5;
171:9
**Richard (1)**
4:7
**right (91)**
5:4,14,21;6:5;8:4;
9:14,23;12:7,25;
13:21;14:8;18:22;
19:14;31:9;41:4;
46:7;47:8,16;48:5;
49:4,14,21;50:5,18;
52:17;54:6;55:7;
58:9;60:24;61:21;
63:1;65:24;68:23;
71:22;79:24;81:2;
84:11;85:19;86:13;

89:24;90:7,10,14,17;
91:2,10;101:15;
102:3;110:5,17,24;
113:17;117:12,19;
118:5;121:13,25;
126:6;127:19;
129:12;130:4;
131:12;133:10;
135:4,13;141:25;
142:1,7,18;143:10;
148:1;152:17;158:3;
160:7;166:2,5;
167:17,23;169:5;
173:6;177:1;180:17,
18;194:16,25;
201:24;210:13;
217:18;219:1,2,14
**right-hand (1)**
113:5
**rights (6)**
70:19;130:5;
133:16;135:8;
145:23;185:19
**risk (4)**
35:12,16;86:5;
161:10
**Robin (3)**
4:2;5:8;221:21
**Robitaille (1)**
176:22
**Rodriguez (3)**
82:16;128:2;
193:22
**role (7)**
14:14,24;15:7;
16:12;144:15;175:7;
204:12
**rolled (1)**
146:9
**Romine (4)**
4:21;47:25;
110:18,22
**room (3)**
9:5,7;41:13
**roster (1)**
191:3
**rounding (2)**
55:22;164:20
**Royal (1)**
4:18
**rude (1)**
10:3
**rule (4)**
40:21;126:3;
198:24;206:3
**rules (1)**
8:5
**ruling (1)**
11:2
**run (1)**
58:4
**Ruth's (6)**
106:5,7,13,18,23;

107:22

---

**S**

**SAITH (1)**
222:14
**salaries (4)**
45:16,20;153:22;
154:7
**salary (2)**
45:11;155:1
**sale (41)**
17:11,11,13;
18:16;21:8,14,25;
24:18;25:8;27:4,4,
17,17;28:4,4,9,10;
29:4,5;62:1;67:6;
71:11;115:6,24;
116:5;142:22;
143:16;144:11,23;
145:19,20;150:25;
155:25;157:1,3,20;
178:8;179:12;
185:19;187:15;
192:11
**sales (6)**
22:8;53:9;164:4;
188:7;198:12,12
**Salton (1)**
4:23
**same (33)**
8:6;9:19;10:19;
13:12;54:3;56:2,10;
57:14;62:18;63:10;
79:2;90:11;93:9;
95:14;112:15;
120:11,11;150:24;
155:3;156:15;
173:19;178:15,17,
18,22;189:22;
210:25;211:7;
218:12;219:24;
221:24;222:6,7
**Santiago (8)**
98:10,11,16;
99:16;121:12;122:1,
10;157:22
**Sara (2)**
4:21;174:6
**satisfaction (3)**
39:2;199:11;201:8
**satisfied (4)**
38:11;103:4;
104:21;201:10
**save (2)**
169:4;173:20
**saw (2)**
96:3;137:12
**saying (21)**
42:23;51:4;70:17;
93:11;94:18;96:13,
17;97:13,18;106:15;
108:19;109:8;119:6;

121:17;122:6;140:3;
141:10;160:18;
183:24;189:20;
202:23
**scan (1)**
176:25
**scenario (16)**
31:21,23;52:20;
61:9,11;71:3;92:23;
94:13;95:3;96:8,12,
18,23;192:15;
212:22,23
**scenarios (4)**
19:20;50:25;52:7;
209:19
**schedules (2)**
187:7,10
**scope (10)**
37:6,21;38:15;
39:9;73:19;77:7;
99:24;162:24;
167:20;221:15
**Scottsdale (1)**
176:19
**screen (9)**
49:13;66:25;
111:13;113:3;
135:17;137:5;
169:21;173:8;195:1
**searched (1)**
183:19
**searching (1)**
15:12
**second (36)**
31:12;48:1;50:1;
55:8;56:7;61:21,22,
24;64:10,17;74:1;
112:12;113:7;114:1;
115:3;124:10;129:3;
139:15,16;140:4,12,
24;141:3,5,14;144:9;
147:2;159:23;
161:21;170:7;
173:19;178:5,21;
181:8;187:20;
212:22
**Section (8)**
123:3;135:15;
142:10,13;144:6;
157:12,15;159:23
**seeing (5)**
38:22;106:13,17;
183:6;184:7
**seem (4)**
108:16;118:13,14;
176:18
**seemed (3)**
96:7;162:6;207:18
**sell (2)**
17:8;154:18
**seller (41)**
14:21,21;16:17;
25:3,6,16,20,21;

26:19,19;67:18;
70:18;71:4;139:11,
20,23;140:2,5,14,24;
141:1,6,13;147:17;
151:18;154:15;
155:19,20;175:14;
177:3,13,16;178:7;
179:19;180:10,17;
181:22;183:18;
187:25;189:2;
207:19
**sellers (2)**
182:8,9
**seller's (4)**
71:7;151:25;
152:4;153:12
**selling (22)**
17:7,7;21:13,14,
14,17,17,23;24:6,19;
25:16;26:14,19;
70:8;86:6;142:20;
154:16;157:6;
183:23;185:22,23;
186:18
**senior (1)**
138:20
**sense (1)**
124:18
**sensible (1)**
85:5
**sentence (8)**
115:4;129:17;
133:13;135:6;
141:23;142:15;
144:9;160:2
**sentences (1)**
118:16
**separate (5)**
23:5;31:1;34:17;
42:16;146:16
**September (1)**
104:13
**Series (24)**
4:13,22;32:3;
62:14,21;68:12;
69:19;70:12;83:5,
23;84:9;107:20;
130:21;207:25;
208:4,10,23;209:5;
210:4;211:13,21;
212:12;217:8,13
**served (1)**
177:12
**service (29)**
22:11,11;35:8;
37:25;46:24;54:12;
92:22;103:5;117:8;
118:7;144:2,12,13;
153:22;154:2,4,7,8;
155:3,21;156:15;
165:19,25;187:6;
190:13;194:4;
208:23;209:5;

