UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:23-cv-00201-TPB-AAS

MATTHEW SIMMONS, SHEILA MURRAY,
JACK MITCHELL, JACKIE RODRIGUEZ,
MADISON LEIFFORT, AND EMILY CARTER,

      Plaintiffs,

vs.

USI INSURANCE SERVICES, LLC, a foreign
limited liability company and USI ADVANTAGE
CORP., a foreign corporation,

      Defendants.

_____/

USI INSURANCE SERVICES LLC,

      Counter-Plaintiff,

vs.

MATTHEW SIMMONS, JACK MITCHELL
and SOUTHEAST SERIES OF LOCKTON
COMPANIES, LLC.,

      Counter-Defendants.

_____/

## USI INSURANCE SERVICES, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO MARKET VALUE DAMAGES

Counter-Plaintiff USI Insurance Services, LLC  ("USI"), pursuant to Federal

Rule of Civil Procedure 56 and the Court's instruction at the hearing in this matter

on November 15, 2023,[1] hereby moves for partial summary judgment as to the availability of market value damages.

## INTRODUCTION

USI and Lockton are competitors in the insurance brokerage industry. Lockton grows its business by hiring insurance producers and their support teams from competitors and using them to divert clients in violation of industry-standard non-solicitation agreements. As it did here, Lockton will sometimes thereafter file suit on behalf of their new employees in an effort to invalidate the non-solicits, despite deploying nearly the same restrictions in their own employee agreements. Rather than pay market value for the clients it intends to steal, Lockton uses the Court system to force a sale of the producer's book of business, either through settlements or damages. To ensure the damage award is less than fair market value, Lockton advocates for a limited lost profits damage model, if liability is found, limited to the profits its competitor would have received from the diverted accounts during the restricted period (typically 2 years in this industry) only. Lockton resists any damage model seeking market valuation damages, which is necessary to its profitability strategy of acquiring books of business below market.

True to form, Lockton here lifted out Matthew Simmons and Jack Mitchell, both producers, and their USI service team ("Simmons Team"), guaranteed them

---

[1] While USI has already filed a Motion for Summary Judgment, the Court invited the Parties to file a second motion for summary judgment motion on damages only. This motion addresses the availability of one of USI's proposed alternative damage models if USI is able to prove liability and prove the amount of damages.

above market compensation, and supplied them with counsel. Lockton then raced to the courthouse to force USI into a sale of the Simmons' Team book, while also stealing nearly 30 restricted USI customers with a book value of over $4 million.

Because Defendants stole a significant portion of the Simmons Team book of business without paying for it, USI can only be made whole, at a minimum, if damages are equal to the amount USI would have received in the open market for a sale of the book. For that reason, USI has advanced a damage model that uses a market valuation approach to compensate USI for Counter-Defendants' wrongs.[2] Keen to keep its business plan intact of paying below market value for insurance business, Lockton has challenged USI's right to seek market valuation, and argues that USI, at best, is limited to Lockton's limited and incorrect view of lost profits. Through this Motion, USI respectfully requests a ruling from the Court that, if liability is shown, and the underlying facts ultimately support it, market valuation damages is a viable model for compensating USI.

## STATEMENT OF FACTS

1.    Insurance brokerage acquisitions are common in the industry.

2.    Indeed, the overwhelming majority of top ten insurance brokers,[3] including Brown & Brown Insurance, Arthur J. Gallagher & Co., Marsh McLennan, and HUB International, as well as many others, engage in acquisitions in a similar

---

[2]    USI has also advanced separate lost profits and disgorgement measures of damages, but those models are in the alternative to the market valuation model and not at issue in this Motion.
[3]    *See* 2023 Brokers Profile: World's 10 Largest Insurance Brokers
https://www.businessinsurance.com/article/20230712/STORY/912358419/2023-Brokers-Profiles-Worlds-10-Largest-Insurance-Brokers,-Marsh-McLennan,-Aon.

3

manner to USI. *See* Deposition of Ed Bowler ("Bowler Dep.") attached as **Exhibit A**, at 110:1–111:25.  In 35 years of experience in mergers and acquisitions for USI, Bowler, USI's Senior Vice President Chief Financial Officer and Head of Corporate Development, has never seen Lockton in a merger or acquisition transaction in the United States. *Id.* at 112:12-113:1.

