**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MATTHEW SIMMONS, SHEILA
MURRAY, JACK MITCHELL,
JACKIE RODRIGUEZ, MADISON
LIEFFORT, and EMILY CARTER,

      Plaintiffs,

v.                               Case No.: 8:23-cv-201-TPB-AAS

USI INSURANCE SERVICES, LLC, a
foreign limited liability company and
USI ADVANTAGE CORP., a foreign
corporation,

      Defendants.

_____/

USI INSURANCE SERVICES LLC,

      Counter-Plaintiff,

v.

MATTHEW SIMMONS, JACK MITCHELL
and SOUTHEAST SERIES OF LOCKTON
COMPANIES, LLC,

      Counter-Defendants.

_____/

**ORDER DENYING "USI INSURANCE SERVICES, LLC'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT AS TO MARKET VALUE DAMAGES;" and**

**ORDER GRANTING IN PART AND DENYING IN PART**
**"COUNTER-DEFENDANTS' MOTION TO EXCLUDE DAMAGES-RELATED**
**OPINIONS OF DR. ANNE GRON AND ROBIN C. FROST"**

This matter is before the Court on Defendant/Counter-Plaintiff "USI

Insurance Services, LLC's Motion for Partial Summary Judgment as to Market

Value Damages" (Docs. 130; 167) and "Counter-Defendants' Motion to Exclude Damages-Related Opinions of Dr. Anne Gron and Robin C. Frost." (Docs. 128; 162).[1]

Counter-Defendants filed a response in opposition to USI's motion for summary judgment on December 21, 2023, and USI filed a reply on January 11, 2024. (Docs. 139; 154; 165).

As to Counter-Defendants' motion to exclude certain damages testimony by USI experts Gron and Frost, USI filed a response in opposition on December 21, 2023. (Doc. 136).

The Court held a hearing on these and other motions on January 30, 2024. (Doc. 172). Based on the motions, responses, the reply, argument of counsel, the court file, and the record, the Court finds as follows:

## Background

USI Insurance Services, LLC and Lockton Companies, Inc.[2], are large national insurance brokerage firms and are competitors in the industry. Until their departure, Matthew Simmons and Jack Mitchell were "Producers" in USI's Tampa, Florida, office. Simmons led a team that included Mitchell, along with Plaintiffs Emily Carter, Madison Lieffort, Sheila Murray, and Jackie Rodriguez. In the industry, Producers have various responsibilities, but at its core, a "Producer" is a salesperson who, acting on behalf of an insurance broker, convinces clients to

---

[1] Some of the papers on the pending motions have been filed in both redacted and unredacted versions, the latter filed under seal.
[2] Lockton is represented in this suit by its affiliate Southeast Series of Lockton, LLC,

purchase insurance products and then provides ongoing services to those clients to encourage the clients to continue purchasing insurance products through the insurance broker.  Successful Producers in this industry are *highly* compensated, and this case reflects a battle in an ongoing "war for talent" between by various insurance brokers.

 Simmons and Mitchell entered into written employment agreements with USI.  In exchange, Simmons received over $3 million dollars in payments in the year preceding his departure from USI.   The agreements do not flatly prohibit these employees from leaving USI to join competitors such as Lockton.  They do, however, contain several restrictive covenants.

First, the agreements provide that Simmons and Mitchell – for two years post-employment – cannot, with respect to Client Accounts that they managed or regularly serviced while at USI, directly or indirectly, (i) sell, provide, or accept any request to provide services in competition with USI for any Client Account; (ii) solicit or attempt to solicit services in competition with USI as to any Client Account; (ii) divert or attempt to divert services away from USI with respect to any Client Account; (iv) consult for any Client Account with respect to services in competition with USI; (v) sign a broker of record letter with any client account to provide services in competition with  USI; or (vi) induce the termination, cancellation or non-renewal of any Client Account.[3]

---

[3]  The account restriction described above is specifically limited to: (a) USI Client Accounts that Simmons or Mitchell managed or regularly serviced and/or about which they obtained confidential information on behalf of USI within the last two years of their employment with USI; or (b) active prospective clients that Simmons or Mitchell solicited and/or about

Second, the agreements contain a provision prohibiting Simmons and Mitchell – for two years post-employment – from, directly or indirectly, soliciting employees that they worked with at USI.  Third, the agreements prohibit Simmons and Mitchell from using or disclosing USI's confidential information.  Finally, they require departing employees to provide a 60-day notice of resignation.

