IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

_____
                                        )
MATTHEW SIMMONS, SHEILA MURRAY,        )
JACK MITCHELL, JACKIE RODRIGUEZ,)
MADISON LEIFFORT, AND EMILY            )
CARTER,                                 )
                                        )
          Plaintiffs,                   )
                                        )
vs.                                     )   Case No.:  8:23-CV-201
                                        )
USI INSURANCE SERVICES, LLC,           )
a foreign limited liability            )
company and USI ADVANTAGE              )
CORP., a foreign corporation,          )
                                        )
          Defendants.                   )
_____)
                                        )
USI INSURANCE SERVICES, LLC,           )
                                        )
          Counterplaintiff,            )
                                        )
vs.                                     )
                                        )
MATTHEW SIMMONS, JACK MITCHELL, )
and SOUTHEAST SERIES OF                )
LOCKTON COMPANIES, LLC,                )
                                        )
          Counterdefendants.           )
_____)


**PRETRIAL CONFERENCE PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS P. BARBER**

**March 18, 2024**
**1:40 p.m. to 5:30 p.m.**


(Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**APPEARANCES:**

**FOR THE PLAINTIFFS,**          LYLE E. SHAPIRO, ESQUIRE
**COUNTERDEFENDANTS:**           Herskowitz Shapiro, PLLC
                                 9130 South Dadeland Boulevard
                                 Suite 1609
                                 Miami, Florida 33156

                                 CHRISTOPHER J. BANKS, ESQUIRE
                                 Crowell & Moring, LLP
                                 3 Embarcadero Center
                                 26th Floor
                                 San Francisco, California 94111

                                 NICOLA GELORMINO, ESQUIRE
                                 Gelormino Law, PA
                                 9130 South Dadeland Boulevard
                                 Suite 1609
                                 Miami, Florida 33156

**FOR THE DEFENDANTS,**          DAVID E. CANNELLA, ESQUIRE
**COUNTERPLAINTIFFS:**           Holland & Knight
                                 200 South Orange Avenue
                                 Suite 2600
                                 Orlando, Florida 32802

                                 MATTHEW Z. ZIMMERMAN, ESQUIRE
                                 Holland & Knight
                                 222 Lakeview Avenue
                                 Suite 1000
                                 West Palm Beach, Florida 33401

                                 KRISTIN N. ROYAL, ESQUIRE
                                 Holland & Knight
                                 200 South Orange Avenue
                                 Suite 2600
                                 Orlando, Florida 32802

**ALSO PRESENT:**                MATTHEW SIMMONS, PLAINTIFF
                                 JACK MITCHELL, PLAINTIFF
                                 SARA ROMINE, LOCKTON GENERAL COUNSEL
                                 CHRISTOPHER MURRAY, DEFENDANT

Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

(Call to Order of the Court at 1:40 p.m.)

**THE COURT:**  Afternoon, everybody.  Nice to see you-all again.  This is the case of -- well, I don't know.  We have to talk about who the plaintiff is now, but Simmons, Mitchell, et al. versus USI, Case 23-201.

Go ahead, for the record, introduce yourselves, starting with who -- I think we're going to start to call the plaintiff, I think, USI.  You can just sit and just put the mic in your face.

**MR. CANNELLA:**  Afternoon, Your Honor.  Dave Cannella, Matthew Zimmerman, Kristin Royal on behalf of USI Insurance Services.  With us is Christopher Murray, who is EVP and associate general counsel as the client rep.

**THE COURT:**  Defense.  You're now defense.

**MR. BANKS:**  Good afternoon, Your Honor.  Christopher Banks of Crowell & Moring on behalf -- sit down?

**THE COURT:**  Yeah.  Put the mic close to your mouth, please.

**MR. BANKS:**  All right.  Christopher Banks on behalf of the defendant, Lockton Southeast.  And with us is Sara Romine, head of litigation for the US -- no, I'm sorry, what -- US general counsel for -- well, for Lockton Southeast.

**THE COURT:**  She's your client.  If you don't get her title right, she's going to fire you.

**MR. BANKS:**  Yeah.  That's fair.

UNITED STATES DISTRICT COURT

**THE COURT:**  Give him a break.  Don't fire him for that.

**MR. SHAPIRO:**  Good afternoon, Your Honor.  Lyle Shapiro and Nicola Gelormino on behalf of all the counterdefendants.  We're here with Matthew Simmons and Jack Mitchell.

**THE COURT:**  Welcome again.

So we've got a lot of things to talk about today.  I'll lead the discussion on certain points, and then maybe we'll have a conversation about where we go from here.

So the clients are present, which is good.  And it's important for everyone to understand what you're getting yourselves into when you say you want a trial.  The federal courts have a lot of cases, especially criminal cases, and those always take precedence.  And it's always been this way.  When I was a lawyer, and we went to the other building, that's now the Le Meridien Hotel, we would call and get -- you know, there was no Internet even.  We would call and talk to the CRD, and we would get a list and find out what was going on.  And sometimes you'd find out that these criminal cases all went away.  Sometimes they don't.

So there are plenty of criminal cases in front of your case.  And no matter when we move it to, there will always be.  I think we have now, is it eight or ten criminal cases set?  There's four in April, and I think another four in May.

One of those May cases is a Fort Myers case.  So I think we're up to ten in the months of April and May.  I'll probably be doing criminal trials every week in April except one.  So to the extent this is going to be an April trial, probably not going to happen.

But if one of those cases goes away at the last second, things do happen -- Sonya is giving me the list now.  Sometimes defendants change their mind at the last second.  Sometimes, you know, people die or, you know, government witnesses are in the military and they get deployed and we can't do the trial.

If one of these cases goes away, my intention would be to say to call you, say, come on down and we'll start the trial.  That's where we are logistically.  So everyone needs to keep their calendars open.  Although I'd like to work with people, things like, well, I have to be in this place for a deposition or I have a trial here with this case or whatever are not good reasons when we get into this posture.

So before I proceed, and I have some more information on that, give me a feel for how long this is going to be.  It's -- by the way, we're not having 400 exhibits and 60-something witnesses or whatever.  That's going to be chopped significantly.  We'll get to that.  What is your reasonable expectation of how long this is going to take?

**MR. CANNELLA:**  Yes, Your Honor.  I mean, we still

think it's going to be -- we understand Your Honor's point on the exhibits and the witnesses.  We're conferring.  We're narrowing it -- that down.  But we still think this is going to be a six- to eight-day trial.

THE COURT:  Yeah.  Probably not.  Eight is too long. I was thinking about this.  To me, I sort of feel like, after having looked at this, both sides should be able to get whatever they need to get out in about two days apiece.  But I'm not sure it can be squeezed into one week.  Because there's going to be things that happen.  I mean, the fire alarm goes off, jurors don't show up.  You know, we lose time that way. But what do you think time-wise?

MR. SHAPIRO:  Your Honor, we're estimating five to seven days.

THE COURT:  Yeah.  So I think if we started this on a Monday, we went through it and made good progress, jurors like to leave a little early on Friday, we're all tired by Friday, do a little legal work Friday afternoon, come back on a Monday and, you know, maybe have the case to the jury at the end of the day Monday or Tuesday, that would be, I would think, a fair amount to spend on something like this.

In any event, are you -- how many -- how many plaintiffs -- now, we're going to say, for purposes of this, USI is the plaintiff.  Is it -- is it just one person -- one entity?  I haven't focused on all --

**MR. CANNELLA:**  Yes, Your Honor.

**THE COURT:**  So there's one plaintiff.  On the defense side, we have at least two individuals and then a corporate -- one corporation.  Is that how this is going to go?

**MR. BANKS:**  That's correct, Your Honor.

**THE COURT:**  Are they going to maintain -- and don't listen to my words literally.  All right.  I'm not trying to bust on you guys.  But we all know the reality of the situation.  Are they going to maintain in front of the jury three different -- three different lawyers, so every time one of their witnesses testifies, we have, you know, cross-examination from the corporation, from Mr. Mitchell, from Mr. Simmons?  I mean, how is that going to play out?

Because I can see that going both ways, where the jury may learn about how this all went down and it's sort of masterminded by Lockton, but now Lockton is pretending that it's three different people and saying Matt Simmons, we never heard of that guy, when, you know -- I mean, so I don't know strategically what you guys are thinking.  Give me some insights, because it has to do with how long the case will take.

**MR. BANKS:**  Certainly, Your Honor.  There are different legal issues and different factual issues that are relevant between Lockton Southeast and the individuals.  The way we envisioned it is Lockton Southeast would have

representation.  Then the individuals would be jointly represented.  That doesn't mean we're going to be duplicating questioning on cross, but instead where it is from primarily Lockton issues, probably I will do the lead questioning.  Where it was predominantly individual issues, Mr. Shapiro or Ms. Gelormino will do the questioning.

**THE COURT:**  Are you guys going to be representing the individuals, meaning like one lawyer for one individual or are you just going to kind of -- how is that going to go?

**MR. SHAPIRO:**  Together, Your Honor.

**THE COURT:**  All right.  Okay.  And that comes up a little bit even as early as the jury selection, when we talk about how many strikes and everything like that and how all that works.

So we'll get to that at some point.  I just wanted to get a flavor for that.  Because it makes it take a lot longer when you have multiple parties, especially when you get lawyers who are trying to add value by duplicating everyone's work.  But you guys are close enough to being on the same team that I think you'll -- you won't do that.  I hope you don't do that.

Okay.  Now, going back to the scheduling of this thing.  Maybe you'll think what I'm about to tell you is more than you need to know or maybe you need to know it.  I'm not sure.

We have six district judges here in Tampa.  One of

9

them has recently taken senior status and isn't doing any new cases.  Another is out on a medical issue, and I'm covering her docket.  I have a criminal trial from that judge that I just set this morning, so -- or I'm working on setting.  And we used to have three senior judges.  These are retired judges still doing cases.  Judge Bucklew officially retired at the end of last year.

So we're down a lot of manpower.  That's the wrong word.  Person power.  Who's the HR person?  What am I supposed to say?  Human resources.  We're down human resource-wise.

So getting these trials done is going to be a challenge.  I personally would like to do this case.  I'm interested in this case personally, because I'm just -- I've been working on it, and I find the legal issues interesting.

But it may be necessary for me to hand this off to a retired judge or -- we don't call them retired.  We call them a senior judge, if I can get one to even take it.  The senior judges generally don't like civil cases because they take too long and they have too many exhibits.  So we'll see.  We'll see where we are on that.

The other option, which I've offered to y'all before and you haven't taken, which is fine, you don't have to, but is the magistrate judge.  The magistrates don't have criminal responsibilities for trials, and they can give you an actual date and say we're going to pick the jury on May 15th, and

we're going to do the trial, and you can plan your calendars accordingly.

So that still is an option.  And if you want to do that, that will not hurt my feelings, as I've said before. It's a good thing, because then that allows me to be focusing on the criminal cases and not have to try to get you guys in along the way.  This part we'll put off the record.

(Discussion off the record.)

**THE COURT:**  Now, moving forward, I think the status of this interference claim will tell us a lot about the scope of the trial and how long it's going to take, and I haven't fully made up my mind on that yet, and I wanted to talk to you a little bit about it today.  And that's sort of a deep kind of conversation.

Is there anything else logistically you want to talk about before we dive into that, that makes sense to bring up, scheduling or anything like that?  No?

Okay.  All right.  So let's talk about the interference thing.  I know USI would like the case to be basically putting before the jury what Lockton has done as a -- in a very general way, as a unlawful business practice and say that's not the right way to do it.  And we talked at the very beginning about how that's where we were going to go here.  We were going to figure out what -- A, what did they do, and, B, was it in some way actionable.

And I've asked y'all a couple of different times, you know, where is the smoking gun?  Where is the thing going to be where there was this secret meeting between, you know, Mr. Sharma and whoever where they, you know, did something that was obviously interference?

And I don't feel like I've gotten anything that was super egregious.  Maybe that's because it all happened behind the attorney-client privilege, like we've talked about.  I don't know.  But I'm not seeing this as a case that can legally go forward on a very general totality of what they did was a tortious interference.  I think it has to be much more specific.

And in that regard, I would invite somebody from the USI side of things to identify for me -- I'd say your top three.  And there may be more.  But what are your top three most egregious examples of actionable tortious interference that would let you go to the jury?

**MR. CANNELLA:**  Yes, Your Honor.  So, you know, there's more than three.

**THE COURT:**  Yeah.

**MR. CANNELLA:**  And we presented that at the injunction hearing, but we've also discovered facts since the injunction hearing, which we briefed.  And those include -- well, I'll start first with the number one.  And that is the indemnification of Simmons.  Indemnification is really a

misnomer here.  Because indemnification typically means that we will cover you if you are sued.  But you still have to comply with your obligations to your previous employer.  That was the indemnification that was at issue in the Centennial Bank case.

The indemnification here is quite different.  What the record evidence in this case is, is that Mr. Simmons, and I can quote you page and line of his deposition, said that he would not have left USI unless he could bring the clients with him.  In order to bring the clients with him, he needed to have the service teams go with him.  Otherwise, he wouldn't have been able to have attracted the clients to go with him.  And he wouldn't have done either of those things.  He says in his deposition, there is no way I would do any of this unless Lockton agreed to indemnify me and cover the lawyers and pay any expenses.

That alone would be sufficient evidence to get to a jury on tortious interference.

THE COURT:  Okay. Let's just stop right there.  I've heard that before.  It's in your briefs.  Just give me the chapter.  You said you had chapter and verse.  I just want to put it in my notes right now.  I want to talk specifically about that.  Because all you need is one.  I mean, to keep this interference case in court, you just need one thing to talk to the jury about.

MR. CANNELLA:  Right.  So if you look at Simmons's

March 27th, 2023 deposition, Page 74, starts at Line 23 goes through 75, Line 10.

He says, "There's no chance I was going anywhere without indemnification."

**THE COURT:** Okay.

**MR. CANNELLA:** "There's no chance I would ever leave the firm without indemnification."

**THE COURT:** Okay. Got it.

**MR. CANNELLA:** And then there's more. I'm not going to give you everything. But 104, starts at Line 23, he testifies about he needed to accept the business.

"I wasn't going to leave those people there, you know."

He's talking about his friends and his clients.

"I told them," them being Lockton, "there's no way it will work if that's not okay."

Now, what is interesting about this, Your Honor, is that this testimony brings this case into the Westgate versus Sussman world. Now, that's a 2019 case that Judge Dalton decided. Centennial cites it. It's in the Middle District of Florida. We briefed it in our opposition. Lockton didn't touch it in their reply. And it's also not mentioned in the order that we got denying the tortious interference without prejudice.

But that is a very interesting case. That was a case

that Westgate, a timeshare developer, brought against a timeshare exit owner.  Now, I've represented timeshare developers before.

THE COURT:  You lost that case, didn't you?

MR. CANNELLA:  No, no.  That's -- I lost the Exploria case.

THE COURT:  All right.  Because there's one of those ones where I saw your name on that.

MR. CANNELLA:  Yeah.  And I lost that case.  We appealed it, and it was affirmed on appeal.

THE COURT:  One of those timeshare --

MR. CANNELLA:  One of those timeshare exit lawyer cases.  That's right.  Westgate got a better result, admittedly.  They deposed owners where the owners did not breach until they were reassured by Mr. Sussman, who's a timeshare exit lawyer, that the breach would not cause any financial consequences to them.

What's interesting about the Westgate case, Your Honor, is that Sussman made the same arguments that Lockton makes here.  He said that the timeshare owners were predisposed to breach.  They reached out to me.  One of those owners actually reached out to and engaged with the Reed Hein firm, which is a different timeshare exit firm.  All of the owners expressed displeasure with mounting payments.  They were looking to exit, but they would not exit until they were

reassured that they would be spared the wrath of Westgate and the financial consequences.  That's analogous to here.

Judge Dalton writes in Westgate that expressing displeasure with mounting payments and looking to exit does not amount to reneging on contractual obligations to pay.

Judge Dalton also writes, according to Sussman, an owner's cogitation on whether it's possible or not to terminate his timeshare interest manifests an intent to breach. Nonsense.  If these owners really had intent to breach, Mr. Sussman never would have entered the picture.  But as the deposed owners testified -- and the cite again is 387 F.Supp. 3d, 1318, Middle District of Florida, 2019.

But as the deposed owners testified, they agreed to his or an exit company services on the promise of legitimate cancelation that wouldn't expose them to Westgate's wrath in its financial consequences.

Judge Dalton also writes, the predisposition to breach means that the breach by the party to the contract rather than persuasion by the defendant was the proximate cause of the plaintiff's damages.

So applied here, Your Honor, I've given you the two cites from Simmons where he says I would not leave without indemnification.  I would not leave unless I could accept the business.  That's similar to the timeshare owners.  They weren't happy with Westgate.

Several of them, and this is at Page 1355 of the decision. It's a long case. It's Page 27, if you print it out. Several of them had financial hardships, where they couldn't pay the mounting fees.

And Judge Dalton found in that case that there was no predisposition, because even though the timeshare owners had financial hardships, even though they reached out to the timeshare exit firm, even though they weren't happy, none of them breached until Sussman persuaded them that it would be possible to breach without them having financial consequences, which is exactly what's happened in this case, based on the record in this case.

**THE COURT:** Let me just stop right there.

All right. What happens -- what if -- we'll play the law school game now or the appellate court game. What if the facts were different? And what if the facts were -- well, first of all, do you have any evidence at all that what they've said is wrong, that they -- it was initiated, the contact was initiated, the conversation was initiated by Simmons and not Lockton?

**MR. CANNELLA:** No, Your Honor. But it doesn't matter.

**THE COURT:** Okay.

**MR. CANNELLA:** The answer is no.

**THE COURT:** So let's just -- that's just -- one step

at a time.  So hypothetical, Simmons initiates the conversation and says I would not leave unless you give me an office.  Is that actionable?

MR. CANNELLA:  That's a question for the jury, Your Honor, whether that's an improper means or not.  They did a -- I would probably say based on that, probably not.  But there's a lot -- there's obviously a lot more at play here.

THE COURT:  I understand.  So you know my next question.  We give you an office and we give you a lot more money than you're making.  We give you an office, we give you a lot more money, we give you a bigger staff; we give you an office, more money, bigger staff, and, you know, company car; bigger staff, company car, indemnification in case you get sued.

In other words, there's all of these things that an employer might do.  And, of course, you know, we -- we have the overriding idea here that there's also a case out there that says, you know, employing somebody, knowing that they have -- they will be breaching a noncompete isn't actionable as an interference.

So I guess your argument is, I think, that these are all jury questions.

MR. CANNELLA:  Not necessarily.

THE COURT:  Okay.

MR. CANNELLA:  So let me clarify.  I don't want to

conflate the breach.  The breach is not Mr. Simmons leaving or Mr. Mitchell leaving.  They can leave at any time.  The breach is that -- how they left and what they did leading up to when they left.

The breach is the violation of the nonsolicitation and nonacceptance the provisions.  Lockton could have put a sign up across from USI's offices, you know, a billboard up, saying come to Lockton, we give you more money, and we have better Christmas parties, whatever.  You know, that's not tortious interference.  That's not improper means.

But what is improper is when the conversation is -- when Lockton knows of these restrictive covenants, which, of course, they know about them, because they have the same covenants in their contracts.  And they say, You can't bring clients with you.  And he says, I want to bring clients with me.  I'm not going to come unless I can breach.  And Lockton says, Well, okay.  We'll do that.  We'll let you do that.  And not only that, we'll indemnify you if you get sued.

In Centennial, the indemnification agreement required the employees to comply with their obligations to their previous employer.  That's not the case here.  In this case, we've got two months of phone calls before they departed, before Simmons and Mitchell departed, with Lockton and strategizing, you know, how to do this.  And we would submit that --

**THE COURT:** Wait a minute. Put a pin in that, as my wife likes to say. Put a pin in that. Because that might be something different. But right now, your point is that doing this indemnification thing is an actionable event for a case against Lockton for tortious interference. I get we're not talking about the breach of contract stuff against the individuals. But by Lockton doing this indemnification, that in and of itself is actionable as a tortious interference.

**MR. CANNELLA:** Yes.

**THE COURT:** Okay.

**MR. CANNELLA:** It's not -- but understand, it's not just that, but it's evidence of improper means. And we cited a case in the trial brief that we, you know -- and the response to the motions in limine that we filed this morning --

**THE COURT:** Yeah. I haven't read any of that stuff.

**MR. CANNELLA:** I understand that. I'm just letting Your Honor know that you don't have to take my word for it. Other courts have found that indemnification in certain circumstances where you indemnify the former employees for violating their restrictive covenants can be evidence that goes to the jury as improper means or improper methods.

And as Your Honor knows the case law on this in this circuit for over 40 years, you know, is that -- I mean, Your Honor yourself in your order said that USI covered actions on the part of Lockton that might be characterized as disturbing,

bad business practices, aggressive, unseemly, unprofessional, unfair, underhanded, greedy, or even immoral.  But then Your Honor asked the question, does it cross the line.  We submit that the jury determines whether it crosses the line.

