# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MATTHEW SIMMONS, ET AL.,

     Plaintiffs,

v.

USI INSURANCE SERVICES LLC, ET AL.,

     Defendants.

Case No. 8:23-CV-00201-TPB-AAS

USI INSURANCE SERVICES, LLC

     Plaintiff,

v.

MATTHEW SIMMONS, JACK MITCHELL and SOUTHEAST SERIES OF LOCKTON COMPANIES, LLC,

     Defendants.

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

Under Rule 50(a) of the Federal Rules of Civil Procedure, Matthew Simmons, Jack Mitchell, and Lockton SE ask this Court to enter judgment as a matter of law.

## INTRODUCTION

USI set out to prove that Simmons and Mitchell stole its clients and

employees, that Lockton SE encouraged them to do it, and that it lost money as a result.  But after 18 months of no-stone-left-unturned litigation and more than a week of trial, the evidence shows that the clients who left would have followed Simmons and Mitchell no matter what—and were free to do so.  That the employees who moved with Simmons and Mitchell had their own reasons for leaving USI and joining Lockton—and were free to do so.  That Lockton SE did nothing more than compete by attracting top-tier talent—and advising that talent *not* to solicit clients, employees, or take confidential information with them.  That everything USI lost it would have lost anyway, no matter how Simmons and Mitchell chose to leave their jobs.  Because USI has not proved all the elements of any of its claims, this case shouldn't go to the jury.

In whittling down this case, the Court should start with USI's bid for the extraordinary relief of punitive damages.  USI has come nowhere near proving the kind of malicious conduct that would warrant punitive damages.  Days of testimony have proved only what the Court has long known—Simmons told some clients and employees he was leaving USI, Mitchell told two clients, and Lockton SE accepted the clients and employees when they came.  None of this conduct is the rare kind that would authorize the striking social condemnation of punitive damages.  Nor is there any basis for USI's vindictive effort to claw back compensation from Simmons and Mitchell—compensation that indisputable evidence shows they had already earned based on years of service

to USI and the revenue they generated for it.  That vested compensation didn't become unjust enrichment merely because Simmons and Mitchell notified some clients or employees they were leaving.

The Court should not stop there.  It should enter judgment on all claims because USI has not proved any lost profits from client defections.  USI chose not to put in any evidence from clients showing they would have stayed at USI; the one former client USI called proved the opposite.  Without the testimony of the clients, USI has no other evidence they would have stayed absent any breach.  USI also has no evidence of damages:  Its expert admitted he tried only to value the lost business, not to measure damages.

The Court should dismiss USI's remaining claims against Lockton SE for other reasons, too.  There is no evidence Lockton SE induced Simmons or Mitchell to service former USI clients, so it can't be liable for tortious interference under the only theory left for USI to argue to the jury.  Nor can Lockton SE be liable for aiding and abetting any alleged breaches of fiduciary duty—if in fact there were any such breaches.  No evidence shows Lockton SE substantially assisted or encouraged any conduct that USI might claim amounted to a breach.  In fact, the evidence is the opposite: Lockton SE told Simmons and Mitchell not to solicit clients or employees, and it reminded Simmons and Mitchell to continue to work solely for the benefit of USI.

The trial testimony has also revealed gaping holes in USI's claims

against Mitchell and Simmons.  USI practically forgot about Mitchell at the trial; it has zero evidence that he told any employees he was leaving, or that the one client who followed him to Lockton SE would have stayed at USI. Simmons told some employees and clients he was leaving, but USI didn't prove those notifications had any effect.  The employees all testified they would have left USI no matter when or how they found out Simmons had left.  Finally, Simmons and Mitchell didn't breach any fiduciary duty to USI.  They at most prepared to compete with USI; they continued generating revenue for USI through the bitter end, in some cases just hours before leaving for Lockton SE.

## LEGAL STANDARD

Courts "should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." *Cleveland v. HSN, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004).  The nonmoving party must have "'evidence of such quality and weight that reasonable and fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions.'"  *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990).  "A mere scintilla of evidence is insufficient to present a question for the jury"; "[t]here must be a conflict in substantial evidence to create a jury question." *Id.*

## ARGUMENT

### I.      USI is not entitled to punitive damages as a matter of law.

As the Court noted, "[p]roof that a defendant committed an intentional

tort is not by itself sufficient" for punitives; instead, "[t]he conduct shown must not only be intentional, but 'egregious and sufficiently reprehensible to rise to the level of truly culpable behavior deserving of punishment.'"  Dkt. 227 at 4. That is "'an extraordinarily high bar.'"  *Id.*; *see also Phoenix Mgmt. Servs., Inc. v. Waterchase Homeowners' Ass'n, Inc.*, 384 So. 3d 206, 207 (Fla. Dist. Ct. App. 2024) ("garden-variety intentional torts may be proved without the evidence necessary to justify an award of punitive damages.").

