UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:23-cv-00201-TPB-AAS

MATTHEW SIMMONS, SHEILA MURRAY,
JACK MITCHELL, JACKIE RODRIGUEZ,
MADISON LIEFFORT, AND EMILY CARTER,

     Plaintiffs,

vs.

USI INSURANCE SERVICES, LLC, a foreign
limited liability company and USI ADVANTAGE
CORP., a foreign corporation,

     Defendants.

_____/

USI INSURANCE SERVICES LLC,

     Counter-Plaintiff,

vs.

MATTHEW SIMMONS, JACK MITCHELL
and SOUTHEAST SERIES OF LOCKTON
COMPANIES, LLC.,

Counter-Defendants.

_____/

### USI INSURANCE SERVICES, LLC'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

     USI hereby submits its Response in Opposition to Defendants' Motion for Judgment as a Matter of Law ("Motion") (Doc. 271).

## **LEGAL STANDARD**

The standard for judgment as a matter of law under Rule 50 mirrors the standard for summary judgment under Rule 56. *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133 (2000). "Thus, the court must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence." *Id.* "The latter functions, along with the drawing of legitimate inferences from the facts, are for the jury, not the court." *Id.* Accordingly, while the court should review the record as a whole, "it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*

## **I.     The Trial Evidence Proves Entitlement To Punitive Damages**

The evidence presented at trial supports USI's claim for punitive damages, which should be adjudicated by the jury. Punitive damages are appropriate when a defendant engages in conduct that is malicious or committed with such recklessness as to indicate a wanton disregard for the rights of others. *See Owens-Corning Fiberglas Corp. v. Ballard,* 749 So. 2d 483, 486 (Fla. 1999); *see also ABC-Paramount Records, Inc. v. Topps Record Distrib. Co*., 374 F.2d 455, 462-63 (5th Cir. 1967) ("'[M]alice' does not necessarily mean 'anger or a malevolent or vindictive feeling toward the plaintiff'. . but can be inferred from 'entire want of care of attention to duty, or great indifference to the persons, property or rights of others."). The evidence in this case demonstrate that Defendants' action constituted, at the very least, intentional misconduct, recklessness, and/or gross

negligence sufficient to support a finding of punitive damages. *See Reese v. Fla. BC Holdings, LLC*, 2020 WL 10486252, at *6 (M.D. Fla. Jan. 16, 2020) ("Intentional misconduct is demonstrated when Synergy had actual knowledge of the wrongfulness of its conduct and there was a high probability of injury or damage to Mr. Reese and, despite that  knowledge, it intentionally pursued that course of conduct, resulting in injury or damage.").

Further, punitive damages are generally available for intentional torts, such as tortious interference. *See, e.g. DME Holdings, LLC v. Print Source One*, 2008 WL 11435768, at *1 (M.D. Fla. May 7, 2008) (finding claims for punitive damages and injunctive relief were properly raised pursuant to sufficiently pled claim for tortious interference and unfair competition); *Slip-N-Slide Records, Inc. v. TVT Records, LLC,* 2007 WL 3232274, at *17 (S.D. Fla. 2007) (affirming jury's award of punitive damages for conduct "based in part on malice as well as intentional or reckless conduct"); *ABC-Paramount Records, Inc. v. Topps Record Distrib. Co.*, 374 F.2d 455, 462-63 (5th Cir. 1967) (reversing trial court and finding that, in light of evidence to support a finding of malice or reckless disregard for plaintiff's rights in connection with tortious interference claim, issue of punitive damages should have been submitted to the jury).

Punitive damages are likewise available for breaches of fiduciary duty, even where no compensatory damages are awarded.  *See Laney v. Am. Equity Inv. Life Ins. Co.,* 243 F. Supp. 2d 1347, 1354 (M.D. Fla. 2003) ("Florida courts have held, however, that finding a breach of fiduciary duty will support an award of punitive

damages, even if no compensatory damages are awarded); *see also Ault v. Lohr*, 538 So. 2d 454, 454–55 (Fla. 1989) (addressing 11th Circuit certified question of "In Florida, must a compensatory damages award underlie a punitive damages award in a case in which the jury has made express findings against a defendant?, and holding "We answer the question in the negative, concluding that a jury finding of liability is the equivalent of finding nominal damages and, consequently, the jury may assess punitive damages.").

