IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

_____
                                        )
MATTHEW SIMMONS, SHEILA MURRAY,         )
JACK MITCHELL, JACKIE RODRIGUEZ,        )
MADISON LIEFFORT, AND EMILY             )
CARTER,                                 )
                                        )
          Plaintiffs,                   )
                                        )
vs.                                     )   Case No.:  8:23-CV-201
                                        )
USI INSURANCE SERVICES, LLC,            )
a foreign limited liability            )
company and USI ADVANTAGE              )
CORP., a foreign corporation,          )
                                        )
          Defendants.                   )
_____ )
                                        )
USI INSURANCE SERVICES, LLC,            )
                                        )
          Counterplaintiff,             )
                                        )
vs.                                     )
                                        )
MATTHEW SIMMONS, JACK MITCHELL,         )
and SOUTHEAST SERIES OF                 )
LOCKTON COMPANIES, LLC,                 )
                                        )
          Counterdefendants.            )
_____ )

**VOLUME IV OF IX (pp. 736-1016)**

**JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS P. BARBER**

**July 11, 2024**
**8:36 a.m. to 5:23 p.m.**

(Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**APPEARANCES:**

**FOR THE PLAINTIFFS/**          LYLE E. SHAPIRO, ESQUIRE
**COUNTERDEFENDANTS:**           Herskowitz Shapiro, PLLC
**(SIMMONS, MITCHELL)**          9130 South Dadeland Boulevard
                                 Suite 1609
                                 Miami, Florida 33156

                                 NICOLA GELORMINO, ESQUIRE
                                 Gelormino Law, PA
                                 9130 South Dadeland Boulevard
                                 Suite 1609
                                 Miami, Florida 33156

**FOR THE PLAINTIFFS/**          CHRISTOPHER J. BANKS, ESQUIRE
**COUNTERDEFENDANTS:**           Crowell & Moring, LLP
**(LOCKTON SOUTHEAST)**          3 Embarcadero Center
                                 26th Floor
                                 San Francisco, California 94111

                                 DANIEL ADLER, ESQUIRE
                                 Gibson, Dunn & Crutcher
                                 333 South Grand Avenue
                                 Suite 4700
                                 Los Angeles, CA 90071

**FOR THE DEFENDANTS/**          DAVID E. CANNELLA, ESQUIRE
**COUNTERPLAINTIFFS:**           KRISTIN N. ROYAL, ESQUIRE
                                 Holland & Knight
                                 200 South Orange Avenue
                                 Suite 2600
                                 Orlando, Florida 32802

                                 MATTHEW Z. ZIMMERMAN, ESQUIRE
                                 Holland & Knight
                                 777 South Flagler Drive
                                 Suite 1900 West Tower
                                 West Palm Beach, Florida 33401

**ALSO PRESENT:**                SARAH ROMINE, ESQUIRE
                                 MATTHEW SIMMONS
                                 JACK MITCHELL
                                 TOM LONGHTA

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

INDEX

**COUNTERPLAINTIFF'S WITNESSES**                                    **PAGE**

ANNE GRON
Voir Dire Examination by Mr. Cannella                             742

CHRISTOPHER KAKISH
Direct Examination by Mr. Cannella                               764
Cross-Examination by Mr. Banks                                   806
Redirect Examination by Mr. Cannella                             831

THERESA KEMP
Direct Examination by Mr. Cannella                               844
Cross-Examination by Mr. Banks                                   887

FRED ZUTEL
Videotaped Testimony                                             901

JACK MITCHELL
Direct Examination by Mr. Cannella                               932
Cross-Examination by Mr. Shapiro                                 963
Redirect Examination by Mr. Cannella                             977

CLAUDIA MANDATO
Videotaped Testimony                                             982

**COUNTERPLAINTIFF'S EXHIBITS (ADMITTED INTO EVIDENCE)**

**NO.    DESCRIPTION**                                             **PAGE**

42     01/25/23 Email from Shelat to Mitchell. Subject:          946
       Capital Account Example and Attachments

43     01/05/23 Email from Mitchell to Shelat. Subject:          942
       Lockton Modeling/Mitchell Compensation and
       Attachment

46     01/25/23 Email from Sharma to Wild. Subject:              954
       ECA-USI Claims Advocate Intro

64     Kakish Employment Agreement with Lockton                  769

65     01/23/23 Zoom Meeting Invite from Shapiro to              787
       Sharma. Subject: Chris Kakish

66     01/24/23 Email from Sharma to Kakish. Subject:            789
       Indemnification Language

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**COUNTERPLAINTIFF'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 67 | 01/23/23 Offer letter from Lockton to Kakish | 790 |
| 71 | 02/17/23 Email from Ridley to Kakish. Subject: Avesta, Revised team chart | 796 |
| 74 | 02/17/23 Email from Sharma to HIT Promotional Products. Subject: Revised team chart and next steps and Attachment | 781 |
| 75 | 02/17/23 Email from Sharma to Crescent Real Estate. Subject: Revised team chart and next steps and Attachment | 795 |
| 80 | 02/17/23 Email from Sharma to ECA Property Holdings. Subject: Revised team chart and next steps and Attachment | 759 |
| 81 | 02/17/23 Email from Sharma to SCG. Subject: Revised team chart and next steps | 798 |
| 87 | 02/17/23 Email from Sharma to PGT Innovations. Subject: Revised team chart and next steps and Attachment | 776 |
| 130 | 02/09/23 Email from Sheila Murray to Zach Oseland with ZMR Capital Re: ZMR Capital LLC Team Chart and Attachment | 861 |
| 138 | Jack Mitchell Annotated Phone Records from 11/01/22 to 08/24/23 and Text Messages | 938 |
| 160 | 06/21/23 Email form Zach Oseland to Chris Boni Re Boardwalk and Hanley | 759 |
| 160 | 06/21/23 Email from Zach Oseland to Chris Boni Re Boardwalk and Hanley | 800 |
| 187 | Email String dated 05/16/2023 from Shelat to Manoj Sharma Subject: Fwd: Broker of Record Letter - MPL Policies | 759 |
| 190 | Theresa Kemp Subpoena Production (03/22/23) | 847 |

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**COUNTERPLAINTIFF'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 195 | 02/08/23 Email from Simmons to Smith Re Jacaranda Insurance Review | 863 |
| 197 | 02/09/23 Email from Rodriguez to Crescent - Lockton Team Chart and Attachment | 794 |
| 199 | 02/09/23 Email from Rodriguez to Avesta - Lockton Team Chart and Attachment | 772 |
| 210 | 02/13/14 Webex Invite to Oseland Re ZMR Lockton Team Introduction and Attachment | 861 |
| 214 | 02/17/23 Email from Sharma to Team Re Account Support & Access | 759 |
| 218 | 05/11/23 Email from Mandato to Sharma Re Tampa New Clients | 759 |
| 231 | 05/12/23 Email from Zach Oseland to Matthew Fluharty | 759 |
| 232 | 05/03/23 Email from Zach Oseland to Zami Kazi Fwd Premiums Finance Quote, Attachment Draft Allocations 2023 | 759 |
| 251 | Text Messages between Simmons and Theresa Cabilao 07/06/20 - 01/24/23 | 759 |
| 255 | Simmons's Commission Statement from Lockton 10/10/23 | 759 |
| 282 | 07/09/23 Email from Chris Hamm with IFP to Daryl Olenschalk and Annette Zenzer Subject: Leveraged/ Inverse Question from Independent Financial Partners | 759 |
| 322 | 01/13/23 Appointment from Lyle Shapiro (hslawfl.com) to Randi Tangney, Sheila Murray, Manoj Sharma, Nicola (Gelorminolawpa.com) and Sara Romine Subject: Sheila Murray/ Lockton -Attorney Client and Joint Defense Privileged | 759 |

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**COUNTERPLAINTIFF'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 337 | 01/24/23 Email chain from Jack Mitchell to Manoj Sharma with attached Term Sheet - Jack Mitchell Subject: Term Sheet and Benefits Information | 950 |
| 370 | 01/25/23 Email chain from Claudia Mandato to Scott Seward, Ty Price Subject: Next Steps - Morespace | 759 |
| 406 | 08/28/22 Email from Simmons to Barkley, Murray, Rodriguez and Jones. Subject: Account Spreadsheet | 834 |
| 418 | 03/03/23 Email from Jeanne Caldwell to Joe Gosselin Re: RFobbins Real estate - Revised Team Chart and Next Steps, Attachments: Revised Robbins Real Estate | 759 |
| 450 | Jack Mitchell Member Agreement with Lockton | 960 |
| 642 | 1/11/23 Email Chain re: FWD: Privileged & Confidential | 759 |

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

(Call to Order of the Court at 8:36 a.m.)

**THE COURT:** Let's do the Dr. Gron thing. Come on down. This is an abbreviated proffer.

WHEREUPON,

**ANNE GRON,**

was called as a witness and, after having been first duly sworn, testified as follows:

**VOIR DIRE EXAMINATION**

**THE COURT:** Very good. Have a seat.

**MR. CANNELLA:** Good morning, Your Honor.

**THE COURT:** Morning. Cut right to the chase. I've already read her resume.

**MR. CANNELLA:** I'm cutting to the chase. I'm not going to go into qualifications. I'm not going to go into all the documents she reviewed in this case. We're going to cut to the quick.

**THE COURT:** Go ahead.

**BY MR. CANNELLA:**

**Q.** Good morning, Dr. Gron.

**A.** Good morning.

**Q.** Please tell the judge what it is you are prepared to testify about.

**A.** I'm here to testify about the importance of relationship-specific assets to insurance brokers in general, in particular, because it results in a high retention rate of

clients, as well as the impact of the departing employees on USI's relationship-specific assets with certain clients and how it affected their competitive position.

**Q.**   Dr. Gron, are you an economist and insurance broker industry expert?

**A.**   Yes.

**Q.**   Could you describe for the Court your expert work in the insurance broker industry?

**A.**   So my former employer was a subsidiary of Marsh McLennan, which is one of the largest insurance brokers in the world.

When I was working there, I worked on several projects, one of which was looking at trying to quantify the effect, if any, of contingent commissions on insurance prices.  It was related to what's called the contingent commission scandal.  And that occurred in about 2005, if I recall correctly.

I worked on a matter -- I authored a white paper that looked at the effect of the contingent commission ban that was in place for the top four insurance brokers on their competitive position relative to insurance brokers in the next six, you know, really in the top ten, who are not subject to that ban and who were still accepting contingent commissions.

I also consulted with my former employer related to one of their largest clients who was alleging that their insurance premiums had been affected by contingent commission.

I worked on a matter involving antitrust allegations of

monopolization in the distribution of bank-owned life

insurance.  And I've worked on several matters involving

departure of producers and employees and clients in the

brokerage industry.

**Q.**   Was one of those latter cases Mountain West Series of

Lockton Companies v. Alliant.

**A.**   Yes.

**Q.**   Were you retained by Alliant in that case?

**A.**   No.

**Q.**   Not Alliant.  I got that backwards.

Sorry, Your Honor.

Were you retained by Lockton in that case?

**A.**   Yes, I was.

**Q.**   You used the term relation-specific asset.  Can you

explain to the judge what a relationship-specific -- what that

means.  What's a relationship-specific asset?

**A.**   Sure.  That's economic concept, which is really capturing

the idea that certain investments or assets build up between

parties transacting over a period of time.  And the assets that

make those parties preferred partners in business are what

relationship-specific assets really encompasses.

So in the brokerage industry, those take the form of

knowledge embedded both in employees and documents at the firm,

business records, which capture the fact that the broker has

learned about the industry and the complex insurance program

that clients have over time, and that makes that broker preferred partner for that client over most other brokers all else equal.

Q.   I'm going to call it RSA for sure, relationship-specific asset.  Is that unique to the insurance industry or does it apply to other businesses too?

A.   Well, as a concept, relationship-specific assets can be actual physical investments or they can be the type I just mentioned.  They can occur in various industries.  They're important for the brokerage industry in the form I just talked about, and they're important for the industry dynamics.

Q.   Once a client and broker firm work together, are they likely to stick together?

A.   Yes.  The client tends to come back to the existing broker in part, because of that relationship-specific asset, because of that knowledge of their program and their business.

Q.   Are incumbent brokers more likely to retain a client than a new broker?

A.   Yes, for the same reason.

Q.   In this case, how did the departures affect USI's ability to retain the business that was serviced by the team?

A.   So the departing employee is represented part of the relationship-specific asset that USI had built up with its clients over time.  And when they left, USI lost that part of their relationship-specific asset with those clients.  And so

USI became sort of a less-better choice relative to all the other brokers that those clients could pick.

Q.   How did the departures affect USI's ability to compete in the marketplace with Lockton?

A.   So when they went to Lockton and used their client-specific knowledge with those clients, they basically had taken that portion of the relationship-specific asset from USI and deployed it at Lockton, so it -- so the departure reduced USI's relative competitive position and increased Lockton's relative competitive position for those clients.

MR. CANNELLA:   Thank you, Dr. Gron.

That's the summary, Your Honor.

THE COURT:   Okay.  And that -- that information is relevant to which legal issue in the case?

MR. CANNELLA:   It's relevant to issues of causation and mitigation, Your Honor.  And I would note that when Mr. Longhta testified about these concepts, Mr. Banks jumped up and said objection, you know, expert testimony, calls for expert testimony.  And Your Honor said Mr. Longhta can testify as to his personal experience only.

So what Dr. Gron does, is she gives an overall industry perspective that essentially talks about, from an economics perspective, how stickiness is real.  It's not something that only USI is claiming occurs in the marketplace.  It actually does occur in the marketplace, and it's objectively

verifiable by the fact that Lockton and USI and other brokers have 90-percent retention rates.

And what Dr. Gron's testimony does, is explains to the finder of fact why that is.  And it's beyond the -- we would submit it's beyond the normal understanding of a layperson and Dr. Gron testified -- or she's qualified to render such testimony and assist the finder of fact.

**THE COURT:**  Okay.  What do you guys -- what's your argument on this?

**MR. BANKS:**  So a couple things, Your Honor.  First, that this is -- I mean, they've already put this testimony in through Mr. Longhta.

But, secondly, this is no different from Dr. Lasson.  Dr. Lasson was going to -- the only thing we wanted him to opine on is, there were studies done that when a leader leaves a company, that it is highly likely that the employees who work with that leader are going to follow.  And there were statistics and studies that he was going to testify about.  It was the single thing that we were going to put it on.  Your Honor found that that was really nothing more than kind of common sense backed up by an expert.

This is no different.  She's saying nothing special here.  It's just that employees have relationships, and when you lose the people who have those relationships, you lose -- the employer loses those relationships.  And it makes it harder

for them to keep the clients.  We don't even deny that.

**THE COURT:**  That's what I was going to say.  I mean, that's why these guys are making the money they're making, because these companies are willing to pay a whole bunch of money to get them because they come with the clients.  And this -- the idea that stickiness is real isn't really being disputed, I don't think.  Right?

**MR. BANKS:**  It's actually part of our defense.

**THE COURT:**  Yeah.  What do you think about that?

**MR. CANNELLA:**  I mean, first of all, I said it yesterday, Lasson is distinguishable.  That may have been what Mr. Banks intended Mr. Lasson to say.  But Mr. Banks -- I'm sorry, Dr. Lasson has fact-specific opinions in this case that working conditions at USI were terrible, and because the conditions were terrible, that's why the employees left.  That's entirely different than this.

This opinion testimony is -- it fits the causation and mitigation issues in this case, because the causation issues is in the economic -- they've raised a competition defense, Your Honor.  That's one of their affirmative defenses is competition.

And what Dr. Gron is testifying to is that in this industry, and she's an industry expert.  She's also an economist, it is harder to compete with -- when you -- when there's damage to the relationship-specific asset, which in

this case was not just the departure of Mr. Simmons and Mr. Mitchell, but the entire service team on one day. And that's all she's being offered for.

And it is different than Dr. Lasson. She is not going to say PGT left because Matt Simmons told them the entire service team. She's not going to go client-by-client and give that kind of testimony.

Again, Your Honor, when Mr. Longhta attempted to give testimony about the reasons for, you know, the restrictions and what USI would have done during the notice period and how USI could have mitigated its damages, Mr. Banks jumped up and said, objection, that's a subject of expert testimony.

THE COURT: Yeah. But I then let him -- I let your guy tell his reasons why he thought that.

MR. CANNELLA: From his personal experience.

THE COURT: Well, that's better than an expert. Isn't the guy working in there every day a more reliable thing than -- I'm not demeaning you -- you know, than an academic person coming in and talking about, you know, relationship-specific asset.

MR. CANNELLA: Relationship-specific assets, which is a term -- I mean, it's a term --

THE COURT: I know. But my question is, isn't it better testimony for the guy that actually lives it to talk about it, which I let him do, than to have someone come in and

just kind of say, you know, looking from the outside, he was right.  I don't think anybody is saying he wasn't right.

**MR. CANNELLA:**  Dr. Gron is not going to comment on the testimony of any fact witness.

**THE COURT:**  I know that.  But, I mean, I'm saying that the point that he was making to the jury is not only right in a practical everyday sense from a guy who's working in the industry, but it's also validated to be correct, because, you know, academic people have looked at it and have come up with data that support that.

**MR. CANNELLA:**  Yes, Your Honor.  As Your Honor knows, under Daubert, the inquiry is, is the witness qualified, and she is.  Was her methodology reliable?  There's been no challenge to her methodology.  The third thing is, does the testimony fit, and it fits issues of causation in mitigation.  And the defendants did not move to exclude these portions of Dr. Gron.

**THE COURT:**  You're right about that part of it.  But that doesn't stop anybody from making an objection along the way.  Let me think about this a little more.  I'll give you a decision in just a minute.

You can't resist.

**MR. BANKS:**  I understand, Your Honor.  I'll refrain then.

**THE COURT:**  Go ahead.

UNITED STATES DISTRICT COURT

**MR. BANKS:**  I did have one or two other points I was going to make earlier.  That is, also, that Dr. Gron I don't think is qualified to offer these opinions.  Although she has done some analysis on pricing in the insurance industry, she's never worked as a broker, et cetera.

**THE COURT:**  Oh, no.

**MR. BANKS:**  She's just relying on statements in the annual report.

**THE COURT:**  If that's your only argument, you lose.  She can say it.  If I think it's helpful to the jury, she's got the qualifications to do it.

Thank you.

**THE WITNESS:**  Thanks.

**THE COURT:**  What else?

**MR. CANNELLA:**  Your Honor, would you like to hear anything else?

**THE COURT:**  Not on this.  Not on this.

**MR. CANNELLA:**  Okay.  Thank you, Your Honor.

**THE COURT:**  But I want to clean up what we're doing today before the jury gets here.  So what's the game plan?  I saw some real people out there.

We've been on a treadmill that's been like step -- like you see the people in assisted living, where my dear mother lived, and they would be like this.  We're now pushing the button where we're not jogging, but we're going to walk

pretty quickly.

So what's the game plan?

MR. CANNELLA:  Game plan is we're going to call three live witnesses this morning.  We're going to start with Mr. Kakish, who's out there.  We will either -- depending on timing, we will either call Mr. Mitchell, who's in here.  And Ms. Kemp is a nonparty witness who works with Lockton.  She's also out there.  We will call her too.

THE COURT:  Great.  That will get us to lunch.

MR. CANNELLA:  I anticipate -- yeah, I anticipate we'll get through all three of those before lunch.

THE COURT:  Are we going to get close to Sharma today?  Do I need to have that ready to go?  Have you guys finished fighting about that?  We have one volume done, but not the other one.  Where are we on that?

MR. ZIMMERMAN:  I think we have Volume 2.

THE COURT:  Do we have 2?

THE LAW CLERK:  We do.

THE COURT:  We do.  All right.

MR. ZIMMERMAN:  Ideally, I don't think we're obviously going to get to two volumes of Manoj Sharma, but there's a chance at least of Volume 1.

THE COURT:  How's that going to work, though?  Is he a video depo?

MR. ZIMMERMAN:  He's a video depo.

**THE COURT:** So you need to have your technical people chopping that all up, based on these objections and stuff like that. Wouldn't it be better to do that over the long weekend? I mean, isn't there something else we can do to fill the day?

**MR. ZIMMERMAN:** We do. We have other shorter depositions, like Mr. Zutel, that already had been -- I think that we've addressed them. I don't know if there's one or two objections that --

**MR. BANKS:** No. Zutel is done.

**MR. ZIMMERMAN:** That's ready to go, Your Honor.

**THE COURT:** So after the live people, other than Sharma, the depos would be who?

**MR. ZIMMERMAN:** Mr. Zutel.

**THE COURT:** Zutel, which I've already dealt with. So he's good to go.

**MR. ZIMMERMAN:** Yes, Your Honor.

**THE COURT:** And who else?

**MR. ZIMMERMAN:** I will come back with another short deposition to address. It's going to be Morneau, Mr. Morneau.

**THE COURT:** All right. We have issues with that one?

**MR. ZIMMERMAN:** I don't think we've addressed them yet. There were a few objections in there.

**MR. BANKS:** My understanding is that one was submitted last week, as was Janet Shuman. They have several.

**THE COURT:** So I'll make sure we're okay with

Morneau, and I've done what I need to do on Morneau.  Who else?

**MR. ZIMMERMAN:**  And then the last one would be Ms. Mandato.

**THE COURT:**  Mandato.

**MR. ZIMMERMAN:**  Mandato.

**THE COURT:**  Okay.  Do we have what we need on that one?

**MR. ZIMMERMAN:**  Yes, Your Honor.

**THE COURT:**  Okay.  All right.  So if we do those live people and these three depos we just talked about, is that going to fill the day, do we think?

**MR. ZIMMERMAN:**  As well as expert --

**THE COURT:**  You got Jack Mitchell.  He's on deck. He's the running play if you --

**MR. CANNELLA:**  One of the three this morning.

**MR. ZIMMERMAN:**  Our expert testimony, we'd like, obviously, Dr. Gron if the Court allows it.

Your Honor, I don't think you're going to have a problem with this.  But unlike, for example, Morneau, we're trying to tighten up a little bit.  It's not any controversial testimony, so we might be cutting down.  Not might.  We've cut it down.  Things like that have been covered already, like what's a broker-of-record letter.  So some of that, we will show it to Mr. Banks.  I don't think there will be any issue. But we are trying to reduce those even further.

**THE COURT:**  Okay.  Very good.  I mean, this idea of doing these depos of these people on Friday, I think that's -- that's a nice thing to do.  But I don't think that I can order that, so I'm not.  But it's live by the sword and die by the sword.  If you guys want to be difficult like that, they're going to be difficult on stuff in return.

**MR. CANNELLA:**  We're not being difficult, Your Honor.  We've given our reasons why we think that that's inappropriate.  If those witnesses want to come here and testify live, they can do so, much like Mr. Tyson can do so, even though his video is ready to go.

**THE COURT:**  You and I can disagree on what's being difficult, if we've got a third party who has no stake in this -- maybe they're one of Mr. Simmons's friends from high school.  I don't know who this person is.  I heard she was -- is it a he or a she?

**MR. BANKS:**  He.

**THE COURT:**  He's on vacation someplace, and his wife doesn't want him to come down for this because it's going to ruin their family vacation, I think that's being difficult.  But that's just my opinion.  We can agree to disagree.

All I'm saying is, live by the sword, die by the sword.  If it's stuff you want from them, courtesies like that, they're probably not going to agree to it, so -- but I'm not ordering it.  So if you guys can figure it out, figure it out.

If not, not.  So that's that.

What else?

MR. SHAPIRO:  Your Honor, small item.  We talked about the stipulation on the phone records.

THE COURT:  That's becoming such a headache, yes. Not because of you guys, just because of this seal business.

MR. SHAPIRO:  Yeah.  So the way we presented it to the Court, the staff -- Mr. Bittick.

THE COURT:  Just a second, Lyle.

Have you heard about this, Sonya?  The clerk was rejecting this downstairs or something like that?

THE COURTROOM DEPUTY:  I have not heard of it.

THE COURT:  Or they were questioning.

THE LAW CLERK:  They flagged it because of phone numbers.

THE COURT:  All right.  So we've resolved that with the people downstairs.

THE LAW CLERK:  I think they're waiting on whatever we want to do.

MR. SHAPIRO:  I was going to mention, it's not just that it's cell phone numbers, it's also essentially a client list of the key contacts of Mr. Simmons.  So I think it could fall into -- we're only asking for two or three sealed items.

THE COURT:  Fine.  I'm fine with a few sealed items. We've just got to figure out how to do it because mechanically

it's causing a lot of heartburn for people.

MR. SHAPIRO: I can talk with the other side. We can figure out administratively.

MR. ZIMMERMAN: Is it easier, Judge, if it's sealed as an exhibit, like a trial exhibit versus filing it?

THE COURT: I don't know. Ask Sonya. Talk to Sonya about it. You guys figure it out. It matters not at all to me. Only thing that matters to me is if we have too sealed documents, which we don't, which is good.

MR. ZIMMERMAN: One other housekeeping item, Judge. We could do it any time today. We did want to read in for Madam Clerk the exhibits so far so there's no confusion. I think it would help the clerk and help everybody.

THE COURT: Good idea. Do it right now.

MR. ZIMMERMAN: Thank you, Judge.

THE COURT: Ready, Sonya?

THE COURTROOM DEPUTY: Yes, sir.

MR. ZIMMERMAN: This is USI on July 9th for Mr. Longhta.

THE COURT: And just a second. I don't need to be here for this. I'm going to go back and make my decision on Dr. Gron while you're doing this, and I'll come back out later when the jury is here. Okay. Thank you.

MR. ZIMMERMAN: Thank you, Judge.

MR. BANKS: Thank you.

**MR. ZIMMERMAN:** Ready.

**THE COURTROOM DEPUTY:** Yes, sir.

**MR. ZIMMERMAN:** All right. Tom Longhta, July 9th, Plaintiff's 26, Plaintiff's 447, Plaintiff's 176, Plaintiff's 33, Plaintiff's 124, Plaintiff's 398, Plaintiff's 648, Plaintiff's 647, Plaintiff's 188, Plaintiff's 477, Plaintiff's 428, Plaintiff's 425, Plaintiff's 30, Plaintiff's 27, Plaintiff's 40, Plaintiff's 396, Plaintiff's 394, Plaintiff's 60, Plaintiff's 397, Plaintiff's 392, Plaintiff's 393.

Is it easier for you to keep going, or do you want to do the other Tom Longhta exhibits from the defendants? What's easier?

**THE COURTROOM DEPUTY:** We can keep going with plaintiff, and then we'll move over to defendants.

**MR. ZIMMERMAN:** I also think, Chris, I don't think I've seen your list. I want to check that.

**MR. BANKS:** Yeah. That's fair.

**MR. ZIMMERMAN:** Okay. Then also on July 9th, this was with Mr. Simmons, Plaintiff's 19.

**THE COURTROOM DEPUTY:** Counsel, are these the ones that were admitted -- you're saying the 9th. I think I have everything from the 9th. So I really just need the 10th.

**MR. ZIMMERMAN:** This is the last one for the 9th, just to make sure you have it, and then we'll move on. So I'm sorry, ma'am. Plaintiff's 19.

**THE COURTROOM DEPUTY:**  19.  Okay.

**MR. ZIMMERMAN:**  Now I'm on the 10th.  Plaintiff's 24, Plaintiff's 4.  But that's subject to an objection still in part that we have to address with the judge.  So that's like half in.  Plaintiff's 171, Plaintiff's 139, Plaintiff's 12, Plaintiff's 20, Plaintiff's 80.  I have on here Plaintiff's 20 again.  Let me just check with Ms. Royal.  I'll come back on that one.  Plaintiff's 88, Plaintiff's 89, Plaintiff's 173, Plaintiff's 25, Plaintiff's 642, Plaintiff's 274, Plaintiff's 250, Plaintiff's 251, Plaintiff's 370, Plaintiff's 127, Plaintiff's 47, Plaintiff's 30, Plaintiff's 377, Plaintiff's 61, Plaintiff's 254, Plaintiff's 129, Plaintiff's 167, Plaintiff's 131, Plaintiff's 253, Plaintiff's 418, Plaintiff's 282, Plaintiff's 449, Plaintiff's 640, Plaintiff's 187, Plaintiff's 160, Plaintiff's 218, Plaintiff's 214, Plaintiff's 232, Plaintiff's 231, Plaintiff's 48, Plaintiff's 274, Plaintiff's 249, and Plaintiff's 255.  And then lastly with Ms. Murray yesterday, Plaintiff's 122, Plaintiff's 116.

**THE COURTROOM DEPUTY:**  116.

**MR. ZIMMERMAN:**  116 and Plaintiff's 322.

(Counterplaintiff's Exhibits 80, 160, 187, 214, 218, 231, 232, 251, 255, 282, 322, 370, 418, 642 admitted into evidence.)

**MR. ZIMMERMAN:**  I think we're going to do something similar with defendants.  They're going to give us a list just

to make sure there's not an issue.  So they're working on their list.  They're going to check with us.  We can read it in quickly, and we can make sure there's no objections and issues.

Thank you, ma'am.

**THE COURTROOM DEPUTY:**  Thanks.

(Recess from 9:00 a.m. to 9:07 a.m.)

**THE COURT:**  The jury is here.  Let me hit on Dr. Gron one last time.  Is there some argument that you think that -- Mr. Cannella, that Lockton could make that you're concerned about that Dr. Gron would help you with?  I mean, are they going to get -- they're not -- I mean, they should be agreeing with Dr. Gron that this -- what is the word, stickiness?

**MR. CANNELLA:**  Stickiness.

**THE COURT:**  Stickiness is real.  That's a point they like, I think.  But what could they say that you would need Dr. Gron to rebut?

**MR. CANNELLA:**  Two arguments, principally.  Number one, they're arguing clients are free to leave.  You know, we don't dispute that.  But in this industry, they don't.  They're free to leave.  But they typically don't.  Under normal market conditions, they don't.

The other argument is -- that they're making is about client conduct, you know, in the industry.  And so what she assists the trier of fact in is weighing that, you know, client -- you know, that clients are free to leave.  You know,

we don't dispute that.  But in this industry, they typically don't.  And that's not just USI's experience.  That's not just Lockton's experience.  That's the market.  That's this market.

THE COURT:  But Simmons -- this ties back into this whole damages theory that you had in the beginning.  Simmons is free to go, and you're -- but that's your argument.  That's fine.  But we could have kept -- we could have done our magic to keep the clients, because clients don't typically want to leave.

MR. CANNELLA:  Because of the relationship-specific asset and when producers comply with the terms of their restrictive covenants, which are two years across the board, the incumbent broker is more often than not able to keep the clients.  They don't just turn on a dime and leave when a producer leaves.

THE COURT:  I think -- well, go ahead.  You want to respond to that?

MR. BANKS:  Only to the last portion.  I don't think there's any -- there's no statistical analysis that's been done whatsoever that says if people complied with their restrictive covenants, USI is more likely to keep the clients.

THE COURT:  Yep.  She's not -- she wouldn't be able to say that.  I didn't hear that on your proffer that she has any studies or data or anything like that on that specific idea.  Right.

**MR. CANNELLA:** No. She will speak to, you know, her experiences with brokers. And, also, she does talk -- she does talk about in her report, you know, her review of studies, including a study from the UK.

She also talks about, you know, Form 10-Ks filed by the larger publicly traded brokers, which, as Your Honor is aware, these are statements filed with the SEC in which brokers, you know, set forth the risk factors to their business and the importance of client retention to retention rates of -- you know, the importance of retention of employees and retention of clients and the importance of restrictive covenants in ensuring that the clients are retained.

**THE COURT:** Okay.

**MR. CANNELLA:** She does have reliable information and data on which to base her opinion.

**THE COURT:** Okay.

**MR. BANKS:** So I --

**THE COURT:** All right. Let's get started. I'm going to try to do something in writing on this, one way or the other, real quick. Let's start with the next witness, and then I'll close the loop on that. All right.

**MR. CANNELLA:** Your Honor, the next -- should I wait for the jury before I call the next witness, or I can just --

**THE COURT:** Yeah. When they come out. We have a little bit of theatrical thing where you call them and they

walk out.

MR. CANNELLA:  In the interim, I'm sorry -- what's your last name, Steve?

THE COURT SECURITY OFFICER:  Billor.

MR. CANNELLA:  Can Mr. Billor give you the witness exhibit binder for this witness?

THE COURT:  Yeah.  Good.  Bring the jury out, please.

Who is that?  That's for the witness.  Right?

MR. CANNELLA:  No.  This one is for the witness. That one is for Your Honor.  I'm going to put this one on the table.

THE COURT:  Thank you.

THE COURT SECURITY OFFICER:  All rise for the jury.

(Jury in at 9:14 a.m.)

THE COURT:  All right.  Have a seat, everybody. Welcome back.  Today is a great day to be on jury duty.  You see it's dreary out there.  It's miserable.  It's gloomy. We're going to try to have a bright experience for you here today with bright lights.  All right?

We're ready to roll.  I anticipate the pace will pick up now, and we won't have, you know, one witness a day.  We'll start to hear from multiple witnesses.  All right?

So who's next?

MR. CANNELLA:  Good morning, Your Honor.  Good morning.  USI will call as its next witness Chris Kakish.

THE COURT: All right. Have him come down, please. Raise your right hand.

WHEREUPON,

**CHRISTOPHER KAKISH,**

was called as a witness and, after having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

THE COURT: Have a seat right there. He's going to hook you up to the mic. Tell us your name and how to spell it, please.

THE WITNESS: My name is Christopher Kakish. Kakish.

THE COURT: All right. Sounds good. We can hear you just fine. Keep your voice up. If the jury can't hear, they'll start waving at you. They're not saying, you know, hi. They're letting you know they can't hear you.

All right. Go ahead, Mr. Cannella.

**BY MR. CANNELLA:**

Q. Good morning, Mr. Kakish.

A. Good morning.

Q. There is a binder on your desk in front of you. It's an exhibit binder. There may be times during the course of the examination where I ask you to look at a document, and I'll direct you to which document to look at. Okay?

A. Okay.

Q. Mr. Kakish, before January 25th, 2023, you were employed

Christopher Kakish - Direct Examination

by USI.  Is that correct?

**A.**  That is correct.

**Q.**  And you are now employed by the Southeast Series of Lockton.  Is that correct?

**A.**  That is correct.

**Q.**  And at USI, you were a member of the technical resource team?

**A.**  Yes.

**Q.**  And you started at USI in June of 2021.  Is that correct?

**A.**  Yes, that's correct.

**Q.**  And you were recruited by USI.  Is that correct?

**A.**  Yes, that's correct.

**Q.**  And you signed an employment agreement with USI?

**A.**  Yes, I did.

**Q.**  And that employment agreement contained what we called restrictive covenants.  So we've also called them during the course of the trial hands-off agreements.  Do you recall that?

**A.**  I don't know hands-off agreements, but, yes, restrictive covenants, I'm familiar with.

**Q.**  Mr. Kakish, you're a lawyer.  Right?

**A.**  Formerly practicing.

**Q.**  You were a member of the Ohio bar?

**A.**  That is correct.

**Q.**  And you were an attorney at a law firm in Ohio?

**A.**  I was.

Christopher Kakish - Direct Examination

Q.   We're going to see some of your emails that you send to clients.  Do you use the initials JD after your email?

A.   Yeah.  It's my juris doctorate degree that I got.

Q.   JD, juris doctorate, stands for a law degree.  Correct?

A.   It means I have a law degree, correct.

Q.   Right.  And you let the clients you interact with know that you have a law degree.  Right?

A.   I'm proud of my educational background, yes.

Q.   So as a lawyer, you know how to read contracts.  Right?

A.   I learned it in law school, yes.

Q.   One of your jobs at USI was to review contracts.  Right?

A.   I would review insurance provisions of contracts. Correct.

Q.   Okay.  So let me show you what's already in evidence as Exhibit 477.  And it's in your notebook, too, Mr. Kakish.  It's behind Tab 1.

A.   I have it.

Q.   Okay.  Is this your employment contract with USI?

A.   Yes, it is.

Q.   And it's effective June 28th of 2021?

A.   Correct.

Q.   And in your agreement with USI, did you agree in section -- I'm going to try to zoom this in a little bit.

     Section 3.6, that in consideration for your employment with USI, during your employment and for a period of two years

Christopher Kakish - Direct Examination

after you are no longer employed with the company, you will not sell, provide, accept or request any -- or accept any request to provide services in competition with the company to any client accounts.

          **MR. BANKS:**  Objection, Your Honor.  That does not read the complete provision.

          **THE COURT:**  Well, I think the witness can deal with this adequately.  Overruled.

          **THE WITNESS:**  Amongst other things, it does say that.  That portion you highlighted is correct.

**BY MR. CANNELLA:**

**Q.**   I can highlight the rest.  Or sign any -- "or sign or accept a broker-of-record letter to provide services in competition with the Company to any Client Accounts; in each case with respect to any Client Accounts that the employee regularly" -- I'm sorry -- "that the Employee managed or regularly serviced and/or about which the Employee obtained Confidential Information on behalf of the Company within the last two years of the Employee's employment with the Company."
     See that, sir?

**A.**   That's correct.  It says for client accounts that I -- that I, the employee, managed or regularly serviced to obtain confidential information.

**Q.**   Not just regularly serviced, sir.  It says and/or accounts for which you obtained confidential information.  Right?

