IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

_____
                                        )
MATTHEW SIMMONS, SHEILA MURRAY,         )
JACK MITCHELL, JACKIE RODRIGUEZ,        )
MADISON LIEFFORT, AND EMILY             )
CARTER,                                 )
                                        )
          Plaintiffs,                   )
                                        )
vs.                                     )   Case No.:   8:23-CV-201
                                        )
USI INSURANCE SERVICES, LLC,            )
a foreign limited liability            )
company and USI ADVANTAGE               )
CORP., a foreign corporation,           )
                                        )
          Defendants.                   )
_____)
                                        )
USI INSURANCE SERVICES, LLC,            )
                                        )
          Counterplaintiff,             )
                                        )
vs.                                     )
                                        )
MATTHEW SIMMONS, JACK MITCHELL,         )
and SOUTHEAST SERIES OF                 )
LOCKTON COMPANIES, LLC,                 )
                                        )
          Counterdefendants.            )
_____)


**VOLUME VIII OF IX (pp. 1901-2079)**

**JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. BARBER**

**July 18, 2024
8:08 a.m. to 4:20 p.m.**


(Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

APPEARANCES:

**FOR THE PLAINTIFFS/**          LYLE E. SHAPIRO, ESQUIRE
**COUNTERDEFENDANTS:**           Herskowitz Shapiro, PLLC
**(SIMMONS, MITCHELL)**          9130 South Dadeland Boulevard
                                 Suite 1609
                                 Miami, Florida 33156

                                 NICOLA GELORMINO, ESQUIRE
                                 Gelormino Law, PA
                                 9130 South Dadeland Boulevard
                                 Suite 1609
                                 Miami, Florida 33156

**FOR THE PLAINTIFFS/**          CHRISTOPHER J. BANKS, ESQUIRE
**COUNTERDEFENDANTS:**           Crowell & Moring, LLP
**(LOCKTON SOUTHEAST)**          3 Embarcadero Center
                                 26th Floor
                                 San Francisco, California 94111

                                 DANIEL ADLER, ESQUIRE
                                 Gibson, Dunn & Crutcher
                                 333 South Grand Avenue
                                 Suite 4700
                                 Los Angeles, CA 90071

**FOR THE DEFENDANTS/**          DAVID E. CANNELLA, ESQUIRE
**COUNTERPLAINTIFFS:**           KRISTIN N. ROYAL, ESQUIRE
                                 Holland & Knight
                                 200 South Orange Avenue
                                 Suite 2600
                                 Orlando, Florida 32802

                                 MATTHEW Z. ZIMMERMAN, ESQUIRE
                                 Holland & Knight
                                 777 South Flagler Drive
                                 Suite 1900 West Tower
                                 West Palm Beach, Florida 33401

**ALSO PRESENT:**                SARAH ROMINE, ESQUIRE
                                 MATTHEW SIMMONS
                                 JACK MITCHELL
                                 TOM LONGHTA

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**INDEX**

| | PAGE |
|---|---|
| Jury Charge Conference | 1908 |
| Jury Charge | 1953 |
| Closing Argument by Mr. Cannella | 1988 |
| Closing Argument by Mr. Banks | 2013 |
| Rebuttal Closing Argument by Mr. Cannella | 2046 |
| Jury Charge | 2053 |
| Verdict | 2061 |

**COUNTERPLAINTIFF'S EXHIBITS (ADMITTED INTO EVIDENCE)**

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 10 | 10/27/22 LinkedIn from Zutel to Mitchell | 2060 |
| 11 | 11/03/22 Zutel Email to Sharma Re Lunch Today - Thank you | 2060 |
| 13 | Mitchell Texts | 2060 |
| 14 | Sample Member Agreement of Southeast Series of Lockton Companies, LLC | 2060 |
| 45 | 01/17/23 Lockton Producer Member Term Sheet for Mitchell | 2060 |
| 58 | 01/18/23 Lockton Offer Letter of Employment to Rodriguez | 2060 |
| 68 | 02/17/23 Email from Sharma to OM Ventures. Subject: Revised team chart and Attachment | 2060 |
| 94 | 01/25/23 BOR Letter for ZMR Capital | 2060 |
| 95 | 01/25/23 BOR letter for Robbins Property Associates | 2060 |
| 96 | 01/25/23 BOR letter for Argyle Real Estate | 2060 |

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**COUNTERPLAINTIFF'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 100 | 01/25/23 BOR letter for Avesta Real Estate Holdings, LLC | 2060 |
| 104 | 01/26/23 BOR Letter for Mothership, LLC | 2060 |
| 105 | 01/26/23 BOR Letter for SCG Hotel, LLC dba Renaissance | 2060 |
| 106 | 01/25/23 BOR Letter for Crescent Real Estate | 2060 |
| 108 | 01/25/23 BOR Letter for HIT Promotional Products | 2060 |
| 109 | 01/27/23 BOR Letter for NavaDerm | 2060 |
| 112 | 01/30/23 Email from Jankovic to Mandato. Subject: Better Health BOR Letter signed and Attachment | 2060 |
| 125 | 01/25/23 Resignation Email from Sheila Murray to Shari Segall | 2060 |
| 130 | 02/09/23 Email from Sheila Murray to Zach Oseland with ZMR Capital Re: ZMR Capital LLC Team Chart and Attachment | 2060 |
| 141 | Text messages between Alfonso, Mitchell and Zutel 11/16/22 | 2060 |
| 142 | Text messages between Zutel and Mitchell 11/28/22 - 11/29/22 | 2060 |
| 155 | 02/ 03/ 23 Email from Morneau to Tyson PGT Re Request Updated COI for All Open Projects; 02/09/23 Email from Elaine Lewis to Richard Tyson; 02/09/23 Email from Emily Carter to Steliyan; 09/09/23 Email from Emily Carter to Mmalatin; 09/02/23 Email from Sheila Murray to zoseland; 02/09/23 Email from Sheila Murray to Gmeadows; 00/00/00 Email from Sheila Murray to John Free; 00/00/00 Email from Sheila Murray to Chris Hamm | 2060 |

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**COUNTERPLAINTIFF'S EXHIBITS (ADMITTED INTO EVIDENCE)
(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 157 | 01/16/23 Email from Lockton to Kakish, Subject: Account Executive - Property & Casualty | 2060 |
| 158 | 01/23/23 Email from Lockton Recruiting Re Lockton Offer of Employment | 2060 |
| 172 | 11/09/22 Email from Sharma to Sean, Neil, Paul and Rick Re Producer Candidate (Matt Simmons) | 2060 |
| 182 | Email dated 11/09/22 To Anand Shelat from John Davis | 2060 |
| 193 | Kemp Employment Agreement with Lockton | 2060 |
| 200 | 02/09/23 Email from Jackie Rodriguez to J Caldwell Re Robbins Real Estate and Attachment | 2060 |
| 201 | 00/00/00 Email from Jackie Rodriguez to SCG Hotel Re Lockton Team Chart- SCG Hotel LLC and Attachment | 2060 |
| 202 | 02/09/23 Email from Jackie Rodriguez to J Smith -1754 Properties Re Lockton Team Chart- AI 1754 St. Pete and Attachment | 2060 |
| 206 | 02/09/23 Email from Madison Lieffort to SE Seward - MoreSpace Re Lockton Team Chart - MoreSpace Management, LLC | 2060 |
| 207 | 00/00/00 Email from Madison Lieffort to Mothership - Re Lockton Team Chart - Mothership, LLC and Attachment | 2060 |
| 208 | 0 2/13/23 Webex Invite from Rodriguez to Others Re Introductory Call FMH, LLC & Lockton and Attachment | 2060 |
| 209 | 02/13/23 Webex Invite from Emily Carter to Steliyan - OM Ventures Re OM Ventures Team Intro | 2060 |
| 211 | 00/00/00 Sheila Murray Email to Richard Tyson- PGT Re Lockton Team Chart and Attachment | 2060 |

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**COUNTERPLAINTIFF'S EXHIBITS (ADMITTED INTO EVIDENCE)**
**(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 215 | 02/17/23 Email from Ridley-Avesta to Kakish Re Revised Team Chart and Next Steps | 2060 |
| 216 | BOR Chart - Checklist and Tracker - Excel Spreadsheet | 2060 |
| 217 | Composite Emails to Mandato Re: BORs from clients and Attachments | 2060 |
| 236 | 12/13/22 Email from Lockton Recruiting to Jackie Rodriguez Re Account Executive -Property & Casualty Tampa 22029H at Lockton Companies LLC | 2060 |
| 237 | Candidate Information Regarding Jackie Rodriguez | 2060 |
| 241 | Candidate Information regarding Sheila Murray | 2060 |
| 242 | 12/27/22 email from Shuman to Sharma re - applied online commercial AM-AE Tampa | 2060 |
| 243 | Candidate Information regarding Madison Lieffort | 2060 |
| 244 | Candidate Information regarding Emily Carter | 2060 |
| 252 | Text Messages with Theresa Cabilao with Crescent-various dates | 2060 |
| 308 | Matt & Jack Excel Spreadsheet attached to 01/26/23 Email | 2060 |
| 316 | 01/05/23 Email from Anand Shelat to Jack Mitchell and Manoj Sharma with attached Revenue & Expense Example, Capital Account Example and LTI Example Subject: Confidential: Capital Account Example | 2060 |
| 343 | 11/19/22 Email chain from Matt Simmons to Manoj Sharma Subject: Fwd: FW: USI Share Grants with attachments | 2060 |
| 360 | 01/05/23 Email from Jack Mitchell to Anand Shelat and Manoj Sharma Subject: Lockton Modeling/Jack Mitchell Comparison | 2060 |

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**COUNTERPLAINTIFF'S EXHIBITS (ADMITTED INTO EVIDENCE)
(CONTINUED)**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 406 | 08/28/22 Email from Simmons to Barkley, Murray, Rodriguez and Jones. Subject: Account Spreadsheet | 2060 |
| 493 | 06/29/22 Email from Simmons to Varnadore and others with Subject "Staffing Discussions" and attaching "Simmons Team Book Split 6.29.2022" (native) | 2060 |

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

(Call to Order of the Court at 8:08 a.m.)

**THE COURT:** Morning, everybody. One thing I want to do is, I made a couple little changes to the jury instructions that are substantive. I want to talk -- just talk through those. And we've got some nitpicks. And you guys probably found some stuff. Let's just kind of do an editing sort of exercise.

**MR. ZIMMERMAN:** I know we'll get there, Your Honor, but obviously want to talk about the verdict form as well.

**THE COURT:** Yeah, yeah. There's some stuff on that. The instructions didn't work exactly perfectly. We've got to tighten that up. Give me one second to pull that up.

So the first thing we need to do on page -- Kelly, I think what we'll do is put this on the Elmo.

Is the Elmo working, Gretchen?

**THE COURTROOM DEPUTY:** Yes.

**THE COURT:** I think we've got to go from June the 5th, which was my last trial, to July 18th. Got to fix the date on the cover sheet.

**THE LAW CLERK:** I have to go print another copy.

**THE COURT:** No. I'm going to give it to you, and you're going to put it up. They don't need to see that first one, because nobody cares about that.

Go ahead and put this one on there.

**MR. ZIMMERMAN:** Judge, on the first one, it's not

anything controversial.  I think we may have taken out later.  I think it still has compensatory.  I just didn't want to confuse --

THE COURT:  Let me know when we get there.  That's exactly what we're trying to catch, is that kind of stuff.

Going down to page -- what page is that where that comes up, 7?  Yeah, this is -- you can keep the lights on.  You don't have to -- looks like there's an errant dash in there.  In the other ones, we don't have that, so that dash is coming out.  I may have fixed other commas or something like that.  I'm not necessarily going to tell you about every one of them.

I worked that broker-of-record concept in there.

Put this one on there, please, Kelly.  Actually, let's do it this way.  You just put them on there one-by-one, and we'll talk about them.

And, Matt, let me know when we get to the compensatory that's not supposed to be in there.  And we'll hit the verdict forms in a second.

What page is that one, Kelly?

THE LAW CLERK:  The one I just took off?

THE COURT:  No, the next one you're going to put on.

THE LAW CLERK:  Page 9.

MR. ZIMMERMAN:  The part I was referencing, Judge, was on Page 5.

THE COURT:  Okay.  Let's go back.

**MR. ZIMMERMAN:** I would just suggest just striking the word compensatory to avoid confusion. It should say damages.

**THE COURT:** Good idea. Good idea. What page is that, Kelly, we're on now?

**THE LAW CLERK:** Are you done with Page 5?

**THE COURT:** Yeah. Putting up page what?

**THE LAW CLERK:** 9.

**THE COURT:** 9, I worked in that broker-of-record thing there. What's the next one?

**THE LAW CLERK:** Next one we have is Page 10.

**THE COURT:** 10 is -- there's something that -- where it says solicitation of employees, that dash comes out of there. But then we've got induced in there twice. Simmons was not permitted to directly or indirectly solicit, and we take out the word or induce -- solicit USI employees or otherwise induce them. So we don't need induce in there twice. All right. The rest of that is fine. What's next?

**THE LAW CLERK:** Next is Page 13.

**THE COURT:** All right. This is just some minor wordsmithing. I did get the tenses right with his and their.

All right. So what does that say? Employees -- you don't like the comma, but we don't care about that. It's okay.

Or what's after or? What is that word, Kelly? I can't see it. What have you written after the word or?

THE LAW CLERK:  Oh, by.  Or by preparing to establish rival business.

THE COURT:  By preparing to establish rival business, employees also have a duty to blah, blah, blah, blah, however, employees -- okay.  May not engage in disloyal acts in anticipation of their future competition, such as using -- during the course of their employment or soliciting customers and other employees prior to the end of their employment.

Okay.  What's next?  Page what?

THE LAW CLERK:  Page 21.  My note out to the side, it says, however, dot, dot, dot, this is just a question of consistency between this instruction and the format of the succeeding instructions.  They're very similar, but not quite.

THE COURT:  Don't worry about it.

MR. ZIMMERMAN:  Wait.  I'm sorry, sir.  What page are we on?

THE COURT:  We're not on that one.  We're moving forward.  What's next?

MR. ZIMMERMAN:  Your Honor, if we can talk about on Page 19, or has the Court already ruled on all those?

THE COURT:  19 yet?  You want to go back to 19? What's 19?

MR. ZIMMERMAN:  An easy one, evidence concerning other litigation.  It just has a typo in concerning.

THE COURT:  What was that?

Jury Charge Conference

**MR. ZIMMERMAN:** Just the word concerning on the second title has a typo. Just want to catch that for you.

**THE COURT:** What do you want it to say?

**MR. ZIMMERMAN:** It just needs an N, Judge.

**THE COURT:** Oh.

**MR. ZIMMERMAN:** And then just give me one moment on this one, Judge.

**THE COURT:** Yeah. That's new. We didn't talk -- yeah, I'm glad you highlighted that. We didn't talk about this one. That's one I put in after we had our meeting yesterday. Who gave me that? Is that -- you guys gave me that?

**MR. ADLER:** We gave you a slightly different version of it.

**THE COURT:** I wordsmithed it. Yours is just a little too broad, and I've got to cut it back. That's okay. I think this is what I've been saying all along. You know, it's part of the story, but it's just background. Keep thinking about that. If you have anything you want to say about it later, we can come back to it. But let's keep moving forward.

What's the next one, Kelly?

**MR. ZIMMERMAN:** We can come back to this one, Judge. We're still looking at that one.

**THE COURT:** We'll come back to it if you want to look at it more, but you weren't saying anything.

**MR. ZIMMERMAN:** I'm sorry, Judge. We were trying to

corral our comments.

THE COURT:  It's okay.  We'll come back to it.

What's next, Kelly?

THE LAW CLERK:  The next one really relates to the same question about the language at the end of each damages.

THE COURT:  That's just a consistency thing, but it's close enough as it is.  It's not a big deal.  What's the quote? Consistency is the hobnob of -- who was that one?

MR. CANNELLA:  Hobgoblin.

THE LAW CLERK:  It's a foolish consistency.

MR. CANNELLA:  Mr. Bittick is right.  Foolish consistency.

THE COURT:  Every time I say that, he reminds me of that.

THE LAW CLERK:  It's a good thing.

THE COURT:  What's next?

THE LAW CLERK:  This is the same thing, but with the addition of the tortious interference instruction doesn't have the naturally flows language.

THE COURT:  All right.  We've got to fix that.  That one isn't -- that's different.  We've got to fix that.  I tried to get this interference thing to sound like all the rest, and I guess I missed some of it.

Okay.  So what does it need to say now?  If you find that USI -- okay.  That's only a one-sentence instruction.

What do we need to have after that?

**THE LAW CLERK:**  The language that's in the previous instruction, and which naturally results from the breach of duty.

**THE COURT:**  That phrase has to come on the end of that sentence.

**MR. ZIMMERMAN:**  Would it be naturally flow from the interference?  It's going to be a duty.

**THE COURT:**  For some reason, this isn't working. There we go.  Okay.  Moving forward.

**THE LAW CLERK:**  That may be all the stickies.

**THE COURT:**  That's it?  What do you guys have? Nitpicks, and then we'll talk substance.  Let's just do nitpicks first.

**MR. ZIMMERMAN:**  I don't have any nitpicks.

**THE COURT:**  None?

**MR. ZIMMERMAN:**  No nitpicks.

**THE COURT:**  You didn't find any?  Wow.

**MR. ZIMMERMAN:**  But -- and we're trying to also be reasonable in what we ask for.  We're looking at -- but we do have some comments on Page 19.

**THE COURT:**  Yeah.  We'll do substance in a second.

You guys have nitpicks somewhere?

**MR. ADLER:**  I think everything qualifies as substance.

THE COURT: Oh, come on. I'm disappointed. I guarantee there's stuff in there we've all missed, but that's okay.

All right. Let's do -- you want to go back to 19, Matt.

MR. ZIMMERMAN: Yes, Your Honor.

THE COURT: Okay. Dime. That's Spanish for tell me. What do you got?

MR. ZIMMERMAN: So on indemnification, we're just going to ask, again, in context of this case, from the Court saying it's not wrongful for one party to agree to indemnify another, we would ask that not be included. I think that's covered with saying you may not consider any indemnification agreement when deciding the amount of damages.

But, you know, alternatively, if you can say something like, in general, it is not wrongful. I don't -- in this particular case, I think coming from the Court and commenting on that, which we do think it creates some issues and confusion.

THE COURT: Okay. This will dovetail a little bit into how this is argued. I'm inclined to leave it exactly the way it is. But I don't want to hear you guys putting that up on the screen or highlighting it and saying, members of the jury, the judge just told you it's not wrongful for one party to indemnify. So they shouldn't even be bringing that up.

Jury Charge Conference

They shouldn't be talking about that.  You can't count that against us, because I don't think that's accurate.  I think this is something that's part of a -- the totality of the circumstances of why -- is why I'm allowing this under the circumstances of this case.

So that's how I think that should be done.  I don't know what you're planning on doing.  But if you're planning on somehow arguing that -- I mean, you can say it was harmless, it was okay, we're allowed to do it, but to try to say it's just that -- something the jury is not allowed to consider at all, I'm drawing the line on that.

Is that clear -- who's doing it?  Lyle, are you doing it?

**MR. SHAPIRO:**  Chris is doing it.

**THE COURT:**  Chris, you understand what I'm saying?

**MR. BANKS:**  I'm taking the slide out right now, Your Honor.

**THE COURT:**  Good.  So I'm going to leave the instruction the way it is.  If it's argued too much, if it's overkill, I may come back and do something else with it.  But I'm going to leave it the way it is for now.

And you get to argue -- oh, let's talk about what I'm recommending that somebody argue.  Again, I'm not suggesting anything to anybody to try to help them win.  I'm suggesting this to try to avoid juror questions.  Okay.  Here's a couple

things I hope you-all will touch on.

Number one, how do we tell the difference between these different defendants on the damages?  Now, you can argue it as a failure of proof and stuff like that, but I really hope that that's discussed.  Because I don't want to get a question from the jury, is that, you know, how do we -- we don't know what to do with these different defendants.

Number two, how do we know the difference on damages when it comes to this interference versus breach of contract.  A related question could be just this simple.  What's the difference between the breach of contract claims and the tortious interference claims?

And I'm not going to tell them, well, that's why we have the independent tort doctrine that the judge rejected.  But, I mean, you understand that that could be a legitimate question.  Okay?  So those are just some things I'm thinking about that we don't want juror questions about.  And I may have more, too.

But -- okay.  So what else you got?

**MR. ZIMMERMAN:**  I do think we're on the same page, Judge.  We appreciate the feedback and glad that at least we're in the ballpark in what we were thinking about doing.  Thank you for that feedback on that.

On evidence concerning other litigation.

**THE COURT:**  Yes.

**MR. ZIMMERMAN:**  I think at the end, the proposed instruction, you may not consider this evidence in deciding whether any defendant is liable, the amount of damages, if any, or for any other purpose, we would just propose it should just say, you may not consider this evidence in deciding whether any defendant is liable or the amount of damages, if any --

**THE COURT:**  That's true.  I'm telling you I've allowed it for the purposes of background and context.  And then at the end, I say you can't consider it for any purpose.  You got me on that, Mr. Adler.  I should have taken that out.  That's coming out.  I agree.

What else you got?

**MR. ZIMMERMAN:**  Those are the issues that we wanted to raise, Your Honor.

**THE COURT:**  Okay.  All other objections made yesterday are preserved for the record.  These are just additional things, so you're good.

What do you guys got?

**MR. ADLER:**  Okay.  I'll be quick.

Number one, I think we'd like to add back the solicit, divert, induce instruction.  As we were talking about it last night, it seemed that the jury probably does need a definition of those words, so we think it makes sense to put that one back in the hopper.  We like the one you came up with.

**THE COURT:**  Okay.  It's pretty straightforward.  I

think I may have gotten it from you guys, actually.

**MR. ZIMMERMAN:**  I don't think that's the case, but you did ask us to work on that if there's a question.  We are working on language.

**THE COURT:**  The what?

**MR. ZIMMERMAN:**  I don't think we had submitted that originally.  But, frankly, there's so much in this case, I could be wrong.  But I don't think so.  But we -- I think the Court's recommended that if there's a question on it, it would be ready.  We're working on -- and you had asked us to propose something we were comfortable with if there was a question. We're working on that, and we'll have something this morning for you, Your Honor.

But, you know, ultimately, you know, the contract has language that explains what the requirements are.  The Court's given the tools and the instructions --

**THE COURT:**  I don't remember.  Does the contract have definitions in it?

**MR. ZIMMERMAN:**  It has definitions.

**THE COURT:**  None of those words.

**MR. ZIMMERMAN:**  I don't think it defines those particular words.  But in the paragraph, I think the context of the paragraph is pretty clear what's allowed and not allowed. And I think the jury has enough to read the paragraph and understand it.  If they have a question -- and my concern,

Judge, is there's a bunch of law on this in Florida. And it's, you know, a solicitation could be a solicitation regardless of who initiates the contact, and a solicitation could be a solicitation if this and if that. And I really, you know, think when you get into minutia on that, without a question from the jury, it's going to create more confusion.

**MR. ADLER:** Your Honor, I think the jury is going to be confused by these terms, if it doesn't have guidance. I don't think the contract provides adequate guidance. And, also, we're not just talking about a contract claim with this stuff. We're talking about the other claims. So I think the jury could use a plain English instruction. The one you provided seemed pretty vanilla to me and probably would head off some questions and confusion. That's why we think it should be in there.

**THE COURT:** One thing about that is -- I'm trying to think if I've done a trial lately that didn't have juror questions. I'm not sure I have. They always have questions. And if this would avoid questions, I think the trick on that, though, is the contract says direct or indirect. And so they would need to be reminded of that somehow or another so that they're not kind of tricked into thinking it's narrower than it is.

Yes?

**MR. BANKS:** This is -- actually, this is exactly what

we were talking about last night, was that -- I mean, one question the jury might have is, why was there a finding of solicitation on the contract, but not on the fiduciary duty.

