UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MATTHEW SIMMONS, SHEILA
MURRAY, JACK MITCHELL,
JACKIE RODRIGUEZ, MADISON
LIEFFORT, AND EMILY CARTER,

      Plaintiffs,                                    Case No. 8:23-cv-201-TPB-AAS

vs.

USI INSURANCE SERVICES, LLC, a
foreign limited liability company and
USI ADVANTAGE CORP., a foreign
corporation,

      Defendants.
_____/

USI INSURANCE SERVICES LLC,

      Counter-Plaintiff,

vs.

MATTHEW SIMMONS, JACK MITCHELL
and SOUTHEAST SERIES OF LOCKTON
COMPANIES, LLC.,

      Counter-Defendants.
_____/

## ORDER DENYING POST-TRIAL MOTIONS

This matter is before the Court on "Defendants' Motion for Judgment as a

Matter of Law or, in the Alternative, a New Trial" (Doc. 293) and "USI's Motion for

New Trial on Damages and to Amend the Judgment to Disgorge Lockton's Gains"

(Docs. 334; 350).   The parties filed responses in opposition to the motions on September 16, 2024, and November 14, 2024, respectively.   (Docs. 319; 347).   Based on the motions, responses, the court file, and the record, the Court finds as follows:

## **Background**

Matthew Simmons and Jack Mitchell were highly compensated "producers" in the Tampa, Florida, office of USI Insurance Services, LLC, a large commercial insurance broker.   Under employment agreements between Simmons and Mitchell and USI, Simmons and Mitchell were free to leave USI to join USI's competitors, but they were required to provide 60 days' notice of resignation.   For two years post-employment, Simmons and Mitchell could not solicit or service clients whose accounts they had serviced for USI.   They were also prohibited for two years from directly or indirectly soliciting other employees they had worked with at USI.

On January 25, 2023, Simmons and Mitchell resigned from USI via email, stating they would be joining USI's competitor, Southeast Series of Lockton, LLC, effective immediately.   Within a few hours on the same day, USI employees Emily Carter, Madison Lieffort, Sheila Murray, and Jackie Rodriguez, who supported Simmons and Mitchell and worked on the accounts at issue, also resigned effective immediately to join Lockton.

Simmons, Mitchell, and their team had given USI no prior notice of the impending resignations, but Simmons and Mitchell had provided advance notice to the USI clients they serviced.   The same day as the resignations, a number of clients whose accounts were serviced by Simmons or Mitchell submitted "broker of

record" letters naming Lockton as their new broker to handle their insurance needs. Eventually, more than 25 USI client accounts previously serviced by the Simmons team moved all or a portion of their business to Lockton.

The same day they resigned, Simmons, Mitchell, and the other Simmons team members, represented by counsel provided by Lockton, filed a complaint against USI in Hillsborough County Circuit Court seeking a declaration that the restrictions in their employment agreements were illegal and unenforceable. USI removed the action to this Court, answered, and asserted a counterclaim naming Simmons, Mitchell, and Lockton as counterdefendants, alleging claims for injunctive relief, breach of contract, breach of fiduciary duties, tortious interference, conspiracy, and aiding and abetting.[1]

Following discovery, the parties filed cross-motions for summary judgment. The Court's rulings on the motions left for trial only USI's counterclaim. *See* (Docs. 178, 179, 181, 225, 226, 227, 325).[2] More specifically, the following claims and issues remained: (1) as to breach of contract against Simmons and Mitchell, the issue of the amount of damages, if any, caused by their breaches, which the Court ruled as a matter of law had occurred; (2) USI's claim for breach of fiduciary duty against Simmons and Mitchell; (3) USI's claims against Lockton for tortious

---

[1] The Court thereafter granted USI's motion for preliminary injunctive relief, ordering Simmons and Mitchell to refrain from servicing their former USI clients or otherwise violating the terms of their employment agreements, and directing the Simmons team members who moved to Lockton to comply with the same terms. (Docs. 31, 73).