Case 8:23-cv-00201-TPB-AAS   Document 128-4   Filed 11/30/23   Page 248 of 253
PageID 10343
MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC
ROBIN FROST
October 25, 2023

210:24
serviced (4)
52:15;136:1;
210:25;211:8
Services (25)
4:4,8;23:9;34:10;
39:3,4;104:22;
136:3;143:19,23;
155:6,12;156:4;
159:4;169:16;
176:10;178:7;
179:10,18;180:11;
182:15;183:16;
190:11;206:1;
212:15
Services/BAII (1)
178:9
servicing (10)
63:20;67:20;
102:22,23;143:1;
144:15,19;146:2;
153:8;186:6
serving (1)
102:20
set (3)
29:19;33:25;48:3
Setting (2)
97:22;171:21
settled (1)
191:20
Seven (1)
128:4
several (4)
81:9;88:24;
196:21;200:12
shake (1)
50:12
SHAPIRO (7)
4:14,14,15;81:6,
11,13,22
share (8)
20:20;49:13;
53:12;137:5;173:10;
182:13,18;195:1
shareholder (1)
136:5
sharing (1)
125:3
sheet (2)
147:11;151:12
Sheila (4)
82:16;123:9;
128:1;193:21
short (1)
108:14
shortly (4)
75:18;142:6;
160:5;213:18
show (15)
54:18,23;65:3,23;
111:12;113:2;
135:17;157:23;
158:13,21;169:21;

178:12,14;199:7;
200:5
showing (3)
49:10;59:6;209:4
shown (2)
65:18,18
shows (7)
55:25;57:21;
105:10;194:24;
200:24;209:4,9
sic (2)
5:25;123:8
side (11)
17:4;19:13,18,21,
22;20:9;21:2;51:4;
155:10;179:8;185:9
sign (3)
25:23,25;221:20
signed (1)
112:19
significant (8)
24:16;40:2,6,11;
146:8;152:18;
154:23;188:18
significantly (1)
185:12
signing (1)
115:25
similar (9)
124:25;125:1;
142:2;150:10;160:8,
12;168:18;191:14;
214:19
Similarly (7)
10:7;38:14;78:19;
119:15,20;158:16;
168:16
Simmons (124)
4:3;32:8,12;36:7,
17,24;37:1,16,19;
38:5,10;39:14;40:8;
45:18;62:12,15;
66:15;67:12;68:5;
69:3,6;70:14;71:12,
18;72:5,18;73:2,16,
24,24;74:13,20;
75:24,25;76:9,12,19,
22;77:2,23;79:20;
80:13;81:17;82:6,
15;84:14;87:9;
89:22;91:16,24;
92:6;93:1;95:4;
99:17;102:1,3;
104:22;107:10,19;
108:6,7,11,20,25;
109:5,9;115:12,17,
18,21;116:7,11,16,
21;121:12,17,23;
122:2,10;123:8,19;
124:12;129:1;142:3,
21;143:10;144:18;
156:2;158:17;159:1;
160:3,20;161:16;

163:11;165:6,15;
166:2,8,25,25;
167:10;168:3;
191:25;193:9,16,21;
194:8;197:3;201:4;
206:21;207:7,16;
210:13,16;211:6,14,
19,20;212:10,12;
218:14;220:14;
221:1,11
Simmons' (15)
32:3;35:25;37:4,
25;39:15;62:22;
73:22;74:8;75:21;
101:19;121:6;143:3;
164:8;206:21,24
simple (2)
24:11,14
simply (4)
75:24;76:23;
77:23;117:10
simultaneously (3)
123:16;129:19;
204:17
single (5)
54:25;147:22,25;
183:19;185:25
sit (1)
172:2
sitting (5)
12:15;13:1;27:20;
172:24;179:7
situation (10)
125:23;167:19;
188:9,16;191:9,15,
21;192:6,20;197:2
situations (3)
19:16;190:23;
191:11
Six (5)
128:7,8,10,25;
171:7
sixth (2)
117:2,4
size (5)
12:19,25;101:5;
159:18;183:9
skip (1)
118:16
skipped (1)
176:22
slightly (5)
75:16,17;83:19;
98:13;215:12
slowed (1)
213:20
small (4)
53:25;54:6;
152:19;186:19
smaller (3)
148:15;184:16;
200:25
so-called (1)

62:1
sold (14)
16:9;17:10;19:13;
22:1;24:5;25:19;
71:8;145:21;151:3;
183:24;187:17;
188:12;193:21;
198:10
sole (1)
35:25
solely (2)
168:8;216:4
solicit (1)
109:4
solicitation (14)
123:8,9,10,14,22;
166:16;204:9,13;
213:1;217:9,12;
219:11,13,17
solicited (4)
108:12,13,20;
109:9
soliciting (4)
71:20,20;75:12;
166:11
someone (3)
9:11;19:6;155:22
sometime (2)
45:24;165:18
sometimes (7)
8:19;173:14,15;
182:9,10,13;186:15
somewhat (7)
96:6;125:22;
126:25;137:11;
146:25;159:8;
203:20
somewhere (5)
47:18;51:5;56:17;
166:9;212:5
sorry (45)
6:6;17:2;20:13;
33:6;42:12;43:6,7,
17;50:9;55:14;57:2;
59:25;60:1;61:23;
65:12;71:1;76:3;
81:6;87:2,16;91:6,
21;98:17;101:2,14,
21;103:10;113:1;
129:5,6;143:21;
147:24;155:13;
157:13;168:7;169:4;
178:8;181:3;182:9;
186:14;187:20;
202:10,16;213:13;
216:1
sort (8)
14:5;16:8;22:23,
24;25:6;37:10;
50:19;184:22
sorts (1)
172:10
sound (1)