3.    Acquisition transactions in the insurance brokerage industry have become even more common over the last ten years, and the market has become increasingly competitive. *See* Second Deposition of Manoj Sharma ("Sharma Dep."), attached as **Exhibit B**, at 20:9–21; Bowler Dep. at 107:14–25.

4.    In an acquisition on the open market, most business is valued by applying a multiple to EBITDA (earnings before interest, taxes, depreciation and amortization), which is a proxy for cash flow, and reducing the result for debt to arrive at equity value. Bowler Dep. at 105:11–17; 106:4–23.

5.    Because of heightened competitiveness in the market, valuations applying EBITDA multiples in the range of 12–17 are expected in the present market. Bowler Dep. at 105: 113:2–16.

6.    Because producers' agreements not to solicit or move accounts or colleagues for two years after leaving an employer is industry standard, a acquisition is the typical manner to immediately acquire business and talent while respecting the contractual agreements between parties and to fairly compensate for that business and talent, including the waiver of restrictions.

## Lockton's Growth Strategy: "New Ventures"

4

7.      Unlike its competitors, Lockton does not use acquisitions as part of its growth strategy. In fact, Lockton has not participated in any acquisitions on the open market since at least 2015. Sharma Dep. at 19:24–20:8; 22:2–4.

8.      Nevertheless, Lockton maintains aggressive growth targets. For instance, in the fiscal year ending in 2023, Lockton budgeted for ███████ growth year over year. Sharma Dep. at 147:10–148:7.

9.      And Lockton has indeed grown. For example, in the last 8 years, Lockton has ████████████████████████████. Sharma Dep. at 17:14–18:25.

10.     Similarly, the number of individuals employed by or affiliated with Lockton has more than tripled—with its number of producers roughly doubling to 45. Sharma Dep. at 17:14–19:5. The number of Lockton's major office locations has also increased from 3 to 5, including a new location in Tampa, Florida. Sharma Dep. at 23:15–25.

11.     While Lockton does not pursue acquisitions on the open market, it ████████████████████████████████████████████.″ Sharma Dep. at 29:11–30:1. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Essentially, all the elements of a sale, with the exception of a willing seller and a waiver of the restrictive covenants.

12.     Team lift outs are beneficial to Lockton in many ways. Lockton admits

5

that recruiting qualified employees in the open market is a challenge given the "war for talent" in the insurance industry, and there is a benefit when a producer brings their support team with them to Lockton. (Doc. 65-6 at 38:9–39:9). Similarly, acquiring a producer with an already established book of business ensures revenue immediately instead of the delay resulting from the nature of the sales cycle when starting from scratch. (Doc. 66-3 at 14:7–20) (Discussing cyclical nature of sales cycle and noting "So, typically, when people get in this business, the first year they write almost nothing.").

13.    Typically, to recruit an experienced Producer with a significant book and team, a brokerage would have to pay a premium for the Producer to move and not expect commensurate revenues to support the significant financial commitment because no prior clients that the Producer was servicing can be accepted for two years. *See, e.g.,* (Doc. 65-21 at 28) (discussing salary negotiation); (Doc. 65-6 at 61:7–21 (discussing Simmons' negotiation for higher salary from Lockton). Simmons was paid signficiant and guaranteed compensation, including over $3 Million in his first year. *See* Sharma Dep. at 154:11–22 (Describing $1.5 million signing bonus and $1.7 guaranteed draw per year).

14.    To cover the capital outlay typically associated with these new ventures, Lockton assumes business and employees will move in the first year despite any agreements to the contrary, and therefore assumes substantial producer payments and litigation costs, for which Lockton seeks financing from its parent entity ("Lockton Parent"). *See* Sharma Dep. at 24:3–25:1.

#234564527_v1

15. 

17.     And, because Lockton anticipates litigation in light of its disregard for the restrictive covenants of its competitors, the investment price also includes anticipated litigation costs. (Doc. 65-6 at 31:8–32:6) (discussing Project Buccaneer Pro Forma).

████████████████████████████████████████████████████████

███████████████████████████████

20.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

21.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

22.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

8

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████  (10)  Project

Buccaneer.