On January 25, 2023, Simmons and Mitchell resigned from USI via email, stating they would be joining USI's competitor, Lockton, effective immediately. Within a few hours, Carter, Lieffort, Murray, and Rodriguez, who supported Simmons and Mitchell and worked on the accounts at issue, resigned effective immediately to join Lockton.

Also on January 25, 2023, Simmons, Mitchell, and other Simmons team members filed a complaint against USI and USI Advantage Corp. in the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, seeking a declaration that their agreements are illegal and unenforceable.  The action was removed to this Court by Defendants USI and USI Advantage Corp., who then filed an answer.  USI also counterclaimed against Simmons, Mitchell, and against Lockton as an additional counterclaim defendant, alleging claims for injunctive relief, breach of contract, breach of fiduciary duties, tortious interference, conspiracy, and aiding and abetting breach of fiduciary duty.

---

which they obtained confidential information on behalf of USI within the last six months of their employment with USI.

The same day, several USI clients whose accounts were previously serviced by Simmons or Mitchell submitted "broker of record" letters naming Lockton as their new broker to handle their insurance needs.  Since the morning of Simmons' resignation, 26 USI clients previously serviced by the Simmons team have moved all or a portion of their business to Lockton.

After leaving USI, Simmons, Mitchell, and the other Simmons team members serviced the accounts of former USI clients to one degree or another in violation of their agreements until the Court entered a temporary injunction prohibiting them from doing so.  After the original order was entered, Lockton discovered that two additional former USI employees – Theresa Kemp and Chris Kakish – who were not expressly covered by the injunction order and were not named Plaintiffs in this litigation, were actively servicing one or more of these accounts.  The Court then entered an additional order prohibiting them from doing so as well.  It appears the prohibitions in the Court's orders have been complied with.

Trial is currently set to begin in April 2024, and the parties have filed various pretrial motions.  This Order addresses USI's motion for partial summary judgment, which addresses the legal viability of the fair market value damages model reflected in the proposed testimony of USI's experts as an alternative to a traditional lost profits damages analysis.  Counter-Defendants oppose USI's motion, arguing that USI's fair market value damages model is unavailable on the facts of this case, and they have filed a motion of their own seeking to preclude testimony by USI experts opining on that damages model.  Counter-Defendants additionally

seek to preclude certain expert testimony relating to USI's lost profits damages model.

## Legal Standard

### Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A properly supported motion for summary judgment is not defeated by the existence of a factual dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Only the existence of a genuine issue of material fact will preclude summary judgment. *Id*.

The moving party bears the initial burden of showing that there are no genuine issues of material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the nonmoving party's favor. *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

### Expert Testimony

An expert witness may testify in the form of an opinion if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "The party offering the expert testimony bears the burden of establishing, by a preponderance of the evidence, the expert's qualification, reliability, and helpfulness." *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942 (11th Cir. 2015) (citing *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc)).

Functioning as a gatekeeper, the district court plays an important role by ensuring that all expert testimony is reliable and relevant. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Although *Daubert* references specific factors for the district court to consider when evaluating relevancy and reliability, the inquiry is a flexible one, focusing on the principles and methodology employed by the expert, not on the conclusions reached. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014); *see also Hanna v. Ward Mfg., Inc.,* 723 F. App'x 647, 649-50 (11th Cir. 2018) (outlining the criteria for the admissibility of expert witness testimony). Essentially, the Court is simply asked to determine if the evidence "rests on a reliable foundation and is relevant." *Daubert*, 509 U.S. at 597.

***Measuring Damages***

Whether a proposed measure of damages is proper in a particular case is a question of law for the court. *See, e.g., Asset Mgmt. Holdings, LLC v. Assets Recovery Ctr. Investments, LLC*, 238 So. 3d 908, 911 (Fla. 2d DCA 2018) ("Whether the trial court applied the correct measure of damages on a breach-of-contract claim is a question of law that this court reviews de novo."); *RKR Motors, Inc. v. Associated Unif. Rental & Linen Supply, Inc.*, 995 So. 2d 588, 591 (Fla. 3d DCA 2008) ("The trial court's determination as to the proper methodology to be used in Florida to calculate lost profits due to a breach of contract is strictly a legal issue. Thus, our standard of review is de novo."). When asking a jury to award damages, a plaintiff is not permitted to argue for whatever amount of money it wants. Rather, the amount of money a plaintiff requests from a jury must be rooted in the law – the request must have a legal basis.