**THE COURT:**  That's what I want to talk about.  Now I have the jury instruction up.  Let me just find -- you guys did a good job with the jury instructions for the most part.  I mean, we're going to have -- we'll give you a final set.  But it's good so far.

Okay.  So on the standard instruction, you may have massaged it a little bit.  But I'm reading from 408.6 of the Florida standard jury instructions.  Says defendant must have also acted unjustifiably.  Claimant must prove that defendant acted unjustifiably because defendant violated a statute, committed a tort, or committed other improper acts.

So your -- under your -- under what this says and under your argument, why wouldn't -- why wouldn't the -- giving the employee an office be a jury question about whether that was an improper act?

**MR. CANNELLA:**  Because given --

**THE COURT:**  They knew he had a contract, and they employed him, and they gave him an office.  Outrageous.

**MR. CANNELLA:**  That's conflating the breach.  He could have worked for Lockton.  It's never been our position that he could not leave USI and work for Lockton.  He could

have complied with his contract.

**THE COURT:** I know that. But I'm changing -- you're, as they say in law school, bucking the hypo. I'm just trying to isolate this question, and it's really at the heart of this case, as to whether this stuff is actually a jury question or the judge has a duty or an obligation to define whatever the legal duty is. And not just -- essentially have a free-for-all for a jury to say, oh, yeah, that was an improper method. That was improper.

Put a pin in this question. How does a jury determine what's proper or improper? Do we have experts on business practices? I mean, somebody had an expert who wanted to talk about, I guess you guys did, what was economically rational and stuff like that. But how is a jury supposed to know what's improper and what isn't improper if that's really the way the law works?

So go ahead.

**MR. CANNELLA:** All right. I'll answer the first pinned question first and then the second.

**THE COURT:** Don't do any pin questions. My question is, why isn't, under my hypothetical, they -- he came to them and said, hey -- or he came to me and said, Hey, I want to work for you.

Oh, but don't you have a contract?

Yeah, I do, but I'm going to breach it.

Well, okay.  Under whatever that case is, I'm allowed to employ you.

And he says, Well, will you give me an office?

I said, Yeah, we'll give you an office.

Why isn't -- why aren't you entitled to go to a jury and say I just interfered because I gave him an office and have a jury decide whether that was improper or not?

**MR. CANNELLA:**  Well, you have to -- one of the elements of the tort of tortious interference is that there's a breach of contract.  So you've got to tie -- you've got to tie the underlying act to the breach of contract.

**THE COURT:**  Right.  So it's a 60-day notice, like you have here.  That's the breach.  All right.  I'm going to employ him the next day and not honor the 60 days.

**MR. CANNELLA:**  All right.  I'm an employee.  I'm supposed to give my employer 60 days' notice.  You know I'm supposed to give him 60 days' notice.  But I tell you what, if you give me an office tomorrow, I'm coming.  I think that that would create -- that would create, arguably, a jury question.

But I keep going back to Manufacturing Research v. Greenlee Tool.  That's an interesting case from 1982, where the court says, when there's room for different views, the determination of whether the interference is improper or not is ordinarily left to the jury --

**THE COURT:**  Yeah.

**MR. CANNELLA:** -- to obtain the common feel for the state of community mores and the manner in which they operate under the facts in question.  So I think even that would be a jury question.

Of course, in the MRC case, that was a case where, you know, you had one competitor make statements at trade shows that they had a superior product to the plaintiff's competitor or to the plaintiff's product, even though they knew that those statements were false.  They didn't have the product.  It was years off from being developed.

And that case went to trial in Orlando before Judge Reed.  And there was a jury verdict in favor of the plaintiff.  And the Eleventh Circuit sustained the jury verdict award.

Now, I suppose Greenlee could say we were just puffing.  You know, we were at a trade show.  All we said was, you know, we're working on something that's going to be out next week when it wasn't out for another five years.  So why should we be on the hook?  In that case, the Eleventh Circuit said, you know what, that's a jury question.  So back to your --

**THE COURT:**  Okay.  You may be right.  You know, this is -- this is far from clear to me.  That's why we're having this conversation.  Suppose you're right about that, it is a jury question.  Then don't we need a jury instruction?  I mean,

how is the jury -- how is the jury supposed to decide what's improper and what isn't?  Isn't it opening up the world to any competitor filing an interference case under the ridiculous example I gave of we'll give you an office, making anything actionable, and if a jury thinks that giving an office is improper, then, oh, well, you win.

It just -- what -- shouldn't we be able to tell the jury what -- is there some kind of definition of what might be improper or have some kind of testimony about, well, this is, you know -- in this industry, I don't know if that testimony could be given, but --

**MR. CANNELLA:**  There is that testimony, both from the fact witnesses, you know, Mr. Longhta, and from the fact witnesses on their side.

**THE COURT:**  They would say what?  They would say what?

**MR. CANNELLA:**  Among other things, that the stickiness of the client relationships and why these restrictive covenants are in place in the first place to prevent something like this happening in the first place.  The insurance broker industry recognizes the value of the client relationships and the importance of being able to have the teams in place to support the relationships, which is -- and why clients, once they sign up with an insurance broker, they will stay for a long time, unless there's a business

interruption outside the normal course of business.

I'm quoting Lockton's member agreement, Section 5.1. It says in there that the client relationships, once they're established, are expected to be long-lasting unless that's a disruption outside of the normal course of business. There's your industry standard.

We also have, Your Honor, and I'm sure this is going to come up again today, but Dr. Gron has not been excluded for all purposes. Your order on the Daubert motion excluded Dr. Gron and Robin Frost from offering testimony as to damages on fair market valuation.

**THE COURT:** Let me interrupt you. I'm also excluding so-called experts that testify about stuff that is not expert stuff. It's just people work for companies that pay them more. You don't need an expert to tell us that. And so I'm not -- I'll let you finish where you're going. But don't think that I might not also take the axe to some of her stuff if it's just what ordinary people know anyway. But go ahead.

**MR. ZIMMERMAN:** I mean, Dr. Gron speaks to -- that was Dr. Lasson right. Dr. Lasson's testimony was not helpful to the finder of fact, because he says workers who feel unhappy or underappreciated will leave their jobs. That's a matter of common sense.

Dr. Gron is different. Right. She's an industry expert and an economist who teaches insurance at Northwestern's

Keller School and also the University of Chicago.  She's got opinions that are outside of the normal understanding of members of the jury.

I remember when I first got this type of case, I had the same reaction that a lot of people did.  I speak to my insurance broker once a year.  You know, what's the big deal?  I don't understand this.  Dr. Gron can testify, based on her industry experience and her economic analysis, that how producers and service teams are critical assets to the brokers and how they are critical to preserving client relationships and the impact of a sudden departure on the incumbent's ability to retain that business.  Those are all concepts of economics and industry, which are not within the common-sense experience of a jury.

**THE COURT:**  I think we're moving a little fast.

**MR. CANNELLA:**  I know they are.  You asked how is the jury supposed to know what's standard in the industry and what's proper and improper.  She's not going to opine what they did is improper.  That's a jury question.  Right?  But she can opine as to what is standard in the industry.  That is wholly different than Lasson.

It's also different than the Gron opinions you excluded.  I understand that.  Gron rebutted Lewis.  They moved to strike the Gron rebuttal report.  You struck the portions of Lewis that Gron rebutted, ergo Gron gets stricken too.  I

understand that. But they didn't move on her other opinions in her initial report. They only moved on her hypothetical forced sale theory.

**THE COURT:** Yeah. Yeah.

**MR. CANNELLA:** That's different.

**THE COURT:** Maybe. But I also have the ability, which I gently dropped into a footnote, about cutting this thing down to something that is fair to everybody, including the jurors. As I said in my little mini speech in that footnote, I mean, they're volunteers, and they don't need to sit here for an unnecessarily long amount of time while two companies essentially fight each other about money.

That's all this case is. I know some people think of it is more because it's your life, but, ultimately, it's a fight about money. There is an amount of money right now that USI would accept to settle the case. They say it's a matter of principle. Every client says -- who's the client?

**MR. CANNELLA:** Mr. Murray.

**THE COURT:** It's a matter of principle. Right?

**THE WITNESS:** Very much is.

**THE COURT:** Very much. If you could settle the case, and they would pay you a trillion dollars, you'd take it. You don't have to admit it, but I know you would. And so these cases are about money, ultimately, although there are principles along the way. I understand.

Now, going back to this question of what is fairly in front of a jury or what is a jury question for purposes of this interference case?  You gave me the indemnification.  That was your number one thing.

What's -- give me another.  Just give me -- you said you had many.  Give me another one or two.

**MR. CANNELLA:**  Yeah, the recruitment of the service team.

**THE COURT:**  Okay.

**MR. CANNELLA:**  Right.  What we've learned since the time of the injunction, Your Honor, is that these were not positions that were open in the normal course of business.  Right?  So Lockton didn't post openings on its website for an account manager or the account representatives until December 12th of 2022, which is about a week and a half after they flew Mr. Simmons up to Kansas City to meet with him for a day and a half to talk about, among other things, you know, the book of business, and, you know, his desires.  And, remember, his testimony is he's told Lockton all along, I'm not coming unless I can bring the clients with me.

So that's another element is that -- that's also part of the coordination.  And Lockton knows that this is improper and not standard in the industry, because the same employees that they onboarded from USI with positions that they didn't post until December 12th of 2022, they had those same employees

sign the same type of agreements with Lockton.  So of course Lockton knew that that was not how it's done as a matter of routine in the industry.

THE COURT:  But before arguing what the legal implications of that, explain to me factually a little bit more.  You just said recruitment of service teams.  But what exactly, factually are you referring to?

MR. CANNELLA:  Okay.  So, Your Honor, the way the brokerage industry is set up, I analogize it a lot to a law firm, because that's been my experience of 31 years.  You've got the producer who's like the shareholder.  You know, he's the rainmaker, the one that's got the client relationships.  You've got an account manager.  And we'll call them like an associate.

THE COURT:  I get it.  I get what they do and stuff.  But I'm curious what did Lockton do to recruit them that would be interference -- a tortious interference?

MR. CANNELLA:  Well, they recruited them, they posted the recruitments for them, and they recruited them with the intent that they service the same accounts that they service at USI.

How do we know that?  We know that because in October of 2023, we took the deposition of Mark Morneau.  The day before his deposition, an exhibit was produced.  It was an assignment sheet, which shows on day one, when they started,

Lockton identified who the teams would be.  And the producers for these accounts that came over were either Matt Simmons or Jack Mitchell.  And the account representatives and the account managers that were assigned to these accounts on day one were, you know, Sheila Murray and Jackie Rodriguez, you know, the account executives, the account managers.  And the account representatives were Madison Lieffort and --

THE COURT:  The other person that was caught working on those clients after they weren't supposed to.  Right?

MR. CANNELLA:  Well, so that happened -- right.  So that happened after the Court issued its injunction.  There was a shift where the producer position -- and that's another thing we've learned after the injunction.

THE COURT:  Just say one thing at a time.  So Lockton recruits meaning Lockton reached out to these people or these people reached out to Lockton?

MR. CANNELLA:  No.  They were -- I'll answer your question directly.  No.  They did not reach out to these people directly.  What they did, there's testimony, which you've heard, that Mr. Simmons told his coworkers, I'm leaving, I'm looking at Lockton.  And then the position was posted on December 12th.  And I think by December 14th is when the first of the account managers applied.  Their testimony is that they never applied with anybody else.  Right?  They never -- they had not applied with Lockton prior to that posting.

**THE COURT:**  Okay.  So I'm taking --

**MR. CANNELLA:**  I think the jury can make a reasonable inference as to what happened.

**THE COURT:**  Let's ask about that, though.  I mean, let's -- so taking that evidence in the light most favorable to you is Lockton says, hey, we're employing Simmons.  We know he's violating his contract in some way.  But we know we're allowed to employ people who are violating their contract, because we have this case that says -- what's the name of the case?  I forgot.  Do you guys know it by heart?

**MR. CANNELLA:**  Are you talking about the Centennial?

**THE COURT:**  You should know it by heart.

**MR. CANNELLA:**  The Centennial case?

**THE COURT:**  Centennial?  Okay.  So we know we can do this under Centennial.  We know we can employ Simmons.  Why can't we employ his associates?  I mean, he's the partner in the firm.  Why can't we employ his associates, knowing they might have these contracts?  As a matter of fact, we're going to sign them up for the similar ones ourselves.  But why is that an actionable interference?  Again, it might be breaches of contract and all that stuff, but why is that Lockton interfering?

**MR. CANNELLA:**  Because Simmons was able to bring the clients from USI because of the service teams, he was able to tell the clients -- he was able to induce the clients at USI to

leave in part because he told them, and you heard the PGT testimony at the injunction hearing, you know, me and your entire service team are going over to Lockton.

And the evidence is that the seven employees or these other employees, they all resigned at the same time, within one hour of each other.  They provided no notice.

**THE COURT:**  You know what?  I thought you were going to find out in discovery, when we had this case before, I thought you were going to find some e-mail or something where somebody at Lockton orchestrated that whole thing.  And then, you know, we're going to come back and you're going to go, aha, I told you so.

**MR. CANNELLA:**  It's been -- you know, we've dealt -- we've talked about the privilege issue.  I think that the circumstantial evidence is sufficient that the jury can draw that conclusion, because not only did the six employees -- or eight, ultimately -- but six of them resigned within one hour on January 25th.  All of them testified that Lockton picked the day of their departure.

It's undisputed that on January 25th, Simmons, Mitchell, and four other employees filed a declaratory judgment action in the Thirteenth Judicial Circuit.  That didn't just happen the morning of January 25th.  This was ongoing.

And if you read the Theresa Kemp depo, I'll have to pull it and get you the page and line cite, because I actually

didn't have that squibbed out before.  When she was asked about her notice, she talks about I decided I didn't have to give the notice.  Well, how did you decide that?  Then there was a privilege objection.  Right?

So, you know, I mean, I don't know if this gets in front of the jury or not.  But just talking about the case with Your Honor, I mean, the inference is that they decided they didn't have to give the notice because a lawyer told them they didn't have to give the notice.

So even though they gave two weeks' notice to every job that they ever resigned from, they didn't do it here.  Why?  Because Lockton picked the date January 25th, 2023.  Why?  Because the inference is that's the same date that they filed the declaratory judgment action.  It's also the same day that Claudia Mandato flew from Kansas City to Tampa to be able to execute and facilitate the broker of record letters.  The facts are that it was coordinated and structured.

**THE COURT:**  I agree with you that the facts give it at least a circumstantial, maybe even more than that, case that this was coordinated.  It couldn't have all happened the way it did otherwise.  And so, again, Lockton is employing people who might be breaching their contracts, who might be breaching their fiduciary duties, and Lockton may be coordinating that employment.

But we're not hearing, or at least I'm not hearing

that Lockton, as opposed to maybe Mr. Simmons or maybe Mr. Mitchell or who knows, being the person that's initiating these conversations.  And your argument is, well, they don't have to be the initiator, though.  The whole thing is actionable because of its improper nature.

**MR. CANNELLA:**  Well, yes, and -- not really.  I mean, we have specific facts that we would, you know, present to the jury, you know, not a general amorphous, you know, this isn't fair, or we just don't like the way that this happened.  I mean, we have specific facts, specific time.

**THE COURT:**  That's what I'm trying to get -- that's what we're doing.  That's exactly what we're talking about.  So we have the employees that all resigned on the same day, on a date picked by Lockton.  Is that something that a jury is entitled to label as, you know, improper -- not unfair.  Improper.  Right?  That's what the jury instruction says?

**MR. CANNELLA:**  Improper.

**THE COURT:**  Improper business practice.

Go ahead.  You have more to say on that one?

**MR. CANNELLA:**  The point is, is that that -- that is evidence that induces the breach.  The breach of contract claim is against Mr. Simmons and Mr. Mitchell.  They can't breach without their service teams being with them, and they wouldn't have left and breached.

Leaving is not the breach of contract.  It's the way

they left where they told clients for months where they're going, where they were able to tell these clients if you come with us, you're going to still be able to work with the same people.  They couldn't have done that without Lockton's help.  That goes to aiding and abetting the breach of fiduciary duty, which is different, which I understand that's different than tortious interference, but --

**THE COURT:**  Let's go off script.  I'm going to regret this.  I always do when I do.  We have to take a restroom break in a second.  All right.  You're right.  Suppose you still have that aiding and abetting breach of fiduciary duty.  It's a mouthful.  But, basically, it's designed to pick up the idea of Lockton helping them do some of the bad things you said they did.  So you've still got that claim.  I haven't been as concerned about that claim.

What does this interference claim get you, other than possibly trying to introduce all this evidence of all these other cases and all these other things, which I might be eliminating regardless.  But we'll come to that later.  What does this interference claim get you that you would lose if it wasn't in the case, other than you don't want to lose anything?

But, I mean, if we go to a trial and you present the same evidence you're going to present anyway, what is it -- what does it change?  I mean, you can still -- if you can get punitive damages, can you still get them under this aiding and

abetting fiduciary duty thing?

**MR. CANNELLA:**  Yes.

**THE COURT:**  Yeah.  So, again, if -- I didn't say -- so we'll talk about that.  So what is the interference getting you other than creating a potential appellate issue, confusing the jury and making the trial longer?

**MR. CANNELLA:**  Yeah.  So what it gets us is -- it is more weight that establishes the proper rules of the game.  And I understand Your Honor's point about, you know, all clients say it's the principle, but it's really about money.  But these are competitors.  And the way that Lockton does it is unlike the way that USI does it, that Marsh does it, that Aon does it, that Gallagher does it.  Those companies when they grow through expansion or they grow, they buy it on the open market.  I'm not making a fair market value argument here.

**THE COURT:**  It's okay.

**MR. CANNELLA:**  Okay.  Then I will.

**THE COURT:**  No, I get it.

**MR. CANNELLA:**  So it's more expensive to buy it legitimately than it is to do what Lockton does, which is why the Lockton Southeast series has done this nine times since 2015.  Those are just the cases we know about.  The smaller regional brokers that can't afford to play in this space probably just throw their hands up and say please don't take anybody else.

But what it gets us is -- it helps establish the rules of the game going forward, so that this company doesn't keep doing it to USI. And so I understand if a jury comes back and says no interference, well, okay.

**THE COURT:** Then your client can do that next time and not get in trouble for interference. You both want this trial, because you can get something away from it, win or lose.

**MR. CANNELLA:** Right. So I think the risk, though, unfortunately, you know, the risk is a lot higher for appellate issues, and I'm not an appellate lawyer, but I would think that the risk would be higher if summary judgment were granted on a tortious interference claim where you've got these fact issues. Right? And the safer course would be -- or the more conservative course would be, let the case try --

**THE COURT:** I know. I know.

**MR. CANNELLA:** -- and you can either do a DV or you can do a JNOV after the verdict.

**THE COURT:** That's exactly what I've been thinking about. That's exactly what I've been thinking about. I haven't made up my mind about that yet. That's why I want to have this thorough conversation now and not after we've heard all the evidence, and then we've got jurors in the hall, and it's, you know, a short period of time and we have to kind of rush the conversation. That's why I want to do it right now.

So we've been going about an hour now. Let's just

take a five-minute restroom break and we'll pick up.  My next question is going to be give me one or two more examples, like, I've got indemnification, and I've got the recruitment of service teams.  Maybe two more, and then I'll have a good flavor for this.  I know a lot of this is in your briefs, but it's more helpful to have a conversation.

So we'll see you in five minutes.  Thank you.

(Recess from 2:32 p.m. to 2:46 p.m.)

**THE COURT:**  Okay.  So go ahead and give me two more examples of something that's actionable as an interference by Lockton.

**MR. CANNELLA:**  Yeah.  So the two that spring top to mind is they -- you know, the dec action.  You know, they paid for the dec action, knowing that the agreements were similar to, if not the same as the agreements that Lockton uses itself, and so they filed a dec action, we would argue, not in good faith in an effort to disrupt USI further.  And that disruption included not just the eight people that left on the same day.  But you heard testimony from Mr. Varnadore last April at this hearing, that for several of the clients, contact information was missing, or the information said Mr. Inconspicuous.

You know, we've also learned that these client accounts, Lockton has not reassigned any producer to those accounts.  Those accounts are being held for the benefit of Mr. Simmons and Mr. Mitchell, thereby enabling them to benefit

from the commissions earned on those accounts, even while they are enjoined by this Court from being able to work on those accounts. And that's additional inducement by Lockton to get the producers to violate the agreement.

Finally, Your Honor, you've heard testimony -- you've heard evidence that this entire enterprise was financed with a loan from Lockton Southeast corporate parent. That financing doesn't work unless Lockton could get the business to move when it did.