Florida courts routinely refuse to permit punitive damages when the defendant's conduct amounted to tortious interference or breach of fiduciary duty but was not sufficiently reprehensible to merit punitive damages.  In *Imperial Majesty Cruise Line, LLC v. Weitnauer Duty Free, Inc.*, 987 So. 2d 706 (Fla. Dist. Ct. App. 2008), for example, the defendant cruise operator appealed from a punitive-damages award for a tortious-interference claim.   The defendant had "essentially sought to preclude competition in the sale of duty-free goods" by "barricad[ing] and prevent[ing] its passengers from shopping at [the plaintiff's] store"—conduct that the trial court deemed "'calculated, predatory, and excessive.'"  *Id.* at 708.  Nonetheless, the District Court of Appeal concluded the defendant's "conduct did not rise to truly culpable behavior, for which damages are tenable to 'express society's collective outrage.'"  *Id.*  The court thus reversed the punitive-damages award.

It was the same story in *Air Ambulance Professionals, Inc. v. Thin Air*,

809 So. 2d 28 (Fla. Dist. Ct. App. 2002).  There, the jury awarded punitive damages on claims of tortious interference and breach of fiduciary duty, but the District Court of Appeal reversed, emphasizing that "[r]ecord evidence may support an intentional tort, but not necessarily an award of punitive damages." *Id.* at 30.  "Although the jury found that [the defendant] breached his fiduciary duty to [the plaintiff]" by interfering with the plaintiff's business relationships, there was no evidence "of an illicit scheme to put [the plaintiff] out of business." *Id.* at 31.  Nor was there "evidence of fraud or malice . . . or of any other type of behavior which would justify punitive damages."  *Id.*

The Eleventh Circuit, too, has set aside punitive-damages awards for similar reasons in tortious-interference cases.  In *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526 (11th Cir. 1985), for example, the defendant condominium developer "wanted to rid itself" of its property manager, breached the parties' management contract "for pretextual reasons, and then "arranged for [the property manager's] employees to resign and to be employed by [it] on the same day."  *Id.* at 1535.  Although that "evidence support[ed] the jury's findings that [the defendant] intentionally and unjustifiedly interfered both with [the plaintiff's] employees and the unit owners," it did "not rise to the level of reckless, malicious or offensive character to support the award of punitive or vindictive damages."  *Id.* at 1537.

Here, too, USI has introduced no evidence that could justify an award of

punitive damages against any of the Defendants.  Start with Mitchell.  The only potentially objectionable thing he did was calling two clients to inform them he was resigning before he left USI.  That's it.  He didn't badmouth USI or try to sell the clients on Lockton.  His name was rarely mentioned at trial, and when it was, it was generally because a witness was explaining he had done nothing wrong—for example, that he never even notified other USI employees he was leaving, much less enticed them to move to Lockton SE with him.  *E.g.*, 7/11 Tr. 90:9-11.[1]  Given that other courts have held that notifying clients of an imminent move to a different firm doesn't support even a breach-of-contract claim, *e.g.*, *Regions Bank v. Raymond James & Assocs., Inc.*, 2020 WL 6870815, at *4 (M.D. Fla. May 15, 2020), it's impossible to see how it could support punitive damages for outrageous wrongdoing.

Next consider Lockton SE.  None of USI's evidence about Lockton SE comes close to "the level of reckless, malicious or offensive character to support the award of punitive or vindictive damages."  *G.M. Brod*, 759 F.2d at 1537.  Far from proving that Lockton SE acted with malice, the evidence shows Lockton SE instructed Mitchell and Simmons *not* to solicit their clients or take any confidential information with them, and to keep working for USI alone.  *See, e.g.*, 7/11 Tr. 171:13-172:4; 7/10 Tr. 185:10-19; 7/15 Tr. 152:24-153:7.

---

[1] Lockton SE cites the rough trial transcripts throughout this motion because those are the only ones currently available.

Lockton SE offered Simmons more money *not* to bring his clients with him. 7/10 Tr. 134:17-22. The company ultimately agreed to accept the clients, 7/10 Tr. 159:21-160:1, 259:10-22, but there is nothing wrong with that either; the clients were indisputably free to leave, and Lockton was indisputably free to accept their business. 7/11 Tr. 20:15-17.