For example, the court in *Bailey v. St. Louis*, 196 So. 3d 375, 381 (Fla. 2d DCA 2016) addressed tortious interference and fiduciary duty claims analogous to those at issue here. In *Bailey*, a defendant incentivized plaintiff's employees to leave, took plaintiff's client list, and urged potential new employees not to work for the plaintiff. The *Bailey* court reversed the trial court's denial of damages for claims of breach of fiduciary and tortious interference, holding "the factual findings made by the trial court support an award of punitive damages." *Id.* at 379. In ruling, the court explained that defendant's "behavior transcends the level of simple negligence, and even gross negligence, and enters the realm of wanton intentionality, exaggerated recklessness, or such an extreme degree of negligence as to parallel and intentional and reprehensible act." *Bailey*, 196 So. 3d at 381-82.

Here, Defendants' actions are akin to the actions of the defendants in *Bailey*, warranting punitive damages, including because evidence at trial has established that: (1) Simmons and Mitchell, while still employed at USI, acted as double-agents to recruit employees and clients to leave USI and join Lockton upon their USI

departures; (2) for good measure, Simmons expensed his travels to USI, despite using those client visits for the purpose of soliciting the clients to Lockton; (3) Lockton knew that Simmons and Mitchell were soliciting their clients to join Lockton while they remained USI employees, and instructed Simmons and Mitchell on who at Lockton they should direct their accounts to contact; (4) in its financial modeling used to compensate Simmons with millions of dollars, Lockton knew that more than $4 million in business would leave USI for Lockton in Simmons' first year with Lockton, with Lockton's financial prediction (developed prior to Simmons' departure from USI) being nearly identical to USI's lost business in the weeks following the mass departure; (5) Lockton has done this before— including in its recruitment of Mr. Fred Zutel and other employees from another competitor, the litigation and resolution of which was shared with Mr. Simmons; and (6) knowing of their restrictions, Lockton nevertheless assigned the Producers and Simmons Team to the Lost Accounts as Lockton employees in, at the very least, indirect violation of the Producers' Agreements, to ensure the business.

Indeed, because claims for tortious interference and breach of fiduciary duty, like those here, are themselves in the nature of intentional, malicious acts, some courts have found punitive damages warranted on a finding of liability alone. *See, e.g. Laney v. Am. Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1354 (M.D. Fla. 2003) ("finding a breach of fiduciary duty will support an award of punitive damages, even if no compensatory damages are awarded."); *accord Ault v. Lohr*, 538 So. 2d 454, 456 (Fla. 1989) (in civil rights case, Florida Supreme Court holding

5

that "an express finding of a breach of duty should be the critical factor in an award of punitive damages. Accordingly, we hold that a finding of liability alone will support an award of punitive damages even in the absence of financial loss for which compensatory damages would be appropriate.").

Defendants' acts are the type of "malicious" and "wanton" acts that warrant entitlement to punitive damages. *See ABC-Paramount Records, Inc. v. Topps Record Distrib. Co.*, 374 F.2d 455, 462-63 (5th Cir. 1967) ("Malice does not necessarily mean anger or a malevolent or vindictive feeling toward the plaintiff . . . but can be inferred from 'entire want of care of attention to duty, or great indifference to the persons, property or rights of others."). Producers felt that they could get away with breaching their agreements, and Lockton felt it could get away with inducing and assisting the breaches, in complete disregard of the rights of USI. Accordingly, the issue should be left to the jury. *See id.* ("[W]e do not think that the evidence excludes the possibility that ABC wanted Velvit for itself and felt that it could get away with inducing Velvit to break an otherwise binding agreement, in complete disregard of the rights of Curran, Elias, and Topps. This issue should have been left to the jury.").

There is myriad evidence from the trial record establishing USI's entitlement to punitive damages. For instance:

- It is virtually undisputed that Lockton knew of each of the agreements and restrictions at issue, the two-years "hands-off" agreements, which are commonly used in this industry, including by Lockton.

- Mr. Sharma testified and record evidence demonstrates that, to procure producers like Mr. Simmons and Mr. Mitchell and their teams, it is expensive. Lockton was required to seek a loan from its parent company. To obtain it, Lockton had to provide financial support for analysis by Lockton's parent (which described Project Buccaneer a "Big Deal").  Those models were based, at least in part, on revenues from immediate movement of clients from USI to be serviced by in violation of the Hands-Off Agreements.