Christopher Kakish - Direct Examination

**A.**    Correct.  I said that.

**Q.**    Now, does your Lockton agreement provide the same thing?

**A.**    I don't recall.  They're substantially similar.

**Q.**    Would you agree your Lockton agreement prevents you, for a period of two years after you leave Lockton, from accepting any business from any customer accounts that you worked with while at Lockton or from whom you received confidential information?

**A.**    I don't recall the exact provision, but I would agree that they're substantially similar.

**Q.**    Okay.  Let me show you exhibit -- let me direct you to Tab 2 of your notebook.

Do you recognize Exhibit 64 in your notebook?

**MR. BANKS:**  Objection, Your Honor.  Cumulative and relevance.

**THE COURT:**  Question was did he recognize the document?  So let's --

**MR. BANKS:**  I'll wait.  Withdrawn.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yes.

**BY MR. CANNELLA:**

**Q.**    Is this your employment agreement with Lockton that you executed on -- or that you signed on January 25th, 2023?

**A.**    I think it's dated January 24th, '23.

**Q.**    Okay.  Fair enough.  You signed the agreement on January 24th, 2023.  I was reading the effective date at the

beginning.  Let me direct your attention to Section 5 at Page 5

of the agreement.

**A.**   I'm there.

          **MR. CANNELLA:**  Your Honor, may I move this into

evidence as Plaintiff's Exhibit 64?

          **THE COURT:**  Okay.

          **MR. BANKS:**  Your Honor, same objection as we've made

to these before.

          **THE COURT:**  All right.  It's admitted.

          **MR. CANNELLA:**  Thank you, Your Honor.

     (Counterplaintiff's Exhibit 64 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.**   This is Exhibit 64.  Zoom out a little bit, then I'll zoom

back in.

     Now, sir, I want to direct your attention to Page 5,

Nonsolicitation of Customer Accounts.  It's also in Section 5.

Did you agree that you would not -- I'm sorry, I'm not going to

read the language directly.  I will highlight it for you.

     Did you agree you would not accept work from customer

accounts?

          **MR. BANKS:**  Objection, Your Honor.  Relevance,

cumulative, asked and answered.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes.  That's what it says in the

portion highlighted.

Christopher Kakish - Direct Examination

**BY MR. CANNELLA:**

**Q.**   Correct.  So I think your testimony was that you believe your Lockton agreement's substantially similar to what you agreed to with USI.  Is that right?

**A.**   That's correct.

**Q.**   Okay.  Mr. Kakish, are you able to tell the difference between the hands-off restriction in the USI agreement and the hands-off restriction in the Lockton agreement?

**A.**   I don't know if the hands-off has a particular meaning.  I'm not familiar with that term.

**Q.**   I'm speaking colloquially.  But would you agree with your -- I said colloquially, which I mess that word up every time.  I'm trying to speak as a layperson rather than as a lawyer, which after 30 years is hard to do.

Would you agree that you're restricted from doing the same thing at Lockton that you're restricted -- that you were restricted from at USI?

**MR. BANKS:**  Objection.  Cumulative, relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yes.  I agree they're substantially similar.  Correct.

**BY MR. CANNELLA:**

**Q.**   Okay.  And when you were -- you were at USI for about a year and a half before you resigned.  Is that correct?

**A.**   That's correct.

Christopher Kakish - Direct Examination

Q.   And you worked for -- you worked with a lot of clients when you were at USI.  Is that right?

A.   Behind the scenes with clients, yes.

Q.   Behind the scenes, but you still provided service -- as a member of the technical resource team, did you provide services to clients while you were at USI?

A.   Mostly provided services to the account teams at USI.

Q.   But did you receive client information when you were at USI in order to provide those services?

A.   Some client information, sure.

Q.   And you met with some clients while you were at USI.  Is that correct?

A.   That's correct.

Q.   For example, did you meet with Avesta when you were employed by USI?

A.   Yes.  One time I went to San Antonio to visit some of their staff to give kind of a seminar on how to read the contractual insurance provision.

Q.   So you went to San Antonio to Avesta to give a seminar for how to read contractual provisions.  Right?

A.   Correct.  I shouldn't say seminar.  I met with like four or five of their property managers, I believe.

Q.   And Avesta was a client of USI's before January 25th of 2023.  Is that right?

A.   Yes, that's correct.

**Q.**   And you work with Avesta once you got to Lockton?

**A.**   I did.

**Q.**   I'd ask you to turn to Tab 3 in your notebook, Plaintiff's Exhibit 199.  Do you recognize this document, Mr. Kakish?

**A.**   Appears to be an email from Jackie Rodriguez to individuals at InvestRes, and I was cc'd on it.

   **MR. CANNELLA:**  USI moves Exhibit 199 into evidence.

   **THE COURT:**  Same objection?

   **MR. BANKS:**  Well, no objection.  This is --

   **THE COURT:**  All right.  Admitted.

  (Counterplaintiff's Exhibit 199 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.**   I'll zoom back in in just a minute.  But this is an email that was sent by Ms. Rodriguez.  She's one of the people that worked at USI that came over to Lockton.  Is that correct?

**A.**   Yes, that's correct.

**Q.**   And so she sends the email on February 9th, 2023.  And then the subject of the email is "Lockton Team Chart - Avesta."  Do you see that, sir?

**A.**   I do see that.

**Q.**   As you mentioned, you were copied on this email.  Correct?

**A.**   Correct.

**Q.**   And Avesta, you already told us, was a client of USI's before January 25th, 2023.  Is that right?

**A.**   Correct.

Christopher Kakish - Direct Examination

Q.   And Ms. Rodriguez writes, among other things, to the Avesta team, "We are excited to continue our relationship with you and look forward to servicing your business."

Do you see that?

A.   Yes, you read that correctly.

Q.   And then I believe Ms. Kemp is also copied on this email, Theresa Kemp.

A.   Yes.

Q.   Madison Lieffort or Lieffort is copied on this email.  Is that correct?

A.   Correct.

Q.   Now, these four people, who I just highlighted, they were employees at USI until they resigned on January 25th, 2023.  Is that correct?

A.   That's correct.

Q.   And you were -- you had done a presentation for Avesta. Do you know whether Ms. Lieffort, Ms. Kemp, or Ms. Rodriguez did any work for Avesta while they were at USI?

A.   I do not know.

Q.   Okay.  Let's look at the team chart.  And this is the core service team.  Do you see that, sir?

A.   Yes.

Q.   And you were listed as the strategic adviser.

A.   I see that, yes.

Q.   And Ms. Rodriguez is an account executive?

**A.**    Correct.

**Q.**    Ms. Lieffort is a account manager?

**A.**    Correct.

**Q.**    And Ms. Kemp is a property practice leader?

**A.**    That's what it says, yes.

**Q.**    And as the strategic adviser, would you be the main point of contact between the core service team and the client?

**A.**    Generally, yeah, that would be my role, would be to be a point of contact and be somebody that kind of coordinates service.

**Q.**    And is that a role typically played by the producer?

**A.**    Depends.

**Q.**    Let me just -- give me just a minute, Your Honor.

Now, Mr. Kemp -- I'm sorry, Mr. Kakish.  I apologize.

**A.**    It's okay.

**Q.**    Been a long week.  It's only Thursday.  Mr. Kakish, who assigned you and these other highlighted people to be on the core service team for Avesta?

**A.**    You know, I'm not exactly sure who was assigning those accounts.  I believe Mark Morneau and Manoj Sharma were involved.

**Q.**    And Mark Morneau is an employee of Lockton.  Right?

**A.**    He is.

**Q.**    And Manoj Sharma is the chief operating officer of Lockton?

Christopher Kakish - Direct Examination

**A.**   Of the Southeast Series, correct.

**Q.**   So just for shorthand, I'm going to refer to the Southeast Series as Lockton.  It's just easier for me.

So to be clear, you were assigned -- you and these other highlighted people were assigned to the core service team to Avesta by Lockton?

**A.**   Yes.  Correct.

**Q.**   Because in your role, you don't originate client relationships.  Correct?

**A.**   That's correct.

**Q.**   You're a service person.  Is that right?

**A.**   At Lockton, yes.

**Q.**   Now, when you were at USI, did you provide technical resource support for a client known as PGT?

**A.**   Yes, I did on a couple of occasions.

**Q.**   In fact, you did two diligence reviews for PGT when they were acquiring somebody.  Is that right?

**A.**   Correct.

**Q.**   And PGT was a client of USI's as of January 25th, 2023.  Is that right?

**A.**   Yes.

**Q.**   And PGT became a client of Lockton on or after January 25th of 2023.  Is that right?

**A.**   That's correct.

**Q.**   And you did work for PGT after you got to Lockton?

Christopher Kakish - Direct Examination

**A.**    That's correct.

**Q.**    Lockton instructed you to take the PGT account.  Is that correct?

**A.**    That's correct.

**Q.**    Lockton assigned you all the accounts you worked on once you got to Lockton.  Is that right?

**A.**    That is correct.

**Q.**    And over 20 of those accounts were former clients of USI?

**A.**    I don't recall the number, but yes.

**Q.**    All right.  Mr. Kakish, I want to direct you to Tab 4 in your notebook.  And this is Plaintiff's Exhibit 87, an email from Manoj Sharma to Richard Tyson, dated February 17th, 2023. Do you see that, sir?

**A.**    I do.

        **MR. CANNELLA:**  Your Honor, USI moves to introduce into evidence Plaintiff's Exhibit 87.  I believe there's no objection to this exhibit.

        **THE COURT:**  Okay.

        **MR. BANKS:**  He's right.

        **THE COURT:**  Admitted.

    (Counterplaintiff's Exhibit 87 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.**    Now, Mr. Kakish, this is an email dated February 17th, 2023 from Manoj Sharma of Lockton to Richard Tyson.  And you're copied on this email.  See that, sir?

Christopher Kakish - Direct Examination

**A.**   Yes.

**Q.**   And Mr. Sharma is advising Mr. Tyson of changes to his existing service team.  Do you see that?

**A.**   Correct.

**Q.**   Do you know if there was a core service team chart prior to February 17th, 2023 for PGT?

**A.**   I do not know.

**Q.**   Okay.  So the first service chart we saw for Avesta, that was February 9 of 2023.  Right?

**A.**   Yes.

**Q.**   And on that service chart, it indicated Jackie Rodriguez, Sheila Murray, and I think Madison Lieffort, and Theresa Kemp, maybe not Jackie Rodriguez?

**A.**   I don't think Sheila was on there.

          **MR. BANKS:**  Objection, Your Honor.  It misstates.

          **THE COURT:**  Well, that's sustained.  Ask it --

**BY MR. CANNELLA:**

**Q.**   It was Jackie Rodriguez, Madison Lieffort, Theresa Kemp, and yourself?

**A.**   Correct.

**Q.**   On the one that was sent out on February 9th.

     And then on February 17th, a new team chart is being sent out.  Correct?

**A.**   To be clear, this is a different client.

**Q.**   I understand that.

**A.** Yeah.

**Q.** My question was, do you know whether other team charts were sent out on February 9th? We'll get to those maybe a little later.

**A.** That, I do not know.

**Q.** You don't know whether PGT received one?

**A.** I don't recall.

**Q.** Okay. And in this February 17th email, Mr. Sharma is advising PGT that Mr. Simmons, Mr. Mitchell, Ms. Rodriguez, Ms. Murray, Ms. Carter, Ms. Lieffort have to stop servicing PGT. Correct?

**A.** Correct.

**Q.** And the core service team as of February 17th is reflected on the next page. Is that right?

**A.** Yes.

**Q.** And the core service team still includes you, as a strategic adviser, and Ms. Kemp, as a property adviser. Do you see that?

**A.** I do.

**Q.** Did that change at some point in the future?

**A.** Yes.

**Q.** What changed?

**A.** In -- sometime in April, I was asked to step aside from working on the account.

        **MR. CANNELLA:** Your Honor, may I have just a second?

Christopher Kakish - Direct Examination

THE COURT:  Yep.

MR. CANNELLA:  Your Honor, may I approach the witness?  This is an exhibit that's not in his notebook.  I'll show it to opposing counsel first.  It's Exhibit 218, which is already in evidence.

THE COURT:  Yep.

MR. CANNELLA:  Your Honor, may I approach?  I want to give the witness the courtesy of the exhibit before I throw it up on the screen.

THE COURT:  Yep.

THE WITNESS:  Okay.

MR. CANNELLA:  Thank you, Mr. Kakish.  That's my only copy.  Thank you.

BY MR. CANNELLA:

Q.  All right.  Mr. Kakish, I'm showing you Exhibit 218 in evidence.  This is an email from Claudia Mandato to Manoj Sharma.  And then below that email is an email from Claudia Mandato May 10th, 2023.  Do you see that, sir?

A.  Yes, I see it.

Q.  In this email, Ms. Mandato is advising that "The Court ruled that Matt Simmons, his team, Theresa Kemp and Chris Kakish cannot work on the USI accounts."

Do you see that, sir?

A.  Yes, I see that.

Q.  And you had been working on those accounts, you had been

Christopher Kakish - Direct Examination

working on the accounts since you arrived at Lockton in late January of 2023.  Is that right?

**A.**    I had worked on them from sometime in February until the middle of April.

**Q.**    Okay.  And that work was assigned to you by Lockton.  Is that right?

**A.**    That's correct.

**Q.**    Okay.  Ms. Mandato writes that, "I know that most of you have already formed strong ties with the clients for which we thank you."

Do you see that?

**A.**    I see that.

**Q.**    Were you able to form strong ties with the clients that you hadn't worked with previously at USI that were assigned to you when you got to Lockton?

**A.**    I was on the -- for the ones that had renewals coming up and that were going through active renewal processes, I had talked with them a lot.

**Q.**    That would have been within the first 60 days after you got to Lockton.  Is that right?

**A.**    Correct.

**Q.**    You also did work for Hit Promotional Products when you were with USI?

**A.**    Yeah.  I think I reviewed a couple of contracts for them.

**Q.**    And you worked with Hit Promotional Products after you got

Christopher Kakish - Direct Examination

to Lockton?

A.   Yes.  I was assigned to them.

        MR. CANNELLA:  Your Honor, Exhibit 74, there's no objection, it's Tab 5 of your notebook, Mr. Kakish.

        THE COURT:  So it's admitted.

    (Counterplaintiff's Exhibit 74 admitted into evidence.)

BY MR. CANNELLA:

Q.   This is an email, dated February 17th, 2023, from Mr. Sharma to Gary Meadows of Hit Promotional.  You are copied on it.  Do you see that, sir?

A.   Yes, sir.

Q.   This is similar to the email we went over with PGT. Mr. Sharma is advising this client, Hit Promotional, that Matt Simmons, Jack Mitchell, Jackie Rodriguez, Sheila Murray, Emily Carter, and Madison Lieffort can't service the accounts temporarily.  Do you see that, sir?

A.   I do see that.

Q.   If we look at the team chart, core service team, you are the strategic adviser.  Is that right?

A.   Correct.

Q.   The property adviser is still Theresa Kemp.  Is that correct?

A.   That's correct.

Q.   Now, I want to shift gears.  Let's talk about Theresa Kemp for a minute.  Was Ms. Kemp also on the technical resource team

Christopher Kakish - Direct Examination

at USI?

**A.**   Yes, she was.

**Q.**   Did she negotiate property insurance programs with carriers while she was with USI?

**A.**   Yes, she did.

**Q.**   Was she serving that same role when she was at Lockton?

**A.**   Yes.

**Q.**   I want to shift gears and ask you about -- we can turn the lights back on.  Thank you.  I'm sorry.  Appreciate it.

I want to shift gears and talk to you a little bit about Matt Simmons.  Matt Simmons was a colleague of yours at USI.

**A.**   Yes, he was.

**Q.**   And did Mr. Simmons tell you he was leaving USI?

**A.**   He did.

**Q.**   Did you and Mr. Simmons have a conversation at the USI Christmas party about your future with USI?

**A.**   Yes, we did.

**Q.**   And that would have been in early December 2022?

**A.**   Yes, that's correct.

**Q.**   And during that conversation, did you and Mr. Simmons agree to keep each other in the loop about your plans?

**A.**   Yes, we did.

**Q.**   And did Mr. Simmons later definitively confirm for you -- I'll strike that.  I'll try to ask it like a real person.  Did Mr. Simmons tell you he was going to Lockton?

**A.**   Yes, he did.

**Q.**   And did he tell you that at his house?

**A.**   Yes, he did.

**Q.**   He called you up and asked you to come to his house and talk to him?

**A.**   Yes.  We had a meeting on some other business as well.  He said, hey, can you come to my house, he told me at his house.

**Q.**   While you were at his -- let me ask you this.  Between the time of the Christmas party -- between the time of the Christmas party, which would have been in December, and the time that you went to Mr. Simmons's house, which would have been in January, did you apply to Lockton?

**A.**   No.

**Q.**   Had you applied anywhere between the time of the Christmas party and when Mr. Simmons told you -- strike that.  What did Mr. Simmons and you talk about at the Christmas party?

**A.**   We were talking about some of our frustrations.  You know, it has been well known that Matt was frustrated with USI for a while.  We had confided in each other.  I was a little frustrated with some of my career advancement opportunities at USI, some things we had talked about that didn't come through or fell through that I had talked about with USI, and we were kind of just venting about that.

**Q.**   So you're kind of venting about the job?

**A.**   Correct.

Christopher Kakish - Direct Examination

**Q.** All right. And did you both discuss leaving USI, or was it just we're frustrated here?

**A.** I think it was we're frustrated, and, you know, keeping in the loop if we're -- you know, decide to go somewhere else.

**Q.** Okay. And so after that party, at some point, Mr. Simmons called you, and you went over to his house. Do you recall that?

**A.** Yes.

**Q.** And what did Mr. Simmons tell you at his house?

**A.** He told me that he was going to Lockton.

**Q.** And did Mr. Simmons tell you that -- at this meeting, do you recall when in January it would have been?

**A.** I don't. It was -- I don't know. Early, first, or second week, probably the second week.

**Q.** All right. Did Mr. -- did you apply to Lockton on January 16th?

**A.** On January 16th, I did.

**Q.** Going to write CK, January 16th. Mr. Simmons told you before January 16th, that he was going to Lockton?

**A.** That's correct.

**Q.** Do you know how many days it was?

**A.** It was a few days.

**Q.** And did Mr. Simmons tell you that he was going to file a lawsuit against USI.

**A.** At some point, he had mentioned something about a

Christopher Kakish - Direct Examination

potential declaratory judgment action.

Q.   Now, as a lawyer, do you know what a declaratory judgment action is?

A.   Yes.

Q.   Okay.  Did Mr. Simmons tell you before you applied to Lockton that he was going to file a lawsuit?

A.   I don't recall the timing.

Q.   Mr. Kakish, I'm going to show you your deposition testimony just for -- I'm going to have you look -- read it to yourself first, and then I'll ask you some questions about it.

Mr. Kakish, that's from a deposition I took of you in October.

A.   Okay.

Q.   All right.  Mr. Kakish, did Mr. Simmons tell you about his plans to file a lawsuit at the same meeting at his house where he told you that he was leaving for Lockton?

A.   It appears that might have been the timing, yes.

Q.   Okay.  Well --

A.   That's what I said.

Q.   That's what you said in your deposition.  Right?

A.   Yes.

Q.   So at this meeting at his house before January 16th, Mr. Simmons told you he's going to Lockton.  Right?

A.   Correct.

Q.   And he also told you, I'm going to file a lawsuit against

Christopher Kakish - Direct Examination

USI?

**A.**    No.  He said he was contemplating filing a declaratory judgment.

**Q.**    And a declaratory judgment action, as a lawyer, you know what that means, that Mr. Simmons would seek a declaration that his contract was not enforceable?

**A.**    Correct.

**Q.**    And after this meeting with Mr. Simmons, did you apply to -- did you apply for a job at Lockton?

**A.**    I did.

**Q.**    And you didn't apply for a job -- strike that.  Did you apply for a job on the website?

**A.**    Yes.

**Q.**    And you applied on January 16th, your first -- when was your first interview?  Was it January 23rd?

**A.**    Yes, that's correct.

**Q.**    And you spoke with Manoj Sharma on January 23rd.  Is that correct?

**A.**    That's correct.

**Q.**    And you spoke with Mark Morneau?

**A.**    That is correct.

**Q.**    Is that right?  So just so we're clear on the record, did you apply online?

**A.**    Yes.

**Q.**    Do you recall what positions were open on the website?

UNITED STATES DISTRICT COURT

Christopher Kakish - Direct Examination

**A.**   I don't recall all the positions that were open, but I applied for an account executive position.

**Q.**   The interview was on Monday, the 23rd.  Is that right?

**A.**   That's correct.

**Q.**   And when you met with Mr. Sharma, did he tell you that he would -- that you would also be meeting with Lockton's lawyers?

**A.**   He told me that I would be getting an invite, yes.

**Q.**   And did you get an invite from Lockton's lawyer?

**A.**   Yes.

**Q.**   And I'm going to direct you to Exhibit 65.  It is Tab 6 in your notebook.

          **MR. CANNELLA:**  Your Honor, I believe there's no objection to Exhibit 65.

          **THE COURT:**  Okay.  It's admitted.

     (Counterplaintiff's Exhibit 65 admitted into evidence.)

          **MR. CANNELLA:**  For some reason, it's not showing up on the --

          **THE COURTROOM DEPUTY:**  Sorry.  My fault.

          **MR. CANNELLA:**  That's all right.

**BY MR. CANNELLA:**

**Q.**   This is Exhibit 65.  Is this the invite that you received on January 23rd, 2023?

**A.**   It appears to be so.

**Q.**   And who is Mr. Shapiro?

**A.**   Mr. Shapiro is one of my lawyers.

**Q.** Is he the Lockton lawyer?

**A.** Yes. He represents Lockton also.

**Q.** In addition to the assignment of the lawyer, did you and Mr. Sharma discuss indemnification?

**A.** I don't remember if it was during that call or not, but we did discuss it at some point.

**Q.** As a lawyer, you know what indemnification is. Right?

**A.** Yes.

**Q.** What is your understanding of indemnification?

**A.** An indemnification would -- Lockton would agree to defend and indemnify me should I be brought into any type of lawsuit.

**Q.** It means that if there's any -- if there were any judgment against you, Lockton would cover that. Right?

**MR. BANKS:** Objection, Your Honor, to the relevance.

**THE COURT:** No. It's overruled.

**THE WITNESS:** I -- yes, that would -- that would be correct.

**BY MR. CANNELLA:**

**Q.** And you knew before you applied to Lockton that Mr. Simmons was at least contemplating filing a declaratory judgment action. Isn't that right?

**A.** Yes, that's correct.

**Q.** So you knew that, based on what Mr. Simmons told you, that we would likely be here. Correct?

**A.** I don't know if we'd be here, but --

**Q.** I'm being a little too loose. I'm sorry. You knew that it was likely that there would be litigation?

**A.** I knew that was a possibility.

**Q.** You became a member of the Ohio bar in 2004. Is that right?

**A.** 2005.

**Q.** 2005.

**MR. CANNELLA:** Your Honor, Exhibit 66 is in evidence.

**THE COURT:** Yeah.

**MR. CANNELLA:** I'm going to publish it. It's in Tab, I believe, 6, of your -- sorry, Tab 7 of your notebook.

(Counterplaintiff's Exhibit 66 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.** An email from Mr. Sharma to you dated January 24th regarding indemnification language. Do you see that, sir?

**A.** Yes.

**Q.** Okay. I'm not --

**MR. BANKS:** Your Honor, I just need to note for the record, we have a continuing objection to the indemnification.

**THE COURT:** So noted.

**BY MR. CANNELLA:**

**Q.** Now, Mr. Kakish, I'm not going to -- I'm not going to have you read through the whole thing, unless you think it's necessary to answer my question, but is this the indemnification language that Mr. Sharma proposed?

**A.**    Yes.

**Q.**    Does the language provide that you are -- you get indemnification so long as you substantially comply with the advice you were given by your counsel?

**A.**    Yeah.  Amongst other things, yes.

**Q.**    Is there anything in this indemnification language that requires you to comply with your obligations to your previous employer?

**A.**    Yes.

**Q.**    Now, did Lockton tell you that your start date would be January 25th, 2023?

**A.**    Yes.

**Q.**    So did that strike you as kind of quick?

**A.**    It was quick.

**Q.**    When you resigned from a previous employer, did you give two weeks' notice?

**A.**    Yes, I did.

**Q.**    But you didn't have the opportunity to give two weeks' notice to USI in this instance.  Right?

**A.**    No.

**Q.**    Mr. Kakish, I'm going to show you your employment offer letter, Exhibit 67 in evidence, Your Honor, Tab 8.

     (Counterplaintiff's Exhibit 67 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.**    The date of this letter is the same date of your interview

Christopher Kakish - Direct Examination

with Mr. Sharma.  Is that right?

**A.**    That's correct.

**Q.**    And so you applied online on January 16th.  A week later, you get an interview with the chief operating officer of the company, and that same day, you get the employment offer.  Is that right?

**A.**    That's correct.

**Q.**    And they tell you that you're going to start on January 25th, 2023.  Is that correct?

**A.**    That's correct.

**Q.**    And your compensation was set at $275,000 annualized.  Is that right?

**A.**    That's correct.

**Q.**    Now, did you report to work for Lockton on January 25th, 2023?

**A.**    Yes.

**Q.**    Did you send a resignation email to USI on January 25th, 2023?

**A.**    Yes.

**Q.**    And did seven other colleagues of yours start work on the same day, January 25th, 2023?

**A.**    Yes.

**Q.**    The jury already knows these colleagues, but that would be Mr. Simmons, Mr. Mitchell, Ms. Rodriguez, Ms. Murray, Ms. Carter, Ms. Kemp.  Is that right?  And Ms. Lieffort?

**A.**   Yes.

**Q.**   Now, you testified that in every other position that you resigned from, you gave two weeks' notice.  Is that right?

           **MR. BANKS:**  Objection, Your Honor.  Relevance.

           **MR. CANNELLA:**  I'm just setting it up for the next question.

           **THE COURT:**  Fine.  Overruled.

**BY MR. CANNELLA:**

**Q.**   Why didn't you give two weeks' notice this time?

**A.**   I didn't have two weeks' notice to give.  I was excited to get started, and the job was to start on the 25th.

**Q.**   Did you push back at all on the start date?  Said, hey, give me a week, give me till Monday, the 30th?

**A.**   No.  I was excited to get started.

**Q.**   And you knew that Mr. Simmons was starting on January 25th.  Is that right?

**A.**   I don't recall if I knew that.

**Q.**   Well, did you expect to show up on January 25th and you were going to be the only USI guy there?

**A.**   No.

**Q.**   So you knew other people were going to start on January 25th.  Right?

**A.**   Yes.

**Q.**   When you arrived at Lockton, was Claudia Mandato there?

**A.**   Yes.

**Q.** She's from Kansas City?

**A.** That's correct.

**Q.** Right.  And the Lockton office, that's on Boy Scout Road. Right?

**A.** Correct.

**Q.** Over by that mall?  What's that, Westshore Mall?

**A.** International Mall.

**Q.** International Mall.  So Claudia Mandato from Kansas City was there.  Manoj Sharma was there, too, wasn't he?

**A.** Yes, he was.

**Q.** So Manoj Sharma from Atlanta came to Tampa for your first day.  Is that right?

**A.** Yes.

**Q.** And Fred Zutel from Miami, was he there?

**A.** Fred was there early.  I don't recall if it was the first day or not.

**Q.** Okay.  But Fred came up from Miami to Tampa for your first day at Lockton.  Is that right?

**A.** Again, I don't recall if he was there on the first day, but he was there early.

**Q.** I think we already established this, but once you got to Lockton, Lockton assigned you the clients to work on.  Is that right?

**A.** Not that same day, but, yes, eventually, Lockton assigned the clients to me.

Christopher Kakish - Direct Examination

Q.    So on the first day, did y'all have like an office event at a restaurant or something on January 25th, like around 4:00?

A.    I don't recall.

Q.    We talked a little bit about some of the previous announcements that were provided to the Lockton -- I'm sorry, to the clients.  I want to go through just a couple more, not too many.

Exhibit 197 is in evidence, Your Honor.

(Counterplaintiff's Exhibit 197 admitted into evidence.)

BY MR. CANNELLA:

Q.    This is Crescent.  Do you see that, sir?

A.    What exhibit number is it?

Q.    197.  Tab 9 in your notebook.

A.    Tab 9.  Thank you.

Q.    Sure.

A.    Yes, I see that.

Q.    All right.  And this is February 9th, 2023, from Ms. Rodriguez, kind of the same language as the other email to Avesta and MD -- Avesta.

"We are excited to continue our relationship with you and look forward to servicing your business."

Crescent was a client of USI's before January 25th.  Is that right?

A.    Yes, I believe so.

Q.    And the core service team on February 9th was yourself, as

Christopher Kakish - Direct Examination

the strategic adviser, Ms. Rodriguez, as the account executive, Ms. Lieffort, as the account manager, and Ms. Kemp as the property adviser.

A.    That's correct.

Q.    And that changed after -- that changed on February 17th, didn't it?

A.    Yes, that's correct.

Q.    I'm going to show you Exhibit 75, which is in evidence.

(Counterplaintiff's Exhibit 75 admitted into evidence.)

BY MR. CANNELLA:

Q.    Do you know who Theresa Cabilao is?

A.    I believe she was the client contact at Crescent.

Q.    All right.  And so this is similar to the other email regarding PGT and Hit Promotions where Crescent is advised that certain people from USI need to stop servicing the accounts. Do you see that?

A.    Yes, I see that.

Q.    And then the new team chart, you're still the strategic adviser and Theresa Kemp is still on this.  Is that correct?

A.    Correct.

Q.    Now, that -- did that change in May of 2023 as well?

A.    It actually changed at some point in April.

Q.    April 2023.  Now, I want to ask you about Avesta.  That was the first exhibit we looked at, the announcement of the team for Avesta that went out February 9th of 2023.  It was in

Christopher Kakish - Direct Examination

your notebook at Tab 3.

Did Avesta get an email on February 17th, advising them that certain service team members could no longer work on their accounts?

I'll show you Tab 11 in your notebook.  It's Plaintiff's Exhibit 71, which is in evidence.

**A.**   Yes.

(Counterplaintiff's Exhibit 71 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.**   This is a February 17th, 2023 email to Avesta.  And we saw the February 9th email where you were listed as the strategic adviser.  I want to direct your attention to one of the responses that you got from Avesta.

Rachel Ridley, is this the contact person at Avesta?

**A.**   Yes.  She was the main contact.

**Q.**   And she asked whether Theresa Kemp can stay on the account.  Do you see that, sir?

**A.**   Yes.

**Q.**   And you write back, "That is correct."  That's your signature, and this is what we talked about earlier, Chris Kakish, JD.

And was Ms. Ridley glad to hear that news, that Theresa Kemp could continue to work on the account?

**A.**   That's what she wrote, yes.

**Q.**   Ms. Ridley wrote, "Super happy to work with Theresa again.

She's the best!"  Right?

**A.**   Correct.

**Q.**   Did any of the clients that received the February 17th email express to you or Lockton that they hoped the situation was temporary, that Mr. Simmons and his team would be able to come back to servicing the accounts soon?

**A.**   I don't recall.  Might have.

**Q.**   Well, you've been in the -- have you been in the insurance broker business since 2014?

**A.**   End of 2013 -- no, I'm sorry.  Yeah.  End of 2013.

**Q.**   And is it your experience that clients don't like change?

**A.**   Sure.

**Q.**   Clients like to work with the same producer and same service team?

**A.**   If they have a good one, yeah, I think everybody likes to work with people they trust.

**Q.**   And so clients -- if clients had their preference, it would be to work with the same team.  Is that right?

**A.**   I would think so.

**Q.**   Okay.  And did any USI clients tell you that they -- that they wanted to work with the same team that they worked with at USI?

**A.**   I don't remember specifically.  They may have.

**Q.**   Well, Lockton assigned over 20 clients to you.  Is that correct?

Christopher Kakish - Direct Examination

**A.**    I think that's about correct.

**Q.**    Okay.  And did some of those clients express that they hope that this would get resolved quickly so they could go back to working with the people that they worked with at USI?

**A.**    I honestly don't recall at the moment.  They may have. I'm not trying to --

**Q.**    That's fine.  I know it's been a long time ago.  That's why I got the documents to show you.

**A.**    Fair enough.

**Q.**    Okay.  So Tab 13 in your notebook is Plaintiff's Exhibit 81.  I don't believe there's any objection to this, Your Honor.

         **THE COURT:**  Okay.

         (Counterplaintiff's Exhibit 81 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.**    This is another one of those emails that Mr. Sharma sent on February 17th of 2023.  Do you see that, sir?

**A.**    I do.

**Q.**    And this is an email to SCG Group, same date.  That was a client of USI that was now a client of Lockton.  Is that right?

**A.**    I believe it's a client of Lockton's currently.

**Q.**    Right.  But it was a client of USI's before?

**A.**    Yes.

**Q.**    Okay.  In fact, all of the 20 accounts that you were assigned were former clients of USI.  Is that right?

Christopher Kakish - Direct Examination

**A.**    I believe so, yes.

**Q.**    Okay.  Now, do you know who Tony Haddad is?

**A.**    Yes.

**Q.**    Is he the -- is he the decision-maker at SCG?

**A.**    Yes.

**Q.**    What's his position, if you know?

**A.**    I don't know exactly.

**Q.**    Now, Mr. Haddad receives this email from Mr. Sharma.  And then he writes back -- and that was a Friday, February 17th, that he received it.

He writes back on the 20th, Monday, "Thanks for the update.  Hopefully, this gets resolved quickly."

Do you see that?

**A.**    I do.

**Q.**    And did any other clients express to you disappointment that Mr. Simmons and his service team could not service the accounts at Lockton the same way that they were servicing the accounts at USI?

**A.**    They may have.

**Q.**    Let me show you another document, Plaintiff's Exhibit 160. It's Tab 14 in your notebook.  See that, sir?

**A.**    Yes.

          **MR. CANNELLA:**  Okay.  Your Honor, we're going to move into evidence Plaintiff's Exhibit 160.

          **THE COURT:**  Any objection, same objection.

MR. BANKS: No. I think -- whatever objections we had, we've dealt with already.

THE COURT: All right. Good, thanks. It's admitted.

(Counterplaintiff's Exhibit 160 admitted into evidence.)

BY MR. CANNELLA:

Q. So this is an email from Zach Oseland of ZMR. Do you know who Zach Oseland is?

A. I do.

Q. Did you have -- after February 17th, did you have contact with Zach? Were you the primary contact for ZMR?

A. Yes.

Q. Was Zach Oseland the contact for ZMR?

A. He was my main contact.

Q. You would speak frequently with Mr. Oseland?

A. Yes. We spoke frequently at that time.

MR. CANNELLA: It's admitted.

MR. ZIMMERMAN: Zoom in.

MR. CANNELLA: Okay. I'm getting there.

BY MR. CANNELLA:

Q. Did Mr. Oseland ever tell you that he wanted to work with Mr. Simmons and his team?

A. I don't know if he actually told me that, but he was -- you know, he -- at some point, he was frustrated with the situation.

Q. All right. Did you tell Mr. Oseland in April or May of

Christopher Kakish - Direct Examination

2023 that you weren't going to be able to work with ZMR anymore?

**A.**   Yes.

**Q.**   And how did he take that news?

**A.**   Seemed to take it fine when I talked to him.

**Q.**   All right.  Let's look at the email.  This is an email that Mr. Oseland sent internally on May 1st, 2023 to Matthew Fluharty.  Do you see that, sir?

**A.**   Yes.

**Q.**   And let me direct you to the second paragraph first. "Lockton told Chris and Theresa" -- I'm assuming that's you and Theresa Kemp.  Is that right?

**A.**   I would assume so.

**Q.**   "To get pencils down for a few days.  It told them not to notify clients because it didn't want to send alarming letters that 'they can't take work on your account.'  Chris was not supposed to have called me last week to inform me of this, but he did."

Is that right?

        **MR. BANKS:**  Objection, Your Honor.  Misstates the document.

        **THE COURT:**  Well, the document is in evidence.  It speaks for itself, and the witness can address the question.

        So go ahead.

        **THE WITNESS:**  I'm sorry.  Can you repeat the

Christopher Kakish - Direct Examination

question?

BY MR. CANNELLA:

Q.    I'm not trying to say you did anything wrong.  I just want to confirm the time line.

Did you call Mr. Oseland and tell him that you and Theresa Kemp couldn't perform work on the account?

A.    I did.  I was frustrated because there were a lot of emails that I had not responded to.  And I finally wanted to tell them, hey, we can't -- you know, we've been asked to step aside and no longer work on the account at this time.

Q.    And Mr. Oseland writes Mr. Fluharty, "FYI the shitshow of moving to Lockton continues."

Do you see that?

A.    That's what it says, yes.

Q.    Is there Oseland expressing dissatisfaction with the move to Lockton thus far?

MR. BANKS:  Objection.  Lacks foundation.

THE COURT:  I'll sustain that.  The document speaks for itself.

BY MR. CANNELLA:

Q.    All right.  Mr. Oseland writes, "So now we've been shuffled to Dan and Lisa [sic], our second set of brokers we don't know from Adam during our main renewal season."