And so our suggestion or my suggestion was that in the contract section, it should probably not say that you found solicitation.  You did.  But what you found was at least indirect.

And then I think Your Honor said this yesterday, there's some difference between the contract and the tort.  I think the tort applies to solicitation.  It doesn't necessarily apply to everything covered by the contract.  And so our thought was maybe that should be clarified in the instruction.

And if Your Honor is thinking something differently, that's, you know, fine, as long as we know it, so we know what to argue.

**THE COURT:**  I kind of tried that a little bit.  The more I wrote, the less clear it became.  It's very hard to capture in a concise way what's meaningful to jurors.  So I -- that's why I left it the way I did.  I'm going to leave it the way it is now.  I understand what you're saying.

No, I think I am going to put that back in.  But when you talk, it will be up to you to remind them that all those words are qualified in the contract by direct or indirect.  I'm not going to put that in the instruction.  But you can bring that out, because you're going to show them -- at some point,

you're going to have -- you're going to put the contract, like that provision up there?

**MR. ZIMMERMAN:** We may, yeah.

**THE COURT:** And then you'll highlight direct or indirect, and that will cover that.

**MR. ZIMMERMAN:** So, Your Honor, just two quick points on that.

One is, you may recall that we had offered testimony from Mr. Sharma on how Lockton understood those words. And that was objected to by defendants, and the Court disallowed it. And so any confusion, I think, could have been cleared up by Mr. Sharma's, you know, words. And I think the reason the Court said was, you know -- I assume was, you know, that's for the jury to decide what those words mean. And now we're telling them what the words mean without the guidance of what the people involved actually understood them to mean.

**THE COURT:** Agreed. But I think these are pretty common-sense, straightforward words.

**MR. ZIMMERMAN:** That's our point, Judge. I think giving an instruction that you should use the common-sense definition of those words in this context.

**THE COURT:** Yeah, well --

**MR. ZIMMERMAN:** We're not doing that. We're giving more definitions, which isn't full of Florida law, but --

**THE COURT:** I get it. I made that decision. I'm

going to put it in there.  I just need to remember where it was.  I think it's before the breach of fiduciary duty thing, I think.  I think that's where it comes.  Yes, that's where it comes.  I'm going to just make myself a note.  It's going to be exactly what was yesterday.

            **MR. ZIMMERMAN:**  Judge, with your -- I understand the ruling that's in.  If we have a tweak, will you -- will the Court consider it?

            **THE COURT:**  Sure.  Give it to me now.  Let me look at it.

            **MR. ZIMMERMAN:**  Okay.  We'll get it to you very shortly, Judge.

            **THE COURT:**  Yeah.  Okay.  Anything else?

            **MR. ADLER:**  Yes, Your Honor.  So just briefly, I'll make a record on this, I just renew my objections from yesterday, as you said.  For example, objecting to, you know, any indemnification or retention of counsel coming in for any purpose.

            **THE COURT:**  Don't put a bunch of objections on the record.  We'll do that when I go back and work on this.  You can do it, but not yet.

            What else you want me to change?

            **MR. ADLER:**  So the tortious interference claim, I think it would be helpful to clarify that there is nothing related to the tortious interference with the employees'

agreements, that is with everyone other than Mr. Simmons and Mr. Mitchell, because there was considerable testimony on that, because I think the other side was under the misimpression that that was part of the case. And I think the jury should be instructed that they should not consider that for any reason.

THE COURT: No. They're not going to argue it that way. If they argue it that way, I might need to do something about it. But good to bring it up. I mean, I've already changed or taken that out.

That part of your claim got the ax. So don't talk about it. All right? But if it comes up in a way, I might need to do something different.

I'm doing the instructions first, so if it comes up in the closings, sometimes I do additional -- I do one instruction at the end, and if I need to put stuff in, that's where I put it in. Because they will hear from me one last time.

Yes?

MR. BANKS: Your Honor, am I free to say to the jury that's not part of the case?

THE COURT: Yeah.

MR. BANKS: Thank you.

THE COURT: Okay. What else?

MR. ADLER: I think other than objections that I can say outside your presence about the tortious interference claim

that I continue to struggle with, I think that's -- I think that's it for us.

**THE COURT:** Okay. Your struggles are not the jury's problem, but that's okay.

What -- they're going to send me some tweaks. I'll take a look at them. Do it by email.

Who's doing it? Kristin, are you doing it? Who's working on it?

**MR. ZIMMERMAN:** Yes. We'll send it very shortly.

**THE COURT:** Just email it.

**MR. ZIMMERMAN:** Thank you so much. Does the Court want to discuss the verdict form, because we do have --

**THE COURT:** Yeah, yeah. We need to do that next.

So, Kelly, you have those ready to put up?

**THE LAW CLERK:** Yes.

**MR. ZIMMERMAN:** Judge, we had also asked for that instruction, and we need to get it to the Court a little bit on the later side about damages.

**THE COURT:** I'm not doing that one. I saw it. I thought about it. I'm not going to do it. It's covered in the existing instructions. You've just got to harp on that, highlight it, put it up there. I think that's good enough.

Okay. Verdict form.

What's first, Kelly? What do you have up first?

**THE LAW CLERK:** Happens to be Lockton, but --

**THE COURT:** Lockton's coming up first. What do we have on Lockton, Kelly? Anything? Is that the one where the instructions were funky?

**THE LAW CLERK:** Right. But I had only gotten to the first one where I thought it needed an adjustment.

**THE COURT:** Maybe the parties picked it up. What do you guys have on this verdict form?

**MR. ZIMMERMAN:** So we have a couple things, I guess, across the board that's going to apply. So it -- I do think -- so looks like the Court has combined damages. I do think there should be a line for fiduciary duty damages, or in the case of Lockton, aiding and abetting fiduciary duty damages, and a line for --

**THE COURT:** I'm not following you. So the next page, you want to go down on this to damages? Okay. So go to damages and you want to split it out?

**MR. ZIMMERMAN:** Yes, Your Honor. There -- from our perspective, there's really two categories of damages, and it's going to apply to the individual verdict forms as well. Right? So there's breach of contract, and then tortious interference lines up with breach of contract.

So the Lockton one would be tortious interference damages, and then there's fiduciary duty damages and aiding and abetting fiduciary duty damages. So those should be separated. Those are different categories of damages. There are some

things that could be awarded for fiduciary duty that may not be awarded for breach.  So I do think --

THE COURT:  I think I probably agree with you about that.  It doesn't hurt to help the jury try to figure out what in the world -- how these differ.  Right?  I think your verdict form initially may have had it done that way.

MR. ADLER:  One moment, Your Honor.

MR. ZIMMERMAN:  It did, Your Honor, both sides.

THE COURT:  No.  One had it combined.  So you want to split these all out by cause of action?

MR. ZIMMERMAN:  I don't know if you need to -- I'm not trying to make it too difficult, but rather than saying what is the total damages, if any, Simmons's wrongful conduct caused USI to sustain -- oh, I'm looking at Simmons, so --

THE COURT:  We're on Lockton.

MR. ZIMMERMAN:  You could say for breaches of fiduciary duty, for -- in this case, for aiding and abetting breach of fiduciary duty, for tortious interference, so I think it could be just two lines there.

THE COURT:  Okay.  What else?

MR. ZIMMERMAN:  Okay.  Then the comment -- so I think that the other concern we had in number two.

THE COURT:  We're on Lockton now.

MR. ADLER:  Your Honor, before we move on, did you make a decision on -- I have some thoughts if --

**THE COURT:** On what?

**MR. ADLER:** On splitting out the damages.

**THE COURT:** Yeah. What are they?

**MR. ADLER:** I think there's real risk of jury confusion on that and also a risk of awarding damages in triplicate. So I think it would be better probably just to have the single, especially given the way this case was presented. I mean, they have a single damages theory. I heard no evidence of distinct damages for anything else. I think there's real risk that the jury will be induced to award damages more than once for the same thing.

**THE COURT:** I'll do it in a way that they won't. I think this actually helps you, because it might illustrate to the jury the idea that there really isn't any difference, and how in the world can we figure this out. And maybe what this case really is, is just a breach of contract case, and we'll put a number on breach of contract and zero everything else out. That's my thought.

**MR. ZIMMERMAN:** But, Your Honor, and the Court recognized this yesterday, there are damages. For example, the month of disloyal service.

**THE COURT:** I'm not saying you can't argue it. I'm just saying the way the jury may think of it.

**MR. ZIMMERMAN:** That's fine. But, you know, the jury could award the breach of contract damages for the lost

profits, and they could award the fiduciary duty damages for the disloyal period that we put in evidence on what was paid during that time.  Those are different damages.

THE COURT:  Yeah, I get it.

MR. ZIMMERMAN:  Not duplicative.

THE COURT:  And it gives them the opportunity, if they wanted, to basically make Mr. Simmons pay back some of his compensation, and that's a little number, and it's distinct, and it doesn't get blended into everything else.  It gives them an opportunity if they wanted to do that.  And if they wanted to say, you know what, I think the clients were going to leave anyway, so I'm not really worried about that.  I just want -- I want Simmons to pay back some of his comp.  It gives them a little line to do that, and I think that's -- if that's what they want to do.

MR. ADLER:  Your Honor, I don't think the jury can consider that issue.  That sounds like a restitutionary remedy, which would be an equitable decision for this Court to make. There's a lot of law on that, that juries do not get to decide equitable claims or remedies.

THE COURT:  You're right.  They don't.  This could also be in the bucket of compensatory, so I'm not worried about that piece.  Okay.

MR. BANKS:  Can I ask a clarification on that then?

THE COURT:  Yeah.

**MR. BANKS:** Your Honor made the comment about there's a small part of this compensation. I think I would agree with that, there's only a small part that would have been during that period. I anticipate, though, that the plaintiffs are going to ask for the return of that bonus that was fully earned on December 1.

**THE COURT:** They can put that on there. I'm saying, if the jury, best case for you, wanted to buy your argument, that, oh, it's that two months or whatever you're going to say it is, they have an opportunity.

They can also say, you know what, I get his claim that the bonus was earned, but you know what, I think that that's the number. And that's what juries do. They can put that number in there.

You can file a motion and say it's unsupported by the evidence and all this other stuff. But that's going to be up to them to put whatever number they want in there. It could turn out in your favor. It could go against you. Don't know.

But that's why I don't know why you would oppose it, because if it's all blurred in one thing, you lose that argument. You don't know where that pot came from. Right? So I'll fix it.

What else you got?

**MR. ZIMMERMAN:** We understand the Court's goal of avoiding duplicating damages, which is our goal, too. Right?

We don't want to have issues with this verdict.

But we think it's confusing to say -- first of all, it's twice, because we have the question two -- it's included, and then three. And then, you know, in number two, please remember to deduct amounts, if any, caused by any other defendants. I think this is where there's confusion.

Let's talk about tortious interference claim. Let's say they agree with us completely. They award the lost profits, you know, the percentage for Mr. Simmons, the percentage to Mr. Mitchell, to each of them, and then they get to tortious interference and they say, okay, Lockton, we do think you induced that as well, we're going to award the same amount. Okay?

That -- please remember to deduct amounts, if any, caused by any of the defendants causes confusion there. I think the issue of where avoiding duplication should be addressed is where the Court has it in three. Because, theoretically, there could be -- let's just say $4 million for breach on Mr. Simmons and $4 million for tortious interference for Lockton.

They both caused the damage, the jury found it, but I would agree that if the jury did not intend that to be, you know, duplicated, that should be noted. But they would be damages caused by another defendant. And, here, you're instructing them to deduct. So I think that's confusing. So I

would just take that out, and let's deal with it as I think the Court has correctly done in question three.

THE COURT:  I'm not sure about that.  I see what you're saying.  I'll think about it.  I'll think about it.

What else?

MR. ZIMMERMAN:  It may depend on how that's done.  I think we would propose, then, if you're awarding under three, just, you know, what are the total damages you intend to award for the breach of contract and tortious interference, what are the total damages you intended to award for fiduciary duty slash aiding and abetting.

THE COURT:  And then for the whole deal?  Or you don't think it should be the -- should be everything?

MR. ZIMMERMAN:  I don't think then you say for the whole deal.  I think by breaking it out, then it's all clear.  For example, in my example, if they gave the 4 million to Mr. Simmons on the contract, if they gave 4 million on tortious interference on -- with the contracts to Lockton, then, here, the question is, what is the total amount you intended to award for breach of contract, tortious interference, and the answer is either going to say four or eight.

THE COURT:  I might --

MR. ZIMMERMAN:  And we know what was intended.

THE COURT:  I might do both.  Actually, I might do both.  Because I really, really want to make sure there's no

double counting going on here, because it's confusing.

**MR. ZIMMERMAN:** I think it -- by doing it belt and suspenders, I think it's adding confusion. I understand.

**THE COURT:** We'll see.

**MR. ZIMMERMAN:** But I would just say, then, rather than say deduct, we don't think it should be in at all. It may be cleaner to say, please remember to only award damages for Lockton here or for Simmons here. I think adding deduct is -- creates more confusion.

**THE COURT:** Okay. That, I think, is a better way to do it. I agree with you.

**MR. ADLER:** Your Honor, I think this discussion is highlighting the importance of a client-by-client approach to this verdict form.

**THE COURT:** Yep. That ship has sailed.

Okay. You guys have anything on this?

**MR. ADLER:** The objection I have is in principle to the structure. We filed a proposed verdict form this morning that tracks the client-by-client approach that we think is important because --

**THE COURT:** Besides that? I'm not doing that. Anything besides that?

**MR. ADLER:** No, Your Honor.

**THE COURT:** Okay. Let me go back and work on these things. It's going to take me a little bit of time, but

hopefully not too long.

MR. ADLER:  Your Honor, one other thought.  This disgorgement thing that I think isn't for the jury, you mentioned that the jury may, you know, segment that in some way.  I'm not sure it would have an opportunity to do so, given the structure that's been proposed.  If they want to seek that as something separate, I suppose it could be somewhere on the form by itself.  But, again, I don't think this is something that the jury should consider at all.

THE COURT:  The damages, I mean, they can -- I think the jury can consider it.  I think that's why this is a common-sense-type thing that they're going to be thinking about.  And if you guys overthink this and try to tell them, you know, they can only do this and only do that, we'll see.  We'll see how it comes out.

MR. ADLER:  Just to sharpen the point, I think the issue is that if the jury is awarding damages on an unlawful or wrongful theory, it would be difficult to disentangle that, given the way the verdict form is structured.

THE COURT:  We'll see.  I think it's pretty clear right now.  Let me go fix it.  I think it's clear with what I'm going to do.  I'll put it that way.

All right.  Thank you.

MR. ZIMMERMAN:  Last thing, Judge.  I don't -- I just want to point out, obviously, there are, like, the permanent

injunction claims and things like that.  I don't think the Court needs anything else for findings when we come back on that.

THE COURT:  Not by the jury.

MR. ZIMMERMAN:  I don't think so.  I think the Court's made the findings it needs.  I just want to note if there's anything that the Court wanted to address here.  I don't think so.

THE COURT:  Let me go work on this.

Before I do that, you guys have questions about am I allowed to argue this, am I allowed to argue that, can I put this slide up, can I put that slide up?  Let's clean this up.

MR. ZIMMERMAN:  We haven't seen the slides yet.

THE COURT:  Okay.  What are the slides?  We're not going to go and do that again and spend an hour on slides and then the machine breaks and we don't use any slides.

MR. ADLER:  Chris has stepped out for a moment.

THE COURT:  Look at each other's slides, figure out everything you think the other side is going to do and object to, and then it will be half of that they weren't going to do anyway, but you objected.  So just do that while I work on this.

MR. ZIMMERMAN:  Thank you, Your Honor.

MR. CANNELLA:  Yes, Your Honor.

THE COURT:  We'll see you in a couple minutes.

(The Court left the bench at 8:50 a.m.)

**MR. ADLER:** Oh, sorry. Yes, Ms. Lockwood. So I just want to get on the record that I renew my objections to the jury instructions from yesterday, including but not limited to the notion that indemnification or retention of lawyers can be used for any purpose at all, and to the notion that a series of independently proper and lawful acts, when composed in a mosaic or zeitgeist or gestalt or whatever else we called it yesterday -- yes, I know, I'm giving your fingers a workout -- that that somehow becomes improper or wrongful or unlawful. I don't think there's any law to support that notion.

I also renew my objection based on the independent tort doctrine that we have two overlapping sets of claims, and the contract claims swallow the fiduciary duty claims, so those should be out of the case.

I also want to say a few more words about one of the Court's instructions, specifically the one about tortious interference. I'm still struggling with that one, because it appears to be quite a departure from the standard Florida jury instructions, which I believe are 408.5 and 408.6.

It's now a kind of hybrid liger or tigon claim, sort of an inducement slash tortious interference claim. It's missing key elements from the standard instructions, including that the defendant acted wrongfully, unjustifiably by improper means.

So I think we've moved away, first, from the claim that was pleaded, which looks nothing like this one and also from any semblance of a typical tortious interference claim.

And I renew my point that the instructions should likewise make clear that there is no claim for tortious interference with the employees' agreements, that is, with those employees, ex-employees of USI, other than Simmons and Mitchell.

And that's all.  Thank you.

(Recess from 8:52 a.m. to 9:17 a.m.)

**THE COURT:**  We're down to changes that need to be made, not things that sound better or feel better.

Check out this verdict form.  What I've done is, for each of them, I've broken out the damages section by cause of action.  But look at what I've done to make sure I didn't mess it up.  I mean, I'm rushing.  So I may have, you know, messed something up.

But the big sentence that's different now is, it says, the amount you determine, if any, must be only for whoever the defendant is, Lockton, and not any other defendants.  I kind of reworded that concept, because I think Matt was right about that.  It was a little confusing.

So take a look at what I've done on this.  And if anybody has anything they want to say, say it now, because this, you may want to use in your closings to put up on the

Elmo.

Yes, Mr. Cannella?

**MR. CANNELLA:** I answered my own question. Thank you.

**THE COURT:** All right. Okay. So, now, let's -- are we fighting about slides?

**MR. ZIMMERMAN:** A small thing, on Mr. Simmons's verdict form, I think question three says Mr. Mitchell. I think it's just a typo. Section 3 under damages. It was probably a cut and paste.

**THE COURT:** Darn it. So which one is it?

**MR. ZIMMERMAN:** On Mr. Simmons -- I'm only through Mr. Simmons so far. Mr. Simmons's verdict form, under damages, question three.

**THE COURT:** Yep. Yeah. Because, obviously, I have Lockton copied, so I'll go fix that. Thank you for catching that.

I'm going to give you guys a second to read through it and make sure there isn't any other dumb mistakes like that, and I'll go and redo it.

**MR. ZIMMERMAN:** Your Honor, on number four, was it the Court's intention to not split up the two claims?

**THE COURT:** Question four is for the whole case.

**MR. ZIMMERMAN:** Right.

**THE COURT:** I'm not doing a sub for the two claims

for this defendant and then another total for the whole case.

I don't want to do that.

          **MR. ZIMMERMAN:**  But the only problem is, we may end

up, depending on what the numbers are, we may not know at the

end what that means.

          **THE COURT:**  What do you mean by that?  Because if you

want -- the more numbers you want to have in here, the more

problems it could be, but go ahead.  What do you mean?

Because --

          **MR. ZIMMERMAN:**  They order of -- yeah.  I mean, my

concern is confusion at the end, but --

          **MR. ADLER:**  I don't see how it could probably be

confusing.  Please indicate the total amount of damages you

award for the entire case in italics and then it's defined.

          **THE COURT:**  I didn't hear you.

          **MR. ADLER:**  I don't see how it could possibly be

confusing the way it's written.

          **MR. ZIMMERMAN:**  I've actually had this issue before,

Judge, so I'm a little sensitive to it, on a 14-million-dollar

verdict.  So I think it takes a minute to make sure it's clear.

          **THE COURT:**  Take some time.  I'm fine with it.  But

let's -- no slide fights?

          **MR. ZIMMERMAN:**  We have a few I think we want to talk

about.

          **THE COURT:**  Let's do it.  The jury has already been

on ice for 20 minutes.  Let's do it.

**MR. BANKS:**  One is just a clarification.  I know we're not going to do the instruction on indemnification.  What about the instruction on lawyers?  Can we show that or not?  I'm happy to take it out.

**THE COURT:**  Any instruction is fair game.

**MR. BANKS:**  Okay.  That's it then.

**THE COURT:**  Any instruction is fair game.  I hope you do, because that will help them understand what's going on.

**MR. ZIMMERMAN:**  Can you put your slides up, Mr. Banks?  Do you mind?  So the judge can see them and we can talk about them?

**THE COURT:**  We're not going to nitpick.  It better be a good objection.

**MR. BANKS:**  I'm not sure I'm using all of these either.  It depends on what they say, obviously.

**THE COURT:**  If you do, we don't want to have an objection in the middle, so put it up.

**MR. BANKS:**  No -- yeah.  I just don't want the Court to be alarmed if there's, like, 60 slides here.

**THE COURT:**  I won't be alarmed.  We've got a timer that's going to go off, and it's going to go [indicating].

**MR. BANKS:**  I'll make good choices.

**MR. ZIMMERMAN:**  If you don't mind, Chris, can you go to 16.  Your Honor, so this series of slides is about the

resources.

THE COURT:  I haven't even seen it yet.

MR. ZIMMERMAN:  I'm previewing it for you.  This series of slides gets into the resource issue.  And, you know, for example, 16 is the cry for help email when it comes up.  The Court has left it in for limited purposes.  The Court is going to tell him it's not relevant.  This is about the producers, not about other employees.

THE COURT:  Yeah.  You're trying -- you know, you've made the decisions you've made.  I may have defended this case differently.  You're trying to force in, basically, in my opinion, by harping on this, the jury to override the idea that they breached the contract and excuse them from breaching the contract because the working conditions were just so terrible. I've thrown that out as a defense.  You're still trying to do it.

This is too much.  This is too much.  There's a jury instruction in there on it.  But we're not going to put up a bunch of slides and try to suggest to the jury that because the working conditions were so awful, that he, you know, is justified in breaching his contract.  Now, is this with regard to a employee?  Because, now, I said it was relevant on an employee.

MR. BANKS:  It is relevant because of the line I've highlighted at the end.  It says, if this doesn't change, we

are going to lose members from both our service and production teams.

THE COURT: Okay. If it's argued in terms of the -- arguing the cause for the employees leaving, if that's the context that the slide comes up, I'm fine with it.

MR. BANKS: The other thing, Your Honor, that I'm going to need to be able to say, if they're arguing that because there are all these phone calls and meetings between Mr. Simmons and Lockton, that that's proof he was doing something wrong, I want to be able to say, Mr. -- and they want to say that Lockton told him what to do, et cetera. I want to say, no, Mr. Simmons found himself in a difficult situation at the end of the year, really an impossible choice. He didn't want to give notice, because he didn't want to say things to his clients that he didn't think were true. But at the same time, you know, he didn't think that those -- that USI could take care of those clients.

THE COURT: And --

MR. BANKS: So that's why he left. Not to justify, not to say that it's right or wrong, but to explain what his motivations were.

THE COURT: Okay. We're just talking about slides. We're just talking about slides. This is the document that's in evidence.

MR. BANKS: That's a document in evidence.

THE COURT: The concern isn't so much the slide. The concern is more about the way it gets argued.

MR. ZIMMERMAN: Your Honor, but I think you should see -- I think you should see the series. That's what I'm saying. If you go back, please, Mr. Banks, to 13.

THE COURT: We're not doing what we did last time and running through every slide.

MR. ZIMMERMAN: We're not, Judge. I just want you to see the series of this is why the objection is and overall. So 13, so go to the next slide, Mr. Banks, please.

MR. BANKS: In total, this is probably about three to four minutes.

MR. ZIMMERMAN: Hold on. There's a cry for help slide we object to. Then there's a time line slide. You skipped one, I think.