[2] Accordingly, this Order will from this point refer to Lockton, Simmons, and Mitchell simply as "Defendants."

interference (limited to the producers' breach of contract after leaving USI); (4) USI's claim against Lockton for aiding and abetting Simmons and Mitchell's breaches of fiduciary duty; and (5) USI's claim against Lockton, Simmons, and Mitchell for conspiracy.

USI abandoned the conspiracy claim prior to trial, and its counterclaim on the remaining claims and issues was tried to a jury from July 8, 2024, to July 18, 2024. The Court granted Defendants' motion for judgment as a matter of law during trial to the extent of eliminating USI's claim for punitive damages. (Tr. 1835). The jury returned verdicts for USI and against each of the Defendants on all claims presented, awarding USI a total of $3,050,000.00, divided between the different counts and Defendants as more fully discussed below. (Docs. 284, 285, 286). The Court entered judgment for damages accordingly, along with a permanent injunction. (Docs. 309, 326).

Defendants filed a post-trial motion to alter or amend the judgment or for a new trial on various grounds. USI moved for a new trial on damages or to alter or amend the judgment to include an award of disgorgement.

## Legal Standard

### *Judgment as a Matter of Law*

Judgment as a matter of law is appropriate "when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005). Thus, the motion should be denied "if there was

any legally sufficient basis for a reasonable jury to find in favor of the nonmoving

party." *Marlite, Inc. v. Eckenrod*, 537 F. App'x 815, 816 (11th Cir. 2013) (quoting

*Pensacola Motor Sales, Inc. v. Eastern Shore Toyota, LLC*, 684 F.3d 1211, 1226

(11th Cir. 2012)).

In assessing the sufficiency of the evidence, the court must view all the

evidence adduced and draw all reasonable inferences in the light most favorable to

the nonmoving party, without making credibility determinations or weighing the

evidence. *United States v. Approximately $299,873.70 Seized from a Bank of

America Account*, 15 F.4th 1332, 1342 (11th Cir. 2021); *Mendez v. Unitrin Direct

Prop. & Cas. Ins. Co.*, 622 F. Supp. 2d 1233, 1236 (M.D. Fla. 2007).

### New Trial

"A timely motion for new trial is addressed to the sound judicial discretion of

the trial court." *Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 807 (11th

Cir. 2017) (internal quotation omitted).  When considering a motion for new trial

based on the weight of the evidence, the court must determine whether "the verdict

is against the clear weight of the evidence . . .  or will result in a miscarriage of

justice, even though there may be substantial evidence which would prevent the

direction of a verdict." *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir.

1984) (internal quotation omitted).  To assure that the court does not substitute its

judgment for that of the jury, "new trials should not be granted on evidentiary

grounds unless, at a minimum, the verdict is against the great – not merely the

greater – weight of the evidence." *Id.* (quoting *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980)).

A court may grant a new trial based on an erroneous jury instruction. *See, e.g.*, *Pate v. Seaboard R.R.*, 819 F.2d 1074, 1077 (11th Cir. 1987). However, even if a jury instruction is erroneous, the moving party must establish that the error resulted in prejudicial harm to obtain a new trial. *See McElroy by McElroy v. Firestone Tire & Rubber Co.*, 894 F.2d 1504, 1509 (11th Cir. 1990).

The admission and exclusion of evidence are matters committed to the broad discretion of the district court. *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1554 (11th Cir. 1995). To obtain a new trial based on an erroneous evidentiary ruling, the movant must show that the erroneous ruling produced a substantial prejudicial effect. *See SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 790 (11th Cir. 2005). A court "may conclude that the party's substantial rights were not affected so as long as [the court] . . . can say with fair assurance . . . that the judgment was not substantially swayed by the error." *Id.* (quotation omitted).