50:13
sounds (4)
46:7;47:15;58:20;
82:19
source (3)
114:20,24;124:16
South (4)
5:17;158:11;
159:4,6
Southeast (27)
4:13,21,22;32:3;
62:14,21;68:12;
69:19;70:12;83:5,
23;84:9;98:15;
107:20;130:21;
158:10;159:6;
207:25;208:4,10,23;
209:5;210:4;211:21;
212:12;217:7,13
Southern (3)
178:25;179:2,4
space (6)
22:12,18;186:20,
23;198:11,12
special (1)
219:16
specialized (6)
34:18;35:15;36:4,
9;179:17,24
specializes (1)
16:5
specialty (10)
34:9,20;35:2;
36:18;37:3,10;
38:12;39:3,3;156:4
specific (25)
27:21;36:3,5,8;
38:22,25;75:8;77:3;
83:12;87:12;93:25;
94:10;103:9;108:23;
138:9;146:17;
148:10;149:10;
185:14;191:22;
197:10
specifically (30)
12:9;14:22;22:14;
27:9,16;32:14;
39:14;59:15;60:11;
63:13;69:21;78:13;
82:18;97:19;102:8,
14;108:25;114:7;
137:19;138:7;156:8;
168:2,12;181:4;
183:4,5;184:20;
186:12;187:14;
197:2
specified (1)
100:3
speculate (3)
12:10;93:24;
192:18
speculated (1)
122:2

**speculating (5)**
18:18;40:7;46:15;
88:14;167:7
**speculation (1)**
12:15
**speculative (9)**
86:15;89:16;97:1,
4,6;98:1,7;121:9;
146:25
**spend (3)**
144:19;156:3;
209:4
**spends (5)**
153:7,22;155:11;
209:5,6
**spent (4)**
170:19,25;171:7;
208:23
**spoke (2)**
73:8;109:1
**SSVS (1)**
206:2
**staff (44)**
21:15;22:6,7,8;
28:18;31:22;33:23;
41:13,14,18;42:6,24;
45:11,13;46:1;
53:10;61:10;67:10,
22;68:1;69:4,13,22,
24;70:6;71:25;
117:9;118:7;125:21;
126:10,11,11;130:3,
4,5;144:1;154:2,4,7;
155:3;167:11,12;
194:4;216:13
**staffed (1)**
155:24
**staffing (1)**
67:22
**stake (1)**
53:18
**standard (4)**
32:20;115:5;
214:10,11
**standards (2)**
205:24;206:1
**start (8)**
8:6;10:10;21:25;
31:6;63:10;137:21;
152:1,4
**started (2)**
54:6;63:4
**starting (3)**
129:20;152:12,15
**state (6)**
4:10;114:14;
120:12,21;121:3;
204:16
**stated (4)**
114:8;142:16;
143:15;163:14
**statement (14)**
20:2,2,5;21:6;

58:5;152:5;156:25;
161:13;163:9;164:3;
205:13,20;206:1,2
**statements (1)**
20:1;157:24;160:8
**States (6)**
14:6;119:13;
120:25;121:8;122:5;
130:4
**statics (1)**
219:7
**stating (1)**
138:24
**statistical (1)**
209:8
**statistics (1)**
210:8
**stay (11)**
86:1;102:25;
110:18;131:8,11;
132:3,5,23;161:2;
169:1;218:12
**stayed (13)**
38:1;73:23;74:8;
102:1;107:2;131:3,
11;132:7;133:4;
160:20;168:20;
197:17;216:8
**staying (2)**
167:3,5
**steakhouse (2)**
106:7,8
**step (6)**
56:2;63:8,8;64:3;
82:10,10
**stick (1)**
149:5
**sticky (1)**
198:16
**still (17)**
11:8;14:2;54:3;
110:19;111:3;
117:16,19;120:10,
11;128:22;132:21;
133:3;149:4;165:19;
167:12;181:5;
191:20
**stop (5)**
10:11;85:6;
113:10;125:3;
173:10
**straightforward (1)**
174:24
**stream (3)**
130:12;133:9;
202:3
**strictly (1)**
193:23
**strike (9)**
68:20;71:2;76:4;
88:3;91:21;97:5;
99:4;129:9;168:17
**strip (1)**

152:23
**strong (1)**
192:10
**strongly (1)**
75:19
**structure (3)**
32:12,25;153:14
**structured (2)**
146:1;216:16
**stuck (1)**
91:18
**study (1)**
219:16
**stuff (1)**
193:24
**subject (1)**
53:9
**submitted (8)**
7:23;33:2;104:11;
105:19;106:18;
112:25;147:5;
170:11
**subpoena (1)**
171:1
**subpoenaed (1)**
6:13
**subsequent (10)**
51:12;53:12;
71:21;75:14;80:17;
87:2;88:12;89:7;
137:25;165:21
**subsequently (8)**
86:8,18;88:11;
92:14;93:6;121:7;
125:21;168:14
**suffer (1)**
96:18
**suffered (8)**
42:18;59:9,22;
60:5,16;66:9;100:1;
116:20
**sufficiency (1)**
19:24
**sufficient (11)**
33:23;37:4;42:5,
24;53:20,20;61:6,9;
71:25;118:15;125:8
**suggest (5)**
107:19;108:11;
119:16,21;201:7
**suggested (1)**
215:12
**suggestive (1)**
204:20
**suggests (1)**
201:10
**suit (1)**
83:14
**summary (2)**
48:2,3
**super (2)**
158:8;159:3
**superfluous (1)**