### Legal Disputes Arising from Lockton's New Ventures

23.  ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████

24.  ██████████████████████████████

████████████████████████████████████

25.  ██████████████████████████████

████████████████████████████████████████████

██████████████████████

26.  ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

## **Lockton's Coordination of its New Ventures**

27.    Knowing producers will bring their clients, Lockton induces producers with assurances regarding litigation, and indemnification.

28.    Lockton's efforts to recruit Simmons began in earnest in September 2022, primarily through Fred Zutel, President of Lockton's Florida Property & Casualty Division. (Doc. 65-7 at 1; Doc. 65-5 at 29:2-11; 38:14-39:1; 32:13-18).

29.    Simmons and Zutel remained in frequent contact, engaging in numerous calls, texts and meetings. (Doc. 65-5 at 40:8-20); *see generally* (Doc. 65-7). One of Zutel's roles was to determine details regarding Simmons' compensation and the book of business that he oversaw. (Doc. 65-5 at 44:9-18).

30.    Zutel used his experience in being a defendant in a breach of restrictive covenant lawsuit with Lockton to assuage Simmons of his concerns about breaching his USI Agreement. *See id.* at 47:25-48:17. Zutel explained to Simmons that his lawsuit "settled quickly in 40 or 50 days and that – all matters get settled." *Id.* at 47:25-48:2. Zutel told Simmons USI would seek to enforce its Employment Agreement and that "this matter would get resolved one way or the other." *Id.* at 47:25-48:2; 58:10-11. Zutel anticipated some payment to be made for the business taken. *Id.* at 25:9-20.

31.    A critical piece in Lockton's coordination of its new ventures is its provision of attorneys and promises of indemnification to its recruitment targets early in the recruitment process. (Doc. 77 at 8:7–14); Sharma Dep. at 166:7–170:7 (discussing Simmons' Member Agreement).

32.    Simmons would not leave USI without indemnification from his new employer. (Doc. 77 at 8:7–14). To that end, Lockton's Producer Member Agreements contemplate indemnification, but provide that indemnification will only be provided to the subject producer *if they comply with the advice of Lockton's counsel*—in this case, Lyle Shapiro. Sharma Dep. at 166:7–170:7 (discussing Simmons' Member Agreement, LOCK0009792).

33.    Lockton connected Simmons with its attorneys, Lyle Shapiro and Nicola Gelormino, in early December, weeks in advance of presenting Simmons with any offer. (Doc. 65-2 at 72:23–73:2). Between December 7, 2022 and January 25, 2023, the day of Simmons' resignation from USI, Simmons had at least 32 separate calls with Shapiro. DOC00010023-10053.

34.    Likewise, Lockton connected the other members of the Simmons Team with Attorneys Shapiro and Gelormino before they were given offers, and whether they requested an attorney or not. *See, e.g*., Deposition of Madison Lieffort ("Lieffort Dep."), attached as **Exhibit D,** at 111:14–112:5 ("I was just following [Manoj Sharma's] direction. I'm just trying to move forward in the interview process. If he wants me to talk to a lawyer, I am going to talk to a lawyer, period.").

35.    At the same time, and while frequently speaking to Lockton's lawyers, Simmons, in the two months prior to his departure from USI, told employees on the Simmons Team and at least 27 USI clients, many during in-person meetings, that he would be leaving USI to join Lockton. *See, e.g.,* (Doc. 65-22 at 14:4–14;

11

Doc. 80-21 at 7–8); *see also* Second Deposition of Matthew Simmons ("Simmons

Dep."), **Exhibit E,** at 71:22–72:1; see, e.g., *id* at 65:2; 70:11-18; 127:2-9.

36.    During these in-person client solicitations, and while still working at

USI, Simmons touted Lockton's resources and complained about USI. *See, e.g.*,

(Doc. 76 at 64:13–65:1; Doc. 65-22 at 24:22–25:17). Simmons told clients that if

they want to move, he could connect them with a Lockton representative, and that

after they moved they would continue to be serviced by their USI service team, who

would be joining Simmons at Lockton. See (Doc. 65-2 at 84:18–85:6; Doc. 65-24

at 12 ("Matt suggested moving the cyber right now and he and his team could take

to finish line."); *see also, e.g.,* (Doc. 65-22 at 23:2–11).