In that vein, the Court's gatekeeper role under *Daubert* and Rule 702 requires the Court to ensure that a jury is not presented with expert testimony that applies a legally incorrect measure of damages. *See, e.g., Children's Broad. Corp. v. The Walt Disney Co.,* 245 F.3d 1008, 1017-18 (8th Cir. 2011) (affirming district court's conclusion that a new trial was required because the court should have excluded expert damages testimony under *Daubert* to avoid "exposing the jury to an exaggerated sum of damages"); *Skypoint Advisors, LLC v. 3 Amigos Productions LLC*, 585 F. Supp. 3d 1326, 1332 (M.D. Fla. 2022) (excluding expert testimony as unreliable because it applied the wrong damages measure); *Fidelitad, Inc. v. Insitu,*

*Inc.,* No. 13-CV-3128-TOR, 2016 WL 7508843, at *5 (E.D. Wash. July 8, 2016)

("Consequently, Ms. Barrick's expert testimony is not relevant, because it relies

upon the wrong measures to determine damages as to Fidelitad's unjust enrichment

claim, and thus, cannot be properly applied to the facts in issue.").

<u>Analysis</u>

USI's damages experts present two alternative damages models, both seeking

to quantify the financial damages allegedly caused by breaches of contract and

breaches of fiduciary duty by Simmons and Mitchell and tortious conduct on the

part of Lockton.  One model attempts to quantify the "fair market value" of the book

of business represented by the clients who left USI for Lockton upon the departure

of Simmons and Mitchell.  The second model, a more traditional approach in

litigation such as this, attempts to quantify future lost profits suffered by USI.

The proffered testimony of Anne Gron, an economist hired by USI, addresses

the nature of the losses suffered by USI in the context of the insurance business and

opines that they are similar to the "value transferred in the hypothetical sale of a

broker office with a book of business."  Another economist, Robin Frost, offers an

opinion on damages essentially based on such a "hypothetical sale" value.  Using a

fair market value model, Frost calculates a damages amount ranging from

approximately $15.8 million to $18.9 million, with a mid-point of about $17.3

million.  Frost alternatively offers opinions on lost profits suffered by USI, opining

on a range of lost profits (reduced to present value) from a low of approximately

$4.4 million to a high of $10.9 million.  Obviously, if the fair market value model is a legally acceptable method of calculating USI's damages, this greatly increases the amount of damages USI could ask a jury to award.

USI has moved for partial summary judgment in its favor, asking for a ruling that the fair market value damages model is viable in this case, assuming liability is established and the underlying facts supporting the damages claim are proven. Counter-Defendants oppose USI's motion and further seek to exclude testimony by Gron and Frost on the market value measure of damages.  As to Frost's lost profits valuation, Counter-Defendants do not seek to exclude it altogether but aim to preclude one of the approaches used by Frost on the issue of lost profits.  Because these summary judgment and expert admissibility issues are related, the Court addresses them here in a single order.

### *Rules Governing Damages under Florida Law*

Under Florida law, damages for breach of contract are aimed at restoring the injured party to the position the party would have occupied had the breach not occurred.  *E.g.*, *Lindon v. Dalton Hotel Corp.*, 49 So. 3d 299, 305 (Fla. 5th DCA 2010).  Such damages may not be used to punish the breaching party nor be applied to put the plaintiff in a better position than it would have been in had the contract not been breached.  *Asset Mgmt. Holdings, LLC*, 238 So. 3d at 912; *see also Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1243 (11th Cir. 2009) ("Damages for breach of a non-compete are intended to make the prior employer whole, not to punish employees.").  In addition, the injured party may recover only

those damages that naturally flow from the breach and could reasonably be said to have been contemplated by the parties at the time the contract was made, that is, those damages that could reasonably be expected to flow from the breach. *Lindon*, 49 So. 3d at 306.

Damages in tort are similarly aimed at "restor[ing] the injured party to the position it would have been in had the wrong not been committed." *Totale, Inc. v. Smith*, 877 So. 2d 813, 815 (Fla. 4th DCA 2004) (quoting *Nordyne, Inc. v. Fla. Mobile Home Supply, Inc.,* 625 So. 2d 1283, 1286 (Fla. 1st DCA 1993)). Tort damages are not limited to those within the reasonable contemplation of the parties, but the damages must nevertheless represent the "natural, proximate, probable or direct consequence of the [tortious] act" as opposed to consequences deemed to be too speculative or remote. *Taylor Imported Motors, Inc. v. Smiley*, 143 So. 2d 66, 67-68 (Fla. 2d DCA 1962).