If I could just say a couple words about Centennial. I think that case is distinguishable on a lot of grounds. Judge Covington said there was no evidence in that record that the indemnification agreement caused any of the departing officers to leave. I think that's at Page 11 of that case.

Also, the timing of the indemnification, the indemnification agreement came two weeks after the departing officers had already signed agreements with ServisFirst Bank. Also, in that case, the departing officers from Centennial all said they were leaving regardless because of the acquisition of their incumbent bank bought by Centennial.

The timing situation in this case is nowhere near similar. You've got some vague, unsupported testimony that Simmons was unhappy for years. He didn't leave until Lockton induced him to leave.

Finally, Your Honor, on the indemnification

agreement, in Centennial, the indemnification offered by service first was we'll indemnify you if you comply with the terms of your agreement.  In this case, the indemnification which was made before any of the producers or the employees, except employment with Lockton, the indemnification was, we'll indemnify you so long as you comply with the instructions of your attorneys.  Those attorneys, of course, being attorneys selected for -- selected by and paid for by Lockton.  So we think that that makes this case different from Centennial Bank.

THE COURT:  Now, related to all of this, your argument on the interference claim -- and, again, I'm just on the interference claim.  Your argument is that this -- all of these things, maybe one of them, maybe two of them, maybe all of them together are, quote, improper business practices, is what the jury instruction says.

Here it is.  Yeah.  Improper acts, and it's really for the jury to decide whether or not that's improper or those things are improper.  Right?

MR. CANNELLA:  That's right.

THE COURT:  Okay.  Is your argument also that these -- all of this stuff is circumstantial evidence of a direct interference, meaning, not some generalized, well, this is improper business, which is actionable, but, no, this is a different species of interference.  This is actually a direct interference.  I understand that their testimony is that they

initiated the conversations and things like that, and that there's no evidence that you -- that Lockton directly did anything, because we think it happened behind the attorney-client privilege.  But all of these things are circumstantial evidence that Lockton actually did take some affirmative steps, which would be a direct interference, not the general improper business practices.

Do you follow what I'm saying on that?

**MR. CANNELLA:**  I think there's circumstantial and direct evidence.

**THE COURT:**  And -- but so the jury would really have two, you know, door A and door B to go through if they wanted to come out your way.  They could say we don't really know if this is an improper business practice, because it's very undefined.  And I guarantee you, if this goes forward, we'll get a juror question, "What is an improper business practice?" And what are we going to tell them?  Rely on your memory of the evidence, you know, good luck.

But if they wanted to just punt on that, because it's too confusing to them, and there's no -- not enough guidance from the Court, they could then say, well, wait a minute, we think that Lockton directly did something because this chain of circumstances suggests it could not have happened had Lockton not done some kind of direct interference.

Two different species of claim.  Yes?  Or am I -- am

I making their case better for them than it was?  I was going your way until just there.  Right?

MR. CANNELLA:  I think it's one -- it's one door, not two.  And I think the jury is going to be given instruction on circumstantial evidence.  I mean, they -- you know, that's part -- that's part of the standard jury instructions.

But there is -- I guess it depends on what the question of direct evidence is.  I mean, you've got the witness who says, I'm not going -- I'm not leaving unless I can take clients and be indemnified.

THE COURT:  Well, a direct interference, what I'm using that term to mean, if you go to somebody and say, hey, I know you have a contract, I want you to breach it, that's actionable right there as an interference.

And I think -- I'm trying to figure out if you're arguing circumstantially that's kind of what they -- even though they deny it, that's what must have happened here.

MR. CANNELLA:  No.  We agree.  But we also think there's direct evidence from Mr. Sharma where he testified that -- I mean, the self-serving testimony is we told him not to do it, but once we heard he was going to do it, we familiarized ourselves with the facts, and we became comfortable with it.  I would say that's an admission.  That's a direct admission.  Similar to what you just said, we know you have a contract, we know you're going to breach it, we want you

to do it anyway.

**THE COURT:** Okay. Let me go over to your side for some different points or related points. Obviously, I'm thinking seriously about taking this interference claim out of the case, because I think it has a lot of issues, legally. It's confusing, et cetera, et cetera. I don't need to belabor that. What if I'm wrong? What if I do take it out, and what if you win the case, and then they file an appeal, and our friends in Atlanta say, well, go and do that again, because you shouldn't have taken that interference case out? I mean, he argued that earlier essentially.

Do you really want me to take the interference claim out? If you think you've got a good argument on it, what -- where are you on this?

**MR. BANKS:** I mean, it should come out. It should come out because that's the right answer. And, you know, if some court of appeal disagrees, that would be very unfortunate. But we think this is the correct thing is to remove the claim. It is for the two reasons identified, and that's both predisposition and the --

**THE COURT:** Did you guys just get the case settled? Your clients were out in the hall.

(Discussion off the record.)

**THE COURT:** Go ahead.

**MR. BANKS:** That's okay. Your Honor, so I was saying

there are two reasons here.  One is the predisposition issue, and, second, is the failure of USI to identify any improper conduct, which is not just a loosey-goosey standard for the jury to decide, but instead does call for clarification.

THE COURT:  Like what?  I mean, what am I supposed to say?

MR. BANKS:  Yeah.  So, Your Honor -- so the Florida Supreme Court helpfully has prepared jury instructions for us.  Your Honor pointed to those earlier.  It's Instruction 408.5 from the civil instructions.  There's notes to that instruction.

What -- now, this really gets to the improper issue, not the predisposition issue.  I think the predisposition is easier to base the decision on here.  But that said, on the instruction and on the improper conduct issue, what the instruction makes clear is that if the allegedly interfering party was motivated by competition, that is a legitimate motive.  And if that is the case, then they have to have used improper means.

And it says here, you know, you have, if you look at this instruction, and I know Your Honor has looked at it before, I can hand it up again if you want.

THE COURT:  I have it right in front of me.

MR. BANKS:  Perfect.  You see in the paragraph, it says defendant must have also acted unjustifiably.

**THE COURT:** That's what I read earlier.

**MR. BANKS:** Right. And there are examples, violated a statute, committed a tort, or committed other improper acts. And then the next paragraph gives examples, and it says the examples would be physical violence, misrepresentations, illegal conduct, threats of illegal conduct, and then it has this bracket with a parenthetical. Right?

Identify other improper conduct. It is not supposed to just read to the jury other improper conduct without any explanation. The plaintiff needs to say what the improper conduct is. And then Your Honor, as the gatekeeper here, needs to decide is that actually improper. Helpfully, the instructions include notes for use.

And in those notes for use, in note number three, they point to us the GMB, Inc. versus United Danco Batteries case.

**THE COURT:** I have that case right here.

**MR. BANKS:** Exactly. That case says -- makes a really important point. That is, we're talking about creating a tort for a third party that has not signed this contract.

**THE COURT:** Yeah. I don't want to cut you off.

**MR. BANKS:** Okay. That's fine.

**THE COURT:** I'm with you on that. I have that case. That's what's motivating my thinking.

**MR. BANKS:** Okay.

THE COURT:  It has quotes in here, like, again, we have the fascinating legal issue of you're citing from a dissent where the majority judges say we think the dissent had the law right.  So I don't even know if this is a valid case or not.

But in any event, Judge Altenbernd, who I have a lot of respect for, who's a great judge, is retired now, he says, and I'm reading from Page 495, when established law has not clearly answered -- announced the duty owed by defendants, it is important for the judiciary -- that's me -- to fulfill its important role in defining the general standard of care owed by all defendants.

All right.  That's good.  Then he goes on to say, I am convinced that the Supreme Court rarely intends the concept of improper business methods to be expanded to include acts that are neither independently tortious nor prescribed by statute.  In a state that values open competition and a free enterprise economy -- you're from California.  Right?

MR. BANKS:  Yes.

THE COURT:  You have that in California?

MR. BANKS:  We believe in that too.  We actually don't even allow these kind of contracts for this reason.

THE COURT:  Tortious interference should not become an amorphous antitrust concept that allows juries to decide on a case-by-case basis whether business practices lawfully

permitted by the legislature are good or bad.  So I'm aware of this.  But -- so what?  I mean that's what this says, it doesn't really answer the question.  If I can articulate a -- you know, define a general standard of care, then the jury should decide.  I mean, that's his argument.  Why is that wrong?

MR. BANKS:  Because I think what this is saying and what the instruction is saying, is it has to be something that is independently improper.  Something that violates a statute or constitutes a separate tort.  And if it doesn't do those things, competitors are allowed to do it.  And just to be clear, that doesn't mean USI is left without a remedy.  USI still has a breach of contract claim that it can pursue against the individuals.  It just doesn't mean that this stranger, this party that never signed this contract and isn't governed by its terms, that there's no claim against it for interference with the contract unless it does something independently wrongful.  And other cases support this.

THE COURT:  I get it.  But what about the argument I just made, that, oh, you know, all of these things happened?  They didn't happen by themselves.  They obviously were coordinated.  They were intentional.  And if they were willing to do all those things -- I mean, you.  If your client was willing to do all of that stuff and coordinate it all, including filing the lawsuit on that exact day, we, as a jury,

are entitled to infer that they probably did cross the line, and they probably did go to them and say, hey, go ahead and breach this contract and violate this fiduciary duty and do -- you know, do all that stuff.  Would that be a jury question in that way from these circumstances?

**MR. BANKS:**  I think -- first, I don't think that's this case.  But, secondly, I think even in that circumstance, where it's just the evidence says that the -- I mean, the testimony from everybody says that these individuals are the ones who wanted to breach, that the third party allowed them to, but did not encourage it.  But you're allowed to disbelieve all of that and still conclude that it came from the other -- from this third party, that's still not interference with contract, because it wasn't independently wrongful.  Right?

Again, these are two issues.  There's predisposition.

**THE COURT:**  Wait a minute.  No.  I don't think you can go to another person that has a contract and say, I'm not doing anything, I'm not using violence, I'm not using threats, but I want you to breach that contract, because, you know, I'm greedy and I want to make more money.  I mean, isn't that just inducement to breach, which is sort of like what tortious interference is supposed to be, going to people and getting them to breach their contracts?

**MR. BANKS:**  That might be some other claim.  I don't think it's tortious interference.  Just the way -- if we look

at what this case says, and we look at what the instruction says, and we look at other cases, they all cite to conduct that is independently wrongful.

The Slip N' Slide Records case talks about defamation, physical violence, misrepresentations, the blue sky --

THE COURT:  Just a second.

MR. BANKS:  I'm sorry.

THE COURT:  Go back to your jury instruction, the second full paragraph.  To be liable for interfering with the contractual relationship between A and B, B must have acted intentionally to interfere with the contractual relationship. A person interferes with contractual relationship between two or more persons if he induces or otherwise causes one of them to breach the contract.

MR. BANKS:  That's the first element of the claim is it has to be intentional.  The second is that it has to have been unjustified.

THE COURT:  Has to know of the business relationship. Well, we can even go back to that Second DCA case.  They tell us the elements there.  Okay.  Well, in any event --

MR. BANKS:  The third paragraph says the defendant must also --

THE COURT:  Yeah.

MR. BANKS:  -- must have also acted unjustifiably, so

it's both.

**THE COURT:**  Okay.

**MR. BANKS:**  And then that's normal.  That is the way this tort works in most other jurisdictions as well.

**THE COURT:**  Yeah.

**MR. BANKS:**  So this isn't some outlier concept that we're arguing here.  This is kind of the way the law has been going the last 20, 30 years.  And Florida is in accord with Georgia, with California certainly, that this tort requires more than just the interference.  It has to be something that's independently improper.

But, again, I think that this is easier on the predisposition.  Because if you look at everything that USI cited, all of the testimony they read to you, all of the arguments that they made, it was that Matt Simmons came to Lockton and asked for these things.  Matt said, I am going to accept clients, and Lockton came around to it.  Matt said, I need indemnification.  There's no evidence that Lockton Southeast did anything to twist his arm, to convince him. That's the distinction between this and the cases that USI is relying on as well.

And so what's the case -- I'm sorry, the case that Your Honor and Mr. Cannella were discussing about the people who were getting out of their timeshares.  Yeah.  Westgate. That was a case where the evidence showed that the attorney

convinced the clients, hey, you can get out of this.  And Mr. Cannella said, this is what he said, he said Sussman persuaded them it was possible to breach without financial consequences.

There is no evidence here that anyone from Lockton Southeast persuaded Mr. Simmons to take the actions he was going to take.  Instead, what the evidence is, that we cited in our papers, is that Matt Simmons had decided he was leaving. He decided he was going to work with these clients wherever he went.  He talked to not only Lockton Southeast, but he talked to Alliant, Gallagher, and Marsh, companies that Mr. Cannella said don't offer indemnity and Mr. Simmons was offered indemnity from them.

Also, he had testified, again, in the testimony we cited in our motion, is that even if none of these companies had hired him, he would have gone on his own and with his own money that he had saved, would have financed his own -- or would have recruited other investors to finance his own indemnification and done exactly the same thing.

Lockton Southeast did not interfere, did not cause him to do these things.  Mr. Simmons made his own decisions. There is no evidence to the contrary.  I don't think that where all the evidence is one direction that the jury can just disregard all of it, especially not based on these facts.

You know, what was the reason that Mr. Simmons asked

for indemnification?  The evidence is that Mr. Simmons talked to his supervisors before leaving and was told, even if you don't breach your agreement, you're going to be sued by USI. USI has sued over 50 producers.  They sue every producer who leaves, pretty much.  They recently called up the husband of a departed producer, asking if he would give them dirt against his own wife to sue her.  So of course Mr Simmons asked for indemnification.  There's nothing wrong with that.

**THE COURT:**  Are they still married?

**MR. BANKS:**  Yes.

**THE COURT:**  Because ex-wives and ex-husbands are wonderful sources of information.  But when they're still married, maybe not.  All right.

**MR. BANKS:**  So that's why he asked for indemnification.  It's not improper.  There's nothing illegal. There's nothing tortious about giving indemnification.

**THE COURT:**  That's what I've got to -- I've got to make a decision on this, which I will pretty soon.

**MR. BANKS:**  Did you want me to run down each of the four examples?  I think it would be --

**THE COURT:**  No, I don't.

Let's see -- let's talk next about -- let's make sure we're kind of on the same page with this breach -- or aiding and abetting breach of fiduciary duty.  What is that -- what does that claim look like?  I didn't pull the jury instruction

on that, but --

**MR. CANNELLA:**  Yeah.  That claim is distinct in that there is no, you know, predisposition defense or competition defense.  A party aids and abets a --

**THE COURT:**  Yeah.  But who?  Is it Simmons and Mitchell, or is it -- are you saying that -- this is my question -- that some of these other employees also breached fiduciary duties?

**MR. CANNELLA:**  No.  The claims against the individuals are just Simmons and Mitchell.

**THE COURT:**  All right.

**MR. CANNELLA:**  And the claims against Lockton are both for tortious interference and aiding and abetting the breach of fiduciary duty.  And the elements of the claim for aiding and abetting, you know, are that they know of the duty -- Lockton knew of the duty, that there was a breach, and that Lockton rendered substantial aid and assistance in the commission of the breach, and that -- you know, our position is that that factually is really -- you know, can't be disputed.  We understand there's a fact dispute.  We'll try it.  The fact of the matter is, is that Simmons couldn't do what he did without the aid and assistance of Lockton.

**THE COURT:**  Okay.  You don't need to argue that one.  I'm leaning your way on that.  Go ahead.  What's wrong with that claim?  Why doesn't the jury get to look and see what

happened?  Say, look, employees have fiduciary duty.  One of them, don't being paid by company A to do stuff for company B, which I think they have one of your guys doing.  Right?

**MR. CANNELLA:**  Correct.

**THE COURT:**  That's a breach of fiduciary duty.  And it's not?

**MR. BANKS:**  No, Your Honor.  So, first of all, I just want to clarify something.  On the interference claim, there is no claim for interference with the other employees' contracts.  There is only a claim for interfering with Mitchell and Simmons.

**THE COURT:**  But stick with me.  We can't go down every rabbit trail here.

**MR. BANKS:**  Okay.

**THE COURT:**  So my question is, what is wrong with this -- I mean, I thought I picked an obvious breach of fiduciary duty.  If you want to try to defend that -- I mean, if they have evidence that your client, while getting a paycheck from them, was actually, like, getting clients to try to move over, isn't it something like that?

**MR. CANNELLA:**  Yeah.  For the last two months before he left, this is from his own testimony, he would visit with clients and tell the clients that he was leaving and tout up Lockton's resources in comparison to USI's.  And then for good measure, he'd get reimbursed from USI for the expenses --

**THE COURT:** To me, that's at least a jury question about whether that was a breach of fiduciary duty.

**MR. BANKS:** Yes, Your Honor.  I think I misheard.  I thought when you talked about getting paid, I thought you meant while he was being paid by Lockton, which is different, because the fiduciary duty ends when his employment ends.

**THE COURT:** Right.  He's still getting a paycheck --

**MR. BANKS:** Yes.

**THE COURT:** -- from USI.  Maybe I said your client. I shouldn't have said it that way, because that's not what I meant.  He's getting a paycheck from USI while he's meeting with clients, talking about moving them to Lockton.

**MR. BANKS:** I understand.  I misheard or misunderstood the one point.

**THE COURT:** I may have misspoke.  So isn't that a valid jury issue to say, well, what part did Lockton play in that?  Did they, quote, aid and abet that -- that situation or any related situation?

**MR. BANKS:** So I think without conceding our issue that we raised in the papers about the torts and the contracts, but, yes, that would be -- assuming that there's a tort for breach of fiduciary duty against the individuals, that could be a breach of fiduciary duty.

The question for aiding and abetting, then, is whether substantial affirmative assistance was provided by

Lockton. And so it has to, again, be Lockton providing substantial affirmative assistance, not just inaction, and it has to be during the time that they were employed. So accepting business afterwards, that's a different issue. That might be something to consider on that, you know, on the interference claim. But it's not for the aiding and abetting, because that's post-departure. So it would have to be pre-departure.

And it also cannot just be the mere acquiescence or not stopping Mitchell or Simmons from doing this. That is an issue that is teed up in the jury instructions, and you may have seen that. That's because that only applies if there's an independent fiduciary duty owed by the third party. I think everyone would agree that Lockton did not owe a fiduciary duty to USI, of course. They're competitors.

**THE COURT:** Yeah. All right. We can sort out the detail on that. But, to me, that's probably staying in the case in one version or another, which means the corporation stays in the case. All of this stuff we've been talking about doesn't really pertain to the claims against the individuals. I mean, those are very much in the case, and we have to figure out what the jury learns about this in terms of indemnification and stuff like that.

I know you have a motion. You say it's like insurance, and they shouldn't know anything about it. I'm not

sure about that.  Maybe we'll get to that today.  Maybe not.

Give me some direction now.  I accomplished some things I cared about.  There's some things you care about that we -- you think we should talk about today that would help you prepare.  I mean, I know you have all these motions and stuff.

**MR. CANNELLA:**  I do have something to seek clarification on, Your Honor.  Fair market value.  We understand your order to mean that, you know, USI cannot seek fair market value damages in the case.  We understand that.  We don't want to run afoul of that.

However, we think -- we laid this out in the pretrial statement.  We think that fair market value for acquisitions is still an issue in this case, as it goes to tortious interference because of the intent element.  You know, there's evidence in this record -- and, look, I'm not going to -- I'm not going to spin it.

There's testimony from our CFO Ed Bowler that says USI and other people in the industry grow through M and A.  And then there's testimony from Mr. Sharma that says we accomplish our growth objectives, but we're not in the acquisition space.  And we think that your order does not foreclose us -- we're not going to spend a lot of time with it.  I agree with your footnote that we shouldn't waste the jury's time.  I understand they're volunteers, and I don't want them being angered at us.

But we do think your order doesn't necessarily

foreclose us from talking about fair market value in that it costs more to acquire a business or a subunit of a business than to do it the way that Lockton did it here.

**THE COURT:** Okay. Well, I got to be very careful, because you guys are going to pull a transcript of everything I say. Sometimes I'm just speaking kind of off the top of my read.

But my thought on that is, any of this conversation about this term fair market value and especially the number is, even if relevant, misleading, confusing, and I would -- I would take it out of the case under that rationale.

But something you just said, a very general point about, look, you know, if you went out and tried to buy this business, it would be a lot more expensive than if you acquired it this way, that seems to me to be fine, without getting into a lot of heavy detail and things like that, or asking the jury to award you that number.

**MR. CANNELLA:** We wouldn't do that.

**THE COURT:** But to make the general point that, you know, other -- in this industry, you know, if you wanted to acquire these by -- I guess the way Lockton -- or who got acquired? USI acquired, who was it?

**MR. CANNELLA:** Wells Fargo.

**THE COURT:** Wells Fargo. Right? I mean, that is a more expensive process than perhaps this is. If somebody has

that knowledge and they could give that testimony, I don't have a problem with that.  But going down into the weeds of that, I think is not good.  So remind me if that comes up.