Finally, USI didn't prove Simmons acted with any malice either. No evidence shows he was driven by a desire to harm USI's interests rather than to do what's best by his clients. There is considerable evidence to the contrary. He left his accounts and information about them in "pristine" condition, filing away all client-related correspondence in tidy folders and finishing renewals that generated a year's worth of revenue for USI immediately before leaving for Lockton SE. 7/10 Tr. 69:6-19, 70:7-19, 77:20-24, 264:12-265:19. He and his team worked hard for USI through the finish line, working late into the night to wrap up a renewal the day before they left. 7/10 Tr. 215:15-16. USI may not like how its employees left their jobs, but their conduct was not malicious.

Finally, permitting USI to press for punitive damages against Mitchell and Simmons would be unfairly prejudicial because they had only a limited opportunity to put on evidence why they left USI, including how its extreme understaffing made it impossible for them to adequately service clients. That is the main reason they left USI in the way they did, and it is therefore crucial to rebutting USI's assertions they acted with malice. *See* Dkt. 228 at 8;7/8 Tr.

8

134:5-138:4; 7/10 Tr. 192:16-193:5. Allowing USI to argue its case for punitive damages without also allowing Simmons and Mitchell to put on the full battery of testimony explaining their actions would deprive Mitchell and Simmons of due process. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

## II.    The Court should enter judgment as a matter of law on USI's request for disgorgement.

This Court rebuffed USI's effort to inject disgorgement into this case once already. *See* Dkt. 178 at 17. In the joint pretrial statement, USI announced it would try again by seeking "disgorgement of all compensation, including salary, bonuses, and benefits, paid to Simmons and Mitchell by USI while they were working to benefit Lockton SE at USI's expense." Dkt. 185 at 28. This Court should reject USI's latest bid for disgorgement for two reasons.

*First*, disgorgement is categorically unavailable for USI's contract and tort claims against Simmons and Mitchell. "[U]nder Florida law, disgorgement of profits earned is not a remedy for breach of contract." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1245 (11th Cir. 2009). It's also not a remedy for tort claims that derive from contract breaches: When a plaintiff's tort claims, including for tortious interference, "all rely on the alleged breach of [a] Non-Compete," the plaintiff can recover only compensatory damages. *Crom, LLC v. Preload, LLC*, 380 F. Supp. 3d 1190, 1207 (N.D. Fla. 2019). That is true here because USI's fiduciary-duty claims depend on a breach of contract.

*Second*, even if disgorgement were available, there would still be nothing to disgorge.  The proper amount of disgorgement is "the defendant's ill-gotten profits or gains." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 698 (Fla. Dist. Ct. App. 2018).  Anything greater than "'the amount with interest by which the defendant profited from his wrongdoing'" is an improper "'penalty assessment.'" *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005).  USI asked for disgorgement in its counterclaim only from Lockton SE, Dkt. 3 ¶ 104, but Lockton SE didn't receive any money from USI; Simmons and Mitchell did.  Lockton SE can't pay to USI what it never had.

USI also didn't prove Simmons and Mitchell were unjustly enriched. USI seeks disgorgement of *all* money paid over some period late in their USI careers, evidently on the theory that Simmons and Mitchell were doing *nothing* to earn their keep at USI.  No reasonable jury could accept that theory. Simmons and Mitchell weren't paid a salary; their regular compensation consisted exclusively of commissions, a share of the revenue they brought to USI.  7/9 Tr. 67:6-14, 97:4-12.  They got paid only if they brought business to USI—and they did exactly that, generating more revenue every year.   7/9 Tr. 67:18-70:16; 7/11 Tr. 235:9-17.  So the only compensation Simmons and Mitchell received was necessarily for actions that were for the benefit of USI. USI got what it bargained for—its share of commissions.  USI's first witness, Tom Longhta, admitted as much.  7/9 Tr. 97:8-98:9; *see also, e.g.*, *Henderson v.*

*Skyview Sat. Networks, Inc.*, 474 F. Supp. 3d 893, 909-910 (W.D. Ky. 2020).

Nor is there any basis for clawing back the bonus USI paid Simmons for staying with USI for five years after it acquired Wells Fargo Insurance Services and for generating significant business after that.  Longhta and Simmons both made clear the bonus was fully vested by December 2022, before Simmons left USI, so it couldn't possibly be the sort of unjust enrichment that would support a remedy of disgorgement.  7/9 Tr. 45:1-20; 7/10 Tr. 69:6-14; *see also, e.g.*, *SEC v. E-Smart Techs., Inc.*, 139 F. Supp. 3d 170, 189 (D.D.C. 2015).