- Lockton forecasted $4.3 million in year one revenue with information from the Producers and applying Lockton's experience, which included USI business to be accepted by Lockton on behalf of the Producers. This is almost exactly the amount of revenue that moved from USI to Lockton. Further, Mr. Sharma testified that the procurement of the loan required such anticipated revenue in the first year to make the loan feasible.

- Mr. Sharma also testified of the value of recruiting other service talent and the benefit to Lockton when a Producer brings over a service team.  Both Mr. Sharma and Mr. Shelat discussed that the projections also anticipated employee cost and bonuses, which likewise had to be supported by the first year revenues inclusive of USI clients.

- Mr. Simmons and Mr. Sharma testified regarding the strategy to accept the Lost Accounts on the Producers' behalf (by the Producers directing the Lost Accounts to contact Mr. Sharma or Ms. Mandato). This was to provide the argument that those clients moved without Producers' involvement (through the Producers directed them to Mr. Sharma) and provide further protection to the Producers (knowing that Lockton would later indemnify them).

- Mr. Zutel testified that he told Mr. Simmons that he was sued and that Lockton took care of it quickly, paying all costs. The jury can infer that this reassured Mr. Simmons that Lockton would shield him from any liability or consequence.

- Mr. Sharma and Ms. Mandato testified that they accepted the business and told the Lost Accounts that they would be able to work with the Producers and/or Simmons Team at Lockton. This was important to clients as each one confirmed.

- Mr. Sharma testified that Lockton assigned the Producers and Simmons' team in a way that mirrored their assignments at USI. Mr.

Morneau testified that this was done with Ms. Rodriguez and Ms. Murray who knew the clients histories and preferences. Ms. Murray testified she became comfortable servicing the Lost Accounts with Lockton's reassurance.

- Information was missing from USI relating to clients. Information assisting clients to move and that would be helpful in servicing the accounts had been sent to the clients by Simmons Team Members after they knew they were going to join Lockton and had met with Lockton's lawyers. The clients forwarded that data to Lockton.

- The evidence supports that Producers were reassured by Lockton's track record, plan, willingness to accept business through Mr. Sharma and Ms. Mandato, payment of attorneys' fees, filing of a lawsuit to attack the agreements, counseling, and indemnification.

This case is therefore unlike the authorities relied on Defendants' motion.

*See, e.g. Phoenix Mgmt. Servs., Inc. v. Waterchase Homeowners' Ass'n, Inc.,* 384 So. 3d 206, 207 (Fla. Dist. Ct. App. 2024) (rejecting complaint amendment because allegations did not rise to the level of punitive damages whereas, here, the Court has already determined USI asserted facts sufficient to meet the pleading requirements for punitive damages (Doc. 227 at 3), and those facts were proven at trial); *Imperial Majesty Cruise Line, LLC v. Weitnauer Duty Free, Inc.,* 987 So. 2d 706 (Fla. Dist. Ct. App. 2008) (Imperial sought to preclude competition in the sale of duty-free goods by preventing its passengers from shopping at another duty-free shop at Port Everglades because it reduced sales at the on-board shop. The court reversed the award of punitive damages, finding that these actions did not rise to the degree of reprehensibility required for a punitive damages award, whereas here the facts show industry-wide disruption and not ordinary competition); *Air Ambulance Professionals, Inc. v. Thin Air,* 809 So. 2d 28 (Fla. Dist. Ct. App. 2002)

(plaintiff failed to put on evidence supporting its theory for punitive damages recovery, which was limited to proving that Defendant intended to put the Plaintiff out of business, yet nevertheless noting "**we remain hesitant to have trial courts routinely remove the question from the jury's consideration . . . .**") (emphasis added); *G.M. Brod & Co. v. U.S. Home Corp.,* 759 F.2d 1526 (11th Cir. 1985) (Defendants were investors in the lodge at issue; acts were in furtherance of protecting their investment in the property).

Finally, as testified by Mr. Zutel, this is not Lockton's first time engaging in such conduct. This is precisely the type of repeated, bad conduct punitive damages are designed to address. *See, e.g., Owens-Corning*, 749 So. 2d at 487 ("Under Florida law, the purpose of punitive damages is not to further compensate the plaintiff, but to punish the defendant for its wrongful conduct and to deter similar misconduct by it and other actors in the future.").