Do you see that, sir?

A.    Yes.  That's what it says.

**Q.** Now, are you familiar with the expression I don't know you from Adam. That's pretty common expression. Right?

**A.** That's correct. Yes.

**Q.** Now, you testified earlier that clients in this industry like to work with producers and service teams that they know. Is that right?

**A.** Yeah. I think that's not just in this industry, that's everywhere.

**Q.** Okay. In this instance, ZMR goes from USI to Lockton. Is that right?

**A.** Correct.

**Q.** And then on February 17th, ZMR learns they can't work with Simmons or members of the Simmons team. Is that right? I can go through all --

**A.** Yeah.

**Q.** -- 20 of the emails --

**A.** No. I --

**Q.** -- Mr. Sharma sends that to all the clients. Right?

**A.** Correct.

**Q.** And then in May -- so you get assigned to the account. Right? Former USI employee, with Theresa Kemp is on the account. Right?

**A.** In February, correct.

**Q.** And then in May, ZMR is told you and Theresa can't work on the account?

Christopher Kakish - Direct Examination

**A.**  Correct.

**Q.**  Is there currently a producer assigned to ZMR?

**A.**  I have no idea.

**Q.**  Do you still have your deposition in front of you?

**A.**  Yeah.

**Q.**  Take a look at Page 105, Lines 14 through 19.

        **MR. BANKS:**  Page 105.

        **MR. CANNELLA:**  105 Page, 14 through 19, and the discussion continues, I think, at 105, 23, just assignment of producer.

        **THE WITNESS:**  Yes.

**BY MR. CANNELLA:**

**Q.**  All right.  Have you had an opportunity to read that testimony, sir?

**A.**  Yes.

**Q.**  Is there a producer -- as of your deposition, which was in October of last year, a new producer been assigned to the ZMR account?

**A.**  To my knowledge, there was not one.

**Q.**  And isn't that true for all of the accounts that you were handling?  There was no -- there was nobody in the producer role?

**A.**  To my knowledge, that's correct.

**Q.**  But -- and at USI, the producer for those accounts was Mr. Simmons.  Right?

**A.**    At USI.

        **MR. CANNELLA:**  Just a minute, Your Honor.  No further questions, Your Honor.

        **THE COURT:**  Let's take a short break before the cross-examination.  Five minutes.  Thank you.

        **THE COURT SECURITY OFFICER:**  All rise for the jury.

    (Jury out at 10:16 a.m.)

        **THE COURT:**  Okay.  See you in five.

    (Recess from 10:17 a.m. to 10:29 a.m.)

        **MR. ZIMMERMAN:**  Your Honor, one quick request, or do you want to just jump into the witness?

        **THE COURT:**  What?

        **MR. ZIMMERMAN:**  I think it's a little confusing about the different ways we've been describing the declaratory judgment lawsuit.  I think at some point -- and we didn't put it into evidence, which is fine, so they can't see it themselves.  But at some point, I think if the Court could explain to the jury that it's a lawsuit, it's a lawsuit seeking a declaration on contracts, but it's not a lawsuit for damages.

        **THE COURT:**  Write something up.  I don't have a problem with that.  I think I did that someplace already.  Maybe it's in the jury instructions I'm working on.  But write something up.

        **MR. ZIMMERMAN:**  Thank you, Judge.

        **THE COURT:**  I'm open to that.  So let's go with the

cross.

THE COURT SECURITY OFFICER:  All rise for the jury.

(Jury in at 10:31 a.m.)

THE COURT:  Have a seat, everybody.

Cross-examination.

MR. BANKS:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. BANKS:**

**Q.**   Good morning, Mr. Kakish.

**A.**   Good morning.

**Q.**   I wanted to go back to something you testified about when Mr. Cannella was asking you questions.  The conversation you had with Mr. Simmons at the holiday party.  Remember that?

**A.**   Yes.

**Q.**   Okay.  First, where were you guys when you had the conversation?

**A.**   We were walking back to the parking garage after the party had ended.

**Q.**   You mentioned you expressed to Mr. Simmons you had some frustrations.  Is that right?

**A.**   I did.

**Q.**   What were those frustrations?

**A.**   During my time at USI, we had talked a lot with leadership about career advancement opportunities.  And I was assured there was a plan for me.

Christopher Kakish - Cross-Examination

I had looked into a couple of different roles.  In fact, I was approached about those roles, and they didn't work out. And I was getting a little just kind of disillusioned as far as what my career -- you know, career path was going to be at USI.

Q.   How long had you been at USI at that point?

A.   Year and a half.

Q.   Okay.  And when you started work at USI, did you relocate?

A.   I did.  I moved to Tampa from Cleveland, Ohio.

Q.   Okay.  And it was mentioned earlier that you were a lawyer.  When did you practice law?

A.   I practiced law from 2005 to 2009.

Q.   Okay.  So about four years?

A.   Correct.

Q.   And was that back in Cleveland?

A.   Yes.

Q.   All right.  Then from there, what did you do next?

A.   I went and worked for Travelers, an insurance company, as a claim counsel.  I was in that position for about a year and a half, and I was asked to take an underwriting role, and I underwrote.  And from there, I left to go to a broker in Cleveland, Ohio, Oswald Companies, and was there from 2013 to '21.

Q.   Why did you leave there to go move down to Tampa, Florida and join USI?

A.   USI had reached out to me through a recruiter about a --

at the time, it was an EPS. Forgive me. I can't remember exactly the acronym. I think it is executive and professional services. It's a director job at USI in the tech resources team. That job would have been responsible for management liability coverages, directors and officers, employment practices, cyber, fiduciary, things of that nature.

So I had some interviews with them and went through the interview process, talked to Tom Longhta and Brian Carlson, Earl Barkley, and several others at the time. Interviewed for that position. And then, ultimately, I didn't get that position. They offered me a different position as well, which is the position I took, the casualty analytics and placement leader.

**Q.** Did you-all discuss, at that time or after you joined USI, whether you would have opportunities for advancement?

**A.** Oh, yes.

**Q.** And what was told to you in that?

**A.** I would -- I was told that there was definite advancement opportunities sooner rather than later, whether it be progressing through tech resources, towards a tech resources director job.

I was approached about a -- becoming a practice leader at USI. Practice leader at USI is really more of a sales leader, responsible for oversight of producers and helping them reach their sales goals. And then, finally, we got into significant

Christopher Kaklish - Cross-Examination

conversations about the regional operations leader position.

Q.   Okay.  And approximately when was it you were having conversations with people at USI about you becoming a practice leader?

A.   You know, that was probably early 2022.

Q.   And that would have been in property and casualty or in some other group?

A.   In property and casualty.

Q.   And were there other practice leaders in property and casualty there already?

A.   Yes.  Each office had a practice leader, at least one.

Q.   Was Blake Varnadore the -- an existing practice leader for property and casualty?

A.   He was.

Q.   Okay.  And what happened to that opportunity?

A.   You know, we had some initial conversations about it, and then it just kind of fizzled.  I got left on the vine.

Q.   And then you said you also talked with leadership at USI about potentially working -- or taking the job as -- was it operations leader for the Southeast?

A.   Correct.  On the property and casualty operations leader for the Southeast.

Q.   And who had that job at the time?

A.   It was Shari Segall.  And so what happened there with that opportunity?

Christopher Kakish - Cross-Examination

Q.   Well, first, I guess, let me ask you this.  When was it you were having these discussions?

A.   This would have been in the -- excuse me -- the fall of 2022, September, October, November.

Q.   Okay.  So a little before the holiday party?

A.   Correct.

Q.   Okay.  So what happened there?

A.   I had had a lot of conversations with Francisco Saldana, who was the regional practice leader, and Tom Longhta, the CEO, about the role.  They thought it would be a great opportunity.  Shari was retiring, and they were looking for somebody to move into that role.  I think we all saw it as a bigger job, right, more reports, and taking over operations for the whole region.

     And so I had a few conversations.  I had started having some meetings with Shari Segall, the kind -- she was kind of showing me the ropes of what the job entailed, giving me, you know, just some insight, background, making sure it was something that I wanted to pursue.  And ultimately, I went to Tom, and I said, you know, yes, let's make this happen.

     We started talking about compensation, and he had to get that approved by the home office in Valhalla, New York.  And, ultimately, the compensation came back that it was going to have to -- if I wanted that position, it would have to take a pay cut.

Q.   Was it a substantial pay cut?

**A.**    Yes.

**Q.**    About how much?

**A.**    About $40,000.

**Q.**    Had you ever -- had you earlier thought this would be a promotion?

**A.**    I was definitely under the impression that it would be a promotion, yes.

**Q.**    Have you ever heard of a promotion where you had to take a pay cut before?

        **MR. CANNELLA:**  Objection, Your Honor.  Relevance, speculation, foundation.

    (Bench conference begins.)

        **MR. CANNELLA:**  I can answer Mr. Bank's question by the way.

        **MR. BANKS:**  Objecting to his state of mind?  This is why he left.

        **THE COURT:**  I think this is -- I'm overruling the objection.  But do you want -- what's the point of all this?

        **MR. BANKS:**  They're saying he was stolen.

        **THE REPORTER:**  Can you get closer to the mic?

        **MR. BANKS:**  They're saying he was stolen.  He's explaining why he was interested in looking for another job opportunity at the time.

        **THE COURT:**  Maybe just ask him that.  It would be a lot shorter.  Overruled.

Case 8:23-cv-00201-TPB-AAS    Document 300    Filed 09/07/24    Page 77 of 281 PageID 812
21164
Christopher Kakish - Cross-Examination

Vol 4, Pg 812

**MR. CANNELLA:**  Thank you, Your Honor.

(Bench conference concluded.)

**BY MR. BANKS:**

**Q.**   Had you personally ever heard of a promotion that involved a big pay cut like that?

**A.**   I have not.

**Q.**   Okay.  What was your reaction to that?

**A.**   I was a little disheartened.  I was excited about that opportunity and was disillusioned a little bit.  And started to make me question what those advancement opportunities at USI really would look like.

**Q.**   So when was it that you had that conversation with Mr. Longhta and he told you about the pay cut?

**A.**   I believe that was, you know, Novemberish.  I can't remember the exact date.

**Q.**   And so is that what you were talking about with Mr. Simmons at the holiday -- or after the holiday party?

**A.**   That was one of the things, yeah.

**Q.**   You said that you and Mr. Simmons kind of agreed to let each other know if you found another opportunity.  Is that right?

**A.**   Yes.

**Q.**   And why did you do that?

**A.**   I liked working with Matt.  I knew he was upset.  You know, I just -- we were friends.

**Q.**   You said you knew he was upset.  How did you know he was upset before?

**A.**   It was well-known that Matt was frustrated with USI for the entirety of the time I was there.

**Q.**   In your position, were you one of the leaders in the technical resource group for the Southeast region?

**A.**   Yes.

**Q.**   Was it discussed amongst the leadership of technical resources --

          **MR. CANNELLA:**  Objection, Your Honor.  Relevance.

          **THE COURT:**  The question is not over yet.  But I might sustain the objection.

          Go ahead.

**BY MR. BANKS:**

**Q.**   Whether Mr. Simmons was dissatisfied with things at USI?

          **MR. CANNELLA:**  Objection, Your Honor.  Relevance and hearsay.

          **THE COURT:**  Yeah.  Well, if you have personal knowledge of this, you can answer it.  You're a lawyer.  You know what the concept is.  All right.  Do you have personal knowledge of this?

          **THE WITNESS:**  I do have personal knowledge.

          **THE COURT:**  All right.  Then you can answer.  Don't repeat any hearsay in your answer.

          **THE WITNESS:**  We had -- I had been a part of meetings

to -- with other leadership to --

**MR. CANNELLA:**  Objection, Your Honor.  That's hearsay.

**THE COURT:**  Agreed.  Over -- so ask something else.

**BY MR. BANKS:**

**Q.**    Let me ask about your role at USI, since you were asked about, you know, you had worked on some clients.  What was your position again?

**A.**    I was the casualty analytics and placement team leader.

**Q.**    Was that considered a client-facing role?

**A.**    No.

**Q.**    What is a client-facing role?

**A.**    Client-facing role would be somebody like a -- an account service team or producer that is in front of clients every day, tasked with day-to-day responsibilities for servicing the client account.

**Q.**    Was your work primarily behind the scenes?

**A.**    Yes.

**Q.**    What does that mean?

**A.**    It means that I didn't really -- I didn't have direct contact with clients on a frequent basis.

**Q.**    Did you manage any clients at USI?

**A.**    I did not.

**Q.**    Did you regularly service any particular clients at USI?

**A.**    No, I did not.

Christopher Kakish - Cross-Examination

Q.   And, specifically, did you regularly service any of the clients in Matt Simmons's or Jack Mitchell's books of business?

A.   No, I did not.

Q.   Okay.  I want to ask you about some of the specific clients that you were asked about.  You were asked about Avesta.  Do you remember that?

A.   Yes.

Q.   Okay.  Did you say that you met with what, four to five -- what were their jobs?

A.   Property managers.

Q.   Property managers.  So around when was that, that you met with them?

A.   It was March or April of '22.

Q.   Okay.  And so you met with four to five property managers, and what did you discuss with them?

A.   How to read the insurance provision in a contract or lease agreement.

Q.   Were any of those people, people that made the insurance purchasing decisions at Avesta?

A.   Not to my knowledge, no.

        MR. CANNELLA:  Objection, Your Honor.  Relevance and speculation.

        THE COURT:  Overruled.

BY MR. BANKS:

Q.   Did you maintain relationships with any of those four to

Christopher Kakish - Cross-Examination

five people?

A.   No.

Q.   Did you utilize your relationship with any of those -- or the one meeting you had with them, with any of those four to five people to do work for Avesta at Lockton?

A.   No.

Q.   So you were asked about PGT.  Did you say you were involved in some potential -- some due diligence for a potential acquisition?

A.   Yes.  That's correct.

Q.   Can you explain kind of what that was?

A.   So when a company is looking to acquire another, there often is a due diligence process, where we will review the insurance program for the target, being -- the entity being acquired, and make observations.

So I would review the insurance provisions or their insurance program, make observations, put it in a report, and send it back to the service team.

Q.   When was that, that you did that approximately?

A.   I don't recall the dates.  I did it on a couple of occasions.

Q.   Did you use any of that information in providing service to PGT once you got to Lockton?

A.   No.

Q.   Hit Promotional Products, did you say you had reviewed a

couple of contracts for them?

**A.**   Yeah.  I think I reviewed some -- a few contracts, warehousing agreement, maybe.

**Q.**   When you got to Lockton, did you use any of the insight you had gleaned from reviewing those contracts to provide service to them, to Hit Promotional Products?

**A.**   No, I didn't.

**Q.**   At Lockton, did you believe you did anything that violated your contract with USI?

        **MR. CANNELLA:**  Objection, Your Honor.  Calls for legal conclusion.

        **THE COURT:**  Well, he can give that.  It's his contract, and he's a lawyer.  Overruled.

        **THE WITNESS:**  I have not done anything to breach my contract.

**BY MR. BANKS:**

**Q.**   I'm going to show your USI contract.  This was, let's see, Trial Exhibit 477.

      Look at Section 3.6A.  Okay.  Mr. Cannella showed you this.  Right?

**A.**   Yes.

**Q.**   Trying to get that straight.  Okay.  Did you understand that the portions of this contract that restricted what you could do only applied to certain clients?

**A.**   That's correct.

Christopher Kakish - Cross-Examination

**Q.** And is it these "Client Accounts that Employee managed or regularly serviced and/or about which Employee obtained, capital C, Confidential, capital I, Information, on behalf of the company within the last two years of Employee's employment with the Company"?

**A.** That's correct.

**Q.** And why do you not believe that you violated that provision while you worked at Lockton?

**A.** Because I did not manage any accounts while I was at USI. I did not regularly service any of these accounts. And I do not have any confidential information for any of these clients.

**Q.** Okay. I want to show you just a list for demonstrative purposes of Mr. Simmons -- I guess of the clients that allegedly were taken from USI.

Okay. So the first company here, IO Hold Co, LLC, do you know -- did you work for that client at USI?

**A.** I've never heard of that client.

**Q.** 1574 Holdings, LLC, did you work on them at USI?

**A.** No.

**Q.** 905 North Florida Avenue OZB Partners, LLC, did you work on them at USI?

**A.** No.

**Q.** ABD Group, Inc./Apothecary By Design, did you do any work for them at USI?

**A.** That client doesn't -- it doesn't sound familiar to me.

UNITED STATES DISTRICT COURT

Christopher Kakish - Cross-Examination

**Q.** The next one is AI 1754 Saint Petes LLC. Did you know that client, or did you work on that client?

**A.** I did not do any work for that client at USI.

**Q.** We talked about Avesta. The next one is Ayon Capital LLC. Did you do work on them at USI?

**A.** I don't recall. I don't think so.

**Q.** Better Health Group, LLC, did you do work on them at USI?

**A.** No, not that I can recall.

**Q.** Big Truck Rental, LLC, did you do work on them while at USI?

**A.** No, sir.

**Q.** We talked -- well, Crescent Real Estate, did you do work for them while you were at USI?

**A.** No, sir.

**Q.** Denver High School-EF Court Place, LLC, did you do work on them at USI?

**A.** No, sir.

**Q.** ECA Property Holdings, LLC, did you do work on them at USI?

**A.** I don't believe so.

**Q.** We talked about Hit Promotional Products. What about IFP Group, LLC, did you do work on them at USI?

**A.** No.

**Q.** That's a no?

**A.** That's a no.

Christopher Kakish - Cross-Examination

**Q.** Marksman Security Corporation, did you do work on them at USI?

**A.** No.

**Q.** MoreSpace Management, LLC, did you do work on them at USI?

**A.** No, sir.

**Q.** Mothership, LLC, did you do work on them at USI?

**A.** No, sir.

**Q.** NavaDerm Holdings, Inc. Did you do work on them at USI?

**A.** I may have reviewed one contract.

**Q.** Did you use any of that information that you gleaned from reviewing a contract --

**A.** No, sir.

**Q.** -- while you were at Lockton?

**A.** Sorry for speaking over you. No, sir.

**Q.** Okay. Did you take anything from USI? Did you take any documents with you that you used at Lockton?

**A.** Absolutely not.

**Q.** Let's see, OM Ventures, did you work on them at USI?

**A.** No.

**Q.** PCP Group, LLC, DBA Pellon Consumer Products, did you do work on them at USI?

**A.** No.

**Q.** We talked about PGT.

What about Robbins Property Associates, LLC?

**A.** No.

Christopher Kakish - Cross-Examination

**Q.** SCG Hotel, LLC, did you work on them at USI?

**A.** No.

**Q.** The Ritz-Carlton Dallas Hotel, did you work on them at USI?

**A.** No.

**Q.** Tuuci, LLC, did you work on them at USI?

**A.** I don't believe so, no.

**Q.** And ZMR Investments, did you work on them at USI?

**A.** No, I don't believe so.

**Q.** Okay. I want to ask you about Exhibit 160 that you were shown.

I've highlighted what Mr. Cannella highlighted during his questioning of you. Okay. So, first, up here, I want to talk about this sentence, it says, "Now we've been shuffled to Dan and Lina, our second set of brokers we don't know from Adam during our renewal season."

Do you see that?

**A.** Yes.

**Q.** Did you understand that the first set of brokers that they had been dealing with that they didn't know from Adam was you?

**A.** That's my understanding.

**Q.** So is it true you didn't know these people before that?

**A.** That's correct.

**Q.** Also, Matt Fluharty, do you know who that is?

**A.** I know who Matt is.

**Q.** Who is Mr. Fluharty?

**A.** I don't know his title. I know he works at -- he's one of the decision-makers at ZMR.

**Q.** Okay. Also down here, Mr. Cannella read to you, he said, "So Lockton told Chris and Theresa to go pencils down for a few days."

First, is it true that in April of 2023, you had been directed to go pencil down on the clients?

**A.** Yes, that's true.

**Q.** And other than telling Mr. Oseland about that fact, did you do anything to tell any of the clients you had been working on what was going on?

**A.** No, I did not.

**Q.** Okay. So then he writes, "It told them not to notify clients because it didn't want to have to send along alarming letters saying they can't work on your account."

And then I want to read the rest of what Mr. Cannella skipped. "'Oh, wait, yes, they can' in rapid succession."

What were you trying to convey there?

**A.** There was a -- there was a hearing on the declaratory judgment action in April, I believe, and I was --

**MR. CANNELLA:** Your Honor, sidebar, please.

**THE COURT:** Yes.

**MR. CANNELLA:** I want to make sure I know.

(Bench conference begins.)

**THE COURT:** This might be a good -- well, this might be a good time to clean all of this up and just explain to the jury what happened, but what's the objection?

**MR. CANNELLA:** It's actually I'm concerned about him waiving his attorney-client privilege. He's talking about what happened at the hearing. How else would he know that except for the attorneys reporting back?

**MR. BANKS:** I'm asking what he conveyed to Mr. Oseland.

**THE COURT:** Well, whatever.

**MR. CANNELLA:** The answer was going into --

**MR. BANKS:** I can keep it tighter.

**THE COURT:** It's really up to you, because sooner or later, you know, we live in the world, you guys live in this world, which is really a shame, of gotcha, gotcha.

**MR. CANNELLA:** Trying to avoid the gotcha.

**THE COURT:** I know. He's going to -- I'm surprised he hasn't done it yet, because some of these people have said stuff that we don't really know who they heard it from at Lockton. Was it Lockton or was it Lockton's slash their lawyer? And I'm just surprised we haven't heard any complaints about that, so just be careful. That's all.

You see what I'm saying?

**MR. BANKS:** Yeah.

**MR. CANNELLA:** I mean --

**MR. BANKS:**  He was --

**MR. CANNELLA:**  -- if he learned that -- if he learns that from a lawyer, then he's waiving privilege.

**THE COURT:**  I'm surprised this is the first time I've heard this.

**MR. BANKS:**  So, Your Honor, as far as the history of what happened in the injunctions, et cetera, we wrote together a proposed statement in the --

**THE COURT:**  You have something?

**MR. CANNELLA:**  There's a suggested jury instruction.

**THE COURT:**  Okay.

**MR. BANKS:**  We submitted that a long time ago.

**MR. CANNELLA:**  It doesn't explain the dec action and all that other stuff.

**THE COURT:**  Well, you're going to work on something. Right?  You can use that as a draft.  It should be a common-sense, noncontroversial, just so there's not people confused about what happened.  So work on that.  Maybe we can do that after lunch.

**MR. ZIMMERMAN:**  Yes, Your Honor.

**THE COURT:**  All right.  So that objection is overruled, but you understand the issue.

(Bench conference concluded.)

**THE COURT:**  Go ahead.

Christopher Kaklish - Cross-Examination

**BY MR. BANKS:**

**Q.** Let me reask the question. I want to keep it tight. Was the concern that you expressed to Mr. Oseland that you didn't want to send confusing directives to the client in April?

**A.** Yes.

**Q.** Okay. And just to be clear, did you ever work on that account again after going pencils down?

**A.** No.

**Q.** All right. I want to get back to -- okay. So to -- let me orient you in time. We talked a little bit ago about the conversation at the holiday party with Mr. Simmons.

**A.** Yes.

**Q.** And did you say it was sometime in January, earlyish January that you had a further conversation with Mr. Simmons?

**A.** Correct.

**Q.** You mentioned that you were working on a client. What was the issue going on?

**A.** There was a client named isolved that was -- they were doing an acquisition. I think they had recently just had a change in decision-maker or CFO, something of that nature, and there was some questions regarding the -- I believe it was the target cyber program, and so we were talking about that.

**Q.** And just to be clear, is isolved a client that came over to Lockton?

**A.** Not to my knowledge.

UNITED STATES DISTRICT COURT

**Q.**   And Mr. Simmons asked you to come to his house.  Is that what you said?

**A.**   Yes.

**Q.**   Was that unusual to you, to meet at Mr. Simmons's house?

**A.**   Matt often was on the go and worked from a lot of different places.  So it didn't strike me at the time.

**Q.**   All right.  So after your conversation with Mr. Simmons -- well, first, let me ask you a little about that conversation. Did Mr. Simmons -- what did he tell you specifically about his potential job change, starting from the beginning.

**A.**   He said, you know, like a few weeks ago, I told you I was going to -- you know, I'd let you know if I was going to, you know, leave, and I've decided -- I've decided to go.

**Q.**   And what was your reaction to that?

**A.**   Shocked, but not shocked.  You know, like, it was the timing kind of got you, but it was not a surprise to me.

**Q.**   Do you remember anything you said after that?

**A.**   I think I guessed that it was -- that he was -- you know, I asked him, I said, Where are you going, Lockton?

**Q.**   And why did you guess that?

**A.**   Because the reputation of Lockton.  It's just -- it always seemed -- from what I knew about the company, it seemed like it would be a good fit for Matt.

**Q.**   And had you been personally interested in going to Lockton before that?

**A.** Yeah. Knowing about Lockton for a long time, about four years prior, I had been reached out to by a recruiter when I was still living in Cleveland, by a Lockton recruiter. Got to know a little bit more about the company.

**Q.** Did Mr. Simmons suggest to you that you could apply at Lockton?

**A.** I said -- at some point, I said, Oh, is there anything for me?

He said, You'd have to go look at the website.

**Q.** Was that, like, a big revelation to you, that you could look on the Lockton website?

**A.** No.

**Q.** You know how to use the Internet?

**A.** Yes.

**Q.** So after that, you submitted an application?

**A.** I did.

**Q.** And you said you applied for an account executive role, was that the same role you had at USI?

**A.** No, it was not.

**Q.** And why did you apply for an account executive role?

**A.** It was a job that I had done before. It was open. And, you know, my prior experience is, when you apply for jobs, it's not always the job you get. So I just wanted to get my name out there and have a conversation, start talking about it.

**Q.** Did you see this as an opportunity to maybe, you know, get

your foot in the door?

**A.**    Get my foot in the door, learn more, get to talk to, you know, some people at Lockton, get them to know me.

**Q.**    You were asked a little bit about whether you resigned without notice.  Were you required to give notice to USI to resign?

**A.**    No.

**Q.**    Did you think it was unusual to resign without notice?

**A.**    People do that all the time.

**Q.**    Why did you resign without notice?

**A.**    Because the job started the next day, and I was excited to get started.

**Q.**    Were you involved in the transfer of any business from USI to Lockton?

**A.**    No, I was not.

**Q.**    Did you assist with any of the broker-of-record letters that day or thereafter?

**A.**    No, I did not.

**Q.**    Did you, you know, get to Lockton and start calling on your clients?

**A.**    I didn't have any clients.

**Q.**    So is that a no?

**A.**    That's a no.  I didn't call anyone.

**Q.**    Did you -- did you participate in any calls with any clients that day?

**A.**   No, I did not.

**Q.**   Did you say earlier that you didn't start working on any clients until sometime in February?

**A.**   That's correct.

**Q.**   Okay.  And by that time, the clients that you worked on, had they already left USI?

**A.**   Yes.

**Q.**   And they had already transferred to Lockton?

**A.**   Yes.  That's my understanding.

**Q.**   Okay.  Let me ask you about couple of these.  I don't want to belabor this.  Okay.  Looking at Exhibit 199 in evidence, as used in your direct, this is one of these team charts.  Do you see it?

**A.**   Thank you.  Yes.

**Q.**   That was sent on February 9th, 2023?

**A.**   Yes.

**Q.**   Do you know, was that a Thursday?

**A.**   I don't know the day of the week.

**Q.**   You don't know.  Do you recall when it was -- well, first, you see the -- Ms. Lieffort and Ms. Rodriguez are on here as highlighted.  Right?

**A.**   Yes.

**Q.**   And did they stop work on those clients a few days later?

**A.**   Yes.

**Q.**   Okay.  And were you and Ms. Kemp included in the first

Christopher Kakish - Cross-Examination

order that came out?

A.    No.

Q.    Let me ask about the second page on the team chart.  I know you were shown these top four or five people.  It's a whole page.  Right?

A.    Yes.

Q.    And these other names that I've highlighted, did they come over from USI to Lockton at that time?

A.    No.

Q.    Okay.  With respect to the clients that you did work on at Lockton during that February to April time period, who did you understand had the -- previously had the primary relationship with those clients, except for ECA Properties?

A.    As far as, like, who brought those clients -- who initially got the client relationship?

Q.    Yeah.  Who had the primary client relationship back at USI?

A.    Matt Simmons.

Q.    Do you have any reason to believe that you could have retained those clients, based on your prior work and relationship with them at USI, if you never left USI?

A.    I didn't know any of these clients, so no.

Q.    Did you ever have a conversation with Jack Mitchell about Lockton or leaving USI before you got to Lockton?

A.    No.

Christopher Kakish - Redirect Examination

**Q.** Did you have any -- well, that's all on Mr. Mitchell.

All right. There's been a contention in this case that you were stolen or poached, that you were an asset that was stolen or poached from USI to Lockton. Do you agree with that?

**A.** Absolutely not.

**Q.** Why not?

**A.** I'm not -- I'm not something that can be stolen. I'm a person. Right? I make my own decisions. I was concerned about the future of USI and my future at USI. And having known about Lockton, it was a place that I wanted to pursue.

**Q.** And if you had found out a little bit later that Matt Simmons had gone to Lockton, do you anticipate you still would have tried to get a job there?

**A.** Yeah. Yes, I do.

      **MR. BANKS:** No further questions.

      **THE COURT:** Any necessary redirect?

      **MR. CANNELLA:** Yeah. Yes, Your Honor.

           **REDIRECT EXAMINATION**

**BY MR. CANNELLA:**

**Q.** Morning, Mr. Kakish. Good morning again, I should say.

**A.** Good morning.

**Q.** When you started at USI, they offered you a 238,000-dollar salary. Is that correct?

**A.** That's correct.

**Q.** And they paid you a bonus of $23,850. Is that correct?

Christopher Kakish - Redirect Examination

**A.**    At the -- not when I started.

**Q.**    Okay.  And they also paid for your relocation expenses from Cleveland to Tampa.  Is that right?

**A.**    Yes, they did.

**Q.**    You had only been at USI for about a year and a half when you left.  Is that right?

**A.**    That's correct.

**Q.**    And despite any dissatisfaction that you may have had with USI, it's true that you didn't -- you didn't apply anywhere until Matt Simmons told you that he was going to Lockton?

**A.**    That's correct.  I did not apply anywhere.

**Q.**    And when you interviewed at USI, was there more than two days between the day you interviewed and the day you started at USI?

**A.**    Yes.

**Q.**    I'm sorry, at Lockton.

**A.**    I'm sorry.

**Q.**    I misspoke it, too.  Right?

**A.**    Yeah.

**Q.**    So it took more than two days between interview and your first start date at USI.  Is that right?  It took more than two days?  I think I had it right the first time.

**A.**    I'm sorry.  I'm confused.

**Q.**    I'm confused too.  In the typical interview process, let's talk about USI.  So you said you interviewed with a bunch of

people.  Is that right?

A.   Yes.

Q.   And did it take longer than two days from your first interview to your start date?

A.   Yes.

Q.   And this property and casualty leadership position, that would have been in early 2022, you said, that you wanted to get at USI?

A.   The practice leader position?

Q.   The practice group leader position.  Is that right?

A.   Yeah.  We had some discussions about it then, yes.

Q.   And did that position ultimately go to Misty Carson?

A.   I'm not sure if that position went to Misty or if this was an additional position.

Q.   Now, Mr. Banks took you through a whole list of clients that you didn't do any work for when you were at USI.  Do you remember that testimony?

A.   Yes.

        MR. CANNELLA:  Your Honor, I'm going to approach the witness and give them -- give the witness Exhibit 406.  I don't think there's any objection to it.

        THE COURT:  Okay.

        MR. CANNELLA:  Your Honor, we'd -- USI moves Exhibit 406 into evidence.

        THE COURT:  Any objection?

**MR. BANKS:** No objection.

**THE COURT:** All right. It's admitted.

(Counterplaintiff's Exhibit 406 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.** Mr. Kakish, I'm showing you Exhibit 406. It's an email chain between Matt Simmons and Earl Barkley, Sheila Murray, Jackie Rodriguez, Radha Jones. Let's talk first about Earl Barkley. Is Earl Barkley the director of technical resources?

**A.** Yes.

**Q.** Was Earl Barkley the person that you reported to as the member of the technical resource team?

**A.** Yes.

**Q.** So earl Barkley would instruct you on what work to do for what clients?

**A.** He could. He didn't often.

**Q.** Okay. So Mr. Barkley -- was there a meeting in August of 2022 between the technical resource team and the members of the Simmons team?

**A.** Yes. There was.

**Q.** And that meeting was in August of 2022, and Mr. Simmons sends Mr. Barkley an attached Excel document. "Please let me know if you have any questions."

Do you see that, sir?

**A.** I see that.

**Q.** So let's look at the attachment. I'll zoom this in. Now,

Christopher Kakish - Redirect Examination

these are different clients of Mr. Simmons.  Is that correct?

          **MR. CANNELLA:**  Can everybody see that?

          **THE WITNESS:**  To be honest, I can't see that.

          **THE COURT:**  Nobody can see that.

          **MR. CANNELLA:**  That might be overdoing it.  But this is a client assignment list that Mr. Simmons and Mr. Barkley are discussing.  Do you see that, sir?

          **THE WITNESS:**  I see the list.  It's on the screen.

**BY MR. CANNELLA:**

**Q.**  I think you've got -- do you not have the actual document?

**A.**  I do.  It's --

**Q.**  Is it easier to see on the screen?  Yeah.  Even with readers it's easier to see on the screen.

     So you'll see client, it will identify different clients, PGT, ZMR, Avesta, Robbins, AI 1754, Hit Promotional Products, Marksman Security, SCG Hotel, HHS Topco, Crescent, Denver High Street, Better Health, NavaDerm, Famous Tate, isolved IFP Group, MoreSpace, Big Truck Rental, PCP.

     Do you see that, sir?

**A.**  I see that.

**Q.**  And then up top, it's got the names of different people that are doing different things, doing different work for these clients.  It's got "Account Rep, Account Executive" -- I'm sorry -- "Account Manager, Account Executive," let's see, "P&C Marketing Placement."

**THE COURT:**  Is there a question here?

**MR. CANNELLA:**  Coming up, Your Honor.

**THE COURT:**  All right.  Good.

**MR. CANNELLA:**  That was the windup.  Here's the pitch.

**BY MR. CANNELLA:**

**Q.**   Let's talk about "Contract Review & Due Diligence."  Do you see that column, sir?

**MR. BANKS:**  Your Honor, I would object to the predicate as assuming facts not in evidence, misstating the document.

**THE COURT:**  We'll have to see.  I don't know.  Let's see what his answer is.  Overruled for now.

**BY MR. CANNELLA:**

**Q.**   Who is identified as the person assigned to do contract review and due diligence for all of these clients that have been highlighted?

**A.**   I see my name highlighted on this list.

**Q.**   Thank you.

**A.**   I would add that these are not client -- that -- because my name is on this list doesn't mean that I did work for them.

**Q.**   I understand that.  But was there the contemplation, at least, that you were going to be assigned to do the contract review and due diligence for these clients?

**A.**   If needed, as needed, that I would -- I would be

Christopher Kakish - Redirect Examination

responsible for either doing it or sending it to somebody else.

Q.   Okay.  That was August of 2022.  Right?

A.   I believe that's correct.

Q.   And let's talk about your employment contract, since you were asked questions about that.

Your restriction -- the restricted clients are not just the clients that you met face-to-face with.  Would you agree with that, sir?

A.   No.  It's managed -- actively managed, really serviced, or obtained confidential information.

Q.   Or obtained confidential information.  Confidential information is a defined term in your contract?

     **JUROR:**  That's good.

     **THE COURT:**  So members of the jury, these documents the lawyers are showing, most of them are admitted into evidence, which means when you go back to deliberate, you'll have a big pile of documents that will have these on it.

     Some of the things the lawyers put up there -- there's a wonderful lawyer word called a demonstrative.  Sounds like monsters.  Right?  Demonstrative.  If it's demonstrative, then you don't get to see it, except when you put it up on here, but that's pretty unusual.  It's like the slides they attempted to do in the opening, but the technology didn't work, things like that.

     Everything else, if it's admitted into evidence, you

Christopher Kakish - Redirect Examination

can look at when you go back to deliberate.  But there is a reason they're putting it up there.  They want you to see it. So make sure you're able to see it.  But don't think it will be the only time you'll see it.

All right.  Go ahead.

**BY MR. CANNELLA:**

**Q.**   Mr. Kakish, confidential -- does confidential information of clients include business plans, marketing strategies, pricing structure?

**A.**   Those are listed, yes.

**Q.**   And does it include the identity, authority, and responsibilities of key contacts?

**A.**   Yes.

**Q.**   And does it include the types and terms and conditions of insurance coverage and particularized insurance needs?

**A.**   That's correct.

**Q.**   Requirements, risk specifications, preferences, expiration dates, claims and loss histories, commission rates?

**A.**   Yeah.  For any of that stuff that's not generally available to the public.

**Q.**   Okay.  So for the clients that you did any work for at USI, regardless of whether you met with them in person or managed them, would you receive this type of information for the clients that you worked for at USI?