MR. BANKS: No. Time line.

MR. ZIMMERMAN: Cry for help is next.

THE COURT: Time lines are effective slides. I'm glad you have a time line.

MR. ZIMMERMAN: Right. But it's a time line about the complaints about resources.

MR. BANKS: Time line at USI. At the end, what should Simmons and Mitchell do.

THE COURT: I don't see any problem with that slide.

MR. ZIMMERMAN: Then there's a cry for help.

THE COURT:  You already hit that one.

MR. ZIMMERMAN:  Two of them.

MR. CANNELLA:  I don't know where the evidence --
what's the evidence on client policy labs on cyber?

MR. BANKS:  Mr. Simmons --

THE COURT:  It's argument.  It's argument.  That
slide is okay.  Keep going.

MR. BANKS:  Okay.  Then we've got -- this is the
notice -- what they sent to the other departing producers
telling them what they can say and not say.  They said that
that's what they would have told Mr. Simmons.

MR. ZIMMERMAN:  I don't think we're objecting to this
slide.  We are objecting to the next one.

MR. BANKS:  It's a Greek myth.  Rock and a hard
place.  I'm going to tell a little Greek story.

THE COURT:  And you understand that they're going to
respond to this argument with something like, members of the
jury, the judge has already determined that this was a breach
of contract.

MR. BANKS:  Yeah.

THE COURT:  Okay.

MR. BANKS:  Then they worked their hardest for USI
until they left.

THE COURT:  This is fine.  But let me make a point.
If you think he's arguing this in a way that is going against

the general intent of what I've been saying all along, object. And if you go and you want to have your closing objected to and the flow of it messed up because you went too far, that's -- could happen.

I really don't want objections to the closing. But if somebody thinks that someone has violated the general intent and spirit of what we've been talking about for the last two weeks, and you guys keep butting up against, if you want to do that, take that risk, I'm not going to tell you to sit down and shut up. I'm going to have you come up here, we're going to have a long conversation, and it's going to annoy the jury. All right.

**MR. ZIMMERMAN:** Twenty nine. So, Judge, we don't know the Court's -- I've seen different rulings on this, on use of video testimony played in the closing. So there's a few clips that have video testimony. We don't think that there should be an overemphasis on witnesses put forward through video, particularly when witnesses that were key to this case were not brought.

**THE COURT:** That's -- you know, that's a problem with this. It's okay to do. But that's a real problem, because you're almost better off playing videos than calling real people, because the real people can't get played up here in the closing argument.

**MR. ZIMMERMAN:** There is some law in the Eleventh

Circuit and the Middle District that it overemphasizes a portion.

THE COURT:  I know about it.

MR. ZIMMERMAN:  So we would object to videos of when this is being played.

THE COURT:  Here's the thing, though, Matt.  I'm giving him a 45-minute thing.  If he played a video for 45 minutes, I'd agree with you.  But he doesn't have enough time to -- I mean, he's going to pick out a few snippets.  I bet it's going to be -- what's the girl that came up at the end that said USI keeps no track of their -- I bet he's got that one in there too.

MR. BANKS:  You're right on target.

THE COURT:  I'm just guessing.  How much is it?

MR. BANKS:  I think they're, like, about 40 seconds each.

THE COURT:  Okay.  It's okay.

MR. ZIMMERMAN:  We would object and ask that they -- you can put the testimony up, and that's why we -- we could do for the witnesses that actually came, but not the video.

THE COURT:  I understand.  The way he's doing it doesn't cross the line.  It's okay.

What's next?

Don't you have some complaints about their slides?

MR. BANKS:  No.  They can argue their case.

**MR. ZIMMERMAN:**  No.  We didn't use objectionable ones.

**MR. CANNELLA:**  Because there's maybe ten, at most.

**MR. ZIMMERMAN:**  I don't know that I'm going to use all these either.  I doubt I'll play Fred Zutel.

**THE COURT:**  I doubt you have time to play most of this stuff.

What else?  Good?  Any other complaints about slides?

**MR. ZIMMERMAN:**  I think there's a comment on, like, the employees, Mr. Mitchell did nothing.  That claim is -- we've already agreed that claim is not going in.  I think that's confusing to keep talking about that.

**THE COURT:**  I think it could be helpful to remind them and simplify the case.  I'm fine with that.  Has somebody been looking at these verdict forms and make sure we don't have any --

**MR. ZIMMERMAN:**  Yes, Your Honor.  I'm going to take a look at it now as well.

**THE COURT:**  Well, you got other people on the Royal team.  It's not Zimmerman team or the Cannella team.

**MR. ZIMMERMAN:**  We talked about that.

**MR. CANNELLA:**  The Holland & Knight team.

**THE COURT:**  Then it would be the Lockton team and the USI team.  That's no fun.

You guys have anything over here?

**MR. ADLER:**  I didn't see anything other than the one Mr. Zimmerman mentioned.

**THE COURT:**  Okay.  Let me go fix that, and I think we're going to be close to -- yes?

**MR. BANKS:**  The only other question I have, Your Honor, is, we will get a copy of the final instructions?

**THE COURT:**  Absolutely.

**MR. BANKS:**  Excellent.  I want to make sure I got the correct ones.

**THE COURT:**  I'm going to go back.  Next thing I'm going to do is run a final final.  There will be mistakes. When I'm reading them, I'll see mistakes in there.  I'll make that last correction on -- it's typos and stuff.  So the jury will get a really good version.

Yes?

**MS. ROYAL:**  We are just finishing up the conversations about the exhibit list.  When is the best time to read into the record the ones that are remaining.

**THE COURT:**  Oh, probably after we finish everything at the very end.

**MS. ROYAL:**  After the instructions are read?

**THE COURT:**  After the whole thing, closing arguments. It's fine.  You're allowed to do that.

Okay.  Let me go fix the verdict form, and then we're close to being ready.

**MR. ZIMMERMAN:** Judge, did you see the nonsolicit add we requested?

**THE COURT:** I saw that last sentence. I had it in there. I read it. I don't like it. It's kind of confusing, and I'm not doing it. So I get it. I looked at it. No can do.

What else?

All right. Good. Stand by for a copy of the jury instructions and a new Simmons verdict form. Thank you.

(The Court out at 9:30 a.m.)

**MR. ADLER:** Ms. Lockwood, one other thing, one other objection that I know the Court doesn't want to hear, which is on the subject of disgorgement. Not only should this not go to the jury at all, but there is serious risk of prejudice to the defendants because disgorgement is a restitutionary remedy that is necessarily remedial and not punitive, and there is significant risk that the jury would award disgorgement for acts that are not wrongful, and any disgorgement should be cabined to the wrongful or improper act and no more. And there is plenty of Fifth Circuit and other circuit and even Supreme Court law to support that proposition. Thank you.

(Recess from 9:31 a.m. to 9:42 a.m.)

**THE COURT:** All right. I think we're ready to roll now. Not sure I kept myself -- somebody give me a copy of their Lockton and Mitchell verdict forms, please, so I can use

those when I read this to the jury.  I'll get you another copy.
I have Simmons.

**MR. CANNELLA:**  I'm giving you all three.  Can I get those back?

**THE COURT:**  I just left the other two in my office.
I'm not going to do anything.

**MR. ZIMMERMAN:**  One issue on the verdict form.

**THE COURT:**  What's that?

**MR. ZIMMERMAN:**  So I understand the Court's ruling on the total, I do think it's confusing to have it three times.  I think -- that's a question -- I don't want to get three answers.

**THE COURT:**  Make sure I explain that.  There's a lot I can do, ad lib, on this thing.

**MR. ZIMMERMAN:**  Okay.  What we would propose is the natural flow of the instructions is that would go after the Lockton, because that's when they would do their damages, and then put in the total there.  So we would propose strike it from Mr. Mitchell's and Mr. Simmons's.

**THE COURT:**  I get what you're saying.  I'm not doing that.  But I'm going to try to explain it in layman's terms, and let me know if you think I got it right or not.  I think I can do it more effectively orally than trying to put it in writing.

All right.  So what will happen now is I'm going to

read these.  Probably going to take me 45 minutes.  And the interns will bring you a hard copy.  You'll get a hard copy of when I'm probably ten minutes into this.  But the first stuff I'm saying is, you already know what it's going to be.

What I really think you should do, I really think you should follow my recommendation on this, throw away whatever hard copies you might have right now, so you don't have multiple copies of these jury instructions kicking around. Because the interns are going to give you a good one momentarily.  All right?

MR. ZIMMERMAN:  And new verdict forms?

THE COURT:  No.  Keep the verdict form.

MR. ZIMMERMAN:  I think you have ours, Judge.

THE COURT:  What?

MR. ZIMMERMAN:  I think you have ours.

THE COURT:  I'm going to give it back to you.

MR. CANNELLA:  Will there be a break before we close?

THE COURT:  I think so.  I think we need to take a break.  Because by the time you listen to me go through all this, we'll all need a break.  All right?

Other than that, I think we're ready to roll.

MR. ZIMMERMAN:  Do we have a minute, Judge, or calling the jury right now?

THE COURT:  I think we're going to get the jury right now.  So interns, law students, this is the most boring part of

all.  They never teach you this in law school, you don't see it on TV, but it's part of the process, so --

**MR. BANKS:**  Mr. Adler finds it riveting, though.

**MR. ADLER:**  I'm literally on the edge of my seat.

**THE COURT:**  By the way, Kelly, my law clerk, did your job, and he retired after 30 years of being you.  So he understands all this stuff.

**THE COURT SECURITY OFFICER:**  All rise for the jury.

(Jury in at 9:45 a.m.)

**THE COURT:**  Have a seat, everybody.  Welcome back. I'm sorry for this delay.  We have been here the whole time working on things.  What will happen now is, I'm going to read you the jury instructions.  This will take me probably 30 or 45 minutes, maybe, maybe less.

This is the part they don't show you on TV or any of the law shows.  You do not need to try to write down what I'm saying.  I mean, you're free to take whatever notes you want. You're going to get a hard copy of these instructions at the end.  Exactly what I'm reading to you, you're going to get.  So I think it's helpful when you know that.

Why am I reading them to you if I'm going to give you a hard copy?  Well, sometimes the answer is, that's just the way we have to do it.  All right.  So that's what we're going to do.  All right.

Members of the jury, it is my duty to instruct you on the rules of law that you must use in deciding this case. After these instructions, the lawyers will present their closing arguments. I will then have one brief final instruction for you, and you will then go to the jury room and begin your deliberations.

Introduction to claims. To help you follow the evidence, I'll summarize the parties' positions and some decisions that were made before trial.

As you have heard during this trial, this case involves a dispute among two insurance brokerage companies and two individuals. The two companies, USI Insurance Services LLC, which has usually just been referred to as USI, and Southeast Series of Lockton, which has usually just been referred to as Lockton or Lockton Southeast, are direct competitors.

USI and Lockton do not provide insurance coverage to their clients; instead, they assist their clients in obtaining insurance coverage from insurance carriers, and they receive commission or other fees for this work.

The two individuals are Matthew Simmons and Jack Mitchell. Simmons and Mitchell work as insurance brokerage producers, meaning they find new clients, manage client relationships, and handle client's insurance-related needs while employed by an insurance brokerage. Simmons and Mitchell

have sometimes referred to as the producers in this case.

Simmons and Mitchell worked as producers at USI until January 25th, 2023, when they resigned and began working as producers for Lockton.  Both Simmons and Mitchell had contractual agreements with USI related to their employment.  During the trial, these might have been referred to as employment agreements or the USI agreements.

When the producers left USI's employment, they, along with others, filed a lawsuit, sometimes referred to as a declaratory judgment action, asking the Court to determine the validity of the employment agreements.  USI filed a countersuit, alleging that actions the producers took before and after leaving USI breached those agreements.  I have determined that the employment agreements were valid and enforceable, and you will not be considering that matter.

This trial has been only about USI's claims.  USI is the plaintiff in this trial, meaning it is the party that brought to lawsuit.  The producers in Lockton are the defendants, meaning they're the parties that have been sued.

USI has brought four different legal claims based on the events you have heard about during this trial.  One, breach of contract; two, breach of fiduciary duty; three, aiding and abetting breach of fiduciary duty; and four, tortious interference.

First, USI claims that Simmons and Mitchell breached

certain parts of their employment agreements. You should note that this breach of contract claim is only between USI and the producers. There was no contract between USI and Lockton. The Court has already determined that the producers breached certain parts of their employment agreements.

For those breach of contract claims, you will only be asked to determine whether any damages were caused by the breaches, and, if so, the amount of damages. For other breach of contract claims, you will be required to determine whether a breach occurred and what amount of damages, if any, may have been caused by any breaches.

Second, USI claims that Simmons and Mitchell breached fiduciary duties owed to USI. You should note that this claim is brought by USI only against the producers because Lockton does not owe any fiduciary duties to USI.

Third, USI claims that Lockton aided and abetted the producers' alleged breaches of fiduciary duty.

Fourth, USI claims that once the producers left USI and began working for Lockton, Lockton tortiously interfered with certain contractual obligations that remained in force between the producers and USI by inducing them to breach these obligations.

USI is asking for a judgment awarding it damages from Lockton and the producers.

Lockton and the producers deny USI's allegations.

Lockton and the producers also deny that USI's alleged damages were caused by any wrongful conduct by them and dispute the calculation of damages sought by USI.

I will now explain the law you must apply in greater detail.

Breach of contract. Elements against Simmons and Mitchell. As I've said, USI has brought a claim of breach of contract against Simmons and Mitchell. USI has also brought -- excuse me. I'll start that again. USI has brought a claim of breach of contract against Simmons. USI has also brought a separate claim of breach of contract against Mitchell.

You must consider the elements indicated below separately for Simmons and for Mitchell. If USI fails to prove any element by a preponderance of the evidence with respect to Simmons or to Mitchell, then you must find in favor of that defendant.

To prevail on a claim of breach of contract against Simmons/Mitchell, USI must prove all of the following elements by a preponderance of the evidence:

One, USI and Simmons/Mitchell entered into a contract;

Two, USI did all or substantially all of the essential things that the contract required it to do and/or that it was excused from doing those things;

Three, Simmons/Mitchell breached the contract by

failing to do something that the contract required him to do or by doing something that the contract prohibited him from doing;

And, four, Simmons/Mitchell's breach was a legal cause of damage to USI.

In determining whether a breach of contract was a legal cause of damage to USI, you should refer to a separate instruction below titled, legal cause of loss or damage.

Nature of -- breach of contract, nature of breach. The Court has already determined that elements one and two have been established as to both Simmons and Mitchell on all breaches of contract claims, and you must accept that determination.

The Court has also determined that element three, above, has been established as to some, but not all of the breach of contract claims. Thus, for some breach of contract claims, you will be determining whether elements three and four, above, have been proven by a preponderance of the evidence. For other breach of contract claims, you will be determining only whether element four, above, has been proven by a preponderance of the evidence.

This specific terms of the employment agreements that are involved in this case are as follows:

Sixty-day notice. Simmons and Mitchell were required to give 60 days' notice before resigning from USI. The Court has already determined that both Simmons and Mitchell breached

this term, which means element three in the instruction above has been established with respect to this term of the agreement. You must accept that determination.

However, element four in the instruction above is for you to determine whether the breach was a legal cause of damage to USI. If you determine that the breach was a legal cause of damage to USI, you must then determine the amount of damages, if any, caused by this breach.

Solicitation, diversion, or inducement of USI customers. Simmons and Mitchell were not permitted to directly or indirectly solicit or attempt to solicit or to divert or attempt to divert customers doing business with USI on behalf of any USI competitor. Simmons and Mitchell were also not permitted to directly or indirectly induce the termination, cancelation, or nonrenewal of services of customers doing business with USI on behalf of any USI competitor.

The Court has already determined that Simmons's notifying customers doing business with USI that he was leaving USI's employment to go to Lockton, while simultaneously failing to provide USI with notice he was leaving, constituted a breach of the foregoing provisions. The Court has made a similar determination that Mitchell notified one customer that he was leaving USI's employment to go to Lockton.

Accordingly, element three in the instruction above has been established with respect to solicitation, diversion,

or inducement of any such customers, and you must accept that determination.

However, element four in the instruction above is for you to determine whether the breaches were a legal cause of damage to USI.  If you determine that the breach was a legal cause of damage to USI, you must then determine the amount of damages, if any, caused by this breach.

Accepting a request to provide future services to USI customers.  Simmons and Mitchell were not permitted to directly or indirectly accept a request to provide future services or accept a broker-of-record letter from former USI customers.

You must determine whether this provision was breached, element three in the instruction above.  You must also determine whether the breach was a legal cause of damage to USI, element four in the instruction above.

If you determine that the breach was a legal cause of damage to USI, you must then determine the amount of damages, if any, caused by this breach.

Providing services to former USI customers.  Simmons was not permitted to directly or indirectly provide services to former USI customers on behalf of any USI competitor.

You must determine whether this provision was breached, element three in the instruction above.  You must also determine whether the breach was a legal cause of damage to USI, element four in the instruction above.

If you determine that the breach was a legal cause of damage to USI, you must then determine the amount of damages, if any, caused by this breach.

There is no claim against Mitchell for directly or indirectly providing services to former USI customers on behalf of any USI competitor.

Solicitation of employees.  Simmons was not permitted to directly or indirectly solicit USI employees or otherwise induce them to leave their employment with USI on behalf of any USI competitor.

As to Simmons, the Court has already determined that his communications with Sheila Murray, Jackie Rodriguez, and Emily Carter regarding his plan to leave USI for Lockton constituted direct or indirect solicitations or inducements for these employees to leave their employment with USI, which means that element three in the instruction above has been established, and you must accept that determination as to this term of the employment agreement and as to these three individuals.

But with respect to Madison Lieffort, Chris Kakish, and Theresa Kemp, you must determine whether Simmons's communications with those employees constituted direct or indirect solicitations or inducements for these employees to leave their employment with USI.

With respect to the breaches found by the Court to

have occurred and any additional breaches which you determine occurred, element four in the instruction above is for you to determine whether the breach was a legal cause of damage to USI.  If you determine that a breach was a legal cause of damage to USI, you must then determine the amount of damages, if any, caused by that breach.

There is no claim against Mitchell for solicitation of employees.

Breach of contract, solicitation, diversion, inducement.  As used in these instructions, to solicit means to ask for or seek something from someone; to divert means to turn a person or thing aside from one course or direction to another; to induce means to cause a person to choose one course of conduct rather than another.

Breach of fiduciary duty against Simmons and Mitchell.  USI claims that Simmons and Mitchell breached the fiduciary duty he owed to USI and that USI was damaged as a result.

A fiduciary duty exists when one party puts its trust in a second party to protect its financial or property interests, secrets, confidences, or private information, and the second party accepts that trust.  Employees owe their employers fiduciary duties.

And as employees of USI, both Simmons and Mitchell owed fiduciary duties to USI during the term they were employed

by USI, but not after.  You must consider the elements indicated below separately for Simmons and for Mitchell.  If USI fails to prove any element by a preponderance of the evidence with respect to Simmons or to Mitchell, then you must find in favor of that defendant.

To prevail on a claim of breach of fiduciary duty against Simmons/Mitchell, USI must prove all of the following elements by a preponderance of the evidence:

One, Simmons/Mitchell failed to act with the utmost good faith, fairness, and honesty, or with the highest and finest loyalty;

Two, Simmons/Mitchell failed to protect USI's financial or property interest or failed to protect USI's secrets, confidences, or private information, or used such information to the detriment of USI;

And, three, a breach of fiduciary duty by Simmons/Mitchell was a legal cause of damage to USI.

In determining whether a breach of fiduciary duty was a legal cause of damage to USI, you should refer to a separate instruction below titled, legal cause of loss or damage.

Employees do not breach their fiduciary duties when they make preparations to compete with their current employer. An employee may lawfully prepare to compete by interviewing with competing businesses or preparing to establish a rival business.  Employees also have no duty to disclose to their

employer plans to compete upon leaving their employment.

However, employees may not engage in disloyal acts in anticipation of their future competition, such as using confidential information acquired during the course of their employment or soliciting customers and other employees prior to the end of their employment.

Aiding and abetting breach of fiduciary duty against Lockton. USI has brought a claim for aiding and abetting a breach of fiduciary duty against Lockton.

To prevail on its claim of aiding and abetting a breach of fiduciary duty against Lockton, USI must prove all the following elements by a preponderance of the evidence:

One, Simmons or Mitchell breached the fiduciary duty;

Two, Lockton knew of the breach;

Three, Lockton substantially assisted or encouraged the breach;

And, four, Lockton's aiding and abetting a breach of fiduciary duty was a legal cause of damage to USI.

To determine whether Simmons or Mitchell breached the fiduciary duty, you should follow the same instructions I just gave you in connection with USI's claim for breach of fiduciary duty against Simmons and Mitchell.

Substantial assistance occurs when a defendant affirmatively assists or helps to conceal something, thereby enabling the breach of fiduciary duty to occur. Lockton's

knowledge that Simmons or Mitchell may have breached a fiduciary duty or a failure by Lockton to prevent a breach of fiduciary duty is insufficient to establish that Lockton aided and abetted a breach of fiduciary duty.

To determine whether aiding and abetting a breach of fiduciary duty was a legal cause of damage to USI, you should refer to a separate instruction below titled, legal cause of loss or damage.

Tortious interference with contract against Lockton. USI has brought a claim of tortious interference with contractual relationships against Lockton.  Specifically, USI claims that once the producers left USI and began working for Lockton, Lockton induced the producers to breach the provision in their employment contracts prohibiting them from directly or indirectly providing services or accepting requests to provide services or accepting a broker-of-record letter from former USI customers.

To prevail on a claim of tortious interference against Lockton, USI must prove all the following elements by a preponderance of the evidence:

One, Lockton intentionally interfered with the contract between USI and Simmons or Mitchell or both;

And, two, Lockton's interference was a legal cause of damage to USI.

To be liable for interfering with the contractual

relationship between USI and Simmons or Mitchell, Lockton must have acted intentionally to interfere with the contractual relationship.

An entity interferes with a contract between two or more other persons if it induces one of them to breach or refuse to perform the contract.  Therefore, Lockton must have known of the existence of the contractual relationship, and it must have either intended to induce the breach of the contractual relationship or acted knowing that its actions were likely to cause that result.

A person does not induce a contracting party to breach a contract if the contracting party had already decided to breach the contract before interacting with the person.

To determine whether tortious interference was a legal cause of damage to USI, you should refer to a separate instruction below titled, legal cause of loss or damage.

Evidence concerning USI resources and support.  I allowed certain evidence in this trial concerning the sufficiency of resources and support provided by USI to the producers and other employees during the time of their employment.  As to the producers, I allowed this evidence for the limited purpose of providing you with information about the background and context in which this dispute took place.  You may not consider this evidence to conclude that the USI employment agreements were invalid or unenforceable.  As I have

previously stated, I have determined that the USI employment agreements are valid and enforceable, and you must accept my determination on that issue.

I have not determined whether Simmons or Mitchell breached fiduciary duties. That is for you to determine. However, when making that determination, you may not consider the sufficiency of resources and support provided to the producers by USI.

As to the employees, other than the producers, you may consider the sufficiency of resources and support provided by USI on the issue of causation. More specifically, you may consider the sufficiency of resources in support when determining the reasons for the employee's departure from USI.

Evidence concerning indemnification. You have heard that Lockton agreed to indemnify Simmons and Mitchell. It is not wrongful for one party to agree to indemnify another. You may not consider any indemnification agreement when deciding the amount of damages, if any, to award.

Evidence concerning other litigation. You have heard testimony about other lawsuits involving some of the parties in this case. I allowed this evidence for the limited purpose of providing you with information about the background and context in which this dispute took place. You may not consider this evidence in deciding whether any defendant is liable or the amount of damages, if any.