## Analysis

### Defendants' Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial

#### Lost Profit Damages

Defendants argue that USI failed to provide evidence from which the jury could reasonably determine the amount of USI's loss, and therefore judgment as a matter of law should be entered in their favor. Alternatively, they argue for a new

trial on the ground that the jury's award was against the great weight of the
evidence.

USI presented substantial evidence from which the jury could reasonably
have concluded that USI suffered over $ 3 million in damages due to Defendants'
conduct.  This evidence included USI's historical retention rate of 90 percent,
evidence regarding the tendency of insurance brokerage clients to avoid disruption
and change, testimony by witnesses as to the efforts USI uses to retain clients when
producers leave, and testimony as to USI's rate of success in these efforts.  *See* (Tr.
260-61, 270, 282-87, 294-95, 1364-71, 1387, 1549-52 & Doc. 327-265 (USI Exh. 640);
Tr. 1567-68.  In judging the extent to which USI would have retained these clients
had Simmons and Mitchell complied with their duties, the jury could also
reasonably have concluded that Simmons and Mitchell decided to breach their
contractual obligations precisely because, if they complied with their duties, USI
would have retained these clients.

USI also presented testimony from an accountant, Robin Frost, who
calculated that, assuming the clients had remained at USI, USI could have expected
to obtain from the book of business represented by these clients future net profits,
reduced to present value, in the range of $4.4 to $4.9 million dollars, based on the
historical (and industry standard) retention rate of 90 percent (at the high end) or
alternatively at 80 percent (at the low end).  *See* (Tr. at 1261-68).  USI's evidence as
a whole therefore gave the jury a "standard by which the amount of damages may
be adequately determined" with "such certainty as satisfies the mind of a prudent

and impartial person," as instructed, and that is all that was required. *See W.W.*
*Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1350-51 (Fla.
1989). Defendants offered contrary evidence and made points on cross-examination
that would have supported a jury decision to award USI little or nothing. But the
matters raised by Defendants in the motion presently before the Court go to the
weight of the evidence and were for the jury to assess.

Defendants complain that USI presented only circumstantial evidence to
support its contentions about the loss of business rather than testimony from
clients. Defendants, in contrast, presented representatives of six of the clients, who
testified they would have left USI for Lockton even if Simmons had given the proper
notice to USI to allow USI to compete for the business. But proof of lost profits does
not necessarily require testimony from individual customers. *See Nebula Glass*
*Intern., Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1215 (11th Cir. 2006). Further,
courts have often viewed hindsight testimony by witnesses about what they "would
have done" under hypothetical circumstances that never existed as inadmissible
speculation. *See, e.g., Washington v. Dep't of Transp.*, 8 F.3d 296, 300 & n.10 (5th
Cir. 1993); *In re: Abilify (Aripiprazole) Prods. Liab. Litig.*, No. 3:16md2734, 2021
WL 54213, at *2 n.4 (N.D. Fla. Jan. 6, 2021). In this Circuit, such testimony is not
necessarily inadmissible. *See Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d
1536, 1553 (11th Cir. 1991). But even so, it cannot be regarded as dispositive or
entitled to such weight as to compel the Court to conclude the jury's verdict on USI's
damages was against the great weight of the evidence. The jury was free to accept

or discount clients' opinions as to what they "would have" done as conjectural and

may have believed their views were colored by bias given their existing and ongoing

relationship with Simmons.  *See, e.g., Matter of Hawaii Corp.,* 567 F. Supp. 609, 627

(D. Haw. 1983) (court in bench trial discounted the reliability of testimony by board

members that presentation of more accurate financial statements would have

changed their votes to approve a reorganization).

Defendants also complain that USI's expert, Robin Frost, did not opine as to

USI's "damages" caused by the breaches of duty or as to what would have happened

had Defendants not breached.  Instead, he only provided the numerical amount of

profits USI would expect based on historical numbers and assuming various

retention rates for the business represented by the accounts at issue.   Frost's

approach was perfectly appropriate.  *See, e.g., Polypack, Inc. v. Nestle USA, Inc.*, No.