85:1
**support (38)**
31:21;33:23;
34:17;35:15;36:4;
38:8,12;39:15;41:12,
14,18;42:5,24;45:10,
22;46:10;54:3;
55:11;61:10;69:4,23,
24;71:24;85:14;
124:6;126:10;130:3;
155:11;156:4,10;
162:2;194:4;201:13,
18;209:1;215:8,16,
23
**supported (4)**
45:17;138:19;
158:25;216:5
**supporting (3)**
35:21,25;144:2
**supports (3)**
214:12;215:11;
216:19
**suppose (2)**
15:11;28:21
**supposition (1)**
141:7
**sure (47)**
6:10;7:8,22;8:4,5,
10;9:14;10:4;13:10;
14:22;15:10;24:24;
29:13;30:5,7,8;34:3,
25;41:22;60:20;
61:1;64:2;74:11;
80:9;84:6;90:24;
93:9;98:17,18;
101:21,22;103:15,
24,25;111:20;
112:13;123:6;124:4;
131:17;147:22;
164:17;171:8;196:5;
199:19;200:7;202:2;
203:11
**surprised (1)**
184:15
**surveys (1)**
39:1
**suspect (1)**
192:25
**sustains (1)**
24:1
**swear (1)**
5:3
**sworn (1)**
5:9
**system (1)**
146:15
**Systems (6)**
105:5,19,24;
107:22;145:17;
195:16

**T**

table (1)
77:13;179:8;
200:6,10;204:25
**tables (2)**
48:3,3
**talent (2)**
22:6;188:7
**talk (4)**
151:2;156:22;
197:7;221:25
**talked (5)**
53:19;83:17;
101:24;146:12;
209:11
**talking (22)**
19:17,18;22:17,
18;36:3;40:7;41:10;
45:24;49:15;54:5;
55:11;88:11;93:9,
10;120:2;132:13,22;
149:22,24;151:1;
161:24;195:23
**Tampa (5)**
121:5;199:3;
206:23;207:2,3
**task (1)**
207:19
**tasked (1)**
194:1
**tax (2)**
114:5;138:11
**team (31)**
36:5;45:17;69:5,
18;70:24;71:24;
85:14;92:17,21,22;
124:6;143:25;144:3,
16;153:22,25;
158:18;159:6;
165:19,22;167:9;
172:12;206:21;
207:7;210:13,16;
211:6,20,24;212:14,
25
**technical (11)**
34:11,15;35:3,11,
19;36:4,5,12;158:9,
11,19
**technically (1)**
70:7
**technology (1)**
23:2
**Tega (1)**
5:17
**telling (11)**
12:2;72:10;
123:20;124:19;
160:21;163:12;
166:14;212:13,24;
217:7,12
**ten (30)**
15:23,24;45:18;
46:12;47:13,19;
48:11;50:21;51:13,

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 250 of 253
PageID 10345

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

22;52:22;55:23;
56:22,23;85:19;86:2,
12;87:8;91:8,12,13;
92:1;94:23;159:24;
168:20;202:5,6,19,
23;203:2
**tend (1)**
215:23
**ten-minute (1)**
89:25
**ten-year (3)**
87:24;91:5,7
**term (4)**
62:8,10;133:20;
135:12
**terminated (1)**
186:24
**terminology (2)**
80:10;159:5
**terms (10)**
75:17;91:18,19;
132:10;181:24,25;
182:8,11,18;190:14
**test (4)**
19:23,24,25;184:2
**testified (15)**
5:10;7:25;13:22;
99:3;117:21;122:1;
125:4;138:22;
139:21;144:18;
147:10;181:9;
196:21;214:4;
218:18
**testify (1)**
219:23
**testifying (3)**
5:15,16;13:12
**testimony (71)**
10:13;13:9,18;
26:4,9;36:2,6,16,20,
22,25;37:14,15;
38:20,23,24,25;
40:14,19;41:8;
45:16;46:9;73:5;
79:19;82:4,13,20;
95:22;96:2,14,17,25;
97:12,22;98:10,14,
20;108:21;109:13,
15;117:6;118:6;
119:3;136:18;139:3,
17;144:21;145:13;
147:6;149:9,14;
153:11;156:1,7,9;
157:18,21;158:7,8,
16;159:16;162:14;
171:22;173:3;
195:25;204:10;
205:16;207:21;
211:23;215:19;
218:22
**testing (1)**
20:10
**Thanks (2)**

74:5;217:20
**theoretical (1)**
67:6
**theory (1)**
193:20
**there' (1)**
186:11
**there'd (1)**
83:13
**therefore (1)**
45:14
**thereof (1)**
135:22
**Theresa (3)**
82:23;128:3;
193:22
**thereupon (1)**
5:5
**thinking (6)**
22:21;61:2;109:5;
195:15;196:2;
202:22
**third (4)**
56:12;139:14;
140:6;141:5
**third-party (1)**
135:23
**though (11)**
6:19;7:22;13:11;
47:16;72:15;109:19;
140:11,17;154:4;
197:24;210:23
**thought (11)**
6:1;18:7;103:10;
121:15,16;128:5,8;
140:22;186:5;
203:19;214:1
**three (11)**
25:13;50:24;51:9;
52:7;64:25;65:9;
91:12;147:21;149:6;
177:18;216:16
**threshold (2)**
53:10;158:5
**thumb (3)**
40:22;126:3;
198:24
**TIAA (2)**
213:22,24
**timeframes (1)**
184:19
**times (9)**
21:7;23:1;88:24;
124:22;165:3;183:7;
185:5;196:21;
214:18
**timing (3)**
204:11,16,23
**tiny (1)**
200:24
**Today (18)**
4:4;7:8;9:15;11:1;
12:16;13:11,16,20;