37.    Other of the Departing Employees, who were also in frequent contact

with Lockton's counsel, emailed USI policy information to clients, without being

requested, just days before their departure. That information was then forwarded

from the client to Lockton in order to move their business. *See, e.g.,* (Doc. 65-24 at

12–15. 19-54, 58–59, 63–65).   This was all done during the period Lockton's

lawyers were directing Departing Employees, which direction Lockton required

Departing Employees to foloow to receive indemnification.

**<u>Lockton's Acceptance of Business</u>**

38.    Lockton knew that the USI Clients that Simmons brought from USI

(the "Restricted Accounts") believed they would continue to work with Simmons

at Lockton, and Lockton told the Restricted Accounts that they would be able to do

so once the Broker of Record process was complete. *See* Sharma Dep. at 238:16–

#234564527_v1

239:21.

39.     Lockton assigned the former employees to work on Restricted Accounts in a way that "mirrored the assignments or the clients that they worked [with] while at USI." Sharma Dep. at 232:8–233:1. Lockton also assigned Simmons and Mitchell as producers to those accounts. *Id.*

40.     The Restricted Accounts have not been assigned to another producer, and are presently coded as "house accounts" for accounting purposes. Indeed, the Restricted Accounts are being held for the benefit of Mr. Simmons and Mr. Mitchell, who will receive the benefit of the historical commissions (from 2023 and 2024) related to the Restricted Accounts once they are reassigned. Sharma Dep. at 192:25–193:8; 276:18–277:22.

## **Lockton's Restrictive Covenants and Enforcement**

41.     Lockton requires its producers, account executives, and account managers to sign agreements prohibiting them after departure from Lockton from, directly or indirectly, soliciting, accepting business from, or servicing Lockton clients with whom they worked. Sharma Dep. at 94:1–15; 96:2–103:13.

42.     Lockton also enforces these restrictive covenants through litigation. For example, in May of 2019, in a lawsuit filed by Attorney Lyle Shapiro, Lockton alleged that a former employee who moved to a competitor breached her restrictive covenants and fiduciary by soliciting a client with whom she had a close relationship that ultimately joined her at her new employer. Sharma Dep. at 108:2–24; 112:24; *see also*, *Valdes* Complaint, attached as **Exhibit F**. Lockton

also alleged that the former employee misappropriated Lockton's trade secrets by, among other things, sending a client's policy information to that client prior to the employee's departure. Sharma Dep. at 113:23–114:25. In the same lawsuit, Lockton sued the departing employee's new employer for tortious interference, aiding and abetting breach of fiduciary duty, unjust enrichment, and civil conspiracy. Sharma Dep. at 108:2–114:25. █████████████████████████████████

████████████████████████████████████████████████████

█████████████████

43.     Lockton has already obtained the benefit of over ███████ in revenue in connection with the Restricted Accounts since January 25, 2023 and expects additional revenues. *See* Revenue Details, attached as **Exhibit G** (describing revenue associated with Restricted Accounts).

44.     If Lockton were to purchase the Simmons business in a transaction open market, it would be sold for a multiple of 12-14. *See* Bowler Dep. at 113 at 5–16.

45.     Lockton has taken the position in this case that USI is only entitled to 60 days' worth of compensation or at most 2 years of lost profits—much less than the typical market value for an insurance brokerage acquisition.

46.     Lockton continues to pursue its "new venture" growth strategy through Project Buccaneer, fully anticipating litigation costs, and after extensive financial evaluation, because the value of the growth and revenues to Lockton outweighed the litigation costs and damages. *See* Project Buccaneer Pro Forma

14

(comparing costs versus revenue).

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A properly supported motion for summary judgment is only defeated by the existence of a genuine issue of material fact." *Fenyesi v. Suncoast Motel and Apartments, Inc.*, No. 8:19-cv-3026, 2022 WL 309404, *1 (M.D. Fla. Feb. 2, 2023). "A motion for summary judgment should be denied only if reasonably minds could differ on the inferences arising from undisputed material facts." *Nuvasive, Inc. v. Absolute Medical, LLC*, No. 6:17-CV-2206, 2021 WL 3008153, *8 (M.D. Fla. May 4, 2021) (internal citations omitted).