Whether in contract or tort, the plaintiff must prove that the breach of duty proximately caused the alleged damage and provide "some standard by which the amount of the damages may be adequately determined." *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989). The amount need only be established with such "certainty as satisfies the mind of a prudent and impartial person." *Id*. In other words, "Florida law does not require exactitude where it is certain that substantial damage has been caused; a reasonable basis in the evidence for computation will suffice." *Marshall Auto Painting & Collision, Inc. v. Westco Eng'g, Inc.*, No. 6:02-cv-109-Orl-22-KRS, 2003

WL 25668018, at *12 (M.D. Fla. May 8, 2003) (quoting *Nat'l Indus., Inc. v. Sharon Steel Corp.,* 781 F.2d 1545, 1548 (11th Cir.1986)).

In the context of noncompetition/nondisclosure litigation such as this, the case law analyzing the types of damages a plaintiff may recover is not well developed. Similarly, there appear to be very few reported opinions analyzing the types of damages recoverable for tortious interference in this factual context. Aside from the general rules relating to the purpose of damage awards and the prohibition on speculative awards, there are few bright lines applicable across the board, and decisions allowing or precluding damages tend to be very case-specific and fact-specific. Nonetheless, the parties seem to agree that, in a case like this, as long as damages can be proven without resort to speculation, there is no bright line rule precluding a plaintiff from recovering damages suffered outside the period during which a contractual restrictive covenant operates.

### Fair Market Value Damages

The primary issue presented is whether USI can recover the fair market value of the accounts USI lost to Lockton allegedly as a result of contractual breaches and tortious conduct. Counter-Defendants argue there is a bright line rule reflected in Florida law to the effect that an award of the market value of a business is only the proper measure of damages when a business is completely destroyed by the defendant's wrongdoing. On the other hand, if the business remains viable, the plaintiff's proper measure of recovery is lost profits. *See, e.g.*, *Montage Group, Ltd. v. Athle-Tech Computer Sys., Inc.*, 889 So. 2d 180, 193 (Fla. 2d DCA 2004); *Sostchin*

*v. Doll Enters., Inc.,* 847 So.2d 1123, 1128 n.6 (Fla. 3d DCA 2003).  Because USI's

business was not completely destroyed, Counter-Defendants argue this rule

precludes USI from recovering fair market value damages and limits USI to lost

profits.  This line of cases, however, holds only that a plaintiff cannot recover the

market value of the entire business where the business is not destroyed.  As USI

correctly points out, USI is not seeking to recover for the entire value of its

business, but only for the value of the lost accounts or the "book" of business lost to

Lockton.  The line of cases cited by Counter-Defendants therefore does not apply to

the specific factual scenario presented here.

On the other hand, the Court rejects USI's argument that its proposed fair

market value damage model is viable because it is simply another method of

calculating USI's lost profits arising from the loss of the specific accounts that

moved to Lockton.  The fallacy of this argument is shown by the calculations of

USI's own expert, Frost.  One of Frost's lost profits calculations projects USI's

revenue had it maintained the lost accounts, subtracting Producer commissions

attributable to those accounts.  The other lost profits calculation subtracts from

revenue a broader range of expenses.  These lost profits calculations produce a

range of lost profits from around $5 million to $10 million.  Frost's fair market value

model, in contrast, multiplies EBITDA (earnings before interest, taxes,

depreciation, and amortization) attributable to the lost accounts by a multiple of 11,

producing a value purportedly reflecting USI's damages that ranges from almost $16 million to almost $19 million.[4]

It is manifest, then, that the fair market value damages model is measuring something more than the stream of profits arising from the specific accounts that left USI, and the Court concludes this "something more" prevents the application of this damages model in this case. In his deposition, Frost acknowledged that additional contributors to value in the sale of a book of business measured by the EBITDA multiple would typically include assets such as intellectual property, physical assets, leases, and the protections of a typical non-competition agreement precluding the seller from competing with the buyer. Frost also repeatedly acknowledged that the value acquired by a seller in such a typical sale – and therefore incorporated into his valuation – included not only the projected revenue stream from the specific accounts being transferred but also the value of the personnel involved in producing and servicing those accounts. This means that in this case, Frost's calculation of the lost "value" USI proposes to request as its damages includes the skills, services, and client relationships of Producers Simmons and Mitchell. Consistent with Frost's testimony, Gron opines that the "value" USI lost, which she testified could be analogized to a hypothetical sale of a