MR. CANNELLA:  Thank you, Your Honor.

THE COURT:  What else?  You got something?

MR. SHAPIRO:  Your Honor, there's a pending motion to include claim for punitive damages, the final judgment.

THE COURT:  What damages?

MR. SHAPIRO:  Punitive damages.  USI's motion.

THE COURT:  Yeah.  That's kind of related to this, you know, whether the interference claim is in or not, and what is the parade of horribles that we're going to be hearing here.  And the law is kind of favorable to letting this stay in the case at least until the plaintiff finishes its case.  It's kind of hard to take it out in advance.  But I'm not sure it's been -- are you fighting about whether it was even pled in the case?

MR. SHAPIRO:  We are, Your Honor.

THE COURT:  What?

MR. SHAPIRO:  Yes, we are, Your Honor.

THE COURT:  Yeah. That's a different problem.  What do you guys think about that?  I mean, you can just -- if it was in state court, you can't even put it in your complaint.  You've got to get the judge's permission, and it comes in late in the game to try to up the ante a little bit.

**MR. ZIMMERMAN:** Yes, Your Honor. You cannot do it this way in state court. We acknowledge that. We're not in state court, Judge. So what we followed was the exact procedure laid out by the Middle District. It's in the Reese v. Florida BC Holdings case. Judge Mendoza lays it out. It's consistent with Rule 54C.

**THE COURT:** How about did somebody ask an interrogatory along the way, tell us what your damages are?

**MR. ZIMMERMAN:** Go ahead. Sorry.

**MR. SHAPIRO:** Yeah. There was never a mention -- I can't say, Your Honor, if I recall an interrogatory that way. But the Rule 26 disclosures did not include a claim for punitive damages, the original Rule 26 disclosures. The supplement that was served two months after discovery closed included it for the first time. So you've got -- the complaint doesn't mention it. The Rule 26 disclosure doesn't mention it.

There was some settlement communications that I think were referenced in the papers where USI says this case may contemplate a claim for punitive damages, but it was never teed up as a claim at any time before discovery closed.

So from the defendants' perspective, this case was never litigated in any way as a case where punitive damages were being claimed. And in federal court, as Your Honor knows, you can plead punitive damages in the original complaint. So USI has come into this Court, and they did from day one, Your

Honor, in the preliminary injunction hearing, claiming that Lockton is this a terrible actor, and they do all these things, and this is playbook.  So they didn't learn anything during the course of the litigation.

THE COURT:  That's what I was asking.  Is there something -- because cases can develop along the way and become worse than they started.

Did anybody ask an interrogatory saying tell us what your damages are?

MR. ZIMMERMAN:  I don't believe so, Your Honor.  But here's what we have in this case and entirely consistent with Middle District procedure.  We lay out in a counterclaim -- right?  Remember, recall we filed a counterclaim after being sued by a dec action.  And it starts off talking about the scheme by Simmons, Mitchell, and Lockton, Lockton's efforts to disrupt our agreements, and goes on with all the types of allegations you'd expect.

And it makes very clear that we're seeking all damages.  It does not use the word punitive damages.  But it doesn't have to use the word punitive damages.  What it has to do is lay allegations that would support the type of intentional conduct and the type of improper conduct that would support punitive damages.

THE COURT:  Did you find out anything new along the case and of course discovery?  I mean, I've been asking for

that all along.

MR. ZIMMERMAN:  Yes.

THE COURT:  I still haven't seen anything that I thought was really super egregious, if that's a legal term. But what -- how did the case change for you, as you went through it, that made it more egregious or more deserving of punitive damages.

MR. ZIMMERMAN:  Yes, Your Honor.  Well, let me just say it was -- everything was laid out in the original complaint, enough to support punitive damages, which is the standard.

And with regards to the question, I just want to finish the answer on the interrogatory answers, Judge, back in September, we asserted in communications that we were seeking punitive damages.  It was never a surprise.  It was --

THE COURT:  What do you mean in --

MR. ZIMMERMAN:  In correspondence between the parties about settlement, about what we were seeking in this case.  It was never any surprise.

THE COURT:  Well, okay.  Well, that's -- I can look at that.  That's not a jury thing.  If you have a letter or an e-mail that says we want punitive damages, show it to me right now.

MR. ZIMMERMAN:  Sure.  We will get you a copy, Your Honor.  It's September 18th, 2023 letter.

**THE COURT:** All right. Well, just do it. Somebody can e-mail somebody, and I can -- if they were talking about it back then, then that's fine.

**MR. ZIMMERMAN:** We did amend our Rule 26 in December. And this idea of after -- there's no other discovery we're seeking. It's not like we're seeking net-worth discovery.

**THE COURT:** I know.

**MR. ZIMMERMAN:** So what did we find out? Let me answer that question. You recall, Judge, we sat here for two days, over two different days, and you heard that we were going to look at the facts and circumstances of Mr. Simmons's situation at USI, and we're -- Lockton is going to make a decision under those facts and circumstances to allow Mr. Simmons to accept the business, to hire his team, and to allow each of them to service the business in violation of their accounts, all based on those facts and circumstances. What we've learned is, in discovery, there are direct admissions by Lockton's chief operating officer that they've done it the exact same way nine different times.

**THE COURT:** If it's legal, what's wrong with that?

**MR. ZIMMERMAN:** If it's legal, what I would submit, Judge, it's not, because each one of those nine times resulted in either a lawsuit six times, a verdict once, it went to verdict, and four -- or three other times were demand letters that ultimately got resolved. It's not legal. It's not part

of the fair rules of the game like the Azar case talks about, which is why Lockton gets sued again and again.

Each time Lockton does it, they get a little bit better at it.  They introduce lawyers a little bit earlier, Judge.  Here, they introduced lawyers to protect the communications two months earlier.

So that's one fact that we learned.  We did not have any of this information.  We had some general ideas of, you know, Lockton had done this before.  We didn't know that it happened quite so many times consistently and different than what was presented.

The second thing we didn't know is that Lockton knew that Mr. Simmons would be notifying each of his clients, or at least many of his clients, about him moving during his last two months at USI, traveling around the country do that, and telling them about leaving USI and about going to Lockton. We -- Mr. Sharma testified that he knew about it.  And then he later testified in his second deposition that that was wrong, that that was --

**THE COURT:**  Sharma to say under oath that that was wrong?

**MR. ZIMMERMAN:**  Yes, Your Honor.

**MR. SHAPIRO:**  No, Your Honor.

**MR. ZIMMERMAN:**  Your Honor, 244 to 245 of his deposition, the Court can take a look.  244, Line 11.

**THE COURT:**  I'm more interested in that September whatever letter that you said was an open-and-shut case.  Are you looking for that?  Is somebody looking for that?

**MR. SHAPIRO:**  I have it.

**THE COURT:**  You've got it.  All right.  Somebody show it to me.  Go ahead.  I interrupted you.

**MR. ZIMMERMAN:**  Your Honor, that's another fact we didn't know.  We obtained the phone records, and we obtained some of the contact information.  We learned that this is not some kind of indemnification if you got sued or if you might get sued.  What we learned was 32 calls between Mr. Simmons and Lockton's designated counsel in December and January of 2023, which we submit was planning each and every step of this coordinated departure.

We also note, Judge, that we determined that the concept of assisting Mr. Simmons to bring his team over to Lockton from USI was a lot more coordinated than initially presented.  Mr. Simmons would tell the employee about Lockton, and Lockton would have an opening for that employee.  It was all very well choreographed.  And these are some of the facts that we learned throughout.

But going back, Judge, the issue isn't in the Middle District whether we learn something new and therefore had to raise a claim.  What Rule 54(c) says is, other than default judgments, every other final judgment should grant the relief

to which each party is entitled, even if that party has not demanded that relief in its pleadings.

That's what the Scutieri case relies on, Eleventh Circuit case, 1987.  And that's what Judge Mendoza ruled on in the Reese case.  That's the procedure we followed.

So in Reese, the defendant made the same argument, you needed to amend, you needed to add more in the complaint. Reese says no.  Reese said you don't have to do.  Incidentally, Reese is a noncompete case.  It's just from the other side of it.

**THE COURT:**  Yeah.  I'll take a look at all this.  It just strikes me as a little wrong to say that we're litigating an entire case, and then we only find out after discovery closes, it's a punitive damages case.  I'm not saying it has to be some super, you know, elaborate, formal disclosure.  You said you've mentioned it in an e-mail or letter.  If you have, I'm probably going to come out your way.

**MR. SHAPIRO:**  Your Honor, can I e-mail it to you? Could I send it to someone?

**THE COURT:**  Sonya will give you a good e-mail.  In the meantime, while you're sending this e-mail, we'll come back to that.  I wanted to mention one thing and make sure you're very clear on this.  I said in an order someplace that Matt breached his contract.  Okay.  And I'm sticking with that on this point, that it is -- the contract says direct or indirect.

My ruling is that notifying customers, even if it's your uncle or your dad's buddy or whatever it is we talked about last time, notifying them you're leaving at all, is a indirect violation.  That is not the same to say that that caused any damages.  Everybody clear on that?  So I don't want a big thing, oh, the judge has already found that he breached the contract and therefore we win the case.  That's just one step.

I mean, because it could be that these customers would say something like, yeah, that's nice, but I was going with him no matter where he went, because I'm only with him -- I'm with him, not Lockton or USI or Wells Fargo or Holland & Knight or Carlton Fields or Hill Ward Henderson.  I'm with him.

And if there's that type of testimony in the case, the jury might very well find that that breach didn't cause damage.  So you guys still have to cross the causation bridge. Everybody understand that?

**MR. CANNELLA:**  Yeah.  We do understand that.  And we fully appreciate that.  And in our trial brief, as to the producers, that we filed today, we point out that we still think that the extent of the breach is relevant for purposes of causation and damages.  Because in some cases, believe it or not, the defendant -- a defendant to this type of case might take the position that, well, Judge, you've already found breach.  So the jury doesn't get to hear about the contract

provisions or about, you know --

**THE COURT:**  I'm not saying that.

**MR. CANNELLA:**  I just want to make sure we're clear on that.

**THE COURT:**  I'm not saying that.

**MR. CANNELLA:**  We will meet our burden.

**THE COURT:**  And I will tighten up the instructions that will say something like -- nobody get any heartburn over this, but I'll say something like as for the element of breach, the Court has determined that contacting customers is a breach. However, the issue of causation and damages is still in the case, or, you know, the artful way of saying that so it's very clear.

**MR. CANNELLA:**  We understand, Your Honor.

**THE COURT:**  Okay.  So where in this September 18th -- well, I've got a copy now.

So now, Mr. Zimmerman, do you go by Matt or Matthew?

**MR. ZIMMERMAN:**  Judge, either is fine.

**THE COURT:**  What?

**MR. ZIMMERMAN:**  Either is fine.  In this case, maybe Matthew, so we don't --

**THE COURT:**  We have Matt and Matthew.

Will you tell me -- highlight here where you tell him?  Because I don't want to read the whole thing.  He just printed it up, because he probably thinks it doesn't say what

you said.

MR. ZIMMERMAN:  May I approach?

THE COURT:  Yeah.  Sure.  Just highlight to me what we're talking about.

MR. ZIMMERMAN:  Just says right here, Judge, but that is likely to obtain the full damages sought, punitive damages --

THE COURT:  Highlight it.  Highlight it.  Bring it back.  Turn on the Elmo, please.  Now, we've got to figure out how to focus that.  I think you've got to turn the thing at the top there.  There you go.  That's good.

MR. ZIMMERMAN:  And I will say, Judge, this was a confidential settlement communication.

THE COURT:  That's fine.  The jury isn't seeing it. I'm not the finder of fact.  The jury is.

USI is confident in its position and believes that at worst it can proceed to trial with the injunction remaining in place and obtain some damages as its attorneys' fees and costs, but that is likely to obtain the full damages sought, punitive damages.

MR. SHAPIRO:  Your Honor, if you can look at a few sentences before.  Put it in the correct context.  What Mr. Murray wrote is, we do note that Lockton is correctly focusing on damages as liability, has largely been established and will likely be the subject of summary judgment.  In

addition, we note that USI would be entitled to recover its attorneys' fees and costs in this action under section -- Florida Section Statute 542.335(1)(k), which will likely exceed $3 million through trial.  Moreover, USI can potentially seek punitive damages for the tortious interference claim as well as disgorgement of Lockton's ill-gotten gains under the fiduciary duty claims.

**THE COURT:**  What am I missing?

**MR. SHAPIRO:**  It's the potential -- what he wrote here is that they potentially could seek.  Your Honor, their Rule 26 disclosures were never -- never amended.  There was no discovery relating to punitive damages.  And when you -- if Your Honor looks at the docket in how this litigation has proceeded, there's never been any targeted -- never any issues on punitive damages at all.  And from the defendants' perspective, Your Honor, just to take it back a moment, is -- you know, from Simmons's and Mitchell's perspective, the individual counterdefendants, you have breach of contract claims for which punitive damages are not available.  You have the breach of fiduciary duty claim, which Your Honor decided should stay in the case.  We argued that there was an independent tort doctrine, but Your Honor disagreed.  Yet, whether, you know, these -- well, announcements or the conversations with employees or customers amounted to indirect solicitation or direct solicitation was never viewed as

something that would arise to punitive damages in that context.

And then in Lockton, in the preliminary injunction -- at the preliminary injunction hearing, Your Honor denied the request for preliminary injunctive relief against Lockton, finding at least at that point in time, there was not -- they did not show a substantial likelihood to succeed on the merits. So in this case, the defendants -- or the counterdefendants are looking at this case as one where it's a contract claims against the individuals. Maybe there was some indirect solicitation, as Your Honor found. And USI has a claim, 90 percent was already just flushed out in the comprehensive preliminary injunction case where there was no substantial likelihood of success on the merits.

**THE COURT:** That's why I asked the question about what came out later, because that's the way the case was presented at the beginning. But if you're going through the case and then some -- something else -- and this is not a rule of procedure or technical point. This is a practical point. If something comes out during the case that seems pretty egregious, then maybe the case changes a little bit. And maybe if I had known at that time, I might not have said, you know, what I said, but -- or vice versa.

And what I'm hearing is something did come out, at least, that I'm going to take a look at and decide how I want to rule on this. But the idea that your client was actively --

what is the evidence, he was meeting with customers and telling them that he was going to be going over to the other side?

MR. SHAPIRO: Yeah. The testimony is, Your Honor, and this was at the preliminary injunction hearing, Mr. Simmons testified that I spoke to -- started on my clients to let them know --

THE COURT: Yeah. In a very generally innocuous way. But, now, didn't I just hear from him that it was all kind of -- I thought his testimony was I told some people I work with, some of them going back to high school, hey, I'm leaving, but now I'm hearing from them it was more elaborate than that.

MR. SHAPIRO: Here's the summary of all the evidence. You have the PGT client. Your Honor has read about all that. Remember Mr. Tyson? You saw his video. Right? So Mr. Tyson testified the way he did. Mr. Simmons testified about, you know, his recollection of those conversations. That is the one client interaction that USI has worked with this entire case. Right? There hasn't been any discovery or any depositions --

THE COURT: I've wondered about that. Nobody wants to depose the clients.

MR. SHAPIRO: They've sent subpoenas to every single one of our clients twice.

THE COURT: Did they depose them? Did you guys depose?

MR. ZIMMERMAN: We got documents, Judge.

**THE COURT:** Documents.

**MR. SHAPIRO:** So the documents are not helpful to them. Right? The documents --

**MR. ZIMMERMAN:** If they're not helpful, are you withdrawing your objection to each and every one?

**THE COURT:** Oh, by the way, you guys need to think about this. You've made so many objections to each other's documents, I could take you at your word that they're all very well taken and grant them all. How many exhibits would we have left? So just think about that.

But go ahead. Finish.

**MR. SHAPIRO:** Yes, Your Honor. So in terms of this issue about Mr. Simmons's interactions with the clients before he resigned, the testimony is the PGT interactions, right, and that's it, other than Mr. Simmons's testimony and Mr. Haskell's testimony, the preliminary injunction hearing, and a few affidavits that Your Honor saw at the preliminary injunction hearing. Mr. Simmons spoke to these clients, most of them were good friends, to let them know he was leaving.

Your Honor, we think, correctly observed after hearing the testimony at the preliminary injunction hearing, said, I think Mr. Simmons used -- I don't want to misquote Your Honor, but something -- reasonable efforts not to solicit, but I think that he did. I think that he violated the agreement. And we understand that.

But this is bringing it all back to the punitive damages.  This was in the way this case has been litigated from the defense perspective, you know, possibly liability on the solicitation, because Your Honor found that at the preliminary injunction hearing.  The breach of fiduciary duty claims are the same allegations.  Right?  Maybe it was indirect solicitation, maybe it was not.  Then Lockton, there was a denial of their injunction at the preliminary injunction hearing, and the case has not changed at all.

I mean, what Mr. Zimmerman and Mr. Cannella are suggesting is that somehow there was something hidden behind the attorney-client privilege or relationship, and it's not true.  Mr. Simmons has testified.  Mr. Sharma has testified.  They're under oath.  They testified multiple times.  There's text messages where Mr. Simmons is reaching out to Lockton, not vice versa.  So this case -- I'm sure USI wishes the facts were different.  But they're not.

**THE COURT:**  All right.  All right.

**MR. SHAPIRO:**  This case is exactly the same as it was in April.

**THE COURT:**  I'm not ready to rule on this yet.  I need to read the rest of the stuff and I'll make a decision.  But this is --

**MR. ZIMMERMAN:**  Can I just point you to two points, Judge, on that, or are you -- heard enough on this issue?

**THE COURT:** I'm ready to move forward.

**MR. ZIMMERMAN:** Thank you.

**THE COURT:** We're running out of time.

**MR. BANKS:** We do have a couple other issues. I think they're pretty fast. One is this similar to the punitive damage. In the pretrial statement, USI has said it wants to pursue disgorgement of Lockton's alleged ill-gotten gains. That is not pleaded. And the first we heard of that was, I think, on Sunday night.

**THE COURT:** That's been -- that's been in there under some other -- well, you're the one that argued it. You said that the number that they had for their -- what was the name of that damages theory that I knocked out?

**MR. ZIMMERMAN:** Fair market value.

**MR. BANKS:** Fair market value.

**THE COURT:** There was somehow disgorgement mentioned there, but the real number to be disgorged isn't the value of the clients. It's the profits that you may have gotten from.

**MR. BANKS:** So, Your Honor, that was only raised in the summary judgment briefing, which was after the close of discovery. We haven't done any expert discovery on this. There's been minimal disclosure of any information about our revenues.

**THE COURT:** What do you got? I mean, you've got a lost-profits case here. I mean, you've got all that down.

You've got witnesses on it.  Why are we confusing the issues with this disgorgement thing?  Are you even really -- I don't even think they really want that.  I think you're kind of --

MR. ZIMMERMAN:  Your Honor, we do have the right to elect remedies.  Right?  And we do have a right to plead different models.  And even the letter you have before you, if you look at the line about punitive damage right before, it says we're seeking disgorgement of Lockton's gains.

THE COURT:  But you don't even have any information on that.

MR. ZIMMERMAN:  Sure we do.

THE COURT:  You know what -- you're going from that thing Sharma did about how much money he --

MR. ZIMMERMAN:  We have that, and we also have Mr. Shelat's testimony that talks exactly what their profit margin is.  We talk how much money they received on these accounts, how much money they can make on these accounts.  That is the record in this case.

THE COURT:  No.  This -- this is not --

MR. ZIMMERMAN:  Separately, Judge, we have a claim for disgorgement on moneys paid out to the defendants during their disloyal period.

THE COURT:  That's a good one.

MR. BANKS:  But --

MR. ZIMMERMAN:  Those are two separate disgorgements

we have.

MR. BANKS:  But, Your Honor, that was only pleaded as a remedy to the aiding and abetting breach of fiduciary duty claim.

THE COURT:  Still in the case.

MR. BANKS:  Still in the case.  But you can't get that from Lockton.  Lockton didn't get that money. Disgorgement is a return of the money that was given to someone that they shouldn't get.  So the amount of money they paid to Simmons and Mitchell, maybe they could pursue on a breach of fiduciary duty claim against them.  They didn't plead that.

THE COURT:  That's a distinction without a difference, because you're indemnifying the whole thing anyway. Right?

MR. BANKS:  It's notice, Your Honor, but yeah.

THE COURT:  They're allowed to do disgorgement of moneys that he got paid when he was breaching his fiduciary duties if that's what a jury determines.  That's a valid piece of damages from him directly, but you're indemnifying, so if you want to say that he can't ask for it from Lockton directly, fine, you win that.

What else?

MR. BANKS:  Okay.  Second, just to give Your Honor notice that we noticed -- we noticed two things in the jury instructions that we would like to submit a correction on.