Simmons and Mitchell duly earned their compensation, and USI has identified no "ill-gotten profits or gains." *Duty Free World*, 253 So. 3d at 698. And it would make no difference even if it had, for no reasonable jury could award what USI requests—every dime paid to Simmons and Mitchell over some unspecified period, even fully vested bonuses for past work and salary for duties they indisputably performed (because they generated revenue for USI). *See, e.g.*, *United States v. Mesadieu*, 180 F. Supp. 3d 1113, 1117, 1122 (M.D. Fla. 2016) (forbidding that sort of blunderbuss approach to disgorgement).

## III.  The Court should enter judgment for Defendants on all claims because USI has not proved any damages.

Damages are an element of USI's claims, and USI agrees that to recover anything, it must prove those damages (in the form of lost profits) to a "reasonable certainty."  *See* Dkt. 185-3 at 61; *see also Proudfoot Consulting Co.*

*v. Gordon*, 576 F.3d 1223, 1242-1243 (11th Cir. 2009).  USI hasn't done so for two reasons.  *First*, it introduced zero evidence showing that clients would have stayed if Simmons and Mitchell had acted differently.  USI called only one client, Rick Tyson, formerly of PGT, and he confirmed PGT had no reason to stay with USI.  7/15 Tr. 198:20-203:23, 213:21-214:1.  Tyson testified he would have rather *sued* USI than hire it again.  7/15 Tr. 199:11-17.  As a result, USI's only evidence to support the idea that clients would have stayed is Longhta's assertion that USI generally retains 90% of revenue each year—a figure, he made clear, that applies to *all* USI revenue, not the revenue of producers who leave USI.  7/9 Tr. 131:1-25.  Longhta admitted USI doesn't track how much revenue—or how many clients—it keeps when a producer leaves.  7/9 Tr. 132:1-5.  USI took a gamble, hoping to prove its case without the testimony of the clients whose business it claims it would have kept.  But without that testimony, it has no evidence from which the jury could find the clients would have stayed.

*Second*, USI also has no evidence showing what profits it lost as a result of Simmons's and Mitchell's conduct.  Yes, USI called a damages expert, Robin Frost, but he admitted that he wasn't asked to (and didn't) supply a damages model; he instead created a *valuation* model.  7/15 Tr. 248:16-24.  He measured the value, as of January 2023, of USI's "lost accounts" in perpetuity, *not* the profits USI would have earned if Simmons and Mitchell had left USI in a

12

different way.  7/15 Tr. 252:24-253:9, 264:4-11.  He also admitted he didn't try to assess how much business USI would have retained because that analysis would have been "speculative."  7/15 Tr. 259:25-262:8.  Frost also gave the jury no way to patch the damages hole that remains in USI's case.  He provided one damages figure—and no way for the jury to award less by apportioning the supposed lost profits on a per-claim or -client basis.  *E.g.*, 7/15 Tr. 252:17-22.

When a plaintiff has not proved its entitlement to damages and has left the court with only one legally invalid damages figure, the court should enter judgment for the defendant.  *E.g.*, *SelectSun GmbH v. Porter, Inc.*, 928 F.3d 550, 553-56 (7th Cir. 2019); *N. Dade Cmty. Dev. Corp. v. Dinner's Place, Inc.*, 827 So. 2d 352, 353 (Fla. Dist. Ct. App. 2002).  The Court should do so here.

## IV. The Court should enter judgment as a matter of law on the tortious-interference claim against Lockton SE.

This Court held there was no evidence that Lockton SE wrongfully induced Simmons or Mitchell to leave USI or to bring any clients or employees with them.  *See* Dkt. 225 at 7.  After the Court's ruling on summary judgment, all that remained for the jury to decide was "whether the plan to have Simmons and Mitchell service their former USI clients originated with Simmons and Mitchell or with Lockton."  *Id.* at 9-10.  The Court suggested it might be appropriate for Lockton SE to move for judgment as a matter of law on this vestige of USI's claim.  *See id.* at 10.  The trial has proved that prediction right.

To prevail on a tortious-interference claim under Florida law, USI must prove, among other things, "the defendant's intentional procurement of the contract's breach." *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998); Dkt. 3 ¶ 83. But Simmons's or Mitchell's "predisposition" to breach the contract would preclude imposing liability on Lockton SE for tortious interference. *See, e.g.*, *Centennial Bank v. ServisFirst Bank*, 2022 WL 10219893, at *8 (M.D. Fla. Oct 10, 2022).