## II.    Disgorgement is a Proper Remedy.

"Disgorgement is an appropriate remedy for an employee's breach of fiduciary duty." *SJ Medconnect, Inc. v. Boice*, 3:20-CV-903-MMH-JBT, 2022 WL 3136798, at \*5 (M.D. Fla. June 17, 2022), report and recommendation adopted as modified, 3:20-CV-903-MMH-JBT, 2022 WL 2981073 (M.D. Fla. July 28, 2022). As set forth in Defendants own motion (and as testified to by Mr. Longhta), the bonus paid to Mr. Simmons was for staying with USI for five years after it acquired Wells Fargo Insurance Services, and was therefore not fully vested until those five years elapsed. 7/8 Tr. 44:23-45:45. This was not before Mr. Simmons began his

disloyal acts to USI, which, according to his own testimony, began in November and December of 2022.

Furthermore, causation may be presumed to support disgorgement in cases involving breach of fiduciary duties and tortious interference. Bailey, 196 So. 3d at 378. In such cases, client by client review is not required and the burden of proving a break in the causal connection rest on the defendants.  *Id.*

### III.    Causation and Damages

Two questions settle causation and damages. The first, which settles causation, is whether, as a result of Producers' breaches, it is more likely than not that the Lost Accounts ended their relationships with USI *sooner* than they otherwise would have. The second, which settles damages, is for what period of time was USI reasonably certain to maintain its respective relationships with the Lost Accounts absent Producers' breaches.[1] These matters are for the jury to decide. As to causation, and at the very minimum, absent Producers' breach of the Notice Provision, the Lost Accounts would have had nowhere to follow Producers *to* on January 25, 2023. The breach of that provision therefore caused USI to lose the business earlier than it otherwise would have absent compliance with the Notice Provision, thus proving causation. Beyond the Notice Provision, however, the evidence at trial established that Simmons and Mitchell primed the Lost Accounts to move while still the Producers were still employed, and then solicited

---

[1]    Of course, USI has presented ample evidence establishing "stickiness." That is, given 60-day notice and a two-year hands off period, USI would retain its business consistent with its 90% retention rate.

that business, either directly or indirectly through others at Lockton, in violation of the Agreements' restrictive covenants, which caused the immediate issuance of more than twenty client BORs. These facts are more than sufficient to allow a reasonable jury to find causation. *Nebula Glass Intern., Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1215 (11th Cir. 2006) (causation and damages were established with reasonable certainty with evidence of expected profits absent breach). As *Nebula* holds, proving lost profits "includes some element of prediction about how the market would have behaved but for the defendant's tortious act or breach;" the law of the Eleventh Circuit thus permits a jury to rely on direct and circumstantial evidence to find causation and damages. *Id.*

As to the second question, Defendants' assert USI's damages are speculative while at the same time attempting to force USI into proving damages with reasonable certainty in a hypothetical world where Producers' didn't breach. But "[t]he wrongdoer may not complain of inexactness where his actions preclude precise computation of the extent of the injury." *Bangor Punta Operations v. Universal Marine Company, LTD*, 543 F.2d 1107, 1110 (5th Cir. 1976).[1] Indeed, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.. . . the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more

---

[1]        Fifth Circuit case law is binding on the Eleventh Circuit for decisions handed down by the Fifth Circuit prior to October 1, 1981. Bonner v. Pritchard, 661 F. 2d 1206 (11th Cir. 1981).

accurate data which the wrongdoer's misconduct has rendered unavailable."
*Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

Moreover, the law of the Eleventh Circuit makes clear that USI is not forced, as Defendants suggest, to establish its damages on a client-by-client basis. *See WL All. LLC v. Precision Testing Group Inc.,* 22-10780, 2022 WL 17830257, at *2 (11th Cir. Dec. 21, 2022) (reaffirming *Nebula* and finding that "defendants' argument that an at-will contract cannot support future damages because it is not an enforceable guarantee of future business overstates the rule in Florida."). Further, the *Precision* Court wrote:

> For instance, in *Nebula Glass*, we upheld an award of future damages where it was established that recent profits were on an upward trajectory and that customers were changing their behavior based on the defendant's breach**.** We specifically noted, "[The plaintiff's] lost profit claim did not depend on any obligation by its customers, but rather on the common-sense notion that a large group of sophisticated commercial purchasers would not, without cause, collectively reject a product they had been using." The rule is thus dependent on the actual facts and circumstances in each case and determined by the evidence presented during the trial."