**A.**   I did not.

Q.   So when you're doing an acquisition for PGT, and you're reviewing insurance programs, your testimony is that you would not receive any of there -- any information regarding their business strategies, marketing or risk analysis?

A.   No, I was reviewing the insurance program for the target acquisition.  Nothing to do with PGT's.

Q.   The targeted acquisition is not considered confidential information of PGT?

A.   I don't -- I didn't see that anywhere in there.

Q.   All right.  I want to talk about the clients that you managed for a couple of months when you went to Lockton.  Your testimony is that these clients didn't know you from Adam either.  Is that right?

A.   That's correct.

Q.   And you worked with these clients for less than 60 days before you were told to stop working with these clients.  Is that right?

A.   That's correct.

Q.   And during these 60 days, were you able to form relationships with these clients?

A.   I was.  It was one of the most stressful 60 days of my life.

Q.   I understand that.  But you formed a good enough relationship with these clients within the 60 days that you could call them and tell them about things that were going on.

Christopher Kakish - Redirect Examination

Right?

**A.**   For -- yeah.  For ZMR, absolutely, because they had several big renewals going on at that point.

**Q.**   That would be true for all the other clients.  Right?

**A.**   No.  In fact, out of those 20 or so that were on there, there's many that I never even spoke with.

**Q.**   Now, you testified, in your opinion, what you did, once you got to Lockton, did not violate your contract.  Correct?

**A.**   That's correct.

**Q.**   And you knew what you were going to do when you left USI to go to Lockton.  You had some understanding of that?

**A.**   I'm sorry.  I don't understand the question.

**Q.**   It was a poor question.  I apologize.  So I'm going to strike it entirely.

     You don't believe you did anything to breach your contract.  Right?

**A.**   That's correct.

**Q.**   But you still asked for indemnification.  Right?

**A.**   I did.  I didn't want to be in part or have any part of any type of lawsuit.

**Q.**   Right.  You're not a named party in this lawsuit, are you?

**A.**   No, I'm not.

**Q.**   Okay.  I want to ask you about the indemnification language.  I was a little confused by your testimony earlier. You testified that the indemnification language required you to

Christopher Kakish - Redirect Examination

comply with your obligations to your previous employer.  But what the language actually says, sir, isn't it, We understand that you have been given advice by your counsel relating to your obligations to your current employer?

**MR. BANKS:**  Objection, Your Honor, beyond the scope.  I didn't ask anything about this.

**THE COURT:**  Sustained.  Keep moving, please.

**MR. CANNELLA:**  Your Honor, I can be heard on this?

**THE COURT:**  No, not right now.

**MR. CANNELLA:**  Okay.

**THE COURT:**  Keep going.

**BY MR. CANNELLA:**

**Q.**  Did you -- were you comfortable that you were in compliance with your contract?

**A.**  I am comfortable I'm in compliance with my contract.

**Q.**  After speaking to your lawyer?

**MR. SHAPIRO:**  Objection, Your Honor.

**THE COURT:**  Yeah.  Sustained.

**MR. CANNELLA:**  No further questions, Your Honor.

**THE COURT:**  Okay.  Come on up.

(Bench conference begins.)

**THE COURT:**  I might be okay with that last thing if that's the end.  But what was it exactly that you were objecting to?  Is this it?

**MR. CANNELLA:**  This is it, Your Honor.  There was --

Christopher Kakish - Redirect Examination

he was asked about compliance with his obligations to -- does he believe he breached the contract. His answer was no.

THE COURT: Right.

MR. CANNELLA: But I think that opens the door to ask again about the indemnification. He didn't think there was -- he was going to be required to do anything that would violate his contract, then why did he ask --

THE COURT: You asked him that. You asked him that.

MR. CANNELLA: I did ask him that. But then I wanted to just clear that point up. I didn't think it was clear.

THE COURT: You don't need to say anything. I think it's very clear. This isn't -- you don't need to ask him about that. Your point is very well-made.

By the way, this doesn't say -- I was just looking at this. This doesn't say -- it says he's required to substantially comply with the advice given by his counsel, and then there's something else here. This doesn't say he's required to abide by his prior contract.

MR. CANNELLA: That's the point.

MR. BANKS: Says that he's not supposed to do anything -- I think that's what he's referring to. I don't know.

THE COURT: Yeah. I think that's an argument you can make.

MR. CANNELLA: Okay. Thank you, Your Honor.

Christopher Kakish - Redirect Examination

THE COURT: But you don't need to question him about it.

MR. CANNELLA: Thank you, Your Honor.

(Bench conference concluded.)

THE COURT: Okay. Thanks. We're going to try to get another witness in before lunch, at least start another witness in before lunch.

Who's next?

MR. CANNELLA: Theresa Kemp.

THE COURT: Who is that?

MR. CANNELLA: Theresa Kemp.

MR. BANKS: Your Honor, do I not get a chance to clarify anything else?

THE COURT: Well, we've tried to limit it that way. Again, remember what I told you last time, think about it, and we'll talk about it.

MR. BANKS: Okay. I just don't want to recall him.

THE COURT: I get it. Up here. Raise your right hand, please.

WHEREUPON,

**THERESA KEMP,**

was called as a witness and, after having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**THE COURT:** Have a seat over there. We're going to get you started this morning, and then we're going to break for lunch right around noon. So you won't finish before lunch, but at least we'll get started. He's going to hook you up to a mic.

Tell us your name and how to spell it, please.

**THE WITNESS:** Theresa Kemp. T-h-e-r-e-s-a. Last name Kemp, K-e-m-p.

**THE COURT:** All right. The acoustics in this courtroom are really bad, so I don't have a loud voice myself, but I have a mic right here that I talk into. So you're going to have to talk up really loud. If the jurors don't hear you, they're going to wave at you. Again, they're not greeting you and saying have a nice day. They're telling you they can't hear you. All right?

**THE WITNESS:** Understood.

**THE COURT:** Can you guys -- is that projector making sounds? Can you hear that at all?

**JUROR:** There's a vent over here.

**THE COURT:** It used to be that projector back there

that made a lot of noise, but now it's a vent that's blowing?
You know what happens when we complain about that?  They'll
turn it off.

**JUROR:**  We're not complaining.

**THE COURT:**  All right.  Go ahead, Mr. Cannella.

**BY MR. CANNELLA:**

**Q.**   Good morning, Ms. Kemp.  Thank you for your patience this
morning.

     Were you a senior property analyst with USI?

**A.**   Yes, sir.

**Q.**   And you now currently have that same job, senior property
analyst for Lockton.  Is that right?

**A.**   No, sir.  I'm a senior vice president, senior property
broker.

**Q.**   Is your job -- are your job duties similar at Lockton to
what you were doing at USI?

**A.**   They are -- they are similar to what I was doing before I
left USI.  They're different from what I was doing when I was
first employed by Wells Fargo Insurance and then acquired by
USI.

**Q.**   Yeah.  Just for timing, I'm just referring to your last
position at USI.

**A.**   Yes.

**Q.**   Not when you started in December of 2016.  Is that when
you started with Wells Fargo?

**A.**   Yes, sir.

**Q.**   And then in -- at some point, Wells Fargo became part of USI.  Is that right?

**A.**   Yes, sir.

**Q.**   And I understand before you worked at Wells Fargo, you actually worked for Lockton.  Is that right?

**A.**   I did.

**Q.**   And when you resigned from Lockton to join Wells Fargo, did you give Lockton two weeks' notice?

**A.**   I did.

**Q.**   And when you resigned from USI to join Lockton again in 2023, you did not give two weeks' notice.  Is that correct?

**A.**   No, sir, I did not.

**Q.**   You resigned from USI on January 25th.  Is that right?

        **THE REPORTER:**  I'm sorry.  I'm sorry.  I didn't hear the answer.

        **THE WITNESS:**  Yes.  I resigned on January 25th.

**BY MR. CANNELLA:**

**Q.**   Ms. Kemp, I want to direct your attention to Tab 1 in your book.  It is an email.  Actually, it's a bunch of documents that you produced in this case.  And I want to direct your attention to Page 5, please, Pages 4 and 5.

     And just so we're on the same page, Ms. Kemp, it's going to look like this.  It's an email to Earl Barkley followed by a letter, dated January 25th.

**A.**    Okay.  I'm not seeing the page number.  So one moment.

**Q.**    Yeah.  They're not numbered pages.

**A.**    Okay.  I see them.

         **MR. CANNELLA:**  Your Honor, USI moves Exhibit 190 into evidence.  These were nonparty production from Ms. Kemp.  I believe there's no objection.

         **THE COURT:**  Admitted.

         (Counterplaintiff's Exhibit 190 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.**    Ms. Kemp, is this a true and correct copy of the email you sent to Earl Barkley on January 25th, 2023 at 2:09 p.m.?

**A.**    Yes, sir.

**Q.**    And attached to this email is a resignation letter.  Do you see that?

**A.**    I do.

**Q.**    All right.  Did you have help writing this resignation letter?

**A.**    I believe I had some guidance maybe on that, but I don't recall exactly having anybody write it for me.

**Q.**    Did anybody assist you in drafting it or did anybody review this letter before it was sent?

**A.**    What I recall --

         **MR. SHAPIRO:**  Objection, Your Honor.

         **THE COURT:**  Well, is it the thing we talked about up here?

MR. SHAPIRO:  Yes.  Well --

THE COURT:  All right.  Be careful with that, Mr. Cannella.

MR. CANNELLA:  I don't want you to reveal anything that's privileged, but I do think it's not privileged to ask whether she had any assistance in writing the letter.

THE COURT:  Yeah.  But don't say -- just say who gave you this assistance?  Who was it?

THE WITNESS:  I believe it was Mr. Shapiro.

THE COURT:  All right.  That's the only thing you need to say about that, not what he said to you, just the fact that he was the guy that assisted you.  All right?

MR. CANNELLA:  That's all I got on the letter, Your Honor.

THE COURT:  Okay.

BY MR. CANNELLA:

Q.   And did you decide you didn't need to give two weeks' notice?

A.   I did.  I'm not required to by my contract.

Q.   Did you -- did you come to that decision after you spoke to counsel?

A.   I don't recall.

Q.   Now, when Wells Fargo became part of USI, you agreed to stay with USI.  Is that right?

A.   I chose to stay with USI at the time, because I had just

Theresa Kemp - Direct Examination

joined them about five to six months earlier, and had relocated from Atlanta to Tampa, and was in a position that a job change that quickly after I left would have been more than I could think through at the time.

Q.   I understand.  So you joined Wells Fargo, I think, in December of 2016.  Is that right?

A.   Yes, sir.

Q.   And at some point in 2017, Wells Fargo became part of USI. Is that right?

A.   Yes, sir.

Q.   And you chose to stay?

A.   I did stay.

Q.   You did stay.  You signed a contract with USI?

A.   Yes.

Q.   You received a bonus to stay?

A.   That was part of the agreement for everybody within the company.  So, yes, it applied to me as well.

Q.   And you stayed at USI in 2018, 2019, 2020, 2021, all of 2022, and for the first three weeks of 2023.  Is that right?

A.   Yes, sir.

Q.   And when you worked at USI, you enjoyed working at USI. Is that right?

A.   I had my moments, but I -- I mean, it was my job, and I chose to stay, and I did however look for other opportunities after the acquisition.

Q.   Well, did you -- you didn't apply to Lockton again until January of 2023.  Isn't that right?

A.   I didn't apply to Lockton at all in 2023 or before.  I received a phone call from Lockton.

Q.   All right.  We'll get to that in just a minute.  Was there ever a period of time during the six years that you were at USI that you enjoyed working there?

A.   Sure.

Q.   And the contract that you signed, it's at Tab 2 of your notebook.  It's already in evidence as Exhibit 188.  You've got it in your notebook too.  I'm also putting it up on the screen.

     In your contract, did you agree not to provide the same services for the same clients of USI in the event you went to a competitor?

A.   There is a clause that I would not service the team, solicit clients -- or sorry, service clients or solicit clients and sign broker-of-record letters and all of that.

Q.   Is this the provision that you're referring to, nonacceptance, or that you're thinking of?  I'm the one referring to.  Is this the provision you're thinking of, the 4.6, "Non-Acceptance/Non-Service of Clients"?

A.   I believe so, without reading through the whole clause, yes.

Q.   Now, is Lockton considered to be a competitor of USI?

A.   Yes.

**Q.** In your capacity as a property placement specialist, and maybe you could explain for me what a property placement specialist does. What do you do?

**A.** Without boring anybody, I apologize, I look -- I help our clients obtain property insurance in the market, from the market being the insurance industry as a whole. I will look at terms and conditions and their exposure.

And, you know, like, I'm working on an account right now that's a chemical plant in Texas that I've sent the policy out. I review it, and I try to protect them as best the insurance market will allow, and, you know, that -- right now, at last count, I had 69 different insurance companies that I was approaching on to try to bring all this together.

**Q.** So in like broad layman term, I may get it wrong, is it your -- are you a matchmaker? Do you match the client up with the carrier that can insure the particular property risk for that client?

**A.** In generalities, that could be true -- in my area of expertise are large, complex, catastrophe-exposed, loss-exposed property portfolios.

**Q.** That could be very complicated work?

**A.** It can be complicated. And most generally one insurance company will not insure that full exposure, we call it. So I pull together many, many insurance companies. And it's like a patchwork of companies to make sure coverage is in place.

**Q.** Sometimes you have to stack them up or intertwine them?

**A.** Looks like a quilt by the -- I put a visual together, and it literally looks like a patchwork quilt.

**Q.** In your capacity, you don't originate the client relationship. Is that right?

**A.** No, sir.

**Q.** The clients you work for are assigned to you by whoever your employer is. Is that right?

**A.** Yes.

**Q.** Okay. I want to just talk about some of the clients that you worked with while you were at USI and some of the clients that you -- that you work with at Lockton.

Start first with PGT. PGT was a client that you worked with at USI?

**A.** Yes.

**Q.** And you worked with PGT for about three years. Is that right?

**A.** On and off.

**Q.** And you had direct contact with a Rick Tyson from PGT. Is that right?

**A.** I had contact with Rick. Directly to me and only to me, I would say on rare occasion that would occur. Usually my contact came through the account service team and/or as either I was copied on something, generally an email, or they were forwarding something to me. I was copied or the team was

copied.  It was very -- on rare occasion, I would say, ever was it solely to me.

Q.   That's because there are different members of the team of a broker that interfaces with the client.  Is that right?

A.   Absolutely, yes.

Q.   You got, like, the producer who brings the client in, originates the client relationship.  Would you agree with that?

A.   Yes.

Q.   And then you've got the account executive and the account manager who kind of deal with the day-to-day?

A.   Yes.

Q.   And then if there's a particularized subject matter expertise need, like complex property placement, that's when Theresa Kemp gets brought in.  Right?

A.   Yes.

Q.   Okay.  And so with PGT, you'd be brought in when they had a complex property placement need.  Is that right?

A.   Yes.

Q.   Okay.  And PGT is a client that you worked with when you got to Lockton.  Is that correct?

A.   For -- I'm sorry.  Are you talking about '23 when I joined Lockton?

Q.   I'm talking about -- good question.  I'm talking about, yeah, January '23.  Because I know you were with Lockton twice. None of these questions are about 2006 to 2016, I think it was.

Theresa Kemp - Direct Examination

They're all after January 25th of 2023.

After January of 2023, was PGT a client that you worked with when you got to Lockton?

A.   I did after a couple of weeks of being there, I did have some contact or work with.  But by the time I got engaged with them, the insurance company that insured the program can write business through a broker, so they can -- the client can come through the broker, or the client can go direct to this particular carrier.

And by the time I got involved, the insurance company had made an arrangement to go direct with PGT.  So at that point, it was more a professional relationship courtesy, because there was no revenue associated with the work that I was doing at the time.

Q.   Right.  And is one of the reasons why a broker would extend such a relationship courtesy because they want to preserve the relationship with the client?

A.   Well, we -- I mean, it's -- yes.  I guess in short, I mean, it's a -- of course, everything we do is based on a relationship and getting the job done that we're hired to do.

Q.   Is that because once a client forms a relationship with the broker, it's more likely to stay with that broker?

A.   Not necessarily.

Q.   I want to ask you about PGT.  This is Exhibit 3 -- or Tab 3 in your notebook, Exhibit 194.

Theresa Kemp - Direct Examination

This is in evidence, Your Honor, 194.

Now, this is an e-mail you sent to John Caruso on February 6th, 2023.  Right?

A.   Yes.

Q.   And this was after you write, the "BOR's are cleared by now."  Do you see that?

A.   Yes.

Q.   And you write, "We are now able to work on PGT."  Right?

A.   Yes, sir.

Q.   And this email includes SOV.  What is that?

A.   That's the -- it's short for statement of values.  And that is where the client would list all of their properties that they would need insured.

Q.   And did you include -- okay.  And this might be a separate email.  I'm not sure.  But this is an email between you and Richard Tyson, dated December 20th of 2022.  Do you see that?

A.   I do.

Q.   And it looks like Mr. Tyson is also communicating with Sheila Murray on February 7th, 2023.  Do you see that?

A.   Yes.

Q.   And this email includes BI values.  What does BI stand for?  Business income?

A.   Business income or business interruption.

Q.   And this email that Mr. Tyson is forwarding to Ms. Murray is an email from him to you, dated December of 2022?

**A.** Yes.

**Q.** And that's when you were still -- that's when you were still employed by USI.  Is that correct?

**A.** That's correct.

**Q.** Now, when you got to Lockton, were you assigned work by Claudia Mandato?

**A.** I believe it was Claudia.

**Q.** And was it Claudia Mandato that assigned you to do work for PGT?

**A.** With that assumption that Claudia was kind of divvying out the work, then, yes, I started working on PGT.

**Q.** And one of the other clients -- I want to talk about another client, Avesta.

**A.** Yes, sir.

**Q.** Avesta is a client you worked with at USI?

**A.** I did early on.  I don't remember.  It was maybe 2017 or 2018, something like that.

**Q.** Of -- I'm sorry.  I didn't mean to interrupt.

**A.** That's okay.

**Q.** Avesta is also a client that you worked with when you got to Lockton?

**A.** No.

**Q.** Rachel Ridley?

**A.** I didn't work on Avesta.

**Q.** Were you assigned Avesta when you got to Lockton?

Theresa Kemp - Direct Examination

**A.**    Not particularly.  It's hard to explain, but there -- the actual assignment of is a little bit -- a little bit gray, because -- but had I worked on any of Avesta?  No.  That was a May account.  If I remember right, toward the end of May, that the policy that was in place would expire.  And by April, I think, we -- I had not had, really, any contact before then.  But by April, we were told to cease and desist and ghost -- basically ghost our clients, you know, that we didn't work with anybody.  I did know Rachel from previous years.

**Q.**    Let me show you some documents.

**A.**    Okay.

**Q.**    Tab 5 in your notebook, Plaintiff's Exhibit 199.  It's in evidence.  This is an email from Jackie Rodriguez.  She was one of your colleagues at USI.  Correct?

She is one of the colleagues at USI that left to go to Lockton on January 25th.  Here's an email that she has written to Avesta, showing the team chart.

I'm highlighting other former USI employees on this email. It might be easier -- it's in Tab 5.  Might be easier for you to follow the screen.  Either way is fine.

When we look at the team chart, you see, you, Ms. Lieffort, Mr. Kakish, Ms. Rodriguez.  And at some point, is it your understanding that Ms. Rodriguez, Ms. Murray -- I'm sorry, Ms. Rodriguez and Ms. Lieffort were told they couldn't work on the account?

Theresa Kemp - Direct Examination

A.   I'm not sure.  I didn't even see this when it originally went out.  But I'm not sure when this went out compared to when the email went out.  Was this the same time?  Okay.

Q.   "Lockton Team Chart, Avesta Real Estate Holdings Team Chart.pptx"?

A.   I see that now.

Q.   And then the core service team, you're there.  That's you.  Right, Ms. Kemp?

A.   I'm on there as a resource, yes.

Q.   And at some point, Ms. Lieffort and Ms. Rodriguez were told they couldn't work on this account anymore.  But you still could work on the account.  Right?  This is in February, mid-February of 2023.  Is that right?

A.   I remember.  So this was the September 9th email, the attachment, so, yes, this was February.

Q.   This February 9th email.  I'm showing you Exhibit 215 in evidence.  It's Tab 6 in your book.  It will be easier just to follow on the screen.  This is a February 17th email.

        MR. BANKS:  Dave, I think the confusion is you're saying the wrong tab numbers.  It's Tab 5.

        THE WITNESS:  Yeah.  I'm looking --

BY MR. CANNELLA:

Q.   I apologize.  Maybe it's better if I just do it on the screen.

A.   Okay.  I was looking at Tab 5, and I couldn't see it.

**Q.**   Whatever your preference is.  I can do it on the screen?

**A.**   I like the screen, but I like being able to reference the affidavits and the person.

**Q.**   I'll try to keep it straight.  I'm sorry, Ms. Kemp.

**A.**   No.  That's all right, sir.

**Q.**   So this is Tab 5.  And this is an email from Mr. Sharma to Rachel Ridley.  And he's advising that certain people, Matt Simmons, Jack Mitchell, Jackie Rodriguez, Sheila Murray, Emily Carter, and Madison Lieffort can't work on the account anymore.

If you follow the email up, Ms. Ridley writes to Mr. Sharma and Mr. Kakish, "Thanks.  Theresa can stay on our account," question mark.

Mr. Kakish writes back, "That is correct."

And then Ms. Ridley writes, "Super happy to work with Theresa again.  She's the best."

See that?

**A.**   I do.  And because I haven't worked with Rachel for several years.

**Q.**   Let's talk about another client you worked with at USI.  That would be Carteret.  Am I saying that right?

**A.**   Carteret.

**Q.**   Carteret.  Thank you.  That was a client you worked with at USI.  Right?

**A.**   I did assist the team one year when the account, I believe it may have been new to USI at the time.

Theresa Kemp - Direct Examination

Q.   And when you got to Lockton, Carteret was assigned to you.

A.   I'm clearly on the program chart as the team, but, again, that was an account that I did not work on.

Q.   You worked on ZMR.  I may have been wrong about Carteret. I'm going to shift gears.  I apologize for that.

I'm going to ask you about the client, ZMR.  You did some work on ZMR when you were at USI.  Is that right?

A.   I did not handle the placement, as we called it.  I did not go into the insurance market for that.  When Mr. Simmons first brought that account in, he was working that -- or his team, I'm not sure which, on their own.  And he received a quote from -- I believe it was CNA that wrote it up the first time.

And he asked me if I could review the terms as -- because I am a resource for those types of things, contract reviews and all of that.  So he asked me if I would review it to see if there were any improvements that he should ask for, so that, you know, the program was improved for the client.

So I -- it's so long ago, I don't remember the date.  I don't know when that account came in, and I had not worked on it.  So I -- as far as being assigned to me at USI, no, the account was never assigned to me.  But I did review one quote at some point in time when it first was coming in and moving.

Q.   It first would have come in in 2022, ZMR?  That was a relatively new client for --

Theresa Kemp - Direct Examination

**A.**   I don't recall the dates.

**Q.**   And were you assigned to ZMR by Lockton when you arrived?

**A.**   ZMR was an account that I worked on.

**Q.**   Showing you Exhibit 210.  It's behind Tab 8.

(Counterplaintiff's Exhibit 210 admitted into evidence.)

        **MR. BANKS:**  Mr. Cannella, I think it's Tab 6.

        **MR. CANNELLA:**  You are correct.  Tab 6.  I'm reading it upside down.

**BY MR. CANNELLA:**

**Q.**   "ZMR-Lockton Team Introduction," 2/14.  You are one of the attendees.  Is that correct?

**A.**   Yes, I'm listed as a required attendee.

**Q.**   This work was assigned to you by Lockton.  Right?

**A.**   Yes, sir.

**Q.**   Just like all -- every client that you work on at Lockton is assigned by Lockton.  Is that right?

**A.**   Yes.

**Q.**   Okay.  And that would include, if we look again at the team chart for ZMR, 2/9/23, email from Sheila Murray.

(Counterplaintiff's Exhibit 130 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.**   She writes to Mr. Oseland at ZMR, "We are excited to continue our relationship with you and look forward to servicing your business."

        And then the team chart shows you, Ms. Carter, Ms. Murray,

UNITED STATES DISTRICT COURT

and Mr. Kakish, among other people.  Right?

A.    Yes, sir.

Q.    Okay.  Crescent, was that a client that you did work for when you were at USI?

A.    That was the same thing when -- I believe when Matt was -- I'm sorry, Mr. Simmons was prospecting that.  I think he had me review a document again or a quotation again, which was from the insurance company.  But I had never met the client.  Same with ZMR, I never met the client.  Had no idea.  Could have been any client, any policy at that point.

Q.    And in February of 2023, you were assigned on the core service team for Crescent Real Estate.  Is that right?

        If you look at Tab 7 of the book.  It's Exhibit 197.

A.    Again, I am on the -- that chart, yes.

Q.    And, again, this is an email from Ms. Rodriguez to the client, Crescent, Kakish -- Mr. Kakish, Ms. Lieffort, Ms. Kemp and some others are on this email.

        And Mr. Kakish writes, "We are excited to continue our relationship with you and look forward to servicing your business."

        Do you see that?

A.    Yes.

Q.    You would agree that the four people above this line are all USI employees, is that right, or former USI employees?

A.    Yes.

**Q.**   You did work for Jacaranda when you were at USI.  Is that right?

**A.**   Not that I ever recall.

**Q.**   Just a minute.  Was Jacaranda managed by 1754 Holdings?

**A.**   Yes.  Which I learned that after rejoining Lockton and helping with that account.

**Q.**   And you did benchmarking and comps for Jacaranda prior to -- prior to you rejoining Lockton.  Right?

**A.**   I don't recall that.

**Q.**   Okay.  Did you ever do any work for Jacaranda Condominiums while you were at USI?

**A.**   Not that I recall.

**Q.**   Did Mr. Simmons direct you to perform work for Jacaranda once you got to Lockton?

**A.**   I don't know that he would have been the one to direct me to work on anything.  That would have been the manage -- you know, the other management team.

**Q.**   Ms. Kemp, I'm going to show you what's behind Tab 8.  If you could turn to Tab 8.  It's Plaintiff's Exhibit 195.

(Counterplaintiff's Exhibit 195 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.**   This is an email from Mr. Simmons, dated February 8th, 2023.  The subject is "Jacaranda Insurance Review."  Mr. Simmons copies you.  Do you see that?

**A.**   Yes, sir.

**Q.**   And then Mr. Simmons is writing the clients 1754 Properties on February 8th, 2023, and he writes, "I have copied Theresa Kemp our property expert who is now running options/pricing if the roof was replaced this year."

Did you perform that work for 1754 Properties for Jacaranda?

**A.**   I did help with Jacaranda, and they had no wind coverage by this point in time.  So, again, that would be a difficult placement.  The market was extremely difficult then.

**Q.**   Do you know if Jacaranda was previously a client of USI?

**A.**   I did not know that at this time.

**Q.**   Now, I want to shift gears.

**MR. CANNELLA:**  Your Honor, we're shifting gears and shifting topics.  Good time to break for lunch?

**THE COURT:**  You're about two-and-a-half minutes early, but I think we can live with that.  Right?  Leave your tablets on the chairs.  Are you doing the pizza, Steve?  Is that what's happening?  So you're not having to leave the building in the rain.  You're going out in the rain.  All right.  Well, we'll see you at 1:15.

**THE COURT SECURITY OFFICER:**  All rise for the jury.

(Jury out at 11:57 a.m.)

**THE COURT:**  So far, we're doubling our production. Instead of one witness a day, we're up to two.

**MR. CANNELLA:**  It's going to go faster than that,

even, Your Honor.  Believe it or not, maybe 15 more minutes

with this one.  But I knew I wouldn't be done at noon.

        THE COURT:  Good.  Good.  All right.  We'll see you

at 1:15.

    (Recess from 11:58 a.m. to 1:16 p.m.)

        THE COURT:  Let's clean up a couple things here.

Where are we on the Sharma thing?  Is somebody going to have

the rest of that for us sometime soon?

        MR. ZIMMERMAN:  I think we provided that already,

Your Honor, to the Court.

        THE COURT:  So what else do we need on that?

        THE LAW CLERK:  There may be some sealing issues on

Volume 2 of Sharma.

        MR. BANKS:  Your Honor, it was only -- we were just

asking them to redact what's not being submitted.  So the

things that nobody is designating, rather than putting that all

out there in the record, to just black that out when they

submit it.  That's all we asked for them to do.  I don't think

it needs to be sealed.

        THE COURT:  There's no sealing issues. Okay. Fine.

Fine.  Let me talk about -- this one is pretty clean, but not

totally.  This is -- may die of boredom as we go through this,

but that's okay.  We won't take too long.

        This is a deposition of Morneau, Mark Morneau.

There's some -- who's doing this?  Who's in charge of this?

MR. CANNELLA:  We're the ones introducing Mr. Morneau.

THE COURT:  All right.  So if you look at Page 53 of this transcript, down at the bottom, around Line 19, it says, "R, comma, 17:18-18:18."

MR. ZIMMERMAN:  Judge, I very much apologize.  Two seconds to just grab it.

THE COURT:  Okay.  Yeah.  Find it, please.

MR. ZIMMERMAN:  Judge, we have a copy.  What's the page?

THE COURT:  Turn to Page 53.  And there's -- down there in Line 19, it says, "R, 17:18-18:18."  What is that all about?

MR. CANNELLA:  They're coded at the going.  I'm not seeing.

THE COURT:  R means relevant.

MR. CANNELLA:  Yeah.  I'm not seeing that in the most recent version, Your Honor.  So that may not even be designated by anybody.

THE COURT:  Then we're on --

MR. BANKS:  53?

THE COURT:  I'm not making it up.

MR. CANNELLA:  53, your Honor?

THE COURT:  Yeah.  Put it on there.

MR. BANKS:  I see 53 designated.

**MR. CANNELLA:** I'm looking at 53 right here.

**THE COURT:** Okay. Do we have the same? No.

**MR. BANKS:** Is that the right one? That's Marrero. I have it right here, Dave. Dave, I have it right here.

**THE COURT:** See, you guys are making it too complicated.

**MR. BANKS:** We have too many Ms, Your Honor.

**THE COURT:** Too many irons in the fire. Too many nitpicking over a sentence here or a word there.

Put up the right Page 53 of the right depo, and you'll see what I'm talking about.

**MR. CANNELLA:** I'm good.

**THE COURT:** Stick it on the Elmo for me, please. So we can make sure -- no, that's not it. Here's mine.

**MR. CANNELLA:** That's a stray, Your Honor. That's not -- that is a --

**THE COURT:** So you see what I'm talking about?

**MR. CANNELLA:** I do see what you're talking about. That's not in the -- forget about it. It's referencing -- it's the wrong page.

**THE COURT:** Here's another one on Page 73.

**MR. ZIMMERMAN:** Same, Judge. Same thing.

**MR. CANNELLA:** That's nothing. I'm sorry.

**THE COURT:** That's easy. All other objections are overruled. Done. Just do an order on that.

MR. ZIMMERMAN:  Judge.

THE COURT:  Okay.  Next, now I'm talking about Mandato, Mandato.  There's one question on this one.  Maybe not.  I don't think there's anything on this one to talk about.

We're good on that one, Kelly.  Right?

THE LAW CLERK:  Yes.

All right.  So that's done.

What else?

Dr. Gron.  All right.

MR. ZIMMERMAN:  So, Judge, just on the Mandato, any objections raised were overruled?

THE COURT:  No.  You'll get an order on that.  Some of these I've gone along with.  There's a couple good objections in here.  Not many, but a couple.

MR. ZIMMERMAN:  Okay.  So there's an order coming out.

THE COURT:  Yeah, yeah.

MR. ZIMMERMAN:  Understood, Your Honor.

THE COURT:  We'll give you something so you can clean up those two depos.  That's going to happen right away.  Right?  Like in the next 30 minutes or so, you'll have something in writing on that.

And then Dr. Gron, I've spent a lot of time on this, and I'm ultimately concluding that she's out, and I'm going to give you a written order on that.

Theresa Kemp - Direct Examination

But what I don't want to have happen is I'm missing something, and it turns out that she does have something that fills in a hole somewhere, and I hear there the Lockton side of the case, aha, they didn't prove this or they didn't do that or this -- there's some attack on something that Dr. Gron could have spoken to.

If that does come up, I'm leaving open the door of maybe she does testify in some sort of rebuttal witness or something like that. But for now, I just don't see that she does anything that's really necessary considering where we are in the case. But you'll get a little written order on that. It's no great work of legal scholarship.

MR. ZIMMERMAN: Your Honor, just to clarify one point on that. You're not -- the ruling is not that she's not qualified or she doesn't have expertise?

THE COURT: No, no, no. She's well-qualified. She's a wonderful person. I'd like to have dinner with her. I think she and I would have a lot of great conversations. Nothing along the lines.

It really has to do with the idea that this is stuff that really is not very disputed and really is more in the lines of common sense and things that -- so it's basically not helpful to the jury to hear things with economic labels attached to them that are really understood by laypeople and could possibly confuse also.

Theresa Kemp -- Direct Examination

But, no, she's very qualified.  And I would love to have her as a witness maybe in another case sometime in the future.  She doesn't have to stay around.  I said -- I'm going to say in the order, if I do end up allowing her at some point in the case, she could do it by Zoom.  Unless she likes Florida, if she wants to be here.  I'm not totally eliminating her for sure, but for now, I am.  And we'll see how it goes.

So, again, if you guys can convince me there's something that Lockton is saying here that she would have, you know, helped you with, let me know.  But not now.  All right?

**MR. CANNELLA:**  Nothing more than what we've already said, Your Honor.

**THE COURT:**  All right.  I just don't know what Lockton is going to say on that that you think that she's necessary for.

But go ahead.

**MR. ZIMMERMAN:**  No.  I'm sorry.  Were you finished, Judge?  I know you had a few other things.  Is that it?

**THE COURT:**  That's it.

**MR. ZIMMERMAN:**  Judge, you had asked -- we had asked about instruction.  You said put something together over lunch.  We only just gave it to the other side because we worked on it during lunch.

**THE COURT:**  I'll take a look at it.  We don't have to say it right now.  I can say it sometime this afternoon, if

necessary.  I'll tell you what else I'm going to do, on Monday, when we come back, is I'm going to read the part of the preliminary instruction where I explain the different claims and stuff, just to refresh everybody's recollection.  But that's already been read once.

All right.  So who's -- we're ready to finish with this witness.  Right?

**MR. CANNELLA:**  Yes, Your Honor.

**THE COURT:**  All right.  Bring the jury back, please.

**MR. BANKS:**  Your Honor, just for the record, we do, I think, have objections to the draft instruction.  Just didn't want you to read it under the impression that we had blessed it in any way.

**THE COURT:**  I haven't even finished reading it.  I'm not going to read it to the jury yet, but I might at some point.  So we'll talk about it.

Bring the jury back, please.

I'm dying to know what you object to on this one, Chris.  This is the most vanilla thing in the world.  We'll talk about it later.

**MR. SHAPIRO:**  It talks about all the other, you know, the other team members.  I just think it could be less -- you know, less factual and talking about nonparties to the lawsuit, things along those lines.

**THE COURT:**  All right.  We'll see.

MR. BANKS: Also, Your Honor, I think if it's going to say that, we should maybe clarify that there's never been a finding Mr. Kakish or Ms. Kemp ever violated anything. There's really never been a finding that any of those people violated anything, other than Mr. Simmons and Mr. Mitchell.

THE COURT: That's true. But, again, we'll see. The more you talk, the more you want to say. So every sentence leads to another sentence and another sentence and another sentence.

MR. ZIMMERMAN: We did try to just keep it vanilla, Judge.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury in at 1:27 p.m.)

THE COURT: Have a seat, everybody. Not raining out there.

(Discussion off the record.)

THE COURT: All right. So we're ready to roll. Go ahead, Mr. Cannella.

MR. CANNELLA: Thank you, Your Honor. Good afternoon. Good afternoon.

BY MR. CANNELLA:

Q. Good afternoon, Ms. Kemp. Welcome back. I want to talk about Crescent Real Estate. That was a client that you said you did not work on when you were at USI. Is that right?

A. I did not formally work on it. I did review something

very early on that I recall was being a quote that I did frequently for all the producers.

Q.    And Theresa Cabilao -- I'm probably saying that wrong, but she's a contact person for Crescent.  Theresa, do you recognize that name?

A.    Yes.  And I can't -- I can't correct you on her name, because I don't know her that well.

Q.    Okay.  Thank you.

I'm showing you -- it's not in your notebook, but this is Exhibit 252, which is already in evidence.  And these are text message exchanges between Mr. Simmons and Theresa Cabilao of Crescent.

Here, can you see that, ma'am?

A.    I can.

Q.    On Wednesday, April 19th, that would be 2023, Ms. Cabilao writes about an old USI policy.  Do you see that?

A.    I do.

Q.    She's asking about -- she's asking Mr. Simmons about terrorism coverage.

She writes, "We didn't buy terrorism coverage, don't remember why, if you can't answer, I will ask Chris or T Kemp."

Essentially, would you agree that Crescent is asking about -- asking why a certain coverage decision was made?