No negative inference from communications with counsel.  It is not wrongful for parties to have a lawyer or to communicate with those lawyers.  Those communications are protected by the attorney-client privilege.  You may not draw any inferences, either negative or positive, because a party asserted the attorney-client privilege to protect its communications.  You may not conclude any defendant acted wrongfully by seeking legal advice from attorneys and not revealing the contents of communications with those attorneys.

Legal cause of loss or damage.  Each of the four different claims in this case, breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and tortious interference requires you to make a determination regarding legal cause of loss or damage.

A breach of legal duty, such as a breach of contract, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and/or tortious interference is a legal cause of loss or damage if the breach directly and in natural and continuous sequence produces or contributes substantially to producing such loss or damage, so that it can reasonably be said that but for the breach, the loss or damage would not have occurred.

To be regarded as a legal cause of loss or damage, a breach of legal duty, such as breach of contract, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty,

and/or tortious interference need not be the only cause.  A breach may be a legal cause of loss or damage, even though it operates in combination with the act of another or some other cause as long as the breach contributes substantially to producing such loss or damage.

Damages introduction.  If you find for defendants, you will not consider the matter of damages.  If you find for USI on any of its claims, you should award USI an amount of money that the preponderance of the evidence shows will fairly and adequately compensate USI for its damages, but your damages award must compensate USI only for the claims on which it has prevailed.

Damages breach of contract.  If you find that USI is entitled to damages for Simmons's and/or Mitchell's breach of contract, you should award USI an amount of money that the preponderance of the evidence shows will put USI in as good a position as it would have been if Simmons and Mitchell had not breached the contracts and which naturally result from the breach.  Lost profits are within this category of damages.

Damages, breach of fiduciary duty.  If you find for USI on its breach of fiduciary duty claim against Simmons, you should award USI an amount of money that the preponderance of the evidence shows will put USI in as good a position as it would have been if Simmons had not breached his fiduciary duty to USI and which naturally result from the breach of duty.

However, if you find for Simmons on this claim, you will not consider the matter of damages.

If you find for USI on its breach of fiduciary duty claim against Mitchell, you should award USI an amount of money that the preponderance of the evidence shows will put USI in as good a position as it would have been if Mitchell had not breached his fiduciary duty to USI and which naturally result from the breach of duty. However, if you find for Mitchell on this claim, you will not consider the matter of damages.

Damages, aiding and abetting breach of fiduciary duty. If you find for USI on its aiding and abetting breach of fiduciary duty claim against Lockton, you should award USI an amount of money that the preponderance of the evidence shows will put USI in as good a position as it would have been if Lockton had not aided and abetted Simmons's or Mitchell's breach of fiduciary duty to USI and which naturally result from the breach of duty. If you find for Lockton on this claim, you will not consider the matter of damages.

Damages, tortious interference. If you find for USI on its tortious interference claim against Lockton, you should award USI an amount of money that the preponderance of the evidence shows will put USI in as good a position as it would have been if Lockton had not tortiously interfered and which naturally result from the tortious interference.

Damages, lost profits. USI claims that it is

entitled to lost profits.  To be entitled to recover lost profits, USI must prove both of the following by a preponderance of the evidence:

One, Simmons's, Mitchell's, or Lockton's actions were a legal cause of USI losing profits;

And, two, USI can establish the amount of its lost profits with reasonable certainty.

For USI to establish the amount of its lost profits with reasonable certainty, it must prove that a reasonable person would be satisfied that the amount of lost profits which it may be entitled to recover is not simply the result of speculation or guesswork.  Instead, USI must prove that there is some standard by which the amount of lost profits may be established.  USI does not have to be able to prove the amount of lost profits can be calculated with mathematical precision, so long as it has shown there is a reasonable basis for determining the amount of the loss.

For USI to establish the amount of lost profits with reasonable certainty, USI's calculation must capture profit after all expenses are accounted for, net profit, not profit after only employees' salaries are considered, gross profit.

To calculate net profit, USI must subtract from total revenue all expenses incurred in the normal course of operating its business.

One second.  All right.

Turning now, burden of proof. In this case, it is the responsibility of USI to prove every essential part of its claims by a preponderance of the evidence. This is sometimes called the burden of proof or the burden of persuasion.

A preponderance of the evidence simply means an amount of evidence that is enough to persuade you that USI's claim is more likely true than not. If the proof fails to establish any essential part of a claim or contention by a preponderance of the evidence, you should find against USI.

In deciding whether any fact has been proved by a preponderance of the evidence, you may consider the testimony of all the witnesses, regardless of who may have called them, and all the exhibits received in evidence, regardless of who may have produced them.

If the proof fails to establish any essential part of USI's claims by a preponderance of the evidence, you should find for the defendant as to that claim.

The duty to follow instructions, corporation involved. Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy or -- sympathy for or prejudice against anyone.

You must follow the law as I explain it, even if you do not agree with the law, and you must follow all of my instructions as a whole. You must not single out or disregard any instructions on the law.

The fact that a corporation is involved as a party must not affect your decision in any way. A corporation and all other persons stand equal before the law and must be dealt with as equals in a court of justice.

When a corporation is involved, of course, it may act only through people as its employees, and, generally, a corporation is responsible under the law for the acts and statements of its employees that are made within the scope of their duties as employees of the corporation.

Consideration of direct and circumstantial evidence, arguments of counsel and comments by the Court. As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted, but anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial when arriving at your own decisions about the facts. Your own recollection and interpretation of the evidence is what matters.

In considering the evidence, you may use reasoning and common sense to make deductions and reach conclusions. You shouldn't be concerned about whether the evidence is direct or circumstantial.

Direct evidence is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.  Circumstantial evidence is proof of a chain of facts and circumstances that tend to prove or disprove a fact.  There's no legal difference in the weight you may give to either direct or circumstantial evidence.

Credibility of witnesses.  When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate.  You should decide whether you believe what each witness had to say and how important that testimony was.  When making that decision, you may believe or disbelieve any witness in whole or in part.

The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To determine whether you believe any witness, I suggest that you ask yourself a few questions.

One, did the witness impress you as one who was telling the truth?

Two, did the witness have any particular reason not to tell the truth?

Three, did the witness have a personal interest in the outcome of the case?

Four, did the witness seem to have a good memory?

Five, did the witness have an opportunity and ability to accurately observe the things he or she testified about?

Six, did the witness appear to understand the questions clearly and answer them directly?

Seven, did the witness's testimony differ from other testimony or other evidence?

Expert witnesses.  When scientific, technical, or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.  But that doesn't mean you must accept this witness's opinion.  As with any other witness's testimony, you must decide for yourself whether to rely on the opinion.

When a witness is being paid for reviewing and testifying concerning the evidence, you may consider the possibility of bias and should view with caution the testimony of such witness where the court testimony is given with regularity and represents a significant portion of the witness's income.

Impeachment of witnesses because of inconsistent statements.  You should also ask yourself whether there was evidence that a witness testified falsely about an important fact, and ask whether there was evidence that at some other time a witness said or did something or didn't say or do something that was different from the testimony the witness gave during the trial.

But keep in mind, that a simple mistake doesn't mean

that a witness wasn't telling the truth as he or she remembers it.  People naturally tend to forget some things or remember them inaccurately.  So if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intended deception.  The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

Verdict form and closing arguments.  Verdict forms have been prepared for your consideration, and I will explain them to you now.

We have three verdict forms.  All right.  Some of the stuff in the verdict forms repeats in each one of them and some are different.  The three verdict forms are for the three different defendants, Lockton, Mitchell, and Simmons.

All right.  I'm going to start with the verdict form with Simmons.  You will have these when you go back.  I'm not necessarily going to read every word in it.  But there is an instruction piece that applies in each one.  I'm just going to read it once.

It says, when answering the following questions and filling out this verdict form, please follow the directions provided throughout the form.  Your answer to each question must be unanimous.  Some of the questions contain legal terms that are defined and explained in detail in the jury instructions.  Please refer to the jury instructions if you're

unsure about the meaning of any legal term that appears in the questions below.

It says, we, the jury, unanimously agree on the answers to the following questions and return them under the instructions of this Court as to our verdict in this case.

Again, this one, starting with Mr. Simmons.  And the first one, it's got a heading, it says, breach of contract.  It said, question one, did USI prove that a breach of contract on the part of Mr. Simmons was a legal cause of damage to USI?

And then you circle yes or no.  Circle yes or no.

And it tells you what to do next.  You just read right down.  It's almost like a tax form.  Right?  Great. Federal court and taxes.  I know everybody is happy.  If you just read right down it, it really tells you what to do.

If you answered no, you have found in favor of Mr. Simmons and against USI and on USI's breach of contract claim.

If you answered yes, you have found in favor of USI and against Mr. Simmons in USI's breach of contract claim. Please proceed to the next question.  Which is breach of fiduciary duty.

That one has two questions.  One, did USI prove that while Mr. Simmons was employed by USI he breached the fiduciary duty?

Circle yes or no.

UNITED STATES DISTRICT COURT

Two, did USI prove that a breach of fiduciary duty on the part of Mr. Simmons was a legal cause of damage to USI?

Again, circle yes or no.

Tells you what to do next.  There's instructions. I'm not going to read them.  You can see what they say.  It's very straightforward.

It gets you to the next section, damages.  Did you find in favor of USI on any of its claims against Mr. Simmons, either breach of contract or breach of fiduciary duty or both?

Again, this is just a check to make sure that we're on the same page, because you've already been asked a version of that earlier.

And if you say no, you should not answer the following questions.  Proceed to sign and date the verdict form.

If your answer was yes, please proceed to the following questions.

What is the total amount of damages, if any, Mr. Simmons's wrongful -- oh, excuse me.  That's the wrong verdict form.  We changed that a little bit, and I need to get the correct verdict form on this one.

Who's got that handy?  I'll tell you -- what happened, members of the jury, is, we had an earlier version, and I left it in my office.  And I asked one of the lawyers in the case -- I'm not going to say who it was -- to give me it,

and they gave me the earlier one.

All right.  So let's do this.  Let's just take a very short two-minute break.  I'll get the verdict form, and that will operate also to let the lawyers get their AV stuff set up, so after I finish this, we'll roll right into the closing arguments.  All right?

And, again, that was on me for leaving it in my office, not on them.  I'm just teasing them, because one of them knows they gave me the wrong one.

All right.  We'll see you in five minutes.

**THE COURT SECURITY OFFICER:**  All rise for the jury.

(Jury out at 10:22 a.m.)

**MR. CANNELLA:**  I'm sorry, Your Honor.

**THE COURT:**  I know.  This is why I say throw away the other versions.

**MR. CANNELLA:**  I thought I had.  I'm sorry.

**THE COURT:**  I know.  It's okay.  No problem.  They needed a break anyway.  We're good.  I'll get the verdict forms.  We'll pick up on that.  And tee your stuff up.  Make sure it's good.

**MR. ZIMMERMAN:**  Judge, do you need any stipulations?

**THE COURT:**  What?

**MR. ZIMMERMAN:**  Do you need any stipulations?

**THE COURT:**  Sometimes we read the stipulations, sometimes not.  I'll be happy to do that if you guys want me

to, but I need them now.  So find them now.

            **MR. ZIMMERMAN:**  Yes, Your Honor.

            **THE COURT:**  I'll be right back.

      (Recess from 10:24 a.m. to 10:32 a.m.)

            **THE COURT:**  Okay.  We're going to give you new verdict forms.  Throw away everything.  We're back to square one.

            What do we want to do with these stipulations?  You guys want me to read one and not the others?

            **MR. ZIMMERMAN:**  Yeah.  I think there's four stipulations.  I think it may make sense to just reference -- I mean, three of them are essentially about documents.  For example, a stipulation about the documents the experts relied on, Mr. Frost, Mr. Lewis.  The parties agreed that -- so I don't think you need to read, like, document number, but maybe just reference that those are stipulated, you know, certain documents are stipulated.

            **THE COURT:**  Yeah, I know what to say about it.  But which one?  Do you want me to actually read --

            **MR. ZIMMERMAN:**  The only one we'd request to be read is the broker-of-record stipulation.

            **THE COURT:**  Okay.  I'm not reading all that.  It's all a bunch of dates and names.  I mean, I'll just tell them there are stipulations.  They'll be there.  They can refer to them.  It's 28 lines of a name and a date.

**MR. ZIMMERMAN:**  I think a summarizing is fine, Judge, that a stipulated broker-of-record letter and dates for each of the clients.

**THE COURT:**  I'll say a little something about it.  To tick all that off, especially after --

**MR. ZIMMERMAN:**  Understood.  Thank you, Your Honor.

**THE COURT:**  Find my little blurb on that.  Okay.  I think we're ready.  I was on Simmons's verdict form.  That's where I started.  Right?  Yes.  Okay.

**MR. CANNELLA:**  Yes, Your Honor.

**THE COURT:**  I'll rerun -- I got to the -- I got to the damages piece of that.  So I'll pick up right there.

All right.  Let's bring the jury out, please.

You guys are ready to press play and go.  Right?  We don't need another break?

**MR. CANNELLA:**  No other break.

**THE COURT:**  All righty.  You know what, Simmons and Mitchell form are identical.  It's just a different name.  Right?  You guys agree with me?

**MR. ZIMMERMAN:**  What's that?

**THE COURT:**  Simmons and Mitchell verdict form are identical, but a different name.  You agree?

**MR. ZIMMERMAN:**  Yes, Your Honor.  Your Honor.

Before you call the jury back, do you want to deal with read in a few exhibits, deal with that?

Okay.  Thank you, Your Honor.

**THE COURT SECURITY OFFICER:**  All rise for the jury.

(Jury in at 10:36 a.m.)

**THE COURT:**  All right.  Thank you.  We're about --
gesundheit.  Was it you that sneezed?  All right.  You need a
tissue?

**JUROR:**  No, thank you.

**THE COURT:**  All right.  We're good then.

All right.  So where we left off last time, damages
on the verdict form for Mr. Simmons I was on.  I was on that
verdict form.  Again, you'll get this verdict form.

I was on the damages piece.  It says, did you find in
favor of USI on any of its claims against Mr Simmons, either
breach of contract or breach of fiduciary duty or both?

Again, this is just to double-check to make sure
we're all on the same page here.  And you circle yes or no.

If your answer was no, you should not answer the
following questions, and proceed to sign and date the verdict
form.

If your answer is yes, please proceed to answer the
following questions.

Two, what is the total amount of damages, if any,
Mr. Simmons's breach of contract caused USI to sustain?  The
amount you determine, if any, must be only for Mr. Simmons and
not on any -- not any other defendants.  Then there's a place

you can write an amount.

Next question, what is the total amount of damages, if any, Mr. Simmons's breach of fiduciary duty caused USI to sustain?  The amount you determine, if any, must be only for Mr. Simmons and not any other defendants.  And there's a line where you can write an amount.

And then the last question I want to make sure everybody understands.  Here's what it says, if you are awarding damages to USI from any of the three defendants, please indicate the total amount of damages you intend to award for the entire case.  This is the total amount of damages after adding together the separate amounts, if any, you determine were caused by Mr. Simmons, Mr. Mitchell, and Lockton.  All right?

So what that question is, and it's on all three of the forms, it's basically asking you to total up the amounts, if any, for the whole deal, the whole case.  So if you come up with any amounts at all, each one of these three forms, the last question should have the same number in it.  All right?  And you'll see what I'm talking.

I should also say, the fact that we've asked you to do this and put lines with dollar amounts is not a subtle hint that you should come up with dollar amounts.  You, of course, have the option of coming up with no dollar amount.  So it's just giving you a way to express what your intent is.  All

right?

So the form for Mr. Mitchell is basically the same as I just read to you, except instead of Simmons, it says Mitchell.  I don't need to cover that in any more detail.

But the form with Lockton, it's different, because there are different claims as to Lockton.  It has the same instructions.  Those are the same on all forms.

And then it says, aiding and abetting breach of fiduciary duty.  Question, did USI prove that Lockton aided and abetted a breach of fiduciary duty by Mr. Simmons?

Circle yes or no.

If you answered no, you have found in favor of Lockton and against USI on USI's claim of aiding and abetting a breach of fiduciary duty by Mr. Simmons.

Please proceed to the next question, which is, did USI prove that Lockton aided and abetted a breach of fiduciary duty by Mr. Mitchell?

So that's splitting up Simmons and Mitchell.

Again, answer yes or no.

And then it tells you what to do from there.  If you answered no, you have found in favor of Lockton and against USI on USI's claim of aiding and abetting a breach of fiduciary duty as to Mr. Mitchell.

If you answered no to both the preceding questions, you have found in favor of Lockton and against USI on USI's

claim of aiding and abetting a breach of fiduciary duty. Please proceed to the section below on tortious interference.

If you answered yes to either the preceding questions, please proceed to answer the following question.

So it's number three. Did you find that Lockton's aiding and abetting a breach of fiduciary duty was a legal cause of damage to USI?

You circle yes or no. If you answered no, you have found in favor of Lockton and against USI on USI's claim of aiding and abetting a breach of fiduciary duty.

If you answered yes, you have found in favor of USI and against Lockton on USI's claim of aiding and abetting a breach of fiduciary duty. Please proceed to the following question.

I'm reading this very quickly. But when you see it, it will make sense to you.

The next claim is tortious interference with contractual relationships. The question is, did USI prove that Lockton interfered with the contractual relationship between USI and Mr. Simmons?

Pick yes or no.

Then the next question, did USI prove that Lockton interfered with the contractual relationship between USI and Mr. Mitchell?

Circle yes or no.

UNITED STATES DISTRICT COURT

The instructions then say, if you answered no, you have found in favor of Lockton and against USI on USI's claim of tortious interference with the contractual relationship between USI and Mr. Mitchell.

If you answered no to both preceding questions, you have found in favor of Lockton and against USI on USI's claim of tortious interference.  Please proceed to the section on damages.

If you answered yes to either of the preceding questions, please proceed to answer the following question.

Did you find that Lockton's tortious interference was a legal cause of damage to USI?

Circle yes or no.

If you answered this question no, you have found in favor of Lockton and against USI on its claim for tortious interference.

If you answered yes, you have found in favor of USI and against Lockton on its claim for tortious interference. Please proceed to the next question.

Again, I'm reading these very quickly.  You'll be able to see, when you go through it, exactly what it says.

Then the section is damages.  Did you find in favor of USI on any of its claims against Lockton, either aiding and abetting breach of fiduciary duty or tortious interference?

Again, this is a double-check.  You can answer yes or

no.

If it's no, you should not answer the following questions and proceed to sign and date the verdict form.

If it's yes, you have to answer the following questions.

Two, what is the total amount of damages, if any, Lockton's aiding and abetting breach of fiduciary duty caused USI to sustain?  The amount you determine, if any, must be only for Lockton and not any other defendants.

Next question, what is the total amount of damages, if any, Lockton's tortious interference caused USI to sustain?  The amount you determine, if any, must be only for Lockton and not any other defendants.

Then there's that last question I told you about that's exactly the same on all three forms.

Your number on that last question should match up.  Again, if you have a number at all.  I'm not suggesting that you do.  That's for you to decide.  But if you do decide on some kind of numbers, they all -- the last question needs to all match up.  All right?

So one more thing before I turn it over to the lawyers.  The evidence in this case includes facts which the lawyers have agreed or stipulated to.  A stipulation means simply that the parties accept the truth of a particular proposition of fact.  Since there is no disagreement, there is

no need for evidence apart from the stipulation.  You must accept the stipulation as fact, but you may give it whatever weight you choose.

And there are four stipulations you'll see here.  Some of them, you've already heard about.  One, just to mention now, it's called stipulation regarding receipt of broker-of-record letters, and it goes through the broker-of-record letters and dates.

And you will have four of those stipulations.  They'll be kind of in a pile when you go back.  You're going to get the documents and things that have been admitted into evidence.  You're going to get my jury instructions.  You're going to get the verdict forms and then this stack of stipulations.

All right.  Now, you take the verdict form with you to the jury room when you go back to deliberate.  When you have all agreed on the verdict, the foreperson will fill in the forms, sign them, date them, and bring them back to the courtroom when you return, and they will be read out loud by me.

At this time, the attorneys will now present their closing arguments.  Keep in mind that what you are about to hear is not evidence.  You have already heard all the evidence there is to hear in the case.

Each side has equal time, but the plaintiff is

entitled to split its time between an initial closing and then a rebuttal after the defendants have completed closing.  When the attorneys complete their closing arguments, I will have one brief final instruction, and then you will begin your deliberations.  All right?

Who's speaking for the plaintiff?

**MR. CANNELLA:**  I am, Your Honor.

**THE COURT:**  Mr. Cannella, whenever you're ready.

Have you alerted the clerk to any heads-up you need for time?  Five-minute warning or something?

**MR. CANNELLA:**  If you can tell me five minutes at 25 minutes.  I'd like to do 30 minutes and 15 for rebuttal.

**THE COURT:**  You want a warning at 25 minutes?

**MR. CANNELLA:**  Yes, Your Honor.

**THE COURT:**  Gretchen will handle that.  Thank you.

Go ahead.

**CLOSING ARGUMENT BY MR. CANNELLA**

**MR. CANNELLA:**  Good morning, members of the jury.  Thank you for your attention these past two weeks.  I know it's been tedious at times, especially with some of the video testimony.  But this matter is important to our client.  It's important to the defendants as well.  And we need your -- we needed your help to resolve this dispute.  And we appreciate all of your time and all of the work that you're going to do, the work you've already done, and the work that you're going to

Closing Argument by Mr. Cannella

do to weigh the evidence and make a decision in this case.

Now, I told you when we spoke a week ago Monday about our burden, and the judge just instructed you on it.  It's preponderance of the evidence.  And I said think of me as Lady Justice.  What preponderance of the evidence means is more likely than not, more likely than not.  My burden is not to show like this.  But on some of these claims, I think we've moved preponderance of the evidence and greater weight of the evidence clearly out of the water.  Right?

One, Mr. Mitchell and Mr. Simmons had contracts with USI.  They breached their contracts with USI.  They agreed that they would provide 60 days' notice.  They didn't.  They agreed not to solicit clients.  They did.  The Court's already found that they committed certain breaches, so you don't have to weigh that.  That's been done.

We also believe that we've proven causation and damages.  I'm not going to even attempt in 30 minutes to summarize eight days' worth of testimony and all those boxes of evidence that you got there.  I mean, I can't do it.

So what I'm going to focus on in my time with you are just some key things or things that I think are important that you should consider when weighing your decision.

We're here because there's a right way to leave an employer and a wrong way to leave an employer.  There's a right and fair way to compete, and there's a wrong way to compete.

Closing Argument by Mr. Cannella

We're here because Mr. Simmons and Mr. Mitchell did the wrong thing. They didn't do what they agreed to do, and that's undisputed. We're here because Lockton, their new employer helped them every step of the way. It helped them cheat. And that's why we're here.

So let's be clear about a few things, because there's a lot of evidence and testimony in the case that went to issues that really aren't in dispute and that don't matter.

First, employees are free to leave. They can leave whenever they want. They just have to leave the right way.

And, second, the clients, the clients are free to leave, too. But they can't be solicited in a way that violates the contract. So in this business, hands-off agreements are the standard. USI has them. Lockton has them. They are an industry standard.

And unless somebody does something that they're not supposed to do, the things that happened in this case don't happen. Eight employees don't just resign the same day and go to a competitor unless somebody did something they weren't supposed to do.

Twenty-seven clients don't move their business within four business days unless somebody did something that they weren't supposed to do.

And six of eight employees don't sue their former employer less than an hour after the last resignation email

Closing Argument by Mr. Cannella

unless somebody did something that they weren't supposed to do.

This all happened because Mr. Simmons breached his employment agreement with USI.  He breached his hands-off agreement.  And Lockton helped him every step of the way.

Now, Mr. Mitchell, I'll acknowledge, you know, he's younger, he doesn't have as much business.  He didn't solicit anywhere near as many clients.  He didn't have a team of people.  So he didn't solicit any employees.  But what Mr. Mitchell did was wrong too.  And Lockton helped him, too.

You've seen the evidence.  USI met its burden by a much greater than the greater weight of the evidence.