8:23-cv-318-SPF, 2025 WL 748261, at *5 (M.D. Fla. Mar. 7, 2025) ("As an initial

matter, a damages expert is expected to assume liability and does not need to

conduct an independent investigation on causation.") (collecting cases); *Painteq,

LLC v. Omnia Med., LLC*, No. 8:20-cv-2805-VMC-AAS, 2024 WL 4834790, at *6

(M.D. Fla. Nov. 20, 2024) (holding that damages expert "did not have to provide an

explanation to make his opinions admissible because he can assume liability.")

Liability, including causation, was for the jury to decide based on the testimony of

the witnesses and argument of counsel.

<u>"Additional" Damages Awarded against Lockton</u>

Defendants next argue that the award against Lockton on the "derivative" claims for tortious interference with contract and aiding and abetting a breach of fiduciary duty cannot stand because the jury awarded "additional" amounts on these claims against Lockton over and above the damages awarded against Simmons and Mitchell on the underlying contract and fiduciary duty claims. Defendants argue that the damages against Lockton are duplicative of those against the individuals and that the only legally proper outcome would have been holding Lockton jointly and severally liable for the same amounts awarded against the individuals.

Defendants' motion is denied as to this ground.  Any argument that the liability of the individual Defendants and Lockton had to be joint and several was waived because it was not included in Defendants' proposed jury instructions and verdict form or in their objections to USI's submissions, nor did Defendants raise this issue in the extensive charge conferences held over multiple days.  *See* (Doc. 188; Tr. 1835-98, 1908-40).  Defendants argued for a client-by-client determination of lost profit damages, but that is a different point and would not have solved the problem Defendants now raise because the jury would still be offered separate damage lines for the individual Defendants and Lockton.[3]

---

[3] Although Defendants complain about the Court's decision not to have the jury award damages on a client-by-client basis, Defendants cite no authority that would require such an approach here.

To address any concern about duplicative damages, the Court had the jury indicate on the verdict forms not only the individual amounts on each claim, but the total amounts awarded against each Defendant and the total awarded on all claims. *See* (Docs. 284, 285, 286; Tr. 2066-69). Of the total of $3,050,000 awarded by the jury, $1,982,500 was awarded against Simmons, evenly divided between USI's claims against him for breach of contract and breach of fiduciary duty. (Doc. 284 at 3). The jury awarded $152,500 against Mitchell, evenly divided between the same two theories.[4] (Doc. 285 at 3). Finally, the jury assessed $915,000 against Lockton, evenly divided between the claims of tortious interference with contract and aiding and abetting a breach of fiduciary duty. (Doc. 286 at 5). The total award against Lockton was therefore actually less than the award would have been had Lockton been held jointly and severally liable for the damages the jury assessed against Simmons and Mitchell (which totaled $2,135,000). Defendants did not object at the time that the verdicts were inconsistent, (Tr. 2063-74), that is, that the jury's answers reflected in the verdict, in light of the "pleadings, evidence, argument, [and] jury instructions" could not "fairly be said to represent a logical and probable decision on the relevant issues as submitted." *Wilbur v. Corr. Services Corp.*, 393 F.3d 1192, 1200 (11th Cir. 2004) (quotation omitted).

---

[4] Defendants argue that the award of $152,500 against Mitchell, evenly divided between the claims for breach of contract and breach of fiduciary duty, cannot stand because that amount is greater than the "lifetime value" of the client who followed Mitchell from USI to Lockton. But Mitchell shared other clients with Simmons, and the evidence supported a conclusion by the jury that Mitchell's role in the overall diversion of clients to Lockton caused damages beyond the loss of one client. *See, e.g.,* (Tr. 936-59).