27:20;29:2;89:13;
159:19;171:18;
172:22,24;173:3;
176:15;202:9
**today's (1)**
202:24
**together (4)**
99:1;135:18;
140:10;171:4
**told (12)**
72:18;73:3,16,24;
74:13;109:5,15;
117:24;123:21;
211:15,19,24
**tomorrow (2)**
161:5,7
**took (12)**
13:11;50:19;63:3;
90:11,12;128:17;
130:23;155:5;
167:10;171:3;
174:21;175:2
**tool (1)**
214:23
**top (2)**
150:15;157:13
**total (8)**
56:22;78:5,17;
121:23;128:9;
139:13;140:1,18
**totality (4)**
77:20;78:6,15;
95:19
**totally (2)**
58:5;190:14
**towards (1)**
137:22
**track (3)**
162:9,15;215:14
**tracks (2)**
210:5,9
**trailing (1)**
198:8
**transaction (47)**
16:17;17:5,24,25;
18:2,11;19:9;23:6,7,
13,15;24:4;25:24;
29:17;59:18;66:18;
71:9;78:16;112:6,12;
141:18;144:11;
146:17;152:13,16;
155:16;175:8;176:4,
7,8;177:19;178:6,17,
18;180:9,10,19,24;
184:17;187:16;
189:14,16,17,18;
190:23;196:4;
198:10;206:5
**transactions (50)**
14:12,15,20,24;
15:5,16;16:21,24;
18:4,14,25;19:5,12;
21:2;24:8,9,17;

25:16,21;27:3,6,22;
28:3;141:20;147:4,5,
7;148:7,10,14,21;
151:10;171:2;
174:17;177:18,23;
178:19;179:25;
180:15;181:17,18,
23;182:24;183:4,11;
184:4;185:1,18;
194:19;206:7
**transcript (3)**
9:15;10:4;172:8
**transfer (15)**
21:16,16;25:2;
72:23;75:19;76:16;
115:7;142:16;
143:13;148:22;
149:6,15;150:7;
151:8;157:1
**transferred (9)**
32:2;62:20;75:18;
76:11;83:13;86:5;
131:20;143:11;
201:4
**transferring (7)**
28:19,19;70:21;
80:17;152:24;154:1;
211:25
**transfers (1)**
25:21
**transmittal (1)**
111:19
**Transportation (4)**
105:4,18,24;
107:22
**Travelers (2)**
157:5,7
**trends (3)**
183:4;185:1;
199:18
**trial (6)**
171:14,17,24;
172:13,17,21
**tried (1)**
74:3
**true (15)**
34:4;7;39:11;
68:10;75:2;94:22;
113:20;114:9;115:8,
9;116:2;131:21;
136:11;146:24;
177:24
**Truest (3)**
4:23,25;113:16
**trust (2)**
187:25;188:25
**truth (1)**
90:12
**truthful (2)**
13:10,17
**try (15)**
7:1;9:19;98:1;
103:2;111:12;134:6;

138:11;153:7;
161:12;162:18;
167:18;183:3;
184:25;193:8;
221:10
**trying (15)**
10:19;15:14;
18:20;19:19;20:5;
40:18;42:18;76:17;
88:5;94:24;97:23;
104:3;178:10;
187:21;191:23
**turn (5)**
8:21;49:4;91:2;
101:11;157:10
**turned (2)**
8:12;194:23
**turnover (1)**
219:8
**two (57)**
24:7;25:12,14,19;
26:3,19;30:3;31:10;
32:14;44:4,5;47:7;
49:10,16,24;52:17;
56:23;57:20,22;58:7,
10,16;59:4,6;63:25;
83:10;91:11,15,19,
20,22;92:1,8,25;
95:5;96:24;97:14,
21;99:1;102:14,24;
108:16;117:7;118:6;
121:5;128:8;139:10;
140:7;159:8;166:1;
178:17,22;179:2;
185:10;199:23;
200:1;204:19
**two-year (4)**
75:14;92:15;
165:20;166:19
**type (5)**
29:23,24;30:12;
146:22;192:17
**types (1)**
185:1
**typical (6)**
21:19;29:17;
59:18;206:5,6,10
**typically (34)**
17:21,23;20:16;
21:15;22:14;23:19;
24:9;25:11,12,19,20;
26:2;27:12;45:4,6;
47:1;65:17;115:24;
119:15;120:16;
138:10;145:6,25;
146:7;152:3;153:18,
24,24;155:2,23;
184:16;186:17;
187:10;216:12

**U**

**UIS (1)**

Case 8:23-cv-00201-TPB-AAS    Document 128-4    Filed 11/30/23    Page 251 of 253
PageID 10346

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

104:18
**UK (1)**
213:11
**ultimately (2)**
114:25;170:23
**unable (1)**
84:24
**unclear (1)**
11:13
**under (13)**
32:11;49:16;68:6;
80:11;90:11;91:17,
18;142:10;144:6;
203:1;210:24;
215:12;219:18
**underlies (1)**
76:13
**underlying (3)**
42:21;76:10;146:6
**underneath (1)**
207:16
**underperforming (1)**
96:11
**Understood (6)**
11:6,17;50:17;
91:15;96:13;222:2
**underwriting (1)**
135:24
**unenforceable (1)**
120:7
**unfortunate (1)**
140:25
**unfortunately (3)**
112:1;140:9;
190:12
**United (1)**
14:6
**Unless (7)**
98:5;114:7;
154:22;155:18,18;
172:10,11
**unlikely (1)**
118:13
**unrelated (1)**
179:2
**untoward (1)**
199:19
**unusual (10)**
23:4,20;69:20;
128:16;138:8;
146:13,18;154:22;
155:23;192:19
**up (41)**
8:9;12:3;13:7;
15:22;17:7;18:6;
27:25;33:25;36:10,
14;50:19;51:24;
54:2;57:1,2,7;64:11,
22;65:5,15;68:21;
78:17;103:10;125:1;
131:16;134:6;
135:12;153:20;
157:23;158:4,13,21;