## ARGUMENT

Lockton analyzed Project Buccaneer as an acquisition. Statement of Facts ("SOF") ¶¶ 16–18. This is evidenced by the financial modeling considered by Lockton and its Parent, which contemplated its investment—referred to as ████████████"—against the return in revenue over time. *Id.* Lockton also gave signficiant compensation Simmons and Mitchell, demonstrating that both were being compensated with the expectation that their USI clients would move with them to Lockton. Because Lockton valued Project Buccaneer as an acquisition, USI has presented a damage model that reflects a market valuation of the Lost Accounts had those accounts been for sale in the highly-competitive insurance brokerage acquisition market. Defendants dispute USI's entitlement to market

15

valuation damages, and argue that because the crux of USI's claims are in the nature of restrictive covenants, USI is limited to "lost profit" damages. Defendants are wrong, and raise distinctions without a difference as set forth below.[4] Indeed, USI's market valuation model is the only measure of damages that can make USI whole and/or place USI in the position it would be in absent the breach, because its market valuation declined commensurate with the book of business that was stolen from it.

Moreover, Lockton knowingly benefits from obtaining valuable immediate revenues from clients, but seeks to pay a fraction of the value by arguing limited lost profits damages. *See* SOF, ¶¶ 41–42. The acquired clients and business teams would not be for sale, but Lockton uses its litigation strategy to force a distressed sale, reaping the benefits as an arbitrage. This is why Lockton has repeatedly pursued its new venture strategy nearly ten times, ███████████████████ ███████████████████████████████████.

### A.    USI's Market Valuation Model is a form of Lost Profits.

USI's market valuation damage model is a recognized method for calculating lost profits. *See Twyman v. Roell,* 166 So. 215, 217 (Fla. 1936) (holding that lost future profits are recoverable so long as proven via "some standard, such as regular market values, or other established data, by reference to which the amount may be satisfactorily ascertained."); *see also Electro Services, Inc. v. Exide Corp.*, 847 F.2d

---

[4]    USI has also presented a lost profit damage model based on the loss of specific customers, which model is in the alternative to its market valuation model addressed in this Motion.

1524, 1527 (11th Cir. 1988) (quoting *Twyman*, including as to measuring lost profits via market values, and upholding lost profits award); *Marshall Auto Painting & Collision, Inc. v. Westco Eng'g, Inc.*, 2003 WL 25668018 *7 (M.D. Fla. 2003) (also quoting *Twyman*, finding that lost profit calculations must meet "some standard" only, and rejecting that lost profit calculations should be limited to only the more popular tests deployed; e.g., yardstick, before and after, and/or projected sales.). Here, USI's market valuation damage model is "some standard" that can be used to value its lost future profits; e.g., USI's value in the insurance brokerage market and/or the profits USI would have received had it sold the Simmons Book on the open market.

Indeed, prior efforts to exclude USI's market valuation damage under similar theories as advanced by Defendants here have failed. For example, in other litigation between USI and Lockton in the Northern District of Georgia, USI advanced a market value damage model that Lockton sought to exclude under *Daubert*. *See USI Insurance Services, LLC v. Southeast Series of Lockton Co., LLC*, No. 1:20cv2490 (N.D. Ga Apr. 26, 2023), Minute Entry Order. In response, USI argued that a market valuation model was an appropriate measure of damages to compensate USI for its lost valuation in the market. *See id.* The court agreed with USI, denied Lockton's *Daubert* motion, and allowed USI 's market valuation model to go to the jury. *Id.*; *see also* **Exhibit H,** Opinion & Order, *USI Insurance Services, LLC v. Aitkin,* No. 3:21-cv-00267-HZ (D. Or. Sept. 21, 2022) (similarly rejecting efforts to prevent USI's damage expert from presenting a market

17

valuation damage model, and stating "[t]he Court finds that Sly's [USI's expert] market approach is a reasonable methodology to determine damages and falls within the industry standard for valuation of lost client accounts.").