---

[4] USI cites *Twyman v. Roell*, 166 So. 215 (Fla. 1936), for the proposition that USI's "market valuation damages model is a recognized method for calculating lost profits." USI's sole basis for this assertion appears to be that *Twyman* refers to "market values" as a component of calculating lost profits from an anticipated crop of peas. In context, "market values" plainly referred to the price at which a business could sell peas, not to the fair market value of the business. While earning high marks for creativity, USI's reliance on this 1936 case to support its sweeping damage model is unpersuasive.

book of business, included the value of the Producers and other employees who had "valuable experience and client relationships," who had "successfully serviced a growing book of business," and who could be expected to attract new business and new employees in the future.

In short, the fair market value model USI proposes to present to the jury would award, as part of USI's damages, the value USI lost by virtue of Simmons and Mitchell leaving USI to join Lockton. But the agreements did not preclude Simmons or Mitchell from leaving USI and moving to Lockton, and thereafter competing with USI in generating new business. It was not a breach of contract or a tort for them to do so. The agreements with Simmons and Mitchell did not give USI the right to keep Simmons and Mitchell working for USI for any period of time. Rather, the agreements only required these Producers to give 60 days' notice before leaving, to refrain from soliciting employees and clients, and to refrain from servicing their former clients for a period of time.

Accordingly, the significant value lost to USI purely due to Simmons and Mitchell leaving does not flow from the alleged breaches of duty and therefore cannot legally constitute a component of the damages awardable to USI if it proves its case. Contrary to USI's argument, awarding damages to USI that includes the loss of the value of Simmons and Mitchell as Producers does not "put USI in the same position it would have been in but for the contractual breaches because it restores the market value that USI lost as a result of the breach." To the contrary, it would impermissibly put USI in a *better* position by awarding USI the value of

Simmons and Mitchell as Producers as a component of damages, when these individuals were free to leave USI at any time without breaching any duty.  Thus, the "position [USI] would have been in but for the contractual breaches" is not one where USI is entitled to keep Simmons and Mitchell as Producers in perpetuity or for any particular time.

Neither in its summary judgment papers nor in its opposition to the *Daubert* motion as to Gron and Frost does USI dispute that the fair market value damages it seeks to recover include the lost value of the client relationships, knowledge, skills, and services of Simmons and Mitchell.  And USI offers no explanation why USI is legally entitled to be compensated *for the loss of Simmons and Mitchell themselves* when those individuals were free to leave USI and join Lockton, as they did, without breaching any duty to USI.[5]

Nor does USI cite Florida case law supporting the application of its fair market value model of damages to a situation like this one.  USI argues that this

---

[5] At the January 30, 2024, hearing, counsel for USI stated that USI would present evidence that Simmons would not have left USI had Lockton not offered to indemnify him and allow him to service his former clients.  But counsel admitted that Simmons could leave and that he would not have stayed with USI "forever" (an understatement, given Simmons' manifest dissatisfaction with USI), and counsel did not argue USI could have retained Simmons for any particular period of time.  Instead, he argued that Simmons would not have left USI when he did and in the manner he did but for Lockton's actions.  While this may be true, it was not a breach for Simmons to leave USI no matter when he did it.  And the damages flowing from Simmons' failure to give 60 days' notice and the other breaches of his agreement are those attributable to the loss of specific accounts and reflected in Frost's lost profits calculation, assuming USI can prove that the breaches caused the loss.  Those damages would not include the loss of Simmons and Mitchell as Producers.  And to the extent USI believes its fair market value model somehow captures damages resulting from Lockton's tortious interference, that argument is rejected as wholly and completely speculative.  The undisputed evidence in this case shows that Simmons and Mitchell were leaving USI regardless of anything Lockton may have done.