They're nothing major.  One is that the affirmative defense of competition, we've looked at it further.  It actually would apply, we believe, to all of the torts against Lockton.  Right now, the instruction itself doesn't say that it's limited to intentional interference, but the title does.  So we want to seek to change that.

THE COURT:  We'll talk about that.

MR. BANKS:  We understand they don't agree with that probably.

THE COURT:  We'll take a look at that.

MR. ZIMMERMAN:  Judge, we haven't heard about either of these yet.  We conferred a lot on these.  So I suggest we should talk --

THE COURT:  I agree.

MR. BANKS:  I just want to raise it so Your Honor knows we may be doing something on this.

THE COURT:  That's fine.

MR. BANKS:  The second is we think there probably should be an instruction on formation of a civil conspiracy. There's instructions that the parties proposed on conspiracy. But it doesn't explain what it takes to form one.  And we looked at this, you know, the last few days in more detail.  It really requires like a meeting of the minds by the parties to commit an unlawful act.  We think it would be appropriate to have an instruction on that so the jury doesn't ask us a

question later and say how is a conspiracy formed.

**THE COURT:**  I think we're getting ahead of ourselves here.

**MR. BANKS:**  Maybe.  I wanted to tee it up, let you know we may be filing something on that.

**THE COURT:**  That's fine.

**MR. BANKS:**  Then the last is, it's not really a new issue.  It's just something that came up earlier on the fair market value.  Mr. Cannella said he would like to raise that as sort of the, you know -- that Lockton doesn't -- or Mr. Zimmerman maybe said it.  Lockton doesn't pay fair value, and they would have had to pay more if they did this the right way.  But as Your Honor found, that fair market value, even if it's not specifically that model, but any model, it's valuing not only the breaches, but a lot of other stuff.  And it's valuing --

**THE COURT:**  He can say it.  You can try it -- if you want to get in that level of the weeds with the jury.  It really depends on how he puts it out there.

**MR. BANKS:**  Understood.  That's what we're trying to avoid is having to go down that path of trying to explain all this on something that really -- I mean, Your Honor already found it's not the appropriate measure.

**THE COURT:**  The common sense -- I think it's a common-sense point that maybe this is a cheaper way of doing it

than the other way.  I don't have a problem with that being mentioned.  If you want to contest that, I guess you could.  But I don't think you need to, but that's up to you.  But what I said before stands on that.

What else?

MR. BANKS:  Your Honor, there's a disagreement on your order with respect to Mr. Lewis.  Our understanding of the order is that if we ask Mr. Lewis things like if the jury concludes that clients would have left anyway, you know, have you created calculations for them to determine damages on a client-by-client basis.  Maybe not damages, but what the loss -- what the revenues were at USI and what they're --

THE COURT:  Experts can be asked hypotheticals.  Now, the question is, is it based on evidence in the case?  And for it to be based on evidence in the case, all that has to happen is one witness has to say something, which I'm sure you'll get somebody to say, and then he can give that hypothetical.

MR. BANKS:  Thank you.  That was all I wanted to clarify.  I think USI has taken the position that his numbers were excluded in any event.

THE COURT:  No.  It's a hypothetical.  But you just hit back with wait a minute, the only reason you said that is because you're relying on the testimony of who?

MR. CANNELLA:  Simmons.

THE COURT:  Yeah.

**MR. CANNELLA:** So -- well, that's true. So, I mean, I view this as -- we laid this out in the pretrial statement. I view this as they're trying to backdoor Lewis back into the case. Your Honor was very clear, he can't give speculation as to who would have left, who would have stayed, or that USI suffered no damages.

**THE COURT:** He has no -- he doesn't say that. He just -- the question would be something like, now, Mr. Expert, assuming hypothetically X, but that X has to have some basis in the case, which will be if one of their witnesses says that. Assuming X, how do the numbers come out? Boom. He's a numbers cruncher only. Not agreeing that X is true or anything like that. And that will have to be done artfully. And I'm sure it will be. Otherwise, it will open a can of worms that won't help anybody.

**MR. BANKS:** Your Honor, along those lines, we assume the same rule would apply to Mr. Frost. Just like Mr. Lewis, you said, could not say what the correct number of years was, we don't think Mr. Frost has qualifications to say what the correct number of years of damages are either.

**THE COURT:** Wait a minute. Frost is the guy that's going off of the ten-year standard in the industry or -- am I remembering that right?

**MR. BANKS:** There's no -- I said that at the hearing last time, that there is no evidence of that. And you'll see

in the deposition designations, USI does not project ten years. They project two years or one year.

THE COURT:  We'll see how it goes.  If they can get that testimony out in a way that there is some -- what is the legal standard?  Some evidence or some --

MR. CANNELLA:  Some standard.

THE COURT:  Some standard.  And I said that sounded to me like it was, quote, some standard.  So if it doesn't end up that way, let me know then.  But for now, there is some standard.  At least they've said there is.

MR. CANNELLA:  We talked last time, because I read the transcript from the 30th, and we can talk afterwards about stipulating to a chart.  I don't know if you read the transcript.

MR. BANKS:  Yeah, I remember we discussed that.

MR. CANNELLA:  Chart that shows client-by-client in revenues.  We'll confer about that afterward.

THE COURT:  That would be good.  That would be good. Again, I'm just saying if there's things I can clean up now that are quick that will help you prepare, let's do that.  I still think we can make a little more progress on that.

But we need to take a short break, and we'll come back and keep going through the list.  All right.  Thank you.

(Recess from 3:46 p.m. to 3:58 p.m.)

THE COURT:  Okay.  Let's, while we're still together

here, switch gears slightly.  Get off the kind of in the weeds legal points and get to some practical stuff.

There's -- I mean, what is your plan to get a reasonable -- I mean, okay.  So a trial -- a jury trial is not every piece of relevant -- every document that's relevant is admitted.  It's not every piece of helpful information is an exhibit.  It's the finite number to really help us that a jury is going to look at.  So you need to do something about that.  What's the plan to get this to a realistic number?

I guess I could rule on some of these motions in limine.  So let me talk about the idea of what other stuff is going to be admissible.  In other words, does USI get to put on a whole long, you know, parade of horribles, they're doing this, it's terrible, it's the wrong way to do it, that -- I mean, because some of these exhibits are pleadings and stuff from other lawsuits.  Right?  Is that what I'm remembering?  All right.  So let's -- let's address that as a way of dealing with the exhibit list.

What -- what do you think is fair game in terms of what Lockton is doing outside of this case?

**MR. CANNELLA:**  Well, so --

**THE COURT:**  He's doing that?  Okay.

**MR. CANNELLA:**  We -- well --

**THE COURT:**  Who's doing that piece?

**MR. CANNELLA:**  We may split it.  So there's two

different categories of litigation.  There's the declaratory judgment action in this case, which our position is that's not under litigation.

THE COURT:  Not what?

MR. CANNELLA:  That was filed in this case.  Right? So we get to talk about the declaratory judgment action.  We're not -- and that's it.

THE COURT:  What would you say, that they filed this declaratory judgment action to try and invalidate the contract and that the judge didn't agree and they lost that?  I mean, what --

MR. CANNELLA:  No.  I'm not -- we wouldn't be spiking the football over the declaratory judgment action.  What we would say is that this declaratory judgment action required coordination amongst the producers in Lockton in order to get done.

It's important, because, you know, Mr. Mitchell's deposition, for example, Your Honor, I asked him the question, when did you realize the other folks were going to be there? And his original testimony was I didn't realize it till I got to Lockton's office that day.

Then we took a break.  I found the declaratory judgment action.  I said, wait a minute, you know, this is you. You see the other employees on here.  You saw this before, you know, you sent your resignation e-mail, didn't you?

He's like, well, yes.

So it's relevant for a lot of reasons.  One of them, of course, would be for impeachment purposes.  One of them would be to -- it's evidence of the coordination of while these producers were employees of USI, not for the benefit of USI, but for the benefit of Lockton.  The timing of it is also very important, because it shows the disruption that it was intended to cause.  So that -- when they talk about litigation, realize that they're including the declaratory judgment action that was filed in this case.

**THE COURT:**  Okay.  Why isn't that -- maybe some of the other stuff also, but at least that -- what's -- doesn't it really depend on what they say about it, but the fact that it happened?  Isn't that fair game?

**MR. BANKS:**  Yeah.  I think that's what our motion in limine says, Your Honor, is that what we don't think they should be able to do is get up and say there was something nefarious or improper, i.e., interference with contract because there was a declaratory relief action, nor should they be able to get up and say you sued your employer.  A declaratory judgment action, yes, is a lawsuit, but it's asking the Court to interpret the legality of provisions.

**THE COURT:**  Well, my general thought on this -- again, I'm talking off the top of my head.  Don't write it down and try to, you know, make more of it than it is.  But my

UNITED STATES DISTRICT COURT

intent on this is that the jury should know what happened here without getting into excruciating detail.

But it's fair game for the jury to understand how this all went down, because you're -- what you-all have done here is you have strategically approached this and tried to, in my opinion, get right up to the edge of what's actionable and what isn't.  Which is fine.  I'm not -- that's not a criticism.  But that doesn't mean that -- I mean, that you -- that then it should be kept secret.  It shouldn't be something that you are ashamed of.  It should be something that if you think is defensible and proper, so be it.  I don't think it should be sanitized or anything like that.

On the other hand, I don't want this to turn into a trial that's not really about this case, that it's about what's going on with these competitors and every other case in the world.  So that's my general take on things.

So I'm saying that that declaratory judgment thing is admissible.  What's said about it and things like that, we'll just have to object at the time.  But the fact that it happened is certainly fair game.  What else?

**MR. CANNELLA:**  Well, there's also the other litigation.  And, look, our intent is not to retry the other lawsuits.  Let me let Mr. Zimmerman address that.

**THE COURT:**  Before he does that, let me ask a question about this.  I'm confused now.  Because there's so

much back and forth between these -- you guys about who's doing what and who's making the other guys sign the exact agreement that you're saying was unenforceable or breached or whatever. Wasn't there evidence, I mean, published opinions of Lockton suing USI?

MR. ZIMMERMAN:  There was evidence presented of Lockton suing other competitors --

THE COURT:  Okay.

MR. ZIMMERMAN:  -- for complaining about the conduct that USI is complaining about in this case.

THE COURT:  Okay.

MR. ZIMMERMAN:  So, for example, there's a case, the Court remembers, where Lockton sued Alliant and said that, you know, having a group of employees leave altogether --

THE COURT:  So Lockton sued -- who was it?

MR. ZIMMERMAN:  Another competitor in this case called Alliant.

THE COURT:  Alliant.  So Lockton sued Alliant basically for doing the same stuff that it's doing here.

MR. ZIMMERMAN:  Correct.  Some of the same types of claims, tortious interference, breach of fiduciary duty, for coordinated departure, for knowing violations or assisting with knowing violations.

THE COURT:  Hasn't USI -- hasn't USI done some of the same stuff --

**MR. ZIMMERMAN:**  No, Your Honor.

**THE COURT:**  -- they're giving you a hard time about?

**MR. ZIMMERMAN:**  No, Your Honor.

**THE COURT:**  I'm asking him that.

**MR. ZIMMERMAN:**  I'm sorry.  I thought you were asking me.

**MR. BANKS:**  I would agree.  They generally don't, because they're not usually hiring -- successful producers don't usually go to Lockton -- I mean, to USI.  That's true. But beyond that -- so there's not that many cases going the other way.  There are cases, though, that have gone the other way.  Some of them are a little older, and there are some.  But that said, we don't think any of this should become any of this.  It should be about this dispute --

**THE COURT:**  Well, no.  I don't --

**MR. BANKS:**  -- unless --

**THE COURT:**  I don't agree with you about that.  I think that the other litigation is admissible in a very general way so the jury has an understanding of -- what did she just tell you?

**MR. BANKS:**  The other point I was going to try to make is --

**THE COURT:**  You can talk if you want.  It's okay.

**MR. BANKS:**  It's not Lockton Southeast.  The Alliant case is a different Lockton entity.  They are different

UNITED STATES DISTRICT COURT

companies run by different management.

THE COURT: Really? They all have the same name?

MR. BANKS: No, they don't have the same name. That's Lockton -- what? Pacific Series of --

MR. ZIMMERMAN: Judge, in much the same way he doesn't know who she works for, there's like a shell game with Lockton entities. They all report up to the same Lockton office in Kansas City where --

THE COURT: I'm not sure that's a distinction you want to really get too deep into. It might mean a lot to you, but to a jury to say, well, it's Lockton, Inc., not Lockton Southeast, that sounds a little like people are playing games. I can't tell you what to do with it, but that's my impression.

Just a second. I think what's admissible here is a general nonspecific-type testimony of some kind from somebody, if they want to give it, that this is a highly competitive industry, that, you know, people move around, and there's a lot of litigation associated with that without getting into specifics or anything like that.

What I don't want the jury is to have some false impression that this is like a one time only thing, it's never happened before, and it's, oh, terrible, so egregious. I think what we have is this is a competitive industry where people move around, and there's a lot of litigation associated with it. Something like that, I'm okay with.

**MR. ZIMMERMAN:**  But I think it's a little bit more on this point, Judge, because the argument is being made here is everything they did was fine.  Right?  I mean, Lockton is saying this is fair competition, business as usual.  You heard that argument today.  But when it comes to admitting it to the jury, they're saying it's so prejudicial to have these acts shown in front of the jury, it needs to be kept out.

And what we're saying is, if Lockton has taken the position that hiring groups of employees, having them walk out in unison and violate the agreements is actionable, then that's relevant to show that that is not acceptable in this industry.

**THE COURT:**  No.  Not specifics about litigation in specific cases and specific parties.  I think you could say something like, you know, Lockton itself is involved in, you know, similar litigation over these issues.  They'll say you're involved in similar litigation over these issues.  I think that's fine.  But any more specificity than that, certainly including admitting pleadings and stuff like that, is out.

**MR. ZIMMERMAN:**  Your Honor, let me just address the pleadings.  We're not intending to admit pleadings.  We just -- to the extent there's a need for impeachment or refresh recollections, that was the only reason --

**THE COURT:**  Let me fix that.  If anyone is under the impression they need to list on their exhibit list things that are for impeachment or to refresh recollection or otherwise --

I'm not sure what otherwise would be -- no.  The exhibit list is supposed to be -- and if my stuff doesn't say this, I'll tighten it up.  The exhibit list is what you expect to be your actual exhibits.  You can refresh recollection with who remembers this, a copy of -- you guys don't remember?  You didn't learn this in law school?  Exactly.  The New York Times.  That doesn't have to be on your exhibit list.  Just exhibits that are admitted.

**MR. ZIMMERMAN:**  Yeah.  So we're not -- it was not our intent, but it is our intent for the general proposition that the Court said that we would ask about the witnesses.  Separately, Judge -- so that's the issue of kind of Lockton pursuing claims, and we hear you from a general perspective.

Then, separately, this is -- from our perspective, it's not really a litigation issue, but it's the issue of Lockton has done this as a growth strategy in this case.  Now, remember, in this case, Mr. Simmons reaches out, the testimony is, to Mr. Zutel.  Mr. Zutel, tells him, I was -- I left Willis.  I left with 20 other employees.  I took a bunch of accounts.  I was sued.  This is what Lockton did.  This is what happened.  And, ultimately, they were able to help me and it settled.  Essentially, that was his testimony.  That was Mr. Simmons's initial introduction to Mr. Lockton, with Mr. Zutel who walked him through kind of what happened with Mr. Zutel.

**MR. SHAPIRO:**  Your Honor -- I'm sorry.

**MR. ZIMMERMAN:**  We go on and learn discovery of how Lockton grows.  Now, one of the things USI does -- and, obviously, we disagree with the unnecessary shot about producers not joining USI.  That's not the case.  But what USI does do is take people from outside the industry, like Mr. Simmons, like Mr. Mitchell, that didn't have any books of business, and say, come in, we're going to --

**THE COURT:**  Thought he worked for Wells Fargo and had clients when USI took over Wells Fargo?

**MR. ZIMMERMAN:**  Mr. Simmons was brought into Wells Fargo -- Wells Fargo became USI.  Mr. Simmons was brought into Wells Fargo by people like Tom Longhta and taught the business.

**THE COURT:**  That's before USI was around.  Right?

**MR. ZIMMERMAN:**  Well, USI -- Wells Fargo effectively became USI.  That company was acquired and became part of USI.  So, yes, for Mr. Simmons, we're referring to the shared history with Wells Fargo.

So when he joined -- when Mr. Simmons joined -- he initially joined through Wells Fargo.  He had no prior experience in the industry, Mr. Longhta helped him, others helped him.  He built up a million-dollar book of business.  Then he made a decision to stay through the acquisition.  USI bought Wells Fargo.  Wells Fargo became part of USI.  And then USI helped Mr. Simmons to grow his book of business from

1 million to seven-, eight-plus million.  There's different numbers on that.

THE COURT:  That's all fine.

MR. ZIMMERMAN:  Mr. Mitchell was -- had some experience in the industry, no real clients.  USI brought him in and trained him.  So that's kind of USI's path to growth, one of their ways to growth, kind of bring people outside the industry, teaching them, training them, and helping them grow their books of business.

We have testimony from Mr. Sharma who talks about some of the ways that Lockton grows.  Mr. Sharma talks about that they grow through what they call partner offices or new ventures.  And that's the nine other examples of projects or lift-outs where they take groups of employees, groups of customers that all move at the same time.

THE COURT:  Let me ask you a question about that.  You use the term lift out and things like that.  Has any of that ever been actually determined to be actionable versus settled?

MR. ZIMMERMAN:  With regard to these parties or in general?

THE COURT:  With these parties -- with them.  I mean, you're wanting to make an issue, saying they're doing it the wrong way.

MR. ZIMMERMAN:  Absolutely.

**THE COURT:** Has that been determined, any of these cases, or have they all --

**MR. ZIMMERMAN:** One case went to verdict in Georgia.

**THE COURT:** And what happened with that one?

**MR. ZIMMERMAN:** There were damages and punitive damages awarded in that case. I believe Lockton prevailed on the tortious interference claim in that case.

**THE COURT:** Oh, okay.

**MR. CANNELLA:** No, because there was an inconsistency in the verdict.

**THE COURT:** Ah. Maybe you shouldn't --

**MR. CANNELLA:** No damages allocated to Lockton in that case.

**THE COURT:** Maybe it shouldn't have been in the case at all. It just confused things.

**MR. CANNELLA:** Well, that's their view of it. I do have a follow-up question, if I may, Your Honor. You said no one will claim that this is a one-time thing. Right? And so with the litigation, that works two ways, because one of the things Mr. Sharma testified to was we became acquainted with the facts of this case, and in this case, we believe that Mr. Simmons could accept the business.

The other litigation comes in, because in every case, they decide that. It's not -- it's not like this was unique. So if we can't talk about the other, you know, specifics of the

litigation, okay, you know, that's fair.  But then he shouldn't be able to get up there and say this is unique.  We normally -- we told him not to accept the business.

THE COURT:  We'll see.

MR. CANNELLA:  Most times we won't let him accept the business, but this time we came to the conclusion --

THE COURT:  I can only draw so many bright lines on this.  I'm trying to give concepts.  We have to see how it goes.  But let's finish this out.  He's trying to get it to be broader than I think I'm willing to go, but I'll give him a shot.  Go ahead.

MR. ZIMMERMAN:  Sure, Judge.

So Mr. Cannella is right, though, that the argument that we're trying to address is that this is somehow a one-time unique situation in this case.  And what we're trying to establish is, they have notice that this is not the proper way to grow.

THE COURT:  Maybe.  Maybe if that's how it comes up. I'm not -- I mean -- are we going to try to say this is -- I mean, this is -- they're not even saying that.

MR. SHAPIRO:  No.  We're saying what happened is what happened.  Mr. Simmons came to Lockton, and Mr. Mitchell didn't.  They had their plan.  Lockton actually tried to convince them not to do it this way.  They would have preferred not to.  They actually offered more money to Mr. Simmons to do

that.  Mr. Simmons felt strongly about what he wanted to do. And that's what happened.

So that's the opposite of what Mr. Zimmerman and Mr. Cannella are trying to put in front of the jury.  They're trying to -- they're trying to go outside of anything that happened, any reasonable inference under the facts of the testimony and say look what happened in these cases that settled.  Lockton did X, Y, and Z.

**THE COURT:**  No.  I'm saying they can't get into those specifics.

**MR. SHAPIRO:**  And then last thing on Mr. Zutel.  So Mr. Zutel has his own litigation in 2021.  The only testimony is Mr. Simmons -- he's another producer, just like Mr. Simmons. They're both producers.  Mr. Simmons, I had heard about the litigation with, you know, that Mr. Zutel was involved in with Wells Fargo -- with Willis Towers.  And I was very familiar with how litigious this industry is, especially USI.