The Court should enter judgment on USI's tortious-interference claim for three reasons. *First*, it has the same problem as the theories this Court rejected before trial. USI offered no evidence that Lockton SE intended to induce or did induce Simmons or Mitchell to breach their contracts by servicing former USI clients. It's not clear *any* defendant was keen to service those clients before this Court ruled on USI's request for a TRO. Simmons worked briefly for a couple of clients in that short period, and only when they needed help. 7/10 Tr. 140:13-141:1. And Lockton, for its part, didn't want the clients to come over to begin with. *E.g.*, 7/10 Tr. 185:10-19; 7/11 Tr. 171:13-172:4.

*Second*, even if Lockton SE had induced Simmons or Mitchell to service their former clients, USI still would not have proved Lockton SE employed "improper methods." *Duty Free Am., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1280 (11th Cir. 2015). Routine, lawful competition can't support a judgment for tortious interference. *See Greenberg v. Mount Sinai Med. Ctr. of Greater*

14

*Miami, Inc.*, 629 So. 2d 252, 255 (Fla. Dist. Ct. App. 1993). Competition is essential to any market economy; "it is only direct and unjustified interference that is actionable." *Perez v. Rivero*, 534 So. 2d 914, 916 (Fla. Dist. Ct. App. 1988). Where tortious-interference "plaintiffs have failed to adequately allege improper methods, [the Eleventh Circuit] ha[s] followed the Florida courts and dismissed these claims." *Duty Free*, 797 F.3d at 1280-81 (collecting cases).

Florida courts have made clear that merely accepting a client that is moving on from an unsatisfactory vendor is not "unlawful or improper." *Perez*, 534 So.2d at 916. So does a recent decision in a case involving USI. There, USI alleged that another competitor, Alliant, had devised a "masterplan" to "poach[]" three "producers in order to steal those producers' clients from [USI]." *Aitkin v. USI Ins. Servs., LLC*, 607 F. Supp. 3d 1126, 1148 (D. Or. 2022). USI alleged its former producers' clients were being serviced by the producers' former USI colleagues, who had also moved to Alliant. *Id.* at 1138. The court entered summary judgment on USI's tortious-interference claim because USI had failed to "establish that Alliant used improper means or acted with an improper purpose in accepting and servicing [USI's] former clients who initiated contact with Alliant employees." *Id.* at 1149. The same is true here.

*Third*, USI's tortious-interference claim against Lockton SE has a causation problem: USI introduced no evidence to support the independent element of "damages resulting from the breach." *Johnson*, 162 F.3d at 1321.

15

USI didn't show how the servicing of clients that had already left USI could have caused any damages. Hardly any service happened to begin with. There is no evidence Mitchell serviced any former USI clients, and Simmons did only a small amount of work before the Court issued a TRO forbidding further work. USI can't demonstrate that work caused it any damages when the clients had already made the decision to move weeks earlier. 7/10 Tr. 220:20-221:16.

For that reason, USI might contend that the real injury came from work of *other* former USI employees on client accounts. But USI never pleaded any such claim, nor did it disclose that theory in the joint pretrial statement or its proposed instructions and verdict form. *See* Dkt. 3, 185, 185-3, 185-4. In any event, there is no evidence that the work of other former USI employees on former USI accounts caused USI to lose clients. None of those employees began working on former USI accounts for about two weeks, and then just a few days after that this Court forbade them from continuing that work. *E.g.*, 7/10 Tr. 220:17-222:19. Two employees, Chris Kakish and Theresa Kemp, worked on those accounts for a little longer, but testified that, if anything, the disruption following the Court's orders would have made those clients less likely to stay at Lockton SE, not more. 7/11 Tr. 62:15-64:4, 81:1-13; *see also* TX-160. That the clients remained at Lockton SE notwithstanding these difficulties underscores that they were not going to return to USI no matter what.

Then, too, if there had been any damage from the departure of clients, it

would already have been done by the time Simmons serviced those clients at Lockton SE.  Allowing USI to submit a service-centric claim to the jury along with a damages model would confuse the jury into awarding duplicative damages.  *See St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1203 (11th Cir. 2009) ("Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed.").

In short, no reasonable jury could accept USI's tortious-interference theory, which would hold Lockton SE liable for actions that it did not induce, that were not improper, and that caused USI no damages.