*Id.* USI has presented myriad evidence of its 90% retention rate. This is supported by the testimony of Mr. Longhta, as well as Ms. Carson, who testified regarding this retention rate (including in the context of the departures of non-breaching Producers Cardew and Goding). This is the retention rate built into the model presented by Mr. Frost, and thus provides the reasonable yardstick necessary to appropriately establish its damages. *Nebula*, 454 F. 3d at 1217 ("[U]ncertainty as

to the precise amount of the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages.").

Defendants' reliance on *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1245 (11th Cir. 2009) is misplaced. There, the court found a lack of causation and lost profit damages because Plaintiff failed to establish that it would have won a bid to work on a new client project that it never even attempted to obtain. *Id.* The evidence in *Proudfoot* established only that Bombardier, which was a pre-existing client of the breaching employee's former employer and new employer, worked with Bombardier on a new project following his departure from the old employer. *Id.* The old employer failed to put on any evidence "indicating that it had made a proposal in connection with the Bombardier Logistics project and offered no evidence that it had any, even embryonic, plans for proposing a similar project to Bombardier. Nor was there any testimony that Proudfoot would have eventually pitched this project to Bombardier." *Id.* at 12442-45. Unlike the plaintiff in *Proudfoot*, USI was the incumbent broker for each of the Lost Accounts in a relationship-based business—as opposed to the project-based business in *Proudfoot*, and put on ample evidence demonstrating the efforts USI made to retain the Lost Accounts following the Simmons' Team mass exodus with no notice.

*Proudfoot* also distinguishes itself from other employment-related cases where causation was shown under facts more similar to what USI has established

in this case. For example, in distinguishing one Florida state court case, *Proudfoot* explained:

> In *First Miami,* 758 So.2d 1229, the defendant employee had used confidential information to solicit customers from his former employer, resulting in some of the accounts being transferred to his new employer. The trial court had concluded, based on various records regarding the transferred accounts, that "damages can be readily calculated from the commissions derived by Defendant at his new place of employment." *Id.* at 1230. **While *First Miami* never explicitly discusses causation, the decision clearly implies that but for the defendant's solicitation, the transferred accounts would have stayed at the former employer. Under such circumstances, it may be reasonable to assume that, absent the defendant's solicitation, those accounts would have generated the same amount of commissions if they had remained with the former employer**."

*Id.* (emphasis added). The facts established at trial show that USI is more like the plaintiffs in *Nebula* and *First Miami. See, e.g. Nebula*, 454 F. 3d at 1217 ("In addition to the direct evidence on causation, Glasslam introduced circumstantial evidence too. From its inception in 1998 through 2000, Safety Plus 1 revenue grew at an annual rate of 27.5 percent per year, but beginning in 2001—at precisely the same time Warwick and Prieto stopped buying Safety Plus 1 because of glass failure—Glasslam's sales of Safety Plus 1 decreased. All of the evidence, taken in the light most favorable to Glasslam, allowed the jury to find with reasonable certainty that Reichhold's defective resin caused Glasslam's Safety Plus 1 revenue and profits to decline."). Indeed, USI did not lose out on a client bid process in which it never even participated; instead, USI was the broker of record for millions of dollars in business, much of which was stripped away in a matter of days through Defendants' organized scheme.

## IV.    Tortious Interference

"A third party intentionally interferes with a contract by influencing, inducing, or coercing one of the parties to the contract to breach the contract." *Westgate*, 387 F. Supp. 3d at 1349; *see also Lake v. Aetna Life Ins. Co.*, 2021 WL 2649234, at *6 (M.D. Fla. June 28, 2021) ("To maintain an action for . . . a plaintiff must establish that a separate entity, third-party or stranger interfered with the contract by influencing, inducing or coercing one of the parties to break the contract."); *Marlite, Inc. v. Eckenrod,* No. 09-22607-CIV, 2011 WL 39130, at *10 (S.D. Fla. Jan. 5, 2011) (evidence to support tortious interference existed where new employer failed to direct employee to refrain from contacting customers).

Mr. Sharma testified that Lockton assigned the Producers and the Simmons' Team in a way that mirrored their assignments at USI. 7/15 Tr. 148:6-8.bon This was Lockton's decision, not the Producers'. The Producers serviced the accounts (in direct violation of their agreements), and the Simmons' team serviced the accounts (in *indirect* violation of the Producers' agreements), and, absent the injunction order, Lockton intended that such service would continue.