A.    Why certain coverages --

Q.    Why a coverage decision was made?

**A.**    Yes.  It seems that's what she's asking.

**Q.**    Would you agree she seems to say that if Mr. Simmons is unable to answer, she'll ask you or Mr. Kakish?

**A.**    Yes, sir.  Appears that.  But with that, we were the only two people at the time that she could call.  I mean, that -- at that point, we were asked to assist getting the coverage, so I would not have been able to speak to why the decision was made. I would have been able to go into the policy and confirm that there was no terrorism coverage.

**Q.**    You were the only two former USI people --

**A.**    Sorry, yes.

**Q.**    -- that Ms. Theresa Cabilao could call.  Is that right?

**A.**    I can't speak to Chris, but I had not worked on Crescent prior to being -- moving, rejoining Lockton.

**Q.**    Ask about Mr. Simmons.  He had a number of property accounts.  Is that right?

**A.**    Yes.  I don't know how many, but yes.

**Q.**    And part of your job at USI on technical resources was to be a subject matter expert on property placement.  Is that correct?

**A.**    Yes, sir.

**Q.**    And you were a resource that was available to Mr. Simmons and his team while you were at USI.  Is that correct?

**A.**    In theory, yes.  I was one of few resources that worked for two different regions.  That was uncommon in the model at

Theresa Kemp - Direct Examination

USI.  And I had worked on -- most of the business that I worked on was out of the Atlanta, Charlotte, or Charleston, South Carolina offices.

Q.    Ms. Kemp.

A.    Yes.

Q.    I don't mean to interrupt, but you were a resource that was available to Mr. Simmons and his team.  Is that right?

A.    Yes.  I would have been a resource available to Mr. Simmons and anybody else within the two regions.

Q.    Right.  And providing quality research -- sorry, providing quality service was important to you when you were at USI.  Is that right?

A.    Of course.

Q.    And providing quality service for Mr. Simmons's clients and assisting his team, when appropriate, that was also important to you.  Correct?

A.    Of course.  Part of that, too, if I didn't have the time, it wasn't good service.  So they would have to look somewhere else for someone that could assist.

Q.    You did provide -- you supported Mr. Simmons and the service team when you were able to?

A.    Yes.  When I was able to.

Q.    And Mr. Simmons told you that he was leaving USI for Lockton before you resigned from USI.  Isn't that right?

A.    He did.  But the -- I had already made the decision to

resign.  That would have been on the 25th, I sent my resignation letter.  So maybe on the night of the 24th, I got a call.  And he said out of professional courtesy, I'm letting you know that I'm leaving.  And I said I assume so, because I had gotten calls from Lockton.

Q.  So the answer to my question is yes?

A.  The short answer would be yes.

Q.  Okay.  Thank you.  Mr. Simmons called you on January 24th.  Is that right?

A.  Yes, sir.  I believe it was after 5:00 or 5:30.

Q.  And Mr. Simmons told you that he was resigning from USI and joining Lockton?

A.  Yes.  He --

Q.  And you believed that you already knew or suspected that that was going to be the case.  Is that right?

A.  Well, I got the phone call from Lockton.  I talked to Doug Hutcherson, the CEO, first.  We were -- you know, I worked for him for 11 and a half years, so we knew each other quite well and we're still work friends.

So get to the 24th, I spoke to Manoj Sharma on -- I think it was a 2:00 call.  And Manoj said there are some things -- we want you to come back.

Q.  I'm sorry, Ms. Kemp.  I'm going to get there in just a minute.  But this will be an easier process if we just kind of go question-by-question.

I think my question was, did you already suspect, before Mr. Simmons told you on January 24th, that he was going to Lockton, yes or no?

**A.**   I think it was fairly common knowledge that Mr. Simmons was unhappy and trying to work with management at USI to have deemed needs met better.  So, yes, I made an assumption that it could have been the case.

**Q.**   And you and Mr. Simmons actually talked about his future at USI after the USI Christmas party in December of 2022.  Is that right?

**A.**   Not after the party.  We talked for a bit at the Christmas party.

**Q.**   At the Christmas party.  At the Christmas party, that would have been sometime in December.  Is that right?

**A.**   Yes.  I believe it was early December.

**Q.**   And at the Christmas party, did Mr. Simmons tell you he was thinking of leaving USI?

**A.**   No.  He told me he was exploring opportunities with other companies.  But I, too, explored other opportunities with other companies without a commitment that I was leaving or not leaving.

**Q.**   What did you tell Mr. Simmons during this conversation?

**A.**   During that conversation, I told him -- I don't recall the exact words, so I'll tell you the gist of the conversation, that, you know, any one of the firms, and I've made assumptions

that they were the larger broker firms, which they're top ten, but four or so of them that I thought he might be a good fit for, and Lockton being one of those.

And I told him, I said, I think any one of them would have the resources he's looking for.  And because of what I know of his style and the way he treats clients and that kind of thing, I thought he would be a good -- you know, based on what I know, like, Lockton has the resources you're looking for.  Not saying anybody else does not, but --

Q.   Did you -- did you tell Mr. Simmons, Lockton is the place for you?

A.   I do not recall saying that, and it sounds so against anything.  It's his decision where he goes.  And I didn't even have an inkling that I would be looking at Lockton.  So I don't know why I would be telling someone I enjoyed working with to go look somewhere else for a job.

Q.   So do you deny saying to Mr. Simmons at the Christmas party, Lockton is the place for you?

A.   If I can only answer yes or no, I would say, yes, I deny saying that.

Q.   Now, you reference this in answer to another question that I asked, and that's Mr. Hutcherson.  You received a text from Mr. Hutcherson?

A.   I did.

Q.   Use my calendar.  If you could look at -- I think it's at

Tab 1.  Those are the documents that you produced in this case.

Can everybody see this?  Okay.

Your Honor, can I use the easel?

**THE COURT:**  Sure.

**MR. CANNELLA:**  Thank you.

**BY MR. CANNELLA:**

**Q.**  Okay.  So, Ms. Kemp, I'm going to mark for you and then I'll show it to the jury, but did Mr. Hutcherson -- if you look at Exhibit 190 behind Tab 1, did Mr. Hutcherson text you on January 21st?

**A.**  He did.

**Q.**  And that was a Saturday.  Right?

**A.**  Yes, sir.

**Q.**  And Mr. Hutcherson is the CEO of the Southeast Series.  Is that right?

**A.**  He is.

**Q.**  Write TK.  This is a calendar for the month of January 2023.  Mr. Hutcherson reached out to you first on Saturday, the 21st.  Right?

**A.**  Yes.

**Q.**  And you knew Mr. Hutcherson because you used to work at Lockton ten years earlier.  Right?

**A.**  No.  I worked for Lockton up until 2016.

**Q.**  Okay.  Were you expecting a text from Mr. Hutcherson on January 21st?

Theresa Kemp -- Direct Examination

**A.**   I was not.

**Q.**   And then Mr. Hutcherson texted you again on January 23rd. Is that right?

**A.**   He did.

**Q.**   And Mr. Hutcherson, on January 23rd -- and hold on a second.  This is all in evidence.  This is a screenshot of the text between Mr. Hutcherson and you.  Do you see that, ma'am?

**A.**   I do.

**Q.**   DH, and then that's you responding?

**A.**   Yes.

**Q.**   Then Mr. Hutcherson texted you on January 23rd, he wants to set up a phone call.  Is that right?

         **MR. BANKS:**  Objection.  Misstates.

         **THE COURT:**  What's the objection?

         **MR. BANKS:**  Misstates the evidence.  It's January 21st.

**BY MR. CANNELLA:**

**Q.**   No, no.  There's a text on January 21st.

         **THE COURT:**  Overruled.

**Q.**   Right?

**A.**   Yes.  The document that's on my screen is the text from January 21st.

**Q.**   And then there's a text that you get from Mr. Hutcherson, says "Doug" up top, January 23rd.  Right?

**A.**   Correct.

**Q.**   Mr. Hutcherson is asking if you got his voicemail.

**A.**   Yes.

**Q.**   And then you respond back, this is the evening of January 23rd, a Monday, you asked, "Can we chat tomorrow?" Right?

**A.**   Yes.

**Q.**   And then Mr. Hutcherson writes you back on the 23rd, "Sure - tomorrow works.  Sneak preview - I want you to come work for us.  Let's make it happen!"

Do you see that, ma'am?

**A.**   Yes, I see that.

**Q.**   Was January 23rd the first that you knew that Lockton actively wanted you to come back soon to work for Lockton?

**A.**   Yes.

**Q.**   You weren't looking to leave USI as of January 21st of 22nd or 23rd.  Is that right?

**A.**   I was not actively looking, but as I've said before, I entertained other calls and interviews from other companies, at least four other companies that I named before.

**Q.**   And on January 24th, is that when you first spoke to Manoj Sharma about this opportunity?

**A.**   Yes.  I spoke to Doug first.  And then he said, I want you to come back.  If you are willing to listen, can I have you -- can I have Manoj call you.

So that was a short phone call with Doug.  And then Manoj

Theresa Kemp - Direct Examination

called me, if I recall, it was a 2:00 phone call.

Q.   Mr. Sharma called you on January 24th?

A.   Yes.

Q.   And on that first phone call with Sharma, were you actually offered the job?

A.   Basically, they said they want me to come back.  He started the call with, Hey, we want you to come back, or something along those lines.  And asked me, he said there are a lot of things that are going on in Tampa.  And when I was up there, they didn't have what I -- they didn't have a Tampa office, or if they had one, it was very new.

But I said, Well, don't tell me anything.  I want to -- I don't want to be influenced by any other decisions.  I want to think through this process and what's right for me.  And so I asked -- that's how he started it.  Then he started sharing details about the job, the role.

Q.   So when you and Mr. Sharma had this phone call on January 24th, he said there were going to be changes in Tampa. Is that right?

A.   Yes.

Q.   And you told Mr. Sharma, hold on, don't tell me anything about that.

A.   Right.

Q.   Okay.  And Mr. Sharma -- you said, hold on, don't tell me anything about that, because you could make your assumptions?

**A.**   I could make my own assumptions.

**Q.**   And your assumptions were that there were other USI employees from the Tampa office that were going to be going to Lockton in Tampa.  Is that correct?

**A.**   No.  My assumption was that Mr. Simmons was probably leaving USI to go to Lockton in Tampa.

**Q.**   Right.  And you also assumed that, in addition to Mr. Simmons leaving USI to go to Lockton in Tampa, you assumed that at least four other people were going to go with Mr. Simmons?

**A.**   No.  That would be an incorrect, as stated in definite. There were people I knew in Matt's team -- sorry, Mr. Simmons's team was -- very much enjoyed their team atmosphere and the accounts they worked on and all that, so I could assume that there possibly could be.

But I had in no way had a number in my mind or anything else.  I made an assumption that there could possibly be others that might go with him.  But my first assumption was that my more -- my more firm assumption in my mind was Matt was -- Mr. Simmons was likely leaving to go to Lockton.

**Q.**   I appreciate the clarification.  You were pretty certain that that meant that Matt would be going.  Did you also assume or guesstimate that the others going would be Ms. Murray, Ms. Rodriguez, Ms. Lieffort, Ms. Carter?

**A.**   No.  That's incorrect to state that so definitively.  I

assumed that there could be others from the team that worked

with Matt, that they could be going over to as well.

          MR. CANNELLA:  Your Honor, may I approach the

witness?

          THE COURT:  Yes.

BY MR. CANNELLA:

Q.    Do you remember I took your deposition?

A.    Yes, sir.

Q.    Last October, and your counsel was present, I was present.

I'm going to ask you to read the testimony between Page -- it's

on Page 145, Lines 1 through 22.  I'm going to give you the

opportunity to read it, and then I'll ask you some questions.

A.    Read it out loud?

Q.    No, no.  You don't have to read it out loud.  I just want

to give you -- I want to be fair.

      Have you had the chance to read the testimony, Ms. Kemp?

A.    Yes, sir.  I don't think it's any different than what I've

said just a minute ago.

Q.    Let me --

A.    I say here that it could be anywhere from one to four.  It

could be -- it could have been Sheila, it could have been

Jackie, it could have been Madison.  But I never ever in there,

that I read, say that there would be four people leaving to go

there as well, that that was my assumption.

      It states in there that I said I could assume as well that

any -- that some may leave, and anywhere from one to four may leave as well.

Q.   Let's try it this way.  I asked you at the deposition, "Did you assume that, with Matt Simmons, there would be other support staff or service team members that would be going from USI to Southeast Series of Lockton?"

Your answer is, "I don't know that that was my direct assumption, but -- but -- and I had no idea who -- or who would not be going, leaving USI, but I did -- or I would have contemplated the fact that others may have left with him that were on his direct team."

And then I asked you, "Well, Mr. Sharma told you that it would make sense for you to come over on the 25th, because others, plural, were being onboarded.  Do you know how many others?"

"I did not."

"Did you have a guesstimate?"

You answered, "I would have guessed that it would have been one to four, and it would have been his direct team, so either -- one of either Sheila, Jackie, Madison, or Emily.  And so it could have been one of those.  It could have been multiples of those.  But, yes, I would have likely had that run through my mind."

Do you see that?

A.   Yes, sir.  But you were saying I definitely said there

were four going over, and I don't think my deposition says that. I said I would have guessed, I could assume. So I'm -- I maybe misunderstood your question.

Q. We might be talking past each other a little bit. That's fine. I'll move onto another topic.

A. I'm sorry.

Q. That's okay.

A. I'm being recorded and everything, and it's nerve-racking to say I said exactly this when I didn't really say exactly that.

Q. That's okay. We can move onto another topic.

A. Okay.

Q. Did Mr. Sharma tell you he wanted you to start on January 25th?

A. He asked me if I could make the decision to leave and start because of the onboarding process that Lockton goes through. And I said that I would get back to him. I think I could do that. And I would get back to him. And he told me he was flying between 6:00 and 8:00. And I could call him -- p.m., and I could call him after that. But I had made the decision well before that. I would have called him if he wasn't on a plane.

Q. The reason why Mr. Sharma wanted you to start on January 25th is because Mr. Sharma had other people starting that same day. Isn't that right?

A.    I can't speak for Mr. Sharma, but I would assume that that -- we did talk about the onboarding.

Q.    And so you and Mr. Sharma had your first conversation on the afternoon of the 24th.  And the first -- one of the first exhibits I showed you was your resignation email at 2:00 on January 25th.  Correct?

A.    Yes.

Q.    So is it fair to say that you made the decision to go from USI to Lockton within 24 hours?

A.    Yes.  Was shorter than that, but yes.

        MR. CANNELLA:  No further questions.

        THE COURT:  Redirect.

                        **CROSS-EXAMINATION**

BY MR. BANKS:

Q.    All right.  Ms. Kemp, I want to focus back actually on that time line you were just talking about.

        So, first of all, before Saturday, January 21st, had you previously worked at Lockton?

A.    I had.

Q.    And was that for Lockton Southeast or a different series?

A.    It was Lockton Southeast for Mr. Hutcherson.

Q.    Where did you work with him?

A.    In Atlanta.

Q.    For how long?

A.    Eleven and a half years.

Q.   Did you like working there?

A.   I did.

Q.   Why?

A.   Lots of reasons.  I was excited when the opportunity came up.  I was excited because they were energetic.  I like people I met through the interview process.  They were on an upward trajectory for growth, which was exciting.

And, you know, they took care of their people.  We had various recognitions.  There were a lot of opportunities for promotions.  The benefits plan was really good.  The 401(k) plan was really good.  You know, they just -- we had celebration parties, Christmas parties, bowling events.  It was just -- we worked hard, but we played hard when we had the opportunity.  So it was a fun place to work.  It was good people.

Q.   So you liked it.  Why did you end up leaving?

A.   Like I said, that energetic and the growth, I had been doing this same type of job, a property broker, since 2002, so I had been doing that for 14 years.  And an opportunity came up through people I knew in the industry to manage a team, and so I looked at that.  This was with Wells Fargo.

I got a call from a friend that was at one of the insurance companies.  And said, Hey, I'd really like you to consider, there's a role similar here to what you're doing.  And because we were work friends, I met with her.  Said there

were a lot of women in management at the place and this and that and just things like that that interested me.  Former co-employee at Marsh, that I was at before Lockton, had moved over there, and I highly respected her.

She would -- so I just -- I went over just to listen, you know, not to turn away the call.  But I listened.  And then I really wasn't as much interested in doing the same thing.  So that role, that I probably initially started the conversations, wasn't much of an interest to me.

And then I made a comment that I had grown up in Florida, and I'm not from Atlanta.  And the head of that office asked me if I would consider relocating.  And I said, Well, I would, but not just to anywhere.  I said, Please don't send me to Oklahoma City, I think.

But -- so they asked about a position they had -- someone retiring in the Atlanta -- sorry, the Tampa office.  And that was to manage a team of 13 brokers, placement people.  So I would be moving from, you know, the front line and doing the deals to managing the deals.  And it was also property and casualty lines business.  So I would have more exposure.  I thought it was a good opportunity, growth opportunity as well.

Q.   So this is with Wells Fargo Insurance?

A.   That's -- I left Lockton to go to Wells Fargo Insurance.

Q.   When did you make the change?

A.   I worked at Lockton until December 15th, and I flew to

Theresa Kemp - Cross-Examination

Tampa on the 16th and started with Wells Fargo.  So December 16th of 2016.

**Q.**   2016?

**A.**   Yes.

**Q.**   So about six months later, did you learn anything about what was going to be happening to the Wells Fargo Insurance business?

**A.**   I did.  I saw an article -- there was scuttlebutt, because, obviously, we were Wells Fargo Insurance, and I think it was called Bloomberg article, that's one of the trades or financial trades, that Wells Fargo was going to divest the Wells Fargo Insurance Services.  They were divesting that.

**Q.**   Did you later learn who was purchasing Wells Fargo Insurance services?

      **MR. CANNELLA:**  Objection, Your Honor.  Relevance. Can we approach?

      **THE COURT:**  Okay.

   (Bench conference begins.)

      **THE COURT:**  Did you learn who's purchasing Wells Fargo?  That's objectionable because it's not relevant.  It's probably not -- it's probably also not objectionable.  What's the issue?

      **MR. BANKS:**  She's going to tell the story about how she got over to USI.  Over the years, her role had changed from what she was hired for, and that's why she wanted to leave.

MR. CANNELLA:  She stayed for seven years.

THE COURT:  The question was, did you learn who was buying Wells Fargo, and that's -- yeah, USI.  Big deal.  But getting in the weeds with these people and these witnesses, like that attempted impeachment, that didn't work.  Quibbling over the date of that thing that you objected to, it doesn't matter.  The jury -- look at them.  They don't want to be this deep in the weeds.

So, I mean, how many times do you want to go through this story with her, because you're going to want to do that with everybody?

MR. BANKS:  Why they wanted to leave?

THE COURT:  Yeah.  Do it short.  Well, I understand, but --

MR. ZIMMERMAN:  It would be the year or two before she left, not seven years earlier.

THE COURT:  We don't need to hear the whole story of her life.  I agree with that.  Just run it in -- make it a little interesting.

MR. BANKS:  I just started.

MR. CANNELLA:  He's going to start through the whole seven-year saga.

MR. BANKS:  I wasn't.

THE COURT:  Good.

(Bench conference concluded.)

**THE COURT:** Go ahead.

**BY MR. BANKS:**

**Q.** Did you learn it was going to be acquired by USI?

**A.** I did.

**Q.** And you became a USI employee after that?

**A.** I did.

**Q.** Over the years, did your role change? You don't need to get too detailed. Just need high level.

**A.** My role did change, but can I make a comment back on when I learned. I had just recently left, and I was very nervous about the new ownership in the beginning, like, oh, no, I just left a job of 11 and a half years.

**MR. CANNELLA:** Objection, Your Honor. Narrative.

**THE COURT:** Yep. That's sustained. He'll ask you questions, if he needs more information. Go ahead.

**THE WITNESS:** Yes, sir. My job did change. It didn't change immediately. There was a transition period, but I was a property broker doing the deals at Lockton. I made the decision to go to Wells Fargo to manage the teams that do the deals. And shortly after, I do not remember the time line, but my job went back to doing what I left at Lockton, was going back and doing the deals. So I went from doing the deals at Lockton, managing for Wells Fargo, back to actually doing the deals with USI.

**BY MR. BANKS:**

**Q.**    Okay.  And you were asked some questions earlier by Mr. Cannella about whether you were a resource for Mr. Simmons. Do you remember that?

**A.**    I do.

**Q.**    Okay.  So in the year 2022, were you a primary, you know, person who worked on his accounts?

**A.**    No.

**Q.**    What amount of your time would you estimate was spent on Mr. Simmons as opposed to the rest of what you were doing?

**A.**    That is hard to judge, but I would say it could -- I mean, I just find it hard to believe it would be more than 5 or 10 percent of my time, if that.

**Q.**    Were you primarily supporting people in other offices?

**A.**    I was.  I had crossed one -- there was one of me, and I was a resource to both regions.  And most of my business was out of Charlotte, Atlanta, South Carolina.

**Q.**    Might as well cover this while we're here.  You were asked about some of the work you did on some of these clients that came -- that were in Mr. Simmons's book of business.  One was Crescent.  When was that it you actually did any work on the Crescent account at USI?

**A.**    I think it was a couple weeks after I started there.  I don't know the exact date, but it wasn't immediate.

**Q.**    More than two years before you start -- before you left

USI?

**A.**   Oh, that I had done -- I'm sorry.

**Q.**   At USI, when had you done work on Crescent?

**A.**   I'm sorry.  I misunderstood.  I would say, definitely, it was a couple of years prior.

**Q.**   So more than two years before the end of your employment at USI?

**A.**   I was --

          **MR. CANNELLA:**  Objection, Your Honor.  Asked and answered and --

          **THE COURT:**  Sustained.

          **MR. CANNELLA:**  -- leading.

          **THE COURT:**  Next question.

**BY MR. BANKS:**

**Q.**   ZMR, you said you did some placement for them.  Is that right?

**A.**   Once I joined Lockton.

**Q.**   Okay.  And had you actually done work for them at USI?

**A.**   I had never met the client or done work directly.  Matt asked -- Mr. Simmons asked me to review a quote, which was work he had done to bring in, excuse me, to see if he had -- if there were any terms improvements or something that he should ask the insurance company to improve upon.

**Q.**   Okay.  Just to clarify on Jacaranda, had you worked on Jacaranda while you were at USI?

**A.**    No.

**Q.**    All right.  So focusing back on the 21st of January, you were reached out to by Doug Hutcherson.  Is that right?

**A.**    Yes.

**Q.**    Okay.  Was Mr. Hutcherson someone you worked with when you worked at Lockton previously?

**A.**    Yes.  He was the -- at the time, the president of the series.  He headed the series, the same role he's in now, different title.

**Q.**    Were you friends?

**A.**    We were.

**Q.**    Did he stay in touch with you after you left Lockton the first time?

**A.**    We did occasionally.  We -- I would text him on his -- mostly it was I would text him on his birthday, happy birthday. And he would text me on my birthday, happy birthday.  And then every once in a while, I might text and say, Hey, I'm going to be in Atlanta on such-and-such date with Wells Fargo at the time, and maybe we can grab lunch.  It never panned out, but, yes, we kept in touch.

**Q.**    So he and you, did you exchange some messages that we saw earlier, right, between the 21st and the 23rd of January?

**A.**    Yes.

**Q.**    During any of that time, did Mr. Simmons reach out to you?

**A.**    No.

**Q.**   Did Jack Mitchell ever reach out to you?

**A.**   No.

**Q.**   Did you ever have any conversations with Jack Mitchell at all about Lockton before you started at Lockton?

**A.**   No.

**Q.**   When you talked to Manoj Sharma the first time when he gave you the job offer, had you talked to Mr. Simmons?

**A.**   No.

**Q.**   And did you make up your mind to go to Lockton before you talked to Mr. Simmons in the evening of the 24th?

**A.**   I had.

**Q.**   Why did you want to go to Lockton?

**A.**   There are a lot of things.  Mainly, I'm in the waning years of my career, and there were a few things that were out there that I considered, rattled them off.

First of all, I like the people that were there.  I knew the company.  I knew it was a good company.  But, you know, the 401(k), Lockton matches a hundred percent.  USI matched 50 percent, but I was capped at what the equivalent of 1 percent, because they put a cap on the 401(k).  So I'm closer to retirement.  That makes a difference.  My benefits, after I got through some of the benefits and talking about that, it costs me more to insure myself alone on a USI plan than it does to insure myself and a dependent on Lockton plan.  So I was saving money there.

I know there were opportunities.  Manoj didn't ask me my age, but I'm sure they knew since I worked there for so long.  He said, you know, what are your plans for the next five years?  I said, well, you know, if you're talking retirement, I don't want to work to full retirement age if I don't have to.

And we got to talking, and I said, And, actually, I don't know that I even want to work to 65 full-time.  And so I said I -- in my mind, ideally, I could see myself hopefully being able to find something that I could do three days a week.  And he said, Oh, we'd do that.  We have people now that are -- I call it semiretired.  They call it part-time.

So between all of those things, it just was a better opportunity for me for my next five-year, seven-year plan.

**Q.**    Did Matt Simmons have anything to do with you deciding to go to Lockton?

**A.**    Absolutely not.

**Q.**    Did Jack Mitchell have anything to do with you deciding --

**A.**    Absolutely not.

**Q.**    -- to go to Lockton?

Let me just -- I may not have any more questions.  But if I do, just make sure I finish before you speak for the court reporter's benefit.

**A.**    Oh, sorry.

**Q.**    That's okay.  Just to clarify, about how long of a period of time did you actually work on any of the former USI accounts

while you were at Lockton?

**A.** Former accounts while I was at Lockton, I would say probably the -- maybe roughly the second week of February and up until maybe the end of March or maybe the first part of April. I'm not sure of the date. But Manoj had called me and said --

**Q.** You don't -- I just wanted to know the time frame. You don't have to go past that.

**A.** I guess that would be, you know, less than two months.

**Q.** And had all the clients already left USI and come to Lockton before you started doing anything for them?

**A.** Yes.

**Q.** Did you have relationships, other than what you mentioned with Rick Tyson, with any of the clients you served?

**A.** No.

**MR. BANKS:** Okay. All right. I have no other questions. Thank you.

**MR. CANNELLA:** No redirect, Your Honor. This witness can be excused.

**THE COURT:** Very good. Thank you. Who's next?

**MR. CANNELLA:** Your Honor, we'd like to -- we'd like to do the Zutel depo now. And that will give me an opportunity to narrow the next live witness, so we can hopefully --

**THE COURT:** Yeah. We'll take a quick little break then, get that set up. All right. See you in a few minutes.

**THE COURT SECURITY OFFICER:**  All rise for the jury.

(Jury out at 2:06 p.m.)

**THE COURT:**  You're good to go.  Is this a video depo?

**MR. CANNELLA:**  This is a video.  But it's 42 minutes.

**THE COURT:**  That's all right.  That's fine.  As long as I can let them know that.  We'll refresh it.  Let's make sure it goes smoothly when you press play, it actually.

**MR. ZIMMERMAN:**  Try it right now, Your Honor.  Fingers crossed.  Can we read in exhibits?

(Recess from 2:07 p.m. to 2:20 p.m.)

**THE COURT:**  Okay.  On a scale of one to ten, how sure are you, Mr. Zimmerman, this is going to work, and it's going to be loud and they can hear it?

**MR. ZIMMERMAN:**  I'm a strong eight, Judge.

**THE COURT:**  Eight.  That's pretty good.  Because, you know, my experience is when the jury walks in the room, they have this, like, spell they put on things.  So we'll see.  We'll see.  How long is it?

**MR. ZIMMERMAN:**  About 45 minutes, I think, plus or minus.

**MS. ROYAL:**  Forty-two minutes.

**MR. ZIMMERMAN:**  Forty-two minutes.

**THE COURT:**  All right.

**MR. ZIMMERMAN:**  Your Honor, can I read in exhibits, or you want to do it later?

THE COURT:  Let's do it later.  I think they're ready to roll.

THE COURT SECURITY OFFICER:  All rise for the jury.

(Jury in at 2:21 p.m.)

THE COURT:  Have a seat, everybody.  Next witness you're about to hear from is appearing by video deposition. This is not a Zoom where it's going to be a live person.  This was a video deposition.  Depositions are taken under oath and they count just like testimony in a courtroom if the witness were sitting here.  So you should treat it just like you would testimony of a live witness.

There are various reasons why people have to be called this way.  In the old days, we didn't have video depositions.  You'd have to just read a transcript.  You know, you'd put another lawyer from the law firm on the witness box and they would pretend to be -- it didn't always work when the lawyer was a male and the witness was a female.  This is a lot better.  All right?

But it is a necessary part of the trial.  Treat it like regular testimony.  And this is going to take us about 40 minutes or so.  So you know in the get-go how long it's going to be.  Probably take a stretch break after that.  It shouldn't be interrupted by objections or anything like that.  That stuff's all been taken care of.  It should just be a straight 40-minute video depo.  Good?

Go ahead.

MR. ZIMMERMAN: Your Honor, we call --

JUROR: Who is it?

MR. ZIMMERMAN: Your Honor, this the -- we call Fred Zutel.

WHEREUPON,

**FRED ZUTEL,**

was called as a witness and, after having been previously duly sworn, testified via videotaped testimony as follows:

**VIDEOTAPED TESTIMONY**

**BY MR. ZIMMERMAN:**

**"Q.** Before you worked at Lockton, we covered that you worked at Willis. Before that, where --

**"A.** Before Willis?

**"Q.** Yes.

**"A.** I worked at Marsh and McLennan. And before that, at Brown & Brown.

**"Q.** Now, when you worked -- go ahead. Sorry. Did you have --

**"A.** Before that, I wasn't in the insurance industry.

**"Q.** Thank you. With respect to Willis, did you sign agreements that contained provisions restricting your ability to solicit clients for a period of time after you left Willis?

**"A.** I did.

**"Q.** And did you also sign agreements that protected the confidentiality of Willis documents and information?

**"A.**   I believe so.

**"Q.**   With respect to your work at Marsh, did you also sign an agreement that contained any type of restriction on solicitation of customers after you left your employment with Marsh?

**"A.**   Yes.

**"Q.**   And with regard to Brown & Brown, did you have an agreement containing any type of restrictive covenant?

**"A.**   I believe so, yes.

**"Q.**   With respect to your work at Lockton, have you signed any agreement that contains any type of nonsolicitation, nonservice, nonacceptance of business restrictive covenant?

**"A.**   We'd have to refer to the specific agreement, but I did sign an employment agreement with Lockton.

**"Q.**   With regard to each place you personally have worked in the insurance industry, they all had some type of agreement that limited the solicitation of customers after you left their employment.  Correct?

**"A.**   Yes.  In exchange for every place I worked at, there were other things that that agreement said that, you know, spoke to obligations by the company as well.  It's a contract.

**"Q.**   In the insurance industry, employees sign employment agreements that have typically restrictions, whatever the specific terms are, but restrictions on solicitation of customers after the end of the employment?

Fred Zutel - Videotaped Testimony

**"A.** I could agree with that.

**"Q.** Well, as an owner or someone with an ownership stake in Lockton Southeast, would you benefit from increased revenues and increased business to Lockton Southeast?

**"A.** Yes.

**"Q.** And it was your hope or your intent to improve Lockton Southeast revenues by recruiting Mr. Simmons.  Is that right?

**"A.** Among many other things.

**"Q.** Sure.  But one of the things was improving the revenues of Lockton Southeast?

**"A.** Yes.

**"Q.** And you personally have an economic interest in that. Right?

**"A.** That that -- in the sense of what we discussed, yes.  I would say we all benefit from running a better business and growing a business.

**"Q.** Are you familiar -- well, let me go back a second.  Are you familiar there's a group of eight employees that left USI to join Lockton all on or around January 25th?

**"A.** Yes.

**"Q.** And are you familiar with those employees?

**"A.** Yes.

**"Q.** So -- and just so the record is clear, I'm talking about Matt Simmons, Jack Mitchell, Sheila Murray, Madison Lieffort, Jacqueline Rodriguez, Emily Carter, Chris Kakish, and Theresa

Kemp.  Is that who you understand to be the employees that moved over from USI to Lockton?

**"A.**  Yes.

**"Q.**  So is Mr. Simmons someone you've been trying to recruit for a long period of time?

**"A.**  Yes.

**"Q.**  Was there a --

**"A.**  Long before, long before joining Lockton.

**"Q.**  Was there a period of time where that manifested into more serious conversations?

**"A.**  Yes.

**"Q.**  When approximately was that?

**"A.**  Probably the third quarter of last year.

**"Q.**  Third quarter of 2022?

**"A.**  Uh-huh, yes.

**"Q.**  Yes?

**"A.**  Yes.

**"Q.**  Yes?  And how did those more serious conversations start?

**"A.**  Matthew reached out to me to express his dissatisfaction with the way he was being treated at USI and how terribly the situation was going for him and the lack of support that he was receiving from his employer.

**"Q.**  How did he reach out to you?

**"A.**  He sent me a text message.

**"Q.**  Now, with respect to Jack Mitchell, when did you first

start having conversations with Mr. Mitchell about potential recruitment?

"A.   That would have been the fourth quarter of 2022, if I'm not mistaken.

"Q.   How did you become aware of Mr. Mitchell?

"A.   Alec Alfonso, the former Lockton employee, introduced me to Jack.  We had a subsequent phone call.

"Q.   Did you know Mr. Mitchell before that time?

"A.   No.

"Q.   With respect to the other six former USI employees, did you have conversations with any of them before they joined Lockton?

"A.   No.

"Q.   Why were you not involved in conversations with those employees?

"A.   I generally don't get involved in hiring service associates.  I'm focused more on client-facing salespeople.

"Q.   As part of your focus on hiring client-facing individuals, is one of the issues that comes up what type of service, support they will receive at Lockton?

"A.   Absolutely.

"Q.   And how do you address that, typically?

"A.   We have a fantastic service model, and we try to take care of our clients, and we also try to take care of our client-facing producers.  And one of the biggest reasons that

people like joining us from other firms, especially from USI, is that we provide them with far more support, from a service staff perspective, which allows them to grow.  It's one of the most appealing things about our business and one of the biggest differences between Lockton and USI.

"Q.  With respect to Mr. Simmons joining Lockton, do you have any supervisory responsibility over Mr. Simmons?

"A.  Not directly.  Only in title.  I consider him a partner.

"Q.  When you say only in title, what do you mean?

"A.  My title is the president of Lockton's property casualty division in Florida.  And Matt is, you know, a member of the team of the property and casualty division of Lockton in Florida.

"Q.  With respect to Sheila Murray, Madison Lieffort, Jackie Rodriguez, and Emily Carter, who do they report to at Lockton?

"A.  They would report, ultimately, to Mark Morneau, who is the practice leader for Lockton Southeast.

"Q.  Let's go ahead and take a look at this document.  Maybe it can help us.  All right.  We received a number of kind of text chains.  So what we tried to do is just assemble them in order, date order.  This -- date order.  This should be the text chains that we received, related text between you and Mr. Simmons.

     "I'm going to go ahead and mark this as deposition Exhibit 4.  And the first page has a Bates number of Doc 995.

Fred Zutel - Videotaped Testimony

Do you see that?

"A.   I do see that.

"Q.   Do you recognize these as the text messages that you had with Mr. Simmons?

"A.   Yes, I do.

"Q.   As you see here, it says, September 13th, 2022, 'Fred, long time, no talk.  Hope you have been well.  Do you have a few minutes to catch up this evening or later?'

        "Do you see that?

"A.   I do see that.

"Q.   Is that what you're referring to as kind of the start of the more serious recruitment discussions with Mr. Simmons.

"A.   Yes.

"Q.   So what do you recall about those discussions in September of 2022?

"A.   So Matt reached out to me, as you can see in the text.  We talked, I believe that night, if I'm not mistaken, for quite some time, an hour or two.  You know, I remember that I was outside in my driveway talking to Matt.  I remember reconnecting with him.  Matt's always someone I've had a lot of respect for.

        "Matt told me about the horrific situation at USI, and how USI does not support its employees and its top producers, and how USI is more interested in hiring producers for the sake of hiring producers than they are supporting their staff.  He told

me that he had signed up to work for Wells Fargo, not for USI, right, and there was a transition.

"And that transition, while it had gone well for him personally, he had hit a limit, and he was unable to continue accepting new business, and that in multiple management discussions with his superiors, nothing had been done about it. And Matt was fed up.

"And he was soliciting my advice, from one successful up-and-coming rising star within the industry to, I guess, another, if you will. I think we've always had a lot of mutual respect for each other.

"Q.  From that time forward, until the time he joined Lockton on January 25th, 2022, were you in frequent contact with Mr. Simmons?

"A.  Yes.

"Q.  Did you have a number of calls?

"A.  Many.

"Q.  Did you have a number of meetings or dinners or other personal interactions?

"A.  Several, yes.

"Q.  Can you estimate the number of in-person meetings or dinners or lunches that you had with him?

"A.  Four or five, three or four, somewhere in that vicinity.

"Q.  With respect to these conversations with Mr. Simmons, was there ever any discussion as to compensation at Lockton?

"**A.**   Only at the highest level, very high-level discussions.  I explained to him how our model worked.

"**Q.**   And so what did you tell him about your model?

"**A.**   I explained to him how producers are compensated under a K-1 structure.  I explained how our commission structure works and how our capital account structure works.  And we just talked through all the intricacies of that model and how it was different, and how it was a partnership, right, as we discussed, as opposed to a one-sided relationship.