The judge has told you that the claims in the case are.

Breach of contract.  What that basically means is, did the producers breach their hands-off agreements?

Breach of fiduciary duty.  What fiduciary duty means is another word for loyalty.  Did these producers work against USI while they still were employed by USI?

Claims against Lockton.  Aiding and abetting the breach of fiduciary duty.  What that means is, could the producers have done this without Lockton's help?

And, finally, tortious interference.  Did Lockton cause the producers to breach the hands-off agreements by accepting and servicing the business?  And that acceptance includes receiving and processing the broker-of-record letters,

Closing Argument by Mr. Cannella

which are undisputed in this case.

So let's clear up some things. I already told you Mr. Simmons and Mr. Mitchell were free to leave USI. All that USI expected was for the producers to do what they said they were going to do. They both resigned without notice. They both told clients they were going to Lockton.

Mr. Simmons told every employee that left, he was going to Lockton before that employee applied to Lockton, with one exception, Theresa Kemp. I'm going to talk about her in a minute.

Clients are free to leave USI. In this business, clients typically don't. Once a client relationship forms, the client sticks. Why is that? Because the clients like to work with people that know their business. Clients don't want some rando handling their insurance business. Clients don't want to work with someone that they don't know from Adam.

So that's why there's a 90-percent retention rate in this business. And that holds true every year, despite the fact that producers come and go. Producers retire. Producers leave for competitors. 90-percent retention rate in this industry. That's both for USI and that's both for Lockton.

Most producers honor their contracts. Most producers give advanced notice and keep their hands off the clients and employees. And when producers do that, when they do what they agree to do, USI has an opportunity to keep the business, and

Closing Argument by Mr. Cannella

it has kept the business.

Tom Longhta and Misty Carson testified about this. I'm not saying USI is going to keep a hundred percent of the business when that happens.  Sometimes they do.  Most of the times, they -- they'll lose some business.  Mr. Longhta told you about an instance with some producers that went to Alliant in South Florida.  In that instance, they kept all the business.  Great.

He told you about Charlie Robinson's departure.  He gave 60 days' notice, hands off for two years.  They lost one client.

And then you've also heard about the trucking guys, you know, Steve Cardew and James Goding.  They gave notice. Sixty days, hands off, assisted with the transition.  First, USI lost about 19 percent of the business, but then they won additional 5 percent back.

So that's a range between 85 percent and a hundred percent.  And that's what USI is able to do when producers do what they say they're going to do when they leave.

USI also honors the competitor's agreements.  USI -- you heard Mr. Longhta and Ms. Carson tell you that when a producer candidate asks if they can bring over business, USI's answer is, no, you can't, and they don't let them do it. That's because USI plays by the rules.

Lockton does not play by the rules.  The rules don't

Closing Argument by Mr. Cannella

apply to them.  Lockton has producer hands-off agreements with the same restrictions as the USI agreement.  They have to provide a notice of resignation.  They have to be hands off the employees for two years, hands off the clients for two years. They can't accept business for two years.

But what does Lockton do?  In this case, Lockton accepted the business.  Lockton accepted the broker-of-record letter.  Lockton accepted the clients that they knew Mr. Simmons was telling that he was leaving and coming.  And then Lockton had its lawyers sue USI on January 25th, to get his new employees out of their agreements.  Lockton doesn't play by the rules.  Mr. Simmons doesn't play by the rules.  He doesn't think that the rules apply to him either.

Mr. Simmons is no different than any other producer. A producer's job is to leverage relationships into customers for the employee -- or the employer.  In this case, it was USI. It doesn't matter whether the personal relationship that then becomes a customer is a high school friend or a college friend or somebody to go on vacation with.  A customer is a customer, regardless of how it started out as a customer.

Mr. Simmons agreed not to solicit clients. Mr. Mitchell agreed to the same thing.  You're going to have these contracts.  You can bring them back in the jury deliberation room, and you can see what it plainly says.

Mr. Simmons and Mr. Mitchell also agreed, Section 7.6

and 6.6, not to accept or service clients that they worked with at USI for two years after they left USI.

Now, the evidence in this case is undisputed that Mr. Simmons told his clients, before he resigned from USI, I'm going to Lockton. And those clients all had the expectation that they would continue to work with Mr. Simmons. And the evidence -- and Mr. Mitchell told one client, and that's undisputed, and that client joined Lockton.

And the evidence is undisputed that when those clients got to Lockton, they were assigned to Mr. Simmons, as producer for clients he worked on at USI, and they were assigned to Mr. Mitchell for the clients he worked on at USI. And they were assigned to the same service teams.

Now, Mr. Simmons was very good at his job. Nobody disputes that. I mean, Mr. Simmons is very good at his job, and his book of business grew at USI. And, you know, the point of this slide is not to point out how much money Mr. Simmons made. That's undisputed.

But you remember when we talked a week and a half ago at jury selection, when you get paid on commission, when you do better -- when you do better when you get paid on commission, that means your business is doing better. And what this slide demonstrates objectively is that Mr. Simmons's book has grown quite a bit from 2018, when -- that was the first year after Wells Fargo became USI, until 2023. Keep in mind, he was at

Closing Argument by Mr. Cannella

USI for one month in 2023.

Mr. Simmons's book grew because he was supported by the largest account service team in Tampa. And despite his agreement, Mr. Simmons -- Mr. Simmons agreed that he would not interfere with employees and solicit them to leave the company. And the testimony in this case is that every one of these people applied to USI after Mr. Simmons told them that he was going USI.

As for Theresa Kemp, she received a text out of the blue a few days before the departure, because -- from Lockton's COO, because they knew that all these people were coming over, along with Mr. Simmons and Mr. Mitchell.

Mr. Mitchell also doesn't think he agrees -- the rules apply to him. He signed the same hands-off agreement. He agreed to provide notice. He didn't provide notice. He agreed not to solicit clients. He was successful in soliciting one, East Coast Acquisitions.

Now, since these producers don't really have a defense to what they've done. What they've come up with are excuses. They should be excused from what they did because they didn't feel supported. They didn't have enough support.

The Court just told you that those excuses don't matter. That doesn't excuse them from their contracts. It doesn't excuse them from their duty of loyalty to USI. They breached the contracts. They were disloyal while they were

Closing Argument by Mr. Cannella

still employed by USI.

So let's talk about Lockton.  Do you remember this?  Opening statement last week, you were asked three questions.  What did Lockton Southeast say?  Why did the employees leave?  Why did the clients leave?  Remember those questions?

Respectfully, those are the wrong questions.  Here's the right questions.  What Lockton says is not as important as what Lockton does.  Actions speak louder than words.  So the question you should ask is not what does Lockton say, but what did Lockton do?

Sure, Lockton says don't solicit.  But Mr. Simmons told Lockton in November of 2022 he had three concerns.  He's worried about rebuilding his book from scratch, because if he went to a new broker and complied with his agreement, he'd have to start over.  He was worried about a lawsuit, and he was worried about compensation.  And Lockton took care of all those concerns.

You saw the video testimony, Lockton -- Mr. Sharma, he's the chief operating officer of Lockton, based in Atlanta.  He said that Matt could accept the business.  So that took care of rebuild.  Matt could accept the clients.  So rebuild, that's checked off.  That was decided in December of 2022.

Lockton expected $4.3 million to come over.  Mr. Shelat told you that the inputs for this model came from Mr. Simmons.  Lockton used this model to get the loan from the

Closing Argument by Mr. Cannella

parent company, and Mr. Simmons also wouldn't have to worry about rebuilding and starting over with a new team, because when things got -- when Lockton believed that Mr. Simmons was going to come over, what did they do?  They realized there was work in the pipeline, so they posted job openings.  They posted job openings.

On December 12th, 2022, they posted a job opening. Jackie Rodriguez applied the next morning.  And when she applied -- this is from Exhibit 237.  You can take all this back with you in evidence.  When Jackie Rodriguez applied to Lockton in response to the job posting from 24 hours earlier, she applies as a member of the Simmons team.

So Lockton took care of that.  The first concern, rebuild.  Mr. Simmons wouldn't have to rebuild.  He could work with the same clients, and they were going to hire his team.

His second concern was the lawsuit.  Well, Lockton provided a lawyer on December 8th, 2022, and that lawyer is Mr. Shapiro.  And by January, by mid-January, the whole Simmons team was represented by the same lawyer.

Lockton agreed to indemnify Mr. Simmons.  What that means is, they'll pay for the lawyer and any damages.  They'll pay for everything.  Lockton will take care of it all.  All Mr. Simmons and Mr. Mitchell would have to do is comply with the advice of their lawyer.  They don't have to comply with their terms of their USI agreement, clearly, because they

Closing Argument by Mr. Cannella

haven't.  All they have to do is comply with the advice of the lawyer.

And this is the same thing that Lockton did with Fred Zutel.  Fred Zutel was the gentleman who you saw his videotaped deposition.  He's the one that Mr. Simmons reached out to in September of 2022.  Mr. Zutel discussed his experience with Mr. Simmons, which was, I left Willis, a competitor.  More than 20 employees joined me on the same day.  A bunch of clients came over on the same day.  I got sued.  Lockton provided me with a lawyer, but Lockton took care of everything.

So no worries about the lawsuit.  And, also, in this case, Lockton actually sued USI first -- rather, Lockton provided the lawyers that enabled Mr. Simmons and his team to sue USI first.

Compensation.  Lockton agreed to pay a $1.5 million signing bonus.  And they also arranged to get Claudia Mandato to fly from Kansas City to Tampa, where she spent three days processing over 25 USI broker-of-record change letters.  What that means is, the clients were all onboarding to Lockton.  And you heard the testimony from Mr. Manoj regarding the assignment of the teams.

So, no, what Lockton says is not what matters.  Disregard what Lockton says.  You have the evidence of what Lockton does and what Lockton did in this case.  And that's what you should consider.

The second question that the defendants asked, was why did the employees leave.  That's also the wrong question.  If the employees were unhappy, then they were free to leave.  They could have left at any time.  Any one of the Simmons team members could have left at any time.  But what you heard in the testimony, they could have looked for work, they could have applied.  But none of them did that until after Mr. Simmons told them he was leaving.

So that's the wrong question.  Instead, the question is, how did the employees leave?  How did the employees leave?  Now, at the beginning of the case, you were told that each employee has their own story.  Well, you've heard the testimony the last week.  Every employee's story here sounded the same.  Different people, same story.  They all had hands-off agreements.  They all didn't apply anywhere until Mr. Simmons told him he was going to Lockton.

Lockton picked the start date for all of them, even though they applied, you know, December, January.  I think Mr. Kakish applied January 16th, got an interview January 23rd, his start date was January 25th.  They all resigned from USI without notice on the same day.  They all knew that their other employees would be joining them at Lockton on January 25th, 2023.  Lockton provided them with a lawyer.  Lockton assigned them their work when they got there.  And they worked for the same USI clients until the Court told them to stop.  Six

Closing Argument by Mr. Cannella

different employees, same story.

The third question that you were asked last week was, why did the clients leave?  Again, that's the wrong question.  The question is not why did they leave.  Clients are free to leave anytime.  The question is, why did 27 clients go to Lockton between January 25th and January 30th?

Now, Tom Longhta has been in this business for 35 years, and he's told you that he's never seen anything like this in 35 years in his experience in the industry.

So how did this happen and why?  Well, it happened because Lockton and Mr. Simmons gave themselves a head start.  Mr. Simmons told clients in December and January, well in advance, that he was leaving, that he was going to leave.  And the clients left.  These are the -- these are the solicitations in December, January -- December, December/January, January, and these are the clients -- these are the clients that left.  Fourteen clients on day one, seven clients on day two, five clients on business day three, and one client on business day four.

Why did the clients leave in such short order like that?  You heard from client -- you heard the clients testify in this case.  Every client told you that they left USI for Lockton because, A, Mr. Simmons told them in advance where he was going, and, B, every one of them expected to work with Mr. Simmons when he got to Lockton.

Closing Argument by Mr. Cannella

Now, Mr. Simmons -- they also all testified that Mr. Simmons didn't tell any of them, none of them, all of them, his best friend, I can't work with you for two years.  He told them I'm going to Lockton.  I can't solicit, but you can call somebody about it.  And then they left with the expectation that they could work with Mr. Simmons.

You also -- most of those clients -- most of the clients that they called in their case were companies where somebody else dealt with the daily insurance needs.  I mean, they may have been the owner of the company.  They may have been an executive of the company.

But the person that actually dealt with the daily insurance needs was somebody else, except for one witness, and that was the guy we called, Rick Tyson.  Do you remember him?  Rick Tyson of PGT.  He's the one where I had to show him the video from his deposition about why did you leave, why did you make the change.

Mr. Tyson testified that before Mr. Simmons resigned, Mr. Simmons told them to hang on for a Teams meeting afterwards so they could have a conversation.  Mr. Tyson testified, I'm leaving for Lockton.  The seven-person team at USI that's serves your account, they're coming to Lockton with me.  Lockton is better than USI, and you have a short window to move.  Mr. Tyson said Mr. Simmons told him all of that before he resigned and went to USI.

UNITED STATES DISTRICT COURT

Now, ask yourself, is it more likely than not, is it more likely than not that Mr. Tyson was not the only client that Mr. Simmons said that to?

Mr. Simmons testified that when clients asked, I would tell them those details.

Well, which clients asked?

I don't remember.

Is it more likely than not that what Mr. Simmons, undisputed, told Mr. Tyson, you heard it from his own lips, is what Mr. Simmons told all the clients that he spoke to.

That's going to require that you weigh credibility. The judge just read an instruction on credibility. You have to do that with all the witnesses. You have to weigh their credibility.

When you're weighing credibility, I want you to think of three specific times where Mr. Simmons's testimony was directly contradicted by witnesses that were favorable to him.

First, there's Mr. Tyson, we just talked about. Mr. Tyson -- Mr. Simmons testified that he only told Rick Tyson on January 24th, I'm leaving. And then Mr. Tyson tried to call him a bunch, but he didn't answer. Rick Tyson directly contradicted that.

Second, remember the Theresa Kemp example. Mr. Simmons testified that at the USI Christmas party, Ms. Kemp told me, Lockton is the place for you. But Ms. Kemp testified

Closing Argument by Mr. Cannella

that she doesn't remember saying anything like that, and that's not something she would say, because why would I tell somebody I enjoyed working with that they should look somewhere else for a job.

Third, consider Mr. Simmons's testimony about when Lockton agreed to accept the business. His time line doesn't add up. Mr. Simmons told you that the decision to allow him to accept the business was not made until right before he joined Lockton, the week before -- you know, the week before he joined. But Anand Shelat, that's one of the -- that's the witness who built the financial model, told you that that decision was made in December of 2022.

So with respect to the clients, what USI bargained for was a fair chance to retain the business when a producer leaves. That's the purpose of the 60-day notice provision and the two-years hands-off provision. And a broker, when given that opportunity, can and will retain the clients. And the proof is from the testimony that you've heard. You've heard it from Mr. Carson -- I'm sorry, Ms. Carson and Mr. Longhta.

And that's also Lockton's experience as well. Think about it. You heard the testimony of Chris Kakish. I got it. Mr. Kakish told you that he knew -- Mr. Kakish was the gentleman that we called a week ago. He had a beard. He was the strategic adviser. He's at the top of every team chart that you're going to take back with you in the jury room.

Closing Argument by Mr. Cannella

Mr. Kakish said, I knew none of the clients that Lockton assigned me in February of 2023.  But by April of 2023, I developed rapport with them.  So he was able to develop that rapport and relationship within 60 days.

You heard the testimony from the clients that Lockton brought to trial.  Matt Fluharty, he was with ZMR.  He's the fellow that shaved his mustache because his wife got pregnant and she wanted in him to shave the mustache.  Mr. Fluharty testified that ZMR was very upset with the move to Lockton by May of 2023.  ZMR felt burned by the move to Lockton.  One of Mr. Fluharty's coexecutives described it as a shit show.  But by July of 2024, ZMR had grown satisfied with Lockton, and Lockton is doing a great job.

So why did Mr. Simmons not want to give USI a fair chance to what he agreed to?  Not because of servicing issues.  Right?  It's because of money.  It's because Mr. Simmons didn't want to rebuild, and he didn't want to take the risk that some of these clients could develop relationships with other people.

The best example of that is Mothership.  Remember Bert de Alejo?  His two partners have a relationship with Danielle Lombardo, who is another producer.  They wrote last year, if Danielle is doing a good job, then we'll just stick with Danielle, and we won't go back to Matt.  So they didn't want -- Mr. Simmons didn't want to let USI have a fair opportunity to win the business.

Closing Argument by Mr. Cannella

Now, you're going to get -- so USI was denied a fair opportunity to get the business.  You're going to get -- and they were denied a fair opportunity because Lockton got the head start.  USI didn't know this was coming till January 25th, 2023.

In addition to Mr. Simmons telling the clients that he was leaving, there were also things that were done prior to the departures, such as, the clients all got insurance summaries on January 13th, 2023 from members of the Simmons team.  All of them, despite the fact that they had different renewal dates.  They all got them on January 13, 12 days before, despite different renewal date.

You also heard testimony about missing data.  You saw in the email between Misty Carson and Michael Sutherland at 4:00 a.m.  USI is unable to find the data.  You heard the testimony of Misty Carson.  Now, there may be a dispute of where the data was.  But what cannot be disputed is that the team and Mr. Simmons leaving without notice on the same day created chaos, and USI was not able to contact the clients.  And the clients moved before USI could contact them.

So we talked about questions that I want to talk about.  Let's talk about the questions that are really important, which is the questions that you'll be asked to decide on the verdict form.

You will be asked the following questions.  Breach of

contract.  Now, the Court's found that the contracts are valid and enforceable and the contract has been breached.

The Court found Mr. Simmons breached the contract by soliciting clients and by soliciting Sheila Murray, Jackie Rodriguez, and Ms. Carter to leave, and by not providing 60 days' notice.

The Court found that Mr. Mitchell breached his 60-day notice and solicited clients.

You're going to be asked whether Simmons solicited other employees.  You're going to be asked whether producers accepted business in violation of their agreements.

On causation, you're going to be asked whether these breaches caused damage to USI.  And here's some things for your consideration.  All of these clients went to Lockton within four business days.  You read the documents from the clients.  You've heard the testimony from USI.  You've heard the testimony from Lockton.

So even though the clients are free to leave, they typically don't.  Why is that?  It's a concept called stickiness.  In this business, once a client gets with a broker, they stick with the broker unless there's a disruption.  Mr. Longhta told you that.  Lockton's own contract tells you that.  Lockton's own contract says that once a relationship is established, we expect it to last.

And the industry average for client retention is

Closing Argument by Mr. Cannella

90 percent per year under normal market conditions.  Producers come and go.  It's still 90 percent.  Anand Shelat told you, 90 percent.

Now, the books of business are valuable, even though clients can leave.  Why?  Because clients stick around.

Mr. Frost, do you remember him?  He was our damages expert.  He valuates books of business for a living.  Despite the fact that clients can leave at any time, there's a robust market to buy and sell books of business.

Also be asked about breach of fiduciary duty.  Now, the Court's already instructed you on what that means.  What I think it means, I think of the game follow-the-leader.  Remember, you can only follow one leader in that game.  You can't follow two.

From November 2022, January 2023, Mr. Simmons had a follow-the-leader problem.  On the one hand, he has a follow-the-leader problem.  On the one hand, Mr. Simmons has USI, his employer.  On the other hand, you have Lockton, where he wants to work.

Your Honor, I'm going to cut into my rebuttal time.

**THE COURT:**  That's okay.  As long as you don't go over the total time, you can do however you need to.

**MR. CANNELLA:**  Mr. Simmons has a substantial problem, and the evidence is substantial.  It's undisputed he notified clients before he resigned, and he expensed trips and meals to

USI.  He told key members he was going to Lockton before he resigned.

Mr. Simmons made a business decision.  He made a business decision to breach his duty of loyalty and to breach his contract.

Lockton made a business decision too.  And you're going to be asked to consider whether Lockton aided and abetted the breach of fiduciary duty.

The Court's instructed you on the law.  Essentially, the question is, could the producers have breached their loyalty without Lockton's help?

And the evidence here is very clear.  You don't need me to repeat it.  Lockton knew what Mr. Simmons was doing.  They knew he was telling the clients.  They were going to accept the clients when they came.  They provided counsel to Mr. Simmons and his team to give them comfort that they would be protected for breaching their fiduciary duty.  They provided indemnification so that Mr. Simmons and Mr. Mitchell would face no consequences for breaching their fiduciary duty.  That evidence is clear.

You'll also be asked whether Lockton tortiously interfered with the producers' contracts.  And what that comes down to is the acceptance of the business.  It's undisputed that Lockton accepted the business, and they did so on behalf of Mr. Simmons and Mr. Mitchell.  There's no producer assigned

to these accounts, which means that all the revenue that goes into these accounts is for Mr. Simmons's benefit and Mr. Mitchell's benefit.  They accepted the broker-of-record letters.  There's no dispute on that.

We've talked a lot about causation, so I want to finish with damages.  Causation should be clear.  When USI is given the opportunity, they keep the business, and they keep the clients.  You heard that that range is anywhere between 85 percent to 90 percent to a hundred percent when a producer does what they say they're going to do.

As for damages, only Robin Frost model shows you the damages tied to the real evidence in this case.  In this industry, client retention is measured by revenue, not client-by-client.  Mr. Lewis's approach, client-by-client, is an approach that no broker in the industry uses to measure client retention.  Lockton measures client retention by book of businesses, by revenue, not client-by-client.  USI does the same.

Mr. Lewis, who is the gentleman who appeared yesterday, he ignores retention rates.  His model is for two years only, and he wants you to assume that after two years, had there not been a breach, all of the clients that left would have left anyway.  That's contrary to the evidence in this case.  Mr. Lewis also provides a 60-day departure model that assumes that if there was no breach, the clients who did not

Closing Argument by Mr. Cannella

have renewals after March 31st would have left USI anyway.

That's also contrary to what this -- how this industry works.  Mr. Frost, who has professional real world experience in this business, not some guy that spends 75 percent of his time in litigation, right, Mr. Frost provided you with three models.  You're going to be able to take each of them back with you.

Those models show three different scenarios with different retention rates, 80 percent at year one, 85 percent at year two, 90 percent at year three.  90 percent is the actual real-world experience, and the lost-profit number is 4,965,000.

You're going to be asked to fill out a verdict form. There are different claims, and there are going to be different damages.

Let's talk first about Mr. Mitchell.  Mr. Mitchell, did he breach his contract?  Yes.  Did it cause damage to USI? Yes.

So what is the measure of that damage?  East Coast Acquisitions was about a hundred thousand dollars in revenue a year.  That's 2.2 percent.  You can just apply 2.2 percent to the 4.965, and you get $109,000.  That's the lost profits figure.

Mr. Simmons, did he breach his contract?  Yes.  Did it cause damage to USI?  Yes.

Closing Argument by Mr. Cannella

Mr. Simmons's book is 98 percent of the 4.3 in revenue that came over.  Sorry.  The damages figure, the lost-profits figure against Mr. Simmons would be $4,866,000.

Mr. Mitchell breached his fiduciary duty -- did Mr. Mitchell breach his fiduciary duty to USI?  You know, we think you should check the box yes, because it is undisputed that he did at least one thing for -- that was not for the benefit of USI.  Mr. Mitchell was paid $18,000 in January of 2023.  We think that money should be returned to USI.  It should be disgorged.  That's $18,491.

Mr. Simmons breached his fiduciary duty to USI.  In November, December, and January, he worked for the benefit not of just USI, but the benefit of Lockton, the competitor.  We believe that for breach of fiduciary duty, the damage for Mr. Simmons total of $2,174,000.

Where does that leave us with Lockton?  Claims against Lockton are for aiding and abetting the breach of fiduciary duty and tortious interference with the contract by accepting the business and inducing the acceptance of the business, the damages figure for that is $4.9 million.