The total amount awarded – just over $3 million – was within a range supported by USI's evidence. Similarly, the amount the jury assessed against Lockton was within a permissible range. There was no award of duplicative damages for the same injury. A jury may allocate damages under different theories or causes of action "so long as the jury intended that result, and it is supported by the evidence at trial." *Kadiyala v. Pupke*, No. 22-10211, 2024 WL 33910 (11th Cir. Jan. 3, 2024); *Phillips v. Ostrer*, 481 So. 2d 1241, 1246 (Fla 3d DCA 1985) ("When the total award is supported by substantial, competent evidence, the jury's appointment of damages does not affect the integrity of the verdict."); *Coquina Inv. v. Rothstein*, No. 10-60786-Civ, 2012 WL 4479057, at *21 & n.15 (S.D. Fla. Sept. 28, 2012) (holding that the jury may apportion damages between different causes of action when the evidence supports the total damage award), *aff'd sub nom. Coquina Inv. v. TD Bank, N.A.*, 760 F.3d 1300, 1319 (11th Cir. 2014) (agreeing with the district court). Defendants cannot claim prejudicial error because the jury awarded different amounts against Lockton on the tortious interference and aiding and abetting claims from those it awarded against Simmons and Mitchell.

<u>Fiduciary Duty Claims</u>

Defendants argue that the claims for breach of fiduciary duty against Simmons and Mitchell, and the aiding and abetting a breach of fiduciary duty claim against Lockton, fail on multiple grounds.

First, Defendants argue that these claims are precluded by the independent tort doctrine. The Court rejected this argument in denying Defendants' motion for

summary judgment on this issue. *See* (Doc. 179 at 7-10). Defendants' arguments do
not persuade the Court that its decision on that point of law was incorrect.

Second, Defendants argue that Simmons and Mitchell merely notified some
clients of the fact that they were leaving USI, and that this conduct did not violate
their duty of loyalty. Instead, they were merely "preparing to compete." Defendants'
characterization of Simmons' and Mitchell's conduct, however, is just that, a
characterization slanted in Defendants' favor. USI's evidence supported an inference
that Simmons' and Mitchell's conduct went well beyond merely "preparing" to
compete for clients. The jury could reasonably infer from the evidence that Simmons
and Mitchell, while employed by USI, notified their clients of their impending move
to Lockton while hiding this from USI in order to hinder USI in its efforts to keep the
clients, and that Simmons not only told clients he would be leaving for Lockton but
in some instances touted Lockton's superior resources and pursued this conduct on
trips paid for by USI. *See, e.g.*, (Tr. 419-21; 481-82, 516-17, 571-73, 1310-11; Doc. 327-
157, USI Exh. 447). The jury had sufficient evidence to support a conclusion that
Simmons and Mitchell failed to act with the utmost good faith, fairness, and honesty,
or with the highest and finest loyalty. Fla. Std. Jury Instr. (Civil) 451.5; *id.*, Note on
Use (citing *Donahue v. Davis*, 68 So. 2d 163 (Fla. 1953); *Gossett v. St. Paul Fire &
Marine Ins. Co.*, 427 So. 2d 386, 387 (Fla. 4th DCA 1983)).

Defendants argue that judgment as a matter of law should be entered on
USI's fiduciary duty claims against Simmons and Mitchell on the ground that USI
failed to prove Simmons and Mitchell were unjustly enriched, and "disgorgement

[was] the only remedy USI sought for Simmons' and Mitchell's supposed breaches of fiduciary duty." USI in closing argument suggested to the jury that it award disgorgement of a portion of Simmons' and Mitchell's compensation in connection with the fiduciary duty claims. But that was not the only remedy USI requested on those claims. USI's counterclaim and the proposed jury instructions it submitted sought damages for breach of fiduciary duty and for aiding and abetting those breaches, and this was the theory the Court submitted to the jury. (Doc. 3, ¶¶ 97, 98, 103, 104; Doc. 188, at 56-57; Doc. 282 at 15-16, 21-22, 24-25).