169:3,13;170:18;
171:17;174:14;
196:18;203:10;
218:6;220:18
**update (1)**
185:4
**upon (4)**
215:1,2;216:2,4
**use (15)**
62:10,18;91:11;
96:7;120:11,12;
126:3;150:25;
158:11,18;159:3,6;
181:15;184:2;203:3
**used (29)**
27:5,16,21;30:1,
15;32:24;40:21;
57:6;62:8;91:13;
120:25;124:17;
137:10,17;139:7,12;
150:16;151:18;
152:11;181:2;182:2,
23;184:9,19;185:2;
189:21;197:11;
203:5,17
**useful (4)**
42:9;61:3;70:8;
214:23
**uses (4)**
41:11;91:7;117:9;
153:7
**USI (297)**
4:3,19;6:17;16:10,
11,13,15,16,17,20;
23:11;26:5,18;32:2,
5,12,15;34:11,14;
35:3,8,11,14,24;
37:3,24;38:1,10,13;
39:13,19;41:6;42:18,
22;43:4,10,19;44:13;
45:18;46:12;50:25;
51:13;52:8,21;54:13,
24;55:16,20;59:9,22;
60:5,16;61:13;62:13,
15,20,23;66:9,17;
67:11,12;68:5,6,11;
69:8,19;70:12;71:13,
22;72:3,6,7,10,10,11,
19,23;73:4,17,23;
74:9,19,22,22;75:23;
76:1,23;77:6,23;
79:25;82:11;83:23;
84:15,22,24;85:5,10,
19;86:4,12;87:8,23;
88:5,22;89:6,12,20;
91:16,20,22,25;92:5,
7,16,21,24;93:7,13;
97:7,10;98:1;99:7,8,
22;100:1,3,11;101:1,
5,10,17,20;102:2,6,7,
17,19,22,25;104:6,
12,13;105:19,25;
106:20,24;107:2,2,4,

12,23;109:6,16,20;
114:12,19,22,25;
115:13,21;116:6,15,
20;117:21;121:7;
122:20;123:17,21;
124:5,7,11,14,14,19;
125:3,15;126:5,11,
17;128:12,21,25;
129:18,22;130:22,
23;131:3,4,6,7,8,10,
12,24;132:1,3,5,7,18,
24;133:3,4,17;
134:18;135:3,12,25;
136:1,2,4,5,12;
138:21;139:19;
141:18,24;142:6,20;
143:5;145:8,12;
147:5;148:7,21;
151:12,14;152:25;
153:6,10;155:6;
156:4,10,13;157:19;
158:25;160:6,10,13,
20,22,24;161:15,22;
162:8;163:8,9,10;
164:7;165:5,6,17,18;
166:15,25;167:4,5,
12;168:20;169:16;
193:7,15,17,21;
196:17;197:4,5,16,
17,18;199:3,11,14;
201:3,8,14;203:20;
206:13,19;207:5,11,
15;208:24;209:12;
211:1,8,15,20;
212:13;215:20,21;
216:18,24;218:15;
219:5,8;220:6,13
**using (7)**
41:10;51:22;
55:21;125:1;140:11;
182:1;204:1
**USI's (28)**
7:18;10:16;23:8;
32:22,25;39:3;
41:24;43:12;52:12;
94:6;98:14,21;
100:18;103:5;
104:21;121:5;
122:13,16;125:10;
138:19;152:11;
158:17;162:6;
205:15;208:3;209:6;
215:13;216:23
**usual (7)**
87:20;89:2;94:2;
120:7;161:1;168:24;
209:25
**Usually (4)**
12:2,13;14:14;
138:12

**validate (1)**
19:23
**validating (1)**
21:4
**validity (1)**
19:25
**valuable (5)**
23:11,18;145:8;
146:4;202:7
**valuation (127)**
15:14,17;16:22;
18:15,25;19:7,10,13,
23;20:10,17,19,21;
21:1;22:15;28:9;
31:12;37:7,21;38:3,
15;42:11;44:8,12;
46:20;47:10,12;
49:10,11,16;59:5,14,
16,17,19;60:9,15,15,
22;61:25;62:4;63:2,
10,19;65:6,14,16,16;
66:13,22;67:4,9,13,
16;69:15,22;70:16;
76:6,6,14;77:10,11;
78:13,20,20;79:7;
86:19;89:8;91:3;
92:9;99:24;102:9;
109:22;113:9,11,21,
22,25;116:14;
137:23,24;146:9;
148:11;150:17;
157:16,16;161:3;
163:4;167:21;
175:11,12,15,21,22;
176:1,2,5,6;177:20;
178:1;179:9,16,22;
180:2,21,23;181:15,
22;194:2,3;196:7,9,
22,25;197:8,9;204:3;
205:21,23;206:1,4;
219:24;220:3,5,18,
24;221:16
**valuations (5)**
44:5;178:3,4;
184:9;216:25
**value (106)**
15:13;16:8;22:13;
23:22,25;29:25;30:2,
15,18;31:2;42:10,17;
46:20;47:13,18;
49:19;51:17;52:1;
55:7,21;57:5,17,25;
59:8,10,12;63:23;
66:12,16,18,22;67:5,
5;69:16;70:1;77:8,
16;78:17,19,24;
86:16;88:18;92:12,
13;93:3,8,17;94:24;
95:1,7,9;99:13,20;
100:3,7;101:6;
113:21;115:15,19;
116:10,14,23;
118:23;119:10,23;

120:11;123:2,5;
126:25;127:12;
137:10;138:14;
142:19;143:9;
151:23;161:9;163:1;
168:13;180:16;
191:24;192:22,25;
193:8,13,17,19;
194:6,7;196:4,18,18;
198:1,3,4,6,7;
201:23;202:1,3,8,8,
11,17,21;215:12;
220:12
**valued (8)**
38:6;51:21;
115:10;119:12,15,
17,20;192:3
**values (1)**
30:12
**valuing (22)**
66:14;67:4,15;
69:15;93:20;94:18,
24;95:14;115:11;
116:12;118:17;
125:20,23;126:22;
150:22;161:4,9;
193:13,19;194:1;
197:5;220:24
**variable (21)**
39:18,23,24;41:7,
22;45:5,8,9,14;
54:13;55:16;56:13;
58:1,11,17,24;64:16;
127:5,9,13;146:20
**variables (4)**
97:13;162:16;
167:14,17
**varies (1)**
14:16
**variety (1)**
14:11
**various (1)**
153:7
**vary (2)**
45:11;53:18
**vast (1)**
182:14
**verbalize (1)**
50:13
**verified (2)**
114:7,15
**verify (4)**
37:2;114:11;
159:21;205:15
**versa (1)**
159:5
**version (2)**
102:13,13
**versions (1)**
59:4
**versus (2)**
88:6;93:14;99:14;
123:9,10;153:20;