### B. Market Valuation Damages Are Consistent With General Benefit of the Bargain Contract Damages.

Even if a market valuation model differs in some respects from a strict lost profits analysis, USI is also entitled to general contract damages which can be measured via market value revenue multiples, as was done here. For example, in *Holston Invest. Inc. B.V.I. v. Lanlogistics Corp.*, 2010 WL 2495413, *4  (S.D. Fla. June 18, 2010), the court adopted a damages analysis for breach of a right of first refusal that considered investment value and market analyses on revenue multiples. *Id.* In *Holston*, plaintiff was granted a contractual right of first refusal to acquire a company that was part of a family of logistics companies that would have created certain synergies for Plaintiff in Latin America for facilitating and delivering customer purchases. *Id.*, at 1, 3. Ultimately, Defendant sold the business to a third-party purchaser without first giving Plaintiff the bargained-for right to purchase. *Id.* Rather than proceed with a lost profits damage analysis for the lost opportunity to acquire the business, Plaintiff's expert presented a "market approach to valuation" to verify Plaintiff's expected investment value had it been given the opportunity to purchase the company. *Id.* at *5. In that industry, the expert deployed an EBITDA multiple to reach a market value, and used that market valuation to verify Plaintiff's

lost investment value. *Id.* The court ultimately approved the damage model, and awarded Plaintiff damages as calculated by Plaintiff's expert.

The breach of a right of first refusal, as in *Holston*, is akin to the breach of a contractual non-solicitation provision because both restrict what a party can or cannot do with respect to certain assets (e.g., company stock versus client relationships). While USI is entitled to pursue a lost profits damage model based on the loss of specific customers, like in *Holston*, USI is also entitled to pursue a benefit of the bargain damage model for its breach of contract claims that puts USI in the position it would have been in had Individual Defendants not breached their USI Employment Agreements. *See id.*; *see also Capitol Environmental Svcs., Inc. v. Earth Tech, Inc.*, 25 So. 3d 593, 596 (Fla. 1st DCA 2009) ("It is well-settled that the injured party in a breach of contract action is entitled to recover monetary damages that will put it in the same position it would have been had the other party not breached the contract."); *Sharick v. Se. University of the Health Sciences, Inc.*, 780 So. 2d 136, 139 (Fla. 3d DCA 2000) (same). Benefit of the bargain damages may include lost profits, but is not limited to lost profits. *See id.*

USI's market valuation damages are designed to put USI in the same position it would have been in but for the contractual breaches because it restores the market value that USI lost as a result of the breach. It is therefore an acceptable measure of damages under general contract law principles. And though lost profits is generally the measure of damages put forward in restrictive covenant cases in Florida, Florida law does not limit plaintiffs in restrictive covenant cases only to lost

19

profit damages. *See, e.g.,* Fla. Stat. § 542.335(1)(j) ("A court shall enforce a restrictive covenant **by any appropriate and effective remedy**, including, but not limited to, temporary and permanent injunctions.") (emphasis added). Like in any contract case, USI is therefore entitled to pursue damages that compensate USI for the breach, which can include a market valuation approach. *See Holston*, 2010 WL 2495413, *4; *see also* Exh. H.

### C.  USI's Tortious Interference and Fiduciary Duty Claims Also Support Market Valuation Damages.

In addition to contract damages, USI is entitled to pursue damages for its claims for tortious interference, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. Tort damages are designed to make a plaintiff whole. *See, e.g.  Fisher v. City of Miami*, 172 So. 2d 455, 457 (Fla. 1965) (holding in tort action that "the primary basis for an award of damages is compensation. That is, the objective is to make the injured party whole to the extent that it is possible to measure his injury in terms of money."). In some cases, a plaintiff can only be made whole if the Defendant is required to disgorge its own ill-gotten profits. *See, e.g. Bailey v. St. Louis,* 196 So. 3d 375, 381 (Fla. 2d DCA 2016) (upholding award of disgorgement damages in unfair competition case). For example, in *Bailey*, owners of a surgery center met with a prospective lender (a private equity firm) to discuss a loan for the center. *Id.* The parties agreed to confidentiality terms and the surgery center provided the lender with copies of its business plan and other confidential financial information. *Id.* After a diligence period, the private equity firm stated that it would

20

not provide a loan, but  would pay the center to acquire a more than 50% ownership interest in the center. *Id.* Defendants threatened the surgery center that if it was not given a piece of the business, it would open a competing center and take the revenue stream. *Id.* Also, "when threatened with litigation, Defendants stated they were not concerned because **the business would make ten times whatever damages they might have to pay in a lawsuit**." (emphasis added).