approach is justified as a disgorgement remedy for USI's tort claims such as tortious interference and aiding and abetting breach of fiduciary duty. USI cites *Bailey v. St. Louis*, 268 So. 3d 197 (Fla. 2d DCA 2018), where the court endorsed the concept of a disgorgement award on claims for breach of fiduciary duty and other theories. Assuming *arguendo* that disgorgement could constitute a proper remedy for tort claims in a case like this, that would not help USI here, for two reasons. First, the expert opinions offered on fair market value damages do not purport to measure profits obtained by Lockton but instead measure the loss suffered by USI. Those are very different concepts. Second, just as fair market value fails to properly measure USI's losses as a result of the breaches of duty, it also fails to measure Lockton's gain as a result of those breaches, and for the same reason: it includes as part of the value, among other things, the skills and services of Simmons and Mitchell, who were not prevented by their agreements or any fiduciary duty from moving to Lockton or from competing with USI after the move.

USI points to decisions from other jurisdictions addressing a fair market value damages model. However, the Court does not find these cases persuasive in the context of this factual scenario and the Florida law principles governing damages discussed above. For example, USI cites an order from a case in the Northern District of Georgia also involving USI and Lockton, but the order is merely an endorsed order with no explanation or analysis. *See USI Ins. Serv., LLC v. Southeast Series of Lockton Co., LLC*, No. 1:20-cv-2490 (N.D. Ga. Apr. 26, 2023). Another case cited, *USI Ins. Serv., LLC v. Aitkin*, No. 3:21-cv-267 (D. Ore. Sept. 21,

2022), addresses only the reliability of the methodology used by an expert to calculate market value.  It does not address the fundamental underlying issue of whether a fair market value model is legally or factually appropriate in the first place.

Accordingly, the Court denies USI's motion for partial summary judgment and concludes that a fair market value damages model is unavailable in this case as a matter of law.  For the same reason, the Court grants in part Counter-Defendants' motion to preclude expert testimony by Gron and Frost on this measure of damages. To be admissible, expert testimony must be reliable, but it also must be relevant – that is, the testimony must "fit" the facts and legal theories applicable in the case. *See Daubert*, 509 U.S. at 591.  In other words, the court must ensure that the proposed testimony "logically advances a material aspect of the proposing party's case." *Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1312 (11th Cir. 1999) (quotation omitted).  Where testimony fails to do that, it fails to pass muster under *Daubert* and Rule 702 because it is not relevant nor is it helpful to the jury. *Daubert*, 509 U.S. at 591.

The Court concludes that is the case with USI's proposed market value damage model here.  As this measure of damages is legally unavailable, expert testimony on this issue, however reliable in theory, is not legally relevant. Accordingly, USI's experts Gron and Frost will not be permitted to offer testimony or opinions regarding fair market value damages.

***Lost Profits***

Counter-Defendants do not argue that Frost's opinions on lost profits should be excluded altogether, but they make two arguments to limit Frost's lost profits testimony. First, Counter-Defendants challenge the expenses deducted in one of Frost's lost profits calculations, titled "Gross Profit Less Producer Commissions Valuation," where he deducts from anticipated revenue attributable to the lost accounts only the commissions that would be owed to Producers for those accounts. The other calculation, titled "Net Lost Profit Valuation," deducts from revenue not only Producer commissions but also service and support staff expenses and other operating expenses. Frost also includes an average of the results of the two methods. Counter-Defendants seek to exclude the first calculation and the average of the two, arguing that a lost profits analysis must subtract *all* expenses.

USI argues that a lost profits calculation that subtracts only the Producer commissions is "akin to" a "contribution margin" for the lost accounts and is a reliable valuation method because it "accounts for the possibility that USI could have pooled resources and continued servicing the Lost Accounts without incurring additional expense beyond the 25% producer commission."[6] USI also argues that reliance on a "contribution margin" is not "foreclosed by Florida law."

---

[6] "Contribution margin" can be defined as "[t]he difference between a product's selling price and its variable production costs." *Contribution Margin*, BLACK'S LAW DICTIONARY (10th ed. 2014). "The contribution margin measures the amount of funds available for profit and payment of fixed costs." *Id.*

The Court concludes that Frost's "Gross Profit Less Producer Commissions" model is not legally appropriate, nor does it represent a reliable methodology for calculating USI's claimed damages in this case. Florida law generally requires that an analysis of profits lost due to a breach of contract deduct from revenue all expenses necessary to perform the contract, including *both* variable costs and a proportion of the fixed expenses. *See, e.g.*, *RKR Motors*, 995 So. 2d at 592-93. USI offers no argument as to why this standard should not also apply to the tort claims at issue in this case.