**THE COURT:**  Well, that last piece, I'm probably not going to be going with.  But if they want to talk about this is part of the game, litigation is -- it happens, I think the jury should hear about that.  But trying to say especially USI, then USI is going to come back and tell us what a wonderful company they are and really your side is the evil, then it's going to go too far afield.  I don't think it should be saying that.

But I think it's fair game to say that everybody

understands when you move around in this industry, there's litigation.

MR. ZIMMERMAN:  I think that's right.  But think -- I just heard a no.  But we heard a day of testimony on we looked at facts and circumstances unique to Mr. Simmons.  We have the right to impeach that by saying, well, you did this the year earlier.  Were there facts and circumstances in that case?

THE COURT:  Well, let's see how he tries to present it.  I think it's to their advantage, based on the ruling I just made, to not try to go that way, and we'll see how it goes.  But this can't become mini trials about other cases.

MR. ZIMMERMAN:  We agree, Your Honor.  It's not about the litigation.  It's about the growth strategy being employed, which goes directly to what the Court was struggling with earlier is, is this or is this not a fair business practice. That's what the case law says.  That's what Azar says.  It's not illegal.  It's an unfair business practice.  It's not illegal competition.  It's unfair competition.

THE COURT:  Which is civilly actionable.  So I don't know what the difference between illegal and unfair and civilly actionable.

MR. ZIMMERMAN:  We agree, Your Honor.

THE COURT:  But in any event, I'll clear this up a little bit more as we get closer, and we get very specific. But I thought it would be helpful now to get that piece out, so

no one thinks that we're going to be spending a lot of time with witnesses or documents talking about what happened in other cases.

**MR. ZIMMERMAN:**  Your Honor, one thing that may help streamline.  Our view is if a witness is being called in person, for the most part, there should not be any video deposition testimony played.

**THE COURT:**  I agree with you.  I agree with you.

**MR. ZIMMERMAN:**  If there's a witness who's not going to be here, that we should play one time their transcript, rather than different parts of the case.

**THE COURT:**  That's the way we'll do it.  That's the way we'll do it.  Now, what you need to do also is, I didn't go back and look at your witness list and cross-reference how many, because it was 23 -- what does this mean when you say -- where is that?  Twenty-three will call -- here it is.  What does it mean when you say -- I had that marked.  Just give me a second.  I have it in my notes.

Yeah.  USI lists 22 will call and 18 may call.  Is that a total of 40 possible witnesses?  And then same question where Lockton lists 23 will call and 16 may call for a total of 39.  Is that basically 79 different people or what -- how does this all work?  I didn't go back there and cross-reference.

**MR. CANNELLA:**  I think there's overlap, considerable overlap.  I don't think we're going to call 40 witnesses.

**THE COURT:** I know that. That's my problem. We're not doing 40 witnesses a side and 400 exhibits. Let's get real here. How do we get real?

**MR. BANKS:** One thing that would also help, Your Honor, is our second motion in limine which relates to the nonproducer employees. We're not saying they're irrelevant to the case, but USI has designated in the deposition transcripts testimony about their contracts with USI, their contracts with Lockton, and, you know, whether they were honoring their contracts. That's not part of this case. This is a case about Mr. Simmons's contract and Mr. Mitchell's contract, not about all these other folks.

**THE COURT:** Who are these people, his support people?

**MR. BANKS:** Yeah. The support people. There's no lawsuit against them, and there's no claim that anyone interfered with those contracts.

**THE COURT:** They might have relevant testimony about this. What is it you guys want to talk about with them?

**MR. CANNELLA:** They had -- they had similar restrictive covenants that prevented them from doing the things that Lockton engaged them to do. Goes to the heart of tortious interference claim and we could resolve that with a stipulation. We put in a proposed stipulated fact that, you know, Murray, Kakish, Rodriguez, et cetera all had restrictive covenants when they were at USI, and they have restrictive

covenants when they're at Lockton.  The end.  We don't need to, like, do a whole lot more than that.

But what they're trying to do -- and we filed a response to the motion in limine earlier today.  I understand the Court hasn't had an opportunity to read it yet.  But what they're trying to do is they're trying to limit the scope of what the jury can hear, despite for over a year claiming they didn't do anything wrong.

And as Your Honor found in the injunction order against the members of the service team, yes, they were not party defendants to the counterclaim.  But Mr. Simmons and Mr. Mitchell can't do through them what he was -- what they were unable -- what the producers were unable to do themselves.  So we do believe that the contract obligations of the service team that departed at the same time as the producers joined Lockton, that it is relevant --

THE COURT:  Yeah, but --

MR. CANNELLA:  -- for a bunch of reasons.

THE COURT:  -- maybe -- assume it is.  Isn't that just one witness explaining that these people went there and they had contracts?  I mean, you want to call him as a witness and put in a bunch of documents over something that really can't be disputed?

MR. CANNELLA:  It may be just one witness.  The other challenge is that, you know, the one witness who I would call

for that, you know, would be Mark Morneau.  He's beyond a hundred miles from here.  So I'm going to have to go with a deposition from him.  I'd rather do it that way than put on seven people, then I'll do it.

**MR. BANKS:**  Your Honor, the claim that's in this case is Mr. Mitchell and Mr. Simmons solicited those people in violation of Mr. Simmons and Mr. Mitchell's contracts.  There's not a claim in this case against those individuals for breach of contract, and there's not a claim against Lockton or anyone else for interfering with those people's contracts.

**THE COURT:**  So what?  Why isn't it relevant evidence just to say that those -- that Simmons did that?

**MR. BANKS:**  Did what?  We can tell it's solicitation.  That is evidence.  These people are probably going to have to testify about it.  What I'm saying is there shouldn't be testimony about whether they honored their own commitments.  That would be extremely prejudicial in this case.  That's no claim for it.  The jury shouldn't be awarding liability or damages based on claims that don't exist.

**THE COURT:**  I don't -- all those people don't need to be called as witnesses.  One person can say what happened.  It's undisputed.

**MR. ZIMMERMAN:**  Judge, but -- I mean, we have the causation issue.  Right?  So to be clear, our claim, we have the clients, and we have the seven employees.

THE COURT: Yes.

MR. ZIMMERMAN: So the seven employees were putting on evidence that in breach of their duties of loyalty --

THE COURT: That Matt solicited them to talk to them about it?

MR. ZIMMERMAN: Correct.

THE COURT: But that's not really disputed. Right? They said it in a depo.

MR. ZIMMERMAN: Well, but we weren't going to use their depositions if they're local, Judge. We were going to put them on quickly and get the testimony. Because what we're going to hear from the other side is, they were going to leave no matter what. Everyone was going to leave no matter what. They can't prove causation. So I need to prove causation. Unless there's some kind of different ruling on causation, we need to show why these people left and the timing and what happened.

THE COURT: The contract says thou shall not solicit employees. If these employees were actually solicited and they said it in a depo, then you're just down to the causation piece.

MR. BANKS: Agreed.

MR. CANNELLA: It goes to the solicitation of the clients issue, Your Honor, not just the solicitation.

THE COURT: How is that?

UNITED STATES DISTRICT COURT

**MR. CANNELLA:**  Because the service team is an essential part of the reason why clients stay with a broker or go to another broker.  So when these clients knew that their USI service team was now at Lockton and would be able to serve in the same capacity at Lockton as they did at USI, that would lead clients to leave USI and go to Lockton.  We're talking about two different things.

He says the breach of contract is just about the solicitation of the employee.  That's part of it.  But the breach of contract is also the solicitation of the clients.  And the clients' argument is that the clients would not have been as likely to go to follow just one guy.  They would be more likely to go if they knew that their service team was going to be with them.

That's why the contracts with the service team are relevant, because USI thought it had protected itself from such a situation with the enforceable contract provisions.  That's why the contracts of the nonproducer employees is relevant in this case.  And I agree that we don't need to spend a day talking about all the different, you know, contracts of the service team.  But to exclude it entirely --

**THE COURT:**  I never said exclude it entirely.  I'm just trying to figure out a way to get a relatively small point done quickly.

**MR. CANNELLA:**  We can do it by stipulation.

**THE COURT:** Think about that. Think about that. Because that's not -- I mean, maybe bring one person in. If it's a bunch that are going to say the same thing, bring one. And, you know, more is not better. Because I don't think you can get out of this. Right?

**MR. BANKS:** We're not -- again, I wasn't saying these witnesses wouldn't be called. I'm just saying that I think that their testimony should be limited to where they -- you know, why did you leave, did the solicitation matter, that sort of issue. They're going to argue that it does. And that's fine. That's fair game. If they want to say that's important to the clients, that's fair game for them to make those contentions.

Our point was that their independent contractual obligations to USI shouldn't be part of this case, because they're not pleaded, and it would be inviting the jury to award damages or find liability on something that's not part of this case.

**THE COURT:** We'll see. I mean, but they're going to be in the case in a very limited way. That's what I asked earlier, if your interference claim involved stuff with these other employees or not also. But we'll come back to it when we need to.

Now, what else are we going to do to get the -- what are you thinking in terms of witnesses? Who are the main --

all right.  So you're the plaintiff now.  So you're going to call Simmons.  Is he your first -- I mean, that's the case.  Get ready.  Study over the weekend.  All right.  That gets you -- I mean, to me, 85, 90 percent of all the information you need in the case comes from, really, one or two witnesses.

What else?  Who are other big witnesses for your side?

MR. CANNELLA:  Tom Longhta, the regional CEO for USI is also likely going to be our corporate representative sitting with us at trial.  He's going to be a significant witness.  But, you know, we don't -- you know, we took -- we take your footnote and one of your orders to heart.  We're not going to spend as much time in a trial as people spent in depositions.  I think some of these witnesses are going to be kind of on and off.  Some of them are going to be more detailed.

You know, we are likely to call either Blake Varnadore or Misty Carson, because they were involved in the effort to try to retain clients after the departure.  That's important.  I'm -- you're right.  We're going to call Mr. Simmons in our case in chief.  We'll call Mr. Mitchell in our case in chief.  We'll probably do Mr. Sharma either -- I don't know if we would do him live.  We'll do him live if he's here.  They told us he's going to be here.

MR. ZIMMERMAN:  Your Honor, one way that would streamline our exhibit list -- or our witness list, because we

have several on this, is related to our motion in limine about USI's resources. From --

**THE COURT:** I'm not following that.

**MR. ZIMMERMAN:** Let me address. So a big part of what we expect defendants to argue is that USI's resources weren't sufficient. You may recall there's a testimony about cyber resources or other support for Mr. Simmons. And, really, that's a rabbit hole that we don't think is necessary for the trial. Breach has already been determined. And so, you know, Mr. Simmons had the right to leave. He was unhappy. He could leave. But spending days on were the resources good enough at USI, was enough invested in technical resources --

**THE COURT:** It's a matter of opinion. We all -- look, what law firm do you work at?

**MR. ZIMMERMAN:** Holland & Knight, Your Honor.

**THE COURT:** You are not a hundred percent happy with the way your firm is operating right now. I can just tell you that. No lawyer is. All right. And he wasn't happy, and he had reasons he wanted to leave, and he's allowed to say that.

**MR. ZIMMERMAN:** Agreed he's allowed to say that.

**THE COURT:** Debating about whether, well, you know, the details of it all, I just -- it's way too far afield. You can call a witness that says, you know what? He's wrong about that. We're a great company. We gave him all the resources in the world, and --

**MR. ZIMMERMAN:**  Much of the testimony designated by defendants gets into the weeds on how many heads are assigned for technical service, and when was this position filled versus that position filled?  And we just think that's a level of detail that doesn't really move the ball.

**THE COURT:**  I agree with you.  He can say all this stuff and give his reasons, but putting in a bunch of exhibits and making a huge production out of it doesn't help anybody.

**MR. BANKS:**  We agree.  We have designated that much of this.  We have some information designated.  Well -- but they've counterdesignated, saying, well, we have all these great resources.  We've always satisfied --

**THE COURT:**  It's a good idea for us to talk about this and get -- yeah, this is -- I'm not letting them go on and on and say what a great company they were for, like, two days.  They can do that with a couple witnesses and everything.  And then he can say how they're not a great company and why he wanted to leave.  And the jury isn't going to -- you know, figure that out.  None of us can figure that out.

**MR. BANKS:**  Yeah.  We don't have to prove that they in fact were a good or bad company.  It's his perception of it.  That's the issue.  It's definitely relevant.

**THE COURT:**  I already rejected your argument they were such a bad company that they didn't have to follow -- that's out.

**MR. BANKS:**  Yeah.  We understand that, Your Honor.
But we think, you know, to the extent they're disputing and
saying, well, Mr. Simmons had every resource and we treated him
with kid gloves, we should be able to dispute that to a degree.
We don't want to go ad nauseam on this.

**THE COURT:**  Good.  So that's good, David.  I like
that idea.  We're making progress.  Can cut some of that back.

Let's see.  What else?  Can I actually rule on some
of these motions now?  Let's see.  Some of them we've talked
about.

**MR. ZIMMERMAN:**  Your Honor, we do have an issue with
we were going to have to call some client records custodians,
simply to authenticate records that were produced in response
to a subpoena.

**THE COURT:**  Don't you have an affidavit that said --

**MR. ZIMMERMAN:**  We can get an affidavit.

**MR. CANNELLA:**  Business records affidavit.

**MR. ZIMMERMAN:**  We don't think that's a good use of
time.

**THE COURT:**  I agree with you.  Why can't we have a
business records affidavit on this?  What are we talking about?
Anybody say they're not business records?

**MR. BANKS:**  Your Honor, these are internal e-mails
between people sometimes complaining about things months after
the departures.

THE COURT: Relevance is a different -- this is just hearsay, which if they're internal e-mails, they're a business record. What are you going to call, a records custodian, one of their people?

MR. ZIMMERMAN: Some of the clients that left. We agree, relevance, the Court is obviously not determining it right now. We're just talking about authentication and hearsay. That's it. An affidavit on those objections.

THE COURT: So aren't all e-mails that come from clients business records?

MR. BANKS: Not -- that's a debate. It's not necessarily the case. I think that some e-mails -- a business record historically was supposed to be something that was created and maintained in the course of normal business and relied on for its accuracy. E-mails, text messages, and things like that, there are cases that say they're business records, and there are cases that say they aren't.

THE COURT: They're business records. It's a waste of everyone's time to bring in a custodian. Just do an affidavit. You can fight all day long about relevance. But it's not necessary to call a custodian. Otherwise the custodian, they're going subpoena --

MR. BANKS: These aren't our documents.

MR. CANNELLA: So these are --

THE COURT: So now you're going to have to call

clients? Whose clients? Matt's clients?

**MR. CANNELLA:** Current Lockton clients. Three in particular that produced records in response to subpoena.

**THE COURT:** Wait a minute. So you want them to send subpoenas to Matt's clients to come in as records custodians. Matt is looking at you like you're nuts. He doesn't want his clients coming in here like that over a technical objection. Am I missing it now? Do I have it now?

**MR. BANKS:** I don't think it's technical. I think it's only because the e-mails themselves are open to multiple interpretations. Sometimes there's information after the fact. You know, so somebody complains, gosh, this is -- the literal document I know that they want is one where someone says this is a shit show at Lockton. That's the document they want, for example.

**THE COURT:** Great legal term, by the way.

**MR. BANKS:** Right. What's that?

**THE COURT:** That's a great legal term.

**MR. BANKS:** And they want -- I mean, we can argue about relevance. I don't know what it has to do with the case. The clients still stayed, despite thinking there was disorganization at some point in Lockton. We think that if someone is going to be testifying about this, just admitting some document without any context, without any witness to say what the heck this was about --

UNITED STATES DISTRICT COURT

**THE COURT:** What is a records custodian going to do about that? If you try --

**MR. BANKS:** I don't think anything.

**THE COURT:** -- to bring in a records custodian, the custodian doesn't know anything about it either. So if it's a business record, it still gets admitted, and the concern you just expressed still happens whether you bring a records custodian to admit it or you just agree to do it on an affidavit. The real fight is whether I say it's relevant or not. Am I --

**MR. CANNELLA:** That's right, Your Honor.

**MR. BANKS:** If Your Honor has determined that it would be a business record, then that's a different ball game. Our point of view is that these are not really business records, they are just internal communications, people complaining about things. But if they are business records, that changes things.

**THE COURT:** It's a business record. So do an affidavit. And then remind me what you want to fight about. And if I think it's not relevant or it's 403 or whatever, but it's -- they're e-mails, they're business records.

**MR. CANNELLA:** Your Honor, just to be clear, these records are not just clients complaining. These are client -- these are evidence that these clients switched to Lockton, because either Mr. Simmons or Lockton told these clients that

they would be able to work with Mr. Simmons.

**THE COURT:**  We'll see.  We'll see.

**MR. CANNELLA:**  I just want to make that clear.  These are not just clients bellyaching for no reason.

**THE COURT:**  Here's where you are on this.  All right.  These documents are very likely business records.  The way they get admitted is either through a records custodian or an affidavit.  The custodian would not have any personal knowledge of the contents of them, so that's why it's not usually a smart idea to call a -- you accomplish nothing by doing that.

Now, the problem that you've got is, you've got, I think, on your side, some documents that maybe merit some explanation.  And you're trying to keep them out because you don't want to explain them by actually having the clients come into court.  I just think you're stuck in that way.

If they -- if I find that they are relevant, they're certainly admissible as a business record.  And, you know, Matt can try to explain them, because once they're admissible, they're admissible.  It's not hearsay.  Or you're going to have to decide if you want to get those clients in.

But if it's a business record, it's admissible.  I don't know how you get around that.  Somebody have something -- I'm happy to hear from you if you have a solution.

**MR. BANKS:**  I think our solution is they should have to put them in, following the rules of evidence on hearsay with

a witness who actually wrote these so they can be cross-examined on what they meant.

**THE COURT:** Doesn't work like that. When they're a business record, they're admissible. As long as the custodian, sorry, we'll say the business record predicate, they were made at the time, you know, blah, blah, blah, which any custodian will say. Okay.

**MR. CANNELLA:** Your Honor.

**THE COURT:** By the way, by the way, how do you admit those? Just as a business record with no explanation, and you just want to start talking to them out of the blue, pulling them out of the file? With what witness? How does that go? Or do you just in your closing argument pull them out of the stack? We'll have to talk about that. But go ahead. You had a question.

**MR. CANNELLA:** I think to answer your question, I think you can admit them through other witnesses. If they're not hearsay or if they're an exception to the hearsay, you can admit them through other witnesses.

Like, for example, you could ask Lockton witnesses, do you know whether clients were told that they'd be able to work with Simmons and his team once they got there? And if the witness says no --

**THE COURT:** Well, you're calling him in your case. You could admit all those threw him when he's on there.

**MR. CANNELLA:**  I agree.  We could do it that way.

Yeah.  I was going to say, we've also got some motions in limine which I think could, you know, reduce the scope of some of the witness testimony in the case.  One of them is a motion to exclude references to offers made by other insurance broker companies to indemnify Simmons.  There's no admissible evidence of that anywhere.

**THE COURT:**  Say that again.

**MR. CANNELLA:**  Yeah.  So Simmons's testimony is Lockton indemnified me, but everyone else that I was talking to was going to indemnify me too.  There's no admissible evidence of that.  I mean, that's hearsay.  That's Simmons saying what Aon, Gallagher, or Marsh allegedly said to him.  We propounded an interrogatory to Mr. Simmons where we asked him tell us who told you that.  You know, because that doesn't -- that doesn't jive with our understanding of what those -- what those companies do in the industry.

And he refused to answer it.  He invoked confidentiality and privilege.  And he said I've had these long-standing relationships for a long time, and I'm not going to tell you who told me that.  Which is fine, but what the consequence of that is, is it means Simmons -- Mr. Simmons can't, at trial, tell a jury that what Lockton offered him as far as indemnification was no different than what any of the other three or four companies he talked to offered him.

**THE COURT:** Well, just a second. Why couldn't he say, without crossing the hearsay line, everybody I talked to, you know, this is a standard thing in the industry. It's a standard thing. Everybody I talked to had a similar thing. And then you cross-examine him, say, okay, well, tell the jury who did you talk to. Was it Aon or who are some of these companies?

**MR. CANNELLA:** He says Aon, Gallagher, Marsh, that they all -- they all would have done for him the same thing. That's no -- I mean, there's no foundation for that, because, yeah, we don't -- we don't know whether those conversations actually happened. There's no proof of that.

Secondly, you know, the sword and the shield doctrine. You can't refuse to answer a question and then show up at trial and answer the question. We asked him the question point-blank in an interrogatory, he said, I'm not going to tell you. So he can't now tell us at the trial.

**THE COURT:** That's a problem. That's a problem. Just a second. Let me think through it. So he's stuck with that. He's stuck with that. So if he wanted to say on his direct testimony this is just, you know, a bunch of other companies have done this, and this is just what -- the way it works, he could then get hit with a question, you can't tell the jury the name of any of them, can you? And he's -- he's going to have to say, well, no, I can't, because he invoked

that privilege.  What do you do with that?