## V.  USI has not proved that Lockton SE substantially assisted or encouraged any alleged breach of fiduciary duty.

The elements of aiding and abetting a breach of fiduciary duty are: "(1) a fiduciary duty on the part of a primary wrongdoer; (2) a breach of that fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing." *Fonseca v. Taverna Imports, Inc.*, 212 So. 3d 431, 442 (Fla. Dist. Ct. App. 2017).  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Aquent LLC v. Stapleton*, 65 F. Supp. 3d 1339, 1350 (M.D. Fla. 2014).  But "[m]ere inaction 'constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.'" *Chang v. JPMorgan*

*Chase Bank, N.A.*, 845 F.3d 1087, 1098 (11th Cir. 2017).

USI has not proved that Lockton SE substantially assisted or encouraged anything USI might characterize as a breach of fiduciary duty.  The absence of any evidence of affirmative assistance or encouragement of a breach is fatal to USI's aiding-and-abetting claim.  *See, e.g.*, *Anderson v. Talentsy, Inc.*, 599 F. Supp. 3d 1207, 1215 (M.D. Fla. 2022) (no evidence that the defendant was directly involved in diverting corporate opportunities); *Bruhl v. Price Waterhousecoopers Int'l*, 2007 WL 983263, at *10 (S.D. Fla. Mar. 27, 2007) (nothing showing the defendant "substantially assisted" the other defendants in their fraudulent scheme).  Here, too, USI has introduced no evidence that Lockton SE substantially assisted or encouraged Simmons's or Mitchell's alleged breaches of fiduciary duty while the producers were still employed at USI.  Lockton advised Simmons and Mitchell *not* to bring clients and *not* to take confidential information.  *E.g.*, 7/11 Tr. 171:13-172:4; 7/10 Tr. 185:10-19; 7/15 Tr. 152:21-153:7.  It reluctantly agreed to accept clients if they came, 7/10 Tr. 159:21-160:1, 259:10-22, which it was free to do.  Competition isn't a tort. Given the complete lack of evidence supporting USI's claim, no reasonable jury could find Lockton SE liable for aiding and abetting.

## VI.   USI has not proved that Simmons or Mitchell directly competed with USI in breach of any fiduciary duty.

USI's fiduciary-duty claim requires it to prove: (1) Simmons and Mitchell

owed USI a fiduciary duty; (2) they breached it; and (3) USI's damages were proximately caused by that breach. *See Med. & Chiropractic Clinic, Inc. v. Oppenheim*, 981 F.3d 983, 989 (11th Cir. 2020). As this Court has noted, "[t]he independent tort doctrine precludes a party from using a purely contractual duty to manufacture a duty in tort that would not otherwise exist." Dkt. 179 at 8. So USI must prove that Simmons's and Mitchell's conduct "breache[d] an independently-existing [fiduciary] duty." *Id.*; *see also Tulepan v. Roberts*, 2015 WL 235441, at *13 (S.D. Fla. Jan. 16, 2015) (granting summary judgment because fiduciary-duty claim arose out of parties' contract); *Peebles v. Puig*, 223 So.3d 1065, 1068-69 (Fla. Dist. Ct. App. 2017). What USI can't do is rehash evidence of indirect solicitation and expect that to result in tort liability.

This Court has recognized that Simmons's and Mitchell's "contractual duties . . . are significantly broader than the fiduciary duties imposed by Florida law." Dkt. 226 at 9. Simmons's and Mitchell's fiduciary duties, if any, are narrower in two ways—in length and the type of conduct they forbid. While the contractual restrictive covenants extend for two years beyond Simmons's and Mitchell's employment with USI, any fiduciary duties were extinguished once they left USI. *See, e.g.*, *New World Fashions, Inc. v. Lieberman*, 429 So. 2d 1276, 1277 (Fla. Dist. Ct. App. 1983) (fiduciary duty does not "preclude an agent from competing with his principal after the termination of their relationship"); *Armor Corr. Health Servs., Inc. v. Teal*, 2021 WL 5834245, at

*23 (S.D. Fla. Dec. 8, 2021) (fiduciary-duty claim "fail[ed] as a matter of law" because plaintiff's allegations related to conduct after employee resigned).