Finally, for the reasons set forth above regarding causation and damages, there is evidence in the record to support both elements in support of USI's interference claim.

## V.    Aiding and Abetting Breach of Fiduciary Duty

Lockton substantially assisted the Producers with breaching their fiduciary duties to USI (by, among other things, soliciting USI's clients while still employed).

15

Further, Lockton knew that Mr. Simmons was intent on the acceptance of the Lost Accounts and, Mr. Shelat testified that, as of December 2022, Lockton had agreed to do so. Mr. Simmons also testified that he would not have taken his course of action (e.g. breached his fiduciary duties) without such protection and support. Lockton agreed to fully protect the Producers' from any consequences of their pre-resignation breaches with full knowledge, thereby affirmatively assisting them in their conduct. *See, e.g., Aileron Inv. Mgmt., LLC v. Am. Lending Ctr., LLC,* No. 8:21-CV-146-MSS-AAS, 2021 WL 7448243 (M.D. Fla. July 12, 2021) ("Aileron also pleads that American Lending helped the Former Aileron Representatives misappropriate Aileron's loan premiums "by executing the [a]ssignments" that transferred the premiums to American Lending and then to Silver Hawk. The allegations are sufficient to plead that Defendant "enabl[ed] the breach[es] to occur" by assisting the Former Aileron Representatives in carrying out the schemes described in the Complaint."). Ultimately, Lockton's alleged instructions not to solicit clients were nothing more than lip service intended to create a record to support the purported defense it knew it would (given its track record), and now does, present.

Furthermore, the cases cited by Defendants are inapposite here. For instance, in *Anderson v. Talentsy, Inc.*, 599 F. Supp. 3d 1207, 1215 (M.D. Fla. 2022) the court found that the evidence of implications, legal conclusions, or allegations that the alleged aider and abettor "should have known" of any breach were not enough to state a claim. This case has no bearing on USI. The facts at trial

have shown that Lockton had direct involvement in paying for counsel and provided substantial assistance to the Producers. For instance, Lockton knew that Simmons was  he was leaving USI and "instructed Simmons and Mitchell to relay any inquiries from their former clients to someone else at Lockton."

Similarly, in *Bruhl v. Price Waterhousecoopers Int'l*, 2007 WL 983263, at *10 (S.D. Fla. Mar. 27, 2007), plaintiffs failed to allege facts to support the element of substantial or affirmative assistance in the accountant's market manipulation scheme, which is the heart of Plaintiff's alleged fraud and breach of fiduciary duty claims. There were no clear allegations that CFS substantially assisted the accountant's and so the Plaintiff's failed to allege adequately the element of substantial assistance and thus failed to state a claim for aiding and abetting. Unlike in *Bruhl*, USI has alleged and provided factual evidence at trial that Lockton provided substantial assistance at the core of the alleged aiding and abetting a breach of fiduciary duty claim when it gave Simmons license to breach.

Finally, in *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1098 (11th Cir. 2017)*,* the Eleventh Circuit found that banks have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating that those funds are being mishandled, and a bank's inaction, that is, its failure to stop the theft of such trust funds, can constitute substantial assistance. This case is irrelevant as USI does not argue that Lockton owes USI a fiduciary duty, nor does it argue that Lockton was sitting idly by not acting. Lockton in fact, was actively working behind the scenes providing substantial assistance when it gave Simmons

license to breach: providing him with paid counsel, agreeing to indemnify him, informing him (through Zutel) of the process for breaching and litigating, paying for his lawsuit against USI, and agreeing to accept clients on his behalf.

## VI.   Breach of Fiduciary Duty

With respect to an employee's duty of loyalty and "preparing to compete," the Motion misconstrues Florida law and the record evidence. Although it is generally true that routine "arrangements to compete," such as opening a bank account or obtaining office space and telephone service, are permissible, "an employee owes a fiduciary duty of loyalty to his or her employer not to engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment **or soliciting customers and other employees prior to the end of his employment**." *OPS Int'l, Inc. v. Ekeanyanwu*, 672 F. Supp. 3d 1228, 1236 (M.D. Fla. 2023) (citations and quotations omitted). Examples of "acts that constitute actual competition include  . . . **competing with the employer for customers or employees**, and employee behavior leading to the mass resignation of the employer's workforce."  *OPS*, 672 F. Supp. 3d at 1236 (emphasis added) (granting summary judgment against employee who "consult[ed] for a competitor and leverage[ed] that relationship to sell [employer]'s property to that competitor); *see also Classic Soft Trim, Inc. v. Albert*, 6:18-CV-1237-WWB-GJK, 2021 WL 720414, at *5 (M.D. Fla. Feb. 9, 2021) (same, and denying employee's motion for summary judgment where diverted co-workers "**completed job applications and direct**