"**Q.**   In other words, did you talk any numbers along the lines of if your book of -- if a producer's book of business is X, it would likely make Y under our compensation structure?

"**A.**   Yes.

"**Q.**   Did you talk actual numbers of the book of business Mr. Simmons thought he could bring over to Lockton?

"**A.**   No, not in -- no, not in detail.  We wanted to hire Matt because we think he's a great person, and we're more interested in hiring Matt or anybody because of what they're going to do, not because of what they've done or their past.

     "We're interested in the future.  Matt's a younger producer.  I would like to think I am too, though I'm getting old.  And we're interested in the 20- or 30- or 40-year run.  We frankly could care less about prior business.  You know, we're in it for the long-term.  We're privately held.  It's a completely different model, completely different, one that puts

Fred Zutel - Videotaped Testimony

producers and clients and our associates at the center as opposed to on the periphery.

"Q.   Were there any discussions with Mr. Simmons about the types of clients he was servicing at USI?

"A.   At a high level.

"Q.   And what discussions between September and January 25th, did you have with Mr. Simmons about customers he was servicing at USI?

"A.   Matt explained to me that he had a book that was primarily focused on multifamily real estate, which I knew, because I've run into Matt, because I also have a lot of multifamily real estate accounts.

    "The fact is that we've been competing against each other for years.  And I was really excited for Matt to join in the context of furthering our business -- our complementary skill sets, not just across Florida, but across the rest of the US. I think there's an amazing opportunity for Matt being on the west coast of Florida in Tampa to complement what we're doing -- I'm based in Miami -- here in South Florida and for us to combine forces and build an amazing business for the long-term.

    "And as one person who feels he was disadvantaged by his prior employer, me, at Willis, knowing that Matt felt the same way, we thought it would be a great partnership, and it has been to date.

"**Q.** You used the word -- or the term multifamily -- what was that term, multifamily partnership?

"**A.** Multifamily real estate.

"**Q.** Thank you.

"**A.** People that own apartments, generally. It's -- in its most boiled-down definition.

"**Q.** So we're talking about insurance for, you know, essentially people that own property that they lease out?

"**A.** Multifamily property, yeah.

"**Q.** So with respect to Mr. Simmons, did you have any discussions about any specific clients?

"**A.** We did not speak -- we did not speak specifically about clients.

"**Q.** Did you have any conversations about specific numbers with Mr. Simmons and the work he was doing at USI?

"**A.** I had a high-level understanding of what his book of business looked like in terms of numbers. You have to have that if you're in the market.

"**Q.** What did you --

"**A.** I knew that his book was somewhere between 6 and $10 million. I don't know exactly how much of that would be attributable to a specific asset class, if you will.

"**Q.** And how did you know his book was between 6 and 10 million?

"**A.** I knew it because I've been competing against him for

years, and I knew it because he told me.

"Q.   Now, were you involved in determining the compensation to be offered to Mr. Simmons?

"A.   At a very high level.

"Q.   What was your involvement?

"A.   I helped gain an understanding of how much money Matt was getting paid at the time and what his overall book of business looked like.  In order for us to attract someone of his caliber, Lockton has to create a competitive offer, so I was involved in socializing that to other members of our time.

"Q.   You said you looked at or you got information on how much he was getting paid at the time.  What are you referring to?

"A.   Anecdotal information.  I never saw any documents.

"Q.   Is that information that came from Mr. Simmons?

"A.   Yes.  It's very normal for employees to tell their prospective employers how much money they're making.

"Q.   You mentioned that you also looked at what his book of business might look like to help determine or justify the compensation.  What information did you have on that?

"A.   I'm not sure that that's what I said.  I only said that I knew what the size of his book was, and in doing so, you know, utilized that number to kind of come up with an overall very high level idea of what we have to pay him in order for him to be enticed to make a move.

"Q.   Were you aware that there were clients that moved their

business to Lockton on January 25th, the same day that

Mr. Simmons joined Lockton?

"A.   I know that several clients, when they learned of Matt's

leaving, chose to move their business to Lockton.

"Q.   And those clients were to be serviced by Mr. Simmons.   Is

that right?

"A.   I believe so.

"Q.   With regard to your conversations with Mr. Simmons now

between in September and December -- excuse me, September and

January '25 time period, did you ever discuss your lawsuit that

you had with Willis?

"A.   Anecdotally.

"Q.   Well, when you say anecdotally, this is a conversation

between you and Mr. Simmons.   Right?

"A.   Yeah.   I mean, I define anecdotally as telling somebody an

anecdote or a story, so I told Matt the story of what happened.

So I discussed it anecdotally with him.

"Q.   So you told him about your personal experience in the

Willis lawsuit.   Is that right?

"A.   Absolutely.   At length, anecdotally.

"Q.   What did you tell him about that?

"A.   I told him about how I was being mistreated with Willis.

I told him about how we ultimately resolved it in relatively

short order.   I suppose that Willis must have agreed with

everything that we felt.

**"Q.** What did you tell him about how you resolved that case?

**"A.** I mean, I couldn't get into specifics, as Lyle mentioned. There's a confidential agreement in place. But I mentioned to him that these things get resolved, as do all legal matters.

**"Q.** Mr. Zutel, I'm asking you what you told Mr. Simmons about the settlement with Willis. That's the question.

**"A.** Okay.

**"Q.** You can answer.

**"A.** I told him it was settled quickly in 40 or 50 days, and that it -- all matters get settled, just like this matter will get resolved, one way or the other.

**"Q.** When you say just like this matter will get resolved, one way or the other, you're referring to the USI matter?

**"A.** Or every matter for that matter.

**"Q.** But when you just said that a moment ago, are you referring to the USI matter?

**"A.** Yes.

**"Q.** With respect to the lawsuit that you had with Willis and your conversations with Mr. Simmons about that, did you tell Mr. Simmons any -- or provide Mr. Simmons with any guidance about what he should do during this period of time where he was being recruited by Lockton?

**"A.** Yes.

**"Q.** What did you tell him about that?

**"A.** I told him not to take any confidential information or

share any confidential information with us.  And I told him not to solicit his clients.

"Q.  With respect to the guidance you gave to Mr. Simmons, you mentioned not to take any confidential information.  What do you mean by that, when you say confidential information?

"A.  Things like business proposals and, like, client lists or anything that might be deemed to be confidential information. I mean, I don't have a specific definition, but, generally speaking, that's how I would define it.

"Q.  With respect to Mr. Simmons's recruitment, did he ever discuss with you any other employees joining from USI?

"A.  No.  We talked about the fact that other employees might be interested in leaving once they learned that he left, but we never talked about other employees joining, per se.

"Q.  Was there ever a discussion, now or at any time before January 25th, that there was going to be a group of employees that would be joining Lockton on January 25th that you were a part of?

"A.  Yes.

"Q.  So how did that come about?

"A.  We had a lot of different discussions about several employees that were going to join.  I mean, there were many discussions internally about them, but it wasn't necessarily as a group.  I mean, jobs were posted and these people applied. And, again, I wasn't super involved in, like, all the detailed

Fred Zutel - Videotaped Testimony

discussions about this, but, yes, at a high level.

"Q.   Who determines the need for Lockton Southeast to have new job openings to be posted?

"A.   We, I think, all socialize that internally and routinely are looking at how much business we have versus what's projected, and we post jobs.  Right?

"Q.   Were these job postings related to the fact that Mr. Simmons would be joining Lockton?

"A.   They may have been, yes.

"Q.   And you said we socialized internally, who were you referring to?  Who were you talking about that you socialized it with?

"A.   Manoj Sharma, Mark Morneau.

"Q.   With respect to the fact that each of these employees would be resigning from USI on January 25th and joining Lockton on January 25th, when did you become aware of that?

"A.   Probably a week before.

"Q.   How did you become aware of that?

"A.   I don't remember the exact context, but I'm sure that Manoj, Mark, or another colleague advised me.

"Q.   And who at Lockton was coordinating with these former employees to determine start dates and resignation dates and things like that?

"A.   I believe Manoj Sharma.

"Q.   Did you have any conversations with Mr. Simmons about the

former USI employees during that period of time between September 2022 and January 25th, 2023?

"A.  Yes.

"Q.  What were the nature of those conversations?

"A.  Matt explained to me that when members of his team found out that they would be leaving, that they would be very interested in potentially wanting to follow him, whether it was to Lockton or anyone else, any other employer.

"Q.  And what did you do with that information?

"A.  I passed it along to the rest of our team.

"Q.  Did Mr. Simmons identify people to you?

"A.  I did not speak specific people or names with Matt.

"Q.  You say you passed it along at Lockton, who did you pass it along to?

"A.  To Manoj Sharma.

"Q.  And what did you tell him about that?

"A.  I told him that there were a number of employees that might be interested in leaving when they found out that Matt left, and that if they were qualified, we should consider hiring them.  But they'd have to pass our interview process, and we'd have to ensure they're the types of people we would want to have working for us.  We try to hold ourselves to a very high standard.

"Q.  With respect to Mr. Mitchell, were you aware that he worked with Mr. Simmons at USI?

**"A.** Of course.  They both worked at USI in the same office, so I'm sure they worked together.  Absolutely.

**"Q.** Did you have any conversations with Mr. Simmons about Mr. Mitchell potentially coming over to Lockton as well?

**"A.** Yeah.  I know -- you know, I believe that that was discussed.  But it wasn't in the context of the two of them joining together.  We would have hired just Matt or just Jack.

**"Q.** What we were just talking about.  I just asked you about did you have any conversations with Mr. Simmons about Mr. Mitchell joining, and I think you said yes.  And now my question is, what was discussed?

**"A.** I spoke with Matt about Jack.  Matt told me that Jack was a really good guy and that he would be a benefit, you know, to any team, whether it was USI, Lockton, or anywhere else.

**"Q.** Was anything else discussed about Mr. Mitchell with Mr. Simmons?

**"A.** No.  Only high level, you know, about, like, his age and who he was and that kind of stuff.

**"Q.** With respect to Mr. Mitchell, did there come a point in time where you had conversations with Mr. Simmons and Mr. Mitchell together during the recruitment period?

**"A.** No.  That never occurred.

**"Q.** Did there come a point in time where Mr. Simmons and Mr. Mitchell's recruitments became linked at Lockton?

**"A.** In our mind, they were not linked.  Again, we would have

Fred Zutel - Videotaped Testimony

hired them individually or separately.

"Q. Did there come a point in time when Lockton assigned lawyers to Mr. Simmons with respect to his leaving USI?

"A. Yes.

"Q. When did that occur?

"A. I can't -- I don't know specifically. I can't answer it specifically.

"Q. What about generally? What time period are we talking about?

"A. It's truly hard to say. I'm sorry. I imagine sometime before, a month or two. I'm not sure exactly.

"Q. Are you familiar with Avesta?

"A. I am.

"Q. What is Avesta?

"A. It's a multifamily company, real estate owner.

"Q. Is that a client of Lockton?

"A. I believe so.

"Q. Is this what you're referring to as --

"A. Yes, yes. That's the one.

"Q. Okay. And it's an email on January 25th, 2023 from Ms. Ridley?

"A. Yes. For some reason, I thought it was a LinkedIn message, but it looks like it's an email. Apologies.

"Q. The subject is Avesta account. Right?

"A. Yes.

Fred Zutel - Videotaped Testimony

"Q.   And you responded on January 25th.  Right?

"A.   Uh-huh.

"Q.   Yes?

"A.   Yes.  Yes.  Sorry.

"Q.   That's okay.  And you responded to Ms. Ridley and to Mr. Manoj?

"A.   Yes.

"Q.   Okay.  So it says, 'Fred, I saw Matt Simmons.  He's not at Lockton.'

      "Did you know Ms. Ridley before you got this email?

"A.   No.

"Q.   How is it that she reached out to you?

"A.   I assume she looked at my LinkedIn profile.

"Q.   Did you ever speak with her?

"A.   I did.  We -- as you can see, if you kind of scroll up, we had a brief conversation.

"Q.   Okay.  So we scroll up, it says, 'Thanks so much for your email.  I'm including our COO, Manoj Sharma.'

      "Do you see that?

"A.   Yeah.

"Q.   'Please give me a ring and let me know when you'd like to connect.'

      "So there was no call following this?

"A.   Yes, a very brief one.

"Q.   Does Mr. Sharma work out of the Miami office?

Fred Zutel - Videotaped Testimony

**"A.**   No.   He's in Atlanta.

**"Q.**   Why was she in the Miami office on January 25th?

**"A.**   He wasn't in the Miami office on January 25th.

**"Q.**   So were you in Atlanta on January 25th?

**"A.**   No.

**"Q.**   Okay.  So maybe I'm mishearing.  I thought you said you walked into his office?

**"A.**   Yeah.  Oh, well, he was in an office, but not in Miami or Atlanta.

**"Q.**   Okay.  And you both were in which location?

**"A.**   We were both in Tampa.  So he was in an office that I walked into, hence the term his office.

**"Q.**   Got it.  So you were in Tampa on January 25th.  Is that because that was the start date for the former USI employees?

**"A.**   I was there because Matt Simmons was starting, and I wanted to be there the day he started.

**"Q.**   So you were there when all the employees from USI started. Right?

**"A.**   That's correct.

**"Q.**   Other than people who always work out of the Tampa office or primarily work out of the Tampa office, who was there on that day?

**"A.**   I was there, Manoj Sharma was there, and Claudia Mandato was there.

**"Q.**   And this is going to be deposition Exhibit 10.

UNITED STATES DISTRICT COURT

"A.   Okay.

"Q.   Is this a indication that you accepted Mr. Mitchell's invitation on LinkedIn?

"A.   It is.

"Q.   Was that back in October 28th of 2022?

"A.   That's right.

"Q.   And do you recall why you connected with Mr. Mitchell at that time?

"A.   I hit the accept button.

"Q.   Do you recall why Mr. Mitchell was reaching out to you?

"A.   No.  We had not met or talked to each other or been introduced at that time.  But I frequently have many people, including many, many USI employees, both current and former, connect with me on LinkedIn.  So that's not an abnormal occurrence in my world.

"Q.   At that time, back in October 28th of 2022, you had already been in conversations with Mr. Simmons for over a month.  Right?

"A.   I believe so, yeah.

"Q.   This next document is Lock 2737 through 2738.  Do you see that?

"A.   Uh-huh.

"Q.   Yes?

"A.   Yes.

"Q.   Sorry to keep reminding you.  I just have to.

"A.   I'm sorry.  I've got to get better at it.  I'll focus more on it.

"Q.   Deposition Exhibit 11, this is being marked as.

     "All right.  Do you see here this email from Mr. Simmons to Doug Hutcherson?

"A.   Yes.

"Q.   Dated November 2nd, 2022?

"A.   Yes.

"Q.   Who is Doug Hutcherson?

"A.   He is the CEO of Lockton Southeast.

"Q.   Where does he sit?

"A.   Atlanta.

"Q.   It looks like Mr. Hutcherson responds to Mr. Simmons, and then, I don't know, there was BCC.  I don't know.  But sent to Mr. Sharma and then ultimately to you.  Do you see that?

"A.   Yes.

"Q.   And you write on November 3rd, 2022, 'A plus.'  Right?

"A.   Yes.

"Q.   What are you referring to there?

"A.   That's me expressing my excitement that seemingly the meeting with Matt and Doug went well.  It looks like Matt is expressing that he really liked Doug and Lockton.

"Q.   Do you see here it says, the next document is Lockton 474 to 475?

"A.   Uh-huh.

"Q.  Yes?

"A.  Yes.  Sorry.

"Q.  This will be deposition Exhibit 12.

     "And this is the way it was provided, but you see the top is from Mr. Sharma?

"A.  Yes.

"Q.  Okay.  And then there's a number of people that are on this, and you were copied on it.  Do you see?

"A.  I do.

"Q.  If you go down to the email -- or, I'm sorry.  This is dated November 9th, 2022?

"A.  Yes.

"Q.  Now, do you see here, it says, 'Les will be reaching out to you to schedule a Webex with a P&C producer candidate out of Tampa by the name of Matt Simmons.  Matt is currently with USI and has a 9-million-dollar plus book of business.'

     "Do you see that?

"A.  I do.

"Q.  Would you agree that at least in this communication, Lockton was referencing the book of business Mr. Simmons had at USI?

"A.  Yes.  It's very normal to talk about prospective producer's existing book's of business sizes.

"Q.  Did Mr. Simmons ultimately go up to Kansas City?

"A.  Yes.

"**Q.**   Were you there for that?

"**A.**   I was there.

"**Q.**   Why did Mr. Simmons go to Kansas City?

"**A.**   To meet with other members of the Lockton team and reaffirm that Lockton was a great place to work.

"**Q.**   With regard to Kansas City, is that where Lockton Southeast's parent company is located?

"**A.**   That's Lockton's first office and the headquarters of Lockton.

"**Q.**   I think we marked this earlier as Deposition Exhibit 4. I'm going to flip through some of these and ask you about it. You're welcome to tell me to stop if you want to read any of the chain and that sort of thing.

"Do you recall we looked at this earlier to establish that September 13th, 2022 was when you were texted by Mr. Simmons about potentially joining Lockton.  Is that right?

"**A.**   Yes.

"**Q.**   Do you see on the bottom of this email, it says -- or, no, excuse me.  I called it email.  It's a text chain.

"Do you see the bottom of this text chain, it says, 'It was fun catching up with Alec this morning as well'?

"**A.**   Yeah.

"**Q.**   What is that referring to?

"**A.**   I'm not sure specifically, but I know that the reason that I met Matt, like, six or seven years ago or whenever that was,

Fred Zutel - Videotaped Testimony

was because of Alec.  And Alec is frequently in Tampa, so I assume they got together, but I can't speak specifically to it.

"Q.  It seems in reviewing these texts to go through in more detail, it seems like Mr. Simmons was very excited about moving over, and it seems like you were very excited about bringing him over.

"Do you know how the date of January 25th was selected as the date to move?

"A.  Yeah.  I mean, I think -- I don't know specifically how we landed on that exact date, but I do know that we were waiting for, like, certain bonuses and payments and things of that nature to clear that Matt was owed for years of service at USI.  And I don't think that Matt wanted to lose, you know, that money that he was owed.

"Q.  Do you see it says, Matt Simmons is texting with you about a call and said, you know, will call back.  And then he writes -- Matt Simmons writes, 'Stuck in dinner now with group.'

"Do you see that?

"A.  Yeah.

"Q.  Do you know what that's referring to?

"A.  I assume he was at a dinner with a group.  But, no, we were just calling each other a thousand times.

"Q.  All right.  So this is a text chain on January -- looks like January 22nd, going on to January 23rd.  Do you see that?

Fred Zutel - Videotaped Testimony

"A.   I do.

"Q.   We're on Page Doc 1132.  You write, 'It's going to be a good week.'

      "Do you see that?

"A.   Yes.

"Q.   And was that referring to the move from USI to Lockton?

"A.   Every week is a good week at Lockton, but I will tell you that I probably sent him that because I knew he was joining, and I was excited about it.

"Q.   And then you write on January 23rd, 'Need to connect briefly.'

      "So this would have been two days before the team moved.  Do you know why you needed to connect with Mr. Simmons at that time?

"A.   I spoke to him a million times, so I don't know what that specifically could be about.

"Q.   This is a text chain on January 5th, 2023.  Do you see that?

"A.   Uh-huh.

"Q.   It has a Bates Number of Doc 1113.  Do you see that?

"A.   Yes.

"Q.   So January 5th, this would be the same date as your dinner with Mr. Mitchell.  Right?

"A.   I don't know.  It's possible.

"Q.   All right.  Well, let's take a look at that.  And

UNITED STATES DISTRICT COURT

January 5th, 2023, Mr. Simmons writes, 'All good.'  Right?

"A.   Yeah.

"Q.   Did Mr. Simmons know you were meeting with Mr. Mitchell at or around January 5th, 2023?

"A.   I don't recall specifically.  He may have known.

"Q.   Like before, this is a group of text messages that we tried to put in date order from what was produced over this weekend between -- but these are between you and Mr. Mitchell, except I think the first one also included Mr. Alfonso.  Do you see that?

"A.   Yes.

"Q.   Do you recognize these as the text messages between you and Mr. Mitchell?

"A.   Yes.  That looks like the first time I spoke to Jack.

"Q.   So this would have been November 15, 2022.  Do you see that?

A.   I do.

"Q.   And that gives a date to what you talked about earlier when Mr. Alfonso connected the two of you?

"A.   Yes.  Alec connected me with many, many, many producers and associates and other people over the years.  He's from Tampa.  I'm from Miami.  So I don't know as many people in Tampa as he does.  Alec had a very, very positive working experience here, even though it ultimately didn't work out, right, so he was very happy to send us a prospective hires.

Fred Zutel - Videotaped Testimony

"Q.  You had various Mr. -- you had very -- various texts with Mr. Mitchell about potentially joining Lockton and setting up calls and that sort of thing?

"A.  Yes.

"Q.  So if we go down, for example, you send him, 'Here's the story of Jack.'  Is that referring to Jack Lockton?

"A.  Yeah.  It's a book.

"Q.  Now, do you see in this series of texts on January 2nd, 2023, you were talking about a trip for Mr. Mitchell to come to Miami?

"A.  Yes.

"Q.  And you ultimately coordinated that trip -- do you see that -- for Thursday and Friday of that first week of January?

"A.  That's correct.

"Q.  And with respect to Hiram here, who is Hiram?

"A.  He is the president of global growth for Lockton Companies.

"Q.  And why was Hiram being included in this meeting?

"A.  I wanted to introduce Hiram to Jack.

"Q.  Then do you see it says here, 'The plan would be for you to arrive Thursday afternoon and we would do dinner and leave Friday late afternoon.'

     "Do you see that?

"A.  Yeah.  We were trying to do, like, a fishing trip and a dinner.  Or I should say a dinner and a fishing trip; hence,

UNITED STATES DISTRICT COURT

the -- there's a dinner, right, meet Hiram, wake up, go fishing, leave that afternoon, if that makes sense, the context.

"Q.  And then it goes on, you know, you confirm times.

"A.  Uh-huh.  Yes.

"Q.  And then you would agree that at least on January 5th, 2023, at the same -- or around the time you're meeting with Mr. Mitchell, Mr. Simmons is texting you, 'All good.'  Right?

"A.  Yeah.  Matt and I are texting every single day.  So I don't see anything unusual about that.

"Q.  And then last document, this is a sample member agreement we were provided.  Do you see at the bottom -- oh, there it is, Lockton 5000, and it goes down to -- it goes down to Lockton 5019.  Do you see that?

"A.  Yes, I see it.

"Q.  And it says, 'Sample Member Agreement'?

"A.  Yes.

"Q.  Are you familiar with this document?

"A.  Yes.

"Q.  Is this similar to the member agreement you would have with Lockton?

"A.  Yes.

"Q.  And would you also agree that there's a notice provision in this agreement?  And I'm taking you to Exhibit B, 'Any producer may be terminated as a member by such Series members

on 30 days' written notice to this Series.'

    "Do you see that?

**"A.**  I can see it.

**"Q.**  So would you agree that in Lockton's standard member agreement, Lockton requires 30 days' notice to terminate?

**"A.**  That's what the agreement says, yes."

            **MR. ZIMMERMAN:**  I believe that's the end, Your Honor.

            **THE COURT:**  All right.  Very good.  Let's take a little stretch break while I visit with the lawyers.

            **THE COURT SECURITY OFFICER:**  All rise for the jury.

    (Jury out at 3:06 p.m.)

            **THE COURT:**  Thought we could just talk up here, but what's next?

            **MR. CANNELLA:**  Mr. Mitchell.

            **THE COURT:**  Good.  Good.  Good.  That will be live.

            **MR. CANNELLA:**  That will be live.  And hopefully I've shortened it enough to give them ample opportunity to do their business and he'll be done before we break.

            **THE COURT:**  Excellent.  Excellent.  Okay.  In the event we do get done earlier with him, depos next?

            **MR. ZIMMERMAN:**  Yes, Your Honor.

            **THE COURT:**  And that's good.  You'd have to test that?

            **MR. ZIMMERMAN:**  It should be the same system.

            **THE COURT:**  By the way, you get -- congratulations.

Congratulations.

MR. ZIMMERMAN:  Thank you, Judge.  I appreciate it.

THE COURT:  I have never seen that done really where it worked.  We didn't have to stop and do something, so good.

MR. ZIMMERMAN:  It's really Ms. Royal.

MS. ROYAL:  I'll take it, Your Honor.

THE COURT:  You want it.  You got it.  You got it.

(Recess from 3:07 p.m. to 3:20 p.m.)

THE COURT:  Bring the jury in.

THE COURT SECURITY OFFICER:  All rise for the jury.

(Jury in at 3:22 p.m.)

THE COURT:  Have a seat.  We're good now.  We have another witness ready to roll.

MR. CANNELLA:  Yes.  Good afternoon.  Good afternoon. USI calls as its next witness Jack Mitchell.

THE COURT:  Come on down, Mr. Mitchell.  Raise your right hand, please.

WHEREUPON,

**JACK MITCHELL,**

was called as a witness and, after having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

THE COURT:  Very good.  Have a seat there.

Tell us your name and how to spell it please.

THE WITNESS:  Jack Mitchell.  J-a-c-k,

M-i-t-c-h-e-l-l.

THE COURT:  What's my next question going to be, or what am I going to say next?

THE WITNESS:  Speak up.

THE COURT:  You got it.  If the jury is waving, you know why.

Go ahead, Mr. Cannella.

MR. CANNELLA:  Thank you, Your Honor.

BY MR. CANNELLA:

Q.  Good afternoon, Mr. Mitchell.  Before January 25th, 2023, you worked for USI.  Is that right?

A.  Yes.

Q.  And you were a producer at USI?

A.  Yes.

Q.  Were you trained by USI?

A.  Yes.

Q.  And when you joined USI in September of 2019, was your book of business zero?

A.  It was.

Q.  And you resigned from USI on January 25th, 2023 at 8:17 a.m.  Is that right?

A.  Yes.

Q.  The jury has already seen your resignation email through the testimony of Mr. Longhta.  So I'm not going to show it again, unless you want me to.  Your resignation was effective

Jack Mitchell - Direct Examination

immediately.  Is that right?

**A.**   That's correct.

**Q.**   And you also started with the Southeast Series of Lockton Companies on January 25th, 2023.  Is that right?

**A.**   Yes.

**Q.**   And you had a written employment agreement with USI?

**A.**   Yes.

**Q.**   And did you agree to certain restrictive covenants in that agreement?

**A.**   I did.

**Q.**   And those were the same provisions that we went through with Mr. Longhta earlier this week that no solicitation of clients, nonacceptance of business from clients.  Is that right?

**A.**   That's correct.

**Q.**   And you also agreed to provide USI with 60 days' notice before you resigned.  Is that right?

**A.**   Yes.

**Q.**   I want to talk a little bit about your employment history with USI.  When you started at USI, you were what they call an unvalidated producer.  Is that right?

**A.**   That's correct.

**Q.**   And that means that you were paid on a salary.  Is that right?

**A.**   Yes.

Jack Mitchell - Direct Examination

Q.   While you learned the business.

A.   While I grew my book.

Q.   Okay.  And were you mentored by more senior producers?

A.   Yes.

Q.   And were one of those producers Ken Jacobs?

A.   Yes.

Q.   Anybody else during those first couple years?

A.   Ken is a 50/50 partner with Adam Lopatin.  I can say Adam mentored me as well.

Q.   And by January of 2022, your book had grown from zero to 600,000.  Is that right?

A.   Yes.

Q.   On top of that 600,000, you also had about $200,000 in business that Mr. Simmons transitioned to you.  Is that right?

A.   Yes, sir.

Q.   Okay.  So is it fair to say that in early 2022, you were feeling pretty good about how things were at USI?

A.   I was growing.

Q.   Were you an up-and-coming producer?

A.   Yes.

Q.   And do you know who Misty Carson is?

A.   Yes, I do.

Q.   All right.  Misty Carson was hired as a practice group leader -- I'm sorry.  I'm using law firm language.  The property and casualty -- one of the property and casualty

Jack Mitchell - Direct Examination

leaders in USI's Tampa office.  Is that right?

**A.**   Yes, she was.

**Q.**   And weren't you one of the people that encouraged Misty Carson to look into that position?

**A.**   I did.  I felt like there was a group of producers in the office that needed maybe a different sales style or coaching style, kind of a cheerleader.  I felt like she could be a good candidate.  So I got her in touch with USI.

**Q.**   Were you enthusiastic with Ms. Carson about USI?

**A.**   I'm an enthusiastic person.

**Q.**   Did you recommend to Ms. Carson that she look into this opportunity at USI?

**A.**   I did.

**Q.**   And that was in March of '22.  Correct?

**A.**   Sounds right.

**Q.**   Now, fast-forwarding a little bit, about six months forward.  Did you know in October of 2022 that Mr. Simmons was speaking to Lockton?

**A.**   Yes.

**Q.**   That's because Mr. Simmons told you that.  Right?

**A.**   Yes.

**Q.**   And you knew that Mr. Simmons was speaking with Fred Zutel.  That's the fellow we just saw the video depo of. Right?

**A.**   Yes, sir.

UNITED STATES DISTRICT COURT

**Q.** You asked Alec Alfonso to connect you with Mr. Zutel. Is that correct?

**A.** Yep.

**Q.** Did Mr. Alfonso connect you with Mr. Zutel?

**A.** He did.

**Q.** Did you and Mr. Zutel have your first substantive conversation on November 16th, 2022?

**A.** That sounds right.

**Q.** Is that when you started looking into Lockton as a potential opportunity for you?

**A.** Yes, sir.

**Q.** That's because you wanted to unleash your potential?

**A.** Yes.

**Q.** Is that right?

**A.** Yes.

**Q.** I've got that right? Okay. So from September, you're at zero. January of '22, you're at 600. What was your book of business by January 2023?

**A.** About 1.2 million.

**Q.** 1.2 million. All right. I want to ask you about some of your conversations that you had with Mr. Zutel. You'll see in front of you -- Judge, I don't know if you've got this exhibit book for Mr. Mitchell or not.

**THE COURT:** I don't think I do. I don't think I do.

**MR. ZIMMERMAN:** May I approach?

**MR. CANNELLA:** Does the witness have his book? I thought he did.

**A.** It's Ms. Kemp.

**MR. ZIMMERMAN:** May I approach the witness?

**THE COURT:** Yeah, certainly.

**MR. CANNELLA:** My apologies. I thought that was already done.

**BY MR. CANNELLA:**

**Q.** All right. Mr. Mitchell, you've got an exhibit book in front of you. I want to direct your attention to Tab 4. That's Exhibit 138. These are certain phone records.

**A.** Yes.

**Q.** All right. And I believe these are in evidence. So, Your Honor, Exhibit 138 in evidence, these are Mr. Mitchell's phone records.

**A.** I don't know if it's in evidence or not.

**MR. SHAPIRO:** No objection.

**THE COURT:** It's admitted.

**MR. CANNELLA:** It is in evidence now. Okay. Thank you, Your Honor.

(Counterplaintiff's Exhibit 138 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.** Now, you'll see up there, there's a color-coded chart, just to make this easier for us, where the calls that are in blue are Mr. Simmons and the calls that are in green are

Mr. Sharma.

I assume you know who Manoj Sharma is?

A.   Yes, sir.

Q.   All right.  And then the calls that are in yellow are Mr. Zutel.  All right.

So looks like you and Mr. -- this is Mr. Zutel's number.  Looks like you and Mr. Zutel first spoke on November 16th, 2022.  Does that seem consistent with your memory?

A.   Yes.

Q.   And this was your first call with Mr. Zutel.  It looks like nine minutes and then 60 minutes.  Do you see that, sir?

A.   Yes.

Q.   And on that first call, did you and Mr. Zutel discuss your interest in Lockton?

A.   Yeah.  I wanted to get a better idea of Lockton.  I had run up on them.  They're a competitor.  And I wanted to learn more about his background and learn more about Lockton.

Q.   And you knew that Mr. Zutel had recently joined Lockton himself.  Right?

A.   I did.

Q.   Mr. Zutel had joined from Willis, which is another competitor in the marketplace.  Is that right?

A.   Yes.

Q.   And you knew that Mr. Zutel went through litigation after he left Willis to go to Lockton.  Is that right?

Jack Mitchell - Direct Examination

**A.** I did.

**Q.** And by litigation, I mean lawsuit. I've been talking like a lawyer too long. There was a lawsuit. Right?

**A.** Yes, there was.

**Q.** And you knew that when Mr. Zutel moved from Willis to Lockton, Lockton provided him lawyers?

**A.** I don't know if it came up on that call, but I did know that.

**Q.** You eventually found that out. Right?

**A.** Yes, sir.

**Q.** You found that out before you accepted a position with Lockton?

**A.** Yes.

**Q.** Okay. Now, after your call with Mr. Zutel, you spoke to -- this is Matt Simmons's number shaded in blue, the 727. Do you see that?

**A.** Yes, sir.

**Q.** You spoke to Mr. Simmons for about 60 minutes on that same date, November 16th, 2022.

**A.** Yes.

**Q.** Now, you called -- in fact, you called Mr. Simmons immediately after the call with Mr. Zutel was finished. Is that right?

**A.** Yes.

**Q.** And you knew prior to this that Mr. Simmons had been

talking to Mr. Zutel?

A.    I did, yeah.

Q.    So for the next 60 minutes, what did you and Mr. Simmons talk about?

A.    I can't say for, you know -- I mean, it's likely we did talk about Lockton or how I talked with Fred.  Matt and I talked a lot.  We shared ten accounts together.  So I can't say for certain Lockton was the only thing we talked about, but it's very possible we talked about Lockton.

Q.    Did you and Mr. Simmons keep each other in the loop on how the talks with Lockton were going?

A.    Yes, sir.

Q.    In the fall of 2022?

A.    Yes.

Q.    Okay.  The next call I see for Mr. Zutel looks like -- let me know if you can see this or can't see it.  Okay.  Great. Thank you.

      November 28th, 2022, you and Mr. Zutel spoke for, looks like, 75 minutes.  Is that right?

A.    Yes, sir.

Q.    And I -- more conversations about the opportunity with Lockton?

A.    Yes.  Yeah.

Q.    And it looks like the next morning, you and Mr. Simmons spoke for about 23 minutes.  Is that right?

**A.**   Yes.

**Q.**   All right.  Mr. Mitchell, at some point, did you send Lockton your USI employment agreement?

**A.**   Yes, I did.

**Q.**   And did Lockton tell you that they would have their attorneys review the agreement?

**A.**   Yes, as a resource.

**Q.**   And did you and Lockton discuss financial models and projections?

**A.**   We did.

**Q.**   Were those projections used to determine your compensation?

**A.**   Yes.

**Q.**   I want to show you an exhibit.  It's Tab 5 in your notebook.  It's Exhibit 43.

         **MR. CANNELLA:**  I don't believe there's any objection, Your Honor, to this exhibit.  We'd like to -- USI would like to move it into evidence as Exhibit 43.

         **MR. SHAPIRO:**  No objection, Your Honor.

         **THE COURT:**  Admitted.

     (Counterplaintiff's Exhibit 43 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.**   All right.  Mr. Mitchell, this is an email dated January 5th, 2023.  It's from you to Anand Shelat and to Manoj Sharma at Lockton.  Do you see that, sir?

Jack Mitchell - Direct Examination

A.   Yes, sir.

Q.   And what are you trying to convey in this email to Mr. Shelat and Mr. Sharma?

A.   Sure.  So there was -- I had a meeting with Anand, I think, around this time to go through what the modeling process was like in a capital account structure and different terms with what you expect to produce over the course of the years and what your commission splits would be, ultimately deciding what your compensation was.  So I basically was trying to negotiate, you know, my terms.

Q.   Now, are you conveying to Mr. Shelat and Mr. Sharma that you need a better deal to go from USI to Lockton in order for you to make more money?

A.   Something comparable to what I was on my path with USI.

Q.   So if you look specifically at this third paragraph, "Per the attached Excel sheet, you will see I will make less money at Lockton over the five-year period."

     That's in comparison to USI.  Right?

A.   Yes.

Q.   You were present yesterday for Mr. Simmons's testimony. Do you remember that?

A.   Yes.

Q.   And my partner, Mr. Zimmerman, showed Mr. Simmons a similar email where he expresses to Lockton, if I stay at USI, I'm going to make more money over five years than if I go to

Lockton.  Do you remember that?

A.    Yes.

Q.    So you're saying the same thing here.  Is that right?

A.    Yeah.  The account -- or the modeling we went through with Anand I thought was conservative.  Yeah.

Q.    Did you get any assistance from Mr. Simmons in framing up this issue?

A.    No, not specifically.  Fred was a resource for me at this time.  I know Matt had done the modeling process.  He didn't help me with it.  But, you know, I kind of knew he pushed back on his terms as well.

Q.    All right.  So let me break that down.  So Mr. -- you knew that Mr. Simmons had gone through the modeling process.  Right?

A.    I did.

Q.    You and Mr. Simmons discussed the modeling process.  Right?

A.    Very, very eye level.

Q.    Okay.  And you knew that Mr. Simmons had pushed back against the modeling process in an attempt to get higher compensation.  Is that right?