As the judge has already told you this morning, spent a lot of time on the verdict form, you don't add all that up.  It's not going to be 4 million, 4 million, 4 million, and we get 16 million.

So I've gone for about 37 minutes by my count.

Closing Argument by Mr. Banks

Mr. Banks is going to speak next, and then I'll have an opportunity to rebut.

Thank you very much.  Please render a fair and just verdict.

**THE COURT:**  How much time are you taking, Mr. Banks, for the benefit of the jury, so they know?

### CLOSING ARGUMENT BY MR. BANKS

**MR. BANKS:**  I believe we have 45 minutes, so they know.

Ladies and gentlemen, thank you very much for your attention the last two weeks.  I'm going to speak on behalf of all the defendants to keep this efficient rather than dividing things up.

When we started this case a week and a half ago, Mr. Shapiro told you about the impossible choice that Matt Simmons and Jack Mitchell faced at the end of their time with USI.  I'm not saying that their problems with service excused any breaches, but it explains the situation that they were in.

They felt they could not take care of their clients anymore at USI.  They did not want to be put in a position where they would be misleading their clients and handing them off to people that they did not think could care for those clients.  They made the decision that they made.  We understand that that was found to have been a breach.

But they were acting in a way that they thought was

Closing Argument by Mr. Banks

taking care of their clients. They were not doing this to make money. And the only -- the biggest piece of evidence that you need to know about that, is that Mr. Simmons was offered more money by Lockton to leave the clients behind. He was not doing this to steal from USI or to make more money for himself. He could have made more money. He could have avoided all of this if he had just left his clients and left them to the wind. But these were his best friends, as you heard, and he didn't feel morally he could do that.

I told you -- just like Mr. Cannella said, I told you at the beginning of the case, that this is really also about three other questions. What was it that Lockton actually told Mr. Simmons and Mr. Mitchell to do? And it is absolutely important. Because what they have to do to prove a claim against Lockton is show that Lockton was somehow involved in solicitation of clients or some other wrongful activity.

There is nothing wrong with Lockton providing lawyers to Mr. Mitchell and Mr. Simmons. There's nothing wrong with them interviewing him. And there's certainly nothing wrong with them telling him, don't solicit your clients, don't solicit your employees, and don't take any confidential information.

That's what they actually told Mr. Simmons and Mr. Mitchell to do. They were free to accept business once Mr. Mitchell and Mr. Simmons left. That's why there's -- I

Closing Argument by Mr. Banks

mean, they're free to do that.  But they did not assist or participate in any way with any communications with the clients beforehand, other than to agree at Mr. Simmons's request that it would be okay for him to simply tell them that he was thinking of leaving.  They did not ask him to do that.  They did not induce him to do that.  They agreed, because Mr. Simmons wanted to.  So that's number two.

Number three, listen to why the employees left and what would have happened if things had gone differently.  Would they have still left anyway?  Similarly, why would -- did the clients leave?  And I said there's a related question there, too, which is what would have happened if Mr. Simmons and Mr. Mitchell had done all the things that USI expected them to do?  Would those clients have stayed at USI?  And that is because this is a case not just about liability, this is a case about damages.

There have been breaches already found, but there's been no finding that any of that caused harm to USI, let alone how much.  And I want to be clear, USI came into this Court and they were asking for $4.9 million from everyone.

The only side that is giving you an ability to award fair damages in this case has been the defendants.  We have come in, and we have said, look, if they should have stayed for 60 more days, here's the business that would have been included in those 60 days.  And if you think that any of those customers

Closing Argument by Mr. Banks

would have stayed longer, here are the numbers that you can award.  We're giving you that information.  That's your decision.  But we're the only side that's done that, because we're trying to get to a fair result, not a windfall result, which is what USI wants in this case.

All of the employees came here and testified, and they told you why they left.  All of them would have left anyway.  USI would not have had these employees, even if Mr. Mitchell and Mr. Simmons had stayed for 60 more days, even if they had not said anything in advance.

You remember what they said.  Madison Lieffort said I already had decided I was going to leave as soon as Mr. Simmons left, if he did.  You heard from the other employees.  They all said it, if Mr. Simmons was gone, I wasn't going to be there, except, I'll admit, Theresa Kemp didn't say that.

That's because she didn't have anything do with Mr. Simmons.  Her decision to leave was because the CEO of Lockton Southeast knew there was some people coming onboard, he thought, I should call my old friend Theresa, so he did.  They did that all on their own.  Had nothing to do with Mr. Simmons, other than Mr. -- sorry, Mr. -- Doug.  Sorry.  I'm forgetting his last name right now.  But other than the fact that he knew there was some other people from USI coming over.  That's it.  They all would have left anyway.

USI hasn't even assigned any damages to them.  You

heard that from their expert. They haven't said because we lost these employees, we lost X, Y, and Z dollars. They tried to tie to it the clients. Right? They tried to tie it to the clients. That's why the real question is, would the clients have stayed?

USI bears the burden of proving its case. You've heard that in the instructions, and I will show you them again in a few places. You had the benefit of actually hearing from several clients, and not one of these clients said it would have stayed at USI.

Mr. Tyson said he would rather sue USI than work with them again.

Mr. Haskell said, I'm with Matt Simmons till the day I die, even if he has to wait a couple years. He has no problem with that.

Mr. de Alejo, yeah, his company was a little upset. They don't like being assigned to a rando. They didn't like not having Mr. Simmons around. But he said, I wouldn't have gone back to USI and I wouldn't have stayed.

Mr. Fluharty, one of Mr. Simmons's best friends, said he had no problem waiting. And if he had to look around for someone else, he had plenty of options.

Mr. Schmidt said, hey, look, if I couldn't have worked with Matt in the first place, I might have waited for Matt. But my other alternative is, my other best friends

handles the rest of my insurance. I would have gone to him. He wasn't going stay at USI under any circumstances.

And Mr. Pagidipati, he wasn't going to stay at USI under any circumstances. His business partner already used Lockton. He had other options, and USI was never on that short list.

These clients would not have stayed at USI under any circumstance. And this is really important. Because USI's claims are not a speeding ticket.

What do I mean by that? If you get a speeding ticket, you go too fast, you get a ticket, says you've got to pay however much you've got to pay, 250 bucks, 350 bucks, just because you sped.

That's not this case. USI has to prove that what happened here actually caused the harm. And you don't have to take my word for it. It's in the instructions that the Court gave you. They want $4.9 million. Did they prove that?

Did they prove that all of those clients would have stayed initially and just kind of, you know, a little more attrition the first year, and then other than that, stayed like normal? They have to show, as the Court instructed you, that those breaches or bad acts were the legal cause of damages.

So let's take a look at what the instructions say. All right. So we've got breach of contract elements. Says the USI has to prove all of the following elements by the

preponderance of the evidence, including that Mitchell and Simmons's breach was a legal cause of damage to USI.

What does that mean?  Here we go.  Legal cause of damage is you have to prove that it can be reasonably said that but for the breach, the loss or damage would not have occurred. They have the burden of proving that.

That's what Mr. Lewis was trying to testify to.  You don't measure just the value of some accounts on one day.  You look and say, what would have happened without the breaches. It's USI's burden to prove that.  It's not ours.  USI has to prove that if these things didn't happen, we would have kept the business.

Now, again, we've given you the menu.  We have said, if you believe that certain clients would have stayed, these are the damages.  USI is asking for everything, for you to assume that they all would have stayed, even though you heard from the clients who said they wouldn't.

Each of the claims in this case will have another instruction on damages that will also clarify that USI can only be put in as good a position as it would have been if Simmons and Mitchell had not breached the contracts or breached the fiduciary duty or whatever.  Again, USI can only be put in as good a position as it would have been, not what it wants, but what it proves it would have earned.

That's what this case is about.  It's a case largely

about damages.  All right.  So they have to prove what would have happened.

They have to prove also that their lost profits were reasonably certain, not just, you know, this might have happened.  They have to prove to you with reasonable certainty that this is what would have happened.  It's a high burden for USI to prove.  That's because that's the way our legal system is set up.  The plaintiff wants to recover damages, recover whatever their case is, they have to prove that.  They have to show it's more likely than not that they would have kept those customers.

Again, that's your decision, and we've given you the option of how to award those damages.  You are not supposed to speculate.  That is clear in the Court's instruction as well, because there is an instruction on lost profits, and it explains reasonable certainty.  It also explains that that cannot be the product of speculation or guessing.

And you remember -- you may remember when Mr. Frost was on the stand, I asked him about what happens after two years when these -- you know, Mr. Simmons and Mr. Mitchell are allowed to compete full throttle?  He said, yeah, they can do that after two years.  I said what happens then?  It would be speculative.  Right?  He agreed.  Because he doesn't have specific data on what happens then, nor does USI.

I know Ms. Carson said, well, we keep everything

Closing Argument by Mr. Banks

90 percent all the time, but the proof is in the pudding.  They don't have any data to back that up.  They could have it.  They could have done that analysis, but they didn't.  They've never done it.  Because they know, and everyone knows, you don't have to check your common sense at the door.

We've talked about stickiness.  The only thing sticky with these clients is their relationships with Mr. Simmons and Mr. Mitchell.  Yeah, the service team helps.  Sometimes the brand helps.  But for these clients, they knew Mr. Simmons for as long as they did and worked with him and trusted him.  That's where the stickiness was.

Okay.  Quickly, what are the claims?  There are two claims against Mr. Simmons and Mr. Mitchell.  The claims are that they breached their contract and they breached their fiduciary duty.  And there have been findings that they did breach their contracts.  They breached their 60-day notice provisions.  They breached, in Mr. Simmons's case, the Court found that Mr. Simmons solicited clients by telling them he was leaving and where he was going, et cetera, and it found that he had solicited some of the employees by the words he used.

Mr. Mitchell didn't solicit any employees.  That's out.  Mr. Mitchell was found to have solicited one client by calling that client the night before and saying, I'm leaving tomorrow.  That client left.  Mr. Mitchell never did any work on that account, never did a thing for them after they came

Closing Argument by Mr. Banks

over to Lockton and they stayed.  They've never left.  Their renewal didn't come up in 60 days.  It came up in September.  So if he had stayed 60 days longer, USI wouldn't have gotten any more money from ECA.  That's the claim against Mr. Mitchell.

Then there's the breach of fiduciary duty claim.  Pretty similar, but not exactly the same as the breach of contract claim.  One key difference is that the fiduciary duty ends when their employment ends.  Any breach of fiduciary duty had to take place by the time they resigned.  After that, they had no fiduciary duty.  They still had some contractual obligations, but no fiduciary duty.

So what happened?  We heard all the evidence.  Again, I'm not trying to excuse anything, but it's important to understand the mindset.  You heard about Mr. Simmons, how he spent the year and a half trying to get more support for his team.  He met with Mr. Longhta and even cried, and that was never taken care of.  They weren't -- you know, this is some examples.  He's short people, he's drowning, my team is full.

Mr. Mitchell also complained that he needed more support, leading to Blake Varnadore, one of the property casualty group leaders, to write this email on May 5th, 2022.  This is important because what Mr. Varnadore recognized was that these guys weren't alone.  They were hearing it from virtually all of the senior producers.  And as Mr. Varnadore

Closing Argument by Mr. Banks

warned everyone at USI, if this doesn't change, we are going to lose members from both our service and production teams. That's as of May.

Things got worse during the year. Right? You heard about it from Ms. Murray. You heard about it from Ms. Rodriguez. You, of course, heard about it from Mr. Mitchell and Mr. Simmons. They ended up losing key members of their team. They lost Brooke Valentin. The one person who was supposed to help them with their specialty resources, Lisa Power, was tied up at the end of the year on FTX work.

Things got worse. So it shouldn't be any surprise that those employees left. And, in fact, after Mr. Simmons left, as we heard, most of the rest of his team also left. They didn't leave right away. They were there to help USI, at least initially. But they left, too, before too long. Why? Because without Mr. Simmons, the glue, the sticky person, they had no reason to be there.

At the end of the day, Mr. Simmons faced this choice, what do I do? He knew one thing that would happen, if he gave his 60-day notice, USI would control what he could say to his clients. We saw that in the letters they sent to other departed producers. They told him you can't talk with the clients about your resignation or any other reason without permission from your supervisor. We're going to transfer your accounts. You may have to participate.

Closing Argument by Mr. Banks

But, basically, he wouldn't be able to work on those accounts for 60 days.  He'd have to tell Matt Fluharty and his other best friends, CJ Schmidt, here, meet this other person, this rando, they're going to take care of your account.  You don't think those clients would have been suspicious at that point?  What's going on?  Why can't I work with my best friend?  Mr. Haskell says, I want to work with Matt until I die.  He wouldn't have been suspicious?

And in the event you're contacted by clients, contact your supervisor.  So Mr. Simmons was like, I don't want to do that.  I don't want to mislead people.  I don't want to put them in the hands of someone I don't trust.

And so he decided, you know, he had to face this choice.  This looks like a crazy picture.  This is the old Greek story, mythological story of Odysseus.  He's trying to get home from the Trojan War.  He faced the point where he had to go and face this monster, Scylla, that was going to eat his ship, or he'd have to go past this multiheaded dragon thing called Charybdis, and it would eat a bunch of his soldiers.  Right?  So it was an impossible choice.  What do you do?  You've got to choose one or the other.

That's where Mr. Simmons was.  He had to choose one of these two lousy options.  He made the choice he made.  You might disagree with it.

The question is, what are the consequences?  Is it

Closing Argument by Mr. Banks

$4.9 million or is it something else?

Okay.  The evidence also showed that Mr. Simmons and Mr. Mitchell worked their tails off for the rest of their time at USI.  They kept closing renewals until literally the day they left.

They left at -- this is even though they're losing key people.  Right?  Brooke Valentin left.  They didn't abandon ship then.  They stayed through the busiest time of the year. They took care of clients, but they also took care of USI.  USI made a lot of money during those couple of months.

They resigned after that period was over.  If they had wanted to maximize their revenues, they would have left in November before all that business closed.  Again, this wasn't about making money.  It wasn't about hurting USI.  It was that they wanted to leave and they didn't want to leave the clients behind.  At least Mr. Simmons did.  Mr. Mitchell, he only told one client.  He didn't think they were going to leave anyway.

Okay.  They also took the time to organize their files and leave everything in order.  I've got to address something here, which is this idea of destroying data. Ms. Carson testified that there was this system YouEngage, and there was data missing from it.  As you heard from everyone else in this case, YouEngage is something that was set up when you're prospecting a new client, and that -- it's data from years ago.  It's not new or current data.  It's not where you

keep your current communications.

We don't know what's -- what happened with YouEngage. Mr. Simmons couldn't edit it. None of his team members could edit it. There was one person who could edit it. He could view it. His team couldn't even see it. But -- so this old data, I don't know. Was it missing? I don't know. No one knows. But it's not the data that someone should have been using for current context.

As the witnesses, including Ms. Rodriguez, Ms. Carter, Ms. Lieffort, and Mr. Simmons, explained, the current data was on ImageRight and Sagitta. Sagitta is where they track all of the communications ongoing with the clients. That was all there. You heard from them. ImageRight is where all their emails are, all of the policies, all the renewals. Everything is there.

You don't just have to believe me. It's in the documents. This is Defense Exhibit 203, one of the emails after Mr. Simmons and Mr. Mitchell left. They're tracking things. They know. Where do they put it? Sagitta and ImageRight. Those are the databases that were used, not this YouEngage. Mr. Carson wasn't even the one who looked into it. She talked about an email sent to her by somebody else.

You can bet if they have logs or evidence that Mr. Mitchell or anyone else -- Mr. Simmons or Mr. Mitchell or anyone else affiliated with them had altered that data, they

would have shown it to you.  They knew when the data was altered, too, but they didn't tell you that.  All of that would have been in the log, as Mr. Simmons testified.  None of that was shown to you.  That was a misleading impression created by Ms. Carson.

MR. CANNELLA:  Objection, Your Honor.

MR. BANKS:  These folks had nothing to do with this.

THE COURT:  What's the objection?

MR. CANNELLA:  Can we sidebar -- the objection is I think that's counsel -- it's a comment that impugns the integrity of what opposing counsel introduced into evidence.

THE COURT:  Come on up.

(Bench conference begins.)

MR. BANKS:  Mr. Simmons was accused of lying.

MR. CANNELLA:  It's different, though.  The argument was, if they had evidence that this would happen, they would produce it.  So, instead, they put up testimony that they knew was false.  That's --

MR. BANKS:  I didn't say that.

THE COURT:  I didn't think he said that.  I think it's a hole in the proof, you know, why didn't they tell you that?  Well, because they don't have it.  I don't think it means somebody is lying, the way he said it.

MR. ZIMMERMAN:  That was the part when Mr. Cannella jumped up, when he said he heard testimony that was misleading.

**MR. CANNELLA:**  And that we presented it, knowing it was misleading.

**MR. BANKS:**  I did not say Mr. Cannella did anything wrong.

**THE COURT:**  Why don't you just go back and focus on the witness.

(Bench conference off the record.)

**THE COURT:**  The lunch is back there.  All right.  So we've got lunch for you.  We're getting close.  Anybody need a break?  Still good?  No?  You're looking at me horrified, like a break?  I don't want a break.

Keep going, Mr. Banks.

**MR. BANKS:**  Thank you, sir.  All right.  Also got to address the change notices.  Mr. Simmons and Mr. Mitchell did tell some clients they were going to leave.  We understand that.

I know that if they went beyond that, it was contrary to the instructions from Mr. Sharma.  But in their heads, they thought they were trying to avoid solicitation.  They thought that what they were saying was not solicitation.  They testified to that.  It was.  We understand that.

But, still, the big question is, what damage did it cause?  Mr. Mitchell told two people.  One of them left.  He didn't even think they would.  Mr. Simmons told others.  Is that why they left, or did they leave for their own reasons?

Closing Argument by Mr. Banks

That's the question for you to decide.  I think the evidence is pretty clear from the actual witnesses who testified, those folks wouldn't have stayed even if they had found out later.

All right.  The other thing to remember is that Mr. Simmons's team, for the most part, was still there.  USI had every ability to still compete.  They even told clients they did.  They said we can still maintain all your service and your account management team is intact.

All right.  Let's talk about -- one last thing.  I said Mr. Simmons made a lot of money for USI there those last couple months.  He made $1.85 million for them the last couple months.  That's the business that was closed.  While he was interviewing at Lockton.  That went until the day he left.  $725,000 for PGT.  USI was taken care of, as were the clients, and they made plenty of money during this time off of Mr. Simmons.

Lockton, as the judge said, there's no contracts between Lockton and USI.  There's no fiduciary duties.  They are competitors.  They get to go after each other.  They get to compete for clients.  They get to compete for employees.  If Lockton goes out and recruits ten people and says we want them to all start tomorrow, they can do that.  Nothing wrong with that.

Lockton, you've heard from a lot of witnesses.  This is Mr. Sharma.  He explains, you know, a lot about the company,

Closing Argument by Mr. Banks

and how they can have a much smaller profit margin, which allows them to have more resources to take care of their clients, take care of their employees.

I don't want to belabor this.  We know about the resource difference.  This is why Lockton was attractive to the different people who went there, because they had way more resources to support these teams and these clients, even though Lockton has fewer producers.

So for a person like Sheila Murray or Jackie Rodriguez, of course they would want to go to Lockton.  It didn't matter if they found out in advance or if they found out on the day Mr. Simmons left, they were going apply.  And they were going to get a job very quickly within a few days.  They would have been at Lockton anyway.

All right.  We heard a lot about Project Buccaneer, I think in the opening statement it was especially mentioned a lot, like it was some nefarious plot.  Project Buccaneer is a code name for an internal project.  There's lots of internal projects at companies.  No big deal.  It's not named Buccaneers because they're pirates.  It's named Buccaneers because of Tampa.  It's the football team.  It is common.  Mr. Simmons did not want his name out there.  Because what happens when you're looking for a job and your old employer finds out you're loose, you're out there looking?  You lose your job.  So it was a natural thing for him to want to keep it confidential.

Closing Argument by Mr. Banks

So what was Lockton doing?  They were doing what any company would do.  They were evaluating, should we hire this guy?  Should we hire these other people?  Does it make financial sense?  Do we like him?

You heard the evidence.  All these secret meetings, supposedly.  They're interviews.  He went to Kansas City to see if he liked the people who led the Center, and the people at the headquarters wanted to see if they liked Mr. Simmons. Nothing wrong with that.  Mr. Simmons interviewed with ten people at USI when he was just starting out his career.  Of course they would do a little more now when he's a bigger producer.  It's a normal thing to do.  There's nothing wrong with it.

You heard a lot about the $4.3 million.  I've just got to clarify.  The evidence was from Mr. Sharma that that $4.3 million that was projected was about half, brand-new business that had nothing to do with USI.  And they thought, yeah, maybe a million-and-a-half to $2 million would follow Mr. Simmons from USI if we let him accept the business.  That's where the number came from.  Yeah, the number's close to the amount of revenue that came over.  That's not how it was developed.  Nobody knew what clients would come.

The reality is also that Mr. Simmons has generated approximately $6 million in new business since he came over. So that 4.3, yeah, sure, it looks similar to the number that

came from USI.  But if you include the new stuff he generated,
he's like ten-point-something now.  That's the reality.  It's a
projection.  It was a guess that they put together to see does
it make sense to hire this guy.

Another bit of reality is that, again, Lockton
offered him more money to not bring the business.  So to say
that Lockton was trying to steal something or Mr. Simmons was
trying to hurt somebody or make more money, it's just not true.
If he wanted more money, he wouldn't have done it.

The other thing is that these meetings, like I said,
they're interviews.  It's not a grand conspiracy.  Not going to
play the video.  You remember Mr. Zutel.  You heard a lot about
it in closing.  Mr. Zutel gave him the game plan.  He said,
don't worry.  Lockton will take care of you.  They'll give you
lawyers.  They'll take care of everything.

That's not what Mr. Zutel said.  Mr. Zutel said that
in his case, it settled.  It settled quickly, and he thinks all
matters settled quickly.  Then when asked, what else did you
tell Mr. Simmons about what you learned from that, what was the
plan going forward, and Mr. Zutel said in response to that
question, I told him don't take anything, don't solicit any
clients, don't solicit any employees.  That was the game plan
from Mr. Zutel.

It's also what Mr. Sharma said.  You heard a lot of
testimony from Mr. Sharma on video.  He said this multiple

Closing Argument by Mr. Banks

times, that he told Mr. Simmons, don't solicit, don't take, don't solicit employees.  Told them to work and run through the finish line.

That's what Lockton said.  Lockton didn't do anything contrary.  Lockton did not try to solicit any clients.  Certainly never told Mr. Simmons to do it.  That's why there's no claim that Mr. Simmons -- or that Lockton interfered with those parts of Mr. Simmons's contracts.

Truth is that Simmons and Mitchell made their own decisions.  You heard it from them.  They were not forced into anything by Lockton.  They did the things they did because they thought those were the right things to do at the time.  Lockton did not induce anything.

So what did Lockton actually do?  They recruited and interviewed people.  They posted jobs once Mr. Simmons made a decision to come over.  You heard that from Mr. Cannella too.  He said that once Mr. Simmons had made kind of the fairly firm decision he was going to Lockton, Lockton knew there was going to be business with Mr. Simmons coming on, so they started to hire people.

Some people from Lockton -- some people from USI definitely applied.  Mr. Simmons told them, we understand that.  But, again, Lockton did not have anything to do with that.  Lockton considered not only the USI people, they considered people who didn't come from USI.  That's what happened.

But it shouldn't be a surprise that people from USI would apply. They knew how overworked they were. Everyone knew how overworked they were. They knew these people were not happy. Mr. Simmons had said I expect I'm going to have people who will want to follow me. That's true.

They conducted financial analysis. Nothing wrong with that. They hired lawyers. Nothing wrong with that.