Defendants alternatively request a new trial on the ground that USI should not have been allowed to request disgorgement in closing argument because disgorgement is an equitable remedy for the Court, not a legal remedy for the jury to consider. USI's references to disgorgement in closing argument were brief, and the Court's instructions and verdict form did not submit any issue of disgorgement to the jury. *See* (Tr. 2012; Docs. 282, 284, 285, 286). The instructions discussed only damages, specifically lost profits. *See* (Doc. 282 at 21-25). The Court's instructions on these elements and on the issue of causation effectively precluded an award for disgorgement, and the jury is presumed to have followed them. *See, e.g.*, *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993) ("Few tenets are more fundamental to our jury trial system than the presumption that juries obey the court's instructions.").[5] Accordingly, the Court concludes that USI's reference to

---

[5] There is also no reason apparent from the verdicts themselves to think the jury awarded any amounts for disgorgement. The amounts the jury awarded bore no meaningful relationship to the amounts of compensation referenced by USI's counsel in closing.

disgorgement in closing did not result in substantial prejudice to Defendants. *See Carter v. DecisionOne Corp.,* 122 F.3d 997, 1005 (11th Cir. 1997) (the court "sufficiently instructed the jury so that the jurors understood the issues and were not misled") (quotation omitted); *Nettles v. Electrolux Motor AB,* 784 F.2d 1574, 1581 (11th Cir. 1986) (holding that error in admitting evidence was not grounds for reversal where the district court correctly focused the jury's attention on the relevant issue, making it "highly unlikely" that the jury gave the evidence undue consideration).

<u>Tortious Interference</u>

Defendants argue that there was no evidence that Lockton induced Simmons or Mitchell to breach the contractual prohibitions on servicing their former USI clients, and that, given the limited amount of "service" the producers provided prior to entry of this Court's injunction, no damages resulted from the breach. But there was evidence that the plan to have Simmons and Mitchell service their former USI clients originated with Lockton, not with the producers. *See* (Tr. 722, 1171-73). And, the promise of continued service by Simmons and Mitchell was used to help induce clients to leave USI for Lockton, despite Lockton's knowledge that Simmons and Mitchell would thereby be breaching their agreements. *See, e.g.*, (Tr. 666-75, 776, 994, 1108-86, 1111, 1124, 1172-73, 1441-42, 1507-10).

---

Defendants' strained attempt to conjure up a mathematical relationship between the amounts awarded and the amounts requested for disgorgement is unpersuasive. Defendants also argue they "proposed" a separate line in the verdict forms for disgorgement, but that is not the case. *See* (Doc. 276; Tr. 1927-30, 1934, 1936-40).

Defendants further argue that there was no evidence that Lockton used "improper" means, in the sense of engaging in actions that are independently tortious or illegal such as violence or fraud, and that Lockton merely competed for business. The law does allow a party to compete for business, and to do so by persuading clients or customers of another party to end their business relationship with the other or terminate a contractual relationship that is terminable at will. In that situation, while the competing party "interferes" with the business relationship or contract, the interference is not actionable as long as it does not involve improper means, such as fraud, violence, or illegal conduct. *See, e.g.*, *Collier HMA Physician Mgmt., LLC v. NCH Healthcare Sys., Inc.*, No. 2:18-cv-408-FtM-38MRM, 2019 WL 277733, at *9 (M.D. Fla. Jan. 22, 2019) (collecting cases). But this is not true where a competitor directly induces a contracting party to terminate a contract that is not terminable at will or otherwise to breach the contract.[6]  *See, e.g., Advantage Digital Sys., Inc. v. Digital Imaging Services, Inc.*, 870 So. 2d 111, 116 (Fla. 2d DCA 2003) ("Competition for business by a competitor is not actionable, even if intentional, *unless the competitor is attempting to induce a customer to breach a contract that is not terminable at will*.") (emphasis supplied); *Collier HMA Physician Mgmt.*, 2019 WL 277733, at *9 (noting the privilege to compete "does not encompass the purposeful