**V**

Case 8:23-cv-00201-TPB-AAS Document 128-4 Filed 11/30/23 Page 252 of 253
PageID 10347

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

185:2;196:6;221:12
vice (2)
138:20;159:5
VIDEOGRAPHER (14)
4:1,7;5:2;48:12,
16;90:3,7;134:10,14;
164:22;165:1;
217:21,25;222:8
Videotape (1)
4:2
view (4)
42:23;145:15;
196:17;217:9
violation (1)
166:12
virtually (1)
4:6
volume (4)
43:10;52:10,22;
56:24

**W**

wait (4)
9:18;10:3,22;
202:19
waive (1)
222:1
Wales (1)
213:10
watching (1)
173:8
way (32)
31:20;33:11,15;
42:25;45:7;56:1;
61:8;63:5;65:2;
72:17;92:2;100:25;
104:16,20;105:23;
106:22;128:17;
145:25;146:1;
150:13;152:3;
154:17,25;158:3;
171:18;173:8;
182:19;183:10;
190:5;194:21;199:9;
202:22
ways (1)
107:11
week (4)
112:22;172:2;
204:19;205:10
weeks (2)
83:11;205:11
weighted (2)
184:23;194:21
Wells (4)
23:8,12;155:6;
218:15
weren't (4)
71:23;85:12;
99:25;155:8
what's (13)
29:20,21;88:9;

93:25;108:19;
117:25;143:11;
155:13;195:12;
200:22;202:2,8;
212:20
Whereas (4)
53:10,15;58:12;
120:6
whereby (2)
24:5;42:5
wherein (3)
16:22;165:4;180:1
Whereupon (5)
48:23;110:9;
134:20;169:6;174:2
whole (6)
41:15;45:25;71:5;
151:3;153:25;
216:12
wholesale (2)
148:23;149:11
whose (2)
38:10;69:1
wife (1)
154:24
willing (5)
67:17,18;70:18,
18;120:22
wish (1)
172:21
Within (15)
31:9;51:9;83:9,10;
100:24;113:25;
130:15;184:6;
199:19;204:18,19;
205:2,3,6,10
without (17)
24:5,18;27:4,17;
28:4,10;29:4,9;
43:13;52:22;135:20;
142:4;149:4;160:4;
190:9;193:9;205:2
withstanding (1)
206:24
witness (139)
5:3,6;19:4;20:13;
24:23;26:8,22;27:8,
24;28:13;31:19;
35:6;37:18;39:22;
40:18;43:6;44:16,
24;46:15;52:25;
54:16;55:3;58:4,20;
59:3,14,25;60:8,20;
61:16;62:4;65:14;
67:9;69:11;71:16;
72:21;76:25;78:4;
79:9;82:9;83:1;85:3,
24;86:15,25;87:12;
88:25;89:16;93:17;
95:13;96:2,22;98:5;
100:6,14;101:14;
103:21;105:1;107:7,
25;108:9;109:12;

112:17;114:14;
119:25;120:14;
121:15;122:16,22;
123:13;125:12,19;
126:21;127:8;
128:16;129:5,25;
130:17;132:1,9;
134:23;136:24;
140:16;145:6,11;
147:14;148:18,25;
149:8,19;151:7;
154:12;156:7,19;
162:13;163:4;
164:13;166:18;
167:7;168:11,22;
172:5;174:12;
189:25;190:8;
192:15,25;193:12;
194:11;196:16;
197:21;198:9;
199:25;201:10,17;
203:19;204:15;
206:9;207:9;208:6,
13,19;209:8,23;
210:20;211:3,10,23;
212:7,17,22;216:12,
21;217:11;220:18;
221:4,15,20,22
words (2)
54:22;122:9
work (40)
12:4;14:9,17,20;
16:10;17:4;19:7;
21:2;25:21;29:15;
33:16;35:14,15;
36:8;80:13;81:17;
82:15;85:15;97:10;
144:17;152:19;
153:10,25;154:21;
155:19;169:18,22;
170:18,19,22;
171:13,19;175:15;
180:17;182:9,18,20;
189:10;212:5;
214:19
worked (24)
7:19,20;14:11;
16:11,13,19;18:25;
82:23;99:1;157:9;
158:10;163:17,20,
22;174:17,23;185:8;
188:2;190:13,15,17;
191:14;214:17;
218:14
working (11)
14:14;19:23;82:6;
122:13;154:24;
166:9;177:7;179:3;
181:21;182:10;
212:11
world (16)
52:21;71:3;87:23;
88:6,6,22;93:15,22;

94:6;100:18;152:16;
220:13,14,19,20;
221:11
worse (1)
96:8
worst (3)
96:11,17,23
worth (6)
54:12;63:17;
66:20;167:4,22;
203:1
write (12)
115:4;118:17;
124:10;138:18;
142:15;150:20;
156:24;157:12,15;
160:2,13;183:1
writing (1)
21:20
wrong (1)
79:7
wrongful (12)
59:9,23;60:6,17;
66:10;76:22;77:22;
79:5;88:7;100:2;
107:21;143:3
wrote (6)
113:7;114:2;
115:23;117:4;144:9;
171:10

**Y**

Yea (1)
76:14
year (40)
29:12;46:4,7;
50:20,24;51:2,6,14;
52:5,10;53:12;56:19,
24;57:13;63:3;
64:23;91:11,25;
92:7;98:21;125:5;
130:15;131:11;
132:7;133:3;137:17,
22;138:11;139:7,9;
159:24;184:7;
198:15;202:5,7;
216:15;218:10,21,
25;219:5
years (67)
25:12,13,13,14,19;
26:3,19;45:18,21;
46:12;47:13,19;
50:21;51:12,12,22;
52:22;55:23;56:22,
22,23;57:3;85:19;
86:2,12;87:9;89:13;
91:8,12,15,19,21,22;
92:1,25;94:23;95:5;
96:24;97:14,21;
117:7;118:6;148:10;
149:6;150:1;166:1,
21;168:20;185:13;