The *Bailey* defendants ultimately lifted-out the two top employees from the surgery center, at least one of whom was subject to a non-compete, and opened the competing business as threatened. *Id.* Defendants thereafter "made use of Laserscopic's business plan, confidential documents, key personnel including the entire surgical team and other employees, internal forms and documents, and patient leads." *Id.* The Second DCA held that because **Defendants obtained the critical head start and benefit of time and know-how, which gave them a significant advantage in the market**," disgorgement damages to deny Defendants their ill-gotten gains was an acceptable measure of damages. *Id.* (emphasis added).  As to Defendants' prediction that a damages award would be far less than the money to be made from opening a competing business, the Second DCA held as follows:

> Had the appellants been limited to recovering under a lost profits theory, that prediction would unquestionably be accurate. However, the measure of damages for disgorgement is not the profits the appellants might have made absent the wrongdoing— the measure of damages for conscious wrongdoing is the appellees net profit attributable to the underlying wrong. When the defendant has acted in conscious disregard of the claimant's rights,

> the whole of the resulting gain is treated as unjust enrichment,
> even though the defendant's gain may exceed the claimant's loss.

(internal quotations and citations omitted).

USI's market valuation damage model is therefore also available under a disgorgement theory, like in *Bailey*. Here, the Defendant's ill-gotten gain which must be disgorged is the value Defendants obtained from acquiring the Simmons Book without paying for it. The measure for calculating those damages is as USI sets forth in its market valuation model: e.g., the amount Defendants would have needed to pay USI to acquire the business if it was for sale.[5] Indeed, Lockton at all times treated Project Buccaneer as if it was acquiring a book of business, and compensated Individual Defendants consistent with an acquisition of clients. *See* SOF ¶¶ 16–19.

Like in *Bailey*, Defendants here knowingly took the risk of litigation believing a lost profits damage award would be far less than the value of the Simmons Book it intended to steal from USI.  *See* SOF ¶¶ 16–18; *accord* Mercer Health & Benefits LLC, v. DiGregorio, 307 F. Supp. 3d 326, 335–36 (S.D.N.Y 2018) ("Further, Marrero [of Lockton] told [target producer] that it was "cheaper" for Lockton to pay attorneys' fees for new employees because Lockton gains new clients from hiring a competitor's employees. Marrero referred to other employees that Lockton Southeast had recruited from other competitors."). And like in *Bailey*,

---

[5]     The valuation is conservative, because USI could have charged a premium for the Simmons Book above market value because it was not willing to sell the business at the time of Defendants' wrongs.

22

Lockton executed on its plan by lifting out key employees subject to restrictive covenants, and making use of confidential information. *Id.* For this reason, "the whole of [Defendants'] resulting gain" (e.g., the acquisition of the Simmons Book without paying USI a purchase price) should be treated as unjust enrichment, the windfall should be disgorged, and Defendants should be required to pay USI the amount it would have paid had the Simmons Book been for sale, which is what USI seeks in its market valuation damage model. *See Bailey*, 196 So. 3d, at 381.

## CONCLUSION

For the reasons above, USI requests partial summary judgment finding that market value damages is a viable model to compensate USI in this lawsuit.

Submitted this 30th day of November, 2023.

*/s/ David E. Cannella*
David E. Cannella, Esquire
Florida Bar No. 983837
david.cannella@hklaw.com
HOLLAND & KNIGHT LLP
200 South Orange Avenue, Ste. 2600
Post Office Box 1526 (32802-1526)
Orlando, FL 32801
Phone: (407) 244-1165
Fax: (407) 244-5288

and

Matthew Zimmerman, Esquire
Florida Bar No. 011484)
matthew.zimmerman@hklaw.com
HOLLAND & KNIGHT LLP
777 South Flagler Drive, Suite 1900
West Palm Beach, Florida 33401-6148
Phone: (561) 833-2000
Fax: (561) 650-8399

#234564527_v1

*Attorneys for Defendants,*
*USI Insurance Services, LLC, and*
*USI Advantage Corporation and Counter*
*Plaintiff, USI Insurance Services, LLC*