It is true that, outside the breach-of contract setting, courts have in some circumstances permitted calculations of lost profits without necessarily deducting all fixed expenses. *See, e.g., Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1278 (11th Cir. 2021) (lost profits calculation under trade secret statute providing for damages for the "actual loss caused by [the] misappropriation"). For example, in *Murray v. Dep't of Transp.*, 687 So. 2d 825 (Fla. 1997), the Florida Supreme Court allowed an expert's analysis of the business damages caused by a governmental taking of property that deducted from revenue the costs of food, other supplies, laundry and cleaning, payroll taxes, group insurance, and workers' compensation insurance. The defendant argued that these deductions were insufficient, but the expert testified that these were the business costs "which, in his opinion, would have been attributed to production of those sales had the sales not been lost." *Id.* at 826.

Here, in contrast, Frost offered no economic justification for his failure to deduct not only fixed costs but even variable costs other than Producer commissions, even though he admitted that such other variable costs would have existed.  Frost further admitted that his "Gross Profit Less Producer Commissions Valuation" was "purely presentational."  He did not explain what "purely presentational" meant, but it appears that the only basis for doing the calculation is to "present" a larger number to the jury.[7]  The situation is not saved by USI's speculation that it is "possible" that USI could have generated the revenue projected by Frost without incurring any associated expenses beyond the producer commissions.  Frost testified that such other expenses would have existed, and speculation about what might be "possible" is not a substitute for evidence.  *See Fin. Info. Techs.*, 21 F.4th at 1280 (holding trial court erred in denying defendant's motion for judgment as a matter of law where lost profits calculation presented to the jury did not deduct marginal costs, in the absence of evidence the marginal costs were zero).  Accordingly, the Court will not allow USI to present to the jury Frost's

---

[7] USI's reliance on *Highland Consulting Grp., Inc., v. Minjares Soule*, No. 9:19-cv-81636-ROSENBERG/REINHART, 2021 WL 3793028 (S.D. Fla. Aug. 26, 2021) is not helpful.  That case did not involve an expert's calculation of lost profits resulting from breach of an employment agreement where the expert deducted only producer commissions.  Rather, the employment agreement in that case contained a liquidated damages provision of 50% of any fees received.  *Id.* at *11.  The district court rejected the defendant's argument that the provision constituted an unenforceable penalty as a matter of law because an expert testified that the 50% figure "approximates Plaintiff's contribution margin after *certain costs* and commissions are deducted from gross revenue."  *Id.* (emphasis added).  No explanation is given in the opinion as to what the deducted "certain costs" represented.

"Gross Profit Less Producer Commissions Valuation" or the average of that calculation and the net lost profits calculation.

Counter-Defendants next argue that Frost should not be allowed to calculate lost profits for the 10-year period presented in his report on the ground that there is no justification for this period and other evidence suggests USI would not have maintained the lost accounts for a 10-year period. USI points out, however, that Frost's damages calculation does not assume that USI would maintain all the lost accounts for the entire 10-year period. The calculation factors in an annual 10% attrition rate (or conversely a 90% retention rate) per year, which USI contends is consistent with industry standards, data derived from USI's and Lockton's own experience in retaining clients, and with case law approving similar periods for lost profits projections, although in different contexts. Florida law requires only that a claimant provide "some standard" by which to measure the amount of damages. *W.W. Gay,* 545 So. 2d at 1351. The Court concludes that the 10-year period as calculated by Frost satisfies the "some standard" requirement and is not impermissibly speculative or otherwise improper. To the extent Counter-Defendants argue that a different attrition rate should be applied due to the departure of Producers Simmons and Mitchell, that point goes to the weight of Frost's testimony rather than its admissibility and can be made in cross examination and closing argument at trial.

Accordingly, it is hereby

**ORDERED**, **ADJUDGED, and DECREED**:

1.      "USI Insurance Services, LLC's Motion for Partial Summary Judgment as to Market Value Damages" (Doc. 130; 167) is **DENIED**.  The Market Value Damages model is unavailable in this case as a matter of law.

2.      "Counter-Defendants' Motion to Exclude Damages-Related Opinions of Dr. Anne Gron and Robin C. Frost" (Doc. 128; 162) is **GRANTED IN PART** and **DENIED IN PART** to the extent set forth above.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 5th day of March, 2024.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**