**MR. BANKS:**  Well, so, I mean, first, I think he did disclose the companies, but go ahead.

**MR. SHAPIRO:**  We haven't had a chance to go back and look.

**THE COURT:**  But you guys are all looking at her like she has to figure it out.

**MR. SHAPIRO:**  There was an answer.  I thought we identified the companies and the individual names.

**THE COURT:**  Okay.  We can't resolve this -- we can't resolve this right now.  But I just told you what my thinking on that is, is that you could ask a question about it in general without crossing the hearsay line.  And depending on what's happened so far, he might be stuck with, sorry, I can't name anybody, even though maybe he could and didn't, but I don't know.

**MR. ZIMMERMAN:**  Here's the answer, so we can just -- everyone is on the same page.  Simmons objects to this interrogatory on the grounds that it is not relevant nor proportional to the needs of this case.  The specific names of individuals Simmons spoke with at other brokerage firms and details of his conversations beyond those provided here and in his testimony at the April 12th, 13th evidentiary hearing are not relevant.

**THE COURT:**  Matt, let me ask you a question.  Matt,

they asked you about that in a depo.  Right?

**MR. SIMMONS:**  Yes.

**THE COURT:**  And you gave the names then.

**MR. SIMMONS:**  Yes.

**THE COURT:**  How did I know that?  I was just guessing.

**MR. ZIMMERMAN:**  There were no names given, Judge.

**MR. BANKS:**  The company names were disclosed at the hearing.

**THE COURT:**  All right.

**MR. BANKS:**  They asked for more specific information. There were some objections.  And we can look at exactly what was said.  But normally for an evidentiary sanction, it has to be more than just the assertion of objections.  You have to go through, like, a motion to compel, et cetera.  None of that happened here.

But I also wanted to quickly address the hearsay issue, because it's not hearsay if it's an offer.  Right. Offer and acceptance are not hearsay.  Those are verbal acts.

**THE COURT:**  I'm not spending any more time on this. I think we can get it figured out.  I think it's going to be pretty clean actually.

What else?

**MR. CANNELLA:**  Their testimony -- one of our motions seeks to exclude testimony regarding Matt Simmons's health

issues. Certainly, Mr. Simmons can testify as to his state of mind, but -- and I do know this, because I had to go through the deposition designations made by the other side -- they asked lay witnesses, like Mr. Longhta, Mr. Varnadore, others, you know, did you know about Matt's health. Did you know that Mr. Simmons was hospitalized. Did you know Mr. Simmons -- I mean, there's no claims related to medical issues in this case. And anything Mr. Longhta or Mr. Varnadore would have known about Mr. Simmons's health condition would be based on hearsay.

**THE COURT:** Who are those guys, his supervisors?

**MR. CANNELLA:** Yes. Mr. Longhta is the regional CEO. Mr. Varnadore was his property and casualty practice group leader.

**THE COURT:** Are you guys going to try -- he's going to say that this job was driving him nuts, put him in the hospital. I think that's true. Right?

**MR. CANNELLA:** That's not true.

**THE COURT:** It's not?

**MR. CANNELLA:** I'm not going to -- I mean, there's some sensitivity about health issues. But there's a difference between going to a walk-in clinic and you get hospitalized.

**THE COURT:** What's the truth?

**MR. CANNELLA:** He was never admitted to a hospital.

**MR. SHAPIRO:** He had surgery, Your Honor.

**MR. CANNELLA:** That was for something --

**MR. SHAPIRO:** It would be on different sides of --

**MR. CANNELLA:** They're conflating issues again. This is what's going to be the problem with the jury. You know, he -- all the health complaints, he testified in his deposition, were resolved by early January 2022. He didn't leave the job because of the health issues. And the panic attack, if you will, in the summer of 2021 did not require a hospitalization. There was another issue that did require a hospitalization, but there is no testimony from any medical provider that the stress of the job caused the health issue.

**THE COURT:** Okay. That's -- no, he gets to say. If he wants to say that, you know, he had health issues, if he wants to introduce that into the case, I think he's allowed to introduce that into the case not to try to get sympathy. If he tries to take it beyond a normal stress that you-all have as lawyers and law firms or he had as an insurance guy, if he wants to try to gain unfair sympathy or something, I'll shut it down.

But if he wants to say this job was causing me to have health issues and stuff like that, and you want -- David, if you want to come back and go after him on that and say what you just said, you can try it. I don't know if it will work. Maybe it will make you look like a jerk. Maybe it will make him look like a liar. I don't know.

**MR. CANNELLA:** Well, no. I think we're -- I don't

think we dispute that, that he can testify to his state of mind.  What we object to is their designations and their questioning of our witnesses, did you know about Matt's health issues, did you know that Matt was sent to the hospital for this.  It's -- there's no foundation for it.

THE COURT:  It's also not disputed, because he's going to say it, if he wants to.  I'm not saying he has to.  If he wants to put it in the case.

MR. BANKS:  Actually -- so, Your Honor, Mr. Cannella and I spent all day Thursday dealing with all this stuff with the depo designations.  We actually get along quite well.  And we talked about this.  And I think I told Mr. Cannella at the time, look, if you're not going to say he's making it up, you guys aren't disputing that that happened, we don't need to put in other testimony from other witnesses corroborating --

THE COURT:  You don't.  You don't.  If you think you need to, let me know.  But, otherwise, that stuff's out. That's a time waster.

MR. CANNELLA:  I'm not going to say he's making it up.

THE COURT:  All right.  Good.  We're making progress now.

What else can we talk about here?  This thing -- somebody has got a motion, I noticed this one, improper for Simmons and Mitchell to obtain legal counsel.  What's -- who's

making that motion?  What do you want to do with that?  I mean, the fact that his legal counsel is paid for by Lockton, is that going to come into the case?

**MR. ZIMMERMAN:**  Yes, Your Honor.

**THE COURT:**  Beyond that, though, what?

**MR. ZIMMERMAN:**  It only goes -- it goes to just the timing and the fact that being provided as a benefit from Lockton and the fact that they worked together for the two months while he was still employed at USI.  Those are all fair game.  Those are all key facts of the case.  Whatever inference the jury may draw --

**THE COURT:**  Beyond that, beyond that, what say you?

**MR. SHAPIRO:**  The testimony is Mr. Simmons approached Lockton and said I'd like to be indemnified, and Lockton agreed to that.  So I don't see where the relevance to the fact that who's paying for the lawyers has on any claim as -- you know, as to any of the counterdefendants.  You know, USI -- you know, we know, hearing from USI, they are -- they're strategically trying to -- they're going to try to argue that something happened that there's not evidence that they have occurred.  Right?  And by this onus or focus on the attorneys, in addition to not being relevant, I think it unfairly prejudices my clients.

**THE COURT:**  Well, I think the fact that, you know, that the attorneys have been provided as part of this

indemnification thing, right -- I mean it's all the same deal, I think that is okay.  Beyond that, commenting on that about, you know, who knows what happened behind -- you know, commenting on the attorney-client privilege and stuff, no good.  Can't go there.  All right.  So think about that before you ask any questions about that.  But I'm -- and I think you would want that.  I don't think you would want to leave that totally unanswered and have them speculating about all this.

**MR. SHAPIRO:**  We get that, Your Honor.

**THE COURT:**  So that's fair.

**MR. ZIMMERMAN:**  Your Honor, we have a motion in limine to exclude elements of settlement discussions.

**THE COURT:**  That's obvious.

**MR. ZIMMERMAN:**  Lockton listed the settlement letters that went back and forth on their exhibit list.  We're not sure why, but we don't think that's appropriate.

**THE COURT:**  I agree.

**MR. BANKS:**  They know why, because we talked about it last week.  It's because of their whole argument that Lockton doesn't want to pay fair value.  They just want to come steal people and not pay USI anything.  We offered them twice what they're going to be able to seek in damages.

**THE COURT:**  After the case was filed?

**MR. BANKS:**  After the case was filed.

**THE COURT:**  Can't do it that way.  Can't do it that

way.  We'll see how the argument comes out.  But in terms of settlement negotiations during the case after it was filed --

MR. BANKS:  I would just say this, Your Honor, if I could just make the arguments?

THE COURT:  Yeah.

MR. BANKS:  408 only excludes the use of settlement communications to prove liability or lack thereof.  You can use it to show good faith, bad faith, et cetera.  USI is squarely arguing that Lockton acts in bad faith, and Lockton is not willing to pay for what it has taken from USI, et cetera, et cetera, et cetera.

In fact, Lockton has made very, very healthy offers to try to resolve this, far more than what they get to seek in damages.  That would seem to be very relevant to an issue they are raising.

THE COURT:  It might be.

MR. BANKS:  Good faith, bad faith.

THE COURT:  Yeah, I get it.  403, confusing the issues, I don't want that to get in there.  But there's -- just see how the case goes, and if there's a door here, it becomes -- if they've mischaracterized, maybe we get to go somewhere in there.  But we're going to start out with it staying out.

MR. CANNELLA:  I just -- Your Honor has ruled.  I do have a question.  Who would be the witness that would testify

to that?

**THE COURT:**  I don't know.  I don't know.  I don't know.  Maybe you.  I don't know.

**MR. CANNELLA:**  No, it wouldn't be me.  But if it's Mr. Sharma, the only way he would know that is if his lawyer told him, and they've raised privilege.  So I don't even know how that would come in.

**MR. ZIMMERMAN:**  It's all a fundamental misunderstanding.  This is -- USI doesn't want to be paid a pittance for their business.  USI wanted to keep the business.  That's why I'm not going back on the fair market value ruling that the Court made, but that's why USI sought those damages.

**THE COURT:**  I get it.

**MR. ZIMMERMAN:**  It would not sell these for lost profits.

**THE COURT:**  Let's keep moving.  Let's keep moving.  So that's the one on the legal counsel.

**MR. ZIMMERMAN:**  So settlement discussions, the Court ruled is out.

**THE COURT:**  Out.

**MR. ZIMMERMAN:**  So, Your Honor, there's a motion in limine we filed about the kind of ownership structures of USI on the one side and Lockton on the other side, claiming, you know, USI is private equity owned, and somehow that creates an issue, and Lockton is held by a family or by its producer

members.

THE COURT:  Who cares about any of that?

MR. ZIMMERMAN:  We agree.  We don't think that should come in.

THE COURT:  Do you care about that?  Is this something they're dreaming up that nobody cared about?

MR. ZIMMERMAN:  We can get a answer on this, then, yes, it should be out.

MR. SHAPIRO:  I'm sorry.  I was looking for something.  I apologize.

MR. ZIMMERMAN:  Motion in limine number three by USI.

MR. BANKS:  We actually -- in conferring, we told them we're not going to try and contend Lockton is a family owned company --

THE COURT:  Good.

MR. BANKS:  -- a little company from Kansas City. We're not going to say that.

THE COURT:  A little old lady.

MR. ZIMMERMAN:  And no private equity ownership reference as to USI either.

MR. BANKS:  Pardon?

MR. ZIMMERMAN:  And no private equity ownership reference as to USI.

THE COURT:  First of all, nobody even knows what that means, so it's not in the case.

**MR. ZIMMERMAN:**  Thank you, Your Honor.

**THE COURT:**  By the way, what is the function of a motion in limine, to try to imagine every single piece of evidence your opponent may put in that you object to?  No. It's only stuff that really matters.  Only stuff that really matters.  Not ticky-tacky, little things you can object to at the time, and I'll say sustained and we move on.  These are supposed to be big things.  But we're here, so we'll keep going.

**MR. BANKS:**  We have a big one, which is motion in limine number one.  There is not -- there's been no claim in this case for misappropriation of trade secrets.

**THE COURT:**  That's right.  All my other cases have that in it.  This one doesn't have it.

**MR. BANKS:**  It's because proving a trade secret is hard.

**THE COURT:**  But it's not that.  It's confidential information.  Your client has a contractual information not to disclose, quote, confidential information.  Right?

**MR. BANKS:**  Breach of contract is separate.  We're talking about other torts, so like against Lockton or on the breach of fiduciary duty -- first of all, breach of fiduciary duty, there's very specifically no allegation based on confidential information.  That is a limited tort.  Look at the pleading.  It is based on solicitation, predeparture, while the

people were employed there.

For the other torts, there's -- again, you would have to plead a claim for misappropriation of confidential -- of trade secrets under the FUTSA, the Florida Uniform Trade Secrets Act.

**THE COURT:**  Just a second.  I'm not sure we're on the same page.  Your concern -- your client -- I keep saying -- your client is the company.

**MR. BANKS:**  Correct.

**THE COURT:**  Mr. Simmons and Mr. Mitchell had a contractual obligation not to disclose, quote, confidential information.  Right?

**MR. BANKS:**  Correct.

**THE COURT:**  Okay.  So what is it that they -- you're afraid they might do that would be inconsistent with that?

**MR. BANKS:**  Well, I don't think it's been pleaded as that was their breach.  Their breach -- the alleged breach was the solicitation of clients and employees and in servicing of them after coming over to Lockton.  That's the alleged breach of contract.  It is not based on misappropriation of confidential information.

**THE COURT:**  They're not saying that the general, you know, customers was -- you know, customer lists are always considered confidential information, even though most of the people in the world know who they are.  I don't know.

What do you guys think about that?

**MR. ZIMMERMAN:**  I mean, we didn't operate on a trade secrets claim.  That, we can agree upon.  We did plead both in the fiduciary duty and in the breach of contract and in the general allegations that the knowledge and use of the confidential information benefited Lockton and violated the agreements or --

**THE COURT:**  What is the confidential information?

**MR. ZIMMERMAN:**  So the confidential information we have in this case really -- it's really a small issue, but it is an important one.  It's when the employees went over to Lockton, they immediately met with Lockton management and talked about the clients, talked about which employees should be assigned to which client based on their preferences, based on their histories.  They immediately began working on the renewals based on the work they did at USI.  And so the types of confidential information we're talking about is the insurance preferences, the status and insurance renewals, the insurance information.

Then, separately from that, we have an issue, Judge, is in January, after the -- Mr. Simmons had already spoken to his team, and shortly before leaving, about a week or two before leaving, they -- employees started e-mailing policy information and policy documents to the clients.  Now, normally you see in these cases, they e-mail it to themselves.  But they

were smarter than that.  They e-mailed to the clients.  These are the clients that Mr. Simmons had already told that he was leaving or would be going to Lockton, and then those clients immediately sent that information back to Lockton on January 25th, the same day they started.  And so we maintain that that was an attempt to get these type of work product, this type of --

THE COURT:  Who did that?  Who did that?

MR. ZIMMERMAN:  These were some of the members of the Simmons team, so Ms. Rodriguez, Ms. Murray.  Leading up to their departure, after --

THE COURT:  That's an indirect breach of his contractual obligation not to disclose confidential information.

MR. ZIMMERMAN:  Yes, Your Honor.  And then the testimony is they met -- Ms. Murray and Ms. Rodriguez then met with Lockton and were assigned, determined which teams would work on which accounts based on their histories at USI.  All that is fair game.

THE COURT:  That sounds right.

MR. BANKS:  Your Honor, that's not what's alleged here.  The complaint alleges for breach of contract in Counts 2 and 3 that the breaches arose from the solicitation of clients and employees.  Confidential information is only mentioned as a justification for the existence of restrictive covenants.  So

that's the purpose for the agreements.  You know, they have to have a proper purpose for the restrictive covenants to make them enforceable.  But the breach is the solicitation.

THE COURT:  Doesn't -- I mean, I'm just going to guess.  You seem to be interested in very technical things.  Let me just make a guess and check it out for me.  In their complaint, all right, their breach of contract count probably says we -- he breached the contract.  All right.  And we incorporate by reference one through 797, and through one of those paragraphs, it says something about confidential information.  I'm guessing.

MR. BANKS:  I think -- again, there's allegations of the existence of confidential information to justify the contracts, the reason for why they're enforceable, but, also, this is really more of their issue specifically on the contractual claims.

THE COURT:  If it's in there -- if it's in -- there.

MR. ZIMMERMAN:  You're a good guesser, Your Honor.

THE COURT:  What paragraph?

MR. ZIMMERMAN:  Paragraph 51.  Partner took confidential information from USI.  It's --

THE REPORTER:  Excuse me.

MR. ZIMMERMAN:  Sorry.  Sorry.  On information and belief, the departing producers took confidential information from USI and made use of it so that the departing employees

could solicit and continue to service clients with whom they had material contact at USI.

THE COURT:  Okay.  You win.

MR. ZIMMERMAN:  That's incorporated on each of the counts.

THE COURT:  You win.

MR. ZIMMERMAN:  Thank you, Your Honor.

THE COURT:  Was that your motion?

MR. BANKS:  That was our motion.  That's on the contract.  But on the other claims, it has to be brought as a misappropriation of trade secret.  So you win that piece.  But it gets to be --

MR. ZIMMERMAN:  I don't think that's correct, Your Honor.

THE COURT:  I do.  Because you've already got him on the breach of contract.

MR. ZIMMERMAN:  Correct, Your Honor.  But there is a breach of fiduciary duty.  So there's one while you're employed, which we've pled.  But we also pled you have a breach of fiduciary duty to protect confidential --

THE COURT:  That's obvious.  That's obvious.  That can be a breach -- but it's already a breach of contract.  You don't get anything additional for it also being a breach of fiduciary duty.

MR. ZIMMERMAN:  It's just a different -- it's just a

different cause of action.

**THE COURT:** I'm pretty sure employees have a fiduciary duty not to disclose confidential information.

**MR. ZIMMERMAN:** That's all we're talking about. That's in the case.

**MR. SHAPIRO:** Your Honor, just -- maybe this is not -- I understand Your Honor's ruling. But before these employees left, they hired -- there was IT folks to make sure they did not take confidential information. The evidence, the testimony is we were running -- we were doing our job until the last day.

So just so the Court is aware, if these e-mails where the clients are not -- where the employees are not doing their job and sending stuff to clients, USI would be here saying they stopped working weeks before they joined Lockton. So maybe this is something the jury needs to decide. But there's nothing about these e-mails or these documents that USI is referring to that we believe reasonably suggests that this was theft of a confidential information. It was servicing the clients.

**THE COURT:** Maybe. Maybe. But, I mean, that -- maybe it's a relevancy objection, but is a motion in limine now to take it out. I don't think I can do that quite yet. If it's not relevant, it will be a time waster, which we all talked about not doing.

Okay.  So that one is denied.  You can object later if you need to, obviously.

Let's see.  Evidence suggesting other employees breached their contracts.  We talked about that a little bit.

Evidence other employees should have given notice.  What's that?  They're at-will employees.  Right?  What am I missing?

**MR. ZIMMERMAN:**  This -- are you asking for our position?

**THE COURT:**  I don't know.  I don't even know which side filed this.

**MR. ZIMMERMAN:**  Defendants' motion in limine, but I can tell you.

**MR. SHAPIRO:**  The other -- other than Mr. Simmons and Mr. Mitchell, none of the other employees had a notice requirement in their contract.

**THE COURT:**  Okay.

**MR. SHAPIRO:**  They're free to apply for a job.  They're free to leave effective immediately.  Just like USI was free to terminate them effective immediately.

**THE COURT:**  Somebody could say they left and didn't even give two weeks' notice like a normal employee.  Fine.  That's allowed.  You can say, wait a minute, they weren't under any contractual obligation.

**MR. SHAPIRO:**  But, Your Honor, that -- how -- that's

not relevant.  How is that relevant to any claim?  These nonparties or to the counter -- to the counterclaim decided to resign as was allowed under the agreement.  For USI -- USI wants to come in here and try to argue that some extra contractual requirement was necessary.  And if that was not provided, somehow these individuals did something wrong.

**THE COURT:**  I agree with you.  I agree with you. It's not highly probative of anything.  It's part of the general story.  It's fair enough in a very general way.  If somebody tries to make a big deal about it, object, and I'll shut it down.  That's really, literally only one question to a witness.  Did any of these employees give notice?  No, they all left on the same day.  Thank you.  Next.  Boom.  That's it.

Evidence in terms of agreement between Lockton and its producers and associates.  What is this one?

**MR. SHAPIRO:**  USI, as you've heard throughout the litigation, likes to point to Mr. Simmons's and Mr. Mitchell's member agreements with Lockton Southeast and say, hey, Mr. Simmons and Mr. Mitchell, through their member agreements, their ownership agreements, have agreed to certain post-employment restrictions, the same, similar type of restrictions that are contained in the USI employment agreements, and, therefore, why are the counterdefendants resisting these restrictions.

And the motion asks for -- the Court to preclude this

type of information and questioning, because, number one, the member agreements are ownership agreements.  So Mr. Simmons and Mr. Mitchell are owners of Lockton Southeast.  So the enforceability of the restrictions, you know, are different than an employee.