USI's restrictive covenants are also broader, this Court concluded, in that they forbid "even 'indirect' solicitation" in the form of notifying clients. Dkt. 226 at 6. By contrast, Florida law on fiduciary obligations provides that, even before the end of employment, "the agent is entitled to make arrangements to compete" and "has no duty to disclose such plans." *New World*, 429 So. 2d at 1277. That's why the District Court of Appeal affirmed a trial court's judgment in favor of employees who had set up a competing business and notified customers while still employed by the plaintiff. *Fish v. Adams*, 401 So. 2d 843, 845 (Fla. Dist. Ct. App. 1981). The court explained that "the planning of a competing business is not ipso facto a breach of an employee's duty of loyalty"—"[n]or is notification to customers." *Id.*

Recognizing that it must meet a higher bar for its fiduciary-duty claims, USI set out to prove that Simmons and Mitchell, "while still employed by USI, sought to compete with and to divert USI's employees and clients away from USI to themselves, and to Lockton." Dkt. 3 at 25. USI has also said its fiduciary-duty claims rest on a theory of "'planned and coordinated sabotage in violation of [their] fiduciary duties.'" Dkt. 226 at 9.

At trial, USI did not prove that theory to be true. The evidence shows that Simmons and Mitchell worked hard through the end of their time at USI,

generating ever-higher revenues for the company.  7/9 Tr. 67:18-70:16; 7/11 Tr. 235:9-17.  In many cases, that revenue came not long before they left, and USI kept all of it.  *E.g.*, 7/10 Tr. 69:6-19, 70:6-19, 108:19-25, 113:7-12, 215:15-16, 218:24-219:17.  Nor is there evidence that Simmons and Mitchell took any confidential information with them or left USI inadequate information to retain the clients.  To the contrary, Simmons and Mitchell worked with forensic specialists to ensure they had returned all USI information.  TX-27, TX-40. Simmons not only left all the information behind, but carefully organized it so that USI could find whatever it needed.  7/10 Tr. 264:2-265:19.

All USI has demonstrated is that Simmons notified some clients and fellow USI employees he was leaving (and that Mitchell told two clients).  That was enough, in the Court's view, to establish indirect solicitation for purposes of USI's breach-of-contract claims. Dkt. 226 at 7.  But it can't also establish a breach sounding in tort.  *See, e.g.*, *Certain Underwriters at Lloyd's of London v. Ocean Walk Resort Condo. Ass'n, Inc.*, 2017 WL 3034069, at *11 (M.D. Fla. July 18, 2017).  Nor can the producers' discussions with their fellow employees regarding working conditions at USI be a basis for liability; those communications are protected under the National Labor Relations Act.  *See* Memo. re Non-Compete Agreements that Violate the NLRA, NLRB Off. of Gen. Counsel (May 30, 2023), at 3-5, http://tinyurl.com/ynmhxh9v.  USI's evidence shows Simmons and Mitchell just wanted to leave USI behind, not sabotage it.

## VII.   The Court should enter judgment on USI's contract claims.

This Court decided Simmons and Mitchell breached certain contractual obligations to USI.  Specifically, it concluded they didn't give 60 days' notice before leaving (Dkt. 226 at 5) and indirectly solicited clients (*id.* at 7), and that Simmons indirectly solicited three employees (*id.* at 8).  The Court left to the jury to decide whether he solicited three others, "whether any damage resulted from the breaches and, if so, the amount of any such damages."  *Id.* at 11.

"For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach."  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009).  On the third element, the plaintiff "'must show with reasonable certainty that the plaintiff suffered damages and that the damages flowed as the natural and proximate result of defendant's . . . conduct.'"  *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1222 (11th Cir. 2018).

A plaintiff's failure to prove a contractual breach was the proximate cause of damages will defeat his breach-of-contract action.  For example, in a breach-of-contract case brought by an employer against its former employee, the Eleventh Circuit reversed a damages award "because there was no showing that [the former employee's] breach caused the claimed damage."  *Proudfoot*, 576 F.3d at 1241.  Although the former employee breached his restrictive

22

covenant against soliciting clients, the Eleventh Circuit nonetheless held that the district court erred in awarding damages "because the district court never found that absent [the employee's] breach, [the employer] would have obtained the . . . project" it claimed to have lost. *Id.* at 1243. The mere fact that the new employer profited from that breach was also not enough to establish causation; "[d]amages for breach of a non-compete are intended to make the prior employer whole, not to punish employees." *Id.* Here, too, USI has not proved that any breach by Simmons or Mitchell caused its purported damages.