**deposit forms** with [competitor] prior to [employee's] resignation." (emphasis added); *Insurance Field Services, Inc. v. White & White Inspection & Audit Service, Inc.*, 384 So. 2d 303 (Fla. 5th DCA 1980) (solicitation of employer's "field representatives" and obtaining "assurances of business from many of [employer's] customers, [that] had been transacting their business with [employer] through the [employee] or the field representatives violated Florida law).

Defendants' heavy reliance on *Fish v. Adams*, 401 So. 2d 843, 845 (Fla. Dist. Ct. App. 1981) is therefore misplaced. First, even the *Adams* court agreed that "using confidential information . . . or soliciting customers and other employees prior to the end of his employment" would violate an employee's duty of loyalty. Second, the *Adams* court left alive claims for breach of the duty of loyalty with respect to fact questions regarding client and employee solicitations, reasoning that those acts, had they occurred, would support a claim for breach of the duty. *Id.; see also New World Fashions, Inc. v. Lieberman*, 429 So. 2d 1276, 1277 (Fla. Dist. Ct. App. 1983) (solicitation of customers would violate duty of loyalty).

Additionally, Defendants' contention that they "wanted to leave USI behind, not sabotage it," is belied by the evidence. (Mot. at 21.) The evidence presented at trial shows that Defendants competed with USI on myriad occasions during the course of their employment, in breach of their fiduciary obligations. For instance, both Mr. Simmons and Mr. Mitchell testified regarding their solicitations of USI's clients while still employed by USI. Mr. Tyson testified that Mr. Simmons told him that Lockton's resources were better than USI's (7/15 Tr. 176:16-18) and that Mr.

Simmons created a sense of urgency to move business with the prediction of an impending injunction.  7/15 Tr. 174:12-14. Defendants' sole motive in making these communications is clear—they wanted to solicit and encourage current USI customers to take their business to Lockton, who Defendants would be joining in short order. Accordingly, there is ample evidence for a reasonable jury to find that the Producers breached their fiduciary duties to USI.  The Motion should be denied on this basis and the claim submitted to the jury for adjudication.

### VII.   USI's Contract Claims Must be Submitted to the Jury

All of Defendants' arguments regarding breach of contract ultimately boil down to their incorrect assertion that USI has failed to establish causation and/or damages. As set forth in Section III, *supra*, Defendants' framing of the causation inquiry misses the mark. As to causation, the appropriate inquiry is whether, as a result of Producers' breaches, it is more likely than not that the Lost Accounts ended their relationships with USI *sooner* than they otherwise would have.

Defendants suggest that the Lost Accounts followed the Producers.  Rick Tyson testified that PGT moved its business quickly at Mr. Simmons' suggestion. Defendants' cannot credibly maintain their argument that, absent Producers' breach of their notice provision, the Lost Accounts would not have remained at USI after the Producers' departure without notice on January 25, 2023. Thereafter, and with a fair opportunity to keep the business of the Lost Accounts, as discussed above, USI has provided a reasonable yardstick to establish its damages with reasonable certainty.

Dated: July 17, 2024

/s/ David E. Cannella

David E. Cannella, Esquire
Florida Bar No. 983837
david.cannella@hklaw.com
HOLLAND & KNIGHT LLP
200 South Orange Avenue, Ste. 2600
Post Office Box 1526 (32802-1526)
Orlando, FL 32801
Phone: (407) 244-1165
Fax:  (407) 244-5288

and

Matthew Zimmerman, Esquire
Florida Bar No. 011484
matthew.zimmerman@hklaw.com
HOLLAND & KNIGHT LLP
777 South Flagler Drive, Suite 1900
West Palm Beach, Florida  33401-6148
Phone: (561) 833-2000
Fax: (561) 650-8399

*Attorneys for Counter Plaintiff, USI Insurance Services, LLC*