A.    To a certain degree.

Q.    Okay.  And so here, you're doing the same thing.  Right?  You're asking Lockton to take the commission split from 35 percent to 50 percent.  Is that right?

A.    That's right.

Jack Mitchell - Direct Examination

Q.    Okay.  And then let's look at the attachment.  Did you prepare this, Mr. Mitchell?

A.    I did.

Q.    Okay.  And it looks like you're depicting two different things here.  This is what you were doing at USI.  Right?  1.2-million book of business for 2023?

A.    Yes.

Q.    And you're projecting that out.  And then at Lockton, you're -- is this an estimate of what you thought you would be able to originate in year one?

A.    It was.

Q.    Okay.  So you estimated that you would be able to -- that you would generate $500,000 in revenue in year one.  Is that right?

A.    Yes, sir.

Q.    And I just want to make sure I understand.  The $500,000, would that come from all new clients once you got to Lockton, or would any of that be clients that you had at USI coming with you?

A.    All new clients.  I didn't expect any of my clients to move to Lockton.

Q.    Okay.  So yours -- are you assuming here that you're not going to tell any of the clients that you're working at with USI that you're going to Lockton before you go to Lockton?

A.    At this time, I don't think I anticipated.  I mean, I kind

of had a feeling, if I left, I would give them a courtesy call. But nothing more than that, and I had no expectation of clients moving to Lockton. I had a 1.2-million-dollar book. You know, I'm perfectly fine starting over at 27 years old. I was looking at Lockton for the next 35 years, so --

Q. I understand all that, except for the 27. That was a long time ago for me. I just want to be clear, though. You had a 1.2-million-dollar book. And you're telling us that the 500,000 assumes that you start at zero all over again. Is that right?

A. Yes, sir.

Q. Okay. Did Lockton respond to this proposal?

A. They did.

Q. Okay. Well, let me ask you this. Did you get the 50-percent commission?

A. I didn't.

Q. Okay. Did Lockton -- I'm showing you, sir, Exhibit 42, and it's Tab 6 in your book.

          MR. CANNELLA: Your Honor, USI moves to introduce into evidence Exhibit 42.

          THE COURT: Any objection?

          MR. SHAPIRO: No objection, Your Honor.

          THE COURT: Admitted.

     (Counterplaintiff's Exhibit 42 admitted into evidence.)

Jack Mitchell - Direct Examination

**BY MR. CANNELLA:**

Q.   All right.  So this is the same date as your projection. This is an email from Mr. Shelat.  I think we already established this.  He's the senior manager of finance for Lockton Companies.  See that, sir?

A.   Yes.

Q.   And Mr. Shelat sends you the capital account example. Right?

A.   Yes.  Yes, sir.

Q.   And Mr. Shelat attaches a spreadsheet showing anticipated production revenue in year one.  See that, sir?

A.   Yes.

Q.   And Mr. Shelat projects this out from year one to year ten.  Is that right?

A.   Yes.

Q.   Now, it's your understanding that, you know, if you joined Lockton, you're not entering into a ten-year contract.  Right? You could leave at any time.  Right?

A.   Yes, sir.

Q.   But Mr. Shelat is using a ten-year projection here.  Is that right?

A.   That's right.

Q.   And in year one, Lockton anticipates $300,000 in revenue in year one.  See that?

A.   Yep.

**Q.**   Okay.  I think we established earlier that you sent your USI employment agreement to Lockton.  Was that Mr. Sharma that asked you to do that?

**A.**   Yes.

**Q.**   And did Mr. Sharma tell you you would be speaking with one of Lockton's lawyers?

**A.**   He did.

**Q.**   And the Lockton lawyer that you spoke to was Lyle Shapiro. Is that right?

**A.**   Yes, sir.

**Q.**   The first time you spoke to Mr. Shapiro, that would have been on or about January 6th, 2023?

**A.**   Sounds right.

**Q.**   And you're aware that Mr. Shapiro also represents Mr. Simmons.  Right?

**A.**   Yes.

**Q.**   Mr. Shapiro also represents Lockton.  Right?

**A.**   Yes.

**Q.**   Mr. Shapiro also represents Sheila Murray?

**A.**   Yes.

**Q.**   Mr. Shapiro represents Jackie Rodriguez?

**A.**   Yes.

**Q.**   Mr. Shapiro represents Madison Lieffort?

**A.**   Yes.

**Q.**   Mr. Shapiro also represented Emily Carter?

**A.** Yes.

**Q.** And Mr. Shapiro also represented Chris Kakish, who we saw earlier today?

**A.** Now, I guess, yes.

**Q.** All right. And Mr. Shapiro also represented Theresa Kemp. Right?

**A.** Yes.

**Q.** All right. Now, when you were in discussions with Lockton, did you tell Lockton that you had a 1.2-million-dollar book of business?

**A.** Yeah.

**Q.** Now, was the start date of January 25th, 2023 chosen by Lockton?

**A.** It was.

**Q.** And we've already established that's the same day you resigned from USI. Right?

**A.** That's right.

**Q.** And before January 25th, 2023, were you presented a term sheet from Lockton?

**A.** Yes.

**Q.** Mr. Mitchell, if you could look at Tab 7 of your notebook. It's Exhibit 337. Let me know when you're there.

**A.** I'm there.

**Q.** Okay. Thank you. Do you recognize 337 and, rather, what's behind that is the term sheet?

**A.**   Yes.

**Q.**   All right.  Your Honor, USI moves to introduce into evidence Plaintiff's Exhibit 337.

         **MR. SHAPIRO:**  No objection, Your Honor.

         **THE COURT:**  Admitted.

         (Counterplaintiff's Exhibit 337 admitted into evidence.)

**BY MR. CANNELLA:**

**Q.**   Okay.  So I'm going to flip to the term sheet so we're all on the same page.

         This term sheet is dated January 17th, 2023.  Is that right?

**A.**   Yes.

**Q.**   Now, as of January 17th, 2023, was the anticipation that the start date would be January 30?

**A.**   Looks like that.

**Q.**   Right.  But we know that that start date was actually five days earlier in reality.  Right?

**A.**   Yes.

**Q.**   So do you know why the start date was moved up to January 25th, 2023?

**A.**   I don't.

**Q.**   That was the same day that the lawsuit was filed.  Right?

**A.**   It was.

**Q.**   Okay.  That was the same day that you resigned.  Right?

**A.**   Yes.

**Q.** Did you tell any of your clients that you were leaving USI before you told USI?

**A.** Yes. I thought it was the right thing to do to give a few of my clients just a professional courtesy good-bye. You know, I wanted them to hear it from me.

**Q.** All right. So the answer to my question is, yes, you did that before you told USI. Is that right?

**A.** Yes.

**Q.** You told East Coast Acquisitions. You told Susquehanna Holdings. Right?

**A.** That's right.

**Q.** You believe that the revenue per year for East Coast Acquisitions was somewhere between 125,000 to $150,000 per year?

**A.** Say that again.

**Q.** It was a poor question. I apologize.

Do you believe that the annual revenue per year for East Coast Acquisitions was 125,000 to $150,000?

**A.** Sounds right.

**Q.** Okay. So that was a big client for you. Right?

**A.** Yeah. It was a big -- yeah.

**Q.** And the other client you told was Susquehanna Holdings?

**A.** Yes.

**Q.** When you called -- I want to talk about East Coast Acquisitions first. The person you spoke to was Chris Wild?

Jack Mitchell - Direct Examination

**A.** Yes, sir.

**Q.** And did you tell Mr. Wild that if he called you the next day, you might be able to share some more information with him about Lockton?

**A.** When I spoke with him on the 24th, I was very cautious. I said, I hope you can respect I can't talk about my future employer while I'm still at USI. So they invited another conversation the next day.

**Q.** What did you tell them specifically?

**A.** Called Chris, told him that I had, you know, caught up for a little bit. We were working on a couple things. Told him that I made a really tough decision to leave USI, a personal decision that I was going to go to Lockton.

**Q.** And did you also tell him, "But you know you can call me tomorrow, and I might be able to share some details about Lockton. And if you decide to choose to go to Lockton again, I can't be a part of that. I made that all very clear on the call."

Did you tell them they could call you the next day and get more information?

**A.** They were asking more details, and I continued -- I wanted to be very cautious about, you know, not leaving them or doing anything like that. I continued to just say, I can't talk about my future employer while I'm still employed at Lockton. I hope you can respect that.

**Q.**   All right.  So the next day, on January 25th, did ECA --
I'm sorry, I'm using the acronym -- did East Coast Acquisitions
call you the next day on January 25th?

**A.**   They did.

**Q.**   And you spoke to Chris Wild?

**A.**   Yes.

**Q.**   And you told Chris Wild that you had started at Lockton?

**A.**   I did.

**Q.**   And Mr. Wild told you that this relationship means a lot?

**A.**   He did.

**Q.**   And you gave Mr. Wild the cell phone number for Manoj
Sharma?

**A.**   Yes.

**Q.**   And then do you know whether Mr. Wild then sent Mr. Sharma
an email with the insurance information for a policy that
renewed in September of 2022?

**A.**   He wanted to work with Lockton.

**Q.**   Let me direct you to Tab 8 of the notebook.  Let me know
when you've had a chance to read that.

**A.**   Just the first page?

**Q.**   No.  You can read through the whole -- it's a quick
flip-through.

        **MR. CANNELLA:**  Your Honor, while the witness is doing
that, USI moves to introduce into evidence Plaintiff's
Exhibit 46.  I don't believe there's any objection.

Jack Mitchell - Direct Examination

**MR. SHAPIRO:** No objection.

**THE COURT:** Okay. Admitted.

(Counterplaintiff's Exhibit 46 admitted into evidence.)

**THE WITNESS:** I've read it.

**BY MR. CANNELLA:**

Q.   Okay.  Thank you, Mr. Mitchell.

So you see here, January 25th, 2023, from Manoj Sharma to Chris Wild, ECA, "Received.  Thank you for your business.  It is greatly appreciated."

And it appears that earlier that day, Mr. Wild forwarded the summary of insurance binder placement to Lockton.  Do you see that, sir?

A.   Yes.

Q.   And this was information that Lockton needed in order to facilitate the change of the broker of record?

A.   Yes.  It was.

Q.   All right.  And you're familiar with the -- what a broker-of-record letter is.  Right?

A.   I am.

Q.   And that's where the client lets the carrier know that they've got a new broker?

A.   Yes.

Q.   They've got to set forth certain policy information in order for that to be an effective letter.  Right?

A.   Yes.

Q.   Now, you worked with East Coast Acquisitions when you got to Lockton.  Is that right?

A.   I did hardly anything for them on the -- in this chain. They had a fire in Brooklyn at a property they owned.  It was actually the policy started September 28th of 2022.  So this had only been a USI client for four months.

     The day we bound coverage, there was a fire at a property in Brooklyn.  They own shopping centers.  And when they moved the business to Lockton, I was hands off for several days.  And I think they needed to get in touch with a claims advocate to help work with adjusters from the insurance company and to move that along.  So I did facilitate, I think, an intro to them, and that's it.  I haven't -- I haven't spoken to them or had any interaction with them since.

Q.   Let me try that -- frame the question a different way. Other than East Coast Acquisitions, are there any clients that you worked with at USI that you worked at with Lockton from January through February 15th, 2023, when the Court said you couldn't work with the clients anymore?

A.   Say it again.  Sorry.

Q.   Yes.  Are there any clients that you worked with at USI that you worked with at Lockton from January 25th of 2023 through February 15th of 2023?

A.   I haven't worked with any other clients that worked at USI.

**Q.** The only one was East Coast Acquisitions.  Correct?

**A.** Yes.  Only one client.

**Q.** Did Susquehanna Holdings come over with you?

**A.** No.

**Q.** As far as you know, is that client still with USI?

**A.** I don't know.

**Q.** Did you -- when you called Susquehanna Holdings, was that also on January 24th?

**A.** It was.

**Q.** So you called Susquehanna Holdings and East Coast Acquisitions while you were still employed by USI?

**A.** I was.  Or I did.

**Q.** Were those calls for the benefit of USI?

**A.** I thought it was the right thing to do to give people who I've worked with and brought in, just the moral thing to do to hear it from me that I was leaving.  I didn't want them to be, you know, caught off guard.

**Q.** Did those calls benefit USI?

**A.** I don't know.  I don't know.

**Q.** You didn't provide USI with 60 days' notice.  Is that right?

**A.** I didn't.

**Q.** You did not.  Right?

**A.** I did not.

**Q.** When you left the employer, was it BKR you were with

before?

**A.**   Close.  BKS.

**Q.**   BKS.  I'm sorry.  It's been a long week.  When you left BKS, did you give them notice before you joined USI?

**A.**   I did.

**Q.**   You gave them what, two weeks' notice?

**A.**   I think so.

**Q.**   When you sent the resignation email to Tom Longhta, which the jury has already seen, you knew that Sheila Murray, Jackie Rodriguez, Matt Simmons, Madison Lieffort were also all resigning on January 25th.  Is that right?

**A.**   Yes.

**Q.**   In fact, you knew that because you're one of the plaintiffs that sued USI.  Right?

**A.**   Yes.

**Q.**   This has already been seen as a demonstrative exhibit. But that's you.  Right?

**A.**   Yes, sir.

**Q.**   Okay.  And this was filed on January 25th at 9:31 a.m. Correct?

**A.**   That's right.

**Q.**   That was less than an hour -- it was about an hour -- about an hour and 15 minutes after you sent your email to Mr. Longhta.  Right?

**A.**   Right.

Jack Mitchell - Direct Examination

Q.   The attorneys who filed this suit on your behalf, those were the lawyers that were paid by Lockton.  Right?

A.   Yes.

Q.   And the reason why this suit was filed was because you and the other plaintiffs wanted to be able to continue to accept business from the USI clients.  Is that right?

A.   I didn't think my employment -- I wanted to challenge my employment agreement.

Q.   Okay.  Now, you arrived at Lockton's office on January 25th, 2023.  Right?

A.   Yes.

Q.   And when you got there, were Ms. Simmons, Ms. Murray, Ms. Rodriguez, Ms. Carter, Ms. Lieffort, and Mr. Kakish already there?

A.   Coming in throughout the morning.

Q.   All right.  And my understanding is that Theresa Kemp arrived later that day?

A.   Yes.

Q.   And then what -- during the morning of January 25th, was there a discussion around about broker-of-record letters?

A.   I think there was, I think, something about that, yeah.

Q.   Right.  So there was discussions the morning you reported about trans -- getting clients from USI over to Lockton through broker-of-record letters.  Right?

A.   I think so.

Jack Mitchell - Direct Examination

Q.   And Ms. Mandato, who we've heard about before, she came in from Kansas City to Tampa.  Right?

A.   She was there.

Q.   Okay.  And do you know what she did to assist with the broker-of-record letters?

A.   I didn't really know her specific role there that day.  But I believe she filed broker-of-record letters.

Q.   And do you know how many clients moved from USI to Lockton between January 25th and January 30?

A.   Not specifically, no.

Q.   And, eventually, you signed a member agreement with Lockton.  Is that right?

A.   Yes.

Q.   Sir, if you could turn to Tab 10 of your notebook.

A.   I'm there.

Q.   All right.  Is this a true and correct copy of your member agreement with Lockton?

A.   Yes.

        MR. CANNELLA:  Your Honor, USI moves into evidence Plaintiff's Exhibit 450.

        THE COURT:  Any objection?

        MR. SHAPIRO:  I think that's already been addressed by the Court, Your Honor.

        THE COURT:  All right.  Fine.

Jack Mitchell - Direct Examination

(Counterplaintiff's Exhibit 450 admitted into evidence.)

**BY MR. CANNELLA:**

Q.   I want to ask you a couple questions about the agreement.
Not going to go through all 18 pages.

Let me ask you first about nonsolicitation of customer
accounts.  Do you see that, Mr. Mitchell?

A.   Yes.

Q.   And do you agree -- or did you agree with Lockton that you
would not accept, service, work on, or attempt or threaten to
accept, service or work on, any such competitive business from
any of the customer accounts that member may not solicit?

A.   Yep.

Q.   All right.  And you may not do any business with any of
those customer accounts?

A.   Yes.

Q.   And that's for a period of two years?

A.   I think so.

Q.   And we've kind of referred to that during the course of
the trial as hands off?

A.   I haven't heard it as that, but yes.

Q.   Okay.  Well, would you agree that the USI agreement and
the Lockton agreement basically prohibit you from doing the
same kind of thing?

A.   Yes.

Q.   All right.  And does Lockton anticipate that once a

Jack Mitchell - Direct Examination

business relationship is established with a client, that relationship is going to last?

**A.**    Last for a certain amount of time, but, you know, business moves.

**Q.**    Let me show you from your agreement, Section 5.1. Customer Accounts is a defined term.  "Member will be provided with introduction or access to such relationships, will use resources and staff of the Lockton Entities to develop and maintain such relationships, and will be relied upon to develop and maintain such relationships on behalf of the Series, and, if applicable, the Other Series" -- I'm just -- I can read the whole thing or I can just have you read it to yourself and I can ask you some questions about it.

Do you have a preference?

**A.**    I'll read it to myself.

**Q.**    Okay.  That's good.  That will save me the embarrassment of getting a word wrong.

**A.**    Okay.

**Q.**    All right.  Sir, do you see that in the agreement, Lockton is saying that, "these relationships generally are likely to continue, and to continue to generate economic benefit for the Lockton Entities, unless the relationships are disrupted or interfered with by events outside of the normal course of business"?

**A.**    Yes.

Jack Mitchell - Direct Examination

**Q.** All right. So I'll ask the question. Does Lockton believe once a client relationship is established that it will continue, unless it's disrupted by an event outside of the normal course of business?

**MR. SHAPIRO:** Objection, Your Honor. Lack of foundation.

**THE COURT:** I think you have to change the question a little bit. So that's sustained.

**BY MR. CANNELLA:**

**Q.** Does your member agreement reflect that Lockton has an expectation that its business relationships will continue once established?

**A.** To a certain extent.

**Q.** And is that one of the reasons given for the necessity for the restrictive covenants?

**A.** I suppose so.

**Q.** And in your member agreement, do you in fact acknowledge that those restrictions are necessary to preserve the business relationships?

**A.** I guess.

**Q.** All right. Is your -- did Lockton guarantee your compensation for the first year?

**A.** It's a forgivable loan.

**Q.** Well, there's also the loan. Right? So there's compensation, and there was also a sign-on bonus of $150,000?

**A.**   Yes.

**Q.**   And that's also forgivable.  Right?

**A.**   Yes.

**Q.**   And Lockton is indemnifying you in this case.  Right?

**A.**   They are.

**Q.**   Okay.  So Lockton is taking care of everything?

**A.**   Yes.

**Q.**   Okay.  Your Honor, can I have just a minute?

THE COURT:  Yes.

MR. CANNELLA:  No further questions, Your Honor.

THE COURT:  Cross-examination.

**CROSS-EXAMINATION**

MR. SHAPIRO:  Your Honor, may I bring the witness exhibits?

THE COURT:  Yes.

MR. SHAPIRO:  Thank you.

**BY MR. SHAPIRO:**

**Q.**   Good afternoon, Mr. Mitchell.

**A.**   Good afternoon.

**Q.**   I want to go back to your time at USI.  And, Mr. Cannella, you know, took you through the history a little bit.  You joined, and you were growing your book of business.

Did there come a point in time, as your book was larger and required more servicing resources, that you became frustrated?

**A.**   Yes.   Early 2022, as I kind of hit that tipping point of having, you know, over 15 clients, really running accounts on my own, there was a service team, but they were so stretched thin, that I was, in essence, acting as account manager and account executive and still being asked to bring in more business.   Very challenging time.

**Q.**   Were you feeling -- so the job of a producer at USI is to bring in more business.   Is that fair?

**A.**   Yes.

**Q.**   Were you finding that you couldn't bring in more business and do your job because you were having to service the business, which was other employees' responsibilities?

**A.**   It was very hard.   And I'd never wanted to leave a client hanging.   I wanted -- to me, the service and making sure the current clients are taken care of is equally as important as new business.   I wanted to make sure everything was buttoned up on current clients, and that took so much of my time.

**Q.**   So we saw this email earlier.   This is Defendant's Exhibit 25.   If you don't mind, if you can turn to Tab 25 in your book there.

     Do you recall you sent an email to the leadership at USI on May 5th, 2022?

**A.**   Yes.

**Q.**   Okay.   And then your supervisor is Blake Varnadore.   Is that correct?

**A.**   Yes, he was my boss.

**Q.**   We talked about this email previously in this trial.  So Blake Varnadore, after receiving your email, sends this following email to his contemporaries, the other leadership in USI.  Is that correct?

**A.**   He does.

**Q.**   Can you read for the jury the paragraph that starts with, "I keep hearing from virtually"?

     Do you see that?

          **MR. CANNELLA:**  Objection, Your Honor.  Document speaks for itself.  The jury can read it themselves.

          **THE COURT:**  Well, it can also be a predicate for a question.  So you want to ask him something about it?

          **MR. SHAPIRO:**  Yes.

          **THE COURT:**  Go ahead.

**BY MR. SHAPIRO:**

**Q.**   Go ahead.  You can read it.

**A.**   Read it out loud?

**Q.**   Please.

**A.**   "I keep hearing from virtually all the senior producers that they can't take on anymore and now I'm hearing it from the younger ones.  Jack has been underwater lately and I see him starting to pull back.  I can't have our producers shutting down the funnel.  I especially can't have one of our best young producers feeling this way -- feeling this way this early on

when they are coming off a great year last year and a great start to the year so far.  He should be leveraging the momentum he has to get as much on the board as possible.  Instead he's in a spot where he thinks some of these accounts would be better somewhere else."

Q.   Now, Mr. Mitchell, was the reason why you reached out to Lockton to explore another opportunity, because that was how you felt, the way that your supervisor Blake Varnadore told his leadership?

MR. CANNELLA:  Objection, Your Honor.  Leading.  I mean, even in cross --

THE COURT:  It's a little confused how we're doing this.  But don't ask him leading questions, if you can avoid it, please.

BY MR. SHAPIRO:

Q.   What was the reason why you explored an opportunity at Lockton?

A.   I was hired as a producer at USI, and I'm, you know, not going to neglect the fact that I was having success at a young age.  But as I started growing my book, which is what I'm supposed to do, I -- to a certain point, I couldn't keep growing my book.

It was extremely challenging to do what's expected of me and hit new business numbers and grow while also prioritizing the service of clients.  I wasn't getting that help.

There were, you know, teams assigned, but they were so stretched thin, every time I would go to a property resource, they were supporting, you know, hundreds of producers.

And I didn't want to peak at 27.  I wanted to -- I have such a long runway, I wanted to go somewhere where I could lay the groundwork, build a foundation and keep growing and knowing my clients are getting the best.

**Q.**   You mentioned earlier that Mr. Cannella showed you what's called the declaratory judgment complaint, and he said that I was challenging my employment agreement.

**A.**   Yes.

**Q.**   Okay.  What was the basis of you challenging your employment agreement?

          **MR. CANNELLA:**  Objection, Your Honor.  Relevance.

          **THE COURT:**  Overruled.

**BY MR. SHAPIRO:**

**Q.**   What was the basis of your filing of the declaratory judgment complaint?

**A.**   I didn't think my contract would be enforceable, given the circumstances that I was going through.  I was really more of an account executive for the last 14 months at USI.  I felt like I couldn't keep producing.  I wasn't getting help.  I asked leadership, I asked my boss for help.

They were always -- they were always good about saying, FYI, this will get addressed.  At a certain point, when you

have so much responses, like, FYI, this will get addressed, or let's talk about it, they're just acknowledging the issues around them, and no one ever did anything to fix it.  So I just got a little -- I got uncertain about my future at USI.

Q.   All right.  So you start -- and then at some point, did you reach out to -- well, strike that.

Who's Alec Alfonso?

A.   Alec is a friend of mine from Tampa.  I grew up here, and so did he.  The summer going into my senior year of college, I interned at a smaller regional insurance brokerage shop.  He's a few years older than me.  And he was a young producer there.  And so I already knew him through Tampa, but I had a work relationship with him.  And then I actually accepted a job with BKS.  That firm started right after I graduated college.  And Alec was there and we shared an office together.

Q.   Mr. Alfonso worked at Lockton?

A.   He worked at Lockton.

Q.   Okay.  And at some point, did you reach out to Mr. Alfonso to see if you could connect with somebody to learn more about Lockton?

A.   Yes.

Q.   Okay.  And did, ultimately, Mr. Alfonso put you in touch with Fred Zutel?

A.   He did.

Q.   Okay.

**A.**   He and Fred are friends.

**Q.**   Okay.  And you connected with Mr. Zutel?

**A.**   I did.

**Q.**   Can you describe for the jury the rest of your interview process or your communications with Lockton from that point forward?

**A.**   Sure.  So it was kind of an intense round of interviews. All the producers and all the associates, I like to think, like, this is the place they go at the end of their career, where they're kind of capped out at the other firms.

So everyone there is very high performing, very professional.  I got to meet members of the executive committee, which they're producers in the Southeast which are on a board.  Lockton is run by producers.  It's not run by managers.  We have producers that function as a committee and make decisions on the Series or make decision about the Series.

And I got to meet with several members of them, including Neil Metzheiser, Doug Hutcherson, the CEO of the Southeast, Rick Elliot, multiple producers.  And I was interviewing them just as much as they were interviewing me.  I really just thought everyone I spoke with was really world-class, very committed to helping me and very committed to -- like, it's a extremely client-first culture, and I just got that vibe.

**Q.**   During the time you were speaking with Lockton, you also knew that Mr. Simmons was speaking with Lockton?

Jack Mitchell - Cross-Examination

**A.**   Yes.

**Q.**   Was there ever a point in time when Mr. Simmons solicited or encouraged you to leave USI and go to Lockton?

**A.**   No.  I mean, we spoke as friends, but I can make my own decision.  I did my own research on Lockton.  I did my own interviews with Lockton.  It was me.

**Q.**   Were you exploring Lockton totally independent of what Mr. Simmons ultimately decided to do?

**A.**   I could have gone to Lockton by myself, and I would be so happy, so yes.

**Q.**   When you -- at any time before you joined Lockton, did you ever have a conversation about Lockton with Sheila Murray?

**A.**   No.

**Q.**   Jackie Rodriguez?

**A.**   Never.

**Q.**   Emily Carter?

**A.**   No.

**Q.**   Madison Lieffort?

**A.**   No.

**Q.**   Chris Kakish?

**A.**   No.

**Q.**   Theresa Kemp?

**A.**   No.

**Q.**   If you can, Mr. Mitchell, if you can turn to the Tab 29, please.

**MR. CANNELLA:** Your Honor, can we -- I object. Can we sidebar?

**THE COURT:** Okay.

**MR. CANNELLA:** I don't want to take -- it won't take enough time to excuse the jury, but let's talk about this.

**THE COURT:** Okay.

(Bench conference begins.)

**THE COURT:** Tab 29.

**MR. SHAPIRO:** We didn't give you a book. I'm sorry, Your Honor. This is Defendant's 29.

**MR. CANNELLA:** It's an article that -- let me state my objection. Relevance, hearsay, foundation --

**MR. SHAPIRO:** Can I --

**THE REPORTER:** Wait, wait, wait. Hold on. One at a time.

**MR. CANNELLA:** I'm going to object first.

**THE COURT:** Just let him go.

**MR. CANNELLA:** Relevance, foundation, hearsay. It goes against the Court's previous rulings about, you know, lawsuits coming into the case. This is an article about another lawsuit.

**THE COURT:** Yeah. What do you want to ask him about?

**MR. SHAPIRO:** So what I want to ask -- he received this at USI in July of 2022.

**MR. CANNELLA:** So?

**MR. SHAPIRO:** And so USI is making the contention that Lockton induced these folks to do things by offering indemnity. I wanted him to say that he was aware -- he was -- he understood before that, that it was likely it was going to be disputed. And that is why he was -- you know, he was happy to be introduced to --

**THE COURT:** Okay. Well, I think he can do this.

**MR. CANNELLA:** Why doesn't that open the door to all the other litigation, Your Honor?

**THE COURT:** It doesn't. He can say he knew in this industry that people moved around, indemnification was kind of in the mix, because he read it in an article.

**MR. CANNELLA:** That's hearsay.

**THE COURT:** No, no, no.

**MR. SHAPIRO:** It's the same thing as the Zutel thing. This is --

**THE COURT:** First of all, this is not getting admitted into evidence. If you want to show him this --

**MR. SHAPIRO:** Okay.

**THE COURT:** -- and bring out the fact he read an article talking about this, that's how he knew that this was, you know, going on out there without talking about anything specific in there, how do we -- how would anybody know anything? We read it somewhere. How do we know our own name? Somebody told us. It's not really -- you have to break the

chain on hearsay at some point.

MR. SHAPIRO: I'll ask him generally, you know, did you have an expectation, or are you aware there's a lot of litigation?

THE COURT: Did you read an article about it at one point. That's fine. That's fine. You can even put that on the thing and just show him there was an article. It's fine.

MR. SHAPIRO: Thank you, Your Honor.

(Bench conference concluded.)

THE COURT: Oh, we need a break. The Michigan fan needs a break. All right. Got a national championship. You can do what you want. We'll take five. We'll take five.

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury out at 4:14 p.m.)

THE COURT: I'm going to totally jinx this by saying I think this witness is going really well. Going to mess it up now. Don't mess it up. All right. I don't mean well for either side. It's just flowing. You did your thing, he did his thing.

MR. CANNELLA: Speak of moving well, Mr. Zimmerman told me that the Mandato video is about 30 minutes. So if we can --

THE COURT: Might be able to do it.

MR. CANNELLA: Yes.

THE COURT: You got our little order on that?

**MR. ZIMMERMAN:**  We already addressed it.  We'll just confirm we're okay, but it's teed up, and might be wishful thinking, I might be pushing our luck, but if we get done by 4:30.

**THE COURT:**  I like it.  You know what you're trying to do is steal this from her.  Trying to steal the award.

**MR. CANNELLA:**  My redirect is three minutes long, unless we go into a bunch of other litigation stuff.

**THE COURT:**  Good.  Good.

(Recess from 4:15 p.m. to 4:22 p.m.)

**THE COURT:**  All right.  Get the jury, please.

**THE COURT SECURITY OFFICER:**  All rise for the jury.

(Jury in at 4:23 p.m.)

**THE COURT:**  All right.  Very good.  We're going to continue.  Go ahead.

**MR. SHAPIRO:**  Thank you, Your Honor.

**BY MR. SHAPIRO:**

**Q.**   Mr. Mitchell, did you decide to resign, effective immediately, from USI and not provide 60 days' notice?

**A.**   Yes.

**Q.**   Why did you do that?

**A.**   I don't think any of the situations I was going through would have changed in 60 days.  And I also didn't want to be in a tough spot, communicating to clients or being manipulated by USI about the service that they would get or the resources that

they would get.  I didn't want to put my reputation on the line with these clients to, you know, tell them false information about the way that business was being done there.  I just couldn't do it.

**Q.**    Did you have a general understanding that when producers in your industry move from one firm to the other, that sometimes there's litigation?

**A.**    Yes.  It's common, yep.

**Q.**    Let me -- let me show you just a couple more documents and be done.  Before I show a document, Mr. Cannella was asking you questions about your communications with Lockton about your potential salary or your potential compensation.  Is that correct?

**A.**    Right.

**Q.**    Now, did you find it reasonable to try to negotiate the best package you could?

**A.**    Absolutely.  Yeah.  I mean, I think Manoj and I even acknowledged that.  Like, he wanted -- he didn't want me to just accept the job.  You know, he wanted me to push back a little bit and negotiate.

**Q.**    And Mr. Cannella showed you your member agreement at Lockton.  Is that correct?

**A.**    Yes.

**Q.**    Let me ask you this.  Is there -- is your status being affiliated with Lockton different than your status being

affiliated with USI?

**A.**   In terms of production or just --

**Q.**   In terms of having a membership interest or ownership interest?

**A.**   Yes.  Producers at Lockton are K-1 members.  They're stakeholders in the Southeast Series.  So we're technically owners.  We own shares of the LLC.  Where USI, you're a W-2 employee.

**Q.**   So, currently, as a producer member of Lockton, you have a ownership interest in the Southeast Series of Lockton Companies?

**A.**   I do.  Yes.

**Q.**   Mr. Cannella asked you about ECA.

**A.**   Yes.

**Q.**   Okay.  So one client who you worked with at USI decided to follow you to Lockton.  Is that correct?

**A.**   Yes.  Only one.

**Q.**   Right.  Only one.  And you had many other clients at USI?

**A.**   I had over 20.

**Q.**   Okay.  You mentioned that that client, ECA, had a renewal date of September 2022, I believe?

**A.**   September 28th, my birthday, actually.  September 28th, 2022.

**Q.**   When that renewal occurred, who gets paid?  How does that work?

**A.**   In this instance, they paid it, lump sum.  It was financed.  So all the premium was paid.  All the commissions were paid to USI for the entire 12 months.  So they were paid for a year, but only serviced it for a little -- close to four months.

**Q.**   Okay.  So when the client decided to move to Lockton, Lockton would be doing that business until September of 2024 without charging the client.  Is that the way it works?

**A.**   Yes.

       **MR. SHAPIRO:**   Those are all the questions I have.  Thank you.

       **THE COURT:**   Any follow-up?

       **MR. CANNELLA:**   Real quick.

                 **REDIRECT EXAMINATION**

**BY MR. CANNELLA:**

**Q.**   Mr. Mitchell, you were shown an email by your lawyer from May of 2022.  Do you recall that?

**A.**   Yes.

**Q.**   You didn't apply to Lockton until December of 2022.  Right?

**A.**   Started discussions early November.

**Q.**   Okay.  Fair enough.  But you didn't -- you didn't start discussions with Lockton until after Mr. Simmons told you he was in discussions with Lockton.  Is that right?

**A.**   Yes.

**Q.** All right. And about that -- about that email, that email exchange, one of the things you were complaining about was that you felt that you were out of the loop because you didn't know who was servicing your accounts. There had been a change, and you found out about it after the fact. Right?

**A.** Yeah. There was -- it was -- it was a mess on the service side.

**Q.** I think, you know, when the jury reads that document from the sales -- if they want to, they'll see that you said, I don't know who is servicing my account. And you sent that email at 4:52 p.m. Right?

**A.** Yes.

**Q.** And by 8:54, your boss or your direct report, Mr. Varnadore, you know, reads the riot act.

**A.** Yeah. I mean, he would go to bat for me the best he could. And that happened on every -- you know, several occasions, but it's like, oh, you're doing the best you can, but everyone around you at a certain point is just acknowledging that there's issues and nothing ever got fixed.

**Q.** Let's talk about that. Mr. Varnadore writes you separately, "FYI, this will get addressed." He sends you that email at 1:00 in the morning. Right?

**A.** I believe so.

**Q.** All right. Your book of business in January of 2022 was $600,000. We established that. Right?

**A.**   Yes.

**Q.**   And in early 2022, you were enthusiastic enough about USI that you recommended Misty Carson consider employment there. Right?

**A.**   I was referred to Misty Carson through a friend of mine. They worked together.  Misty worked at a different -- kind of a different channel of the insurance industry.  She was moving down here for family reasons.  She was enthusiastic.  I thought there was a couple people in my role that weren't having that much success.  I always looked out for the best interest of USI.  In these cases, I looked out for my colleagues that were producers my age, weren't having that much success.  I felt like they needed a cheerleader.  So I brought the opportunity to the practice leaders, and I stepped away.  I said this is someone you might want to consider for this group.

**Q.**   The jury will hear from Misty Carson next week.  They'll hear what she said about USI.  I'll move on.  You went from 600,000 in January 2022 to $1.2 million in January 2023. Right?

**A.**   That's right.

**Q.**   You doubled your book of business in one year.  Right?

**A.**   I was gifted some accounts, transferred some accounts, but that's right.

**Q.**   You doubled your book of business in one year.  Right?

**A.**   Yes.

**Q.**   Now, you mentioned your meetings with the executive committee and with the producers of Lockton.  You kept Matt Simmons in the loop this whole time.  Right?  You guys would talk to each other about who you were meeting with and what you were discussing.  Is that right?

**A.**   Matt knew.  As friends, yeah, we kept each other in the loop.

**Q.**   Fair enough. I want to talk about the declaratory judgment action, the lawsuit.  The result of the lawsuit you filed was that the Court found that your contract --

         **MR. BANKS:**  Objection, Your Honor.

         **THE COURT:**  Well, the question -- start the question again, please.

         **MR. CANNELLA:**  Yeah.  The result of the lawsuit was that the Court found that his contract was enforceable?

         **MR. BANKS:**  No objection.

         **THE COURT:**  At some point, I'll sustain the objection.  But I'll be addressing with the jury directly the information on that lawsuit.  So they'll have that information from me, because it happened in this courtroom, and I decided it.  So I will give them that information directly.  All right.

         **MR. CANNELLA:**  Fair enough.  One more question.  I'm not going to ask about Your Honor's ruling.

**BY MR. CANNELLA:**

**Q.**   But you didn't wait for the Court to decide your lawsuit

before you told clients that you were leaving USI for Lockton. Right?