Let me address one thing. They said they filed a lawsuit. The lawsuit was a request to a court. Eventually, it ended up with Judge Barber. That was a request to please tell us what's enforceable and what's not in our contracts. Here's why we think they shouldn't be enforced. They didn't ask for money. USI has never come in and said we were harmed by this in any way. They were asking for help. What do we do? What can we do, and what can we not do?

You heard Mr. Simmons explain. He said, we stayed away from the business far while. Right? There was a brief period of time where he took a few client calls and answered some questions, helped out. That's it. Mr. Mitchell didn't do anything. Some other people did stuff. But I want to be clear. There's no claims in this case against them, and there's no claim that Lockton breached their agreements, violated their agreements, caused the breach, or anything.

So Sheila Murray, you know, Chris Kakish, and all of them, their contracts had nothing to do with this case.

Closing Argument by Mr. Banks

There's no claim against them, no claim for interfering with their contracts. That's -- I don't know why we spent so much time. We did. They're not part of this case for any liability.

What else did Lockton do? They ultimately accepted business. They're allowed to do that. They're allowed to compete with USI. Again, we asked the Court's guidance. Team members were taken off the accounts immediately when the Court said to. It was a matter of days that people did anything.

For the most part, all they did was show up on the team chart. Showing up on a team chart is not the same as actually working for a client. They did tell you they worked for some clients for about four days. That's it. That's not why clients left. And clients have stayed anyway. That's not what caused any harm to USI.

Competition is a good thing in general. We want companies to compete. It's good for the employees. It's good for the clients.

Let's talk damages. Like I said, a lot of this case is really just about the damages. Mr. Frost admitted on the stand, he didn't actually calculate damages. He created a valuation of some accounts. He did not assess the damages suffered by USI. He never considered what would have happened but for the breaches. He admitted that repeatedly.

He said, I took a snapshot in time. I didn't

UNITED STATES DISTRICT COURT

Closing Argument by Mr. Banks

consider what would have happened.  I didn't consider what could have happened.  I just did a snapshot.  That's not damages.

So what are some of the problems with Mr. Frost's analysis, besides the fact it's not damages?

One is, he measured this out forever.  He assumed that someone like John Haskell, who said, I want to be with Matt Simmons until the day I die, would have stayed with USI forever.  He didn't break anything down by claim or defendant or client.  Instead, USI's attorneys are having to ask you to go and do math to figure out what the damages are for Mr. Mitchell.

The only people who have told you, again, what the potential damages were for Mr. Mitchell was the defendants.

He didn't analyze causation.  He made a number of unsupported assumptions.  For example, he assumed -- and he said that.  He said I assumed USI would lose 10 to 20 percent of the clients in year one.  He didn't have any actually data to back that up.

Mr. Longhta admitted USI has no statistics about what happens when a producer leaves.  They have never measured that.  They've never tried to measure it.

Ms. Santiago, you saw her video.  I won't show it to you again.  You heard her say the same thing.  She agrees.  Clients leave when producers leave.  We have no idea how many.

Closing Argument by Mr. Banks

Mr. Frost said, I never got those statistics.  I asked him, did you get any of those numbers?  No, I didn't.  No.

He also -- well, let me point out some reality here, the total amount of the book of business that left was 38 percent.  If 10 to 20 percent is normal, according to Mr. Frost, they didn't lose that much more than they would expect to lose anyway.

So when they're asking for some of this as damages, just think about it.  Most of the clients stayed with USI anyway.  We're only talking about a portion of the book.  And it's not that much more than they would have ever expected to lose.

And for Mr. Mitchell, let me point out, it's probably 10 percent is what they lost.  Right?  He had one client go.  They said it had revenue of about a hundred thousand.  His book was about a million and a half, less than 10 percent.  So why are they suing Mr. Mitchell?  That's normal losses.

Assumed normal attrition after two years.  This is where I pointed out, I asked him, I said, hey, after two years, they get to go compete full throttle.  Right?

Yeah.

I said, did you have any data about what happens when a producer's covenants expire and they start competing?

He said, I don't think there's any data.

And he's right.  There wasn't.

Ms. Santiago, again, she also testified, we have no idea what happens after two years.  We have no data.

And so then I asked, well, it was admittedly speculative, what would happen after two years.  I also asked Mr. Frost, wouldn't it be speculative to try to assess how much business USI would retain after a departed producer's restrictive covenants expire?

Had to read his deposition, because at first he didn't answer it.  We read the deposition.  He said, oh, yeah, I remember this.  The answer he gave back then was yes.  And then he added, live, he said, yeah, that's what I said.  Yes, it's speculative, unless you have the data.  Correct.

They don't have the data.  He admitted it.  Everybody admitted.  They don't have the data for what happens after two years.  So when USI asks for profits forever, like until the sun explodes, that is not an appropriate measure of damages.

It's also contradicted by USI's real world experience.  Of course it's completely contradicted by the real, live, flesh-and-blood clients who testified in this case.

We know that, at least in some cases, USI can lose as much as 19 or 14 percent of its book of business before the producers even leave.  This is during the 60 days.  That can happen.  That happened with Goding and Cardew.

We also know that some of the clients that stayed

originally, they've gone, because they haven't been happy with USI.

We know that some of the clients who did go to Lockton have left for completely different reasons, meaning neither of these companies would be working with them today. PGT got acquired. They're working with someone else as a result. This company AI 1754, they own properties, they restructured and move the insurance to their new partner's broker, not USI, not Lockton in either case. These two clients, at most, if USI ever got them to stay, would have been there for one year, not forever.

And who's the only side that gave you the numbers to calculate that? The defense.

All right. And, of course, as I said before, these clients all came in. These are the only ones who came in. USI could have brought others. They brought one. We brought five more. This is who you heard from. And what did they say? They said I never would have stayed at USI. And they all -- they weren't just making this up. They had alternatives. They had in some cases absolutely perfect backup plans. If Matt Simmons got hit by a bus, I would go to my other best friend. I would go to Lockton, because they work for my business partner, whatever it might be. They were never staying at USI.

So what are the real damages in this case? Mr. Lewis presented them. And he calculated lost profits for all

Closing Argument by Mr. Banks

business during the 60-day notice period and for a two-year period. I just want to be clear. You don't add them on top of each other. If you think the client would have stayed for two years, that's the damages. The 60 days is already baked in. Okay?

They let me point something out, though. On the 60-day notice period, they include PGT. You heard the evidence. PGT actually, although was scheduled not to close until the end of the month in January or the first of February, it actually did close on the 24th at USI. So these numbers were counted as damages during the 60-day period. It was actually completed before, and USI got paid on that.

So what should the numbers be as you take out PGT? And we talked about that. I've done the math. You don't have to count -- you don't have to trust me. You can go back and do the subtraction yourselves. But it's without PGT, if you measure it strictly for 60 days, it's $52,569. And if you go a few more days and assume maybe some of those contracts would have included earlier, it's 132,000. That's the damages for 60 days.

If you believe at the end of the day that USI has proved that clients would have stayed longer, particular clients would have stayed longer, Mr. Lewis has also given you those numbers. You might want to write this one down. It's Defense Exhibit 278. That's where his numbers are. You can

Closing Argument by Mr. Banks

look at all these in detail.  You can see every single client, what it would have been after one year or after two.  So PGT, you can see, one year of damages, if you believe that client would have stayed at USI.

He's also done an alternative that includes that surety revenue, because that one is kind of nitpicked.  It doesn't change the numbers much.  It's in there too.  All of this is in Defense Exhibit 278.

All right.  Let's talk about the claims and the verdict form quickly.  Mr. Mitchell, there's been a breach of contract found.  We get that.  But you still need to decide what were the damages from the breach of contract.  It's right here on the verdict form.

Did USI prove that a breach of contract on the part of Mr. Mitchell was a legal cause of damages to USI?

The answer is no.  ECA was not staying there.  That's no evidence they would have stayed at USI.  Certainly nothing closed in 60 days.  Their renewal wasn't even until September.  USI had every chance to try and earn them back.  They didn't.  They decided to stay at Lockton, even though Mr. Mitchell never touched them, never worked on them, and nobody else who came over from USI ever did.  There's no reason to believe ECA would have stayed at USI.

Breach of fiduciary duty, you've got to answer the question whether you think there was a breach of fiduciary duty

Closing Argument by Mr. Banks

by Mr. Mitchell.  You've also got to answer the question on damages, even if you found the breach.  Damages, there's nothing different here.  It's still ECA.  The answer, if you go to this question, is no.  ECA was going to leave anyway, and we know that because they did.

Mr. Simmons, same claims, breach of contract and breach of fiduciary duty.  Breach of contract for Mr. Simmons, first question, if I have it showing here right is, yeah, did USI prove the damages.

Okay.  Here, we're ready to concede, 60 days.  We've given you those numbers.  We're not -- I think in the opening they said we're going to claim there's no damages.  There's damages there.  We get it.  I think it should be 52,000 for the reasons I gave.  You might come up with a different number.  That is okay.  We've given you the data to do it.

On top of that, if you think that what he did caused clients to leave that otherwise would have stayed at USI, you can give those damages too.  I don't think the evidence supports doing so.  There hasn't been any evidence that USI would have kept those clients.  I don't think there should be any other damages.  But if you disagree, the numbers are there for you.

Breach of fiduciary duty, you've got to answer was there a breach?  Then you've got to answer the same damages question.  The damages, there shouldn't be any reason why they

Closing Argument by Mr. Banks

would be different from the breach of contract.  It's basically the same claim.

You can read the instructions again yourselves.  But you've got to still answer, was it a legal cause of damage to USI, and USI has to prove it.  You saw in the instructions, that means USI has to prove that but for the breaches, it would have kept that business.  Did they prove that?  The answer, I think, is not beyond the 60 days.

**THE COURTROOM DEPUTY:**  Five-minute warning.

**MR. BANKS:**  Thank you.

Then we have the claims against Lockton.  I do want to spend just a moment or two longer on that, because we kind of need to get the instructions on this.

All right.  So rather than -- because the claims against Lockton are a little bit -- they're different.  They're kind of funky.  One is that Lockton interfered with Simmons's and Mitchell's contracts.  The only claim is that Lockton interfered with their servicing and acceptance provisions, not the 60 days, not the solicitation.  That's not here.  It is just servicing and acceptance.

I think the evidence is clear from Mr. Simmons, Mr. Sharma, and everyone that what happened is Mr. Simmons stayed out of any transfer of business.  He was not involved. If a client wanted a transfer, he said you've got to talk to someone else.  I can't do that.  Talk to Sharma, talk to

Closing Argument by Mr. Banks

Claudia Mandato.

He didn't service clients, for the most part.  I'll admit, he got a couple of clients who reached out to him during a very short window.  He stopped working on any clients by about February 9th, before even the injunction was entered, because they thought, you know, based on what happened in Court, that that's probably what would happen.  So he stayed out.

And in the meantime, he did have a couple of clients' calls that he took.  Did that cause any damage?  The clients still stayed.  That's kind of the proof in the pudding.

But that's the claims, that Lockton somehow caused that, because Lockton -- and you're going read this in the instructions.  Did Lockton induce, did Lockton make Mr. Simmons do that?  What he testified to and Mr. Sharma testified to is, we were planning that he would service the clients.  Right?  But it was sort of a mutual kind of agreement between them.  It wasn't like anybody forced anyone into it.  It was just, yeah, that would make sense.  We ask the Court for guidance.  We tried to wait.  Some clients called.  So he maybe jumped the gun a little bit and serviced some clients before there was a ruling.  That's it.

Lockton did not cause that.  That was the circumstances that clients contacted him, and he responded.

Aiding and abetting a breach -- you can look at these

Closing Argument by Mr. Banks

instructions. It's got to be Lockton induced the breach with Mr. Mitchell. Mr. Mitchell didn't do any of those things. He didn't service any clients. He didn't accept any business. It's got to be intentional interference. It's got to be an inducement, et cetera.

Aiding and abetting is the other claim against Lockton. There, USI has to prove that Lockton knew of a breach of Mr. Simmons's and Mr. Mitchell's fiduciary duties, i.e., while they were still working at USI, that Lockton substantially assisted and -- or encouraged that breach.

Remember, again, what did Mr. Sharma tell them? He said don't solicit. Don't take things. Did Lockton substantially assist or encourage any breaches that occurred? Lockton said to do the opposite.

And then, finally, USI has to prove that that caused the damages. That's the same question we've been talking about. How do you prove causation? They have to prove they would have kept the business. On the Lockton verdict form, I think the answer to all the questions that you're going to be asked is no, because Lockton did not induce a breach of contract, nor did it encourage or assist a breach of fiduciary duty.

Look, I'm done. I'm out of time. I don't get to talk to you again. I do want to thank you. It's been a long time. You've paid a lot of attention. We all really, really

Rebuttal Closing Argument by Mr. Cannella

appreciate it.  That's from everybody on the defense side.  I know the plaintiff's side does too.  Thank you for helping us resolve this dispute.

I do think it comes down to damages, folks.  And we've tried to give you some reasonable number.  We ask you to please do what is right and not give USI a windfall.  Thank you.

THE COURT:  How much time left for Mr. Cannella?

THE COURTROOM DEPUTY:  Ten minutes.

MR. ZIMMERMAN:  Ten minutes, Your Honor.

THE COURT:  Is that right?  Ten?  All right.  You want any kind of warning.  One-minute warning?

MR. CANNELLA:  I'm going to try to do it on my --

MR. BANKS:  Your Honor, I think we had -- never mind.

MR. CANNELLA:  Try to do it on here.  Yes, two minute warning.

THE COURT:  Done.

**REBUTTAL CLOSING ARGUMENT BY MR. CANNELLA**

MR. CANNELLA:  Thanks again for your patience.  Good news.  This is the last time you'll be addressed by a lawyer in this case, and then the case will be in your hands, in your capable hands.

You've heard the evidence.  And this is why we have a jury system in this country.  I heard Mr. Banks's closing argument presentation.  Very good.  But, you know, reminded me

Rebuttal Closing Argument by Mr. Cannella

of My Cousin Vinny, where the lawyer gets up and says everything that that guy said is wrong, which means I disagree. And that's why we have a dispute.

So what I want you to focus on is a couple of questions that you can take back to the jury room. If the clients -- and the questions are these. If the clients would have left anyway, then why didn't Mr. Simmons just wait? Why didn't he comply with his contract? Why didn't he give a 60-days' notice on January 25th, 2023? Why didn't he give a 60-days' notice on December 27th when he got his term sheet. If the clients were all going to come to him anyway, why didn't he wait?

And when he's asked that question, his answer is, well, USI was the Titanic. It was the ship was going down. Well, okay.

When did you think that, Mr. Simmons? He thought that going back to September 2022. So if he thought that USI was the Titanic, why didn't he resign in September of 2022? He wouldn't have had a duty of loyalty then. He could have told his friends, his best friends, USI can't handle your business, you need to come.

Why did he wait? Well, the reason why he waited is because he knew he was going to get a bonus check on January 20th, 2023. That's why he waited.

If the employees were going to come anyway, why

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument by Mr. Cannella

didn't he wait till after he resigned?  He could have resigned.
Employees would have found out about it.  According to
Mr. Banks and Mr. Simmons, they would have followed him anyway.
He didn't do that.  He didn't do that because he knew he needed
to take shortcuts in order to protect the book of business and
bring as many clients as he could.

So you did hear from six clients.  Right?  Six out of
over 20 clients.  Mr. Frost's model assumes attrition.  What
that means, it assumes some clients would leave.  Six out of 20
would be about 30 percent attrition.  Mr Frost's model, one of
them, assumes that 20 percent leaves after year one, an
additional 10 percent leaves after year two.  So that's
30 percent.  And it assumes a loss each year.

Now, defendants have a lot of fun with the residual.
I want you to look at the Frost exhibits.  They're 653 through
657.  You're going to take those exhibits back with you.  653
through 656.  And you can look at the numbers that Mr. Frost
put together.  That model does not last forever.  What there
is, is a residual.  What a residual is, is what's left in the
diminishing returns every year.

Now, you're going to be given an instruction on lost
profits.  You have been given one.  What USI needs to prove is
that there's some standard by which the amount of lost profits
can be established.  USI does not have to prove the amount of
lost profits can be calculated with mathematical precision, so

Rebuttal Closing Argument by Mr. Cannella

long as it showed some reasonable basis for determining the amount of loss.

In this case, you do have a reasonable basis.  You have historical performance.  You have the retention rates of 90 percent.  Under 90-percent retention rate, producers come, producers go.  The reason why it's not tracked, what happens when a producer leaves, is most producers comply with their agreements.  It would make no sense if the producer leaves, a new producer is assigned, why would you still be tracking the Simmons book of business three years after he left?  At different producer would be working on it.  That doesn't make any sense.

You heard a lot about the declaratory judgment action.  And I want to -- I want to address that really quickly.  They did file a declaratory judgment action, but you have not heard any evidence that they're the ones that went to the Court to seek an immediate order on that action, and that they're the ones that went to the Court to seek a ruling on that action.  It's because they weren't.  It was USI that did that.

Now, you heard from Mr. Banks that Mr. Simmons, one of the reasons why he didn't comply with his agreement is because that would have required him to mislead his best friends.  The evidence in this case is that Mr. Simmons actually did mislead his best friends.

Rebuttal Closing Argument by Mr. Cannella

He led them to believe that he would be able to continue to work with their companies.  He did not tell them I have an agreement with USI that I can't work with you for two years.  Now, every one of those clients, when asked would you agree to -- would you agree that -- if Mr. Simmons told you he couldn't work with you for two years because he agreed to that, would you honor that?  Every one of them said yes.  Every one of them said yes.

So the misleading statements to the best friends was, if I move, you can -- I can -- we can continue to work -- we can continue to work together.

Now, Mr. Banks suggested to you that $19 million -- I'm sorry, Mr. Banks suggested to you that $52,000 would be sufficient to cover the losses in this case.  But that doesn't comport with the evidence that you've heard in this case.

This is in evidence.  This is when Mr. Simmons was negotiating for higher compensation from Lockton.  He told Lockton that if I stay at USI, I will make more money than if I go to Lockton.  So he proposed an alternative, $19 million over the course of five years.

Now, you were told several times that Lockton actually offered Mr. Simmons more money not to bring the clients.  Where is that document?  Where is that exhibit?  We didn't see that anywhere.  All we heard is what Lockton said.  And what Lockton said is less important than what Lockton

Rebuttal Closing Argument by Mr. Cannella

actually did.  So there's no evidence of that.

You know, the arguments about the employees, I think we're really missing the mark.  The employees -- the point about the employees is that Mr. Simmons needed the service team to be able to -- to be able to lure the clients to come with him.  He needs the service team to be able to do the work in the pipeline.  It's not whether the service team was unhappy at USI or not.  He needed a team in place on day one so that on January 25th, 2023, when the 25 clients come over, there's a team in place all ready to work with him.  And that's important to the clients.

And how do you know that?  Richard Tyson, again, he sends an email to the leadership of PGT that says, Matt Simmons and our entire USI service team has moved to USI [sic].  And they want to work with the same people, because those people know their business.

Now, let's talk a little bit about causation.  We don't know what would have happened if Mr. Simmons and Mr. Mitchell complied with their agreements, because they didn't.  Right?

So we have to look at other situations where producers did.  And when other producers comply with their agreements, USI keeps the business.  They don't lose 27 clients over the course of four days with revenue over $4.3 million.  We know that about the 90-percent retention rate.

Rebuttal Closing Argument by Mr. Cannella

And we're not assuming that we would have kept all that business, and the model does not assume that.  With respect to, you know, specific data to back up what happens when a producer leaves, we don't measure it, because typically the producers comply with their agreements.  With regard to Mr. Mitchell, we admit, he called one client.  He called them the day before he left, and then he called them the next day.

I've got two minutes.  Thank you.

Mr. Sharma knew that the clients were coming.  They anticipated that they would have $4.3 million in the first year.  They knew that the clients were coming.  That's the aiding and abetting the breach of fiduciary duty.  They knew that the -- Mr. Simmons had a duty to USI.  They knew that in breach of that, he was telling clients that he was coming to Lockton.  They knew that that business would come.  And they made it possible for that business to come by hiring the service team and by putting plans in place to be able to onboard that -- those clients as soon as possible.

I want to talk just a second about PGT.  There's no evidence that PGT not pay Lockton for year two.  And USI was deprived of the opportunity to even continue its relationship with PGT, because that client was taken away.

And the other thing is, is that the relationship between USI and these clients was poisoned by Mr. Simmons and Mr. Mitchell.  By the time the clients came over -- remember,

Mr. Simmons filed suit against USI first. These clients were in a position where Mr. Simmons had sued Mr. -- Mr. Simmons had sued USI. USI had to file a counterclaim against Mr. Simmons. So Mr. Simmons was able to tell his clients, see, I told you there would be litigation.

Members of the jury, I would ask again, and I direct you to the last four exhibits in the box, Frost 653, 656. Frost has the data to support his conclusions. He does this for a living. He evaluates books of business for a living. And you've heard the testimony of all the witnesses in this case.

Mr. Banks and I will never agree on the facts of this case. I can stipulate to that. But we -- that's why we have you. We hope that you listened to the evidence, which you've heard in the last eight days, weigh the evidence, and render a fair and just verdict. Thank you.

**THE COURT:** All right. Members of the jury, thank you for your attention during this trial. We have now reached the final stage of the proceedings.

When you get to the jury room, the first thing you should do is choose one of your members to act as a foreperson. The foreperson will direct your deliberations and will speak for you in court. When you've all agreed on a verdict, your foreperson must fill in the form, sign it, date it. You then return it to the courtroom.

Your verdict must be unanimous.  In other words, you must all agree.

Your deliberations are a secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors.  So you must discuss the case with one another and try to reach an agreement.  While you're discussing the case, don't hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong.  But don't give up your honest beliefs, just because others think differently or because you simply want to get the case over with.

If you wish to communicate with me at any time, please write down your message or question and give it to the bailiff.  The bailiff will bring it to me, and I'll respond as promptly as possible, either in writing or by talking to you in the courtroom.  But I caution you not to tell me how many jurors have voted one way or the other at that time.  If you have questions, I'm required to reconvene court and talk with the attorneys before I answer.  This process may take some time, so you should continue your deliberations while you wait for my answer.

Thank you again for your attention.

In closing, remember that in a very real way, you're judges, judges of the facts.  Your only interest is to seek the

truth from the evidence in the case.

You may now retire to the jury room to begin your deliberations.  Please take your tablets with you.  And I mentioned they'll be destroyed at the end, but you may want to use them for your deliberations.

And we have lunch.  Right?

**THE COURT SECURITY OFFICER:**  Yes, sir.

**THE COURT:**  All right.  Thank you.

**THE COURT SECURITY OFFICER:**  All rise for the jury.

(Jury out at 12:23 p.m.)

**THE COURT:**  Don't go away.  I want to ask you guys something about the verdict form before we give it to the jury. All right.  I'll be right back.

(Recess from 12:24 p.m. to 12:27 p.m.)

**MR. SHAPIRO:**  I see the exhibits are still here.  I think we're working everything out.

**THE COURT:**  Okay.  I want to talk to you guys. Mr. Cannella probably heard nature, like I did, and that's where he is.

**MR. ZIMMERMAN:**  He's here, Judge.

**MR. CANNELLA:**  I'm here, Your Honor.

**THE COURT:**  Okay.  I'm going to do this case slightly differently.  I'm going to look at these verdict forms myself before we announce it to anybody and make sure all the numbers and everything add up, because we could have some questions.

And then I'm going to show them to you, and you're going to have to commit to me that you're okay with it.  All right?  And if you're not, then we can -- I'll keep the jury.  And if you're not, then we can readdress it with the jury before I send them all home, so we don't have this problem that Matt was -- what are you working on, an appeal or something?

          MR. ZIMMERMAN:  Actually, it was in my favor.  So it worked out, but I -- it was very scary.

          But, Your Honor, the way I understand it, though, it would be if there's a question, then there would be, like, a note back to the jury.