---

[6] "Inducing" in this context "refers to the situations in which A causes B to choose one course of conduct rather than another. Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is willing to suffer the consequences. Inducement operates on the mind of the person induced.*" Gossard v. Adia Services, Inc.*, 723 So. 2d 182, 185 n.1 (Fla. 1998).

cause of a breach of contract") (quoting *McCurdy v. Collis*, 508 So. 2d 380, 384 (Fla.
1st DCA 1987)).  Persuading or coercing a contracting party to decide to breach its
contract, as Lockton was alleged to have done here, is not legally proper or justified
simply because the defendant is motivated competition and does not employ
independently wrongful means.[7]

Defendants argue that USI never pleaded the theory on which the Court
instructed the jury, which was that Lockton intentionally induced Simmons and
Mitchell to breach the provisions in their contracts prohibiting them from directly or
indirectly accepting requests to provide services, or providing services, or accepting
broker of record letters.  However, violation of the contract provisions regarding post-
employment conduct were within the allegations of USI's counterclaim.  *See* (Doc. 3,
at ¶¶ 34, 39, 46-51, 80-83).  And it has been clear from early in the case that the
producers' breaches of these provisions and Lockton's inducement of them were at
issue.  *See, e.g.*, (Doc. 9 at 2-3, 4, 24, 26; Doc. 73 at 4-5, 7; Doc. 225 at 9-10).  USI
submitted instructions that covered its theory of post-employment breaches, and
Defendants did not object on the grounds that these issues were not within the

---

[7] *See also* Restatement (Second) of Torts § 768(2) ("The fact that one is a competitor of
another for the business of a third person does not prevent his causing a breach of an
existing contract with the other from being an improper interference if the contract is not
terminable at will."); *id.*, comment h; Restatement (Second) of Torts § 766, comment m,
illus. 3; Fla. Standard Jury Instr. (Civil) 408.5, Note on Use 2 (noting that in most cases
where a contract is not terminable at will, "if the interference is 'intentional,' it is likewise
'improper'" except in relatively rare factual situations not relevant here);  Fla. Standard
Jury Instr. (Civil) 408.7, Note on Use 1 (noting that the instruction on competition "may be
given when the alleged interference is directed at a contract terminable at will or a
business relation").

pleadings, nor have they argued any prejudice from their inclusion. *See* (Doc. 188 at
32-33; Tr. at 1869-70).

Defendants argue it was "confusing" to allow the jury to consider whether
Lockton induced Simmons and Mitchell to breach their employment agreements by
accepting broker of record letters to provide services in competition with USI. They
point out that Lockton was under no contractual obligation to refrain from
accepting broker of record letters for USI clients, and it was Lockton, not Simmons
or Mitchell, who formally accepted the letters. But the producers' employment
contracts prohibited them not only from signing broker of record letters for former
USI clients, but also from "accept[ing] a broker of record letter to provide services in
competition" with USI, *whether directly or indirectly*. (Doc. 327-14, USI Exh. 33, at
13; Doc. 327-77, USI Exh. 176, at 13). The Court's instruction on this theory was
therefore consistent with the requirements of the employment agreements. *See*
(Doc. 282 at 17). The testimony of Lockton's Manoj Sharma equating Lockton's
acceptance of the business with Simmons' acceptance of it and describing how the
broker of record letters were handled supported a conclusion that Simmons
breached his employment agreement because, under these circumstances, Simmons
*indirectly* "accept[ed] a broker of record letter to provide services in competition"
with USI on these client accounts. *See* (Tr. 1107-1112).