189:8,13,14,15,18;
199:8,23;200:18;
201:6,11;202:5,6,19,
23;203:2;216:16;
218:13,16
year's (1)
65:25
year-to-year (1)
162:5
Yep (3)
171:8;174:12;
175:18
yield (1)
47:8
yielded (1)
66:1

**Z**

Zimmerman (1)
4:18
Zoom (2)
5:19,20

**1**

1 (10)
4:2;48:18,24;64:7;
111:5,15;177:24;
200:5;206:1,2
1:16 (1)
90:8
10 (19)
16:21;18:14;51:5,
13;56:23;65:2,4,18;
66:1;94:2;150:14;
162:2,4;183:7,12;
184:3,5;199:8;
215:23
10,000 (1)
50:4
10:07 (1)
4:5
100 (1)
65:15
105 (2)
180:10,24
10X (4)
137:10;138:22;
215:9,16
11 (2)
65:4;66:1
11:11 (1)
48:12
11:24 (1)
48:16
12 (19)
32:4,17;49:25;
56:4;63:17;64:4;
65:2,4,18;66:1;
157:10;183:7,7,12;
184:6;185:5;197:11;
199:19;215:23

Case 8:23-cv-00201-TPB-AAS   Document 128-4   Filed 11/30/23   Page 253 of 253
PageID 10348

MATTHEW SIMMONS v.
USI INSURANCE SERVICES, LLC

ROBIN FROST
October 25, 2023

**12:23 (1)**
90:3
**12:30 (1)**
90:2
**12-month (1)**
63:11
**12x (5)**
137:10;138:22;
184:3;215:9,17
**13 (1)**
183:7
**14 (1)**
203:21
**14th (1)**
82:21
**14X (1)**
138:24
**15 (4)**
81:25;82:14;
83:15;104:13
**15.8 (1)**
66:2
**16 (5)**
176:22;177:1,5,6,
12
**17 (1)**
203:8
**17.1 (1)**
203:5
**17.11 (2)**
203:9,11
**18 (1)**
126:6
**1b (1)**
135:15

---

**2**

**2 (11)**
110:7,10;111:6;
112:10;113:1,2,4;
121:5;129:15;
135:13;180:1
**2:23 (1)**
134:10
**2:32 (1)**
134:14
**20 (5)**
15:24;16:21;
18:14;51:5;142:24
**2006 (1)**
213:18
**2008 (1)**
213:19
**2017 (3)**
174:17;175:19;
214:3
**2018 (5)**
18:6,9;176:8,18;
200:13
**2020 (3)**
189:9,21;200:25
**2020-ish (1)**

189:19
**2021 (2)**
185:5;201:1
**2022 (6)**
64:7;131:9;
137:22;138:2,15;
201:2
**2023 (39)**
4:4;29:13;48:20;
63:14;64:8;80:20,
24;82:5,14,21;93:21;
100:8;104:13;
105:20;106:20;
111:6;112:20;
131:16,22;132:6,16,
18;133:2;137:12,15,
17,24;138:4,5,14;
142:25;148:12;
169:19;193:14;
196:23;197:13,18;
206:24;207:4
**20th (1)**
112:19
**21 (1)**
48:20
**21st (5)**
111:5;170:12,13,
14,22
**22nd (1)**
106:20
**23rd (1)**
169:19
**24th (1)**
132:6
**25 (11)**
33:4,8;50:1;53:8;
56:8;63:16;176:20;
177:1,5,6,12
**250 (1)**
126:10
**250,000 (2)**
40:25;41:17
**25th (26)**
4:4;80:20;83:10;
86:17;87:2;88:9;
89:6;92:10;93:4,21;
100:7;108:15;
126:23;131:16,22;
132:16,18;133:2;
137:24;142:24;
168:14;193:14;
196:22;197:2,13,17
**26 (4)**
176:8;177:1,6,15
**29 (1)**
105:20

---

**3**

**3 (4)**
134:17,21;180:6,6
**3:20 (1)**
164:22

**3:30 (1)**
165:1
**31st (3)**
63:13;64:8;138:12

---

**4**

**4 (6)**
49:5;65:23;117:1;
169:4,7,10
**4.4 (1)**
57:8
**4.5 (1)**
46:7
**4:46 (1)**
217:21
**4:51 (1)**
217:25
**4:56 (1)**
222:8
**40 (1)**
96:6

---

**5**

**5 (7)**
129:13;135:3;
173:24;174:3;
177:24;181:18;
185:19
**50 (2)**
58:1;178:15
**51 (4)**
178:7,11,12;180:1
**52 (2)**
179:9;180:1
**57,925 (1)**
169:23
**5960 (1)**
206:3

---

**6**

**6 (4)**
49:8;117:4;124:9;
137:4
**60 (7)**
117:10;118:12;
165:16;168:4,9;
179:17;180:1
**60-day (5)**
75:13;99:7;
100:12,24;168:12
**60-days (2)**
68:6;167:1

---

**7**

**7 (7)**
80:23;81:22;82:5;
142:11;175:17;
177:19;204:25
**7.1 (2)**

47:13;57:18
**7.2 (1)**
123:3
**7.2.1.1 (2)**
142:10,13
**7.2.2 (1)**
144:6
**7.3.2 (1)**
159:23
**7th (1)**
121:4

---

**8**

**8 (3)**
40:9;47:14;144:5
**80 (4)**
50:25;52:4;56:18;
57:12
**85 (4)**
50:25;52:5,9;
57:12

---

**9**

**9 (1)**
147:1
**9.8 (1)**
47:18
**90 (14)**
51:1;52:5;56:18;
57:12;160:25;
161:25;198:17,20,
25;199:9;209:11,18;
210:2;218:19