Secondly, look, as Your Honor --

**THE COURT:**  You lost.  You lost that.  It's out of the case.  Right?  I mean, you said --

**MR. SHAPIRO:**  Right.  No, no.  That was the US -- we were arguing the USI agreement is not enforceable.  What USI wants to say is, they want to hold up the Lockton member agreements and say, look, Mr. Simmons, Mr. Mitchell, you agreed to all these restrictions now, you know, with Lockton.  Right?  Why -- you know, why are you resisting, or why do you -- why did you -- or are you resisting these restrictions with regard to the USI agreement?  It's not relevant to anything.

You know, at the end of the day, Your Honor, there's litigation -- there's often litigation in this industry, in this space.  There's different state laws.  There's different circumstances.  Your Honor understands that.  And, you know, Mr. Mitchell and Mr. Simmons, if a day comes one day down the line and they separate, the enforceability of those restrictions are what they are, and it will be determined at that point in time.  Doesn't have any relevance to the fact they've signed an agreement with Lockton as to the

enforceability of the USI contract.

**THE COURT:** Well, certainly when they were saying that it was their agreement with USI was unenforceable, that they lost that.

**MR. SHAPIRO:** My guess is that Mr. Simmons's experience at Lockton is similar to the one that he had at USI, he's probably going to be saying the same exact thing. I'm sure of it. Right? So the restrictions -- restrictions are obviously the sealing to the extent a post-employment restriction can be enforced. Then you go to the statute, you go to all the defenses, et cetera, so --

**THE COURT:** I'm going to think about this. I think it's important the jury understand the whole picture here. So nobody -- neither side gets to sort of, you know, make it seem like somebody is really wide and wonderful and the other guy is the bad guy. I mean, I think the jury should know the big -- the whole situation. I'm not sure how this comes into play. So I'm not making a ruling on that just yet. I'll think about it.

Let's see.

**MR. ZIMMERMAN:** Do you want to hear a brief response now, or you'll just look at our papers on it?

**THE COURT:** I'm not ready to rule on it. I don't think I need to. So let's -- let me -- what else do we have on your side? I haven't hit everything yet, but we're running out

of time.

MR. CANNELLA: Yeah, Your Honor. We filed -- yes, Your Honor. We filed our motion in limine last week. And so these next two are kind of conjoined. Motion in limine number six seeks to exclude evidence related to the Cardew/Goding book of business. Motion in limine number seven seeks to exclude testimony by Ben Greer in an unrelated case in Arizona called Havard.

The unifying themes are as follows. The Cardew/Goding departures, these were producers in transportation who left in -- they gave their notice of resignation in July of 2023. They gave 60 days' notice. They didn't leave until September of 2023. They were in transportation, which is a different line of business than the Simmons/Mitchell book of business.

The trucking business is more commoditized because they have more variable costs than other types of business. For example, fuel costs.

THE COURT: Just a second. Remember, you guys live this. I don't. All right. So you're about three steps ahead of me.

Why is it this -- what do you want to put this evidence in to show what?

MR. BANKS: Yeah. So, Your Honor, it relates to damages. And the reason it relates to damages is -- you may

recall Frost's calculation is Frost begins by taking all the revenues for Matt's and Jack's clients during the last 12 months. Then he runs them out ten years. And he assumes there's going be some attrition. He says in year one, I assume that USI will keep 80 to 90 percent of the business. And every year thereafter, I assume they will keep 90 percent of what's left. The flip side of that would be in year one, they lose 10 to 20 percent, and every year thereafter, they lose 10 percent.

The experience that you -- now, USI will tell us, all of their witnesses have said that USI does not track. It has no real way of figuring out what their actual retention rate is when producers leave. Okay. They haven't tracked that data, nor do they exact data of what happens when a producer's restrictive covenants expire. Right? So that's year one and, in this case, year three.

So there's just this assumption used by the expert that it will be 10 to 20 percent in year one and 10 percent every year thereafter. These guys left. They resigned earlier this year. And before their 60 days was even up, 17 percent of the business left.

THE COURT: Okay. I'm with you now.

MR. CANNELLA: It's not that high.

MR. BANKS: It actually --

MR. CANNELLA: But that --

THE COURT: Guys.

**MR. CANNELLA:** -- that frames up the issue right. Okay. They want to introduce evidence of the Cardew/Goding departure to be able to go to damages. But there are some problems with that. Number one, the number of clients that left following the announcements of resignation were 11 percent of the revenue. But let's say it's 17 percent. That's still within the Frost calculation of under 20 percent. But it's a different type of business, number one.

Number two, those were clients that were at renewal.

It's not the -- number three, those clients didn't all leave over the course of three business days, unlike the Simmons.

**THE COURT:** Okay. All right.

**MR. CANNELLA:** And, number four, Cardew and Goding didn't bring any service team members with them. So we think it's confusing to the jury. It's not substantially similar. And it should be excluded.

**THE COURT:** So this comes up, where does this come up? I mean, when your guy -- remind me. What's his name? Which of the experts?

**MR. CANNELLA:** It's going to come up -- they'll ask every one of our witnesses about it, I'm sure.

**THE COURT:** I don't think so. It's a damages thing. So they're -- who's your guy that has the ten-year projection?

**MR. CANNELLA:** Robin Frost.

THE COURT: Frost. The guy that I've let testify on a ten-yearish damages theory.

MR. CANNELLA: Yes, sir.

THE COURT: This guy gets asked, well, wait a minute, Professor Frost, or Dr. Frost, or whatever he is, isn't it true that this Cardew/Goding left and that's not consistent with your thing? I mean, doesn't it just come up in that way? And then if the expert denies it or tries to, you know, weasel around it, maybe you could call these people as a witness to contradict him. But why else would we go that level of down into the weeds?

MR. BANKS: I think that's right, Your Honor. We designated some testimony on this. We don't need to use all of it. They actually produced a document to us at the end of discovery, because we had asked for this in interrogatories as well. My understanding is they were going to stipulate that's accurate and authentic. It's the one that says the 17 percent was lost, but USI would have a chance to compete again for a portion of getting some of it back. That happened in two months, not in 12.

THE COURT: So this comes up only in a cross-examination of that expert unless I say otherwise. And then depending on how the expert answers the questions, maybe these become rebuttal witness or somebody. Have you actually talked to these people or --

**MR. BANKS:** No. We've -- some USI witnesses testified about -- that this happened. They didn't have the exact numbers. We got the numbers from them in a document that they told us they would stipulate is accurate and authentic.

**THE COURT:** If you have an issue with how the expert handles this, maybe you can call somebody as a rebuttal witness to try to get this piece out. Otherwise, this is granted. That applies to Cardew, Goding, and Greer.

**MR. CANNELLA:** Greer is a separate motion. So Ben Greer is a PNC leader out of Arizona. There's a case in Arizona called USI v. Havard. Havard was a producer who left USI and went to Alliant. And we believe, based on the briefing and other motions that have been filed in this case that the counterdefendants are going to seek to introduce evidence out of testimony from Greer. And this may require, you know, a read-through by the Court of the as-filed motion, because it's kind of confusing. But, basically, in the Havard case --

**THE COURT:** Well, time out. Let's do it -- it was better when he started. What do you think this has to do with the case?

**MR. BANKS:** Okay. So Mr. Greer is a -- he's the property and casualty head in Arizona. Property and casualty is the same group that Mr. Simmons and Mr. Mitchell were in at USI. All right. He testified in this Alliant case. He's also been deposed in this case.

And he testified that it is his experience that when -- there's a little bit of ambiguity on exactly the timing of this.  His testimony is either that when producers' covenants expire, so after two years, and they get to compete again, that they're really hard to compete with to retain the business, and that USI loses about 40 percent of the business. That's based on his ten years of experience.

That's the way USI reads the testimony.  I think it's actually not clear whether he's saying it's after two years or right away.  But, regardless, that's what he said.

**THE COURT:**  If he were going to be in the case, how would he be in the case, through a depo?

**MR. BANKS:**  We have his deposition.  We've submitted the designations, and Your Honor can look at this.

**THE COURT:**  Okay.  So your objection is what?  I'm hearing this guy is somebody that undercuts your expert's opinion in some way.

**MR. CANNELLA:**  Well, because the testimony is entirely out of context.  Mr. Greer was asked the question, when a producer leaves and does nothing wrong, how much of the business goes away?  And his testimony was when the producer leaves, but they comply with their contract, none of it goes away.

Then there's this colloquy.  This is all in the Havard deposition.  There's this colloquy about, well, after

the two years, the question is not -- the question and answer is far from clear.  They said, well, after the two years, when the producer is able to compete, do you still keep all of the business?

And Greer says, no.

And then the lawyer who asked the question says, well, how much of it goes away?

Greer says, you know, I don't know, a fair amount.

And then the lawyer says, well, what's a fair amount?  60 percent, 40 percent?

And Greer says, basically, yeah, 40 percent.

But Greer clarified in our case -- I mean, we allowed Greer's testimony in our case rather than, you know, come to the Court with a motion for protective order, because we hoped that it would help resolve the matter.

The only reason why Greer is a witness in this case is because we knew that they were going to use that testimony from the Havard case, which pertains, again, to a different type of business.  They were environmental policies, which environmental policies last between three and ten years.  So it's a different type of business than what is the type of business that's at issue here.

**THE COURT:**  Okay.  I get it.  I'll look at it.  I need to read the transcript on this.

**MR. CANNELLA:**  I think you need to --

**MR. BANKS:** Your Honor, could I encourage, that in this case, we also deposed him, and what he said is that 40 percent number is the number he uses in internally when they're thinking of terminating people to warn USI about how much business --

**THE COURT:** Let me just -- let me just use this as an example. All right. I'll call it a teaching point, not that I'm like the parent and you're the children. But I am a parent.

If anybody thinks that this exchange that just occurred will mean a darn thing to a jury, you're on another planet. All right. You're talking about asking a jury, and this would come what, a week into the trial or more? You're tired now. We've only been here half a day. They've been here a couple weeks, and now you've got lawyers bickering back and forth about what one witness said in another litigation. Where is it, in Oklahoma?

**MR. ZIMMERMAN:** Arizona.

**THE COURT:** And this type of stuff, you don't -- you're not able to fully grasp what I'm saying because you're so in the weeds on this, and you've lived it for so long, and it means so much to you. It has no traction.

I mean, I don't know whether to grant it or deny it. If you try to do it, it means nothing. But we'll see. We'll see. But try to think like that. Try to think is this

something that is enough that it's really going to matter to anybody?  This will not.

**MR. BANKS:**  Your Honor, respectfully, we think it's really important, because the way the damages are calculated, we really take issue with calculating them past two years.  Not only because that's when the covenants end, but also we believe it's far too speculative after that.  We think Frost admitted that.  And this Greer testimony, he's saying they lose 40 percent of the business that they'd retained after two years at that point.  There's a lot that goes into it.

**THE COURT:**  You're really -- I'm going to interrupt you, because you couldn't be making my point better.  All right.  If it was a guy that came in here and was really likable and said that in a really concise way like you just did, right.  But trying to put up a depo with all of that and the back-and-forth, that dog won't hunt, as they say in the south.  All right.  But you can try it, if I don't go his way.  But that's exactly what I'm talking about.

All right.  What else we got here?

Anything else that matters, because I still have some more things to talk about, the mechanics at the trial.  I'm going to be tasking my law clerk with going back and listening to the transcript and entering an order on things we hit and didn't hit.

**MR. ZIMMERMAN:**  We apologize in advance.

THE COURT:  No, it's me.  I've been all over the place on this.  I haven't been systematic.  I'm about getting to the bottom line and not, you know, being ticky-tacky on things.

Okay.  So where we are is -- I just got a note earlier that Judge Moody is going to take one of these criminal trials.  Not mine.  The one I was covering for somebody else.  But things like this happen along the way.  I might -- I might find that one of these criminal cases is resolved, in which case you'll get a call.  You have to be on -- what is it, Sonya?  We usually know by Thursday.  So you'll get a call by Thursday saying come in on Monday.  All right?  We'll come in on Monday, and we'll pick a jury.

Again, this is just the way it has to be.  It's the way it was when I was practicing law.  And we pick the jury pretty quickly.  It's a civil case like this, we'll probably have -- normally, we ask for 24 to get 18 to show up.  But how many strikes do you think you guys have?  Isn't the rule that you get one strike or the -- multiple defendant cases get the same number of strikes as the plaintiff?  I mean, have you looked at this at all?

MR. CANNELLA:  I know in state court, I thought it was equal number of strikes on both sides of the V.

THE COURT:  That's what I was trying to say.

MR. CANNELLA:  Yeah.  So we get three, they get

UNITED STATES DISTRICT COURT

three.  But they may take the position that they get nine, in which case we would get nine.

THE COURT:  No.  In which case I might say they get six maybe and you get six or something like that, but we're not going to go to nine.  I'll figure that out.  But that will affect how many jurors I bring in.  Okay.  And we have to end soon here, because, you know, our court staff does have a life outside of this case.  I don't right now, but they do.

So in any event, so we'll bring the people in.  They will be sitting in the back there where the clients are now.  We flip our chairs around.  And I talk at the beginning, and I ask them some general things that apply.  I'll probably ask them something like do any of you have any personal experience with noncompete agreements or anything like that?  I'll conduct that discussion with them myself.  I'll talk to them about scheduling.

And pretty much after that, I'll turn it over to you-all.  And I usually give about 30 minutes a side.  So we'll figure out how we split that up.  I might go to 40 minutes a side, and you can follow up with them.  You can ask them whatever you feel is relevant within the rules of the game.

After that, we dismiss them.  Have I explained to you how we do peremptories?  No.  Okay.  What will happen is the first six people are the presumptive jury, whoever they may be.  You know, because Juror Number 1 may be out because of cause.

All right. And then the jury is Number 2, 3, 4, 5, 6, and 7. Whatever the first six people that are not out for cause, they're the jury. And then we exercise strikes, starting with the plaintiff. One strike, who do you want to strike? And then whoever you strike, we then pull the name or the number out of a hat to replace that. So Number 8 is not the next juror once somebody goes out.

I hope you're following me on this.

**MR. BANKS:** Yeah.

**MR. ZIMMERMAN:** Yeah.

**THE COURT:** Then we go back and forth exercising strikes, plaintiff, defendant, plaintiff, defendant until we've used up all the strikes or you're happy with the jury. That's the big picture. I can give you a little more detail. But that's how it goes.

You will get forms.

Sonya, give them a copy of the forms, please.

You'll get forms at the beginning with all of this biographical stuff on them, and you'll have enough time to review those forms. And we may see some obvious cause challenges. We just send those people home at the beginning. But most of the time, we bring everybody into court. And then after you're done with the questioning, you return the forms. You don't get to keep those.

But you'll see. Most of the stuff that you care

about biographically is going to be provided in those forms. And I'll be looking at them myself.

That's how the jury selection goes.  We'll be done by lunchtime.  And, plaintiff -- you're now the plaintiff -- will have to have witness ready to go, Monday afternoon, say, at 1:30.

**MR. ZIMMERMAN:**  Judge, how much time do you usually do for openings?

**THE COURT:**  What's reasonable in a case like this?

**MR. ZIMMERMAN:**  Forty minutes.

**THE COURT:**  I say 30, 30.  Because, remember, it's just an overview.  Don't make it argumentative.  This is what the evidence is going to be from 30,000 feet.  Thirty minutes each side.

**MR. BANKS:**  Your Honor, could -- just a quick clarification on that.  Thirty minutes per side?

**THE COURT:**  Yes.

**MR. BANKS:**  So we divide that?

**THE COURT:**  Well, keep reminding me about that. Because it's a little bit of a twist.  I'll let you guys have 40 minutes, collectively, however you want to divide it.  All right.  But don't repeat stuff.  Don't repeat stuff.

**MR. ZIMMERMAN:**  Judge, do you do a charge conference that morning?

**THE COURT:**  I'm going to work on the jury

instructions between now and then.  It would be really nice if I read the jury instructions at the beginning.  That's been determined to be the most helpful way to do it, but I've never been able to have the instructions ready that far in advance.  So we'll figure them out along the way.  I don't know exactly when.

We already talked about calling witnesses out of order.  That's fine.

We already talked about the undesirability of using depos, but you can if you need to.

If you -- if anybody is planning on doing a major dog and pony with technology, don't.  All right.  Clients might like it or maybe not.  It almost never works.  The Elmo is good.  The Elmo is good.  I'm not going to tell you no.  But if you want to come in here with a bunch of AV computer people and stuff like that, that's on your dime.  And if it doesn't work immediately, I pull the plug, and you're back to the chalkboard.  So I just try to say do the Elmo as much as you can and not get too fancy.

I need to tell them something about what the case is about.  And you have in your -- in your pretrial statement, your kind of versions of the case.  I'll probably work on something a lot tighter and a lot shorter, but I'll run that by you before I do it, and it'll be rather general.  But I need to work on that.

What other questions do you have to help you prepare?

**MR. SHAPIRO:** Judge, will we always be starting on a Monday? Is that when you pick the juries?

**THE COURT:** Yes.

**MR. SHAPIRO:** So we don't -- we'll know by Thursday for that week?

**THE COURT:** Yes.

**MR. BANKS:** Couple little things that will help us. One is, if we submit a proposed order to permit food to be brought to the witness rooms during lunch, I know it would help probably both sides not to have to go out to eat?

**THE COURT:** I don't care about that. What's the rule on that?

**THE COURT SECURITY OFFICER:** There's no rule.

**MR. BANKS:** There's no rule. Okay. Some courthouses, it's not allowed without an order. Okay. Excellent. The other would be technology probably for the client representatives.

**THE COURT:** They want to bring their phones and stuff. That's fine.

**MR. BANKS:** The only other thing I was going to say was amount of time for closing.

**THE COURT:** Worry about that later.

**MR. BANKS:** Yeah.

**THE COURT:** I'd like you guys to take to heart

everything we've done here and confer with each other and let me know after -- you know, maybe by the end of next week, just send me an e-mail about how long you think it's really going to take, once you've gotten your 400-exhibit list down to a real number and your 80-witness list down to a real number and -- just so I can plan accordingly.

**MR. BANKS:** Your Honor, can I ask one clarification? This is back on the Goding/Cardew thing. Are we okay using -- what I had said we would just want to do is just use that document and ask the expert about it. Is that going to be all right? Because my impression was that that was, and then at the end, you said you were going to grant the motion. So I wasn't sure.

**THE COURT:** Meaning no witnesses. You can cross-examine an expert about stuff like that.

**MR. BANKS:** That's what I wanted to understand.

**THE COURT:** You're not going to call him as a witness, unless the expert, you know, answers it in a way that says, oh, that's baloney, that's not true, or whatever, then maybe you might as a rebuttal. But you can cross-examine an expert with that.

**MR. BANKS:** Okay. Thank you.

**THE COURT:** Are y'all tired now? Think how you're going to be after a week of sitting in here doing this, all right, and getting up early and not sleeping. So it's just the

way it is.  I'll do what I can to simplify and make it go smooth, but we'll see.

My last question, and you've told me this before and I just don't remember.  It's always been very interesting to me in this case to know, was anyone going to be calling any of these clients?  I talked about that at the very beginning.  Are clients coming in?

**MR. SHAPIRO:**  We plan on calling a few clients, Your Honor.

**THE COURT:**  A few clients.  So some of those people on your witness list are clients?

**MR. SHAPIRO:**  Yes.

**THE COURT:**  Are you guys calling any of the clients?

**MR. CANNELLA:**  We -- yeah, we have objections to clients that were not previously disclosed as witnesses.  But we do have the PGT deposition that we previously used before.  And then there are the matter of the documents.  So it's going to be PGT, and then we'll see what happens with the -- with the documents.  I've reached out to the lawyers for two of the three clients and asked for business records affidavit.  I've not heard back.

**THE COURT:**  Yeah.  Well, we'll see.  Because on this causation thing, on the breach of contract, if it's determined that there was a breach by notifying somebody, how do you -- how do you address the causation if the client doesn't come in

to testify?  I don't know exactly how that comes out, but --

           **MR. CANNELLA:**  Circumstantial evidence, Your Honor.

There's an instruction on it.  And we think that -- we don't

think we need direct testimony client-by-client to prove

causation.

           **THE COURT:**  Like I said, it's been an interesting

part of it I've wondered about.  We'll see.  We'll see.

           Well, thank y'all for your time, and we'll see where

we end up.  We may see each other soon or maybe not.  I'll keep

you posted, or Sonya will when you call.  Thanks.

       (Proceedings adjourned at 5:30 p.m.)

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Rebekah M. Lockwood, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes to the best of my knowledge, skill, and ability.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand at Tampa, Hillsborough County, Florida, this 29th day of March 2024.

_____
REBEKAH M. LOCKWOOD, RDR, CRR
Official Court Reporter
United States District Court
Middle District of Florida