### A.     60 days' notice

USI didn't prove that anything would have been different if Simmons and Mitchell had provided 60 days' notice before leaving USI. To the contrary, the evidence shows USI did not lose any revenue from existing clients due to Simmons's or Mitchell's decision not to provide notice. USI received payments from those clients up front before Simmons and Mitchell left. *E.g.*, 7/10 Tr. 218:24-219:17, 257:21-258:22. When a client buys insurance, the insurance broker collects all the revenue when the policies are bound, even if the client immediately moves to another broker. *Id.* Here, several major clients renewed their policies just before leaving USI; as a result, USI kept every dime from the renewals but was relieved of the costs of servicing those clients. *Id.* Because Simmons had no clients renewing in February, 7/10 Tr. 69:6-18, 70:6-19, and because the clients who moved to Lockton would have left no matter what,

there was no further opportunity for USI to collect additional revenue. If anything, USI actually came out ahead, booking renewal revenue and avoiding significant service costs. Lockton, by contrast, ended up working for free. 7/10 Tr. 237:9-24; 7/11 Tr. 232:12-233:1.

**B.    Soliciting clients**

USI has provided no evidence that clients left USI because Simmons or Mitchell informed them of their impending departure—something those clients would have found out either way. Tyson, the only former client whom USI called to testify, confirmed that PGT would have left USI no matter what. 7/15 Tr. 198:20-203:23, 213:21-214:1. USI has thus offered nothing to show its clients would have stayed. What drove these clients to leave was their enduring personal and business relationships with Simmons and Mitchell, not any phone calls made before the producers moved to Lockton.

The structure of payments also again proves the absence of causation and damages. USI, as the incumbent broker, kept all renewal revenue from clients. 7/10 Tr. 218:24-219:17, 257:21-258:22. When clients moved to Lockton, the revenue did not move with them; Lockton will be paid only if the clients renew with Lockton as their broker of record. 7/11 Tr. 232:23-233:1. USI's damages model rests on the idea that USI had a right to keep those clients for years to come. But USI does not own its clients, clients have no contractual obligation to stick around, and USI presented no evidence

24

suggesting that any clients would have remained with USI of their own accord.

## C.    Soliciting employees

USI also has not proved that Simmons's communications with the other employees harmed USI, and for two reasons.  *First*, the evidence shows that those employees, who were indisputably free to resign at any time and for any reason, would have left USI regardless.  The only employees who testified during USI's case said that they had their own reasons for leaving USI and that they were not lured away by Simmons or Mitchell.  7/10 Tr. 208:15-25, 213:13-214:11 (Murray), 7/11 Tr. 90:13-25 (Kakish), 152:9-153:154:25 (Kemp). USI didn't bother calling the others—a failure of proof it can't correct now.

*Second*, USI has not shown how the alleged solicitation of those employees caused USI any of its claimed financial losses.  Frost admitted his lost-profits damages model is premised entirely on the loss of clients—not the employees.  7/15 Tr. 251:25-252:12. This Court properly struck USI's other damages model, which purported to capture the value of a lost standalone business. *See* Dkt. 178.  The employees' departure could have caused damages only if the employees left because Simmons solicited them *and* that solicitation caused the clients to leave.  But USI has proved nothing of the sort.

## CONCLUSION

The Court should enter judgment for Defendants on all claims.  At a minimum, it should not instruct the jury on punitive damages or disgorgement.

Dated: July 16, 2024                Respectfully submitted,

/s/ Lyle Shapiro
Lyle Shapiro (Fla. Bar No. 120324)
HERSKOWITZ SHAPIRO, PLLC
9130 S. Dadeland Boulevard
Suite 1609, Miami, FL 33156
lyle@hslawfl.com

Nicola Gelormino (Fla. Bar No. 91432)
GELORMINO LAW, P.A.
9130 S. Dadeland Blvd., Ste. 1609
Miami, FL 33156
nicola@gelorminolawpa.com

Christopher J. Banks (admitted pro hac vice)
Molly A. Jones (admitted pro hac vice)
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor, San
Francisco, CA 94111
cbanks@crowell.com
mojones@crowell.com

Lauren Goldman (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York NY 10166
lgoldman@gibsondunn.com

Daniel R. Adler (admitted pro hac vice)
GIBSON DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 900071
DAdler@gibsondunn.com

Attorneys for Defendants Southeast
Series of Lockton
Companies, LLC, Matthew Simmons,
and Jack Mitchell

26

## **LOCAL RULE 3.01(g) CERTIFICATION**

Defendants hereby certify that their counsel has conferred with the opposing party regarding the relief sought via email and, at the time of this filing, USI's counsel has advised that they oppose the requested relief.

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of via transmission of Notice of Electronic Filing generated by CM/ECF.

s/ Lyle E. Shapiro