**A.**   No.  I told my clients the day before the --

**Q.**   You didn't wait.  You told them before you filed the lawsuit.  Right?

**A.**   Yes.

        **MR. CANNELLA:**  No further questions, Your Honor.

        **THE COURT:**  All righty.  Thank you.

        Members of the jury, you've done great work today, but I'm going to ask for 30 more minutes of your time.  Because if we don't do it now, I don't want to get bogged down next week and find out, you know, we have something like a hurricane brews up or we get a bomb threat and we lose a day somehow or another, and then we're messed up.  That can happen.

        So I want to take full advantage of all the time we have.  The lawyers tell me -- you can have a seat.  The lawyers tell me they've got another depo by video.  It's about 30 minutes.  That will get us just at 5:00.  Let's go ahead and do that.

        **MR. ZIMMERMAN:**  Yes, Your Honor.

        **THE COURT:**  Who is this witness?

        **MR. ZIMMERMAN:**  This is Claudia Mandato.

        **THE COURT:**  All right.

        **MR. ZIMMERMAN:**  From Lockton.

        **THE COURT:**  She is who?

**MR. ZIMMERMAN:**  She is a Lockton employee from Kansas City that was involved in accepting the clients at Lockton in Tampa.

**THE COURT:**  Go ahead.

WHEREUPON,

**CLAUDIA MANDATO,**

was called as a witness and, after having been previously duly sworn, testified via videotaped testimony as follows:

**VIDEOTAPED TESTIMONY**

**BY MR. CANNELLA:**

**"Q.**  State your full name for the record.

**"A.**  Claudia Mandato.

**"Q.**  Ms. Mandato, what is your business address?

**"A.**  444 West 47th Street, Kansas City, Missouri 64112.

**"Q.**  Who is your employer?

**"A.**  Lockton Management.

**"Q.**  What is your title at Lockton Management?

**"A.**  Executive vice president of operations.

**"Q.**  If you could, just tell me what are your duties with Lockton Management.

**"A.**  I work as support from the center with all our offices in varying degrees of insurance, HR-related matters, basically supporting their business growth and opportunities.

**"Q.**  You've been with Lockton since 1985.  Is that right?

**"A.**  Correct.

Claudia Mandato - Videotaped Testimony

"Q.  Do you recall where you were on January 25th of 2023?

"A.  I do.

"Q.  Where were you?

"A.  I was in Tampa, Florida.

"Q.  When did you arrive in Tampa, Florida?

"A.  I can't tell you the exact time, but it was probably that morning, the 25th.

"Q.  And your home office -- rather, the office that you work out of normally is the Kansas City office.  Is that correct?

"A.  Correct.

"Q.  And what was the reason for you going from Kansas City to Tampa, Florida?

"A.  About mid to late January, I had received a call from Manoj, telling me that there might be an opportunity of adding a new producer and a couple of people to the Southeast Series, and if I would help in getting them onboarded and get -- if, indeed, any clients did come, if I would help get those onboarded as well.

"Q.  You said Mr. Sharma mentioned there would be a new producer and people.  Did he say how many producers and how many people?

"A.  No, sir, he did not.

"Q.  What was your understanding as to how many people were -- not how many people -- what types of people were coming over in addition to the producer?

Claudia Mandato - Videotaped Testimony

**"A.** That there would be some type of servicing-type associates, our equivalent of account managers or account executives.

**"Q.** And Mr. Sharma asked if you would come in person to Tampa for onboarding of both the employees. Is that right?

**"A.** Correct.

**"Q.** And then, also, I think you mentioned if clients were willing to move, he wanted you to be there for that too. Is that right?

**"A.** Correct.

**"Q.** Did Mr. Sharma give you an indication of how many clients he expected you to facilitate on January 25th, 2023?

**"A.** We did not know. There could have been one, or there could have been multiple. We did not know the number.

**"Q.** So if I understand your testimony, is it fair to say that you didn't know how many clients, and you didn't know how many employees?

**"A.** Correct. I did not. That's correct.

**"Q.** Did it strike you -- let me ask you this. If you believed that it wouldn't be a lot of employees or clients, isn't that something that you could have done from the home office in Kansas City as opposed to having to travel to Tampa, Florida?

**"A.** No. That's never been my style. We always really want to see people face-to-face. And with the onset of COVID, when everyone was shying away from travel, we find that people

Claudia Mandato - Videotaped Testimony

really appreciate an in-person visit.  So whether I had one person or a hundred people, it just really facilitates much better when you're there in person and they get to see a face, and you are able to welcome them a little more engagingly than on a Zoom or Webex.

"Q.  Okay.  And so you arrived in Tampa on the evening of the 24th?

"A.  Correct.

"Q.  And then what time did you report to the Lockton office in Tampa on the 25th?

"A.  I don't report.  I showed up, really, because I'm an early person, so I went in early.

"Q.  If I understand your testimony, you were there until that Friday, the 27th.  Is that --

"A.  Correct.

"Q.  And then you testified that you came back.  Do you know -- did you come back the week of January 30th?

"A.  I did.

"Q.  Why did you come back the week of January 30th?

"A.  When the associates showed up, obviously, this very frenzied, you know, new people come on board, limited space. I'm helping making sure they were set up from a computer perspective.  Then we started getting some client calls.  So it just made sense for me to return and help out where I could.

"Q.  Okay.  And then how long did you stay the week of

UNITED STATES DISTRICT COURT

Claudia Mandato - Videotaped Testimony

January 30th?

"**A.**   I was there -- I was there until the -- just two days, the 31st.

"**Q.**   When did the first of the former USI associates, who I'm going to call the departing employees, when did they start arriving on January 25th?

"**A.**   I don't recall exactly, but it was probably around 9:00, 9:30, 10:00, something like that.  It was later in the morning.

"**Q.**   And when did the former USI producers arrive?

"**A.**   I don't recall who came first, but it might have been Matt first, then the associates.

"**Q.**   By Matt, you mean Mr. Simmons?

"**A.**   Matt Simmons, yes.  I'm sorry.  Yes.

"**Q.**   And had you met Mr. Simmons prior to seeing him on January 25th?

"**A.**   I had not.

"**Q.**   Who else was present from Southeast Lockton on January 25th?  And I can clean that question up a little bit. Was Mr. Sharma there?

"**A.**   Yes, he was.

"**Q.**   Was Fred Zutel there?

"**A.**   Yes.

"**Q.**   Now, when Mr. Zutel joined Lockton, did he leave from another brokerage?

"**A.**   Yes, he did.

UNITED STATES DISTRICT COURT

**"Q.** Where was Mr. Zutel employed prior to coming to Lockton?

**"A.** Willis Towers Watson.

**"Q.** Did Mr. Zutel come with any other employees?

**"A.** He did.

**"Q.** How many employees joined Mr. Zutel from Willis Towers Watson?

**"A.** There were three other producers and 22 people.

**"Q.** And did you also facilitate the transition of clients from Willis Towers Watson to Lockton in March of 2021?

**"A.** I did.

**"Q.** Did you facilitate broker-of-record letters for those clients?

**"A.** I did.

**"Q.** How many clients did you BOR in March 2021 when Mr. Zutel and his team came over?

**"A.** Again, I apologize. I can't tell you how many. There were numerous. His client base is a lot of specific policies. It's a lot of condominiums, a lot of real estate. So it was a good sum of clients.

**"Q.** I think you told me this before, but the first time you met Mr. Simmons would have been on January 25th of 2023. Is that correct?

**"A.** Correct.

**"Q.** Did Mr. Simmons introduce himself?

**"A.** I believe I introduced myself to him.

**"Q.** What did you and Mr. Simmons discuss?

**"A.** That morning it was all about making the change. He was excited, but, obviously, it was new. Sort of recalled how that he had the resignation done. So we really just talked about just trying to keep the waters calm and not really talked about business, per se. So he basically was talking about what he needed to do. Should I change my LinkedIn, social media, doing some of those things. But we did not talk about clients at that point in time.

**"Q.** Did you and Mr. Simmons talk about clients at any point in time on January 25th of 2022?

**"A.** Yes. He indicated to me that there might be some that would be calling, and that if they did, that Manoj would direct them to me. And in sum, Manoj Sharma would direct them to me, if I needed to take those calls.

**"Q.** You said Mr. Simmons discussed his LinkedIn. Do you know if Mr. Simmons changed his LinkedIn prior to you and he meeting?

**"A.** No. He had not done so. He was just asking me sort of our guidelines on social media and when he ought to change that and just some of those kinds of logistical things.

**"Q.** What time of day was it when you met Mr. Simmons?

**"A.** As I said, it was probably mid to late morning, 9:30, 10:00.

**"Q.** And when did you meet -- did you meet the other producer

Claudia Mandato - Videotaped Testimony

on January 25th 20, 23?

**"A.** Yes.  Jack Mitchell.  Yes.

**"Q.** When did you meet Jack Mitchell?

**"A.** Probably later that morning as well.

**"Q.** Do you recall which client spoke to you?

**"A.** Let me think a moment here.  Marksman Security, Better Health, Ayon Capital.  There was a handful.  I apologize.  I don't recall right off the top of my head.

**"Q.** Let's talk about Marksman Security first.  When did you speak to Marksman Security?

**"A.** They would have called that evening or the next day.

**"Q.** What did Marksman Security tell you about their intentions to leave USI and join Lockton?

**"A.** They told me that they understood that Matt Simmons had joined Lockton and that they were longtime friends of Matt and wanted to basically make the move to Lockton.

**"Q.** Was there any discussion about who their service team would be at Lockton?

**"A.** No.  We talked about, obviously, they were concerned and making sure that they would be able to get serviced.  They had some claims concerns that had not been addressed at USI.  We talked about claims, how that would be handled and managed at Lockton.

"Talked about their program, their specialty program, which I was very familiar with.  So we talked really about

Claudia Mandato - Videotaped Testimony

their program structure and their making the move to Lockton,
which precipitated then the BOR discussion of having them sign
a broker-of-record letter.

"Q.   We've talked about Mr. Simmons, and we've talked about
Mr. Mitchell.  When did you meet the other members of the USI
group that left USI to come to Lockton?

"A.   That same day, January 25th.

"Q.   When did you realize how many USI employees had left USI's
Tampa office and were coming to Lockton's Tampa office?

"A.   When they all were in the office that day.

"Q.   And when was that in the morning, when the last of the
former USI employees arrived?

"A.   I'm trying to think.  I'm just trying to think.  Because I
don't believe Theresa Kemp came in that day.  I believe she
came in later, the next day.  But everyone else was there, back
on the 25th.

"Q.   Do you recall who you met with by name?

"A.   Sheila Murray, Jackie Rodriguez, and two other young
ladies.  Their names escape me.  Chris Kakish -- Kakish.

"Q.   And where did you meet?  Was there a conference room?

"A.   Yes.  In the Tampa office, a conference room.

"Q.   Was there an initial orientation or some kind of meeting
amongst everybody?

"A.   We basically sat down to introduce ourselves.  Again, get
them -- they needed laptops and just trying to get some of the

equipment ready.  We talked about getting them signed up for

benefits.  It was more that -- operational logistics day of,

now that you're here, we need to get you make sure you're

properly licensed, do all the routine things that you have to

do when you start a new job.

"Q.  Did you anticipate that there would be clients that would

call?

"A.  Firstly, I always do.  You know, they follow the -- they

tend to follow the producer.  And as close as what I learned

that these clients were with Matt Simmons, it was very evident

that they valued him as a friend and a personal trusted adviser

and were definitely going to probably call him.  But I did not

learn that until after I had conversations with several of

them.

"Q.  Do you recall whether you learned on January 25th that

Matt Simmons, Jack Mitchell, Sheila Murray, Emily Carter,

Madison Lieffort filed a lawsuit against USI on January 25th,

2023?

"A.  I might have learned about it the next morning, in all

honesty.

"Q.  When you spoke to any of the former USI employees, did any

of them convey to you what was important to move the business

quickly that wanted to move?

"A.  No, sir.  You know, when people join a new organization, I

call them shell-shocked.  They had made this move.  We were

making sure that they were settled, they had the equipment they needed to eventually do their jobs.  We wanted to make sure a lot of questions around are my benefits going to be immediate, those kinds of things.  So really talking about the clients was far from the discussion at that point in time.

"Q.   During the three days you were in Tampa, the first leg, January 25th through 27th, were there any discussions that you had with anybody about the need to make sure the clients from USI were moved over quickly?

"A.   No.

"Q.   Did anyone use the phrase we have a short window to move the business?

"A.   No.  We never talked about that.

"Q.   You mentioned that you learned about the lawsuit the next day.  That would be January 26th -- January 26th of 2023.  Is that right?

"A.   Correct.

"Q.   And who did you discuss the lawsuit with?

"A.   I believe Manoj Sharma is who told me about it.  And, again, given that our priorities were making sure the associates were settled, and if, indeed, any clients would be calling, that's really what we focused on.

"Q.   Okay.  What did Mr. Sharma tell you about the lawsuit?

"A.   He basically said that our attorneys had filed suit to basically challenge the nonsolicitation, the noncompetes that

Claudia Mandato - Videotaped Testimony

they had.  And sort of the rationale behind it was, obviously, that they were dissatisfied with USI, the treatment of them and their clients, and so that they had wanted to make a move to Lockton.

"Q.  All right.  Let me break that down a little bit. Mr. Sharma, do you recall what time of day it was on January 26th that Mr. Sharma had this conversation with you?

"A.  I don't.

"Q.  And you said that Mr. Sharma said that our attorneys filed a lawsuit.  Who did you take Mr. Sharma to mean by our attorneys?

"A.  Our in-house counsel.

"Q.  The Lockton counsel?

"A.  Yes.

"Q.  All right.  And you mentioned that there's a challenge to the nonsolicit and noncompete.  Prior to this conversation with Mr. Sharma, were you aware that the USI employees had nonsolicit provisions in their employment agreements?

"A.  I was not aware, but obviously it is industry standard, as you know, that most brokers have those agreements in place.

"Q.  Does Southeast Lockton have those agreements in place?

"A.  Yes.

"Q.  Do you know whether Southeast Lockton or any of the Lockton entities have filed suit anywhere in the country to enforce their restrictive covenants against departing

UNITED STATES DISTRICT COURT

employees?

"A.   We have very few people that leave.  But when we've had to, I think like most, depends on the circumstances.  So I would assume that we would want to enforce those where applicable.

"Q.   Did Mr. Sharma tell you that we shouldn't accept any of the business of the clients of USI until the Court determines that the noncompetes or nonsolicits are invalid?

"A.   No.  The strategy was that we were confident, in that the analysis that was conducted, that we would be able to take on the business, and that we were in good shape to do so, given the position of where we felt we were with those agreements.

"Q.   And who told you that?

"A.   Again, Manoj Sharma and I spoke about it.

"Q.   There's a date, the name of a client, Better Health Group, broker-of-record letter effective date, and then you'll see this language here.  So who drafted this language?

"A.   That has been drafted -- I did that about 25 years ago.  So this is our standard broker-of-record letter that we have at Lockton.  And I think I mentioned earlier, if you were to compare that to other brokers, you'll probably find it's pretty much identical.  This is sort of industry-standard wording that's accepted by all the carriers.

"Q.   Next, we'll mark exhibit as 94.  This is ZMR Capital.  This is a broker-of-record letter that you facilitated.

Claudia Mandato - Videotaped Testimony

"A.   I believe it is.  Was that Zach Oseland?

"Q.   Zach Oseland, yes, ma'am.

        "ATTORNEY:  I'm not seeing that for some reason.  Is that -- can you see that on the screen?

        "THE WITNESS:  It's not that bad.

        "ATTORNEY:  I don't know how you answered it then.

        "THE WITNESS:  Memory.  Sometimes it works.

"Q.   Okay.  Sorry.  Yeah.  It was memory.  We tell people it's not a memory test.  But it is Zach Oseland.  It's Lockton 4178 and, again, it's the same language.  Right?

"A.   Correct.

"Q.   And do you recall whether you actually spoke with Mr. Oseland on January 25, 2023?

"A.   I did.

"Q.   Okay.  And then this information -- this represents the named insureds.  Right?

"A.   Correct.

"Q.   Stop scrolling.  And then you've got the policy schedule. Is that correct?

"A.   Correct.

"Q.   This information -- did this information also come from the client?

"A.   It did.

"Q.   And at the time this broker-of-record letter was executed, who was -- who did Lockton Southeast anticipate would be the

producer on this account?

"A.   At some point, we would just assume it would have been Matt Simmons.

"Q.   Where did your understanding of the client's insurance programs come from in this case?

"A.   In my discussions with the client.

"Q.   This is Exhibit Number 95, Lockton 4184.  Is this another one of the clients that you facilitated when you were in Tampa January 25th?

"A.   Yes.  Jeannie Caldwell.  Yes.

"Q.   Did you speak with Jeannie Caldwell?

"A.   I did.

"Q.   Is this with a Matt Simmons account?

"A.   Yes, it was.

"Q.   That's a duplicate of the ZMR.

     "Argyle Real Estate partners.  Are you familiar with that client?

"A.   I am.

"Q.   Is this their broker-of-record letter?

"A.   Yes, it is.

"Q.   This will be Exhibit 96 to depo, Defendant's Exhibit Number 96.  It's Lockton 4190.

     "Who was the -- who was going to be the Lockton producer on this account?

"A.   Matt Simmons.

**"Q.** And do you know which members of his team that came over from USI would have provided service on this account?

**"A.** No, I do not know who would have done that.

**"Q.** Was that discussed with you at all?

**"A.** No, no. As I said, when we have the clients calling, our first priority was to ensure they were comfortable, they were doing it. So we did not make team assignments, as it does take a few days for the carrier to recognize the broker change. So it wasn't something we needed to talk about immediately.

**"Q.** Right. In any of your conversations with the clients on January 25th or after, did you tell these clients that Matt Simmons and his team would still be able to work with them?

**"A.** No, sir. I did not tell them any of that -- those things, because, again, like I said, they're more concerned about making a change. And as long as they had someone on the other line that could actually help them and take care of them, at this point, they were happy just to get someone to respond to them.

**"Q.** Okay. As you described your process, you would send the client the blank cover sheet, and then they would put their letterhead on the letter, sign it, and send it back to you. Is that correct?

**"A.** Correct. It wouldn't be blank. It would be, as you said, those fields having the date, the named insured, any attachment that describes the policy. Those would have been sent to them.

It wasn't a blank letter.  It was basically prefilled for them, so that they would just simply have to put it on their letterhead.

"Q.  Would you put the letter on their letterhead and then sign it and return it?

"A.  Correct.

"Q.  Exhibit 100, Defendant's Exhibit 100 is Avesta.  And it's Lockton 4206, dated January 25th, 2023.

     "Do you know who the Lockton producer on this account was?

"A.  It would be Matt Simmons.

"Q.  Did you converse with either Rachel Ridley or Daniel French?

"A.  I did with Rachel Ridley.

"Q.  All right.  Did you facilitate this broker-of-record letter?

"A.  I did.

"Q.  And did you speak to -- looks like Ozzie -- do you know who you spoke with?

"A.  Yeah.  Ozzie Mutz.

"Q.  Ozzie Mutz.  And who was the anticipated producer for Lockton for him to be on this account, Mothership?

"A.  Matt Simmons.

"Q.  Exhibit 105 is Renaissance, Lockton 4220.

     "Did you process this broker-of-record letter request?

"A.  I did.

"**Q.** Did you speak to Tony Haddad?

"**A.** I did.

"**Q.** Who was the anticipated Lockton producer going to be?

"**A.** Matt Simmons.

"**Q.** Exhibit 106, January 25, 2023, Lockton 4223.

"Did you process this broker-of-record letter?

"**A.** I did.

"**Q.** And did you speak to Theresa Cabilao?

"**A.** Cabilao, yes.

"**Q.** Who was the an -- who was the Lockton assigned producer for this client?

"**A.** It would have been Matt Simmons.

"**Q.** For all these clients that we've gone over so far, were they all clients of USI prior to January 25th of 2023?

"**A.** Yes, I believe so.

"**Q.** Exhibit 108 is broker-of-record letter from Hit Promotional Products, Lockton 4228.

"Did you process this broker-of-record letter?

"**A.** I did.

"**Q.** Did you speak to Mr. Meadows?

"**A.** I did.

"**Q.** Was Hit Promotional Products a client which Matt Simmons was a producer?

"**A.** Yes.

"**Q.** Was Hit Promotional Products a client of USI prior to

Claudia Mandato - Videotaped Testimony

January 25th, 2023?

**"A.** Yes.

**"Q.** Did Mr. Meadows state to you at any point on January 25, 2023 that Matt and his team were the best?

**"A.** I don't know if those were the exact words, but I know that he mentioned to me that he and Matt were good friends, and that he absolutely wanted to be wherever Matt and his team were.

**"Q.** Exhibit 109, Lockton 4234.  This is NavaDerm, January 27th, 2023.

"Did you facilitate this broker-of-record letter?

**"A.** I did.

**"Q.** Was the Lockton producer assigned to this client, Matt Simmons?

**"A.** Yes.

**"Q.** Were you surprised the volume of letters that you facilitated?

**"A.** Not particularly.

**"Q.** Okay.  Why is that?

**"A.** Because we have, again, the number of clients that would follow could be from zero to hundreds.  So I don't see that that is a huge or disproportionate number of clients that would want to follow a producer to a new broker.

**"Q.** January 26th of 2023, this is Exhibit 112.  And it's from Better Health Group Production, Page 6 [unintelligible].

UNITED STATES DISTRICT COURT

Claudia Mandato - Videotaped Testimony

"'Goran, attached is the broker-of-record letter we need you to place your letterhead on, sign and return to me.'

"Looks like you followed up with Goran on Friday, the 27th.  Is that correct?

"A.   Correct.

"Q.   Goran Jankovic returns the executed broker-of-record letter on January 30 of 2023.  Do you see that?

"A.   Yes.

"Q.   Do you know Chris Kakish?

"A.   I do.

"Q.   Do you know what role Mr. Kakish is playing in the servicing of the accounts that were formerly USI clients?

"A.   Currently at Lockton?

"Q.   Yes, ma'am.

"A.   Right now, he basically is trying to shepherd and make sure that all client-servicing requirements are being met. We've got various Lockton team members handling the accounts. And so Chris is basically overseeing and making sure that the client-servicing needs are met.

"Q.   Prior to Mr. Kakish being in that role, who was in that role?

"A.   We really didn't have anyone, because, obviously, as mentioned, we had the broker-of-record-letter process was going on, we were waiting for acknowledgment from the carriers, and so myself and several others were acting in that capacity so

UNITED STATES DISTRICT COURT

Claudia Mandato - Videotaped Testimony

that we made sure that the client got taken care of.

**"Q.**   Other than Mr. Kakish, are any of the former USI employees that you met on January 25, 2023 performing any service role for the former clients of USI?

**"A.**   The only person would be Theresa Kemp, who is a property broker.  And she is basically facilitating a placement of the property coverages on those clients that have property exposure.

**"Q.**   Other than Mr. Kakish and Ms. Kemp, did any of the other USI employees that you met on January 25, 2023 perform any services for the clients that transitioned to Lockton?

**"A.**   No, sir.

**"Q.**   So you don't -- is it -- you don't know or no?

**"A.**   I should probably qualify that by saying that when we initially felt that they were able to speak to the clients, they obviously did have some conversations.  Once they were enjoined and not able to do so, then we removed them from the communication immediately, and they have not been working, nor have done anything on client-servicing side.

**"Q.**   Okay.  So I'm -- my time frame -- I appreciate that answer.  My time frame for this question is between January 25, 2023 and February 15, when the injunction was entered.  Did Sheila Murray perform any services for any of the clients that transitioned from USI to Lockton?

**"A.**   Part of that time, I think, like I said, might have

been -- might find some emails or something where the client might have directed it to them.  That was something that we directed them to do because we felt they could work on the accounts at that time.  But they don't [unintelligible] immediately took them off of it.

"Q.   Did you say that Lockton directed those clients to contact Sheila Murray prior to the issuance of the injunction?

"A.   Well, what happened was, we were all working in conjunction with it.  So I would get a call from a client asking for something.  I would ask if anyone knew of this particular instance or something like that.  Sheila Murray raised her hand.  I'd say go ahead and call the client, as an example, getting a quote on a property deal.

"So at that time, that would be the direction we would have given, because as you alluded to earlier, we were looking to make team assignments.  So until the time of the injunction, we felt that they could work on the accounts, so there was that very short period of time where they would have gotten involved slightly with the client.

"Once we knew they were no longer allowed to do so, we basically barred them from working on those clients with the exception of Chris Kakish and Theresa Kemp.

"Q.   That instance you just described, were you and Sheila Murray in the same office at the same place when that came up?

"A.   Yes.

Claudia Mandato - Videotaped Testimony

"Q.   All right.  And do you recall the client?

"A.   Let me think about that a minute.

"It would have been -- it was with AMR was the carrier.

"ATTORNEY:  I'm sorry.  Did you say ZMR?

"THE WITNESS:  AMR was the insurance carrier.  I'm sorry.  I don't recall which client it was.

"Q.   Same sort of questions, but with Jackie Rodriguez. Between January 25th of 2023 and February 15th of 2023, did Jackie Rodriguez have contact with or provide service to any of the former USI clients that transitioned to Lockton?

"A.   Again, we worked really as a team, and so we were basically punting back and forth.  So she may have.  I don't recall right off if there's anything that she specifically worked on, but there may have been.

"Q.   Are you aware of any contact between -- by this, I mean professional services contact between Matt Simmons and any of the clients that transitioned to Lockton between January 25 of 2023 and February 15th of 2023?

"A.   I'm not personally aware of, no.

"Q.   Did Emily Carter provide any work for the clients that transitioned from USI to Lockton between January 25, 2023 and February 15, 2023?

"ATTORNEY:  Objection to form.

"A.   Not that I'm aware of.  Not that I'm aware of.

"Q.   Do you know if Jack Mitchell, the other producer that --

that Mr. Simmons from USI to Lockton provided any services for any of the clients that left USI and transitioned to Lockton between January 25, 2023 and February 15, 2023?

**"A.**   He did not."

**MR. ZIMMERMAN:**   Your Honor, that's the end of the video.

**THE COURT:**   Okay.

**MR. ZIMMERMAN:**   There is one question that got cut off, I think -- Mr. Banks, would you like me to read it in for you?

**MR. BANKS:**   Just read the question and answer. That's fine.

**THE COURT:**   Go ahead.

**MR. ZIMMERMAN:**   Judge, you predicted when a male lawyer, so I'll be reading for both, for a female witness.

"Same question, but for Madison Lieffort.  Did she provide any contact with or work for a client that transitioned from USI to Lockton between January 25th, 2023 and February 15th, 2023?"

Answer, "Not that I'm aware of."

**THE COURT:**   Okay.  Good.  We've had a long week. Accomplished a lot.  Just keep in mind the rules.  Don't start discussing this with anybody.  Leave your tablets here on the chair.  Steve is going to collect those up.  We'll hand them out.

We need you back here on Monday at 9:00.  We'll be here at 8:30.  We'll see you at 9:00.  It's very important you don't start Googling and trying to do any additional work.  All right.  You've heard enough.  You're tired.  You don't want to do any more work.  I get it.

But we'll see you back here, ready to go, at 9:00.  My plan is to still have the case be over with on Wednesday or Thursday at the latest.  Thank you.  Appreciate your time this week.

**THE COURT SECURITY OFFICER:**  All rise for the jury.

(Jury out at 5:12 p.m.)

**THE COURT:**  All right.  One thing that comes to mind next week.  I'm going to reread a part of these preliminary instructions where I kind of went through the case and explained what it was all about.

I was looking at that, and I say in here, when the producers left Lockton's employment, they filed a lawsuit asking the Court to determine the validity of the employment agreements.  USI filed a countersuit alleging the actions the producers took before and after leaving USI breached those agreements.  I have determined that the employment agreements were valid and enforceable, and you will not be considering that matter.  This trial is only about USI's claims.

I don't know what else.  The thing you guys gave me basically says that.  I'm not sure what else I need to say.

Maybe it would -- maybe there's something.  But just think about that.

MR. SHAPIRO:  The first sentence, did you say when they left Lockton or USI?  Maybe I misheard it.

THE COURT:  Maybe I misspoke.  When the producers -- yeah, it's supposed to be USI.  You're right.  I need to say -- I read it last time, and you didn't catch it.  Nobody said anything.  Yes.  I'll clarify that.  So that's a good reason to say it again.  So I'll do that at the beginning.  I'll run through all the stuff I did, just kind of remind them where we are and everything.  And then we'll see if you need to do anything else after I do that.

What's the game plan for next week, witness-wise?  Sharma, we're going to have -- we'll have something for you this weekend on Sharma.  Kelly and I will be working on that a little bit.

MR. CANNELLA:  We're going to make some more cuts, I think.

THE COURT:  Then maybe I shouldn't keep looking at it then.

MR. ZIMMERMAN:  Go ahead.

MR. CANNELLA:  No, you go ahead.  You've got it all written out there.

MR. ZIMMERMAN:  Okay.  So what we have left, Judge, for live testimony, we have Rick Tyson, about 30 minutes -- our

side of it, 30 minutes; Misty Carson, about 30 minutes; and Robin Frost, the expert called, 40, 45 minutes.

THE COURT:  Those are live?

MR. ZIMMERMAN:  Those are live.

THE COURT:  Depo is Sharma?

MR. ZIMMERMAN:  Depos, our goal is all the depos to cut down, so it's no more than four hours total.  That might mean either -- we might actually just read in a few parts and not even bother with the video.  But that's going to be -- right now Morneau is about an hour.

I think you've already addressed -- the Court already addressed Morneau.  Sharma is about three hours right now.

THE COURT:  Too long.

MR. ZIMMERMAN:  I suspect after objections that might be cut.  We are going to take another look at it and cut it a little bit further.

THE COURT:  When are you going to do that, because I don't want to be spending my time looking at stuff that you are going to decide you don't want to use.  You think you're going to do Sharma on Monday.  Doesn't sound like it.

MR. ZIMMERMAN:  We'd like to do Sharma on Monday.  We want to finish on Monday, our case.

THE COURT:  Give me something -- you've got all day to work on it.  Give me something, say, by noon on Saturday by email of where you are on that.

**MR. ZIMMERMAN:**  Yes, Your Honor.

**THE COURT:**  We're not going to do any more work on that until then.

**MR. ZIMMERMAN:**  Yes, Your Honor.  Then there's -- Marrero is 35 minutes.  And then there's Shelat and Shuman, and those are two we're going to significantly cut down.  I would not look at those.  We can get you any cuts.  And if there's any issues left by Saturday, as well, if that's acceptable to Your Honor.

**THE COURT:**  Here's my question.  Is Kristin going to be allowed to do anything?  Can she, like, drive the train at all here, or you guys, you've got to do the whole thing?

**MR. ZIMMERMAN:**  She's been doing everything, Judge.

**THE COURT:**  No.  I mean, like talking to a witness.

**MR. ZIMMERMAN:**  Yes, Your Honor.  That's the plan for next week.

**THE COURT:**  You're going to do a witness?

**MS. ROYAL:**  Yes, Your Honor.

**THE COURT:**  All right.  Good.  Good.

I don't know on this side.  I mean, what are we doing with the Nicola, right, and Daniel?  Are you guys going to, like, drive the train at all, or you just have to watch?

**MR. ADLER:**  No witnesses for me, Your Honor.

**THE COURT:**  Nothing?  Nothing?

**MR. BANKS:**  We were going to see.  We've got, you

know, those client witnesses. They're going to be pretty short. We may split those up a bit.

THE COURT: All right. Very good.

MR. ZIMMERMAN: So with regard to Mr. Sharma, there's a number of pages that I think deal with one issue that it may make sense to just talk about that on that deposition, because it will be less for you to look at and potentially less --

THE COURT: Well, if it's short. Otherwise, I need to -- I've got to go over to Mr. Cannella's hometown of Orlando for a judicial thing tomorrow. It used to be a one-hour drive. It can now be a three-hour drive.

MR. ZIMMERMAN: That's fine, Your Honor.

THE COURT: Just tell me what it is.

MR. CANNELLA: I have a hack for you on that, which I can share later.

THE COURT: There are none. There are none. A private plane?

(Discussion off the record.)

THE COURT: What is this, Matt? Let's do five minutes on it.

MR. ZIMMERMAN: Okay. So, Your Honor, we understood the rulings about the other litigation, and the Court has been clear about that. And so we cut out a lot of that already when we went into any level of detail on any of the litigation. But the testimony so far that's been pulled out and presented at

trial and the questions being asked repeatedly suggest that USI is particularly litigious.

THE COURT: Yes. We've heard about that since the day this case was filed.

MR. ZIMMERMAN: And that USI, there's something -- you know, there's a negative inference about USI wanting to enforce its agreements. Right? And so I think, from our perspective, it's highly relevant, then, that several other lawsuits were filed by other brokers without any details against Lockton Southeast for similar alleged conduct, as raised here. So it's not that anything is wrong with USI for enforcing its agreements --

THE COURT: So your point is, that they're giving you a hard time for litigating these things, but they're out there themselves litigating these things?

MR. ZIMMERMAN: That is one. That's a separate issue. There's two issues. Right? That was going to be my second point. One is good for the goose, good for the gander. Lockton is also doing the same thing. And that's a small part of Manoj's testimony.

Then there's a second part of his testimony where, after going through it in detail, we have some summary testimony, and basically says, you took a -- or a group of employees moved on the same date to Lockton and clients moved. And you were sued -- and you knew they had agreements, and you

were sued by Arthur J. Gallagher for this.  That was in whatever it was, call it 2022, and you -- same fact pattern, and you were sued by Marsh for this.  Isn't that correct?

So the point we're trying to make, and why we think the door has been opened quite widely, is that when you breach agreements, the expectation is the party to whom you owe those obligations is going to file suit.  There's nothing wrong with USI doing it.  I understand the Court's ruling, that we don't need to get into the weeds.

**THE COURT:**  It's going to be tricky, because he's not here.  If he was here, I'd find a way to bring that out in a very general way.

**MR. ZIMMERMAN:**  That's their decision, Judge.

**THE COURT:**  Yeah.  I'd try to find a way to do that generally, which I think is fair game in a general way so the jury has an understanding of kind of the competitive environment here that these people are operating in.  I'll have to take a look at it and see if that's a way to do it with what's in the depo.  If not, I don't know what to do then.

**MR. ZIMMERMAN:**  He's in Atlanta.  So that's the other decision, Judge.  That's the strategic decision that Lockton is making.

**THE COURT:**  Could be.  I'll look at it.

**MR. SHAPIRO:**  I don't know if you want argument on it, Your Honor.  It's not -- I mean, they want to put into

case -- allegations in other --

**THE COURT:** Yeah. I'm not going to get into specific cases. I want to find a way so that the jury takeaway is what I think the truth is, which is that, in this industry, there's a lot of litigation. I'm not going to get into declaring a winner and loser, which is maybe what you guys want, that USI is the evil company -- and this may be the reality of it all, that they're the ones that are suing everybody for everything, and they're the outlier, when we know that Lockton has filed its own lawsuits.

We talked about those in the injunction hearing. And both sides, I mean, that's just the way this industry works. They want to paint your client out to be this evil guy because he breached the contract. But my point on this is that that's -- everybody knows that that's what happens in this industry. And I think this works to everyone's benefit to have an understanding.

But we're not going to get to the level of saying one is evil and one is not, which I'm just not going to get into that level of detail. But I think the general point needs to be made somehow or another.

Now, you guys have wanted to tag them as being -- you know, they litigate, and everyone else is Mr. Nice Guy. I don't think that's accurate.

**MR. SHAPIRO:** I think the only testimony is,

Mr. Simmons said he knew, like he knew, being at USI, what happens, and it has to be said.  It's directly relevant.  USI wants to say that Lockton had this game plan, and there's substantial assistance.  Matt is saying there's no game plan.  There's nothing Lockton told me that I didn't already know.  So that point directly is -- you know, disputes -- is directly in response to their specific claim.

        **MR. BANKS:**  It's also directly in response to them trying to basically criminalize the use of Mr. Shapiro and you know why --

        **THE COURT:**  I wouldn't say they're criminalizing it.  I think my point on that is, this is a decision you guys made, in my opinion, to go right up to the edge of what the law allows.  I think you've done that.

        I think you've beaten basically most of the conspiratorial-type things.  You've beaten most of the interference-type things.  And that was a choice that you made, and you've got to live with it.  And that's the line I've tried to -- I've tried to toe here.

        And in any event, so you understand what I think we need to do here.  I'll try to find a way to do it with what you've given me.  If you guys have other suggestions, we can talk about that on Monday.  Okay?  Thank you.

        **MR. ZIMMERMAN:**  Saturday noon is okay, Your Honor?

        **THE COURT:**  What?

MR. ZIMMERMAN:  Saturday at noon is okay to file?

THE COURT:  Yeah.  I'm in Orlando all day today on judicial stuff -- tomorrow on judicial stuff.

MR. SHAPIRO:  Thank you, Judge.

THE COURT:  Okay.  Take care.

(Proceedings recessed at 5:23 p.m.)

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Rebekah M. Lockwood, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes to the best of my knowledge, skill, and ability.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand at Tampa, Hillsborough County, Florida, this 6th day of September 2024.

_____
REBEKAH M. LOCKWOOD, RDR, CRR
Official Court Reporter
United States District Court
Middle District of Florida