          THE COURT:  No, no, no.  I'm going to get the verdict forms, and I'm going to look at them.  If I think they're okay, then I'll -- I'll come out, we'll read the verdict form and everything like that.  And then I'll hold the jury, and then we'll have a conversation before the jury goes home that everyone -- doesn't think there's double counting or this, that, or the other.  If they have a problem, then we have the jury here, and we can readdress it with the jury.

          MR. ZIMMERMAN:  Okay.  I would just pose, if, when the Court reviews it -- sorry, Madam Court Reporter.  If the Court reviews it and sees an issue and the Court thinks a question -- a written question at that point would be appropriate, we can perhaps discuss that.

          THE COURT:  Yeah.  I'll let you know.  You'll be in

the loop on it. so here's the jury instructions and the verdict forms.  Here's the stipulations.  You guys need to bless these, along with the exhibits, and they need to go to the jury.  The jury won't start looking at anything until they have that.

Anything else anybody wants to say?

MR. SHAPIRO:  No, Your Honor.

MR. BANKS:  I'm sorry, Your Honor, Mr. Adler and I were talking about the verdict form.  I understand you were just talking about it, the duplicative issue.  We are concerned about the phrasing of that.

THE COURT:  If you have a better solution, let me know.

MR. BANKS:  But I thought what Mr. Cannella said was very helpful.

THE COURT:  In other words --

MR. ZIMMERMAN:  This is just procedure, not changing any of the language of the verdict form.

THE COURT:  If you have a better solution, if you think you can fix this somehow, I don't mind talking about it.

MR. BANKS:  Our main concern is between Lockton and the other defendants.  It makes sense between Mitchell and Simmons.  They're not going to be overlapping.  But the Lockton damages, I think, by necessity would be, and that last question is written that you should add all three of them together.

THE COURT:  I understand.  I understand.  And that's

why I say, when we get the form back, we'll have to look at it and see, unless you have a better solution now.  Because that question was put in there to avoid the problem that it's causing.

MR. BANKS:  Everyone is trying to get the right result.  Our problem is actually maybe to strike the parenthetical.  Just what's the total amount of damages you award, without telling them you should add all three together.  I think that was the problem, the part in the parentheses.

THE COURT:  I don't know if that solves it.  We'll see what it says.  We'll see what it says.  Like I told -- were you here when I said that?

MR. BANKS:  I did hear that, yeah.

THE COURT:  We'll be able to address it.

By the way, that was Mr. Adler's idea.  When we talked about this early on, I'll tag him with that.

MR. BANKS:  When I heard the instructions, like, what are you doing?

THE COURT:  I will tag him with that if that goes down.

(Discussion off the record.)

MR. SHAPIRO:  Your Honor, through -- during the proceedings, there was Plaintiff's Exhibit 90, 183, and 183A, which are all the modeling, and we had asked that that be placed under seal, and Your Honor said that would not be a

problem.

And then there's a stipulation on the telephone records, which we explained contains some cell phone numbers and also, you know, some potentially confidential information. That's the only other document that we would ask to be placed under seal. The one that was filed with the clerk was filed inadvertently -- was a previous version of that that we have. The correct version that would be filed under seal and go back to the jury, along with all the other exhibits and stipulations.

**THE COURT:** Gretchen, you're good with all that?

**THE COURTROOM DEPUTY:** Yes.

**THE COURT:** Okay. Good. Thank you.

**MS. ROYAL:** And can I --

**THE COURT:** What you need to do is, if you want to leave at some point, just leave your cell number with Gretchen or Steve or somebody. You got it all?

**THE COURTROOM DEPUTY:** Yes.

**THE COURT:** Don't go more than, like, 15 minutes away, but go get some lunch or something. All right? So thank you.

(The Court out at 12:33 p.m.)

**MR. ZIMMERMAN:** We're going to read onto record -- we don't need the judge for this -- some of the exhibits, once it's confirmed. And then Madam Clerk, just -- what Mr. Shapiro

reference was filed already, that's different than what's being put now into evidence. So that filing still needs to either be rejected or sealed.

**MR. SHAPIRO:** Right. We'll do a revised filing. Right?

**MR. ZIMMERMAN:** Well, I think you -- let's go off the record now.

(Discussion off the record.)

**MS. ROYAL:** This is a list of plaintiff's additional exhibits that were entered into evidence. Plaintiff's 11, 373, 182, 406, 10, 13, 14, 45, 58, 68, 90. 90 was entered. There's a motion to seal by defendants. 94, 95, 96, 100, 104, 105, 106, 108, 109, 112, 125, 130, 141, 142, 155, 157, 158, 172, 193, 200, 201, 202, 206, 207, 208, 209, 211, 215, 216, 217, 236, 237, 241, 242, 243, 244. 252 was admitted partially. 308, 316. And that was 316. I think I misspoke. 343, 360, 493.

And that's it. Thank you very much.

**THE COURTROOM DEPUTY:** Any objection? I don't think so. But what I'd like to do is go through the full list one time, and then we'll check off the list.

(Counterplaintiff's Exhibits 10, 11, 13, 14, 45, 58, 68, 94, 95, 96, 100, 104, 105, 106, 108, 109, 112, 125, 130, 141, 142, 155, 157, 158, 172, 182, 193, 200, 201, 202, 206, 207, 208, 209, 211, 215, 216, 217, 236, 237, 241, 242, 243, 244,

252, 308, 316, 343, 360, 406, 493 admitted into evidence.)

(Discussion off the record.)

MR. SHAPIRO:  This is Lyle Shapiro on behalf of the defendants, here with Kristin Royal on behalf of the plaintiff. We've reviewed the USI's trial exhibits and the defendants' trial exhibits, as well as three stipulations that are going back now, the fourth stipulation, which is the stipulation regarding the identity of users of certain phone numbers, is going to -- we're replacing it with the revised version, which will also go back to the jury.  All of this has been approved, and we're good to go.

MS. ROYAL:  Yes.  Kristin Royal on behalf of USI, confirmed we have reviewed the exhibits in the exhibit boxes, and they correctly reflect the exhibits that we believe are in the record.

(Recess from 1:08 p.m. to 3:46 p.m.)

THE COURT:  Okay.  Apparently, the jury has got a verdict.  You must have done a really good job, because we have no questions.  I don't think this is -- I'm not sure I've had a trial in the last ten years that didn't have questions.  Two witness felon in possession cases, the jury has questions.  So this one is -- I was expecting a lot of questions, but we didn't get them.

So what will happen now is the jury will come out, and I'll ask them if they have a verdict, yes.  They'll hand me

Verdict

the forms.  I'll read the forms out loud in kind of summary fashion.  And then I'll send the jury back to the jury room.

In any kind of case like this, we need to look at the form before we send the jury home, make sure there's no issues or anything like that that we want clarification on.

All right?  Any questions?

Okay.  Let's bring the jury out, please.

Anybody want to poll the jury?  I'll poll the jury.  Just say yes.  We'll just do it.

**MR. SHAPIRO:**  Yes.

**THE COURT:**  Good.

**THE COURT SECURITY OFFICER:**  All rise for the jury.

(Jury in at 3:48 p.m.)

**THE COURT:**  Okay.  Have a seat, everyone.  Jury has a verdict.

Who is the foreperson?  You're the foreperson.

**JURY FOREPERSON:**  Yep.

**THE COURT:**  Hand those forms to Steve, please.  I'll go ahead and read them out loud.  You can have a seat.  Everyone can have a seat.  I'll go through this rather quickly.

Before I do that, though, members of the jury, I want to publicly thank you for your service.  It's been a long trial.  Y'all have hung in there.  We've had some delays, more than I usually do.  I apologize for that, but we made it to Thursday, like I said, so I won't be too critical.

In any event, I would like you to stay in the jury room when we're done with this. I need to meet with the lawyers, and then at that point, you'll be free to go.

On behalf of everyone in this case, the entire legal system, we greatly thank you for coming down here and being part of the jury system. Thank you.

All right. First, I'm going to read the verdict form as to Mr. Simmons.

On breach of contract, did USI prove a breach of contract? Yes.

Did USI prove while Mr. Simmons was employed by USI breach of fiduciary duty? Yes.

Did USI prove a breach of fiduciary duty was legal cause? Yes.

Damages, yes, as to findings of liability on both causes of action.

What is the total amount of damages under breach of contract? 991,250.

Next question. What is the amount of damages for breach of fiduciary duty? 991,250, same number.

Last question, total amount of damages in the case? 3,050,000.

And that's signed by the foreperson.

Next is Mr. Mitchell.

The first question, breach of contract? Yes.

Verdict

Breach of fiduciary duty?  Yes.

Next question, legal cause of damage to USI?  Yes.

Damages, is there a finding of liability?  Yes.

Total damages for breach of contract, 76,250.

Next question, on fiduciary duty as to Mr. Mitchell, number, 76,250.

Now, we move to Lockton.

Aiding and abetting breach of fiduciary duty?  Yes.

Next question -- that was to Mr. Simmons.

The next question asks for aiding and abetting breach of fiduciary duty as to Mr. Mitchell?  Yes.

Next question, do you find that Lockton aiding and abetting a breach of fiduciary duty was a legal cause of damage to USI?  Yes.

Next, tortious interference, did USI prove that Lockton interfered with the contractual relationship with USI and Mr. Simmons?  Yes.

Next, did Lockton -- USI prove that Lockton interfered with the contractual relationship between USI and Mr. Mitchell?  Yes.

Next question, did you find Lockton's tortious interference was a legal cause of damage?  Yes.

Damages, again, a pickup question to cover, have you found liability?  Yes.

And then what is the total amount of damages for

UNITED STATES DISTRICT COURT

aiding and abetting?  Number, 457,500.

Next question, damages for tortious interference? Number, 457,500.

All of the verdict forms have had a total amount of 3,050,000.

And, again, all of the forms are signed by the foreperson.

Now, at this time, I'm going to do something called polling the jury.  And I'm just going to point to each of you and ask you the question, is this your verdict, because, you know, it has to be unanimous.

We'll start with the foreperson.

Is that your verdict?

**JURY FOREPERSON:**  Yes.

**THE COURT:**  Is that your verdict?

**JUROR:**  Yes.

**THE COURT:**  Gentleman in the blue shirt, is that your verdict?

**JUROR:**  Yes.

**THE COURT:**  Is that your verdict?

**JUROR:**  Yes.

**THE COURT:**  Is that your verdict?

**JUROR:**  Yes.

**THE COURT:**  Is that your verdict?

**JUROR:**  Yes.

THE COURT:  Is that your verdict?

JUROR:  Yes.

THE COURT:  Is that your verdict?

JUROR:  Yes.

THE COURT:  All right.  If you would, just go back to the jury room at this time.  We'll let you know when you'll be free to go.  Thank you.

THE COURT SECURITY OFFICER:  All rise for the jury.

(Jury out at 3:53 p.m.)

THE COURT:  Okay.  Let's put this up.  There's one thing we've got to check out here.

Kelly, run this form.

So basically came out with liability everything in favor of the plaintiff.  So that's all what it is.

Put these forms up.  Turn to the damages page.  This is the verdict form for Mr. Simmons.  Start with Simmons and then do Mitchell.

Yes, Gretchen?  Kelly is going to do it.  Turn the Elmo on, please.

I think there's something we need to deal with here right now, in my opinion.  Somebody can say I told you so.  I don't know who.  Is it -- not Adler.  Somebody had the idea of totaling it up for each defendant.  Was it you, Mr. Zimmerman?

MR. ZIMMERMAN:  I believe so, Your Honor.

THE COURT:  You got me.  Here's my question.  They

had the exact same number for everything they did.  You guys can sit down.

MR. ZIMMERMAN:  The math works out, Your Honor, though.

THE COURT:  What?

MR. ZIMMERMAN:  The math works out with the total.  So it's clear their intent, the total amount of damages is 3 million.  If you add up -- I understand the Court's question, the number is the same.  But if you add up 991, 991 here, the numbers for Mr. Mitchell, and the numbers for Lockton, it totals the --

THE COURT:  Does it add up?

MR. ZIMMERMAN:  It does, Your Honor.  There's really not confusion, even though I think the way I propose is better.

THE COURT:  I'm going to do one thing on this, unless somebody gives me a reason that's just very compelling.  I'm thinking that I'm going to invite the jury -- push that form up, Kelly.  And I just ask them, I'm going to say, members of the jury, I noticed on all three of these verdict forms you had the same number for both causes of action.  I want to make sure your intent is -- it appears, based on the math, assuming -- has somebody checked his math?

MR. ADLER:  Yes.

THE COURT:  Based on the last question, it seems that your intent was something, but I'd like you to just write under

question three on this form, I might even put a red X, the total amount of damages is your intent to award from that defendant. And that way, if they total that number up, they've confirmed that. Otherwise, you have maybe a possible question.

MR. ZIMMERMAN: Your Honor, I think going back and asking again is going to create the question. I think we -- over what we suggested, we put in the total that defendants asked for to avoid this issue.

THE COURT: What do you guys think?

MR. ZIMMERMAN: The number adds up.

MR. ADLER: I think it couldn't hurt to confirm, Your Honor, because we do have potentially duplicative damages. We have the jury here. Let's ask them.

THE COURT: The reason I say that --

MR. ZIMMERMAN: That's not what the rules provide, Judge.

THE COURT: Just a second. The reason I say that, Matt, is it happens to be the same exact number on all three.

MR. ZIMMERMAN: Agreed. Agreed, which is why we didn't want to do it this way. But they wanted to do it this way. And they gave a total number of damages. That's to address it. So, clearly, they apportioned it between the claims, and they split it up between the claims. But the way the defendants wanted it, that's what it says, total amount of damages. There's really no ambiguity here.

THE COURT:  Put the other form up, Kelly, so we can just see what we're talking about.

THE LAW CLERK:  For Mitchell?

THE COURT:  Yeah.  It's the same number.

MR. ZIMMERMAN:  All of them have the same number. When you add them all up, it equals the 3 million, which the check that defendants requested.  And, I mean, we're just creating an ambiguity.  That's not what this is for.

THE COURT:  I don't think so.  I think if you're right, they're going to do the math on that, and that takes that issue totally off the table for anybody else to complain about.

MR. ZIMMERMAN:  I think it's creating an issue to ask another question to the jury.  That's creating an appellate issue, Judge.

THE COURT:  Objection noted.  I'm doing that.

Let me have it, Kelly, please.

I'll show you how I'm going to do it.  Bring the forms down.

Bring the jury back out, please.

THE COURT SECURITY OFFICER:  All rise for the jury.

(Jury in at 3:57 p.m.)

THE COURT:  Okay.  One more thing.  Have a seat, everyone.  Just want to make doubly sure, members of the jury, each of these defendants has two what we call causes of action

or claims. And you have written the same exact damage number for both of the claims. I think the math all works out on the last question. But we just want to make doubly sure what your intent was.

So I've written a red X under the -- for each defendant, and if your total -- if your intention is, for example, Mr. Mitchell, where you wrote 76,250 and 76,250, if your intent is to be -- have 76,250 as the total for him, that would be your number. If your intent was to add those two together and have that as the number, then you'd write that number on the red X.

Is that clear what I'm asking?

**JURY FOREPERSON:** Yeah. So the last page is the total for Mitchell, the last page?

**THE COURT:** Yeah. The total in the case. And I'm just asking you to do a total for each defendant. I put a red X under each one. And I think that -- if that was your intent, you'll let us know by what you put in there, and it won't take you too long to do.

So here's the forms. And just let us know when you're ready on that.

**THE COURT SECURITY OFFICER:** All rise for the jury.

(Jury out at 3:59 p.m.)

**THE COURT:** Here's the next thing we're going to do, when we bring them back, I'm pretty sure they're going to total

those numbers up, I'm going to run some copies of these verdict forms. I'll be back there thanking the jurors.

Do we have the challenge coins? Have you guys seen these great challenge coins that we have? I'm going to hand them their challenge coins. We should have given the lawyers a challenge --

MR. ZIMMERMAN: Who gets the final trophy, Judge?

THE COURT: But while I'm doing that, you'll be looking at the forms. And if anybody has any issues with the math or the numbers or any of this stuff, now is the time to speak up or forever hold your peace. All right. I'm going to be asking you if you have any objections or anything you'd like the jury to clarify, because we have the jury here, and we can do it if we need to. So that's what's going to happen.

So whats, Kelly, when the jury comes back, I'm going -- I'm just going to read the numbers out loud, and then I will give you the verdict form to make copies for the parties. So you'd make -- just make one for each side, for each verdict form. Give the originals back to Gretchen. By that time, I'll be done with my thanks.

Can I have the coins, please.

MR. ZIMMERMAN: Your Honor, can we -- with your permission, could you ask the jury if they would have any issue after they're released if we were to talk to them.

THE COURT: Sure. It's very useful. I'm not sure

this group will, but they might.  I have done that before. That is really, really useful.

            **MR. ZIMMERMAN:**  And one other question.  And just, procedurally, you know, so after the verdict, at some point, we're going to address just any of the kind of equitable, the permanent injunction claim and those type of things, just however the Court would like to us do that.

            **THE COURT:**  We'll do it when I come back and I ask you questions on the verdict form, make a list, and we'll talk about it while we're all here.

            **MR. ZIMMERMAN:**  Thank you, Your Honor.

            **THE COURT:**  You guys have got to take your stuff back, any documents or anything.  We don't need it.  There's one more over here.

            Done?  You have to bring the jury out again.

            **THE COURT SECURITY OFFICER:**  Yeah.

            **THE COURT:**  As expected, they totaled the numbers up.

            **MR. ZIMMERMAN:**  It's what we expected, total is 3 million?  Thank you, Your Honor.

            **THE COURT:**  Nobody changed the last number.  They just added the two causes of action, so clears that up.

            **MR. ZIMMERMAN:**  Okay.  Good thing.

            **THE COURT:**  It was a great idea as long as it came out your way.  If they had come out --

            **MR. ZIMMERMAN:**  Actually, we can go off the record

for a second?

(Discussion off the record.)

**THE COURT SECURITY OFFICER:** All rise for the jury.

(Jury in at 4:03 p.m.)

**THE COURT:** Members of the jury, thank you for handling this. You have gone back and totaled up the two claims in each verdict form and done the math. And I appreciate that. That clears up any question that might have arisen. I have to ask the same question again.

Is that your verdict?

**JURY FOREPERSON:** Yes.

**THE COURT:** Is that your verdict?

**JUROR:** Yes.

**THE COURT:** Is that your verdict?

**JUROR:** Yes.

**THE COURT:** Is that your verdict?

**JUROR:** Yes.

**THE COURT:** Is that your verdict?

**JUROR:** Yes.

**THE COURT:** Is that your verdict?

**JUROR:** Yes.

**THE COURT:** Is that your verdict?

**JUROR:** Yes.

**THE COURT:** Is that your verdict?

**JUROR:** Yes.

THE COURT: Very good. I'll see you in the jury room right now. Everyone will stay here, and we're good to go.

Oh, if you want to talk -- it's not a criminal case. Nobody is going to jail or anything like that. If you want to talk to any of the lawyers afterwards, if you would like to talk to them, you're free to do that. They're not free to come talk to you. But if you want to talk to them or share any insights or, you know, suggestions or whatever, if you want to do it, that's great. But, otherwise, you're not required to. All right?

THE COURT SECURITY OFFICER: All rise for the jury.

(Jury out at 4:05 p.m.)

(Recess from 4:05 p.m. to 4:16 p.m.)

THE COURT: Let's go back on the record here, clean up anything we need to clean up.

MR. ADLER: I would love to talk about the injunction, Your Honor.

THE COURT: Anybody have anything we need to do? Matt was saying something about equitable disgorgement or whatever.

MR. ZIMMERMAN: Yes, sir.

THE COURT: What do you want to say?

MR. ZIMMERMAN: So, Your Honor, so I think remaining now is the claim of permanent injunction as to clients that were not addressed here, the clients that remained at USI, the

end of the two-year period, which I think is almost up.

**THE COURT:** Isn't there -- isn't the un-American injunction that I entered still cover everything?

**MR. ZIMMERMAN:** I think it would cover it, I think -- correct me if I'm wrong, I think it would cover it through the judgment, and I think the Court would enter a permanent injunction with the judgment when the Court enters it.

**THE COURT:** You guys can talk about that. I'm not going to do anything with that right now.

What else?

**MR. ZIMMERMAN:** There would still be -- the Court would have the ability to look at disgorgement as an equitable --

**MR. ADLER:** Whoa, whoa, whoa. Your Honor, couple thoughts here. Number one, they --

**THE COURT:** He wasn't done. Go ahead.

**MR. ZIMMERMAN:** Yeah. So the Court would still have the ability to look at that. I think we would -- if we decided to pursue that, we would have to file a motion. I don't -- I think we would have to pursue it before the judgment is entered, but -- so I wanted to raise it. And then if we decide to file something, just wanted to bring that to the Court's attention, that we may do that.

**THE COURT:** Okay. It is what it is.

Anything else?

**MR. ADLER:** Yes.

**THE COURT:** Don't object to anything he said, because he's just talking. Save it. You got something new?

**MR. ADLER:** Just responses on both of those points.

**THE COURT:** Don't need it.

**MR. ADLER:** I do have affirmative relief we'd like to ask for.

**THE COURT:** Yeah. Well, I think we're good. I think we're good.

**MR. ADLER:** Your Honor, I think we need to clarify the injunction, because under the doctrine of election of remedies, they have elected a remedy with respect to -- you're pointing at me. Should I stop?

**THE COURT:** Everybody on your team is like, Adler, what are you talking about? We're going to deal with it later.

**MR. BANKS:** No.

**THE COURT:** No?

**MR. ADLER:** I think it's today, Your Honor.

**THE COURT:** No?

**MR. ADLER:** Here's the situation. They have a large number of clients who moved from one brokerage to another. They have now sought the forever value of those clients and have been awarded it by a jury of their peers. That means that they have reduced those claims to a monetary amount, which means that there is no irreparable harm that could justify an

UNITED STATES DISTRICT COURT

injunction, therefore, those clients need to be released, and Matt Simmons should be able to call them tonight.

MR. BANKS: Just the clients that have -- that are not as USI.

THE COURT: Right. The ones who are already there.

MR. BANKS: Not clients that are still there.

MR. ZIMMERMAN: And I think when I made the point very clearly was that we were talking about the clients that remained at USI.

MR. BANKS: I heard that too.

MR. ZIMMERMAN: I'm not sure why there's argument, because that's what I --

THE COURT: Sounds like --

MR. BANKS: We just want to know -- like Mr. Haskell, can he call Mr. Haskell tonight?

THE COURT: Well, that's a valid question. We might as well clear it up since we're here.

What's your position on that?

MR. ZIMMERMAN: I think for the clients that were subject that have moved and were at issue in the trial that were subject to damages claim, that is no longer appropriately part of the injunction. I think for clients that remained at USI and were not the 20 or so at issue, they remain under the injunction, pending the permanent injunction.

THE COURT: Well, maybe -- you might want to submit

something in writing or something short.  I mean, I know what the issue is, and then I can give you something in writing to clean up the situation.  Okay?

MR. ZIMMERMAN:  Yes, Your Honor.  And then we, obviously, also will be pursuing attorney's fees.  I think we do that post-judgment.  We'll file a motion.

THE COURT:  There's ways to do that.  I'm not even going to get involved in that.  There's time limits and all kind of things like that.

MR. SHAPIRO:  Judge, I just wanted to thank you and your staff for all the hard work.

THE COURT:  I know Sonya appreciates it.  She's not here.  And Gretchen appreciates it.  And, Bekah, well, her hands are tired.  Thank you.  So we can go off the record now.

(Proceedings adjourned at 4:20 p.m.)

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Rebekah M. Lockwood, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes to the best of my knowledge, skill, and ability.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand at Tampa, Hillsborough County, Florida, this 6th day of September 2024.

_____
REBEKAH M. LOCKWOOD, RDR, CRR
Official Court Reporter
United States District Court
Middle District of Florida