Sharma testified that the impetus for this course of conduct lay wholly with
Simmons, rather than Lockton, and that Lockton would have preferred not to have
accepted the business at all. (Tr. 1108). The jury could have credited Sharma's

testimony in that regard and concluded that Lockton did not induce any breach.  Or, the jury might have doubted his testimony based on USI's arguments and evidence that Lockton was in fact anxious to obtain the business of Simmons former USI clients and planned to do so from the outset.  *See* (Tr. 478-79, 1118; Doc. 327-80, USI Exh. 183-A).  The jury was properly instructed that for a defendant to be liable for tortious interference with contract, it must have induced the breach of contract, and that if the contracting party had already decided to breach before interacting with the defendant, then the defendant did not induce the breach.  (Doc. 282 at 17-18).  The issue was therefore properly submitted to the jury.

Defendants argue the Court's instructions to the jury on the tortious interference claim were erroneous because they failed to require USI to prove that Lockton's inducement of Simmons and Mitchell to breach their contracts was "unjustifiable" in the sense that it involved "improper means" and failed to instruct the jury on Lockton's "competition" defense.  For the reasons discussed above, neither the requirement of "improper means" nor the competition defense applies to the type of direct inducement to breach asserted by USI.

The Court has considered Defendants' other arguments, including their arguments that there was no support for USI's aiding and abetting claim and that the Court abused its discretion by admitting certain evidence at trial, and concludes them to be without merit.  For all the foregoing reasons, Defendants' motion for judgment as a matter of law or for new trial is denied.

***USI's Motion for New Trial on Damages or to Alter or Amend the
Judgement to Disgorge Lockton's Gains***

<u>Motion for New Trial on Damages</u>

USI moves for a new trial to allow the jury to consider awarding additional damages.  USI argues that the Court erred when it precluded USI from requesting punitive damages.  Given the uncertainties as to how far businesses in Lockton's position may go without stepping over the line from permissible to tortious conduct, and light of all the evidence presented at trial, which the Court has carefully considered, the Court believes it correctly declined to submit the issue of punitive damages to the jury.  *See* (Doc. 227 at 4-5; Tr. 1827-35).

USI also argues that the Court erred by precluding it from presenting an alternative theory of damages based on the fair market value of the book of business USI lost and by limiting USI's lost profits evidence to net profits.  The Court rejected these arguments prior to trial in a written order fully explaining its reasoning.  *See* (Doc. 178 at 12-18, 19-22).  Nothing in USI's arguments persuades the Court its analysis was incorrect.

<u>Motion to Alter or Amend the Judgment</u>

Having sought unsuccessfully to be allowed to present the market value model to the jury as an *alternative* measure of its damages, USI now moves the Court to alter or amend the judgment to award USI as an equitable remedy an *additional* $15 to $17 million representing "disgorgement" of Lockton's profits, based on the same market value calculation for the book of business USI lost to Lockton.  USI's

disgorgement model suffers from the same flaw as its alternative market value damages model: the market value of the book of business incorporates the value of Simmons' and Mitchell's expertise, relationships, and future services, even though those individuals were free to leave to move to Lockton at any time, as long as they did so properly. Such an award would also result in a double recovery by USI, because the market value of the book of business includes as a component the profits the book of business would generate, and USI has already received an award of lost profits from this book of business. The Court therefore finds that awarding the additional amounts requested to USI's existing multimillion dollar damage award would amount to a windfall for USI and would not be equitable.

For the foregoing reasons, USI's motion for a new trial or to alter or amend the judgment is denied.

It is therefore

**ORDERED**, **ADJUDGED, and DECREED** that:

1.      "Defendants' Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial" (Doc. 293) is **DENIED**.

2.      "USI's Motion for New Trial on Damages and to Amend the Judgment

to Disgorge Lockton's Gains" (Docs. 334; 350) is **DENIED**.

      **DONE** and **ORDERED** in Chambers in Tampa, Florida, this 31st day of
March, 2025.

 

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**